# EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.:

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

Plaintiff,

v.

MEDIATRIX CAPITAL INC.,
BLUE ISLE MARKETS INC. (St. Vincent & the Grenadines),
BLUE ISLE MARKETS LTD., MICHAEL S. YOUNG,
MICHAEL S. STEWART, and BRYANT E. SEWALL,

Defendants,

and

MEDIATRIX CAPITAL FUND LTD., ISLAND TECHNOLOGIES LLC, VICTORIA M.
STEWART, MARIA C. YOUNG, HANNA OHONKOVA SEWALL, MICHAEL C. BAKER,
WALTER C. YOUNG III, ARUAL LP, WEST BEACH LLC, SALVE REGINA TRUST, TF
ALLIANCE, LLC, CASA CONEJO LLC, HASE HAUS, LLC, DCC ISLANDS
FOUNDATION, KEYSTONE BUSINESS TRUST, WEINZEL, LLC, THE 1989
FOUNDATION, MEDIATRIX CAPITAL PR LLC, MEDIATRIX CAPITAL, LLC, and BLUE
ISLE MARKETS INC. (Cayman Islands),

Relief Defendants.

---

**FILED UNDER SEAL**

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, United States Securities and Exchange Commission (the "SEC"), alleges as

follows against Defendants Michael S. Young ("Young"), Michael S. Stewart ("Stewart"),

Bryant E. Sewall ("Sewall"), Mediatrix Capital Inc. ("Mediatrix Capital"), Blue Isle Markets Inc.

("Blue Isle 1"), and Blue Isle Markets Ltd. ("Blue Isle 2") (collectively, the "Defendants"); and against Relief Defendants Mediatrix Capital Fund Ltd., Island Technologies LLC, West Beach LLC, Salve Regina Trust, TF Alliance, LLC, Casa Conejo LLC, Hase Haus, LLC, DCC Islands Foundation, Keystone Business Trust, Weinzel, LLC, The 1989 Foundation, Mediatrix Capital PR LLC,  Mediatrix Capital, LLC, Blue Isle Markets Inc. (Cayman Islands), Michael C. Baker, Walter C. Young III, Arual LP, Victoria M. Stewart, Maria C. Young, and Hanna Ohonkova Sewall (collectively, the "Relief Defendants").

## SUMMARY

1.      The SEC brings this emergency enforcement action to halt a fraudulent, ongoing international trading program that has placed at risk more than $125 million of investors' funds. From March 2016 to the present (the "Relevant Period"), Young, Stewart, and Sewall (the "Individual Defendants"), through Mediatrix Capital, Blue Isle 1, and Blue Isle 2 (the "Entity Defendants"), raised more than $125 million from investors in unregistered securities offerings by representing to investors that their money would be pooled and invested using Defendants' allegedly highly profitable algorithmic trading strategy.  Defendants falsely claimed to investors that from December 2013 through at least March 2019, their trading strategy had never had an unprofitable month and had returned more than 1,600%.  Defendants further claimed that their highly successful trading strategy had enabled Mediatrix Capital to accumulate assets under management of $225 million as of the end of 2018.  None of this was true.

2.      In reality, since mid-2016, Defendants have misappropriated more than $35 million of investors' money by transferring it out of the Entity Defendants' bank and brokerage accounts rather than using the money for trading.  Defendants used investors' money to purchase

luxury properties and vehicles, and diverted more than $5 million of additional investors' funds for other improper expenditures to perpetuate the fraud.

3.      Even when Defendants used the remaining portion of investors' money for trading, Defendants' trading consistently lost money – losing more than $18 million from its trading in 2018 alone.  Because of Defendants' massive misappropriation and trading losses, Mediatrix Capital's assets under management are nowhere close to the amounts represented by Defendants.  For example, at year-end 2018, Defendants represented that Mediatrix Capital had $225 million under management, when in reality, the firm had approximately $35.3 million in assets under management (less than 16% of the amount claimed).

4.      To induce investment into their failing trading strategy, Defendants defrauded investors by repeatedly misrepresenting the profitability of their trading, falsifying investors' account statements to show phantom profits, and making Ponzi-like payments to investors who opted to cash out their "profits" — all in order to prop-up the façade of profitable trading.

5.      Defendants made numerous additional, material misrepresentations and omissions to investors regarding the supposed transparency of Mediatrix Capital's trading, as well as third party involvement in verifying trading results.  Defendants falsified investors' account statements and manipulated trading results to reflect profits rather than the actual losses resulting from their trading.  Defendants falsely claimed that Mediatrix Capital's trading results had been audited.  Defendants also made numerous misleading statements implying that Blue Isle 1 and Blue Isle 2 were independent, third-party administrators that received Mediatrix Capital's trading data directly from brokerage firms before reporting it to investors, when in fact, Defendants

owned and controlled the Blue Isle entities and manipulated the trading data it conveyed to investors.

6.     Defendants' misrepresentations, omissions, and other fraudulent conduct had the same goal and effect: provide investors with a false picture of trading profitability and a false sense of security, so as to induce additional investment to perpetuate the fraud.  Defendants' continued misappropriation and accelerating trading losses have driven their fraud to the brink of collapse.  Mediatrix Capital's most recent bank and brokerage account records indicate that only a fraction of investors' funds remain, likely saddling investors with tens of millions of dollars in losses.

7.     As a result of the conduct described herein, Defendants violated and, unless restrained and enjoined, will continue to violate Sections 5(a) and (c) and Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77e(a) and (c) and §77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Mediatrix Capital, Young, Stewart, and Sewall also violated and, unless restrained and enjoined, will continue to violate Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8], and, in the alternative, defendants Young, Stewart, and Sewall aided and abetted Mediatrix Capital's violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

8.     The SEC has also named numerous Relief Defendants because throughout the fraud, Defendants transferred millions of dollars of investors' money to spouses, other relatives,

friends, and shell companies they owned or controlled.  Each of the Relief Defendants received illicit proceeds from Defendants' fraud to which they have no legitimate claim.

9.      The SEC seeks permanent injunctions against each of the Defendants, enjoining them from future violations of the securities laws, disgorgement of all Defendants' and Relief Defendants' ill-gotten gains from the unlawful activity set forth in this Complaint, together with prejudgment interest, and civil penalties against Defendants under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], and such other relief that the Court may deem appropriate.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa], and Sections 209(d) and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d) and 80b-14].

11.      Defendants, directly or indirectly, made use of the means or instruments of transportation or communication in interstate commerce, the means and instrumentalities of interstate commerce, or of the mails, in connection with the acts, practices, and courses of business set forth in this Complaint.

12.      Venue lies in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)], Section 27 of the Exchange Act [15 U.S.C. § 78aa], and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1391(b).  Defendant Young resided in this district at least during part of the fraud, Young conducted Mediatrix Capital business out of an office in

Colorado, which is still maintained, and Colorado investors invested in the Mediatrix Capital

offerings.  In addition, many of the acts, practices, transactions, and courses of business alleged

in this Complaint occurred within the District of Colorado.

## DEFENDANTS

13.     **Mediatrix Capital Inc.** ("Mediatrix Capital") was originally formed on or about

January 8, 2015, as an International Business Company in Belize and was subsequently moved to

the jurisdiction of The Bahamas.  Mediatrix Capital is the investment adviser to the Fund.  As

stated in the Confidential Explanatory Memorandum ("CEM"), "Mediatrix Capital Inc., a Belize

registered company, will serve as the Fund Manager and Investment Manager to the Fund."  The

Individual Defendants own Mediatrix Capital through Island Technologies LLC ("Island Tech.")

and jointly share "absolute decision-making authority" over Mediatrix Capital, including the

authority to direct how the Fund invests its capital.  Prior to establishing Island Tech., Mediatrix

Capital was 100% beneficially owned by the Individual Defendants', either directly or through

various shell companies.  Mediatrix Capital has never been registered with the SEC.  No

registration statement has been filed with the SEC with respect to securities issued by Mediatrix

Capital.

14.     **Blue Isle Markets Inc.** ("Blue Isle 1") was formed in Saint Vincent and The

Grenadines as an International Business Company on or about December 2, 2015, and has its

principal place of business in Nassau, The Bahamas.  The Individual Defendants control Blue

Isle 1 and own it through Island Tech., along with three minority owners who collectively own

12%.  Blue Isle 1 has never been registered with the SEC.  No registration statement has been

filed with the SEC with respect to securities issued by Blue Isle 1.

15.     **Blue Isle Markets Ltd.** ("Blue Isle 2") is a New Zealand Limited Company registered with the New Zealand Companies Office.  In approximately April 2019, Blue Isle 2 acquired all of the assets of Blue Isle 1.  Blue Isle 2 is controlled by Stewart at least in part Blue Isle 2 has never been registered with the SEC.  No registration statement has been filed with the SEC with respect to securities issued by Blue Isle 2.

16.     **Michael Stephen Young** ("Young"), age 47, was a resident of the Denver, Colorado metropolitan area in 2016, still maintains a house and office in Colorado, but claims to now be a resident of Dorado, Puerto Rico.  Young has been listed in various offering and marketing documents as a Co-Founder and Chief Executive Officer of Mediatrix Capital and as the manager and a member of the board of directors of Mediatrix Capital Fund Ltd. (the "Fund"). Mediatrix Capital's Due Diligence Questionnaire lists Young as one of three directors and officers of Mediatrix Capital (along with the other two Individual Defendants) and, in describing the firm's "governance structure and decision-making process," states that Young, Stewart, and Sewall "have absolute decision-making authority."  Young is responsible for sales, marketing, investor relations, and overseeing the business of Mediatrix Capital.  Young is also identified as the Director of Sales for Blue Isle 1 in a bank account application.

17.     **Michael Shawn Stewart** ("Stewart"), age 56, was a resident of Scottsdale, Arizona in 2016, still lives in Arizona for a portion of the year, but claims to now reside in Nassau, The Bahamas.  Stewart has been listed in various offering and marketing documents as a Founder, Managing Director, and Chief Trader of Mediatrix Capital; the Chief Operations Officer and a member of the board of directors of the Fund; the General Manager-CEO of Blue Isle 1; and Director of Blue Isle 2.  Mediatrix Capital's Due Diligence Questionnaire lists

Stewart as one of three directors and officers of Mediatrix Capital (along with the other two

Individual Defendants) and, in describing the firm's "governance structure and decision-making

process," states that Young, Stewart, and Sewall "have absolute decision-making authority."

Stewart and Sewall assist with sales, dealing directly with prospective investors.  Marketing

materials state that Stewart, in connection with Sewall, developed the proprietary algorithms

purportedly used by the Entity Defendants for trading investor funds.  In 2001, the United States

Commodity Futures Trading Commission ("CFTC") brought an action against Stewart that he

settled, without admitting or denying the allegations, and ordered him to pay restitution of

$13,500, prejudgment interest of $592.71, and a civil monetary penalty of $20,956.41.  *In the

Matter of Currency Trading Systems, et al.*, CFTC Dkt. No. 00-06 (Nov. 6, 2001).  Stewart was

also ordered to not apply for registration or seek exemption from registration with the CFTC in

any capacity and to not engage in any activity requiring such registration or exemption from

registration.

    18.    **Bryant Edwin Sewall** ("Sewall"), age 52, was a resident of the Dallas, Texas

metropolitan area in 2016, still maintains a house in the Dallas area, but claims to now reside in

Nassau, The Bahamas.  Sewall has been listed in various offering and marketing documents as

the Executive Vice President of Operations, and Lead Trade Manager of Mediatrix Capital, and

as the Chief Technology Officer and a member of the board of directors of the Fund.  Mediatrix

Capital's Due Diligence Questionnaire lists Sewall as one of three directors and officers of

Mediatrix Capital (along with the other two Individual Defendants) and, in describing the firm's

"governance structure and decision-making process," states that Young, Stewart, and Sewall

"have absolute decision-making authority."  Marketing materials provide that Sewall, in

connection with Stewart, developed the proprietary algorithms purportedly used by the Entity

Defendants for trading investor funds.  Sewall also has full authority over the brokerage accounts

where investors' monies are traded and the individual account statements provided to investors

reflecting purported profits gained from that trading.

## RELIEF DEFENDANTS

19.     **Mediatrix Capital Fund Ltd.** (the "Fund") was formed on or about September

14, 2016, in The Bahamas as an International Business Company.  The Fund is registered with

the Securities Commission of The Bahamas as a Bahamian Professional Fund.  Neither the Fund

nor its securities are registered in the U.S.  The Fund has a board of directors consisting of the

Individual Defendants.  In April 2019, the Fund had approximately $3.5 million of assets that

had been fraudulently raised from 5-6 investors, all but one of whom are from the U.S.

Mediatrix Capital and each Individual Defendant served as investment advisers to the Fund.

20.     **Island Technologies LLC** ("Island Tech.") is a Puerto Rico limited liability

company with its principal place of business in Dorado, Puerto Rico.  It is a holding company

that the Individual Defendants created to own the Entity Defendants.  It has accounts in its name

and at Defendants' direction, and for no recognizable consideration, funds raised from investors

have been transferred to and commingled in Island Tech.'s bank accounts.  Island Tech. has no

legitimate claim to such funds.

21.     **West Beach LLC** ("West Beach") is a Puerto Rico limited liability company

formed on December 6, 2017, with a principle place of business in Dorado, Puerto Rico that

owns Young's Island Tech. shares.  It has accounts in its name and at Defendants' direction, and

for no recognizable consideration, funds raised from investors have been transferred to and commingled in West Beach's bank accounts.  West Beach has no legitimate claim to such funds.

22.     **Salve Regina Trust** is a Cook Islands trust that Young formed as a shell company that hold Young's and Maria Young's ownership interest in Island Tech.  It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in Salve Regina Trust's bank accounts.  Salve Regina Trust has no legitimate claim to such funds.

23.     **TF Alliance, LLC** is a Colorado limited liability company that Young formed as a shell company.  It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in TF Alliance, LLC's bank accounts.  TF Alliance, LLC has no legitimate claim to such funds.

24.     **Casa Conejo LLC** is a Puerto Rico limited liability company that Young formed as a shell company.  It acquired real estate in Puerto Rico paid for exclusively with proceeds of the fraud.

25.     **Hase Haus, LLC** is a Colorado limited liability company that Young formed as a shell company.  It owns residential property paid for exclusively with proceeds of the fraud where Young resides when in Colorado.  Young and Maria Young are the sole LLC members.

26.     **DCC Islands Foundation** is a Bahamian entity that Sewall formed as a shell company.  It acquired real estate in Texas and The Bahamas paid for exclusively with proceeds of the fraud.

27.     **Keystone Business Trust** is a Massachusetts Business Trust that was formed on January 1, 2018, by Sandy Toes, LLC.  Stewart and Victoria Stewart are the managing members

of Sandy Toes, LLC.  Sandy Toes was formed in Puerto Rico on December 6, 2017, and Stewart is the President.   It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in Keystone Business Trust's bank accounts.  Keystone Business Trust has no legitimate claim to such funds.

28.     **Weinzel, LLC** is a Nevada limited liability company that Stewart formed as a shell company.  It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in Weinzel's bank accounts.  Weinzel has no legitimate claim to such funds.

29.     **The 1989 Foundation** is a Bahamian entity that Stewart formed as a shell company.  It acquired real estate in Arizona paid for exclusively with proceeds of the fraud.

30.     **Mediatrix Capital PR LLC** is a Puerto Rico limited liability company that Young, Stewart, and Sewall formed to receive proceeds of the fraud and pay expenses, including payroll.  It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in Mediatrix Capital PR's bank accounts.  Mediatrix Capital PR has no legitimate claim to such funds.

31.     **Mediatrix Capital, LLC** is a Colorado limited liability company that Stewart and Sewall formed prior to forming Mediatrix Capital in Belize.  It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in Mediatrix Capital, LLC's bank accounts.  Mediatrix Capital, LLC has no legitimate claim to such funds.

32.     **Blue Isle Markets Inc. (Cayman Islands)** is a Cayman Islands entity that one or more of the Individual Defendants formed to allow for the opening of a bank account in the Cayman Islands in the name of Blue Isle.  It has accounts in its name and at Defendants' direction, and for no recognizable consideration, funds raised from investors have been transferred to and commingled in Blue Isle Markets Inc. (Cayman Islands)'s bank accounts. Blue Isle Markets Inc. (Cayman Islands) has no legitimate claim to such funds.

33.     **Michael C. Baker**, age 47, lives in the Denver, Colorado metropolitan area.  He is Young's friend and owns 1% of Island Tech.'s B shares, representing an equivalent ownership interest in Blue Isle 1.  He is the registered agent for Hase Haus, LLC and the trustee of the Salve Regina Trust.  He has received proceeds of the fraud.

34.     **Walter C. Young III**, age 50, lives in Seattle, Washington.  He is Young's brother and owns 1% of Island Tech.'s B shares, representing an equivalent ownership interest in Blue Isle 1.  He has received proceeds of the fraud.

35.     **Arual LP** is a Utah limited partnership controlled by Young's first cousin, Seldon Young, with a principal place of business in Ogden, Utah.  It owns 10% of Island Tech.'s B shares, representing an equivalent ownership interest in Blue Isle 1.  It has received proceeds of the fraud.

36.     **Victoria M. Stewart**, age 51, is Stewart's spouse.  She is authorized on bank accounts used to conduct the fraud, including Island Tech.'s accounts.  Investors' funds have been transferred into accounts that she either solely controls or jointly controls with Stewart.  She has no legitimate claim to these funds.

37.     **Maria C. Young**, age 36, is Young's spouse.  She is authorized on bank accounts used to conduct the fraud, including accounts for TF Alliance, LLC and West Beach LLC. Investors' funds have been transferred into accounts that she either solely or jointly controls. She has no legitimate claim to these funds.

38.     **Hanna Ohonkova Sewall**, age 26, is Sewall's spouse.  She is a resident of Kiev, Ukraine.  Investors' funds from the fraud have been transferred into accounts that she either solely controls or jointly controls with Sewall.  She has no legitimate claim to these funds.

## FACTS

I.     **Background**

   A.     **The Individual Defendants Offered and Sold Securities and Raised Investor Money through Mediatrix Capital and Blue Isle.**

39.     The Individual Defendants, as equal partners, formed Mediatrix Capital in 2015 and jointly operated it to solicit investors to invest in their currency trading program.

40.     The Individual Defendants formed Blue Isle 1 to track trades, provide support for their trading operations, provide an entity through which they could assign account numbers to their investors, and to facilitate reporting fabricated account information to investors in Mediatrix Capital.

41.     In approximately April 2019, Blue Isle 2 acquired all the assets of Blue Isle 1, and, on information and belief, Blue Isle 2 performs the same function as Blue Isle 1.  (Blue Isle 1 and Blue Isle 2 are collectively referred to herein as "Blue Isle.").

42.     From March 2016 through the present, Mediatrix Capital and the Individual Defendants made two related securities offerings.

The Managed Account Foreign Exchange Funds

43.     First, Defendants offered investments through what was called the Managed

Account Foreign Exchange Funds ("MAFEF"), whereby investors' monies would be pooled and

traded according to Defendants' purported algorithmic trading strategy in foreign currency

markets.  Mediatrix Capital and the Individual Defendants solicited investors to invest in the

MAFEF and the MAFEF received its first investor in or around March 2016.

The Fund

44.     Second, beginning in or around September 2016, the Individual Defendants

created the Fund in the Bahamas as an International Business Company, whereby investors'

monies would be pooled and, according to the Fund's CEM, "invest[ed] in securities, derivatives

and other instruments to establish long and short investment exposures around the world."

45.     Mediatrix Capital is the investment adviser to the Fund and makes

recommendations and investments of securities on behalf of the Fund.  The Individual

Defendants who jointly control Mediatrix Capital, also act as investment advisers to the Fund

and make recommendations and investments of securities on behalf of the Fund.

46.     Mediatrix Capital and the Individual Defendants solicited investors to purchase

shares in the Fund (*i.e.*, securities) and the Fund received its first investor in or around 2017.

47.     The securities at issue are the investments of the MAFEF investors and of the

Fund into pooled accounts at prime brokerage firms, and investors' investments into the Fund.

The Individual Defendants Share Control over the MAFEF and Fund Offerings.

48.     Throughout this Complaint, "Defendants" refers to each of the Defendants and

"Individual Defendants" refers to Young, Stewart, and Sewall, as specifically defined above, and

the use of "Defendants" or "Individual Defendants" is an allegation that each of the Defendants or Individual Defendants took the alleged action.

49.     Through their materially false and misleading statements, omissions, and fraudulent conduct, as outlined herein, Defendants have raised over $125 million from MAFEF and Fund investors since March 2016 and continue to raise investor funds and operate the fraud to this day, despite approximately 75% of investor monies having been already misappropriated, lost in trading, or improperly spent to perpetuate the fraud.

50.     Defendants used multiple offering documents to offer and sell these securities. Defendants provided MAFEF investors with offering materials titled "the Managed FX Disclosure Documents" and a Limited Power of Attorney ("LPOA").  Defendants provided Fund investors with a CEM and a Subscription Agreement.  Other offering documents provided to MAFEF and Fund investors included a "Due Diligence – Frequently Asked Questions" document ("Mediatrix FAQ"), Mediatrix Capital's Due Diligence Questionnaire, and monthly performance summary sheets, which are one page advertising sheets with purported trading results.  The Individual Defendants jointly prepared, reviewed, and disseminated to investors and prospective investors all of the offering materials provided to MAFEF and Fund investors (collectively, the "Offering Documents").

51.     The Individual Defendants shared authority and control over the Offering Documents, including their content and dissemination to investors.  For example, in Mediatrix Capital's Due Diligence Questionnaire, filled out by Stewart, in response to the statement: "Describe the Firm's governance structure and decision-making process," Stewart wrote: "Michael Young, Michael Stewart, and Bryant Sewall have absolute decision-making authority."

52.     Defendants have solicited investors in the United States since at least 2016 to the present.  To locate investors in the U.S. and abroad, in addition to the Offering Documents described above, during the Relevant Period, Mediatrix Capital and the Individual Defendants used independent sales representatives in the U.S., met with groups of high net worth U.S. investors, and presented at domestic investment conferences.

53.     Defendants also solicited U.S. and foreign investors through an Internet website, a LinkedIn page, a publicly available YouTube video with an interview of defendant Young, and through the issuance of press releases and periodic news bulletin emails sent to current and potential investors.  Specifically, during the Relevant Period, Blue Isle and the Individual Defendants solicited investors through a website that touted Blue Isle's experience and listed Mediatrix Capital as a client.  Blue Isle also issued a press release, which disguised its relationship with Mediatrix Capital and the Fund, and provided inaccurate, inflated trading results to third parties for use in marketing materials and to the MAFEF investors in daily and monthly account statements.

54.     Following solicitation by the Defendants, U.S. investors from multiple states have invested tens of millions of dollars with Mediatrix Capital through the MAFEF and the Fund, including investments through self-directed IRA accounts.

55.     Through the means described above, Mediatrix Capital and the Individual Defendants have also solicited foreign investors who have invested with Mediatrix Capital through the MAFEF and the Fund.

**B.**     **The Flow of Investor Monies**

56.     As alleged below, Defendants misappropriated a portion of the funds invested in

MAFEF and the Fund before those monies were transferred to brokerage accounts or used for

trading.  However, the majority of investor money invested in the MAFEF and the Fund was

ultimately pooled in brokerage accounts to be traded using Defendants' purported algorithmic

trading strategy in foreign currency markets.

MAFEF Investments

57.     When investors invested in the MAFEF, the investor monies were first sent to and

pooled in bank accounts in the name of Blue Isle.

58.     Stewart is, and has been, the sole authorized signatory on the Blue Isle 1 bank

accounts.

59.     Stewart is also the authorized signatory on the Blue Isle 2 bank accounts, along

with another individual, Y.J.Q.

60.     Mediatrix Capital's Due Diligence Questionnaire, which was provided to

investors starting in 2018, and filled out by Stewart, provides that "[a]ll cash movements [for

Mediatrix Capital] are initiated and approved by Michael Stewart and/or Michael Young."

61.     Once an investor invested money in the MAFEF through a Blue Isle bank

account, the Individual Defendants did one of the following: (a) immediately misappropriated

the money by diverting it to themselves and various non-trading entities they own and control;

(b) improperly spent the money on fees for sales representatives or other expenses to perpetuate

the fraud; or (c) transferred the money to a Blue Isle brokerage account to be traded at a prime

brokerage firm.  The Individual Defendants either misappropriated or improperly spent over $40 million of the approximately $125 million invested.

Fund Investments

62.     With respect to Fund investors, their money was first sent to a bank account in the name of the Fund.  The Individual Defendants are, and have been, the sole authorized signatories on the Fund's bank account.

63.     After investor money was deposited in the Fund's bank account, it was then forwarded to and pooled in Blue Isle bank accounts, the same bank accounts to which the MAFEF monies were sent and pooled.

64.     Once Fund investor monies were placed into the Blue Isle bank accounts, the Individual Defendants immediately misappropriated the money by diverting it to themselves and various non-trading entities they own and control, improperly spent the money on fees for sales representatives or other expenses to perpetuate the fraud, or transferred the money to a Blue Isle brokerage account, the same brokerage accounts to which the MAFEF monies were sent and pooled.

65.     Thus, whether the investor invested in the MAFEF or the Fund, their monies were first pooled in a Blue Isle bank account, and then, unless misappropriated or improperly spent by the Individual Defendants, transferred to and pooled in Blue Isle brokerage accounts located at three prime brokerage firms ("Prime Brokers) for trading (the "Blue Isle Brokerage Accounts").

The Blue Isle Brokerage Accounts

66.     The Blue Isle Brokerage Accounts, into which investments into the MAFEF and Fund investments were comingled, are not so-called "omnibus" accounts whereby brokerage

firms maintain an aggregate account for an institutional customer, with subaccount designations

denoting the funds of numerous of the institutional customer's underlying clients.  The Prime

Brokers only have accounts in Blue Isle's name and do not have any subaccounts on their books

for individual investors in the MAFEF, the Fund, or investors in the Fund.  The individual

investors and the Fund are not customers of the Prime Brokers, and the Prime Brokers do not

maintain any information regarding the individual investors or the Fund.

67.     All investor monies in the MAFEF and the Fund sent to the Blue Isle Brokerage

Accounts were pooled.

68.     Neither the MAFEF investors nor the Fund investors are provided access to the

Blue Isle Brokerage Accounts where the actual trading takes place and the assets are held.

69.     MAFEF investors are given an account number at Blue Isle, not the Prime

Brokers.  MAFEF investors receive online access to their purported account showing their

investment amount and purported profits from trading, which are actually just numerical

representations, manipulated by Defendants.

70.     Blue Isle also emails the MAFEF investors daily and monthly account statements

showing their purported ending balance, along with commissions and any performance fees

charged.  These statements generally showed profits from trading in the accounts, ever

increasing account balances, the withdrawal of monthly performance fees based on the

purportedly successful trading, and no withdrawals or charges for commissions.

71.     Fund investors do not have access to the Fund account at Blue Isle, nor can they

access the actual Blue Isle Brokerage Accounts.  Instead, Fund investors receive monthly

statements from the Fund's administrator that set forth the amount of Fund shares owned by the

investor, the net asset value (the "NAV") per share, the value of the shares at the end of the month, and the return for the month.  As with the MAFEF account statements, the Fund statements generally showed consistent profits.

72.     Regardless of whether an investor invested through the MAFEF or the Fund, other than monies that were misappropriated or diverted elsewhere, Defendants ultimately commingled and pooled investor monies into Blue Isle Brokerage Accounts.  The Defendants then implemented one combined investment strategy for MAFEF and the Fund:  a purported fully automated algorithmic trading program where a group of nine algorithms trade up to 30 currency pairs plus gold.  Defendants then provided MAFEF investors, the Fund, and Fund investors with false and fraudulent account statements reflecting their investment had grown through profits from the underlying trades.

73.     When trading MAFEF and Fund investors' money held in the Blue Isle Brokerage Accounts, Defendants traded those funds in an undifferentiated fashion without respect to the ownership of those funds or the strategy of any particular investor.  Specifically, in implementing one combined investment strategy, Defendants did not trade specific investors' accounts according to their individualized trading objectives, suitability, or desired risk profile. Defendants did not customize trades for specific investors by limiting asset classes, holding duration, or other technical trading parameters.  Only after completing the trading did Defendants assign closed trades to individual investors and the Fund.  Because of Defendants' pooling of all investor funds, losing open positions impacted all investors equally until closed. In many instances, Defendants held open losing positions for months or years.  Similarly, closed

positions had an equal impact on all investors until Defendants made an after-the-fact decision to allocate profits or losses from a specific trade to a particular Blue Isle account number.

74.      Key terms of Blue Isle's trading in the Blue Isle Brokerage Accounts, such as margin, leverage, and pricing, were made possible by Defendants' pooling of investors' funds to enable Blue Isle to become a single, large customer of the Prime Brokers.  These terms applied to all investors as a result of the pooling of both the MAFEF and Fund assets.

**C.      Performance Fees, Commissions, and Management Fees.**

75.      Per the MAFEF and Fund Offering Documents, Mediatrix Capital was entitled to receive fees for managing the MAFEF and the Fund if certain requirements were met.  However, Mediatrix Capital's contemplated compensation differs depending on whether investors invest in the MAFEF or the Fund.

MAFEF

76.      MAFEF investors' account statements generally showed profits from trading in the accounts, ever increasing account balances, the withdrawal of monthly performance fees based on the purportedly successful trading, and no withdrawals or charges for commissions.

77.      Per the "Managed FX Fund Disclosure Documents," Mediatrix Capital was entitled to receive performance fees on investments in the MAFEF on a monthly basis, but only if there was positive performance that exceeded the previous highest results in the account (the "high water mark").

78.      The Managed FX Fund Disclosure Documents also stated that Mediatrix Capital "has a duty to notify the client of the possible commissions charged" by Blue Isle on each

transaction." MAFEF investors were not provided any documents, including account statements, which showed commissions actually being charged to or taken from their accounts.

79.    Pursuant to the Limited Power of Attorney ("LPOA") signed by investors in the MAFEF and countersigned by Mediatrix Capital, Mediatrix Capital was also entitled to receive commissions on the trades in the MAFEF, but like the performance fees, the commissions were only payable in the event that a new high water mark was set.

80.    Blue Isle was required to send investors each month a commission statement of any commissions earned by Mediatrix Capital. The daily and monthly account statements sent by Blue Isle to the MAFEF investors never showed any commissions being charged or withdrawn from the account, or any other withdrawals for mark-ups, spreads, or any fee other than the performance fee.

The Fund

81.    With respect to Fund investments, pursuant to the Fund's CEM, Mediatrix Capital, as the Fund's adviser, was entitled to a management fee of 1% of the Fund's NAV, along with a performance fee on any monthly net new appreciation above 0.667% per month (the "Hurdle Rate").

**D.    Defendants' Trading Was Unprofitable.**

82.    Defendants' purported fully automated algorithmic trading program was not profitable, but rather resulted in substantial losses.

83.    The Blue Isle Brokerage Accounts – which held investments from both the MAFEF and the Fund – incurred monthly losses for at least 24 months between March 2016 and April 2019, which ranged from negative $81,000 to several million in those months.

84.     In fact, the Blue Isle Brokerage Accounts reflected an aggregate profit only in the first month of trading in March 2016, where it profited by $575, and two months later in May 2016, when there was an aggregate three-month profit of approximately $353,000.

85.     After May 2016, the Blue Isle Brokerage Accounts never again attained an aggregate profit.  Or, put another way, gains in the Blue Isle Brokerage Accounts that were attained during any one particular month were never high enough to make up for the losses incurred during earlier months.

86.     From March 2016 through April 2019, the Blue Isle Brokerage Accounts incurred aggregate trading losses of approximately $19 million.

87.     The Defendants did not disclose these losses to investors in the MAFEF or in the Fund and, as more fully explained below, actively concealed these losses in order to fraudulently acquire new investors and induce new investments from existing investors.

88.     Defendants, through Blue Isle, provided MAFEF investors and the Fund and the Fund investors (through the Fund Administrator) with account statements that generally reflected positive month-to-month trading performance and steadily increasing account balances that tracked Mediatrix Capital's advertised positive performance figures.  The MAFEF investor statements also reflected the withdrawal of performance fees purportedly earned by Mediatrix Capital on the trading.

89.     These statements were false and did not reflect the actual trading or losses in the Blue Isle Brokerage Accounts at the Prime Brokers, nor did they reflect the true balance in the investors' accounts.  The statements also did not reflect any other amounts being withdrawn except for performance fees.  The Blue Isle Brokerage Account records show trades reflecting

significant losses were allocated to accounts in Mediatrix Capital's name.  On information and belief, Defendants selectively allocated profitable trades (only within the Blue Isle software system) to the Blue Isle MAFEF investor accounts and the Blue Isle Fund account to make it appear as though the overall trading was successful.  At the same time, Defendants concealed large losing positions by nominally allocating the losses to supposed proprietary accounts, which exist only "on paper" in the Blue Isle software system.

   **E. Defendants' Misappropriated Investor Monies.**

  90. In less than four years, the Individual Defendants have misappropriated at least $35 million of investors' monies raised.

  91. Since March 2016, Defendants received approximately $125 million from MAFEF and Fund investors into Blue Isle's and the Fund's bank accounts.  The Blue Isle bank accounts had no other significant sources of monies aside from investor deposits.

  92. Of this approximately $125 million, only approximately $75 million was forwarded from the Blue Isle bank accounts to the Blue Isle Brokerage Accounts at Prime Brokers and used in the unprofitable trading described above.

  93. Defendants misappropriated over $35 million of investor monies for their own personal use, such as purchasing luxury properties and vehicles.  Defendants further misappropriated an additional $5 million of investor monies to perpetuate the fraud by, among other things, paying certain fees to sales representatives that were only due in the event of profitable trading, which did not occur.

94.     Defendants also made Ponzi-like payments by using investor money to meet redemption requests by other investors in order to conceal that Defendants' trading had not returned profits, but rather resulted in large losses.

## II.    Defendants Made Material Misrepresentations and Omissions in Connection with the MAFEF and Fund Offerings.

95.     In raising funds from both MAFEF and Fund investors, Defendants made numerous material false and misleading statements and omissions regarding, among other things, the profitability of trading, the amount of assets under management, the length of trading history, the use of investor proceeds, fees and costs, the auditing of the MAFEF and the Fund, the transparency and access to information provided to investors, prior bankruptcies, and the Individual Defendants' affiliation with and control over related entities.

### A.    Defendants Made False and Misleading Statements About Trading Profits.

96.     Throughout the Relevant Period, in written documents sent to investors and prospective investors, and, on information and belief, in oral communications made to investors and prospective investors, Defendants represented that Mediatrix Capital had successful performance returns from its purported algorithmic trading program:

a.     Mediatrix Capital and the Individual Defendants prepared and disseminated to investors a 2018 revision of a Mediatrix Capital White Paper stating that "[a]s of June 2018, we have achieved **54 straight months of client gains**."  (emphasis in original)

b.     Mediatrix Capital and the Individual Defendants prepared and disseminated to investors a pitch deck stating that Mediatrix Capital had "[v]erified, annualized net returns of 50%+ per year since December 2013."

      c.      Mediatrix Capital and the Individual Defendants prepared and disseminated to investors the Mediatrix FAQ stating that the "percentage estimate of winning vs. losing trades" was "80%+- / 20%+-."

      d.      Mediatrix Capital and the Individual Defendants prepared and disseminated to investors monthly one page performance summaries with trading results showing that Mediatrix Capital had consistent, increasing returns.

      e.      Mediatrix Capital and the Individual Defendants stated in Mediatrix Capital's Due Diligence Questionnaire that Mediatrix Capital has "averaged mid double digit returns annually."

      f.      Blue Isle and the Individual Defendants prepared and disseminated to investors from Blue Isle's email address MAFEF account statements on Blue Isle letterhead stating that the investor accounts had profits.

      g.      Mediatrix Capital and the Individual Defendants prepared and disseminated to investors a Managed FX Funds prospectus stating that "[w]e use state-of-the-art technology and strategies that have been proven over and over to provide a consistent reliable return."

      h.      The Mediatrix Capital LinkedIn page, which was created by Young and Stewart, and the Sewall LinkedIn page, which on information and belief was created by Sewall, state that Mediatrix Capital "offers qualified investors access to one of the finest high rate investment funds available anywhere in the world with 100% transparency, 100% liquidity and world class, dependable monthly returns that most firms only hope for in any single year's time."

        i.      The Mediatrix Capital website, which Young and Stewart created content for, stated, "We use state-of-the-art technology and strategies that have been proven to provide verified, consistent world class monthly returns."

        j.      Blue Isle and the Individual Defendants prepared and provided documents to the Fund administrator showing the trading was profitable, which the administrator then used to provide monthly statements to the Fund and Fund investors representing the Fund had profits.

97.     A reasonable investor would have understood from Defendants' statements and disclosures that their algorithmic trading was successful and profitable, and, because it was based on an algorithm, could likely replicate its profits.

98.     These statements were false because, as alleged above, Mediatrix Capital's trading of MAFEF investor and Fund monies was done through the Blue Isle Brokerage Accounts, which consistently lost money, totaling approximately $19 million in losses between March 2016 and April 2019.  In fact, not only did the majority of the months end with trading losses, there was no aggregate profit since May 2016, two months after MAFEF's inception, as of any month-end.  Thus, trading profits in the Blue Isle Brokerage Accounts were never able to offset trading losses after May 2016.

99.     Each of the above disclosures and representations regarding the results of Defendants' trading were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the results of their trading were false and misleading.

100.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the results of their trading not misleading.

101.    The above misrepresentations and omissions with respect to the results of Defendants' trading were material to investors and potential investors because, among other things, they believed Defendants' algorithmic trading had been successful and profitable and therefore Defendants could replicate their past success and would continue to operate in the future, when, in reality, Defendants' purported algorithmic trading had consistently lost money. Meaning, replication of prior trading was likely to bring more losses, and the likely eventual collapse of Mediatrix Capital.

**B.      Defendants Made False and Misleading Statements About Assets Under Management.**

102.    Throughout the Relevant Period, in written documents sent to investors and prospective investors, and, on information and belief, in oral communications made to investors and prospective investors, Mediatrix Capital and the Individual Defendants made statements to investors and potential investors that, consistent with Defendants' misrepresentations that their trading was profitable, Mediatrix Capital's assets under management ("AUM") continued to grow:

a.      Mediatrix Capital and the Individual Defendants stated in monthly performance summaries the amount of its AUM and continually showed an increase in the AUM month over month.  Mediatrix Capital claimed to have AUM of $90 million at year end 2017 and $225 million at year end 2018.

b.      Mediatrix Capital and the Individual Defendants stated in the pitch deck that Mediatrix Capital had $235 million in AUM as of February 4, 2019.

103.    A reasonable investor would have understood from Mediatrix Capital's and the Individual Defendants' statements and disclosures that they were investing in an enterprise whose trading was successful and profitable, thereby resulting in a steadily increasing AUM, that the AUM was larger than investors' original investments (*i.e.,* profits were made from trading investors' monies), and that by the end of 2018, Mediatrix Capital had $225 million in capital to trade.

104.    These statements were false.  Mediatrix Capital's AUM as of December 31, 2017 and 2018 were approximately $38.9 million ($51.1 million less than claimed) and $35.4 million ($189.6 million less than claimed), respectively.

105.    Defendants' trading losses – along with their misappropriation of investor monies and Ponzi-like payments – were so staggering that the December 31, 2018 AUM of $35.4 million was less than half of what investors had invested at the time.

106.    Each of the above disclosures and representations regarding assets under management were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning AUM were false and misleading.

107.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding AUM not misleading.

108.    The above misrepresentations and omissions with respect to AUM were material to investors and potential investors because, among other things, they believed AUM was increasing in part due to Defendants' profitable algorithmic trading, and because they believed the growing AUM signaled Defendants were operating successful investments capable of returning profits consistent with their investment strategy, when, in reality, the AUM was a

fraction of what was represented because Defendants' trading was not profitable and losses sustained were so severe that by no later than December 31, 2018, Defendants had little hope of returning investors' principal, much less profits.

**C.     Defendants Made False and Misleading Statements about Mediatrix Capital's Length of Trading History.**

109.     Throughout the Relevant Period, in written documents sent to investors and prospective investors, and, on information and belief, in oral communications made to investors and prospective investors, Defendants represented to investors and potential investors that Mediatrix Capital had been operating and trading successfully since December 2013:

      a.     Mediatrix Capital and the Individual Defendants prepared and provided in the Managed FX Funds prospectus a chart showing trading since December 2013 and stated that the chart shows "individual monthly returns that are actual real live results audited from December of 2013 through the present day."

      b.     Mediatrix Capital and the Individual Defendants in the 2019 Mediatrix Capital pitch deck stated that Mediatrix Capital was "launched in 2013" and "[s]tarted trading as Mediatrix Capital in December 2013."

      c.     Mediatrix Capital and the Individual Defendants stated in the Fund's CEM that Young "launched Mediatrix Capital in 2013."

      d.     Mediatrix Capital and the Individual Defendants stated in Mediatrix Capital's Due Diligence Questionnaire that Mediatrix Capital's "program inception" was December 2013.

e.    Mediatrix Capital and the Individual Defendants stated in the Mediatrix FAQ that Mediatrix Capital "began trading live with the algorithmic suite in 2013."

f.    Mediatrix Capital and the Individual Defendants stated in the Mediatrix Capital White Paper that "[b]y mid-2013, the firm went live trading its own capital and shortly thereafter began trading client funds."

g.    Blue Isle and the Individual Defendants provided purported trading results for Mediatrix Capital dating back to December 2013 that were used in offering and marketing materials provided to investors.

110.    A reasonable investor would have understood from Defendants' statements and disclosures that Mediatrix Capital had been in business since December 2013 and therefore Defendants' algorithmic trading strategy had been successful and profitable since that time.

111.    These statements were false because Mediatrix Capital was not formed until 2015 and did not receive its first investor funds until March 2016.

112.    Each of the above disclosures and representations regarding trading history were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning trading history were false and misleading.

113.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding trading history not misleading.

114.    The above misrepresentations and omissions with respect to Mediatrix Capital's trading history were material to investors and potential investors because, among other things, they believed Defendants' algorithmic trading had an extensive history of successful and profitable trading, when, in reality, Mediatrix Capital did not receive its first investor funds until

March 2016 and therefore the purported algorithmic trading strategy did not have the extensive history of success Defendants represented.

**D.     Defendants Made False and Misleading Statements About the Use of Investor Monies.**

115.    Defendants made material false statements, misrepresentations and omissions regarding the use of investor proceeds that the Individual Defendants misappropriated, improperly spent, and used to make Ponzi-like payments to other investors.

116.    Throughout the Relevant Period, in written documents sent to investors and prospective investors, and, on information and belief, in oral communications made to investors and prospective investors, Defendants represented that investor monies would be invested in a number of investments:

    a.     Mediatrix Capital and the Individual Defendants stated in the Managed FX prospectus that it "invests in spot, forwards, non-deliverable forwards, and option (vanilla and exotic) positions."

    b.     Mediatrix Capital and the Individual Defendants stated in the Managed FX Fund Disclosure Documents that it "seeks capital appreciation of Clients' assets through either guaranteed structured products or speculative trading in Over-The-Counter (OTC) foreign currency Spot or options trading."

    c.     Mediatrix Capital and the Individual Defendants stated in the Fund's CEM that the "Fund seeks to reach its investment objective by investing in securities, derivatives and other instruments to establish long and short investment exposures around the world."

        d.     Defendants provided account statements to MAFEF investors that showed trading in the spot FX Market and the only account withdrawals being for performance fees.

117.    A reasonable investor would have understood from Defendants' statements and disclosures that MAFEF and Fund investor monies would be used for investment and trading in order to return profits in which the Defendants and investors would share, and would not be misappropriated, used for Defendants' personal use, used to make Ponzi-like payments to earlier investors, or used to pay performance fees and trading commissions not owed in the face of consistent trading losses.

Defendants Misappropriated Investors' Money.

118.    Defendants' statements and disclosures with regards to use of investor proceeds were false and misleading when made because Defendants intended to and did use MAFEF and Fund investors' money for personal use.  The Individual Defendants ultimately misappropriated approximately $35 million and improperly spent at least $5 million out of approximately $125 million raised (approximately 33% of the money raised) for various purposes by distributing these monies to themselves and entities they control; to pay commissions to sales agents involved in the MAFEF and Fund offerings; property rentals; travel-related costs; and other numerous payments that were personal in nature.  This includes at least $18.5 million that was never forwarded to any Blue Isle Brokerage Account or returned to investors, but rather was transferred out of the Blue Isle bank accounts after deposit to other bank accounts controlled by Defendants and Relief Defendants or was otherwise dissipated by Defendants.  Misappropriated investor money was used to purchase a boat and boat lift (over $400,000), three Land Rovers

(over $230,000), jewelry (approximately $225,000) and seven real properties (over $12 million), among other things.

<u>Defendants Made Ponzi-Like Payments with Investor Monies.</u>

119.    Defendants' statements with regards to use of investor proceeds were false and misleading when made because Defendants intended to and did use MAFEF and Fund investors' money to make Ponzi-like payments to investors that obtained redemptions of their investment.

120.    Most investors, after receiving the account statements reflecting phantom trading profits, opted to leave their money invested with the MAFEF or the Fund, and some have invested more funds with Mediatrix Capital.  However, other investors opted to cash out their investment.

121.    Investors who cashed-out their investments were led to believe, through account statements reflecting phantom trading profits, that they were receiving their initial investment back, along with profits earned from Defendants' trading, when, in reality, in order to prop up the façade of profitable trading, Defendants simply paid-out other investors' money that had not yet been lost or misappropriated.

122.    For example, a U.S. investor, Investor A, invested $25,000 in the MAFEF in November 2016.  Investor A did not make further investments in the MAFEF.  In May 2019, Investor A closed his account and received $40,279.

123.    As there were cumulative losses in the Blue Isle Brokerage Accounts during that time span, the amount paid to Investor A in excess of $25,000 was a Ponzi-like payment comprised of other investors' money and not profits.

124.    Moreover, since the overall performance of Investor A's investment was negative, as the pooled Blue Isle Brokerage Accounts' (the only trading accounts) performance were negative, a substantial portion of the original $25,000 returned to Investor A was also a Ponzi-like payment.

125.    In fact, despite consistently losing money in their trading, and misappropriating a large amount of investor monies, Defendants "returned" more than $30 million of investor funds to investors, a portion of which were Ponzi-like payments whereby Defendants disguised other investors' monies as trading profits in order to maintain the façade of a profitable enterprise.

Defendants Improperly Took Performance Fees.

126.    Defendants' statements and disclosures with regards to use of investor proceeds were false and misleading when made because Defendants intended to and did take performance fees from investors' monies when those fees were not owed because of Defendants' unprofitable trading.

127.    In addition to the statements above, the Defendants specifically stated that they would only receive fees under certain circumstances.  Mediatrix Capital and the Individual Defendants stated in the Mediatrix FAQ that "[w]e make no money unless we perform."  This same document states: "We charge no management fee on [the MAFEF] … Everything is based on a high water mark."

128.    Various Offering Documents described the "high water mark."  For example, the MAFEF prospectuses state: "To ensure that the performance fees are based on the long-term performance of a Client's account, [Mediatrix Capital] will also adhere to a 'High Watermark' procedure in which [Mediatrix Capital] receives a performance fee only to the extent Net Profits

in Client's account exceed any Net Losses that have not been recovered from a prior trading period.  In the event the Client's account has Net Losses that have not been recovered, [Mediatrix Capital] shall not be allocated any such performance fee until Client's account has first recovered such Net Losses."

129.    Despite not reaching the high water mark, Blue Isle and the Individual Defendants sent MAFEF investors monthly account statements showing withdrawals for purported performance fees.

130.    The performance fees deducted from investors' accounts were based on phantom trading profits, which did not reflect the true trading results.  Because Defendants' trading consistently lost money, concealed in part through fictitious account statements reflecting profits, no performance fees were owed.

<u>Defendants False and Misleading Statements Were Made with Scienter and Were Material.</u>

131.    Each of the above disclosures and representations regarding Defendants' use of investor proceeds were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements concerning the intended use of investors' money were false and misleading.

132.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding their use of investor proceeds not misleading.

133.    The above misrepresentations and omissions as to use of investor proceeds were material to investors and potential investors because, among other things, they believed their investments would be used for trading consistent with the disclosed trading strategy to generate profits to be returned to investors, and because any amount Defendants misappropriated or used

to make Ponzi-like payments necessarily decreased the amount of money available to Defendants to effectuate the intended trading.

**E.     Defendants Made False and Misleading Statements Regarding the Relationship Between Mediatrix Capital and Blue Isle.**

134.     Defendants made material misrepresentations and omissions regarding the relationship between Mediatrix Capital and Blue Isle.

135.     Throughout the Relevant Period, in written documents sent to investors and prospective investors, and, on information and belief, in oral communications made to investors and prospective investors, Defendants did not disclose that Mediatrix Capital and Blue Isle were under common ownership and control and that essentially, they functioned as the same enterprise:

a.   In the Limited Power of Attorney Defendants stated that Mediatrix Capital was "not an employee or agent of [Blue Isle]"; that Mediatrix Capital is not "endorsed by [Blue Isle], its employees, or its affiliates"; and that Blue Isle "does not endorse [Mediatrix Capital] or its past or current performance statistics."

b.   Mediatrix Capital and the Individual Defendants responded to an item in Mediatrix Capital's Due Diligence Questionnaire, which asked: "Do the Firm's key personnel have any Outside Business Activity for which any conflict of interest has been identified?  For example, any activity or duty performed by an employee, outside of the context of his/her duties at your Firm, whether paid or unpaid, full or part-time, permanent or temporary," with "No."

c.   Blue Isle, in a press release on January 17, 2017, and intending that it be read by current and prospective investors, announced that the Fund selected it to provide "trading infrastructure support."

d.   The press release has a quote from Young, listed as Mediatrix Capital's Co-Founder and CEO that stated: "After several months of discussions and an in-depth review of Blue Isle's ECN/STP structure, we are comfortable knowing that Blue Isle will handle our trades in a professional manner.  We are impressed with the fact that they offer institutional pricing combined with the service of a boutique shop, which provides us exceptional client service and room for growth."  It does not disclose Young's ownership of Blue Isle or employment with Blue Isle.

e.   The press release has a quote from Stewart, who is listed as Blue Isle's General Manager that states:  "We have access to options and OTC exotics, which supports a component of the Mediatrix Fund's strategy of risk mitigation in the long term.  They were also supportive of our recent brokerage of the year award from ManagedFX.com, which is a great accolade."  It does not disclose Stewart's ownership or employment with Mediatrix Capital.

136.   This press release and other statements were made to create the appearance that Blue Isle was an independent operating entity, when in reality, the Defendants used Blue Isle's supposed independence as a façade to conceal Mediatrix Capital's trading losses.

137.   The statements and omissions concerning the relationship between Blue Isle and Mediatrix Capital were false and misleading because the Individual Defendants owned and controlled both Blue Isle and Mediatrix Capital, all three Individual Defendants operated and

managed both Blue Isle and Mediatrix Capital, which shared an office, and each entity was functionally the alter ego of the other.

138.    A reasonable investor would have understood from Defendants' statements and disclosures that Mediatrix Capital and Blue Isle were unrelated and that the Individual Defendants did not control both entities.

139.    The disclosures and representations regarding the relationship between Mediatrix Capital and Blue Isle were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements stating or otherwise suggesting that the entities were unrelated were false and misleading.

140.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the relationship between Mediatrix Capital and Blue Isle not misleading.

141.    The above misrepresentations and omissions as to the relationship between Mediatrix Capital and Blue Isle were material to investors and potential investors because, among other things, the separation and independence of the reporting entity (Blue Isle) provided assurance that the investments, profits, and fees were being reported correctly based on trading results obtained directly from the Prime Brokers.  Defendants misled and concealed from investors that because the Individual Defendants controlled both entities, Blue Isle provided no third-party confirmation of the trading data being reported by Mediatrix Capital.

F.    **Defendants Made Other False and Misleading Statements and Omissions in Effectuating their Fraud.**

142.    In addition to the above, Defendants made false and misleading statements and omissions for the purpose of concealing the failure of their purported algorithmic trading, as well

as their misuse of investor monies, in order to fraudulently obtain additional investor monies to prop up the failing enterprise.

<u>Defendants Falsely Claimed Trading Results were Audited</u>.

143.    From at least 2016 to the present, in written documents sent to investors and prospective investors and, on information and belief, in oral communications made to investors and prospective investors, Mediatrix Capital and the Individual Defendants represented that the MAFEF trading results were audited:

> a.    Mediatrix Capital and the Individual Defendants stated in the prospectus that the trading results are "real live results audited from December of 2013 through the present day" and that "[t]echnical information and audits of performance are available upon request."

> b.    Mediatrix Capital and the Individual Defendants stated in the Mediatrix Capital White Paper that "[a]s of June 2018, we have **achieved 54 straight months of client gains**, based on an audit from December 2013 to date."  (emphasis in original) This same document later states: "Audited Returns of 150%+ since December 2013."

144.    Similarly, in written documents sent to investors and prospective investors and, on information and belief, in oral communications made to investors and prospective investors, Defendants represented that the Fund was audited.

145.    For instance, Mediatrix Capital and the Individual Defendants stated in the Fund's CEM that the Fund would be audited each year and an audited financial statement of the Fund would be provided to Fund investors within 180 days of the financial year end (December 31).

146.    These statements were false and misleading because the MAFEF investments were not audited.  While a Bahamian accounting firm was hired by Mediatrix Capital, it was not hired to do an audit of the MAFEF, but rather to perform mathematical accuracy checks on documents they received purporting to reflect the trading results.  In fact, the accounting firm's report states that the report is not an audit.

147.    Similarly, with respect to the Fund, its 2017 audit report contained a qualified opinion and, on information and belief, was not provided to Fund investors.  The auditor was fired after issuing that report for 2017 and, upon information and belief, no subsequent auditor has been hired for the Fund.

Defendants Falsely Claimed Investors Would be Given Access to Underlying Trading Information.

148.    From at least 2016 to the present, in written documents sent to investors and, on information and belief, in oral communications made to investors and prospective investors prospective investors, Defendants represented that the MAFEF investors would have access to trading information and full transparency as to the results of those trades:

a.    Mediatrix Capital and the Individual Defendants stated in the MAFEF Disclosure Documents that there was "100% Transparency."

b.    Mediatrix Capital and the Individual Defendants stated in the MAFEF prospectus "100% Full Transparency, see every trade."

c.    Mediatrix Capital and the Individual Defendants stated in the Mediatrix Capital White Paper that there was "100% Liquidity, Transparency, and Client Control."

d.   Blue Isle and the Individual Defendants sent MAFEF investors daily and

monthly account statements claiming to show every trade that took place in their

purportedly separate accounts.  Blue Isle and the Individual Defendants also sent the

Fund administrator statements purporting to show every trade made by the Fund in its

purportedly separate account, which was then used to calculate the NAV and account

value provided monthly to Fund investors.

149.    These statements were false and misleading because the MAFEF investors were

not provided with, and did not have access to, the Blue Isle Brokerage Accounts, which were the

only actual trading accounts, nor were they able to see the trading losses that were occurring,

which did not appear on the individual account statements emailed to investors by Blue Isle or

provided to the Fund administrator by Blue Isle.

Defendants Falsely Claimed Stewart and Sewall Had No History of Bankruptcy.

150.    From at least 2016 to the present, the Managed FX Fund Disclosure Documents

as well as other offering materials listed the background of Stewart and Sewall with no mention

of bankruptcies and, from at least 2018 to present, in Mediatrix Capital's Due Diligence

Questionnaire, Mediatrix Capital and the Individual Defendants represented no "key personnel"

of Mediatrix Capital had "ever applied for or been granted a discharge in bankruptcy."

151.    These statements were false and misleading, and contained material omissions,

because Stewart filed for bankruptcy in 1994 and 2006, and Sewall filed for bankruptcy in 1999

and 2002.

<u>Defendants' False and Misleading Statements Were Made with Scienter and Were Material.</u>

152.    A reasonable investor would have understood from Defendants' statements and disclosures that the trading results for both the MAFEF and the Fund were audited, that MAFEF investors would be provided with the underlying trading data accurately reflecting Defendants' trading, and that neither Stewart nor Sewall, who were both key personnel of Mediatrix Capital, had previously filed for bankruptcy.

153.    The disclosures and representations regarding the audit of trading results, investor access to the underlying trading data, and history of bankruptcy were false when made, and Defendants knew or were reckless in not knowing, and should have known, that their statements were false and misleading.

154.    Defendants omitted to state material facts that were necessary to render their disclosures and representations regarding the audit of trading results, investor access to the underlying trading data, and history of bankruptcy not misleading.

155.    The above misrepresentations and omissions as to the audit of trading results, investor access to the underlying trading data, and history of bankruptcy were material to investors and potential investors because, among other things, they believed that they could rely on Mediatrix Capital and the Individual Defendants to make accurate representations about themselves and their past, because an audit of trading results and access to underlying trading data would provide investors with confidence that their investments existed as reported, and because the absence of bankruptcies from Mediatrix Capital key personnel suggested that the investment was overseen by individuals who had always been able to meet their obligations, as

disclosure of prior bankruptcies would have caused investors to, at a minimum, do more due diligence on the investment.

**III.     Defendants Engaged in Other Fraudulent Conduct.**

156.    Through the conduct described above, Defendants defrauded investors by falsifying and misrepresenting investment returns and the amount of AUM; falsely claiming a trading history that went back to 2013; falsely claiming investors monies would be used for trading while Defendants were misappropriating investor monies, using the monies to make Ponzi-like payments, and using the monies to pay performance fees that were not due because of Defendants' unprofitable trading; falsely claiming that the MAFEF trading results were audited; falsely claiming that Defendants were transparent and would provide the underlying trade data to investors; and falsely claiming that none of the Individual Defendants had previously declared bankruptcy.

157.    Defendants also committed additional deceptive acts in furtherance of this fraud. Among other things and as more fully alleged above, the Defendants:

   a.   misappropriated investor funds;

   b.   falsified MAFEF account statements to hide their fraud and pay themselves performance fees;

   c.   gave false trading data to the Fund's administrator, which in turn used that data to provide false account statements to the Fund and Fund investors; and

   d.   made Ponzi-like payments to investors making redemptions.

**IV.     Mediatrix Capital and the Individual Defendants Violated Their Fiduciary Obligations as Investment Advisers.**

158.     The Fund was primarily engaged in, held itself out as being primarily engaged in, and proposed to engage itself primarily in the business of investing, reinvesting, and/or trading in securities.  The Fund stated in the CEM that "[t]he Fund seeks to reach its investment objective by investing in securities, derivatives and other instruments to establish long and short investment exposures around the world."  Additionally, the Fund is engaged in the business of investing, reinvesting, owning, holding, or trading in securities, and invested virtually all its assets in securities when it invested the Fund assets in the Blue Isle Brokerage Accounts.

159.     Mediatrix Capital and each of the Individual Defendants were investment advisers to the Fund.  Mediatrix Capital and each of the Individual Defendants advised the Fund as to the specific investments to make, and the advisability of investing in, purchasing, and selling the securities.  Mediatrix Capital and each of the Individual Defendants controlled the purchase and sale of the securities held by the Fund.

160.     Throughout the Relevant Period, Mediatrix Capital and each Individual Defendant made investment decisions for the Fund.  They evaluated and recommended to the Fund that it invest in securities, and the Fund did invest virtually all Fund assets in the Blue Isle Brokerage Accounts other than the funds that were misappropriated or otherwise misdirected.  Mediatrix Capital and each Individual Defendant also monitored the performance of the Fund's investments and, through the Fund Administrator, provided investors with monthly account statements reflecting inflated trading results.  According to Mediatrix Capital's Due Diligence Questionnaire, Young, Stewart, and Sewall "have absolute decision-making authority" over

Mediatrix Capital, which includes authority to direct how the Fund invests its capital, including its investments in securities.

161.     Mediatrix Capital and each of the Individual Defendants received compensation for their investment adviser services to the Fund.  The Individual Defendants were each paid a salary of $10,000 a month, plus distributions.  Additionally, the Fund pays a management fee of 1% of the Fund's NAV, along with a performance fee on any monthly net new appreciation above the 0.667% per month Hurdle Rate.  Last, Mediatrix Capital and each of the Individual Defendants misappropriated monies from the Fund.

162.     As the Fund's investment advisers, Mediatrix Capital and each of the Individual Defendants owed fiduciary duties to the Fund.  That fiduciary duty entails an affirmative duty of utmost good faith, and obliges Mediatrix Capital and each of the Individual Defendants to employ reasonable care to avoid misleading the Fund and to act in the Fund's best interests.  Mediatrix Capital's and the Individual Defendants' duty to disclose all material facts to the Fund includes a duty to tell it about all of its actual or potential conflicts of interest that might incline them to render investment advice that is not disinterested.

163.     Through the conduct alleged above, Mediatrix Capital and each of the Individual Defendants breached their fiduciary duties to the Fund, a pooled investment vehicle.

**V.      In the Alternative, Young, Stewart, and Sewall aided and abetted Mediatrix Capital's Violations of Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206-4(8) thereunder.**

164.     Young, Stewart, and Sewall, by virtue of the conduct described above, each knowingly or recklessly provided substantial assistance to Mediatrix Capital's violations of

Sections 206(1), 206(2), and 206(4) of the Advisers Act and Rule 206-4(8) thereunder [15

U.S.C. § 80b-6(1), 80b-6(2), 80b-6(4), and [17 C.F.R. 275.206(4)-8].

**VI.    The MAFEF and Fund Investments Into the Blue Isle Brokerage Accounts Are Securities.**

165.    The MAFEF and the Fund investments into the Blue Isle Brokerage Accounts are

securities as defined in Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the

Exchange Act.  Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act

define "security" to include, among other things, "investment contracts."  An investment contract

exists where a person invests his or her money, in a common enterprise, and is led to expect

profits solely from the efforts of the promoter or a third party.

166.    The MAFEF investments in the Blue Isle Brokerage Accounts were investment

contracts.  The MAFEF investors made an investment of money into the pooled Blue Isle

Brokerage Accounts and signed an agreement with Mediatrix Capital to manage the money.  The

MAFEF investments were part of a common enterprise whereby Defendants commingled the

MAFEF investments with other investor money in the Blue Isle Brokerage Accounts and traded

all the money in pooled accounts in Blue Isle's name only to execute their trading strategy and

make profits for the MAFEF investors, the Fund, and themselves.  Neither Defendants nor the

Prime Brokers gave individualized consideration to any investor during the trading process.  The

investors' investment of money was passive and they expected profits to be derived solely from

the efforts of the Defendants through their purported investment strategies.

167.    For the same reasons, the Fund investments in the Blue Isle Brokerage Accounts

were investment contracts.  The Fund made an investment of money into the pooled Blue Isle

Brokerage Accounts and signed an agreement designating Mediatrix Capital as its investment

manager.  The Fund investments were part of a common enterprise whereby Defendants commingled the Fund investments with other investor money in the Blue Isle Brokerage Accounts and traded all the money in pooled accounts in Blue Isle's name only to execute their trading strategy to make profits for the Fund, the MAFEF investors, and themselves.  Neither Defendants nor the Prime Brokers gave individualized consideration to the Fund during the trading process.  The Fund's investment of money was passive and profits were to be derived solely from the efforts of the Individual Defendants through their purported investment strategies.

168.    Investors' investments in the Fund are also securities.  The Fund investors contributed money to the Fund, received shares of stock, and signed a Subscription Agreement designating Mediatrix Capital as the adviser of the Fund tasked with managing it by trading its assets on a discretionary basis.

169.    On information and belief, at least some investors understood that their investment would be pooled with others investors' funds for purposes of trading.  For instance, the Managed FX Funds prospectus provides that clients had to deposit money directly to Mediatrix Capital via its "Private Managed Fund held with the Prime Broker" and the Managed FX Disclosure Documents provided that because all accounts are under the Mediatrix Capital umbrella, clients have access to larger credit lines and more attractive pricing.  Moreover, the MAFEF was advertised as a fund in which the success depended solely upon Mediatrix Capital's trading strategy.

170.    The Defendants' pooling of the funds allowed them to perpetuate the fraud.  The Prime Brokers would not have opened individual accounts for retail clients.  By pooling, the

Defendants were able to open the Blue Isle Brokerage Accounts at the Prime Brokers and negotiate better leverage, pricing, and margin, which they touted to investors.  Pooling also allowed Defendants to conceal their trading losses from investors.

## VII.    Defendants Conducted Unregistered Securities Transactions.

171.    Sections 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), make it unlawful for any person, directly or indirectly, to use interstate commerce or the mails, to send a security unless a registration statement is in effect as to the security, or to offer to sell a security unless a registration statement has been filed as to such security.  A registration statement is transaction specific.  Each offer and sale of a security must either be made under a registration statement or fall under a registration exemption.

172.    From March 2016 to the present, Defendants offered and sold two Mediatrix Capital securities – specifically, the investments by the MAFEF investors and the Fund into the pooled Blue Isle Brokerage Accounts and the investments into the Fund (collectively, the "Mediatrix Capital Securities") -- when no registration statement was filed or in effect for the transactions.  The Individual Defendants were a necessary and substantial participant in the Mediatrix Capital Securities offerings and sales.  Among other things, they drafted the Mediatrix Capital Securities offering materials and solicited investors.

173.    No registration statement was filed or in effect with the SEC in connection with the offer and sale of the Mediatrix Capital Securities.

174.    The Mediatrix Capital Securities were not exempt from the registration requirements of Sections 5(a) and (c) of the Securities Act.

175.     Defendants offered and sold Mediatrix Capital Securities using the means or instruments of interstate commerce, including but not limited to telephones, the Internet, commercial couriers, and the mails.

## VIII.   Relief Defendants Received Proceeds from Defendants' Fraud to Which They   Have No Legitimate Claim.

176.     As alleged above, each of the Relief Defendants received proceeds from Defendants' fraud for which they provided no reciprocal goods or services, and to which they have no legitimate claim.  As a result, those funds should be returned to Mediatrix Capital's defrauded investors.

**FIRST CLAIM FOR RELIEF**
**Fraud (Misstatements and Omissions): Section 10(b) of the**
**Exchange Act and Rule 10b-5(b)**
**(All Defendants)**

177.     The SEC realleges and incorporates by reference paragraphs 1 through 176, as though fully set forth herein.

178.     Defendants, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security, made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

179.     By virtue of the foregoing, Defendants, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Fraud (Misstatements and Omissions): Section 17(a)(2) of the Securities Act
### (All Defendants)

180.     The SEC realleges and incorporates by reference paragraphs 1 through 179, as though fully set forth herein.

181.     Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, obtained money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.     By virtue of the foregoing, Defendants, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(2) of the Securities Act [15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF
### Fraud: Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)
### (All Defendants)

183.     The SEC realleges and incorporates by reference paragraphs 1 through 182, as though fully set forth herein.

184.     Defendants, directly or indirectly, acting with scienter, by use of the means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, in connection with the purchase or sale of a security: employed devices, schemes, or artifices to defraud; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon another person.

185.     By virtue of the foregoing, Defendants, directly or indirectly, each violated, and, unless restrained and enjoined, will again violate Section 10(b) [15 U.S.C. § 78j(b)] of the Exchange Act and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)] thereunder.

**FOURTH CLAIM FOR RELIEF**
**Fraud: Section 17(a)(1) and (3) of the Securities Act**
**(All Defendants)**

186.     The SEC realleges and incorporates by reference paragraphs 1 through 185, as though fully set forth herein.

187.     Defendants, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, acting with the requisite state of mind, employed a device, scheme, or artifice to defraud and engaged in transactions, practices, or a course of business which operated or would operate as a fraud or deceit upon purchasers.

188.     By virtue of the foregoing, Defendants, directly or indirectly, violated and, unless restrained and enjoined, will again violate Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

**FIFTH CLAIM FOR RELIEF**
**Offer and Sale of Unregistered Securities in Violation of**
**Securities Act Sections 5(a) and (c) [15 U.S.C. §§ 77e(a), 77e(c)]**
**(All Defendants)**

189.     The SEC realleges and incorporates by reference paragraphs 1 through 188, as though fully set forth herein.

190.     Defendants, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, in connection with the purchase or sale of a security,

offered and sold securities or carried or caused such securities to be carried through the mails or in interstate commerce, for the purpose of sale or delivery after sale, when no registration statement had been filed or was in effect as to such securities.

191.    By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless restrained and enjoined will again violate, Section 5(a) and (c) of the Securities Act.

## SIXTH CLAIM FOR RELIEF
**Fraud by an Investment Adviser in Violation of**
**Section 206(1) of the Advisers Act**
**(Against Defendants Young, Stewart, Sewall, and Mediatrix Capital)**

192.    The SEC realleges and incorporates by reference paragraphs 1 through 191, as though fully set forth herein.

193.    As a result of the conduct alleged herein, Defendants Young, Stewart, Sewall, and Mediatrix Capital, while acting as investment advisers, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly with scienter, employed a device, scheme, or artifice to defraud any client or prospective client.

194.    By virtue of the foregoing, Defendants Young, Stewart, Sewall, and Mediatrix Capital, directly or indirectly, violated, and unless enjoined, will again violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## SEVENTH CLAIM FOR RELIEF
**Fraud by an Investment Adviser in Violation of**
**Section 206(2) of the Advisers Act**
**(Against Defendants Young, Stewart, Sewall, and Mediatrix Capital)**

195.    The SEC realleges and incorporates by reference paragraphs 1 through 194, as though fully set forth herein.

196.    As a result of the conduct alleged herein, Defendants Young, Stewart, Sewall, and Mediatrix Capital, while acting as investment advisers, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon any client or prospective client.

197.    By virtue of the foregoing, Defendants Young, Stewart, Sewall, and Mediatrix Capital, directly or indirectly, violated, and unless enjoined, will again violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

### EIGHTH CLAIM FOR RELIEF
**Aiding and Abetting Fraud by an Investment Adviser in Violation of Sections 206(1) and (2) of the Advisers Act**
**(Against Defendants Young, Stewart, and Sewall, Alternatively)**

198.    The SEC realleges and incorporates by reference paragraphs 1 through 197, as though fully set forth herein.

199.    As a result of the conduct alleged herein, Defendants Young, Stewart, and Sewall aided and abetted Defendant Mediatrix Capital's violations of Sections 206(1) and (2) of the Advisers Act by knowingly or recklessly providing substantial assistance to Mediatrix Capital which, while acting as an investment adviser, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly:

(a).    employed a device, scheme, or artifice to defraud; or

(b).    engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon a client or prospective client, as more particularly described above.

200.    By virtue of the foregoing, Defendants Young, Stewart, and Sewall, directly or indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) & (2)].

<u>**NINTH CLAIM FOR RELIEF**</u>
**Fraud on Investors in a Pooled Investment Vehicle in Violation of**
**Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder**
**(Against Defendants Young, Stewart, Sewall, and Mediatrix Capital)**

201.    The SEC realleges and incorporates by reference paragraphs 1 through 200, as though fully set forth herein.

202.    At all times relevant to the Complaint, Defendants Young, Stewart, Sewall, and Mediatrix Capital acted as investment advisers to the Fund, which is a pooled investment vehicle as defined in Rule 206(4)-8(b) [17 C.F.R. § 275/206(4)-8(b)].  Defendants Young, Stewart, Sewall, and Mediatrix Capital, while acting as investment advisers to a pooled investment vehicle, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative.  Defendants Young, Stewart, Sewall, and Mediatrix Capital, directly or indirectly:

(a).    made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; or

(b).    otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

203.    By virtue of the foregoing, Defendants Young, Stewart, Sewall, and Mediatrix Capital, directly or indirectly, violated, and unless enjoined, will again violate Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(2)] and Rule 206(4)-8 [17 C.F.R. § 275/206(4)-8] thereunder.

**<u>TENTH CLAIM FOR RELIEF</u>**

**Aiding and Abetting Fraud on Investors in a Pooled Investment Vehicle in Violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 Thereunder (Against Defendants Young, Stewart, and Sewall, Alternatively)**

204.    The SEC realleges and incorporates by reference paragraphs 1 through 203, as though fully set forth herein.

205.    As a result of the conduct alleged herein, Defendants Young, Stewart, and Sewall aided and abetted Defendant Mediatrix Capital's violations of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder by knowingly or recklessly providing substantial assistance to Mediatrix Capital who, while acting as an investment adviser to a pooled investment vehicle, by the use of the mails or any means or instrumentality of interstate commerce, directly or indirectly engaged in acts, practices, or courses of business which were fraudulent, deceptive, or manipulative and directly or indirectly:

(a).    made untrue statements of material fact and omitted to state material facts necessary to make statements made, in the light of the circumstances under which they were made, not misleading, to investors and prospective investors in a pooled investment vehicle; or

(b).    otherwise engaged in acts, practices, or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in a pooled investment vehicle.

206.    By virtue of the foregoing, Defendants Young, Stewart, and Sewall, directly or indirectly, aided and abetted and, unless enjoined, will again aid and abet violations of Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(2)] and Rule 206(4)-8 [17 C.F.R. § 275/206(4)-8] thereunder.

## ELEVENTH CLAIM FOR RELIEF
### Equitable Disgorgement
**(Against Relief Defendants Mediatrix Capital Fund Ltd., Island Technologies LLC, Victoria M. Stewart, Maria C. Young, Hanna Ohonkova Sewall, Michael C. Baker, Walter C. Young III, Arual LP, West Beach LLC, Salve Regina Trust, TF Alliance, LLC, Casa Conejo LLC, Hase Haus, LLC, DCC Islands Foundation, Keystone Business Trust, Weinzel LLC, The 1989 Foundation, Mediatrix Capital PR LLC, Mediatrix Capital, LLC, and Blue Isle Markets Inc. (Cayman Islands))**

207.    The SEC realleges and incorporates by reference paragraphs 1 through 206, as though fully set forth herein.

208.    Each Relief Defendant received and held proceeds of the fraud.

209.    Each Relief Defendant has no legitimate claim to these illicit proceeds, having obtained the funds under circumstances in which it is not just, equitable, or conscionable for it to retain the funds, and therefore has been unjustly enriched.

## RELIEF SOUGHT

**WHEREFORE**, the SEC respectfully requests that this Court:

### I.

Find that the Defendants committed the violations alleged in this Complaint;

### II.

Enter an injunction, in a form consistent with Rule 65 of the Federal Rules of Civil Procedure, temporarily, preliminary and, permanently restraining and enjoining Defendants and their agents, servants, employees, attorneys, and accountants, and those persons in active concert or participation with him or it, who receive actual notice of the Final Judgment by personal service or otherwise, and each of them, from engaging in transactions, acts, practices, and courses of business described herein, and from engaging in conduct of similar purport and object in violation of Section 17(a) of Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, Sections 5(a) and 5(c) the Securities Act [15 U.S.C. § 77e(a) and (c)], and Sections 206(1), 206(2), and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2), and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8];

## III.

Order Defendants and the Relief Defendants to disgorge all ill-gotten gains received during the period of violative conduct and pay prejudgment interest on such ill-gotten gains;

## IV.

Order Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]; and

## V.

Grant such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

The SEC demands a trial by jury on all claims so triable.

Respectfully submitted, September 12, 2019.

*/s/Stephen C. McKenna*
Stephen C. McKenna
Mark L. Williams
Attorneys for Plaintiff
UNITED STATES SECURITIES AND
EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000