# EXHIBIT 6

# Kuwait Oil Tanker Company Sak, Sitka Shipping Incorporated v Abdul Fattah Sulaiman Khaled Al Bader, Hassan Ali Hassan Qabazard, Timothy St John Stafford v H Clarkson & Company Limited, Hugh O'neill Mccoy, Kuwait Petroleum Corporation, Sheikh Ali Khalifa Al Sabah

 **Positive/Neutral Judicial Consideration**

**Court**
Court of Appeal (Civil Division)

**Judgment Date**
18 May 2000

A3/1998/1606, A3/1998/1625, A3/1999/0023, A3/2000/5128

Supreme Court Of Judicature Court Of Appeal (Civil Division)

**2000 WL 571379**

Before : Lord Justice Nourse Lord Justice Potter and Lord Justice Clarke

Thursday, 18th May 2000

On Appeal From The High Court Of Justice Commercial Court Queen's Bench Division

(Mr Justice Moore-Bick)

Handed Down Judgment Smith Bernal Reporting Limited 180 Fleet Street London EC4A 2HG Tel: 020 7421 4040 Fax: 020 7831 8838 (Official Shorthand Writers to the Court)

**Representation**

Mr Stanley Brodie QC and Mr Robert Howe (instructed by Messrs Olswang ) appeared on behalf of the appellant first defendant. Mr Stanley Brodie QC and Mr Selwyn Bloch (instructed by Messrs Brian Harris ) appeared on behalf of the appellant third defendant.
Mr Julian Malins QC , Mr Richard Slade and Mr Jonathan Adkin (instructed by Messrs Shaw and Croft ) appeared on behalf of the respondent claimants. Mr Craig Orr (instructed by Messrs Slaughter and May ) appeared for the third third party.

**Judgment**

Lord Justice Nourse

**Introduction**

1. This is the judgment of the court, to which each of its members has contributed. These are appeals against an order of Moore-Bick J dated the 15th December 1998 by which he gave judgment against all three defendants for very large sums of money. The first claimant ("KOTC") is a subsidiary of the Kuwait Petroleum Corporation ("KPC"), which is in turn owned by the State of Kuwait. The second claimant ("SITKA") is a Liberian company which is a wholly owned subsidiary of KOTC.

© 2020 Thomson Reuters.

The events which gave rise to the action took place between 1985 and 1992. During that period the first defendant ("Mr Al Bader") was both chairman and managing director of KOTC and president and a director of SITKA and the second defendant ("Mr Qabazard") was deputy managing director (administration and finance) and head of the finance department of KOTC. The third defendant ("Captain Stafford") was fleet operations manager of KOTC until September 1989, when he left and retired to Australia, although he returned to work for KOTC for a month in the summer of 1990. While he was in Kuwait Captain Stafford for most practical purposes acted as head of the operations department of KOTC and reported directly to Mr Al Bader.

2. The claimants put their case against the defendants in various ways, but their primary case was that the defendants dishonestly conspired to defraud them of more than US$60 million. The judge essentially accepted the claimants' case on conspiracy, although he also held that the defendants were liable for breach of fiduciary duty and thus liable to account to the claimants as constructive trustees. As a result of his conclusion that they were constructive trustees he awarded compound interest against all three defendants.

3. The total amounts awarded inclusive of compound interest but exclusive of costs were as follows. Mr Al Bader and Mr Qabazard were ordered to pay KOTC US$92,052,751 and £144,371 and SITKA US$44,733,165 and £174,291, making a total for each of them of US$136,785,916 and £318,662. Captain Stafford was ordered to pay the same sterling sum but slightly less in dollars, namely US$90,634,252 to KOTC and US$44,733,165 to SITKA, making a total of US$135,367,417. The reason for the difference between Mr Al Bader and Mr Qabazard on the one hand and Captain Stafford on the other was that the judge held that Captain Stafford did not join the conspiracy at the very beginning, but shortly afterwards. The amounts awarded reflect the fact that Mr Qabazard repaid an amount of about US$8 million to the Kuwait Prosecutors' Office in 1993.

4. Mr Brodie QC, who represented Mr Al Bader at the trial and has represented both Mr Al Bader and Captain Stafford on this appeal, challenges the judge's conclusions under three heads, namely conspiracy, fiduciary duty and constructive trust and interest. Mr Qabazard represented himself at the trial and attended throughout. He cross-examined the witnesses and made final submissions, but he did not give evidence. He served an appeal notice and indicated that he intended to represent himself on this appeal, but in the event he did not appear and was not represented at the hearing. In these circumstances we shall consider his appeal as well as those of the other defendants. We shall first say a word about the trial and the judgment and then address the principal issue of conspiracy. We shall address that issue under English law and then consider the question of double actionability. After that we will deal with the issues of fiduciary duty and constructive trust and interest.

**The Trial and the Judgment**

5. These proceedings were commenced in July 1994 and came to trial in 1998. The trial lasted 70 days, during which the judge heard many witnesses, including Mr Al Bader and Captain Stafford. He also heard evidence from representatives of SITKA's shipbrokers, H Clarkson & Co Ltd ("Clarksons"), including in particular from Mr McCoy. Those witnesses had to be subpoenaed by the claimants because the defendants had made both Clarksons and Mr McCoy third parties, although in the event the third party claims were abandoned before the trial.

6. Mr McCoy was an important witness because he played a significant part in the relevant events, although the claimants did not suggest that he acted dishonestly in any way. Shortly after his appointment as chairman of KOTC in March 1983 Mr Al Bader had become acquainted with Mr McCoy, who was then deputy head of the sale and purchase division of Clarksons. As the judge found, much of Mr McCoy's contact with KOTC was through Captain Stafford, who both handled the day to day aspects of KOTC's purchase and sale of tankers and played a major role in SITKA's chartering of tankers.

7. At the trial much depended upon whether the defendants acted dishonestly at the time. The judge held that in each case they did. Given the length of the trial, during which Mr Al Bader gave evidence for some eight days and Captain Stafford

also gave evidence at some length, the judge had a good opportunity to form a view on that central question. He did not, however, do so on the basis only of his views of Mr Al Bader and Captain Stafford in the witness box, but on the basis of a thorough and painstaking analysis of both the oral and, in particular, the documentary evidence relating to the large number of transactions called into question, which at every stage he tested against the probabilities. His judgment extends over 176 pages and discusses almost every point in the case. Whatever conclusions are reached on the issues in this appeal, the judgment is a tour de force which we greatly admire.

8.  In the skeleton argument lodged in this appeal on behalf of Mr Al Bader and Captain Stafford the arguments advanced were almost entirely points of law. It was expressly stated that, although Mr Al Bader and Captain Stafford did not accept the correctness of the findings of fraud and dishonesty made against them, for the purposes of the appeal it was not intended to challenge the judge's findings of fact as such. However, after that skeleton had been lodged, certain new evidence came to light upon which both Mr Brodie and Mr Malins QC (who appears for KOTC and SITKA) now seek to rely. At one time each was (at least formally) seeking to exclude the evidence upon which the other sought to rely, but as the appeal progressed it became clear that neither was seriously arguing that any of the evidence should be excluded. In the result we admitted it and have considered it in some detail.

9.  In opening the appeal, Mr Brodie relied in particular upon new evidence relating to an account in the name of Gulf Shipping (to which we shall refer further below) and submitted that if that evidence had been available to the judge he would not have reached the conclusions that he did in the case of Mr Al Bader and Captain Stafford. As the appeal progressed, Mr Brodie developed that submission until, by the end of the argument, he was challenging many of the judge's findings of fact. By contrast Mr Malins submitted that the new evidence supports the judge's findings, which (he submitted) were based on the careful and detailed analysis referred to above.

10.  The judge described the central issues at the trial and expressed his view of the correct approach to the burden and standard of proof in a case of this kind, where serious dishonesty is alleged, in this way (at page 35):

> Notwithstanding the complexity of the allegations made by the plaintiffs, however, Mr Malins QC … nailed his colours to the mast and accepted that they could only succeed in this case if and to the extent that they could satisfy the court that the defendants had been acting dishonestly. There was scarcely any dispute about the movement of funds as I have described them and so, although a large number of issues were raised during the trial, the two central issues between the parties can really be stated quite simply: to what extent was each of the defendants involved in withdrawing and disposing of funds belonging to the plaintiffs; and, insofar as he was, was he acting dishonestly? That being so, it is necessary to keep two things in mind: first, that the burden of proof rests firmly on the plaintiffs; and secondly, that although the standard of proof in this case is the same as that which applies in all civil proceedings, namely, proof on the balance of probabilities, where fraud is alleged the court should require cogent evidence commensurate with the seriousness of the allegation before it considers itself justified in finding the case proved: see *Hornal v Neuberger Products Ltd [1957] 1 QB 247* . I mention this both because these are important principles in themselves and because Mr Brodie QC and Mr Bloch both submitted that there were many aspects of this case which remain unclear and that the evidence left too many questions unanswered for me to be satisfied that their clients had been guilty of dishonesty.

That passage both makes clear what were the central issues at the trial and, in our view, correctly sets out the approach to be adopted to the burden and standard of proof in a case like this. We turn to the alleged conspiracy.

© 2020 Thomson Reuters.

**Conspiracy**

11. It was not disputed either at the trial or on this appeal that each of the defendants owed duties of good faith and honesty to KOTC or that Mr Al Bader also owed such duties to SITKA and that those duties would be broken if they engaged in dishonest schemes to embezzle or misapply the companies' funds, or (to put it another way) to defraud the companies. In this regard the defendants did not and do not seek to draw any distinction between KOTC and SITKA for the purposes of any issue which arises on this appeal. The essential basis of the claimants' case at the trial may be summarised in this way. The defendants dishonestly conspired together and with Mr Mohsin, who was financial manager of KOTC and immediately subordinate to Mr Qabazard, to steal or otherwise divert substantial sums of money from KOTC and SITKA by whatever means were or might become available. In short they conspired to defraud the claimants and thus conspired together to effect breaches of the fiduciary duties owed by each of them. Pursuant to the conspiracy they defrauded KOTC and SITKA of very large sums of money between 1985 and 1992. Although the claimants alleged that there was one overall conspiracy, for convenience of presentation they divided the case into four schemes reflecting the particular method of fraud adopted. In order to appreciate the true position it is important to consider the schemes in chronological order. We shall therefore consider them in the order of Schemes I, IV, II and III. In order to do so it will be necessary to refer to the facts, although for a much more detailed explanation of the underlying facts, reference should be made to the judge's judgment.

**The Facts**

*Scheme I*

**Back to Back Charterparties**

12. Scheme I involved the use of back to back charterparties. In the mid-1980s KOTC owned some sixty ships, but from about April 1984, by which time the Iran/Iraq war had been in progress for over three years, Iran began attacking Kuwaiti vessels. As a result, in April 1986 the Supreme Petroleum Council of Kuwait decided to establish a floating oil reserve outside the Straits of Hormuz. That decision was subsequently ratified by the Council of Ministers. In September 1986 it was decided that KOTC should be solely responsible for the chartering of vessels in order to meet the requirements of the strategic oil reserve. From that time onwards all chartering was carried out by Captain Stafford and Mr Al Bader through Clarksons as sole brokers. The claimants' case was that the defendants set up a scheme which operated in this way. A nominee company chartered the vessel from the third party owners or disponent owners ("the owners") at a certain rate of hire. The nominee company then chartered the vessel to SITKA on terms which were back to back with one crucial exception, namely that the rate of hire in the charterparty with the owners was less than the rate of hire in the charterparty to which SITKA was a party. As a result SITKA paid more hire than the owners received. The difference was in effect stolen by the defendants by being paid into an account or accounts with the BMB Bank in Switzerland, whence it could be and was distributed either to one or more of the conspirators personally or in accordance with their instructions.

13. For the purposes of the scheme three Liberian companies were incorporated or acquired on the instructions of Mr Al Bader. Between the 7th October 1986 and the 27th October 1987 Captain Stafford, with the approval of Mr Al Bader, fixed nineteen vessels through Mr Derek Hagger of Clarksons in the name of one of the three nominee companies. After the rate of hire between the owner and the nominee company had been agreed it was necessary to decide what rate of hire to insert into the charterparty between SITKA and the nominee. Before inserting the rate of hire Captain Stafford would speak to Mr Al Bader who would decide by how much that rate should exceed the rate agreed with the owners. It was usually about US$2,000 a day. Captain Stafford would thereafter sign the charterparty between SITKA and the nominee on behalf of both parties. He used his normal signature when signing for SITKA but a heavily disguised signature when signing on behalf of the nominee.

14. At first the excess hire which was produced by these arrangements was to be disbursed by arrangements made through the BMB Bank in Geneva ("BMB"). The charterparties between SITKA and the nominee provided for hire to be paid into one of three accounts opened with BMB, namely nos 7740, 7750 and 7760. The accounts were opened in Captain Stafford's name but in BMB's records were given references to the three nominee companies. Mr Al Bader and Sheikh Ali Khalifa Al Sabah ("Sheikh Ali"), who was variously the Oil Minister and the Finance Minister and who was a member of the Al Sabah Ruling Family, were intended to be signatories on the account, but in any event the bank agreed to accept telephone instructions from Captain Stafford or Mr Al Bader. In addition the application form contained instructions that any balances remaining after payment of hire were to be transferred to account no 7730, which was a personal account which had been

opened a few days earlier, on the 6th October 1986, by Mr Al Bader. In the result, the sums due to the nominee companies were to be paid into accounts 7740, 7750 and 7760, the sums due to the owners were to be paid to them in accordance with the terms of the charterparties and the balances were to be transferred into account 7730.

15. Shortly after those arrangements were made, as appears in a BMB memorandum dated the 22nd October 1986, the instructions to the bank were changed so that all the hire was paid into account 7730 and accounts 7740, 7750 and 7760 simply showed debits 'according to standing instructions'. The bank was to continue to receive instructions to pay hire to the true owners from accounts 7740, 7750 and 7760, but would actually make those payments into account 7730, although that was not to be shown on any of the records. Captain Stafford accepted in evidence that one reason for that procedure was to disguise the fact that the amounts paid out in respect of hire were not being remitted in full to the owners. The judge held that Mr Qabazani was aware of this arrangement by January 1987 at the latest.

16. As time went on, substantial sums began to accumulate in account 7730. Instructions for payments out of that account were given, mainly, if not entirely, by Captain Stafford acting on instructions received from Mr Al Bader. In December 1986 the first of many transfers of funds were made from account 7730 to Mr Al Bader's personal account at UBS Geneva. On the first two occasions the payments were, as the judge put it, relatively modest, only US$60,000 each, but between December 1986 and March 1989 amounts totalling US$8 million were transferred in that way. In addition two further sums totalling US$1.5 million were transferred from account 7730 to Mr Al Bader's personal account at UBS Geneva. Mr Al Bader was not, however, the only recipient of funds from account 7730. On the 4th March 1987 the sum of US$100,000 was paid into Captain Stafford's account at the Trustee Savings Bank ("TSB") at Anlaby and between that date and the 29th April 1987 a total of US$1.4 million was transferred to the account of Al Surooh Construction and Materials Company ("Al Surooh") with the Bank of Kuwait and the Middle East at Safat. It was the evidence of Mr Al Bader that Al Surooh was a nominee of Sheikh Ali. In addition the statement of account for account 7730 shows a number of large transfers to 'one of our customers', none of which was explained.

17. Mr Malins demonstrated to us the way in which the alleged fraud operated in this period by taking a particular example relating to hire for May 1987. On the 14th April 1987 Captain Stafford, as the 'Manager Fleet Development', sent a memorandum on SITKA notepaper to Mr Mohsin, as 'Manager Finance', showing the total amount of hire stated to be payable by SITKA in respect of eight vessels for May 1987 as US$2,833,300 and asking him to transfer that amount to accounts 7740, 7750 and 7760 at BMB via Manufacturers Trust in New York. No doubt as a result of that request, by now communicated to Mr Qabazard, Mr Qabazard wrote to the Burgan Bank in Kuwait on the 19th April 1987 instructing it to pay the sum of US$2,883,000 to Manufacturers Trust in New York for the credit of accounts 7740, 7750 and 7760 at the BMB Bank in Geneva. The total sum was to be divided between those accounts on the basis that hire for four vessels was to be paid into account 7740, hire for two vessels was to be paid into account 7750 and hire for the remaining two vessels was to be paid into account 7760. Documents from BMB show that those amounts were indeed credited (or perhaps notionally credited) to those accounts and then all transferred to account 7730 as a 'transfer from one of our customers'.

18. The true amount of hire payable to the owners of the eight vessels for May 1987 was not a total of US$2,883,000 but a total of US$2,394,750. On the 28th April 1987 Captain Stafford sent a written instruction to BMB instructing it to pay a total of US$2,394,750 to the various accounts of the true owners. BMB's copy of the instruction shows that that sum was then compared with the amount received of US$2,883,000, leaving a balance of US$488,250. Further bank documents dated the next day, the 29th April, show that the sum of US$120,024.10 was paid to Mr Al Bader's UBS account in Geneva and that the sum of US$400,034.43 was paid to Al Surooh's account described above.

19. It was the claimants' case that account 7730 was used as a distribution account, first to pay the true hire and then to pay away the balance of the hire paid by SITKA to the conspirators. The claimants submitted that the above example was typical of the way in which SITKA was defrauded of hire in the period from about October 1986 to April 1988.

**Change of System after April 1988**

20. Although during that period Clarksons, who were SITKA's shipbrokers, had been involved (entirely innocently) with some excess payments, in early April 1988 Mr Qabazard asked them to open two new accounts. The new arrangement was described in this way in a memorandum dated the 5th April 1988 from Mr McCoy to Mr Moyse, also of Clarksons:

      **Re: SITKA**

© 2020 Thomson Reuters.

> We have just fixed the BT Investor and BT Trader with this company. When remitting freights they
> will include an additional amount of 3,000 dollars. This amount is to be credited in the amounts of
> 1,000 and 2,000 dollars to two internal accounts which I would be grateful if you would open under
> the headings "Account One" and "Account Two".

The system described in that memorandum was put into effect. The source of the US$2,000 per day was the same as previously, namely the difference in hire between the back to back charterparties. The source of the US$1,000 per day was, however, different. It was achieved by negotiating with the owners what were in fact rebates of hire (although often described as commission) in favour of the charterers so that the amount actually paid to the owners was US$1,000 per day less than that stipulated in the charterparty.

21.  A typical example of the way Scheme I worked at this time can be seen from the treatment of the hire for May 1989. On the 27th April 1989 Clarksons received the sum of US$1,139,250 in respect of hire for two ships. On the same day, out of that sum, US$62,000 was paid into account no 1 and US$155,000 was paid into account no 2. A few days later, on the 2nd May, Mr McCoy instructed Mr Moyse to pay the sum of US$62,000 from account no 1 to Gulf Shipping's account no 026 026 at Bank Cantrade in Geneva and the sum of US$155,000 from the no 2 account to Mr Al Bader's account at UBS in Geneva. It was the claimants' case that the Gulf Shipping account, which had been opened by Mr Qabazard, was used as a distribution or transit account to enable the conspirators to receive payments from the stolen money. We shall return below to the roles played by the nos 1 and 2 accounts and the Gulf Shipping account, which are central to the issues on this part of the appeal.

**Commission**

22.  The claimants alleged that in addition to excess hire from the part of Scheme I which we have tried to describe, Scheme I also involved the dishonest diversion of some of the commission paid to Clarksons under the charterparties and of excess war risk premiums and crew war bonuses. As to the commissions, between November 1986 and December 1987 Clarksons credited to an internal account called the 'Bristol' account half the commissions which they had received from the charterers. The commission in the charterparties was 2.5 per cent of gross hire so that the amount credited to the Bristol account was 1.25 per cent. In due course those sums were paid out in the form of traveller's cheques, cash and transfers to third parties.

**War Risk Premiums and Crew Bonuses**

23.  War risk premiums and crew bonuses were administered by Clarksons, who submitted the owners' invoices to the nominee companies, who in turn invoiced SITKA. From about January 1987 Captain Stafford arranged from time to time for the amount charged by the nominee companies to exceed that which had been charged by the owners, usually by US $30,000. False invoices were created in the name of the owners to cover the payments in SITKA's books and the balance of the funds remaining after payment to the owners was retained by Clarksons for the account of KOTC in an internal account called 'Devon Maid'. Captain Stafford admitted what had been done and said that Mr Al Bader was well aware of it, but Mr Al Bader himself denied any knowledge of the account. Between March 1987 and March 1989 a total of US$966,025.93 was paid into the Devon Maid account in that way.

24.  As explained above, most of the monies in BMB account 7730 were transferred to Mr Al Bader's personal UBS account in Geneva. Between the beginning of April 1988 and the end of August 1989 hire differences amounting to some US$4,200,000 were paid into account no 2 and for the most part subsequently transferred to Mr Al Bader's Geneva account, although a total of US$460,150 was paid out to a company called World Tankers Ltd and three transfers totalling US91,602.40 were made to account no 1. In the same period about US$2,700,000 was paid into account no 1. Transfers out of that account included a total of US$274,806.25 to a company called Al Jameel Trading in May and early June 1988 and a small sum to account no 2, but the vast majority of the payments, amounting to over US$1,900,000 were to an account in the name of Gulf Shipping at the Bank Cantrade in Geneva. That account was opened in July 1988. Mr Brodie submitted that Gulf Shipping was solely the vehicle of Mr Qabazard and that (contrary to the findings of the judge) Mr Al Bader knew nothing about it. This is a key question in this appeal and we shall return to it below. The contents of the Bristol and Devon Maid accounts, namely US$1,154,259.41 and US$1,297,241 respectively, were for the most part disbursed in the form of traveller's cheques between 1987 and August 1989.

25.  On the 20th August 1988 a ceasefire was declared in the Iran/Iraq war which, although it was not immediately appreciated, in the event marked the end of hostilities. As a result Kuwait no longer needed a strategic oil reserve and no further tankers

© 2020 Thomson Reuters.

were chartered for the purpose, although vessels which had already been chartered remained on hire until August 1989. In these circumstances Scheme I could no longer be operated and it came to an end. For the most part, except for the important question who received what and the state of knowledge of each appellant, there was little or no issue as to the primary facts which we have tried to summarise. Thus the various payments were accepted as having been made and it was common ground that the essential question in the case of each defendant was whether he had acted dishonestly. The judge held in each case that he had. On that basis there was little dispute at the trial as to the quantum of the claimants' claim with regard to Scheme I. After resolving such disputes as there were, the judge held that the claimants' loss referable to the differences in hire was US$18,566,804, their loss referable to excess war risk premium and crew bonuses was US$966,025 and their loss referable to the 1.25 per cent commission was US$1,126,312. The total loss in respect of Scheme I was therefore US$20,659,141. No question of quantum arises on this appeal so that the principal question of fact is whether the judge was right to hold that the defendants each acted dishonestly and, if so, in what respects. We shall return to that question after considering briefly the facts relating to the other schemes.

*Scheme IV*

26. Although Scheme II followed Scheme I, it is convenient to consider Scheme IV at this stage because, with Scheme I, it was the first in time. Indeed it began at the end of 1985, although it appears that there was then a gap until about October 1986 so that Schemes I and IV thereafter proceeded side by side. It was the claimants' case, which was accepted by the judge, that the two schemes were part of the same conspiracy. The origins of Scheme IV are described thus by the judge at pages 12 to 14 of his judgment:

> At this point in the narrative it is convenient to return to December 1985 in order to describe the first in a series of transactions which took place over a period of over four years under which large sums were withdrawn from the accounts of KOTC and its subsidiaries mainly in the form of traveller's cheques. On 2nd December 1985 Mr Al Bader on behalf of KOTC drew cheque No 1782 on its US Dollar call deposit account No 701002523200 with the Burgan Bank in favour of the Burgan Bank in the sum of US$301,500 to cover the purchase of US$300,000 worth of traveller's cheques and the bank's commission. A messenger collected the traveller's cheques from the bank and Mr Mohsin signed for their receipt. There are no documents within KOTC's files explaining the purchase of these traveller's cheques and the bank statement merely recorded a "transfer" in the amount in question. Mr Al Bader received traveller's cheques in the amount of at least US$100,000 from the batch supplied on this occasion. On 15th January 1986 using cheque No 1783 he arranged for the purchase of a further US$350,000 worth of traveller's cheques in the same way and on 4th March 1986 Mr Qabazard using cheque No 1784 obtained a further US$150,000 worth. Although this last purchase does not form part of KOTC's pleaded claim, it is of interest as part of the sequence and sheds further light on the way in which these large amounts of money were being drawn. There are no documents in KOTC's files which cover the purchase of any of these traveller's cheques or which explain the purposes for which they were obtained. However, such documents as are available suggest that these transactions did appear in the bank statements in one form or another and so would have been apparent to the auditors, although the entries would not have indicated that the funds in question had been used to purchase traveller's cheques.
>
> Later that year there was a further sequence of substantial purchases of traveller's cheques on Sitka's account. On 30th October 1986 Mr Qabazard wrote to the Burgan Bank on behalf of Sitka asking it to supply traveller's cheques in the sum of US$314,000 and a few days later on 3rd November Mr Al Bader wrote asking the bank to supply further traveller's cheques in the sum of US$350,000 on the same account. Mr Qabazard signed the purchase slips for at least US$249,100 worth of those cheques. Again, there are no documents in KOTC's files which cover the purchase of these traveller's cheques or explain the purposes for which they were obtained. Finally, on 18th November 1986 Mr Mohsin on behalf of Sitka asked the bank to supply traveller's cheques to the value of US$172,000 also against the same account. Again, the documents provide no explanation for that, but there is nothing to indicate that the transactions did not appear on the face of Sitka's bank statements. Some transactions of a similar kind occurred during 1987. Mr Qabazard drew US$58,100 and £20,700 from KOTC's account in the form of traveller's cheques and cash respectively in March and June. Then on 17th September 1987 Mr Al Bader wrote on behalf of Sitka to the Burgan Bank asking for

traveller's cheques to the value of US$413,000 to be debited to the company's account. The purchase slips for all those cheques were signed by Mr Al Bader, but cheques to the value of US$44,000 were cashed by Capt Stafford.

27.  Scheme IV extended from December 1985 to March 1990, which was after Captain Stafford had left for Australia. The claimants alleged that it was throughout a scheme whereby the defendants obtained money from the claimants' bank accounts held at the Burgan Bank in Kuwait by making dishonest requests for traveller's cheques, cash and bank transfers. The judge accepted the claimants' submissions and therefore that all the transactions in respect of which they claimed were carried out pursuant to the conspiracy. The judge recorded that on that basis the amount of the claimants' loss in respect of Scheme IV was US$11,246,902 and £146,358. He held that all three defendants were liable until the end, but that Captain Stafford was not liable in respect of the two amounts of US$301,500 and US$350,000 drawn from KOTC's account to buy traveller's cheques in December 1985 and January 1986 because he had not joined the conspiracy at that time. We shall return below to the question whether the judge was right to find that the defendants were dishonest with regard to the transactions which formed the basis of Scheme IV and to the further question whether Captain Stafford was properly held liable in respect of the period after he left Kuwait in about September 1989.

28.  A somewhat startling example of Scheme IV relied upon by the claimants and found by the judge involved the forgery of a letter apparently on Clarksons' notepaper which KOTC later found in its files. On the 2nd June 1987 Mr Qabazard asked the Burgan Bank for travellers cheques amounting to US$215,699.38 (less commission) from SITKA's account, which was debited by that amount on the same day. Also on the same day Mr Al Bader received and signed for travellers cheques amounting to US$200,000 at a cost of US$200,539.38 inclusive of commission and Mr Qabazard received and signed for US$15,000 worth of traveller's cheques at a cost of US$15,160 inclusive of commission. The sum of US$200,539.38 and US$15,160 is of course US$215,699.38.

29.  The letter found by KOTC which proved to be a forgery was apparently on Clarksons notepaper and was dated the 21st May 1987. It was in these terms:

> As you were not in agreement with 2.5% brokerage commission due to two brokers involved in the fixtures of your chartering of 8 tankers (excluding Stena Concordia and Stena Explorer) and in consideration of our long business relationship, we are in agreement to charge 1.25% which as you confirmed will be payable by you since we excluded it from the daily hire agreed.
>
> Attached herewith our invoice No 1911 for a total sum of US$215,699.38 which represents our brokerage commission up to 31.5.1987.

The letter apparently bore the signature of Mr McCoy of Clarksons, but his signature had been forged. The letter also contained three manuscript notations which the evidence showed were in the writing of and signed by Mr Qabazard, Mr Al Bader and Mr Mohsin respectively. That of Mr Al Bader said: 'This is approved please action'. Attached was a document which purported to be Clarksons' debit note no 1911 showing a detailed breakdown of commission at 1.25% on hire over particular periods in respects of eight ships. The evidence subsequently proved that the debit note too was a forgery because the Clarksons' debit note no 1911 related to something entirely different.

30.  The judge held that the Clarksons' letter and debit note were indeed forgeries designed simply to cover the purchase of traveller's cheques. They were presumably designed to mislead KOTC's auditors. Similar transactions were carried out subsequently which are described in the judgment and which it is not necessary to discuss in detail here. We simply give an example from 1988 to which Mr Malins particularly drew our attention. It relates to forged letters and invoices apparently emanating from Brown & Root (Gulf) EC ("Brown & Root"). On the 10th July 1988 Mr Qabazard wrote to the Burgan Bank asking it to transfer US$737,645 from a Porchester Shipping Company ("Porchester") account to a Citibank account in Bahrain in settlement of five Brown & Root invoices. Porchester was a company which had previously owned a ship but now remained in existence for the purposes of transactions of this kind. The letter of the 10th July was genuine, as were the Brown & Root invoices. However a copy of a letter also dated the 10th July 1988 was found on the file, by which KOTC

© 2020 Thomson Reuters.

purportedly instructed the National Bank of Kuwait to transfer US$1,337,645 to Citibank in settlement of the same Brown & Root invoices. It was stamped 'Original signed by HA Qabazard DMD (Administration & Finance)'. The judge held that there was no original and that it was dishonestly left on the file in order to satisfy the auditors or others that the sum of US $1,337,645 had been paid in settlement of genuine invoices. The judge said that he was in no doubt that one or more false invoices was or were created to match the copy of the letter. He further held that there must have been an instruction to the National Bank of Kuwait because what in fact happened was that on the 12th July 1988 it transferred the sum of US $1,337,640 to Porchester's account at the Burgan Bank. On the same day the sum of US$737,663 was debited to Porchester's account to cover the genuine Brown & Root invoices, the additional US$18 no doubt being in respect of transmission charges.

31.  Also on the same day, the 12th July 1988, Mr Qabazard wrote to the Burgan Bank on behalf of Porchester requesting it to supply them with traveller's cheques in the amount of US$952,000 out of the same account. That represented almost the whole of the remaining US$600,000 together (as the judge held at page 22) with a further sum of US$352,643.35 which had been received from the insurance brokers Sedgwick Marine & Cargo Ltd ("Sedgwicks"), probably by way of rebates of war risk insurance premia. Of those traveller's cheques, Mr Al Bader cashed at least US$40,000 and Mr Qabazard cashed US$400,000. Those transactions accounted for almost the whole of the credit balance on the Porchester account at that time.

32.  The judge described in detail further transactions of a similar kind to those referred to above at pages 22 to 24 of his judgment. He expressed his conclusion in this way (at page 24):

> The plaintiffs identified 18 separate transactions of this kind carried out between July 1988 and December 1989. It is agreed that by that means a total of US$3,781,156.28 was transferred from KOTC to Porchester over and above what was required to pay Brown & Root. The money was drawn out mostly in the form of traveller's cheques which were cashed (or at any rate signed) by Mr Al Bader, Mr Qabazard, Capt Stafford and Mr Mohsin.

The judge subsequently held that those sums were all dishonestly obtained as part of Scheme IV, which was proceeding at the same time as Scheme I, and indeed Scheme II, and was part of the same overall conspiracy.

33.  There were further withdrawals which formed part of Scheme IV and which the judge described in detail in his judgment between pages 24 and 26. There were eight withdrawals between the 21st March 1988 and the 4th March 1990. Of those eight withdrawals, only two were after Captain Stafford left. They were US$20,000 on the 21st November 1989 and £15,000 on the 4th March 1990. Also of the eight withdrawals, six were comparatively small, between about US$15,000 and US$65,000, half of which were made by Mr Qabazard and half by Mr Mohsin, but two were more substantial. There was evidence of a request dated the 7th February 1988 by Mr Qabazard to the Burgan Bank on behalf of SITKA asking it to transfer the sum of US$1,435,865.23 to Porchester's account. The judge held that it was likely that the same steps were taken as described above in order to conceal the payments to Porchester. He was unable to ascertain who received the monies from Porchester but concluded that it was part of the fraudulent scheme. The eighth withdrawal was of US$137,000 worth of traveller's cheques by Mr Qabazard in November 1988. Of those, Mr Al Bader cashed US$62,000, Captain Stafford cashed US$55,000 and Mr Qabazard cashed US$9,000. The balance could not be traced.

34.  Finally in Scheme IV, between November 1987 and August 1989 there were a number of withdrawals from the account of Yucatan Shipping Inc ("Yucatan"), which was a subsidiary of KOTC which (like Porchester) had once owned ships but now simply had a bank account. On the 1st November 1987 Mr Qabazard wrote to the Burgan Bank on behalf of Yucatan asking it to supply traveller's cheques in the sum of US$456,236.72 less the bank's commission. On the 1st December 1987 Mr Qabazard requested traveller's cheques in the full amount of the balance of the account, which was US$60,100, which, as the judge put it, 'certainly does not suggest a transaction in the ordinary course of business'. On the 9th March 1988 Mr Al Bader asked for traveller's cheques in the amount of US$312,931.69 less the bank's commission. Of those traveller's cheques Mr Qabazard cashed US$100,000, Captain Stafford received US$100,000 and passed them to his investment consultant who cashed them and an unidentified third party received US$48,000. As in the case of many of the traveller's cheques which subsequently came into the claimants' hands, the signatures on the others could not be identified. There were two other withdrawals of smaller sums, namely US$33,000 and £33,000 on the 26th January and the 1st August 1988 respectively.

© 2020 Thomson Reuters.

35.  In the context of this appeal the most significant transaction occurred on the 27th August 1989, when Mr Al Bader signed a letter on Yucatan notepaper requesting the Burgan Bank to transfer US$2,300,000 to a Gulf Shipping account in Geneva. The claimants submitted that that was a payment to a distribution account for subsequent distribution either directly to the conspirators or on their instructions. Mr Al Bader denied any knowledge of the letter and said that he knew nothing of the Gulf Shipping account. The judge held that Mr Al Bader was not telling the truth, describing his explanation of the letter as lamentable. Mr Brodie submitted that the new Gulf Shipping documents show that the judge was wrong to reach that conclusion and that the person responsible for the fraud was not Mr Al Bader or Captain Stafford but Mr Qabazard. This is a key question on the facts on this appeal, to which we shall return below.

36.  Of the US$11,246,902 and £146,358 which the claimants lost as a result of scheme IV, the claimants were able to identify about US$6 million worth of traveller's cheques. They were also able to identify somewhat less than US$1million worth of traveller's cheques in connection with Scheme I. Of those traveller's cheques, the identity of the person who signed for them or cashed them could be identified in respect of about US$3 million, leaving about US$3 to 4 million unaccounted for. We shall return below to the part played by each of the defendants in this regard.

*Scheme II*

37.  Scheme II was the most profitable. It extended from May 1989 to August 1990 and it was agreed at the trial that if the judge held the defendants liable the claimants' losses were US$31,752,000. The scheme involved what the claimants said and the judge found were payments of unauthorised commissions to the defendants from the sale and purchase of a number of vessels. A forerunner of the scheme involved the sale of the AL RAWADATAIN in January 1987, although for some reason monies received by the defendants arising out of it were not claimed by the claimants, so we shall not refer to it in any detail. We simply note that this was the first of many occasions on which Mr Qabazard received money from Clarksons in the form of traveller's cheques. He received a total of US$132,725. Mr Al Bader admitted cashing US$29,000 worth of those traveller's cheques and Captain Stafford received at least US$9,000 for his personal use.

38.  The way this scheme worked can be seen from the purchase of the KRISTINE MAERSK and the KATRINE MAERSK, which were bought for US$30,000,000 each in April 1989. Clarksons acted as KOTC's brokers and their internal documents show that they were to receive 3 per cent, or a total of US$1,800,000, from KOTC as buyers and 10 per cent, that is a total of US$6,000,000, from the sellers. On that basis their total commission would amount to US$7,800,000. However, (as noted in an internal memorandum dated the 4th July 1989) it was agreed between them and KOTC that they would in fact only retain US$270,000 per vessel or US$540,000 in all. Clarksons invoiced KOTC for US$1,800,000 and the sellers for US$6,000,000 and, as a result, received US$7,800,000. They deducted their commission of US$540,000 and paid away the rest as follows. Mr Al Bader's UBS Geneva account received US$1,260,000, which was no doubt US$1,800,000 less US$540,000, on the 19th July and the further sum of US$6,000,000 on the 21st July. On the same day Mr Al Bader transferred US$1,400,000 from his UBS account to Mr Qabazard's account in London.

39.  A very similar arrangement was made in January 1990 when KOTC agreed to purchase the ATLANTIC CONCORD and the ATLANTIC CONQUEST for US$29,500,000 each. The judge described the position in this way (at page 27):

> Similar arrangements with regard to commission were made both with the sellers and with KOTC, save that the sums involved in this case were US$2.5 million (sellers) and US$885,000 (KOTC) respectively. Again, Clarksons' copies of the debit notes sent to KOTC reflect an agreement that they should retain only US$270,000 in respect of each vessel and should pay away the balance of US$615,000. The vessels were both delivered on 4th April 1990 and the funds required to cover the purchase price must have been made available by that date. On 25th April Clarksons transferred to Gulf Shipping a sum of US$10.85 million. That included US$1.23 million representing the balance of the commission apparently payable by KOTC to Clarksons and also the US$2.5 million due from the sellers by way of commission in respect of the *Atlantic Concord* . The commission of US$2.5 million payable in respect of the *Atlantic Conquest* was transferred by Clarksons to Gulf Shipping on 27th April.

© 2020 Thomson Reuters.

Kuwait Oil Tanker Co SAK v Al-Bader (No.3), 2000 WL 571379 (2000)

The only difference between those transactions and those relating to the MAERSK vessels was that excess amounts were paid away to Gulf Shipping.

40.   Later in 1990 very similar arrangements were made in connection with the purchase by KOTC of four new buildings. The contracts for the first two were signed in March 1990 with Hyundai and Daewoo respectively. In each case Clarksons received commission of US$3,638,000 from the sellers, of which they retained US$78,000 and on the 25th April 1990 paid the balance of twice US$3,560,000, namely US$7,120,000, to Gulf Shipping. The contracts for the third and fourth new buildings were signed with Hyundai and Daewoo on the 19th July 1990 and in accordance with a similar arrangement large sums were paid away by Clarksons to Gulf Shipping. The sums of US$5,265,000 and US$550,000 were paid on the 6th August and, because of an arrangement made between Clarksons and Daewoo which delayed the payment to Clarksons, the further sum of US$5,327,000 was paid on the 19th October.

41.   Further sums were paid by Clarksons to Gulf Shipping arising out of the four new buildings. Correspondence in February 1990 shows that by way of remuneration for an appraisal of the market Mr Al Bader agreed on behalf of KOTC to pay Clarkson a fixed fee of US$300,000 in respect of each vessel ordered. In accordance with that agreement KOTC paid Clarksons a total of US$1,200,000, but out of that sum Clarksons retained only US$50,000 per pair of vessels and paid away the rest to Gulf Shipping. The first payment of US$550,000 was made on the 26th March and the second on the 6th August.

42.   We shall return below to the role of Gulf Shipping, but it may be noted here that on the 8th May 1990 Mr Qabazard transferred US$8.67 million out of his UBS account in London to Mr Al Bader's account in Geneva. The judge held that this was out of the commissions paid by Clarksons to Gulf Shipping. As already indicated, the total amount of the claimants' loss by reason of Scheme II was agreed to be US$31,752,000.

*Scheme III*

43.   Iraq invaded Kuwait on the 2nd August 1990. In the period from about the 5th October 1990 to the 10th February 1992 Sedgwicks made substantial rebates of war risk insurance premiums. Previous such rebates had been paid to Kuwait but, no doubt because of the position in Kuwait after the invasion, during this period they paid them to Clarksons. They did so pursuant to an instruction given by Mr Qabazard on the 31st August 1990 to open an account in the name of Clarksons as KOTC's agents. Thereafter Sedgwicks received premium amounting to US$12,612,655 from KOTC and paid rebates amounting to US$6,026,803 to Clarksons. Clarksons subsequently paid US$6,009,048 to Gulf Shipping and US$17,755 in traveller's cheques and cash to Mr Qabazard personally. In these circumstances it was agreed that the loss from Scheme III was US$6,026,803.

*The Judge's Conclusions.*

44.   In order fairly to consider the issues raised by this appeal in their context it is convenient to consider the conclusions reached by the judge on the evidence before him. Before discussing the issues in detail the judge carefully described the views which he had formed of the witnesses. He regarded all the witnesses from Clarksons, including Mr McCoy, as being both honest and reliable, although he recognised that after ten years Mr McCoy's recollection was unlikely to be wholly accurate and held that it was not. He also regarded Mr Sultan of KPC as a truthful and generally reliable witness. By contrast he took a dim view of Mr Al Bader, of whom he said this (at page 39):

> … he was often unduly defensive and argumentative and was frequently inclined to give complicated and lengthy answers to straightforward questions. Of itself that does not take the matter very far and was no doubt due in part to the same factors as were at work in the case of Mr Al Roumi. What was much more damaging was his inability to provide any adequate explanation for some of the most telling evidence against him. In some cases he gave explanations which were either demonstrably false or wholly incredible; in others he effectively failed to deal with the point in a satisfactory way at all. Inevitably that undermined my confidence in him as a witness.

The judge then referred to the evidence of three distinguished character witnesses, who had had personal dealings with Mr Al Bader in the relevant period and spoke highly of him. The judge added:

© 2020 Thomson Reuters.                                                                                                11

Kuwait Oil Tanker Co SAK v Al-Bader (No.3), 2000 WL 571379 (2000)

All of them spoke highly of Mr Al Bader's energy, shrewdness, managerial ability and patriotism and of his good character in general. All that I have, of course, borne in mind when making my findings, but despite this impressive array of character witnesses the fact remains that I found Mr Al Bader a distinctly unimpressive witness when it came to dealing with many of the matters put to him in cross-examination which lay at the heart of the case. Even allowing for the difficulties to which I have referred, therefore, I found myself unable to place a great deal of reliance on his evidence in relation to controversial matters unless it was supported by other material.

In assessing Mr Al Bader's credibility the judge took account, as he was entitled to do, of the fact that, through his solicitors, he gave two different accounts of the ownership of the flat in which he lived, one in a letter to the Home Office, which was designed to persuade them that he was a person of independent means with property in London, and the other in an affidavit in connection with the Mareva injunction against him, which was designed to show that he had no assets within the jurisdiction. One or other account must have been untrue.

45. In the case of Mr Qabazard the judge noted that he did not give evidence, but he declined to draw any inference against him on that account because he said that it was not necessary to do so. Of Captain Stafford, the judge said (at page 41):

Capt Stafford did give evidence and in general he did so in a confident and direct manner. However, there were a number of occasions on which he too was evasive and was unable to provide an adequate explanation for the material being put to him. One of the most difficult pieces of evidence with which he was confronted was a tape recording of a telephone conversation between himself and Mr Qabazard in January 1993 while Mr Qabazard was in custody. The whole tenor of that conversation is difficult to reconcile with Capt Stafford's evidence that he was completely unaware of any misappropriation of funds by Mr Al Bader and he was quite unable to offer any satisfactory explanation for certain specific parts of the conversation. That inevitably undermined his credibility and in general where his evidence was in conflict with that of the plaintiffs' witnesses I have tended to prefer theirs. For the most part that means the evidence of Mr McCoy. I should say, however, that there were a number of points at which his evidence differed from that of Mr Al Bader, not always to their advantage. I found Capt Stafford a more impressive witness generally than Mr Al Bader and where their evidence conflicted I have in general preferred his evidence to that of Mr Al Bader.

Mr Brodie observed in argument that care should be taken when considering the tape recording because Mr Qabazard was in prison and Captain Stafford, who was in Australia, was not aware that the conversation was being recorded. We agree, but there is no doubt that the judge fully understood the position.

46. The judge then considered each of the schemes in considerable detail. Mr Brodie submitted that the case was bedevilled by the fact that the claimants insisted on alleging one conspiracy when they should have focused upon the individual torts implicit in each of the dishonest transaction relied upon. He submitted that injustice resulted. We shall return below to the question whether it was appropriate to allege a conspiracy, but we reject the submission that to do so caused any injustice to any of the defendants. Every transaction was considered with great care both during the evidence and by the judge in the course of his judgment. We will try to refer to the judge's conclusions with regard to each scheme and to the central issues in the case as shortly as possible because his judgment is available for consultation if necessary. It is, however, necessary to refer to them in some detail having regard to the extensive challenge made to the judge's conclusions as the argument progressed. As we see it, it is necessary to identify the reasons given by the judge for his conclusions in order to decide what, if any, difference the new evidence would have made.

**Scheme I**

© 2020 Thomson Reuters.                                                                                          12

47.  The primary facts relating to Scheme I are set out in paragraphs 12 to 25 above.

**Hire differences.**

48.  The fact that in the first instance hire differences were paid into BMB account 7730 and then for the most part to Mr Al Bader's personal account at UBS in Geneva was not in dispute. Nor was it in dispute that both he and Captain Stafford played a part in the operation of the scheme. Their explanation was that the system was set up as a result of instructions from Sheikh Ali as the Oil Minister that Mr Al Bader should establish a strategic fund abroad for the use of the state. They accepted that they were both concerned in the operation of the back to back charterparty arrangements which had the effect of transferring the hire differences into account 7730 but said that that was for state purposes and was not in any way dishonest. Mr Al Bader admitted that large payments were made into his personal account at UBS Geneva but said that the money was then used for state purposes. Much of it, he said, was paid to Sheikh Ali or on his instructions. On the evidence of Mr Al Bader and Captain Stafford the same was true after the change of system in April 1988.

**Commissions**

49.  Mr McCoy said that during a discussion about commission Mr Al Bader told him about the strategic fund, which KOTC wanted to finance through payments in the nature of a 1.25 per cent address commission. Mr Al Bader denied that he had ever told Mr McCoy about the strategic fund. He subsequently gave what the judge described (at page 49) as confused evidence about the 1.25 per cent commission. After considering the evidence in some detail the judge expressed his conclusions in this way (at page 51):

> Viewing the evidence as a whole I am left in no real doubt that it was Mr Al Bader who made the arrangement with Mr McCoy which resulted in the accumulation of 1¼% commission in what became known as the Bristol account, whether or not he knew precisely how Clarksons chose to handle it in their own books. I have reached that conclusion for several reasons. In the first place, I accept the evidence of Mr McCoy on this point in preference to that of Mr Al Bader. Mr McCoy struck me as an honest and generally straightforward and reliable witness whose evidence was consistent with the contemporaneous documents and the inherent probabilities of the case. By contrast, on this aspect of the matter, as on many others, Mr Al Bader gave me the impression of being uncomfortable and evasive and I found much of what he said implausible. Although Capt Stafford had dealt with Mr McCoy for some time in connection with the routine sale and purchase of vessels, it is unlikely that Mr McCoy would have accepted instructions from him in a matter of this kind and no one suggested that he did. That leaves only Mr Qabazard and Mr Al Bader. Mr Brodie suggested, without actually putting forward a positive case, that it may have been Mr Qabazard who made these arrangements with Mr McCoy and that there may have been some private agreement between the two of them to siphon off funds from KOTC in this way. Such a suggestion was never put to Mr McCoy and I can see nothing to support it. The arrangement to retain 1¼% commission must have been made early in October at the very latest, in other words before Mr Qabazard became involved in the chartering programme, and probably at the time when Clarksons were first instructed. It is just the kind of arrangement which, if it were to be suggested at all, one would expect Mr Al Bader himself to raise with Mr McCoy. Moreover, the incentive of obtaining a large amount of business might well explain why Clarksons were willing to agree to a commission-sharing arrangement of that kind. However, Mr Qabazard was not himself in a position to hold out the prospect of exclusive access to a substantial amount of business and was not therefore in a position to lay the groundwork for the chartering programme with Clarksons. At that stage there had been relatively little contact between Mr Qabazard and Mr McCoy and little opportunity to build up a working relationship. By common consent Mr Al Bader was a capable and shrewd businessman who exercised a high degree of personal control over KOTC's operations (even if he did not like to concern himself too much with matters of detail) and had a good grasp of what was going on within the company. I think it most unlikely that either Mr McCoy or Mr Qabazard would have felt sufficiently confident that a fraudulent scheme of the kind suggested by Mr Brodie could have been kept hidden from him for very long. Finally there is the link between the Bristol account and the sale of the *Endurance Glory* . The first entry in the account is the debit of US$100,000 linked to the

sale and purchase of that vessel. There is nothing to suggest that Mr Qabazard was involved in that transaction in such a way as might explain that.

As to Captain Stafford's involvement, the judge added:

> Was Capt Stafford aware of the 1¼% commission arrangement as well? He said he was not, but it would be surprising if that were so. He was very closely involved in the back-to-back charter arrangements, even, on his own account, to the point of being a party to the original discussions with Sheikh Ali which led to the establishment of the strategic fund. He was directly involved in the inflation of invoices for additional war risk premium and crew war bonuses by which further funds were made available for the strategic fund. He was clearly very close to Mr Al Bader who trusted him fully. He was closely involved in the negotiation of the charters and must have been aware that Clarksons were receiving 2½% commission on gross hire, if only because there was an express reference to the rate of commission in two of the early charters. I can see no sensible reason why Mr Al Bader should not have told him about the arrangements to collect address commission and I think it much more likely that he did. However, there would have been no particular need for Capt Stafford to discuss the address commission with Mr McCoy, and the evidence suggests that he was not aware in any detail of the manner in which it was being handled within Clarksons.

## War Risk Premiums and Crew Bonuses

50.  The judge expressed his findings in this regard succinctly as follows (at page 47):

> There was a curious divergence of evidence between Capt Stafford and Mr Al Bader on this aspect of the case. Capt Stafford admitted that he had been aware of the creation of inflated invoices for war risk premium and crew war bonuses from time to time from January 1987 onwards as a means of producing additional income for the strategic fund. Although he maintained that the invoices rendered by the nominee companies to Sitka had been produced by Mr Qabazard, it is clear from his evidence that he knew of and supported the arrangement. It is difficult to believe that in implementing this aspect of the back-to-back charter arrangements Capt Stafford and Mr Qabazard were acting behind Mr Al Bader's back for their own private benefit, and indeed that has never been suggested. However, Mr Al Bader denied any knowledge that funds were being accumulated with Clarksons in that manner. He suggested rather obliquely that Mr Qabazard might have used that as a means of raising funds to pay for traveller's cheques when they were required and that he did not concern himself with their origin. However, even if I were able to accept that Mr Al Bader did not unduly concern himself with the source of funds which on any view were being drawn for unorthodox purposes, I should be unable to accept his account of the matter. It is clear from Clarksons' records that this method was not simply used to raise funds on an ad hoc basis as and when required. On the contrary, substantial amounts were flowing into the Devon Maid account on a regular basis and it was being used to build up a substantial fund from which transfers were made from time to time. I can only conclude that Mr Al Bader was concealing the truth and that these funds were being accumulated with his knowledge and on his instructions.

## The Clarksons' Accounts

© 2020 Thomson Reuters.

51.  The judge held that all the defendants were aware of the Clarksons' accounts. He discussed the operation of the accounts in considerable detail between pages 53 and 57 of his judgment. Mr Brodie submitted to the judge that account no 2 and the Devon Maid account were what he called 'open' accounts which were used for legitimate state purposes and of which Mr Al Bader and Captain Stafford were broadly aware, whereas account no 1 and the Bristol accounts were 'secret' accounts which Mr Qabazard, with the connivance of Mr McCoy, was maintaining for his own benefit and of the existence of which Mr Al Bader and Captain Stafford were unaware. The judge expressed his conclusions in this way (at pages 57 to 58):

> Both Mr Al Bader and Capt Stafford denied any knowledge of Account 1 or Bristol and indeed of the accumulation of funds through the collection of 1¼% commission or the additional US$1,000 a day being collected under the back-to-back charter scheme. (Indeed, Mr Al Bader, as I have already observed, also denied any knowledge of the accumulation of funds through the inflation of war risk premiums and crew war bonuses). It is certainly true that there were marked differences between the ways in which Accounts 1 and 2 were operated, but I am unable to accept that Account 1 and Bristol were the private creatures of Mr Qabazard. In the first place, for the reasons I have already given, I have no doubt that the arrangements for the collection of 1¼% commission and the establishment of the Tankers/S&P Special Charters (later Bristol) account were made by Mr Al Bader. That was, therefore, an account of which he was aware, and whether or not he took a close interest in the precise state of the account it would have been difficult for Mr Qabazard to draw large amounts from it for his own purposes without that coming to Mr Al Bader's attention. The relationship between Mr Al Bader and Mr McCoy was a close one based on frequent contact and mutual trust. I am unable to accept the suggestion that Mr McCoy was willing to deceive Mr Al Bader in order to assist Mr Qabazard in furthering his own ends, but unless that were the case there was the constant risk that Mr McCoy would inform Mr Al Bader, either deliberately or inadvertently, of any private dealings by Mr Qabazard with the funds held by Clarksons.

52.  The judge then discussed other evidence which he concluded supported the view that Mr Al Bader was aware both of the Bristol account and of account no 1. He held that just as Mr Al Bader must have been aware of the state of account 7730 he must also have been aware of the state of account no 2 in to which the hire differentials of about US$2,000 a day were paid. He then pointed to the fact that on three occasions there was transfers from account no 2 to account no 1, which (given his conclusion that Mr Al Bader must have been aware of the state of account no 2) was, as he put it, quite a strong indication that Mr Al Bader was aware of account no 1. The judge added (at page 59):

> Moreover, in June 1988 Clarksons received instructions to transfer US$66,806.25 from Devon Maid to Account 1 and then transfer the resulting balance (US$90,000) to a company called Al Jameel Trading Agencies. In one of two memoranda of 2nd June passing these instructions to his finance department Mr McCoy states that instructions had been given verbally and the confirming fax sent by Capt Stafford the same day asked Clarksons to "process the disbursement in the amount of 66,806.25 USD as per instructions from Mr Al Bader". I think it more likely than not that in that instance the oral instructions received by Mr McCoy did indeed come from Mr Al Bader and if that is so, it provides yet further evidence of Mr Al Bader's knowledge of Account 1. The fact that there were also transfers from Devon Maid to Bristol and from Bristol to Devon Maid is a further indication that although these ledger accounts were separately maintained, no doubt for good reasons, they were operated in conjunction with each other as circumstances demanded.

53.  The judge accepted, as was plainly the case, that account no 1 was operated primarily for the purpose of making funds available to Mr Qabazard and account no 2 for the purpose of making funds available to Mr Al Bader. He concluded that, having been established earlier, both Bristol and Devon Maid were kept in being in parallel with account nos 1 and 2 and used to make funds available in the form of cash and traveller's cheques. He rejected Captain Stafford's evidence that he did not

know what was going on, saying (at page 60) that in the end he was left in little doubt that Captain Stafford was concealing much of what he knew about the way in which the accounts were operated and of his own role.

54. Between pages 61 and 64 the judge analysed the available evidence as to what became of the money in the various accounts. Substantial sums from account no 2 found their way into Mr Al Bader's UBS account in Geneva and into accounts which he held in London. The only other monies in any of the accounts which could clearly be shown to have gone directly into the possession of any of the defendants were those which were made in the form of cash and traveller's cheques which Clarksons delivered to Mr Qabazard and Captain Stafford on their periodic visits to London.

55. Mr Al Bader would draw bearer cheques on his various accounts. Between 1985 and 1994 he drew bearer cheques totalling over £3.9 million. Of that figure a total of £215,000 was drawn in 1985 and 1986 and over £1 million in 1993 and 1994. Mr Al Bader said that those were drawn for private purposes, but that the remainder were drawn as a means of disbursing monies from the strategic fund to agents of foreign governments and others in connection with services during the Gulf war. His evidence was that he would use the bearer cheques to buy gambling chips which he would hand over discreetly to each payee as circumstances demanded. The judge rejected Mr Al Bader's evidence that all the payments between 1987 and 1992, when he ceased to be chairman of KOTC were disbursed out of the strategic fund in this way. He said (at page 63):

> This account, which reads like something out of a novel, cannot be dismissed out of hand given the evidence of the way in which unorthodox payments were made by KOTC on behalf of KPC's marketing department and Capt Stafford's evidence of an occasion when he witnessed Mr Al Bader handing over a substantial sum in cash to a foreign agent, but it does deserve to be examined with some care. What Mr Al Bader wholly failed to explain was the purpose for which he obtained bearer cheques between September 1992 and June 1994 in a total of £1.15 million which, on his own admission, had nothing to do with payments for the benefit of the state. Mr Al Bader admitted to being a member of four or five London casinos and to enjoying gaming regularly when he was in London and it may well be that many of the bearer cheques were cashed at casinos, but their continued use in large amounts after February 1992 suggests that Mr Al Bader found them a convenient form of handling money for his own purposes rather than a simple way of satisfying the demands of foreign agents for untraceable money. There are other aspects of this which also cast doubt on his explanation. The tanker war had begun in 1984 and was at its height in 1986 when he said he was asked to raise the strategic fund. The war came to an end following the ceasefire in August 1988. One would therefore expect that payments of this kind would have been made mainly during 1987 and the first half of 1988 and that few, if any, would have been made in the second half of 1988 or thereafter. In fact, however, the total value of the bearer cheques obtained by Mr Al Bader between January 1987 and the end of August 1988 (£820,000) was far smaller than the total of those obtained between September 1988 and February 1992 (£1.685 million) and smaller even than the value of those obtained after he had left KOTC. All this tends to reinforce the conclusion that Mr Al Bader did not obtain bearer cheques for the purposes of paying foreign agents but simply because he found them a convenient way of handling large sums of money for his personal use. It does not lend any weight to his suggestion that funds remitted to his UBK account were used for state purposes.

56. The judge observed that Mr Al Bader admitted receiving some of the traveller's cheques supplied through Clarksons. So did Captain Stafford, although he said that they were bonus payments from Mr Al Bader or Mr Qabazard. He said that he had never himself knowingly collected cash or traveller's cheques himself from Clarksons and that he had no reason to be aware that significant amounts of money, or indeed any money at all, was being collected in that way. However, the judge described that evidence as less than candid and gave an example of Captain Stafford collecting traveller's cheques from Mr McCoy in September 1987. He also found that Mr Qabazard had cashed some of the traveller's cheques supplied through Clarksons.

57. The judge summarised his conclusions with regard to Scheme I in this way (at pages 64 to 65):

> Although the device of back-to-back charters might well have been explicable simply as providing an additional measure of secrecy, the evidence demonstrates that it was in fact utilised for the purpose

of secretly removing funds from Sitka and placing them in the hands of the defendants. The funds were then used for purposes which, on the evidence, were unconnected with the company's own business. The explanation offered by Mr Al Bader and Capt Stafford was that of the strategic fund, but even if one accepts that at face value, it does not on their own evidence provide a complete explanation for all the funds which went astray. The facts surrounding Scheme I, therefore, point to the conclusion that at least some aspects of it, if not the scheme as a whole, was dishonest.

## Scheme IV

58.  Although the judge considered Scheme II next, we shall consider scheme IV at this stage because it proceeded at the same time as Scheme I. The basic facts are set out in paragraphs 26 to 36 above. In considering this scheme, we have well in mind Mr Brodie's point that traveller's cheques were widely used in Kuwait as cash. However, the judge was struck by a number of aspects of the evidence. For example, the first group of three purchases over a period of some three months involved traveller's cheques to a total of US$800,000 without there being any records at KOTC explaining them and Mr Al Bader was not able to explain why they were purchased. The same was true of traveller's cheques purchased in October and November 1986.

59.  As to the forged documents referred to in paragraphs 28 to 30 above, the judge held that Mr Al Bader was aware that that was the case. He rejected as fanciful a suggestion that the letter and invoice were produced by Mr McCoy pursuant to a private arrangement between him and Mr Qabazard. The judge also referred to part of Mr Qabazard's interview by the Kuwaiti prosecuting authorities on the 13th January 1993. He had held the statements in the interviews to be admissible in evidence at the trial, while correctly directing himself that they should be treated with caution. The judge said (at page 84):

> Finally, if further confirmation were needed, it can be found in Mr Qabazard's prosecution interview on 13th January 1993 in which he told the investigators that on a number of occasions Mr Mohsin had forged documents purporting to come from Clarksons seeking payment of brokerage and had also produced the other documents necessary to implement this scheme in accordance with instructions he and Mr Mohsin received from Mr Al Bader. That description of the scheme is entirely consistent with all the other evidence which demonstrates that this was a sophisticated fraud being practised on KOTC by Mr Al Bader, Mr Qabazard and Mr Mohsin. I leave over for the moment the question of Capt Stafford's involvement in this particular device.

The judge also held that later letters of the 28th August and 9th November 1987 were forgeries and indeed that it is likely that there were other false documents left on the file.

60.  The judge reached similar conclusions with regard to the falsification of the Brown & Root invoices to which we have referred in paragraphs 30 to 32 above. He said (at page 85) that he found it impossible to accept that Mr Al Bader was telling the truth when he said that he was unaware that invoices were being falsified. He gave these reasons:

> In the first place, if he did want to obtain large amounts of money in the form of traveller's cheques for clandestine purposes, I think it would be wholly out of character for Mr Al Bader to leave it entirely to Mr Qabazard to decide how to go about it without ever bothering to enquire how it had been done. The Porchester account was used quite extensively during this period, and whether or not it was in any sense secret, I think it most unlikely that he would not have wanted to keep himself abreast of movements on that account. In fact, on at least three occasions Mr Al Bader himself wrote to the bank asking it to supply traveller's cheques in an amount equal to the difference between the original and the falsified invoice. He was clearly aware, therefore, of how the scheme operated. I find it difficult to decide as a matter of mechanics whether the original invoices were altered and photocopied after they had been signed by Mr Al Bader or whether he signed a photocopy made after the alteration had been carried out. On the whole I think it probable that the alterations were

© 2020 Thomson Reuters.

made after Mr Al Bader had already signed the original, but it does not make any difference since I am unable to accept that the alterations were made without his knowledge and approval whenever they were made.

That being so, I also find it impossible to accept Mr Al Bader's evidence that the traveller's cheques he received were used for state purposes or that he was unaware of the fact that both Mr Qabazard and Mr Mohsin were receiving traveller's cheques for their own benefit. If he was aware of the alterations to the invoices, it is unlikely that he was unaware, at least in a general way if not with some precision, of the amount of money being transferred into Porchester's account and drawn out in the form of traveller's cheques. He must therefore also have been aware of the amounts being received by Mr Qabazard and Mr Mohsin, which in some cases were very substantial, and of the fact that there could be no honest reason for them to receive them. That being so, it is impossible to believe that the traveller's cheques received by Mr Al Bader, who had previously been involved in dishonest schemes to defraud KOTC, were not also taken for his personal benefit rather than for state purposes. This conclusion, which I have reached on the documents in the case and the evidence given by the witnesses at the trial is reinforced, not for the first time, by what Mr Qabazard told the prosecuting authorities in Kuwait. On 13th January 1993 in the course of his second prosecution interview he described accurately and in some detail the method by which money was withdrawn from KOTC using falsified Brown & Root invoices which, he said, had been instigated by Mr Al Bader. I can see no reason why Mr Qabazard should have falsely implicated Mr Al Bader in what was otherwise a true account of this scheme and it is noteworthy that he exonerated Sheikh Ali and Capt Stafford, both of whom he had implicated in other schemes. In his final speech Mr Qabazard was at pains to point out that there is no direct evidence that he was responsible for producing any of the false documents, whether it be the falsified invoices or the false copy letters bearing his stamp. That is quite true, and indeed such evidence as there is outside the document themselves suggests that that was probably the work of Mr Mohsin. However, there can be no doubt that Mr Qabazard was fully involved in and benefited directly from this method of stealing from KOTC and there is no reason to think that he was not fully aware at the time of the part being played by his assistant Mr Mohsin.

Those are convincing reasons for the conclusions reached by the judge, namely that Mr Al Bader and Mr Qabazard were both dishonestly involved in Scheme IV, including the dishonest use of the Porchester and Yucatan accounts. We shall return to the Yucatan account in the context of the role of Gulf Shipping below.

61.  We shall also return to the position of Captain Stafford separately below, but it is convenient to set out here the judge's conclusions as to his involvement in Scheme IV. The judge said (at page 88):

There is no evidence that Capt Stafford participated directly in organising or carrying out any of the transactions falling under scheme IV, but in view of his close relationship with Mr Al Bader and Mr Qabazard and his direct involvement in the back-to-back charter arrangements it would be surprising if he had not been taken into their confidence and remained unaware of what was going on. It would be all the more surprising given the fact that it is clear that on a number of occasions he received substantial sums in the form of traveller's cheques derived from the fraud based on the forged Clarksons invoices and also traveller's cheques obtained from the frauds based on the falsified Brown & Root invoices. There is no evidence, on the other hand, that he received any further money derived from scheme IV after he left Kuwait.

© 2020 Thomson Reuters.

Captain Stafford received at least US$1,241,000 traveller's cheques under Scheme IV. We say 'at least' because it was not possible to identify the recipients of all the traveller's cheques and Captain Stafford only admitted receipt of those traveller's cheques which the claimants could prove had been received by him.

## Scheme II

62. The primary facts are set out in paragraphs 37 to 42 above. Arrangements were made between KOTC and Clarksons before the sale of the AL RAWADATAIN whereby Clarksons would receive a total of US$119,922.79 by way of commission but would retain only US$20,676.34 as their own remuneration. As indicated in paragraph 37, traveller's cheques (which included the US$99,225 difference between those figures) were collected from Clarksons by Mr Qabazard and some of them were subsequently cashed by Mr Al Bader and Captain Stafford. The judge said that he would have expected matters of this kind to have been discussed between Mr McCoy and Mr Al Bader. He therefore expressed surprise at Mr Al Bader's denial that he knew the source of the traveller's cheques which he received. The judge added (at page 65):

> He did not say that the money was part of the strategic fund and the fact that all three defendants received some of the traveller's cheques makes it that much more difficult to accept that these funds were required for state purposes. It would surely be too much of a coincidence to believe that just at the time when Mr Al Bader required traveller's cheques for clandestine payments Mr Qabazard had a similar requirement and it also happened to be a suitable moment to pay a bonus to Capt Stafford. The circumstances surrounding this particular transaction are therefore suggestive of dishonesty.

63. The judge then discussed in detail the purchase of the MAERSK vessels, the ATLANTIC vessels and the newbuildings. As to the MAERSK vessels, Mr Al Bader's explanation for the payment of the US$6,000,000 was that he had instructed Mr Qabazard to obtain 10 per cent of the price for the strategic fund. The judge rejected Mr Al Bader's attempts to distance himself from the transaction. He noted that Mr Al Bader was able to offer no explanation for the transfer by Clarksons of the bulk of the money they received from KOTC to his account at UBS. As to Clarksons' commission, Mr Al Bader denied making any agreement with Mr McCoy for the payment of commission by KOTC to them. He said that he had left it to his staff and that so far as he was aware Clarksons were entitled to the full US$900,000 on each vessel. The judge did not believe him, in part because his evidence was inconsistent both with that of Mr McCoy and with the inherent probabilities. In short he held that the evidence admitted of only one conclusion, namely that, as in the case of the AL RAWADATAIN, Mr Al Bader agreed with Mr McCoy that Clarksons should invoice KOTC for commission in the sum of US$900,000 and that Clarksons should hold US$630,000 to the order of Mr Al Bader, retaining US$270,000 for themselves.

64. As stated in paragraph 38, the sums of US$1,260,000 and US$6,000,000 were credited to Mr Al Bader's Geneva account on the 19th and 21st July 1989 respectively and on the same day, the 21st July, US$1.41 million was transferred form that account to Mr Qabazard's account in London. Mr Al Bader said that he was not aware that the two amounts of US$630,000 had been transferred to the account until some days later when Mr Qabazard told him that there had been a mistake and that the funds had to be repaid to Clarksons. He therefore transferred the sum of US$1,260,000 together with a further sum of US$150,000 to Mr Qabazard intending that he should repay the money due to Clarksons on his behalf. The judge did not believe that explanation. He said that it was inconsistent with the documents, that it did not explain why Mr Al Bader transferred money to Mr Qabazard's private account and not direct to Clarksons and that Mr Al Bader could not explain the extra US$150,000. In short he held that those facts suggested that the payment to Mr Qabazard was nothing more or less than a payment of part of the proceeds of a dishonest transaction.

65. As indicated in paragraph 39, the ATLANTIC vessels' transaction was very similar except that the monies were transferred to Gulf Shipping, of which Mr Al Bader said that he knew nothing. The judge recognised that in this case (by contrast to the previous one) the debit notes were not expressly directed to Mr Al Bader, but he noted that KOTC's regulations required the payment to be authorised by Mr Al Bader and said that it was difficult to accept that he was not aware of them or of the fact that the commission was three times the normal rate for business of that kind. He concluded (at page 69):

Mr Qabazard cannot have been so foolish as to think that a secret arrangement between himself and Mr McCoy would pass under Mr Al Bader's nose without exciting his suspicions. The only sensible conclusion is that the commission arrangements with Clarksons were agreed between Mr McCoy and Mr Al Bader, or at any rate that Mr Al Bader knew and approved of them. It necessarily follows that the instructions to transfer the excess to Gulf Shipping were also given by him or with his approval.

In those circumstances it is impossible to accept that Mr Al Bader did not also know about and approve the commission arrangements between Clarksons and the sellers. Since all the funds found their way to the same destination the only other possibility, namely that there was some secret arrangement between Mr McCoy and Mr Qabazard to abstract large sums of money for their own use by repeating the scheme adopted in relation to the Maersk vessels, is one that can be wholly discounted. None of the defendants has ever sought to justify any of the transfers to Gulf Shipping.

Mr Brodie submitted on this appeal that, whatever the position on the evidence before the judge, the new evidence shows that Gulf Shipping was solely the vehicle of Mr Qabazard and that the true position is that Mr Qabazard dishonestly set up this part of Scheme II entirely for his own benefit.

66.  The arrangements made in the case of the new buildings, which are described in paragraphs 40 and 41 above, involved very large payments by Clarksons to Gulf Shipping. There was a conflict of evidence between Mr McCoy and Mr Al Bader as to the nature and origins of the fee referred to in paragraph 41. The judge did not wholly accept the evidence of Mr McCoy in this regard, but nor did he accept the evidence of Mr Al Bader. He concluded (at page 71) that there was an agreement of the kind described in evidence by Mr McCoy and that it was agreed between him and Mr Al Bader.

67.  The key question considered by the judge was, however, how the arrangements described in paragraph 40 came to be made, because the total amount paid to Gulf Shipping as a result of them was over US$17.5 million. Mr Al Bader said that he knew nothing about the arrangements or the payments to Gulf Shipping. The claimants said that that was untrue and that he knew perfectly well what was happening. They relied upon the fact that on the 8th May 1990 Mr Qabazard transferred US$8.67 million out of his UBS account in London to Mr Al Bader's account in Geneva. They said that that was Mr Al Bader's share and pointed to the fact that the payment was made only a few days after the sum of US$7,120,000 had been paid by Clarksons to Gulf Shipping.

68.  Mr Al Bader said that Sheikh Ali had told him to raise US$8.5 million and that when negotiations were under way for the new buildings he had therefore instructed Mr Qabazard to ensure that US$8.5 million was made available to him through commission payments. He left it to Mr Qabazard to make the arrangements. The payment of US$8.67 million represented those commissions. He did not know that the money had come from Gulf Shipping. He simply expected it to be paid to him when it was available, just as happened in the case of the hire differentials. The judge did not believe Mr Al Bader. He said (at pages 72 to 73):

> Once again, I find it very difficult to accept Mr Al Bader's explanation of events. In the first place, the purchase of two new vessels at a price of US$80 million each is a major project, even for a company with the resources which KOTC had at its disposal, and doubly so if four vessels are being contemplated. It was well outside Mr Qabazard's normal area of responsibility and the ordinary scope of his authority. The evidence of Mr Al Bader's personality and approach to management as attested to by many witnesses indicates that it would have been quite out of character for him to delegate the negotiations for a project of that size in the manner he suggested. I think it unlikely, also that in a matter of this kind Mr Al Bader, who had involved himself closely in the operation of the back-to-back charter arrangements, would not have taken a close interest in the arrangements for raising a sum of this magnitude. Even if he had given Mr Qabazard a fair measure of discretion in making the arrangements, I find it impossible to accept that Mr Al Bader would not have wanted to be informed of their general nature or the time at which funds would become available. Although

there are indications that from the outset KOTC was contemplating ordering four new vessels, the second pair of contracts was not in fact signed until July that year. He might at least have liked to know whether any part of the funds would only become available if and when those contracts were executed.

The judge concluded that the overwhelming likelihood was that the US$8.67 million came from Gulf Shipping.

69.  The judge, however, correctly identified the key question, namely whether Mr Al Bader was party to the payment of the remainder of the commission and its transfer to Gulf Shipping. In this regard he said (at page 73):

> It is implicit in his account that Mr Qabazard used his position as head of the negotiating team to obtain large sums of money for himself under the guise of raising funds for the strategic fund. Such a scheme would, of course, have involved deceiving Mr Al Bader as well as defrauding KOTC. However, apart from the fact that I think it most unlikely that Mr Al Bader would ever have delegated this project so completely to Mr Qabazard, I find it difficult to accept that Mr Qabazard would have taken the risk of attempting a deception of that kind on Mr Al Bader, with or without the assistance of Mr McCoy, or that he would have succeeded had he done so. The total amount of commissions paid by the builders in relation to the four vessels was US$18 million - nearly US$10 million more than Mr Al Bader said he had asked Mr Qabazard to raise. I think it unlikely that the price of those vessels could have been further inflated to that extent without his becoming aware that something untoward was going on.

The judge added that there was plenty of evidence of frequent contact between Mr Al Bader and Mr McCoy and that there was nothing to suggest that Mr McCoy would willingly ally himself to Mr Qabazard in an attempt to go behind Mr Al Bader's back.

70.  On page 74 the judge referred to a note dated the 12th June 1990 made by Mr McCoy dealing with commission on the second newbuilding, which reflects his understanding that US$3.76 million was to be held to the order of Mr Al Bader, even though Mr Al Bader had by then already received the whole of the US$8.5 million which he said he was expecting. The judge concluded this part of the discussion in this way:

> Of course, it is possible that that was something he had been told by Mr Qabazard, but if it were not correct there was every likelihood that he would mention it to Mr Al Bader and the secret would be out. Finally, the fact that all the funds received by Clarksons, both those which were paid to them direct by KOTC and those which were received from the builders, were transferred to Gulf Shipping with which Mr Al Bader was connected in respect of the previous transaction is further support for the conclusion that both the agreement with Mr McCoy relating to Clarksons' commission and the arrangements for the disposal of the much larger commission paid by the shipbuilders were made by him or under his direction. In the end I am left in no doubt that that was in fact the case.

Mr Brodie observed in this connection that the point made by the judge in that passage depends upon the view which should now be taken of Gulf Shipping in the light of the new evidence because, if the judge's conclusions as to the ATLANTIC vessels were wrong, the same would be true of this part of his judgment. We see the force of that submission, but it does seem to us that on the material available to him, the judge's reasoning is very convincing.

© 2020 Thomson Reuters.

71.  The judge then considered the position of Mr Qabazard and Captain Stafford. He said that he was in no doubt that Mr Qabazard was fully involved in these transactions. We entirely agree. We shall return to the position of Captain Stafford separately below.

**Scheme III**

72.  The question here is whether Mr Al Bader and Captain Stafford were concerned in any way with Scheme III, which is briefly described in paragraph 43 above. There can be no doubt that Mr Qabazard was, and the judge so held. We shall return to the position of Captain Stafford below. As to Mr Al Bader, the judge recognised that there was nothing in the documents which directly implicated him, but he held that it was likely that he was aware of the arrangements. He so held partly because of the close relationship between Mr Al Bader and Mr McCoy and partly because the rebates were paid into Gulf Shipping. It seems to us that whether the judge's conclusion that Mr Al Bader was liable in respect of Scheme III can be supported depends upon whether his conclusion that Mr Al Bader knew about and received money indirectly from the Gulf Shipping account can stand in the light of the new evidence. However, before turning to the new evidence, it is appropriate to summarise the judge's conclusions as to the strategic fund and Gulf Shipping on the material before him.

**The Strategic Fund**

73.  A central part of Mr Al Bader's defence was that he received large sums on the instructions of Sheikh Ali as the Oil Minister in order to establish a strategic fund abroad and to place monies at his immediate disposal outside Kuwait for state purposes. The claimants' case was that this was a false story invented as a cover for fraud. The judge discussed this issue in considerable detail between pages 88 and 110 of his judgment.

74.  It is a significant feature of this case that, unlike many other cases in which conspiracy has been alleged, there is evidence of an agreement, even though there is an issue as to its underlying purpose. The claimants say that the agreement was dishonestly to divert monies from them by whatever means came to hand whereas Mr Al Bader and Captain Stafford say that the agreement was to carry out Sheikh Ali's instructions for state purposes. In this regard the scope of the agreement seems to us to be of importance. Both Mr Al Bader and Captain Stafford said that they were both present at a meeting with Sheikh Ali. Mr Al Bader's evidence was not entirely consistent. In his witness statement he said that he was simply instructed to raise money as and when he could for as long as there was a need for it and that, following the meeting, he had asked Captain Stafford to suggest methods by which the funds could be raised. He also said that he had brought Mr Qabazard into the picture, that Sheikh Ali had asked him to keep the fund secret and that in the event the back to back charter arrangements were made to begin accumulating funds which were transferred to his account at UBS Geneva and thence in accordance with Sheikh Ali's instructions. In cross-examination he said that three particular methods of raising money had been discussed with Sheikh Ali, namely creating differences in hire under back to back charterparties, taking sums by way of commission on the sale and purchase of tankers and taking commissions on new buildings, and that a decision had been made to start with back to back chartering. He said in his statement that, although Captain Stafford had been present at the meeting, he did not remember his making any contribution to the discussion. By contrast, he said in cross-examination that Captain Stafford had played an active part in the discussions.

75.  Captain Stafford generally supported Mr Al Bader's account as it had developed in cross-examination. He said that he joined the meeting after it had begun and took an active part in discussing the different methods of raising money referred to above. It follows that it was Captain Stafford's evidence (which he gave in examination in chief) that the discussions covered raising money by what were to become both Schemes I and II. The issue at the trial was whether the schemes were then put into effect for dishonest purposes or for state purposes. The judge held that it was the former. He rejected the evidence that there was any strategic fund. If he was right to do so, it seems to us that the evidence of Mr Al Bader and Captain Stafford provides strong support for the conclusion that there was from the outset an agreement to divert monies by what became Schemes I and II and indeed for the further conclusion that the essence of the agreement was that the defendants would defraud the claimants by whatever means came to hand.

76.  The judge considered the evidence of a number of witnesses from KPC who testified to the fact that they had heard nothing of a strategic fund until the commencement of the proceedings, although he correctly observed that that may not take the matter very far, given that the fund was supposed to be secret. The judge then considered the likelihood or otherwise of Sheikh Ali setting up a secret fund of the kind suggested. He concluded (at page 91) that Sheikh Ali had such influence in Kuwait that there was no need to resort (as the judge put it) to backstairs methods, that there was no need for any more secrecy than had existed in the case of the strategic oil reserve and that there was no reason to think that the Council of Ministers would not have approved a strategic fund if asked, just as it ratified the decision to set up the strategic oil reserve. The judge

then considered the probabilities of Sheikh Ali instructing Mr Al Bader to set up a fund without giving any indication of how much he should raise or how soon any particular amount might be required. He concluded that such general instructions were improbable.

77.  Next (at pages 92 to 93) the judge pointed to three aspects of Mr Al Bader's behaviour which he thought cast doubt on the conclusion that he considered himself to be a guardian of state funds. First, all the funds which he said he received for the strategic fund were paid into his UBS account where they became mixed with his personal monies. Secondly, he appeared to have kept little by way of a record of the amounts he was holding for the strategic fund, or of the amounts he paid out or of the persons to whom they were paid. Thirdly, he appeared never to have given Sheikh Ali a summary of the state of the account. In short Mr Al Bader treated the monies as if they were his own rather than belonging to the state. The judge further rejected the suggestion that there was any parallel between the arrangements for the payment of 'commercial commissions' by KOTC on behalf of KPC.

78.  The judge was struck by the fact that, as a result of hostilities coming to an end between Iran and Iraq, by the spring of 1989 the need for extraordinary measures to protect Kuwait's oil exports must largely have come to an end, even though mines still required removal. Yet on Mr Al Bader's evidence over US$17 million were raised for the fund between July 1989 and February 1991, much more than had been raised during the whole of the previous period. Moreover a considerable part of that sum was raised before the invasion of Kuwait in August 1990. No satisfactory explanation was given by Mr Al Bader of the need to raise such substantial sums during that period. Similarly substantial sums were disbursed at that time, including a payment to Sheikh Ali of US$4.5 million in December 1989. In addition large sums (described by the judge at page 97) were paid out to Sheikh Ali both after he ceased to be Oil Minister and after he left the government. Finally in this regard the judge was struck by the fact that neither Sheikh Ali nor Mr Al Bader mentioned the strategic fund to the new Oil Minister, Mr Al Ameeri, who took office in June 1990.

79.  Between pages 97 and 100 the judge discussed various aspects of the investigations into the whole affair to which it is not necessary to refer save to observe that he rejected a suggestion that the claimants' allegations were politically motivated. The judge then considered the various interviews given by Mr Qabazard. He said (at pages 100 to 101):

> In the course of his first two interviews Mr Qabazard gave the prosecuting authorities a detailed account of a series of fraudulent schemes in which he, Sheikh Ali, Mr Al Bader, Capt Stafford and Mr Mohsin had been involved at one time or another over a period of many years. Leaving aside for the moment the question whether that confession is reliable in all respects, its main significance as far as the present issue is concerned is that it is wholly inconsistent with the creation or operation of a strategic fund of the kind described by Mr Al Bader and Capt Stafford. Not only did Mr Qabazard fail to mention the existence of a strategic fund of any kind, he said in terms that the funds obtained by the various methods I have described were seized by the participants for their own benefit. Even if Mr Qabazard's account is only broadly reliable, therefore, there can have been no strategic fund.

> In view of the fact that he described with considerable accuracy the methods by which funds were siphoned away from KOTC, I am quite satisfied that that part of his account cannot have been invented. Mr Qabazard himself suggested that the investigators had twisted his answers to their questions to construct a story which fitted the documents in their possession and incriminate Mr Al Bader, Sheikh Ali and the others, but as I have already said, there is no evidence at all to support any such conclusion. According to Mr Al Bader, Mr Qabazard had been told about the strategic fund shortly after his meeting with Sheikh Ali in September 1986 and had co-operated in setting it up, even if he had also taken advantage of certain opportunities to line his own pockets. If that were so, however, why should Mr Qabazard confess to many fraudulent schemes, some of which were not dishonest at all, and falsely incriminate Sheikh Ali, Mr Al Bader and Capt Stafford? The only explanation which has been suggested is that he was induced to incriminate the others by the prospect of a more lenient sentence, but in the context of this case I find that most unconvincing. There is no evidence to support the suggestion that the prosecuting authorities were motivated by political considerations to pursue a case against Sheikh Ali or Mr Al Bader or that Mr Qabazard was offered any inducement of that kind. Indeed, it is noteworthy that he is careful to discriminate between the people who were actively involved in the different schemes which suggests that he wanted to lay blame only where it was due. Taken overall, therefore, the account he gave in his interviews amounts to a powerful piece of evidence against the existence of any strategic fund.

© 2020 Thomson Reuters.

The judge was also struck by the fact that Sheikh Ali said nothing in his interviews with the prosecuting authorities which might lend support to the existence of a strategic fund.

80.  In addition to those interviews the judge placed reliance upon the taped conversation between Mr Qabazard and Captain Stafford to which we have already referred. He said (at page 104):

> One of the striking things which emerges from the early part of the tape is Capt Stafford's confidence in his understanding that Sheikh Ali was receiving funds obtained from KOTC for the personal use of himself or his family. Another striking thing is the absence of any hint of the existence of a strategic fund; the whole conversation proceeds on a common understanding that all the funds drawn from KOTC had been obtained for personal, not public, benefit. That is of some significance given the fact that the operation of the BMB accounts was left to Capt Stafford and it is, of course, quite inconsistent with his evidence and that of Mr Al Bader that all the funds generated under the back-to-back charter arrangements were used for the strategic fund.

The judge then identified a number of individual passages in the conversation which he said pointed in the same direction.

81.  Between pages 105 and 109 the judge discussed the evidence of Mr Nader Sultan, who said that in 1988 Mr Al Bader told him that Sheikh Ali had asked him to raise about US$8 million from KOTC to clear his brother's debts. The claimants relied upon that evidence as inconsistent with the story of the strategic fund. After considering the evidence with great care the judge held that the account given by Mr Sultan was in substance reliable and that it provided further support for the claimants' case.

82.  It is apparent from the above that the judge gave careful consideration to a whole series of aspects of the evidence in reaching his ultimate conclusion that the evidence of Mr Al Bader and Captain Stafford that Sheikh Ali had instructed Mr Al Bader to divert large sums of money from KOTC to a secret strategic fund was not true. In our judgment, the judge's reasoning is fully supported by the evidence which was given at the trial and which he so fully analysed.

**Gulf Shipping**

83.  At the hearing of the appeal both Mr Brodie and Mr Malins paid great attention to the section of the judgment between pages 110 and 114 in which the judge discussed the role played by Gulf Shipping. Both sides relied upon the opening passage:

> One of the most intriguing aspects of this case is the role played by Gulf Shipping, the name under which account No 026 026 was held at Bank Cantrade, Ormond, Burrus SA, Geneva. Gulf Shipping runs like a silver thread through many of the transactions falling within all four schemes: there were 15 transfers to Gulf Shipping from Account 1 between July 1988 and August 1989 totalling over US$2.4 million; 9 transfers of funds obtained under scheme II totalling over US$24 million; 10 payments of war risk premium rebates obtained under scheme III between October 1990 and February 1992 totalling over US$6 million; and 5 transfers, four from Porchester and one from Yucatan, under scheme IV between August 1988 and September 1989 totalling over US$5.2 million. To that extent it is a unifying feature on which the plaintiffs rely as showing that there was one single fraudulent conspiracy involving all three defendants. Despite that, the evidence which would demonstrate clearly the precise nature and role of Gulf Shipping is sadly lacking. Both Mr Al Bader and Capt Stafford professed complete ignorance of Gulf Shipping, although Mr Al Bader did agree that it had nothing to do with any strategic fund. Mr Qabazard did not give evidence and therefore said nothing about it at all, although in his final speech he went to some lengths to rebut the suggestion, implicit in what Mr Brodie had said, that it was an account in which he alone had been

© 2020 Thomson Reuters.

concerned. He did not, however, suggest that the evidence before me was capable of supporting the conclusion that any of the transfers to Gulf Shipping were made for legitimate purposes.

The reason why both counsel relied upon that passage is that it shows the central role played by Gulf Shipping in the case. Mr Malins submitted that once it was held that Mr Al Bader was aware of Gulf Shipping, since Gulf Shipping ran 'like a silver thread through many of the transactions falling within all four schemes', Mr Al Bader was implicated in them all. Mr Brodie, on the other hand, submitted that since the above passage showed the importance which the judge attached to the role of Gulf Shipping, if (as he submitted was the case) the new evidence undermined or at least cast doubt on these conclusions, the appeal should be allowed and either the claims dismissed or a new trial ordered.

84.  The judge observed that it was common ground that transfers to Gulf Shipping of funds which either originated from the claimants or were held to their order were dishonest and unlawful. He correctly held that in those circumstances it was less important to ascertain the person who controlled Gulf Shipping than to ascertain which, if any, of the defendants was or were concerned in making transfers to the Gulf Shipping account.

85.  The judge concluded that Mr Al Bader was aware of Gulf Shipping and that he was indeed concerned in making transfers to its account. As indicated in paragraph 65 above, he had held that the instructions to transfer the commissions relating to the ATLANTIC vessels had originated from Mr Al Bader, which he said would be enough by itself to establish his connection with Gulf Shipping. However, the judge pointed to an important letter dated the 27th August 1989 signed by Mr Al Bader in which he wrote to the Burgan Bank on behalf of Yucatan asking it to transfer US$2.3 million to

> Brown Brothers Harriman, New York for Account of Bank Cantrade, Ormond Burrus SA, … Geneva … attention Mr O Burrus favouring Account No 026 026 of Gulf Shipping, advising beneficiary that this amount is in settlement of their account as per their statement dated 30.6.1989.

It can immediately be seen that that letter is an important piece of evidence against Mr Al Bader because it shows him giving instructions for the transfer of a substantial sum to Gulf Shipping account no 026 026, which is the account into which much of the contents of Clarksons' account no 1 and the sale and purchase payments were transferred.

86.  The judge described Mr Al Bader's evidence in this way (at pages 111 to 112):

> Mr Al Bader's evidence about this letter was most unsatisfactory. He admitted that he had signed it and that he had read it before he had done so, but he said that he had understood it as a request to the bank prepared by someone in the finance department for his signature asking for payment to be made to a company called Brown Brothers with whom KOTC was dealing. Brown Brothers, he said, looked much the same as Brown & Root and it was of no concern to him if they had an account in Switzerland. He resolutely denied that the letter amounted to a request to transfer funds to Gulf Shipping or that he had any knowledge of Gulf Shipping. For a man with Mr Al Bader's commercial experience this explanation is lamentable. The effect of the letter is quite clear to anyone with a modicum of business experience who takes any time at all to read it. Numerous witnesses testified to his energy and efficiency as a manager and Capt Stafford, who had worked quite closely with him, agreed that he was not the sort of person to sign an authorisation for a million dollars or more without satisfying himself that it was correct. In my view the only possible conclusion one can draw from this letter is that Mr Al Bader was quite consciously instructing the bank to make the transfer from Yucatan to Gulf Shipping. His denial of that obvious fact is simply further evidence that this transfer, in common with other transfers to Gulf Shipping, was a dishonest one, and that in turn sheds further light on the transfer of US$1.15 million by Mr Qabazard to Mr Al Bader a few days later on 5th September 1989. No other source for that money was suggested by Mr Al Bader

© 2020 Thomson Reuters.

or Mr Qabazard; the obvious inference is that it represented half of the money transferred to Gulf Shipping a few days before.

In our judgment, that reasoning is compelling and played an important part in the overall conclusions reached by the judge.

87.  The judge then considered the position of Mr Qabazard and held that there was plenty of evidence to connect him with Gulf Shipping. There can be no doubt that Mr Qabazard knew all about Gulf Shipping. Indeed there was evidence before the judge that it was his private company. That was what he said in his first interview, although he subsequently said that he had opened the Gulf Shipping account on the instructions of Mr Al Bader. Later still he said that the company had been established on Mr Al Bader's instructions and that funds could only be transferred from the account by him. The judge concluded that those later accounts were probably more reliable than the earlier ones. He said that Mr Al Bader was linked to the account by other evidence and that the total amounts transferred to the account made it unlikely that Mr Qabazard had sole control over it. In the context of this appeal it is important to note that the judge added that none of that really mattered as far as Mr Al Bader and Mr Qabazard were concerned if in fact they were participating in the dishonest transfer of funds away from the claimants into the hands of third parties.

88.  As to Captain Stafford the judge said (at page 114):

> Evidence of how the Gulf Shipping account was operated could, on the other hand, affect the position of Capt Stafford if it established that Gulf Shipping was a distribution account from which he also benefited. In fact, however, Capt Stafford's connection with Gulf Shipping is far less well established. There is no clear evidence showing when the Gulf Shipping account was set up, other than the fact that the first transfer occurred in July 1988 when US$232,000 was transferred from Account No 1, and no direct evidence to show that he received any part of the funds which were paid into it. However, in view of the close co-operation between Capt Stafford and Mr Al Bader in relation to the back-to-back charter arrangements I find it difficult to accept that he did not know of the existence of Gulf Shipping and the fact that funds were being transferred to it.

We shall return below to the position of Captain Stafford and to Mr Brodie's submission that the way the judge expressed the last sentence of that passage reversed the burden of proof.

**Judge's Conclusions**

89.  It was only after considering very many aspects of the case that the judge expressed his conclusions. He correctly did so on the whole of the evidence and correctly directed himself that cogent evidence was required before he could find dishonesty. He summarised his conclusions between pages 114 and 123. Between those pages he drew together his conclusions, but since they emerge from the above discussion it is not necessary to set out them out in detail here. They may perhaps be summarised in this way. He said (at page 115) that after reviewing the whole of the evidence in the case he was left in no doubt that all three defendants acted dishonestly in a variety of ways and over a long period of time to defraud the plaintiffs of very substantial amounts of money. He was satisfied that Sheikh Ali gave no instructions to Mr Al Bader or anyone else to set up a strategic fund for state purposes. In addition to the factors set out in paragraphs 73 to 82 above, the judge said that his rejection of the defendants' case concerning the strategic fund was further supported by the evidence of dishonesty which in many cases was provided by the very nature of the transactions themselves. He then set out again a number of those features to which we have already referred.

90.  The judge's conclusions in relation to each of the schemes (in the same order as before) may be seen from the following extracts from this part of his judgment:

**Scheme I (page 127)**

[Captain Stafford] was first drawn [in] in September 1986 when he and Mr Al Bader joined forces to steal money from the plaintiffs by systematically manipulating the arrangements to charter the tankers required to create the strategic oil reserve. That scheme extended not only to creating and stealing the differences in hire between the back-to-back charters, but to obtaining the 1¼ % commission and the additional amounts generated by inflating invoices for additional war risk premium and crew war bonus. These were all just different ways of using their control over the chartering arrangements to their own advantage. I am satisfied that Mr Qabazard was not originally a party to that fraud but he became a party to it at quite an early stage, certainly before the end of 1986, and from that time onwards was fully aware of and involved in the agreement and all its subsequent developments..

**Scheme IV (pages 126 and 128)**

The evidence in the present case demonstrates clearly, in my judgment, that from at least the latter part of 1985 when the first transactions falling within scheme IV occurred Mr Al Bader and Mr Qabazard were involved in the dishonest misappropriation of money from KOTC by the purchase of traveller's cheques using its account with the Burgan Bank. In view of the way in which those traveller's cheques were purchased, I have no doubt that both Mr Al Bader and Mr Qabazard must each have been aware of what the other was doing and must have agreed, tacitly if not expressly, to support each other's activities. However, there is nothing to suggest that Capt Stafford was involved at that early stage and indeed I do not think that he was.

The various transactions which fall within Scheme IV span the whole of the period from December 1985 to March 1990. All the evidence points to the fact that Mr Al Bader and Mr Qabazard were directly involved together with Mr Mohsin and co-operated in promoting and carrying them out. Although there is no direct evidence that Capt Stafford was involved in implementing any of the transactions, all three defendants were working closely together throughout the period between 1986 and September 1989 when Capt Stafford left Kuwait and I am satisfied that during that time they were all aware of, and lent their support to, all the various schemes that were employed from time to time. The close relationship between them arising out of the back-to-back charter arrangements makes it impossible to believe that any one of them was kept in the dark about what others were doing, but apart from that there is the evidence that Capt Stafford received several substantial blocks of traveller's cheques obtained through the frauds based on the forged Clarksons and Brown & Root invoices. These schemes were little more than developments of the original enterprise underlying Scheme I. In any event, I am satisfied that all three defendants knew of them and lent their support to them. The transfers to Gulf Shipping from the accounts of Porchester and Yucatan all occurred during the period between August 1988 and September 1989 and I am satisfied that they represented thefts falling within the scope of the agreement to which all the defendants were parties.

**Scheme II (page 127):**

The fact that the sale of the AL RAWADATAIN in January 1987 was used as an opportunity to obtain money under the guise of commission does indicate, as indeed their own evidence would suggest, that right from the outset Mr Al Bader and Capt Stafford (and Mr Qabazard as well after he became involved) were looking for ways to obtain money from the plaintiffs by means other than the back-to-back charters should they present themselves, but even if the original agreement did not encompass a scheme of that kind it rapidly developed to do so. Obtaining commissions in connection with the purchases of the *KATRINE MAERSK, KRISTINE MAERSK, ATLANTIC CONCORD* and *ATLANTIC CONQUEST* and the four newbuildings was no more than a continuation of the same basic method of operation.

**Scheme III (page 128)**

Finally I return to scheme III, the misappropriation of war risk premium returns. As I have said, I am satisfied that the arrangements under which returns of premium were paid by Sedgwicks to Clarksons and thence to Gulf Shipping were put in place by Mr Qabazard with the knowledge and approval of Mr Al Bader. However, in his interview Mr Qabazard said that he had begun to embezzle returns of war risk premium some time earlier by having them paid into the account of Porchester from which he could withdraw them at will. Documents in the trial bundles evidence the receipt from time to time of funds by Porchester from Sedgwicks and to that extent support what Mr Qabazard said. If his evidence to the prosecutors is reliable on this point, as I think it is, Scheme III was simply a means of ensuring that the returns of premium continued to flow after the Iraqi invasion had made access to banks in Kuwait impossible. To that extent it was simply a continuation in a different form of a scheme which had already been in operation for some time.

91.  In so far as they relate to Mr Al Bader and Mr Qabazard those conclusions are compelling. It was no doubt for that reason that it was initially decided not to challenge the judge's conclusions of fact on this appeal. That was a sensible decision because we see no reason to disagree with any of the judge's findings on the evidence before him so far as Mr Al Bader and Mr Qabazard are concerned. We shall consider the position of Captain Stafford separately below. We first turn to the new evidence relating to Gulf Shipping.

**The New Evidence – Gulf Shipping**

92.  The new evidence which is relevant to the appeals of Mr Al Bader and Mr Qabazard primarily relates to Gulf Shipping. It was disclosed by UBS London as a result of an order made comparatively recently by Thomas J. It shows that account 026 026 was established with Banque Cantrade in Geneva in the name of Gulf Shipping Limited in early July 1988. The account was opened through UBS London on the instructions of Mr Qabazard and was described in a letter dated the 7th July 1988 from UBS London to Banque Cantrade as a 'transit account'. Mr Brodie submitted that the new evidence shows that this was Mr Qabazard's account opened in the name of Gulf Shipping for Mr Qabazard's own purposes. We accept that submission up to a point. The evidence does indeed show that Mr Qabazard opened the account and that, as between Mr Qabazard and Gulf Shipping or the bank, it was Mr Qabazard who gave the instructions. Moreover it supports the conclusion that Gulf Shipping was Mr Qabazard's personal company.

93.  The new evidence further shows that Mr Qabazard was anxious to give instructions in code, presumably to avoid being identified. Thus there is a manuscript document written at various times by someone at UBS London which evidences the following. On the 7th July 1988 Mr Qabazard met UBS and deposited US$250,000 in traveller's cheques. The new account with Banque Cantrade was discussed. Mr Qabazard appears to have given instructions to UBS that it was to act on receipt of certain coded instructions. For example, if he mentioned 'Bond Street', UBS was to deposit a draft at Barclays Bank in Bond Street in favour of an account in the name of Mr Mohsin. References to the Gulf Shipping account were simply to be to 'Gulf'. Later, on the 17th March 1989 Mr Qabazard told UBS that the code 'Humberside' was to indicate instructions to deposit a draft at Captain Stafford's US dollar account with the TSB at Anlaby in Hull.

94.  Mr Malins submitted that the manuscript note showed that the Gulf account was indeed a distribution account since otherwise there was no explanation for the references to Mr Mohsin and Captain Stafford. Mr Brodie submitted, on the other hand, that there was no reference to Mr Al Bader and that the fact that Mr Qabazard was so secretive shows that the account was for his own benefit. In this regard these documents seem to us to invite at least as many questions as they answer. They show secrecy, but that is consistent with both sides' case. There is no explanation as to why Mr Qabazard contemplated payments to Mr Mohsin and to Captain Stafford. That fact would tend to support the judge's conclusion that Mr Qabazard was distributing monies to his co-conspirators. It is true that the note does not mention Mr Al Bader, but it is only one note and does not explain, for example, the letter of the 27th August 1989 or why Mr Qabazard paid Mr Al Bader the sums of US$1.15 million and US$8.67 million referred to below.

95.  The judge understandably paid particular attention to the letter of the 27th August 1989 referred to in paragraphs 85 and 86 above. There remains no convincing explanation why Mr Al Bader signed a letter on behalf of Yucatan instructing

the Burgan Bank to transfer US$2.3 million to the account of Gulf Shipping at Banque Cantrade in Geneva. Nor is there any convincing explanation why only a few days later on the 5th September 1989 Mr Qabazard transferred to Mr Al Bader's personal account the sum of US$1.15 million, which is of course half the sum of US$2.3 million which was transferred to Gulf Shipping's account in accordance with the instructions in the letter. It is, in our judgment, almost certain that even with this new evidence the judge would still have described Mr Al Bader's evidence about the letter as lamentable and held, as he did in the passage quoted in paragraph 86 above, that the obvious inference was that the payment of US$1.15 million to Mr Al Bader represented half of the money transferred to Gulf Shipping only a few days before.

96.   Equally we do not think that the judge would have changed his mind on two other crucial matters. The first is his conclusion that the instructions to transfer the commissions relating to the ATLANTIC vessels came from Mr Al Bader for the reasons given in the passage from his judgment quoted in paragraph 65 above. The second is his conclusion as to the provenance of the sum of US$8.67 million which was transferred from Mr Qabazard's UBS account in London to Mr Al Bader's UBS account in Geneva on the 8th May 1990, which was only a few days after US$7.12 million had been paid by Clarksons to Gulf Shipping from commissions on the first two new buildings. As stated in paragraph 68 above, the judge held that the overwhelming likelihood was that the US$8.67 million came from Gulf Shipping. That conclusion is not affected by the new evidence.

97.   It may be that in the light of the new evidence the judge would have been less likely to conclude that the Gulf Shipping account was opened on the instructions of Mr Al Bader or that Mr Qabazard did not have sole control over it, but the judge did not base his final conclusion on those considerations. As indicated in paragraph 87 above, the judge said that none of that really mattered so far as Mr Al Bader and Mr Qabazard were concerned if in fact they were participating in the dishonest transfer of funds away from the claimants into the hands of third parties. He held that they were and, in our judgment, he would not have changed his mind on that question. He would still have reached the conclusions which he did.

98.   Mr Brodie relied in particular upon the fact that the Clarkson account nos 1 and 2 were dealt with very differently and that account no 1 was used almost exclusively for transfers to Gulf Shipping, which he submitted that the new evidence showed was nothing to do with Mr Al Bader but was the vehicle used by Mr Qabazard for a fraud of his own. In support of that submission he analysed Mr Qabazard's UBS London account to show that as at August 1990 he had accumulated about £1.9 million and US$32 million, which was more than the cumulative total of known payments made by Gulf Shipping by that time, although the total of such payments included US$5,815,000, which the new documents show was the balance of the Gulf Shipping account as at the 15th August 1990. It was transferred direct from Gulf Shipping to Mr Qabazard's Geneva account and therefore apparently did not form part of the US$32 million. In October 1990 Mr Qabazard opened a personal account with Banque Cantrade in Jersey upon which his wife was a signatory, which it was submitted reinforced the inference that the Gulf Shipping account at Banque Cantrade in Geneva was also in effect his personal account. The sum of £1.9 million was first transferred to Jersey and then in November 1990 was transferred to UBS London and thence, together with US$34 million (which was no doubt the US$32 million plus interest), to his personal accounts at UBS Geneva.

99.   Mr Brodie submitted that since by that time Gulf Shipping had been receiving monies for over two years, if its account was really a distribution account or if (as submitted on behalf of the claimants) Mr Qabazard was really the treasurer for the other defendants, the money would have been distributed long before August 1990. It was fanciful to suppose that the other defendants would have been content to allow Mr Qabazard to accumulate huge sums and retain them in his personal accounts for years and to transfer them between his various accounts in different countries as if they were his own.

100.   We see the force of those submissions, which support the conclusion that Gulf Shipping was Mr Qabazard's company and that he had control over its account, but in our judgment they do not provide a sufficient basis for disturbing the conclusions reached by the judge. Indeed, as indicated above, they do not address the reasons which led him to conclude that Mr Al Bader was aware of the Gulf Shipping account, that he gave instructions for a transfer or transfers into it and that large sums which originated in it were paid via Mr Qabazard's personal account to Mr Al Bader's personal account. We agree with the reasons given by the judge for those conclusions and, in our judgement, the new evidence does not invalidate them. Moreover, the judge's reasons for rejecting the defendants' evidence about the strategic fund remain intact. In short the new evidence does not provide a sound basis for disturbing the judge's conclusion that Mr Al Bader was concerned in the dishonest diversion of funds from the claimants under all four schemes.

101.   Mr Malins went further. He submitted that, far from exonerating Mr Al Bader, the new evidence provides support for the judge's conclusions. In particular he relied upon two manuscript notes on the UBS London file which had almost certainly been prepared by the bank. He submitted that they showed the following. A sum of US$11,080,000 was expected into Mr Qabazard's UBS London account between the 1st and the 10th August 1990, which was to be distributed as follows. The sum of US$5,790,000 was to be transferred to Mr Al Bader's US dollar account at UBS Geneva and the sum of US$5,000,000

was to be put on fixed deposit until the 20th November 1990 for Mr Qabazard. The note also referred to two other smaller sums amounting to US$320,000, making a total of something over US$11 million. Mr Malins submitted that that was further evidence that part of Mr Qabazard's role was to distribute large sums of money to Mr Al Bader and that it was consistent with the conclusions reached by the judge as to the transfers of US$8.67 million and US$1.15 million discussed above.

102.   Mr Malins further pointed to the statements of Mr Al Bader's UBS dollar account which are now available in unredacted form. At the trial they were only disclosed in a redacted form because Mr Al Bader said that many entries were irrelevant. The bank statements show that on the 19th November 1990 a payment of US$5,700,000 was made into that account, which Mr Malins suggested was most of the US$5,790,000 which the manuscript note indicated was to be paid to Mr Al Bader. He submitted that that was consistent with the evidence of the payments arising out of the third and fourth new buildings. As indicated in paragraph 41 above, the contracts for those new buildings were made on the 19th July 1990, the sums of US$5,265,000 and US$550,000 were paid by Clarksons to Gulf Shipping on the 6th August but the sum of US$5,327,000 was not paid until the 19th October because of a delay in payment by Daewoo to Clarksons. Mr Malins submitted that those facts are consistent with the conclusion that over US$11 million were expected between the 1st and 10th August, but that the second substantial tranche was not in fact paid until October and that that was the origin of the US$5,700,000 which arrived in Mr Al Bader's account in November.

103.   Mr Brodie dismissed those submissions as pure speculation. He also pointed to the fact that by a letter of the 15th August 1990 Mr Qabazard instructed Banque Cantrade to transfer the balance of the Gulf Shipping account, namely US$5,815,000, which was of course the sum of US$5,265,000 and US$550,000, to his personal US dollar account at UBS Geneva. Mr Brodie submitted that there is no evidence that that amount ever went through London and that it would be very surprising if it did because the London accounts at that time were subject to emergency regulations as a result of the invasion of Kuwait, whereas the Geneva accounts were not. He submitted that the probabilities are that UBS London did not receive any money between the 1st and 11th August and that the US$32 million which Mr Qabazard had as at the 20th August did not include any sum received from Gulf Shipping between those dates.

104.   On the face of it, notwithstanding the points made by Mr Brodie, there seems to us to be considerable force in Mr Malins' submissions, but we agree with Mr Brodie that they involve an element of speculation. Also it is plain that the available evidence does not provide a complete picture of the way in which Mr Qabazard operated his various accounts. In these circumstances we do not think that it would be safe to draw the inferences which Mr Malins invites us to draw. On the other hand these particular documents certainly do not assist Mr Al Bader. They invite at least as many questions as they answer. In particular, why does the UBS memorandum, which does indeed seem to relate to August 1990, expressly note the sum of US$5,790,000 against Mr Al Bader's UBS account in Geneva, specifying the correct number? Was it paid or intended to be paid to Mr Al Bader? If so, why?

105.   In all the circumstances we have reached the conclusion that none of the new evidence relating to Gulf Shipping invalidates any of the judge's findings relevant to Mr Al Bader. On the contrary the judge's approach to the facts and his very detailed reasoning cannot be faulted, at least so far as Mr Al Bader is concerned. The same is true of Mr Qabazard, since it is not suggested that his position is improved by the new evidence. The position of Captain Stafford, on the other hand, is in some respects different from that of the other defendants, but before considering it, it is convenient to identify the relevant legal principles.

**Conspiracy - Legal Principles**

106.   The judge held that all three defendants were liable for the tort of conspiracy to injure by unlawful means. He held that under English law they were parties to a single actionable conspiracy wrongly to misappropriate the claimants' assets and that the damage caused by that conspiracy extended to the whole of the losses suffered by the claimants, save that Captain Stafford was not liable for the losses before September 1986 because he did not join the conspiracy until then. Mr Brodie submitted that the judge made a number of errors in his approach to the principles governing the tort of conspiracy to injure. He accepted that the tort of conspiracy is known to English law, but submitted that it was subject to important limitations.

107.   It is common ground that there are two types of actionable conspiracy, conspiracy to injure by lawful means and conspiracy to injure by unlawful means. The first is sometimes described simply as a conspiracy to injure and the second as a conspiracy to use unlawful means: see eg Clerk & Lindsell on Torts , 17th edition, paragraph 23-76. In our view they are both conspiracies to injure and their ingredients are the same, with one crucial difference. In both cases there must be conspiracy to injure the claimant, but in the first case (in which the means employed would otherwise be lawful) the predominant purpose

Kuwait Oil Tanker Co SAK v Al-Bader (No.3), 2000 WL 571379 (2000)

of the conspiracy must be to injure the claimant whereas in the second case, although the defendant must intend to injure the claimant, injury to the claimant need not be his predominant purpose.

108.  We shall treat them as different torts, although, as it seems to us, they are better regarded as species of the same tort. It matters not. For present purposes we would define them as follows:

- A conspiracy to injure by lawful means is actionable where the claimant proves that he has suffered loss or damage as a result of action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him, where the predominant purpose of the defendant is to injure the claimant.
- A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so.

We shall call them a 'lawful means conspiracy' and an 'unlawful means conspiracy' respectively.

109.  Those principles seem to us to be consistent with the authorities, including in particular *Lonrho Ltd v Shell Petroleum Co Ltd [1982] AC 173* and *Lonrho Plc v Fayed [1992] 1 AC 448* , which analyse the leading cases. See also for example *Rookes v Barnard [1964] AC 1129* , where (at page 1209) Lord Devlin drew a clear distinction between the two types of conspiracy.

110.  It is important to note that the tort of conspiracy to injure by unlawful means is different in significant respects both from the crime of conspiracy and from the law of contract. A criminal conspiracy is in essence an agreement to commit a crime and, as such, is complete when the agreement is made, whether or not it is carried out. For this reason care must be taken in considering decisions in criminal cases where (as here) the question is whether the tort of conspiracy was committed. Lord Diplock put it in this way in Lonrho v Shell (at page 188):

> Regarded as a civil tort, however, conspiracy is a highly anomalous cause of action. The gist of the cause of action is damage to the plaintiff; so long as it remains unexecuted the agreement, which alone constitutes the crime of conspiracy, causes no damage; it is only acts done in execution of the agreement that are capable of doing that. So the tort, unlike the crime, consists not of agreement but of concerted action taken pursuant to agreement.

In that passage Lord Diplock appears to have been referring to both types of conspiracy. The essence of the unlawful means conspiracy is injury to the claimant as a result of an unlawful act or acts where two or more people have combined to cause the injury. It is not necessary that every overt act is done by every conspirator, but the act must be done pursuant to the conspiracy or combination.

111.  A further feature of the tort of conspiracy, which is also found in criminal conspiracies, is that, as the judge pointed out at page 124, it is not necessary to show that there is anything in the nature of an express agreement, whether formal or informal. It is sufficient if two or more persons combine with a common intention, or, in other words, that they deliberately combine, albeit tacitly, to achieve a common end. Although civil and criminal conspiracies have important differences, we agree with the judge that the following passage from the judgment of the Court of Appeal Criminal Division delivered by O'Connor LJ in R v Siracusa (1990) 90 Cr. App. R. 340 at 349 is of assistance in this context:

Secondly, the origins of all conspiracies are concealed and it is usually quite impossible to establish when or where the initial agreement was made or when or where other conspirators were recruited. The very existence of the agreement can only be inferred from overt acts. Participation in a conspiracy is infinitely variable: it can be active or passive. If the majority shareholder and director of a company consents to the company being used for drug smuggling carried out in the company's name by a fellow director and minority shareholder, he is guilty of conspiracy. Consent, that is agreement or adherence to the agreement, can be inferred if it is proved that he knew what was going on and the intention to participate in the furtherance of the criminal purpose is also established by his failure to stop the unlawful activity.

Thus it is not necessary for the conspirators all to join the conspiracy at the same time, but we agree with the judge that the parties to it must be sufficiently aware of the surrounding circumstances and share the same object for it properly to be said that they were acting in concert at the time of the acts complained of. In a criminal case juries are often asked to decide whether the alleged conspirators were 'in it together'. That may be a helpful question to ask, but we agree with Mr Brodie that it should not be used as a method of avoiding detailed consideration of the acts which are said to have been done in pursuance of the conspiracy.

112.  In most cases it will be necessary to scrutinise the acts relied upon in order to see what inferences can be drawn as to the existence or otherwise of the alleged conspiracy or combination. It will be the rare case in which there will be evidence of the agreement itself. Curiously this is such a case, although it appears to us that in crucial respects it is also necessary to draw inferences as to the extent of the agreement from what happened after it. Thus the essential nature of the agreement can be seen in part from the evidence of Mr Al Bader and Captain Stafford, although, especially in the case of Captain Stafford, the extent of the agreement will depend upon inferences to be drawn both from the surrounding circumstances and subsequent events.

113.  We turn to Mr Brodie's submissions, which may be summarised as follows:

- The tort of conspiracy is subject to important limitations.
- The relevant intention cannot be inferred from the acts complained of.
- When the acts complained of amount to individual torts committed by joint tortfeasors, any prior 'conspiracy' merges in the underlying torts and should not be relied on as a separate tort or remedy.
- The claimants case was not properly pleaded or advanced.

We shall consider these submissions in turn.

*Limitations on the Tort.*

114.  Mr Brodie submitted that the tort of conspiracy is limited to the class of case where the claimant is injured in his trade or business. He drew attention to the fact that conspiracy is a comparatively modern tort which has been developed in the context of trade disputes and industrial relations disputes. It is true that in the case of lawful means conspiracy the tort has been developed principally in that sphere, but there is no authority to support Mr Brodie's submission in the context of an unlawful means conspiracy and we cannot accept it.

115.  The lawful means conspiracy has been described as a curious and anomalous tort because it makes two people liable for an agreement to do an act which would be permissible if done by one: see eg the classic passage in the speech of Lord

Diplock in Lonrho v Shell at pages 188 to 189. However, Lord Diplock, with whom the other members of the Appellate Committee agreed, made it clear that it is too late to discard it. He said (at page 189C):

> The civil tort of conspiracy to injure the plaintiff's commercial interests where that is the predominant purpose of the agreement between the defendants and of the acts done in execution of it which caused damage to the plaintiff is too well-established to be discarded however anomalous it may seem today.

116.  In the light of the subsequent decision of the House of Lords in Lonrho v Fayed the part of Lord Diplock's speech just quoted must, we think, be read as relating only to lawful means conspiracies, whereas the instant case is an unlawful means conspiracy. The same is true of the next part of Lord Diplock's speech upon which Mr Brodie relied. Lord Diplock said (at page 189F):

> This House, in my view, has an unfettered choice whether to confine the civil action of conspiracy to the narrow field to which alone it has an established claim or whether to extend this already anomalous tort beyond those narrow limits that are all that common sense and the application of the legal logic of the decided cases require.
>
> …. I am against extending the scope of the civil law of conspiracy beyond acts done in execution of an agreement entered into by two or more persons for the purpose not of protecting their own interests but of injuring the interests of the plaintiff.

On the facts of Lonrho v Shell the means used were not tortious or otherwise actionable at the suit of the plaintiff but were unlawful because they were breaches of a sanctions order which gave rise to criminal penalties. In these circumstances it is perhaps not surprising that in the light of the passages in Lord Diplock's speech quoted above this court held in *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1990] 1 QB 391* that it was bound by Lonrho v Shell to hold that even in an unlawful means conspiracy the sole or predominant purpose of the conspirators must be to injure the plaintiff.

117.  However, that part of the decision in Metall und Rohstoff was overruled in Lonrho v Fayed. Lord Bridge gave the only speech with which the other members of the Appellate Committee agreed, although Lord Templeman added that the tort might require further analysis and reconsideration in the future. Lord Bridge referred to a number of the leading cases and concluded that Lord Diplock (with whom he himself had agreed) did not intend to lay down a rule of law that the tort of conspiracy to injure required proof in every case not merely of an intention to injure the plaintiff but also that injury to the plaintiff was the predominant purpose of the conspiracy. Such a view would have been inconsistent both with the view of Lord Denning MR in this court expressed in a judgment which the House was approving and with what Lord Diplock had described as Viscount Simon LC's now classic speech in *Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] AC 435* at 439. Lord Bridge said (at page 466F) that the reason for the decision in Lonrho v Shell was the absence of any intention to damage Lonrho. (Our emphasis).

118.  In our view, the effect of the two Lonrho cases is simply that, in order to establish an unlawful means conspiracy, it is necessary to establish an intention to injure the claimant but not a predominant intention or purpose to do so. Immediately after quoting a passage from the speech of Lord Diplock in which he emphasised the anomalous nature of the tort, Lord Bridge said (at page 464C) that the reasoning which led to that conclusion had no relevance to the unlawful means type of conspiracy. Whatever limitations may be required in relation to a lawful means conspiracy, so far as intention to injure the claimant's interest is concerned, there is in our judgment no reason whatever for introducing into the case of an unlawful means conspiracy a restriction of the kind suggested by Mr Brodie, especially where the unlawful means would themselves be actionable in tort.

© 2020 Thomson Reuters.

119.  Mr Brodie submitted that in such a case the conspiracy merges in the tort and is not separately actionable. We consider that submission below, but, assuming that it is wrong and that such a conspiracy is in principle actionable, we can see no reason to restrict it in the way suggested. On the contrary, a conspiracy to injure by unlawful means should in principle be actionable, especially if (as here) it expresses the true nature and gravamen of the case against the defendants. We would add that a restriction of the kind suggested would work oddly. Mr Brodie submitted that the claimants here would fail because they were such a large organisation and of such wealth that even a conspiracy of the magnitude found by the judge would not significantly affect their trade or business. Even if we thought that some restriction of the kind suggested by Mr Brodie should be introduced into this area of the law, we do not think any such principle could justify a distinction between rich and poor claimants of that kind.

*Proof of Intention*

120.  Mr Brodie submitted that, in order to succeed, the claimant must prove that the particular defendant and the other conspirator or conspirators intended to injure the claimant and that such an intention could not be inferred from the acts themselves. For the reasons already given we accept the submission that such an intention must be proved, as held by the House of Lords in the two Lonrho cases. We cannot, however, accept the second part of the submission. In many contexts it will be necessary in order to prove intention to ask the court to infer the relevant intention from the primary facts. We can see no reason why there should be a special rule of evidence in this situation. On the contrary, in the case of most conspiracies to injure by tortious means it will be clear from the acts of the conspirators that they must have intended to injure the claimant. In the case of a conspiracy to defraud by wholesale misappropriation it would be absurd to argue that the conspirators did not intend just that.

121.  Mr Brodie was not able to produce any authority in support of his proposition. We are not surprised. An example of such an inference being drawn in a similar field is in Bourgoin SA v Minister of Agriculture [1986] 1 QB 716 Oliver LJ said (at page 777), in a part of his judgment with which both Parker and Nourse LJJ agreed:

If an act is done deliberately and with knowledge of the consequences, I do not think that the actor can say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them.

The facts of the instant case are a good example. On the judge's findings of fact the defendants' principal purpose was no doubt to line their own pockets, but they cannot be heard to say that they did not intend to injure the claimants or that their acts were not aimed at the claimants. In all the circumstances we are unable to accept Mr Brodie's submissions under this head.

*Merger*

122.  Mr Brodie submitted that, when the conspiracy is to injure by the commission of a tort, the conspiracy merges with the tort and the claimant cannot or should not therefore sue for the conspiracy. In support of this proposition he relied mainly upon two statements of principle by Lord Denning and upon a decision of the Supreme Court of Western Australia. He also relied upon this statement by Lord Dunedin in *Sorrell v Smith [1925] AC 700* (at page 716):

> …. If a combination of persons to do what if done by one would be a tort, an averment of conspiracy so far as founding a cause of action is mere surplusage.

That statement is helpful as far as it goes, but it does not follow that two torts may not exist side by side. Lord Dunedin was certainly not advancing any doctrine of merger.

123.  In *Ward v Lewis [1955] 1 WLR 9* this court refused leave to amend a statement of claim in a slander action by adding an allegation of conspiracy. As we read the judgments leave was refused because no sufficient nexus had been alleged between the conspiracy or the slander and the loss. However in the course of his judgment Denning LJ said (at page 11):

> It is important to remember … that when a tort has been committed by two or more persons an allegation of a prior conspiracy to commit the tort adds nothing. The prior agreement merges in the tort.. A party is not allowed to gain an added advantage by charging conspiracy when the agreement has become merged in the tort.

We agree that a party must not obtain an illegitimate advantage by alleging a conspiracy, but, for the reasons given below, we are of the opinion that there may be good reasons for alleging a conspiracy and not (or not only) the underlying torts. We do not read Denning LJ's view that a conspiracy merges in the tort as part of the *ratio decidendi* of Ward v Lewis. Nor do we consider that it has gained general recognition.

124.  The same is true of a similar statement made by Lord Denning MR in this court in Lonrho v Shell , unreported, 6th March 1981. He said (at page 4):

> It is not every agreement to do an unlawful act which gives rise to a civil action if it causes damage. There is no difficulty, when the unlawful act is one which itself gives rise to a cause of action: such as a tort, or a breach of statutory duty (like the Factories Act). In such cases there is no need – and no place – for an action for conspiracy. It merges in the tort or breach of statutory duty.

Again we do not read that statement as part of the *ratio decidendi*. Indeed it is of interest to note that when, in Lonrho v Fayed , Lord Bridge quoted from that judgment he did not include that passage. It is perhaps fair to note that Fox LJ said (at page 20):

> It seems to me that where the unlawful act itself confers a right of action, as would be so if the act were tortious, there is no need for an action for conspiracy in respect of it".

He said that in the context of a discussion of whether intention to injure was a necessary ingredient in the tort. Moreover he did so in a case in which the unlawful means were not tortious but criminal and made no reference to the notion of merger.

125.  Mr Brodie also relied upon the decision of the Supreme Court of Western Australia in Galland v Mineral Underwriters Ltd [1977] WAR 116 , where the court struck out a claim for conspiracy to commit the tort of conversion on the ground that it was embarrassing and unnecessary. Burt CJ said (at page 119) that if a tort is committed by a number of people acting together and in concert to achieve a common end which is an actionable tort, then each is a joint tortfeasor and each is severally as well as jointly liable to the plaintiff for the resulting damage. We respectfully agree with that proposition. Burt CJ identified the question in the appeal as whether a conspiracy to commit a tort when carried into effect is actionable both as an independent tort, ie the tort of conspiracy, as well as being actionable simply as a tort committed by a number of people acting together to that common end. His answer was no. He put it thus (at page 120):

> I know of no authority which directly supports my opinion, but it seems to me that the answer to that question should be that on those assumptions the appellant has committed one tort and that is the tort of conversion. I say that because, although proof of the agreement is required to implicate the appellant in the commission of the tort and to reveal him to be a joint tortfeasor, it is not an element in the cause of action and hence falls outside the ground covered by the tort of conspiracy.

© 2020 Thomson Reuters.

We have had some difficulty in following that last sentence.

126.  In that case the allegation of conspiracy was struck out as embarrassing. The court's view was that it added nothing to the allegation of conversion. So far as the differing role of joint tortfeasors is concerned, Burt CJ said (at page 123):

> Once an agreement to commit a tort is found and it is found that the tort has been committed pursuant to and in the execution of the agreement then all the parties to that agreement, I think, are joint tortfeasors and it matters not that one party was not actively engaged in the commission of the tort.

We entirely agree with that last statement, but we are unable to agree that a conspiracy to commit a tort in any sense merges in the tort or that a claimant is precluded as a matter of law from alleging both the conspiracy and the tort.

127.  The Federal Court of Australia in Brisbane has recently refused to follow Galland . In State of Queensland v Pioneer Concrete (Qld) Ltd [1999] FCA 499 Drummond J gave these reasons in paragraphs 113 and 114 of his judgment:

> 113  There seems to me no convincing reason why it should not be open to a plaintiff to sue in the alternative both on a conspiracy to commit a tort and on the joint tort. It is true that, by suing on a conspiracy, the plaintiff may obtain procedural advantages not available if it were to sue only on the joint tort ultimately committed. See, eg Ward v Lewis at 56. But it is not apparent why that must necessarily involve an abuse of the process of the court that warrants striking out the conspiracy claim. A plaintiff obtains the advantage of not having to prove actual or threatened damage if it claims an injunction under the Trade Practices Act on the basis that the defendant has contravened s 52 , whereas he must prove damage if he brings a passing off action on the same conduct: see Central Equity Ltd v Central Corporation Pty Ltd (1995) ATPR P41-443 at 40,997-40,998. But that does not justify confining the plaintiff to the cause of action upon which it is more difficult for it to succeed. There are many instances where the courts have countenanced an action on an unlawful act conspiracy to commit a joint tort, without any concern that the so-called doctrine of merger prevents that course being followed. In Jervois Sulphats (NT) Ltd v Petrocarb Explorations NL (1974) 5 ALR 1 at 33, Forster J saw nothing wrong with the plaintiff suing on such alternative causes of action, so long as it did not have two sets of damages in respect of the same tortuous acts "one for the acts themselves, another for the conspiracy to commit them". Concerns, often well founded, about the fairness of prosecutors charging criminal conspiracies when they can rely on charges of substantive offences are not, in my opinion, sufficient to justify denying an injured plaintiff the right to choose its remedy. It is those concerns that may be at the root of this co-called doctrine of merger, as Goodman , ibid, suggests.
>
> 114  This is not to say that, in particular circumstances, a plaintiff may, by suing on a conspiracy to commit a joint tort rather than on the tort itself, abuse the process of the Court. It was submitted by the fourth and fifth respondents that the conspiracy claim was here brought to gain a forensic advantage in so far as it was suggested that damages for conspiracy can be recovered on a more generous basis than damages for the underlying joint tort: see McGregor on Damages , 16th ed, par 1936. However, even if this is so, I cannot see why a plaintiff should be denied a full remedy for the defendant's wrongful conduct because a less generous one is available. I reject this submission.

We agree with that reasoning.

© 2020 Thomson Reuters.

128.  Save as above, there is no suggestion in the many cases which discuss unlawful means conspiracy that the unlawful means exclude actionable torts. The indications are to the contrary. Thus, for example, in Lonrho v Shell in this court Eveleigh LJ quoted with approval this sentence from the 17th edition of Salmon on the Law of Tort (at page 379):

> A second form of actionable conspiracy exists when two or more combine to injure a third person by unlawful means – eg the commission of a crime or tort , or the infringement of a guaranteed constitutional right. (Our emphasis)

Indeed in recent times the debate has not been, as here, whether a conspiracy can be alleged where the unlawful means are tortious, but, as Waller LJ put it in *Surzur Overseas Ltd v Koros [1999] 2 Lloyd's Rep 611* at 616, whether, where a plaintiff alleges a conspiracy to injure using unlawful means, those unlawful means have to be actionable at the suit of the plaintiff. Waller LJ referred to inconsistent dicta on that question, but the whole debate proceeded on the assumption that if the unlawful means are actionable an allegation of unlawful means conspiracy is maintainable. Thus Waller LJ (with whom Hirst and Aldous LJJ agreed) ended by saying (at page 617):

> What is clear, in my view, is that it is eminently arguable that in an unlawful means conspiracy the unlawful means do not have to be actionable at the suit of the plaintiff. (Our emphasis)

Finally, it is perhaps significant that in Lonrho v Fayed the House of Lords allowed the conspiracy allegation to proceed on the assumption that it would stand or fall with the alleged tort of interference with business by unlawful means.

129.  In these circumstances we have reached the conclusion first that there is no authority which binds us to hold that where the unlawful means are tortious the conspiracy merges in the tort and secondly that we should not do so. We are pleased to reach that conclusion because the contrary view would lead to an anomalous situation and because there are many cases, of which this is one, in which it may be properly advantageous to the claimant to allege a conspiracy and where such an allegation will describe the true position much more appropriately than to require the claimant to rely only upon the individual torts.

130.  Any other view would be anomalous because it seems to us to make no sense to permit a claimant to sue for conspiracy to injure by unlawful means where the unlawful means are criminal or a breach of contract but not where they are tortious. The unlawful means may be both tortious and criminal or both tortious and a breach of contract or all three. Or in a case of this kind A and B may conspire to injure C by a breach of contract by B such that B would be liable for the breach of contract but A would be liable in tort for inducing the breach of contract. We are far from sure how the doctrine of merger would or could operate in such a case. Moreover we can see no reason in principle to restrict the tort in this way.

131.  On the contrary there are good reasons for not doing so. To allege a conspiracy to defraud may describe the events in the fairest and most sensible way. As Mr Malins showed, there are now a number of cases in which the courts have recognised that the tort of conspiracy to defraud exists without any suggestion that it does not because the claimant could have sued in the tort of deceit. Mr Malins submitted that one good reason for permitting such a claim to be advanced in a case like this is that it enables the double actionability rule to be applied both more easily and more sensibly. As the judge correctly held, for the purposes of that rule, the court must ascertain where the substance of the cause of action arose: see eg *Distillers Co Biochemicals Ltd v Thompson [1971] AC 458* and *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette [1990] 1 QB 391* per Slade LJ at 443F and 446C. The application of that principle will yield one relevant law (in addition perhaps to English law) in a conspiracy case, whereas if the claimant is bound to sue separately for each of the underlying torts many different laws might be held to apply, even though the gravamen of the case, when viewed as a whole, may be the conspiracy. Such an approach would not in our view make sense.

132.  For these reasons we reject the submission that the claimants were not entitled to claim damages for conspiracy, but we stress that that does not mean that their case must not be properly proved. That involves proving each of the elements in the

*Kuwait Oil Tanker Co SAK v Al-Bader (No.3), 2000 WL 571379 (2000)*

tort, including the nature of the agreement, the unlawful means alleged, each unlawful act relied upon as causing loss and the fact that each such act was carried out pursuant to the conspiracy. The authorities show that the claimants must indeed prove those facts: see eg *Bird v O'Neal [1960] AC 907* and *Huntley v Thornton [1957] 1 WLR 321* . In the former case Lord Tucker said that the defendants might have been held liable

> by looking to see what part, if any, each defendant had played in connection with each specific incident when threats or intimidation had been used and then considering whether such part necessarily compelled the inference that the particular appellant was party to a conspiracy to use unlawful means to further the object of the picketing and thereby create a nuisance.

In Huntley v Thornton Harman J said (at page 343):

> No doubt it is not necessary that all the conspirators should join at the same time, but it is, I think, necessary that they should know all the facts and entertain the same object.

133.  It does not follow from the above that each defendant must personally take part in every act so long as it is done pursuant to the agreement. Moore-Bick J put the matter in this way (at page 126):

> Of course, as in any case of this kind, it is necessary to examine the evidence with care to see whether each defendant was involved in each fraudulent transaction, but once one reaches the conclusion that the defendants combined to steal from their employer by whatever means might present themselves, the question in relation to any particular scheme or enterprise in which only one or some of them can be shown to have directly participated is whether that enterprise fell within the overall scope of their common design. If several people agree to enable each other to steal from their employer, lending their support in different ways at different times and taking different shares of the proceeds (or even each retaining for himself what he takes), each of them is party to the agreement pursuant to which all the thefts take place. In those circumstances there is in my judgment no need for each to be fully aware of the circumstances of each theft in order for him to be liable as a conspirator provided that the theft in question falls within the scope of their agreement.

We agree with those conclusions but stress the need for proof to the relevant standard at every stage.

*Claimants' case properly pleaded?*

134.  Mr Brodie submitted that the claimants' case was not properly pleaded or advanced because it led to a broad brush approach which in turn led to what was described in argument as an ambulatory conspiracy and thus to a lack of reality. This criticism was advanced particularly with regard to Captain Stafford because it led (it was submitted) to his being unfairly held liable for events which were, for example, the subject of Scheme III and which took place long after he had left Kuwait and retired to Australia. It was submitted that the logic of the broad brush approach was that if, for example, two people agree one day to steal and then, say twenty years later, the two not having met in the meanwhile, one commits a burglary without the knowledge or assistance of the other, they are both jointly and severally liable for the burglary because it was within the scope of the common design.

135.  While there were moments during the course of the argument when Mr Malins' submissions seemed to drive him to just such a proposition, it was not the approach of the judge. Nor would it be correct. In our judgment the case was properly

© 2020 Thomson Reuters.

pleaded and advanced by the claimants at the trial both in the tort of conspiracy and as individual breaches of fiduciary duty. Moreover, as we said earlier, every incident was investigated in the evidence and almost every incident was analysed in the judgment.

136.   The judge approached the matter correctly in principle. He considered what agreement was made at the outset, partly by reference to the evidence about what was said at the time and partly by inference from what happened thereafter. He then asked himself whether each of the transactions which made up the four schemes was carried out pursuant to the conspiracy and concluded that the defendants were all parties to a single actionable conspiracy. He then considered whether Captain Stafford at any stage left the conspiracy. In our judgment that was the correct approach, although (as explained below) we have reached the conclusion that in one important respect the judge did not correctly identify the true nature of the conspiracy and that the question whether Captain Stafford left the conspiracy did not have to be considered. We do not consider that there was any unfairness in the way that the judge approached the case or, indeed, in the way in which it was advanced at the trial. The defendants had no doubt at each stage what case they had to meet.

### Conspiracy - Application of Legal Principles to the Facts

*Mr Al Bader and Mr Qabazard.*

137.   Application of the legal principles to the facts leads clearly to the conclusion that the judge was correct to hold that both Mr Al Bader and Mr Qabazard were liable for damages for conspiracy to injure by unlawful means. Once the strategic fund defence was rejected and it was held (in our view correctly) that Mr Al Bader was aware of the Gulf Shipping account and that he received substantial sums from Mr Qabazard, almost certainly out of that account, and given the detailed findings of dishonesty made by the judge, as summarised in the quotations in paragraph 90 above, there was no alternative but to hold that the losses under all four schemes were part of the conspiracy and that Mr Al Bader and Mr Qabazard were liable for them. We turn to Captain Stafford.

*Captain Stafford.*

138.   It is of particular importance in the case of Captain Stafford to identify the terms of the original conspiracy or combination. The judge held that the agreement from the outset was dishonestly to misappropriate the claimants' assets, or put more generally, to defraud them. The agreement was initially made between Mr Al Bader and Mr Qabazard in late 1985 and Captain Stafford joined it in September 1986. The judge correctly considered the evidence as to what agreement was made at that stage. As indicated in paragraphs 74 and 75 above, he held that the discussions at which Sheikh Ali, Mr Al Bader and Captain Stafford were present involved discussion of three particular methods of raising money, namely creating differences of hire under the back to back charterparties, taking sums by way of commission on the sale and purchase of tankers and taking commissions on newbuildings. The judge rejected their evidence that the purpose of the schemes was not their enrichment but to feed the strategic fund. We have already expressed our view in paragraph 75 that the evidence of Mr Al Bader and Captain Stafford provided strong support for the conclusion that there was from the outset an agreement to divert monies by what became Schemes I and II and for the further conclusion that the essence of the agreement was that the defendants would defraud the claimants by whatever means came to hand.

139.   Further the judge held that Captain Stafford played a significant part in the detail of Scheme I, including the commissions and the extra war risk premiums and crew bonuses: see paragraphs 47 to 50 above. He also held that Captain Stafford was aware of all the Clarksons' accounts and that he was concealing much of what he knew both about the way in which the accounts were operated as well as his own role in relation to them: see paragraphs 51 to 53. Apart from the sum of US $100,000 paid into Captain Stafford's TSB account at Anlaby on the March 1987 (referred to in paragraph 17), there is no evidence that he received monies from Scheme I, but he received traveller's cheques both from Clarksons and from Scheme IV. Although the evidence suggests that Captain Stafford received substantially less out of the various schemes than either Mr Al Bader or Mr Qabazard, he admitted receiving traveller's cheques totalling US$1.24 million as and when it became apparent that the claimants could prove such receipt. The judge rejected Captain Stafford's evidence that the traveller's cheques were legitimate bonuses: see paragraph 56. In our judgment the judge was justified in holding that Captain Stafford dishonestly played a part in Scheme I and that he was liable in respect of the claimants' losses under Schemes I and under Scheme IV before he left Kuwait. It should be noted that the judge expressly held that there was no evidence that he received any further money derived from Scheme IV after he left Kuwait: see paragraph 61.

140.   Scheme II began in about May 1989 after Scheme I came to an end because there were no longer any relevant charterparties. The judge expressed his conclusions as to Captain Stafford's involvement in Scheme II in this way (at page 75):

Capt Stafford denied that he was involved in any of the arrangements which make up scheme II and in truth there is very little direct evidence to support the conclusion that he was, other than such inferences as one can draw from the fact that the majority of the funds found their way to Gulf Shipping. If Mr Malins is right in saying that Gulf Shipping was an account which had been set up for the purposes of distributing the proceeds of fraud to the different conspirators, including Capt Stafford, then the fact that funds derived from the various sale and purchase transactions found their way to Gulf Shipping would tend to show that Capt Stafford was implicated in Scheme II along with others who can be shown to have benefited from earlier dishonest transactions. That is something to which I shall return when I consider the position of Gulf Shipping generally. Apart from that, however, Mr Malins could only point to the fact that raising money through commissions on the sale and purchase of vessels was one method which Capt Stafford said had been specifically discussed at the meeting with Sheikh Ali so that he could be expected to be involved in it if it did ever take place; that he received some money in the form of traveller's cheques obtained out of the commission on the Al Rawadatain , and further substantial sums in traveller's cheques during the summer of 1989 when the purchase of the Maersk vessels was being negotiated; and that he attended a dinner at the Savoy to celebrate the handing over of those vessels. None of these seems to me to take the matter very far. The fact that this method of raising money had been discussed (if indeed it was) does not necessarily make it any more likely that Capt Stafford was directly involved in implementing these arrangements. Whether he was personally involved in any scheme would presumably depend on its particular nature. Mr McCoy doubted whether Capt Stafford had been involved in the raising and disposing of commissions and I can see no reason to think that his involvement was necessary. The receipt of traveller's cheques simply raises the question whether, as he said, all the payments he received in that manner were bonuses which is a matter which I shall come to consider a little later. I can attach no significance to Capt Stafford's presence at the dinner at the Savoy: there could be many innocent explanations for that. In the end the plaintiffs have failed to satisfy me that Capt Stafford played any active part in obtaining funds by these means or that he benefited from them other than through the receipt of traveller's cheques obtained in connection with the Al Rawadatain .

141.  We have quoted the judge's conclusions as to Captain Stafford's knowledge of the Gulf Shipping account in paragraph 88 above, but it is convenient to repeat them here. He said:

Evidence of how the Gulf Shipping account was operated could, on the other hand, affect the position of Capt Stafford if it established that Gulf Shipping was a distribution account from which he also benefited. In fact, however, Capt Stafford's connection with Gulf Shipping is far less well established. There is no clear evidence showing when the Gulf Shipping account was set up, other than the fact that the first transfer occurred in July 1988 when US$232,000 was transferred from Account No 1, and no direct evidence to show that he received any part of the funds which were paid into it. However, in view of the close co-operation between Capt Stafford and Mr Al Bader in relation to the back-to-back charter arrangements I find it difficult to accept that he did not know of the existence of Gulf Shipping and the fact that funds were being transferred to it.

As indicated above Mr Brodie submitted that in order to hold Captain Stafford liable it was not sufficient to say that it is difficult to accept that Captain Stafford did not know of the Gulf Shipping account or that funds were being transferred to it. We accept the submission that, if they are to rely upon them, the claimants must prove that Captain Stafford knew those facts.

142.  The problem here from the claimants' point of view is that there is no evidence that Captain Stafford benefited from the Gulf Shipping account and, with the one exception of the traveller's cheques obtained in connection with the AL RAWATADAIN, that he received anything directly from Scheme II. The essence of the judge's conclusion that Captain

Stafford was liable for Scheme II is, however, that the original agreement expressly contemplated such a scheme, that in these circumstances there can be no doubt that Scheme II (which naturally followed Scheme I) was operated pursuant to the conspiracy to defraud the claimants which Captain Stafford joined in about September 1986 and that he received both monies out of the traveller's cheques obtained out of the commission on the AL RAWADATAIN and substantial monies in the summer of 1989 when the purchases of the MAERSK vessels were being negotiated. As the judge put it on page 128 (albeit in the context of Scheme IV) in a passage quoted in paragraph 90 above:

> Although there is no direct evidence that Capt Stafford was involved in implementing any of the transactions, all three defendants were working closely together throughout the period between 1986 and September 1989 when Capt Stafford left Kuwait and I am satisfied that during that time they were all aware of, and lent their support to, all the various schemes that were employed from time to time. The close relationship between them arising out of the back-to-back charter arrangements makes it impossible to believe that any one of them was kept in the dark about what others were doing, but apart from that there is the evidence that Capt Stafford received several substantial blocks of traveller's cheques obtained through the frauds based on the forged Clarksons and Brown & Root invoices. These schemes were little more than developments of the original enterprise underlying Scheme I. In any event, I am satisfied that all three defendants knew of them and lent their support to them. The transfers to Gulf Shipping from the accounts of Porchester and Yucatan all occurred during the period between August 1988 and September 1989 and I am satisfied that they represented thefts falling within the scope of the agreement to which all the defendants were parties.

Captain Stafford's own evidence shows that he knew about Scheme II. In our judgment, the judge was justified in concluding that Scheme II was simply one of the 'various schemes that were employed from time to time' to which Captain Stafford lent his support and from which he benefited at least indirectly by dishonest receipt of traveller's cheques.

143.  We have reached the conclusion that the judge was right to hold on the evidence available at the trial that Captain Stafford was liable for the losses sustained by the claimants under Scheme II while he was still in Kuwait. However, in our judgment the position is different once Captain Stafford left Kuwait and retired to Australia. There is nothing in the evidence of the agreement itself which supports the conclusion that the agreement either expressly or impliedly contemplated that the various conspirators would continue to take part in the conspiracy once they had ceased to be engaged or employed by the claimants.

144.  Although we have expressed the view that a conspiracy of this kind should not be approached as if it were a contract, it is nevertheless appropriate to consider it in its context. In September 1986 Captain Stafford was an expatriate working for the claimants. He was likely at some future date to leave Kuwait and live elsewhere. In these circumstances he would be unlikely to be able to play any part in any scheme to defraud the claimants once he had left. Nor is there reason to suppose that such participation was anticipated. It is not therefore surprising that that there is no evidence that the agreement was that he would do so. In these circumstances, if it is to be held that, so far as Captain Stafford was concerned, the conspiracy extended to any period after he left Kuwait, such a conclusion must be inferred from the overt acts carried out pursuant to the alleged conspiracy.

145.  Captain Stafford left Kuwait at about the beginning of September 1989. The losses sustained by the claimants in respect of Scheme II, except for those referable to the MAERSK vessels, and all the losses sustained by them in respect of Scheme III were suffered after he left. A small proportion of the losses under Scheme IV were also sustained after August 1989. Before the judge it was submitted by the claimants that Captain Stafford was liable in respect of those losses because they were sustained as a result of the conspiracy to defraud the claimants by whatever means came to hand and that he at no time left the conspiracy. The judge essentially accepted that submission.

146.  The judge's conclusion in this regard can be seen from his approach to Scheme III. When considering the position of Captain Stafford he said (at page 79):

© 2020 Thomson Reuters.

Apart from the fact that virtually all the funds were transferred to Gulf Shipping, there is nothing to support the conclusion that Capt Stafford was involved in Scheme III. Mr Qabazard did not mention him in connection with it in any of his interviews and there is nothing in the documents to suggest that he was directly involved. The opportunity for him to become involved no doubt existed because at the time the arrangements were put in place he was in London assisting Mr Qabazard and others to deal with KOTC's affairs. Mr Malins submitted that if Capt Stafford co-operated with Mr Al Bader and Mr Qabazard in setting up and sharing the proceeds of schemes I and II, it is likely that he also co-operated in and benefited from scheme III. However, opportunity is one thing, active participation another. The plaintiffs have failed to satisfy me that Capt Stafford played any active role in diverting war risk premium rebates away from KOTC or that he obtained any benefit from Scheme III.

The judge thus held that the claimants had failed to establish that Captain Stafford played any part in or received any benefit from Scheme III. However, the judge held Captain liable in respect of Scheme III because he had not withdrawn from the conspiracy.

147. He considered the principles relevant to withdrawal from a conspiracy of this kind (at pages 136 to 139) and then concluded that Captain Stafford had not effectively withdrawn in these terms (at pages 139 to 140):

There is no evidence that Capt Stafford received any money after he left Kuwait other than the sum of US$25,000 which he was paid for the assistance he gave to KOTC at the time of the Iraqi invasion, but he has continued to maintain close links with Mr Al Bader who has funded his defence to this action and it would hardly be surprising if someone with as much knowledge as he had of a dishonest conspiracy continued to receive some benefits from it. The evidence does not enable me to make a finding that he has done so, but equally, I am unable to go so far as to make a positive finding that he has not. The frauds based on falsified Brown & Root invoices continued for a few months after his departure, but they were merely a continuation of a method which had already been in use for a year and did not involve any departure from the plan as it had by then developed. The main frauds which occurred after his absence involved the purchases of additional second-hand tankers and the four new buildings (Scheme II) and the diversion of the war risk premium rebates to Clarksons (Scheme III). All those frauds were within the contemplation of the original conspiracy, but even if there were any doubt about that, they were certainly within the contemplation of the conspiracy as it had developed by September 1989. It is not necessary for Capt Stafford to have taken an active role in order for him to have remained a party to the conspiracy, much less for him to remain liable for the loss which the plaintiffs have suffered as a result of its continuing implementation by Mr Al Bader and Mr Qabazard. It is sufficient that he should have continued to play a part by keeping silent and later by helping to protect Mr Al Bader and Mr Qabazard when Mr Al Roumi's investigations began, despite the fact that he had the means to disclose both the existence of the conspiracy and much of what had been done pursuant to it. For these reasons I have reached the conclusion that Capt Stafford did not effectively withdraw from the conspiracy when he retired to Australia. His active participation between September 1986 and September 1989 together with his subsequent silence remained as one of the effective causes of the loss which the plaintiffs suffered as a result of its continued implementation by Mr Al Bader and Mr Qabazard.

148. It is plain from that passage that the judge held that Captain Stafford was liable after he left Kuwait because he had not withdrawn from the conspiracy. It follows that his liability in this regard depended crucially upon the finding that the agreement or conspiracy was to defraud the claimants whenever the opportunity arose. Thus, however long into the future a particular defendant committed an act defrauding the claimants, all the defendants were liable for the loss sustained as

a result because the act was committed pursuant to the conspiracy. We have reached the conclusion that this part of the judge's reasoning cannot be supported. In our judgment, neither the evidence of the agreement in September 1986 (or indeed in December 1985) nor the inferences which could properly be drawn from subsequent events justified the conclusion that Captain Stafford agreed that he would continue to take any part in the conspiracy after he had left Kuwait and the employment of KOTC.

149.  In these circumstances we are unable to accept that it is correct to hold that it was sufficient for Captain Stafford to have continued to play a part by keeping silent and later to help to protect Mr Al Bader and Mr Qabazard when the investigations began. Nor are we able to accept that Captain Stafford's active participation between September 1986 and September 1989 underline with his subsequent silence (our emphasis) remained one of the effective causes of the loss which the claimants suffered as a result of the continued implementation of the scheme by Mr Al Bader and Mr Qabazard after Captain Stafford left Kuwait. We do not think that it was established by the claimants on the evidence before the judge that it was at any time agreed that Captain Stafford would play any part in the conspiracy after he left Kuwait. In short it was not established that he was ever a party to any conspiracy to defraud the claimants after he left.

150.  Dealing with the period before his departure, we accept Mr Malins' submission that Captain Stafford admitted knowing about Scheme II and account no 1 and that, on the evidence before him, the judge was entitled to draw the inference that he knew about Gulf Shipping, but it does not seem to us to follow that he was at any time party to the agreement to defraud the claimants after he left Kuwait.

151.  Mr Malins placed considerable reliance upon a number of events which took place after Captain Stafford left. In the summer of 1990 he returned from Australia to London to help KOTC. It is true, as Mr Malins submitted, that Mr Al Bader and Mr Qabazard were still defrauding the claimants at that time, but Captain Stafford was only in London for about a month, during which he received about US$25,000 for assistance rendered to KOTC in various ways. However, as Mr Brodie observed, August 1990 was a traumatic time for Kuwait because of the Iraqi invasion and, in our judgment, no adverse inference should be drawn against Captain Stafford for assisting his previous employers in return for remuneration during what must have been very a very difficult period for them. Mr Malins relied upon the fact that Mr Qabazard felt able to tell Captain Stafford about Scheme III while they were both in the London office in August 1990, but that does not seem to us to be a sufficient basis upon which to infer that he ever became party to a conspiracy involving him after he left Kuwait in 1989. We do not think that it was proved on the evidence before the judge that Captain Stafford assisted in defrauding the claimants in 1990 or that he agreed to do so.

152.  Mr Malins further submitted that Captain Stafford assisted the conspiracy thereafter by helping to cover it up. In particular he relied upon the following. In June 1992 Captain Stafford refused to assist Sheikh Salman of KOTC in the investigation of alleged irregularities which had taken place under its previous management. The taped conversation between Captain Stafford and Mr Qabazard in January 1993 shows that Captain Stafford knew about 'other bits and pieces' and was willing to discuss them with Mr McCoy. Also in January 1993 Captain Stafford asked Mr McCoy to slow down the process of providing documents to KOTC. Immediately upon receiving the Mareva injunction in July 1994 he communicated with Mr Al Bader by telephone and fax. Mr Al Bader's family have funded his legal costs throughout and continue to do so. Mr Malins also submitted that Captain Stafford continued to play a part in the conspiracy by giving dishonest and untruthful evidence at the trial.

153.  The difficulty with those submissions is that the facts relied upon are consistent with either view as to the ambit of the conspiracy. They are consistent with the view that the conspiracy was entirely open-ended in the sense that the agreement was to defraud the claimants indefinitely whether or not the conspirators continued in the employment of or as officers of KOTC. However, they are also consistent with a more limited conspiracy, namely that the defendants would defraud the claimants so long (in the case of each conspirator) as he was an officer or employee. The other factors relied upon by Mr Malins do not help to identify the true nature of the conspiracy and are consistent with assistance in a 'cover-up' by an employee no longer bound to his former employer by any fiduciary obligation.

154.  In these circumstances we have reached the conclusion that none of the facts relied on by Mr Malins supports the conclusion that Captain Stafford ever agreed to help in defrauding the claimants after he left Kuwait. We do not think that silence or subsequent cover-up rendered him liable as a conspirator in the absence of evidence that he either played a part in, or received the proceeds of, any later acts of misappropriation on the part of Mr Al Bader or Mr Qabazard. The conclusions reached by the judge in the passage quoted in paragraph 147 show that there was no such evidence.

155.  It follows that we need not concern ourselves further with a general consideration of the doctrine of 'withdrawal' from a common enterprise which has given rise to difficulty in the field of criminal law and does not readily transpose into the

field of civil actions for conspiracy. It also follows that Captain Stafford's appeal must be allowed in part unless there is new evidence sufficient to support the judge's conclusion that he should be liable in respect of losses sustained by the claimants after he left Kuwait. Mr Malins submitted that there is such evidence, to which we now turn.

*The New Evidence – Captain Stafford*

156.   There are now available some of Captain Stafford's bank statements which were not available at the trial. Mr Malins submitted that they show that Captain Stafford received both part of the proceeds of the Gulf Shipping account and part of the proceeds of the frauds perpetrated after he left. As to the former, we have already referred in paragraph 93 above to the fact that there is a note on the file of UBS London that Mr Qabazard told it that the code 'Humberside' was to indicate instructions to deposit a draft to the credit of Captain Stafford's US dollar account with the TSB at Anlaby in Hull. We accept Mr Malins' submission that the note supports the judge's conclusion both that Captain Stafford received part of the proceeds of the fraud and that he either received or was intended to receive such proceeds from Mr Qabazard before he left Kuwait. It does not, however, help to determine his liability (if any) thereafter.

157.   In that regard Mr Malins relied on evidence relating to Captain Stafford's own bank statements which are now available. Mr Brodie submitted, by contrast, that the new evidence does not implicate Captain Stafford in respect of any of the events after he left Kuwait. It is common ground that the bank statements show that on the 10th July 1990 the sum of £226,934.85 was credited to Captain Stafford's sterling account at TSB Anlaby. Mr Malins submitted that that was the sterling equivalent of US$400,000 and that it was part of the proceeds of the operation of the conspiracy after he left Kuwait. The question is whether the documents establish that that is the case because, if they do, they provide strong support for the judge's conclusion that Captain Stafford is liable in respect of losses under all four schemes.

158.   On the 4th January 2000 the claimants' solicitors wrote to Captain Stafford's solicitors asking for an explanation. In response he made a witness statement exhibiting a Hill Samuel document dated the 28th June 1990 evidencing instructions to transfer US$400,199.61 from Hill Samuel to his TSB account at Anlaby, although he did not say what its original source was. Thereafter the claimants asserted in their skeleton argument for this appeal that Captain Stafford had not previously revealed the existence of a Hill Samuel account, that he had not explained whence came the money and that the overwhelming inference was that it came from the fraudulent conspiracy after he retired. Captain Stafford then made a further witness statement (his third) in which he said that he had no deposits with Hill Samuel when he swore his affidavit pursuant to the order made at the same time as the Mareva injunction was granted, that without consulting him TSB had in late 1987 opened the foreign currency account with Hill Samuel as a member of the same group and that the monies had originally been transferred to him when he was still employed by KOTC. He also exhibited two documents evidencing a deposit with Hill Samuel of A$665,778.96 on the 26th July 1989, which had grown to A$676,154.02 by the 29th August. The inference which Captain Stafford intended us to draw from those documents was that that sum was the source of the US$400,000. However, as Mr Brodie recognised in argument, that could not be the case because the Hill Samuel account was closed on the 29th September 1989.

159.   After his third statement Captain Stafford made a yet further statement (his fourth) in which he sought to meet a contention on behalf of the claimants that the sum of US$400,000 could not have come from funds in existence when he left Kuwait because payments were made out of the Hill Samuel dollar account which depleted the funds held by him to such an extent that the source of the US$400,000 must have been later receipts. Those payments were transfers to Australia of A$500,000 and A$150,000 on the 4th and 24th May 1990 respectively. Captain Stafford sought to meet that point by saying that the Hill Samuel accounts showed that before leaving his employment he had deposited two sums maturing on the 29th September 1989, namely US$712,421 and A$676,154 respectively. Those sums were in addition to the sterling funds in his Anlaby account. He said that in these circumstances there were ample monies to fund the payment relied on by the claimants.

160.   Both Mr Brodie and Mr Malins analysed the bank statements at some length. Mr Brodie submitted that Captain Stafford's US dollar account showed that he had more than US$700,000 on deposit which was ample to fund the payment of US$400,000. He identified the source of the three sums of A$500,000 (namely US$376,823.25), A$150,000 (namely US $115,500) and US$400,000 in the US dollar account. Mr Malins submitted that those sums add up to much more than the US$700,000 which was in the account when Captain Stafford left Kuwait plus any possible amount of interest earned. Mr Brodie replied that a letter from TSB dated the 4th January 1990 showed that in addition to the US$712,421 which was then standing to the credit of the US dollar account referred to above there was a further sum of US$150,721 standing to the credit of another account (previously no FYL 43), so that there were sufficient funds to meet the payments including that of US$400,000. Mr Brodie thus submitted that it would be wrong to draw the inference that Captain Stafford must have been receiving the proceeds of the continuing fraud. Mr Malins responded that the explanation given by Mr Brodie was not the

© 2020 Thomson Reuters.

explanation given by Captain Stafford in his witness statements and that the bank statements which have been produced are even now incomplete and therefore unsatisfactory.

161.  We agree with Mr Malins that the position is by no means satisfactory for both those reasons. Indeed the missing pages of the FYL 43 might well throw considerable light on what Captain Stafford had been receiving while he was still in Kuwait. Thus, for example, the statements produced for the account which was FYL 43 do not include the year from the 30th April 1988 to 30th April 1989. If this were part of the trial, it would no doubt be appropriate for Captain Stafford to be recalled to explain the position in detail and to answer some of the questions raised by Mr Malins, but the limited question for us to determine is whether it is appropriate on the incomplete evidence which is available to infer that Captain Stafford must have received the proceeds of part of the fraud which continued after he left Kuwait. In our judgment it is not. We remind ourselves of the necessity for cogent evidence in this class of case. Since the explanations given by Mr Brodie for the figures may be correct, we decline to draw the necessary inference.

162.  Finally, the claimants rely upon a further piece of evidence which has recently come to light. It is that a payment of A $100,000 was received into Captain Stafford's wife's bank account on the 25th March 1994. The payment was made by Mr Al Bader. Mr Malins invited the court to infer that that too shows the receipt of monies from the continued fraud. However, in his second witness statement Captain Stafford explained the payment as part of an investment by Mr Al Bader in a company called Engine Care Systems (NSW) Pty Ltd. He produced some documentary support for that evidence and, again, we have reached the conclusion that it would be wrong to draw the inference suggested.

163.  It follows that, while the new evidence raises a number of questions, it is not sufficient to enable us to conclude that Captain Stafford received any part of the proceeds of the fraud after he left Kuwait and retired in September 1989. It follows that it does not lead to the conclusion that Captain Stafford was ever party to a conspiracy operating after his retirement. On the other hand it in no way undermines the judge's conclusion that he was a party to the conspiracy operating while he was still working for KOTC.

**Conclusion on Conspiracy under English Law.**

164.  For the reasons we have given we uphold the judge's view that there was a conspiracy actionable under English law which was originally between Mr Al Bader and Mr Qabazard (and perhaps others) that they would defraud the claimants by any means at their disposal while they were working for the claimants. Captain Stafford joined the conspiracy in about September 1986. Subject to the principle of double actionability discussed below, Mr Al Bader and Mr Qabazard are liable for damages before September 1986 and thereafter all the conspirators are liable for damages in respect of all four schemes, save that Captain Stafford is not liable in respect of losses incurred after he left Kuwait in September 1989.

**Conspiracy - Double Actionability**

165.  The claimants having pleaded their case primarily in the tort of conspiracy, and the judge having found that under English law all the defendants were parties to a single actionable conspiracy wrongfully to misappropriate the claimant's assets, it became necessary for the judge to consider the defendants' plea that the acts complained of as giving rise to their liability took place (or largely took place) in Kuwait, and that Kuwaiti law was thus the lex loci delicti of any alleged tort said to be owed by the defendants to the claimants. On that basis the defendants contended that the rule of 'double actionability' could not be satisfied because the tort of conspiracy is unknown to Kuwaiti law.


166.  It must first be noted in this respect that by Part III of the Private International Law Miscellaneous Provisions Act 1995 the choice of law rules (including the double actionability rule) for determining the law applicable to torts and issues in tort as stated in Rule 202 and Rule 203 of *Dicey & Morris: The Conflict of Laws (12th ed.)* at p.1480 and 1487 have been abolished (save in relation to defamation claims). The statutory principles now applicable and the replacement Rules 202 and 203, as stated by the editors of *Dicey & Morris* are discussed at length in the Fourth Cumulative Supplement to the 12th edition. However, the provisions of Part III of the 1995 Act do not apply to acts or omissions giving rise to a claim which occurred before the commencement of Part III of the Act. Accordingly, because the latest act or omission of the defendants relied upon occurred in 1992, in respect of the claims in tort the judge was concerned (as is this court) with the former common law rules.

167.  The rule of double actionability as stated in Rule 203 in *Dicey and Morris (12th ed.)* At p. 1487 is as follows:

© 2020 Thomson Reuters.

"

(1)  As a general rule, an act done in a foreign country is a tort and actionable as such in England, only if it is both

(a)  actionable as a tort according to English law, or in other words is an act which, if done in England, would be a tort; and

(b)  actionable according to the law of the foreign country where it was done.

(2)  But a particular issue between the parties may be governed by the law of the country which, with respect to that issue, has the most significant relationship with the occurrence and the parties.

Paragraph (1) of the Rule derived from the well known dictum of Willes J in Phillips v Eyre (1890) L.R. 6 Q.B.1 that:

"As a general rule, in order to found a suit for a wrong alleged to have been committed abroad, two conditions must be fulfilled. First, the wrong must be of such a character that it would have been actionable if committed in England… Secondly, the act must not have been justifiable by the law of the place where it was done."

169.  The text of Clause 1 (as set out above) was the subject of express approval in the judgment of the Privy Council in Red Sea Insurance Co v Bouygues S.A. [1995] 1 AC 191 at 199 per Lord Slynn of Hadleigh. Having referred to the decision of the House of Lords in *Boys v Chaplin [1971] AC 356* the effect of which (overruling *Machado -v- Fontes [1897] 2 QB 231*) led to the present wording of Clause (1)(b), Lord Slynn stated:

"Lord Guest, at p.381, explicitly accepted that:

"To justify an action in England for a tort committed abroad the conduct must be *actionable* by English law and by the laws of the country in which the conduct occurred, the lex loci delicti." (Emphasis added)

Lord Wilberforce at p.388, also regarded Machado v Fontes as having been wrongly decided:

"The broad principle should surely be that a person should not be permitted to claim in England in respect of a matter for which civil liability does not exist, or is excluded, under the law of the place where the wrong was committed:"

© 2020 Thomson Reuters.

He continued:

> "I would, therefore, restate the basic rule of English law with regard to foreign torts as requiring actionability as a tort according to English law, subject to the condition that civil liability in respect of the relevant claim exists as between the actual parties under the law of the foreign country where the act was done."

> Their Lordships in the present case thus consider that it is clear that there was a majority in favour of reading "not justifiable" as meaning actionable in civil proceedings even if it was not necessary for the act to be characterised as a "tort" under the foreign law. Their Lordships agree with that decision and, subject to the effect of Clause (2), consider that Rule 203(1)(b) in *Dicey & Morris, Conflict of Laws (12th ed.)* , is a correct statement of the law."

170. As is clear from the authorities, the "double actionability" rule was concerned with the broad question of whether the facts which would give rise to liability in tort under English law would render the defendant liable in a civil action under the foreign lex loci delicti. Thus the fact that he might be criminally liable there, or only entitled to receive compensation under a statutory compensation scheme, rather than by way of civil proceedings, would be insufficient.

171. The rationale of the rule that the act or omission of the defendant must be actionable abroad in civil proceedings between the same parties is by way of a safeguard against imposing liability upon a defendant in England as the lex fori for acts in respect of which there would be no liability in the lex loci delicti. However, it is not necessary for the act or omission to be characterised as a tort or delict under the foreign law, provided there is a right of recovery to a similar extent by way of civil action. The reasons of policy which dictate that the defendant should not be held liable in circumstances where, or to the extent that, he would not be held civilly liable in the country where the relevant acts or omissions took place, do not dictate that the legal basis of such liability should be the same. Indeed, the degree to which systems of civil law differ the world over, and the diversity of the conceptual routes by which they impose liability on a defendant to compensate or otherwise make restitution to a claimant in respect of a civil wrong, militate against the requirement that the court of the lex fori should enmesh itself in an exercise of characterisation and fine distinction as between the remedies afforded by different jurisdictions to achieve a similar result. Thus, so far as acts or omissions on the part of a defendant or defendants may give rise to a liability in tort under English law, there is no requirement that such conduct must be tortious by the lex loci delicti. All that is required is that it should be "civilly actionable" there (see Boys v Chaplin per Lord Hodson at 377 and per Lord Wilberforce at p.389 and *Metall und Rhostoff A.G. v Donaldson Lufkin & Jenrette Inc. [1990] 1 QB 391* per Slade LJ at 439-440). It follows from this that, as stated in *Dicey & Morris (12th ed.)* at p.1496

> "It is sufficient if by that law [i.e. the lex loci delicti], his [i.e. the defendant's] liability to pay damages is contractual, quasi-contractual, quasi-delictual, proprietary or *sui generis* ."

© 2020 Thomson Reuters.

172.   As a preliminary to his consideration and application of the double actionability rule in this case, the judge first considered the question: where was the tort committed? In that respect the claimants had submitted that, despite the strong Kuwaiti connection of the parties, having regard to the seat of the claimants' operations and the residence and activities of the defendants, on a detailed analysis of the facts relied on, the tort of conspiracy was properly to be regarded as committed in England rather than in Kuwait. It was submitted that that was so whether one applied the "substance" test propounded in Distillers Co Bio-Chemicals Limited v Thompson [1971] AC 458 D-E , per Lord Pearson ("the right approach is, when the tort is complete, to look back over the series of events constituting it and ask the question, where in substance did this cause of action arise?") or the test that the court should first consider all the elements of the tort and then decide with which jurisdiction they are "mostly closely connected": see *Diamond v Bank of London and Montreal [1979] QB 333* per Lord Denning MR at 345G–346G and Stephenson LJ at 348H-350G. See also generally Metall und Rohstoff (supra) at 447-9. If that were right, then no question of double actionability would arise in relation to the tort of conspiracy.

173.   Briefly stated, the claimants contended that the design underlying the defendants' fraudulent activities was to generate funds outside Kuwait, the primary location chosen to effect such design being London. The monies were largely obtained through Clarksons in London, Mr McCoy playing a central role in the events which gave rise to the proceedings; of the twenty-seven charterparties used by the defendants as part of their fraudulent conspiracy, only six were signed in Kuwait and the rest were signed in London; the overt acts of the conspirators in effecting their frauds were substantially committed in London, Schemes I, II and III all involving the procurement of Clarksons to remove money from accounts held by them on the claimants' behalf in London, largely in cash or traveller's cheques delivered in London; and the bulk of the known enrichment took place in London rather than Kuwait.

174.   Nonetheless, having made a detailed analysis of the various elements and events relied on as constituting the conspiracy, the judge, applying the principles discussed in Metall und Rohstoff , reached the conclusion that the tort was in substance committed in Kuwait and, therefore, that it was necessary to apply the double actionability rule in the circumstances of the case. By their respondents' notice, the claimants assert that the judge erred in his conclusion. However, since the judge went on to apply the double actionability rule in favour of the claimants, Mr Malins made clear in responding to the appeal that the alleged error of the judge would only be relied on if the court held that he had erred in his application of the rule. As appears hereafter, we consider that the judge was correct in his application of the rule; it has not therefore been necessary to consider the point raised in the respondents' notice.

175.   So far as concerns sub-paragraph (a) of Rule 203(1), the judge found, and as we have stated rightly found, that the acts of the defendants complained of constituted the tort of conspiracy under English law. The critical question was thus whether the acts constituting the conspiracy were also civilly actionable according to the law of Kuwait.

176.   The relevant law was the subject of evidence from three expert witnesses, Dr Mark Hoyle for the claimants, Professor William Ballantyne for the defendants, and Judge Mohammed Sallam (a retired judge of the Kuwait Court of Cassation) for the third parties. There was little disagreement between them on the basis of civil liability for wrongful acts under the law of Kuwait. That law is contained primarily in a series of codes, the relevant code in this case being the Civil Code of 1980 which is based broadly on the Egyptian Civil Code. Kuwait does not, like English law, have a law of individual 'torts', but contains general provisions relating to obligations and civil wrongs. It was agreed that the provisions relevant to this case were Articles 227-229 which relate to the award of damages and/or compensation for civil wrongs and Articles 264 and 267 which deal with questions of restitution. Their relevant text as translated into English is as follows:

"Art  227-1. Every person who by his wrongful act causes damage to another is liable to compensate such other, whether he acted directly or indirectly.

…………

Art.228-

(1). If the damage was caused by the fault of several persons,.each of them is liable to compensate the injured party for all the damage he has suffered.

(2). Liability shall be apportioned between the several wrongdoers in proportion to the part played by their wrongdoing in causing the damage. If it is impossible to determine what part each played liability shall be apportioned equally.

Art.229.- Where the wrongful act which caused the damage was the result of incitement or assistance the damage shall be deemed to have been caused by the wrongful act of the immediate perpetrator and those who incited or assisted him, all of whom shall be liable to make compensation therefor.

Art.264.- He who has received that which is not due to him must restore it.

Art.267-

(1)  Where the receiver of that which is not due was of good faith he shall only be bound to return that which he received; but if he was of bad faith he shall be liable to restore also the fruits he has obtained or which he has failed to obtain as of the date of receiving the thing or from the date when he became of bad faith as the case may be.

(2)  In any case, he who has received that which was not due shall be obliged to restore the fruits from the day of initiation of proceedings against him for restitution."

177.  In dealing with the cause of action in conspiracy, it was common ground between the experts that there was no civil wrong known to the law of Kuwait which depended on proof of an agreement or combination between two or more persons to injure another, and thus equated to the tort of conspiracy in English law. However, it was also not in dispute between the experts that Article 227 provided a broad basis of liability for wrongful acts which caused damage to another, and that, whatever the precise nature of what would be regarded as "wrongful" in this context, it would include the dishonest appropriation by whatever means of money or other assets. As the judge rightly held, that would obviously include obtaining by fraud as well as simple theft. It was also common ground between the experts that if two or more people acted together in such a way as to cause damage to another, Article 228 rendered each of them liable for the whole of the loss. As the judge observed, essentially this Article reflected the principles governing liability as joint tortfeasors under English law, liability as between the wrongdoers themselves being apportionable under Article 228(2) . It was not disputed between the experts that if the defendants had co-operated to obtain money by fraud from the claimants, the defendants would be liable to compensate the claimants in accordance with those provisions of the Civil Code. It was further accepted on all sides that if the facts alleged by the claimants could be established, the claimants would in principle be entitled to recover from all the defendants. Nonetheless, the defendants argued below, as Mr Brodie has argued before us, that double actionability had not been established by the claimants in respect of the plea of conspiracy for two reasons, both of which were largely interrelated with the arguments we have already considered in relation to the plea of conspiracy under English law.

178.  Mr Brodie's first argument is essentially a pleading point. He submitted that Kuwait being the lex loci delicti, the claimants should have begun by identifying the causes of action open to them under the law of Kuwait. He submitted that, had they done so they would have seen under the Articles previously quoted that the acts of wrongdoing on which they relied provided them prima facie with individual causes of action in respect of each of the misappropriations alleged against one or more of the defendants jointly and severally. Had those causes of action been pleaded it would have been seen that essentially similar claims for deceit, conversion and restitution lay against the defendants as several and joint tortfeasors under the laws of England, which claims could and (as Mr Brodie submitted) should have been pleaded without resort to the tort of conspiracy. He conceded that, had that been done, the double actionability rule would have been satisfied. However, he

submitted that, the claimants having decided to pin their colours to the conspiracy mast in order to gain what they regarded as a more advantageous cause of action, it was appropriate that the question of double actionability should depend upon whether or not a cause of action for conspiracy to injure or defraud is known to the law of Kuwait.

179.  Mr Brodie's second argument was that, because no such civil wrong as conspiracy is known to the law of Kuwait, the claimants, in breach of the principle stated by Lord Wilberforce in Chaplin v Boys at 389d, were seeking to claim in England in respect of a matter for which civil liability does not exist under Kuwaiti law and that civil liability in Kuwait in respect of the relevant claim could not be demonstrated.

180.  Mr Brodie's first argument is neither founded upon authority nor hallowed by practice. The claimants case, as originally pleaded, was a straightforward case in conspiracy in respect of which the claimants placed no reliance upon foreign law, it being their case that the lex loci delicti was English. Once the defendants had pleaded that the law governing any claim by the claimants arising out of any alleged breach of duty owed by the defendants was Kuwaiti law and it was expressly denied that the tort of conspiracy was actionable under the law of Kuwait, the claimants amended their claim to plead that each of the unlawful means by which the conspiracy was put into effect, and upon which the claimants would rely as a self-standing cause of action, was unlawful under the law of Kuwait as a breach of each of the defendants' duties of good faith and honesty owed as directors (in the case of Mr Al Bader and Mr Qabazard) and as an employee (in the case of Captain Stafford) and that the deliberate assistance by one defendant of any breaches committed by another defendant would be actionable under Article 227 . That was a perfectly proper way to proceed and, save that the claimants later added to the Articles of the Kuwaiti Civil Code on which they relied, that was the way matters proceeded.

181.  So far as the form of the pleading was concerned, the judge observed:

> "Although the plaintiff must show at trial that the acts complained of give rise to civil liability as between himself and the defendant in the country where they were committed, and may, if he chooses to do so, identify at the outset the relevant foreign law on which he relies, he is entitled to rely on the presumption that foreign law is the same as English law until the contrary is proved: see University of Glasgow -v- The Economist (1990) [1997] 1E.M.L.R. 495 "

182.  The case last referred to was a decision of Popplewell J as to the propriety of a libel pleading which the claimants proposed to amend to allege that the publication abroad of the libel complained of was actionable in the particular countries in which publication occurred, but declined to plead particulars of the relevant foreign laws relied on. The defendants objected to a plea in that form; but the claimants argued that they were simply entitled to rely on the presumption that, in the absence of proof to the contrary, the laws of the countries concerned were the same as English law. In making observations much to the same effect as those made by the judge, Popplewell J nonetheless did not doubt that, so far as a libel pleading was concerned, the claimant had to state (albeit he need not state more) that the tort was actionable in the foreign country concerned. In this connection we note the general view expressed at paragraph 2.20 of the Law Commission Working Paper No. 87 on *Private International Law, Choice of Law in Tort and Deceit'* that:

> "it is not necessary for the plaintiff to plead the existence of civil liability under the lex loci delicti: he may rest his case on the basis of English law alone, and leave it to the defence to raise any questions of foreign law. If the defence does not do so, the case will be disposed of without any reference to foreign law."

183.  In the text which follows Rule 203 in *Dicey & Morris (12th ed.)* at p.1514 which related to allegation and proof of the lex loci delicti, it is stated that authority is divided on the question whether it is for the claimant to allege that the defendant's conduct is actionable under the lex loci delicti (i.e. that such an allegation is part of the claimant's positive case), or whether it is sufficient for the claimant to plead the cause of action in English law, it then being left to the defendant to plead and prove that his conduct was not actionable under that law. Preference is expressed by the editors for the latter view, thus aligning themselves with the Law Commission.

184.  Since English courts proceed on the basis of a presumption that foreign law is the same as English law unless the contrary is proved as a fact, it seems clear that, whether or not the claimant incorporates in his pleading an averment that the matters relied on are civilly actionable under the lex loci delicti, the burden in practice lies upon the defendant to plead and prove that his conduct was not actionable under the lex loci delicti. That being so, the debate appears to be a somewhat arid one. The context in which it is likely to give rise to controversy is at the interlocutory stages of an action involving a foreign element when the court is concerned to consider and give directions in relation to any issue of foreign law arising on the face of the pleadings and as to the form and extent of any expert evidence of foreign law sought to be adduced by the parties. It seems to us that questions of where the burden lies and its practical consequences for the progress of the action are best dealt with on a case by case basis rather than by the application of an inflexible rule. So far as the instant case is concerned, by the time of trial, the issues of law were unambiguously pleaded on both sides, directions having been given in respect of the expert evidence to be called, and the judge was entirely right to deal with the matter as he did.

185.  Mr Brodie's second argument was considered and rejected by the judge in the light of the state of the expert evidence before him considered in the light of the authorities to which we have referred. The judge (at page 151) held that:

> "It is immaterial in the present case that the law of Kuwait does not recognise the separate terms of liability based on the existence of a combination provided that the acts which give rise to the tort under English law provide a cause of action under that law. In the present case they do, and the effect of Art. 228 is to render the defendants liable to the same extent as under English law."

Again, it seems to us that the judge was entirely right in the conclusion which he reached.

186.  As already indicated, and as Mr Brodie accepted, Article 227 of the 1980 Civil Code speaks in terms of liability for 'wrongful acts' and Article 228 imposes joint and several liability in respect of damage caused by the fault of several persons; in this respect the Articles appear to be conceptually similar to, and entirely apt to cover, the position of joint tortfeasors in English law. Thus, they are apt in substance to cover tortious acts committed by individuals pursuant to a common agreement or combination to effect such acts. In the course of argument Mr Brodie conceded, indeed as part of his argument upon merger (see paragraphs 122-127 above) he asserted, that if and to the extent that the individual defendants were found liable in respect of the misappropriations complained of, they could and should be liable as joint tortfeasors and the averment of conspiracy was surplusage. That is because the gist of the action in a civil case of conspiracy is the damage caused not by the agreement itself, but by the acts carried out pursuant to it. We consider that the words of Lord Wilberforce in *Boys v Chaplin* ("civil liability *in respect of the relevant claim* ") should be read with his earlier reference to a "claim in England *in respect of a matter*

© 2020 Thomson Reuters.

". The essential question is simply whether the underlying facts and matters which gave rise to the tort claim in England would also gave rise to civil liability (whatever the label or description of the cause of action) under the lex loci delicti.

**Fiduciary Duty and Constructive Trust**

187.  By way of alternative to their claim for damages for conspiracy to defraud by the various acts of misappropriation relied on, the claimants' points of claim also characterised the unlawful means adopted by the defendants as breaches of the duties of good faith and honesty which each owed to the claimants by reason of his office or employment. In addition, by later amendment, the claimants asserted that they would if necessary rely upon each of the unlawful means adopted as giving rise to a separate and self-standing cause of action against each of the defendants, should the claim in conspiracy fail. The judge was somewhat critical of the brevity of the pleading; however he regarded it as cured by the particulars separately supplied which made the defendants well aware of the nature of the case made against them.

188.  We start by considering the claimant's alternative claim in the context of English law. In many company fraud cases it is necessary to distinguish between a director who misapplies the claimant company's funds on the one hand and someone who either receives them for his own benefit with knowledge of the misapplication (knowing receipt) or dishonestly assists in the misapplication (knowing assistance) on the other. Those who fall into the first category, being persons who control the company's funds and owe it fiduciary duties, are treated by the law as if they were *actual* trustees of the funds. Those who fall into the second category, being persons who neither control the company's funds nor owe it fiduciary duties, are classified as *constructive* trustees of the funds. The only reason why the directors are not actual trustees of the funds is because the whole legal and beneficial ownership of the assets of a company is vested in the company itself. The principle was authoritatively stated by Lindley LJ in *Re Lands Allotment Co. [1894] 1 Ch. 616* , 631:

> "Although directors are not properly speaking trustees, yet they have always been considered and treated as trustees of money which comes to their hands or which is actually under their control; and ever since joint stock companies were invented directors have been liable to make good moneys which they have misapplied upon the same footing as if they were trustees …"

A more recent affirmation of the principle is to be found in the judgment of Buckley LJ in *Belmont Finance Corp. v. Williams Furniture Ltd (No 2) [1980] 1 All ER 393* , 405.

189.  In the present case Mr Al Bader was a director of both KOTC and SITKA and Mr Qabazard was a director of KOTC. Moreover, both here and below, Mr Brodie accepted that, although Mr Qabazard was not a director of SITKA and Captain Stafford was not a director of either company, each of them owed fiduciary duties to the claimant or claimants in respect of funds which were under his control. Accordingly, each of the three defendants fell into the first category stated above, and it was only necessary for the claimants to establish that they had misapplied the funds. Questions of interest apart, it was not even necessary to establish that they had acted dishonestly, although the nature of the misapplications was such that, once found, it was inevitable that they would also be found to have been dishonest. What was unnecessary and merely confusing was for the judge to be asked to consider whether the defendants were liable as constructive trustees. Plainly they were not. An actual trustee or someone whom the law treats as such cannot at the same time be a constructive trustee.

190.  The judge held that the claimants' alternative claim was made out. Although his consideration of the question proceeded mainly on the footing that the defendants were liable as constructive trustees, he concluded by holding that they were also liable by reason of breaches of their fiduciary duties to the claimants. On the basis of his previous findings, that conclusion

© 2020 Thomson Reuters.

was both justified on the facts and correct in law. However, because the rule of English private international law is that the obligation to restore the benefit of an enrichment such as was obtained by the defendants in this case is governed by the law of the country where the enrichment occurred (see *Dicey & Morris: The Conflict of Laws (13th ed.)* Rule 200(2)(c)), it was necessary for the judge's decision to be based, in the first instance, on the law of Kuwait.

191.  Although the concept of a trust is unknown to Kuwaiti law, both Dr Hoyle and Professor Ballantyne agreed that Articles 264 and 267 of the Civil Code (see above) imposed on each of the defendants an obligation to make restitution to the claimants in respect of the funds misapplied by him. On that footing the judge followed the decision of Chadwick J in Arab Monetary Fund v. Hashim (15th June 1994 - unreported), which has since itself been followed by Mance J in Gruppo Torras S.A. v. Al Sabah (24th June 1999 - unreported), and held that the restitutionary obligation under Kuwaiti law could be characterised as fiduciary in character by English law and thus capable of supporting the equitable remedies in personam which would be available to the claimants in an English court.

192.  In our judgment both the decision of Chadwick J in Arab Monetary Fund v. Hashim and the judge's application of it to the present case were correct. In Hashim the claimant sought recovery from the defendants on the grounds that they had acted in breach of fiduciary duties under the law of Abu Dhabi. Chadwick J said:

> "In the context of a claim to invoke its equitable jurisdiction it is for the English court to decide whether the necessary fiduciary relationship exists. Where the duties to which a relationship gives rise are determined by foreign law, the question for the foreign law is what is the nature of those duties. It is for the English court to decide whether duties of that nature are to be regarded as fiduciary."

Later, having referred to a passage in the judgment of the Privy Council delivered by Lord Templeman in *A.G. for Hong Kong v. Reid [1994] 1 AC 324* , 331, and to what is now rule 200 in Dicey and Morris's Conflict of Laws, Chadwick J continued:

> "I find nothing in the rule which is inconsistent with the view that, in cases involving a foreign element in which an English court is asked to treat a defendant as a constructive trustee of assets which he has acquired through misuse of his powers, the relevant questions are: (i) what is the proper law which governs the relationship between the defendant and the person for whose benefit those powers have been conferred, (ii) what, under that law, are the duties to which the defendant is subject in relation to those powers, (iii) is the nature of those duties such that they would be regarded by an English court as fiduciary duties and (iv), if so, is it unconscionable for the defendant to retain those assets."

193.  Our only possible criticism of Chadwick J's judgment is that he too referred to the defendants in that case being treated by English law as constructive trustees and not as actual trustees. There may have been special reasons for that. But whether there were or not, the inaccuracy of the description can have had no effect on the principles by which the defendants were held liable. In the present case the answers to Chadwick J's four questions are the following: (i) the proper law which governed the relationship between the defendants and the claimants was the law of Kuwait; (ii) the duties imposed on the defendants by Articles 264 and 267 of the Civil Code were to make restitution in respect of the sums misapplied by them respectively; (iii)

© 2020 Thomson Reuters.

*Kuwait Oil Tanker Co SAK v Al-Bader (No.3), 2000 WL 571379 (2000)*

the nature of those duties was such that they would be regarded by an English court as fiduciary duties; and (iv) it would be unconscionable for the defendants to retain the funds. We accordingly hold that the claimants' alternative case is made out.

## Interest

194.  The claimants sought, and the judge awarded, compound interest upon the principal sums for which each defendant was held liable. He did so on the basis of the decision in *Wallersteiner -v- Moir (No.2) [1975] QB 373* as considered by Lord Browne-Wilkinson in the *Westdeutsche case [1996] AC 669* .. The judge said (at page 174):

> "… Lord Browne-Wilkinson at page 702D-E indicated some support for the view that compound interest could be awarded in all cases where a fiduciary has improperly profited from his trust and in my judgment that should follow from the application of established principles to modern conditions. An award of compound interest in accordance with equitable principles is in the nature of a remedy designed to ensure that the wrongdoer makes full restitution. As such I think the jurisdiction to make such an award is to be regarded as part of the procedural law of the lex fori."

The judge concluded (at page 175) that, while he was satisfied that he had power to award simple interest under the provisions under s.35A of the Supreme Court Act 1981 he should nonetheless make an award of compound interest in the exercise of his equitable jurisdiction, this being:

> "a case in which the defendants can properly be regarded as being under a duty to account the plaintiffs for a property which they received and any benefits obtained from it."

195.  The judge reached that conclusion, despite the submissions of Mr Brodie, renewed on this appeal, that any award of interest in the circumstances of this case would amount to a breach of the double actionability rule, because the law of Kuwait does not recognise or provide for awards of interest, save in respect of transactions governed by its Commercial Code and save insofar as permitted by Article 306 of the Civil Code, which all experts agreed were not applicable to the circumstances in this case.

196.  The judge dealt with Mr Brodie's argument by posing and answering the following three questions. (1) Was an award of interest precluded by the double actionability rule as being contrary to the law of Kuwait? (2) If not, was it a case in which it would be appropriate as a matter of discretion to award interest at all? (3) If so, should such interest be awarded on a simple or compound basis?

197.  In relation to question (1) he rightly stated (at page 167-8):

> "Whether the plaintiffs are entitled to recover interest on any sum awarded as damages in the present case, either under s.35A of the Supreme Court Act 1981 or under the rules of equity, depends first on

© 2020 Thomson Reuters.

whether in making an award of interest the court is giving effect to procedural or substantive rights. If the part of an award of interest is simply procedural it is governed exclusively by English law as the lex fori and no question of Kuwaiti law arises, save insofar as it may be relevant to the exercise of the court's discretion. If, however, the court is giving effect to substantive rights it becomes necessary to decide whether the loss of use of money represents a head of liability recognised under Kuwaiti law so as to satisfy the double actionability rule: see Chaplin -v- Boys ."

198.  The judge first considered the position in relation to awards of statutory (simple) interest under s.35A , and adopted the view of Hobhouse J in Midland International Trade Services Limited -v- Al Sudairy (11th April 1990, reported Financial Times 2nd May 1990) that such awards are procedural rather than substantive in nature. He expressed a similar conclusion in respect of awards of compound interest based on equitable principles. That being so, he concluded that both types of award may be made in English proceedings regardless of the lex causae.

199.  In case he was wrong, the judge went on to consider the position under Kuwaiti law. He concentrated simply upon the provisions of the Kuwaiti Civil Code because, although the defendants' acts of misappropriation were all committed in a commercial context, the expert witnesses were agreed that the court could not resort to the principles governing commercial transactions contained in the Kuwaiti Commercial Code, as the matters complained of did not amount to commercial activities for the purposes of that Code. However, so far as the Civil Code was concerned, the judge held, on the basis of the expert evidence which he had heard, that interest upon sums misappropriated was recoverable in the sense and to the extent that the terms of Article 267 justified such an award ("Where the receiver of that which is not due was of … bad faith he shall be liable to restore also the fruits he has obtained or which he has failed to obtain … from the date when he became of bad faith …").

200.  The judge stated (at page 172):

"… [although].. with the possible exception of the funds received by Capt. Stafford which were invested the plaintiffs are not in a position to show that the stolen funds did actually produce any fruits in the hands of the defendants … Art. 267 also imposes an obligation on a person who has received property in bad faith to account to the plaintiff for the fruits he ought to have received. This aspect of the Article was not investigated with the witnesses in very great depth, but Prof. Ballantyne accepted that it imposed an obligation on the defendant to account for any fruits which could have been obtained but were lost as a result of his negligence. That being so, I am satisfied that the Kuwaiti courts have the power under this Article to award interest where they are satisfied that the property in question could have been used to earn interest and would have been so used if the interests of the owner had been properly safeguarded. It seemed clear to me from the evidence of both Dr. Hoyle and Prof. Ballantyne that the Code is more concerned with laying down principles of general application than with prescribing different rules for different types of claim. Prof. Ballantyne accepted that a person who stole property would be regarded as having thereby received it in bad faith within the meaning of Art. 267 with all the consequences which that Article prescribes, and since in the present case the defendants were acting in concert, I think it follows that receipt by any one of them could properly be regarded as receipt by all. That being so, I am satisfied that interest could be awarded against them under the law of Kuwait."

© 2020 Thomson Reuters.

201.  The judge therefore answered his question (1) in the negative. So far as his question (2) was concerned, he made clear that in principle he considered an award of interest appropriate, and in answer to question (3) he concluded that it should be on a compound basis.

202.  As to the judge's finding that interest could be awarded under Article 267 , Mr Brodie raised two points on this appeal. First, he submitted that, in coming to his decision, the judge should have disregarded Article 267 altogether. That was because Article 267 had not been pleaded and reliance had not been placed upon it in the claimants' expert's report, although its text appeared in a schedule thereto. We do not think that complaint has substance. It is correct that Dr Hoyle first placed reliance upon Article 267 as itself applicable to a claim in respect of interest in the course of his cross-examination by counsel for the third party. He had earlier asserted a power in the court to award compensation for loss of the claimant's monies. In cross-examination he expressed the view that interest earned, or which could reasonably be expected to be earned (which he called 'opportunity cost'), could also be awarded under Article 267 as part of the Kuwaiti court's general power to compensate a victim of misappropriation. Mr Brodie objected to that evidence at the time, but it was admitted on the basis that Professor Ballantyne should have an opportunity to deal with the point and that Mr Brodie could apply to have Dr Hoyle recalled for further cross-examination should he see fit. Following Professor Ballantyne's evidence, that right was not exercised. In these circumstances, it seems to us that Mr Brodie's complaint must fail so far as it was based upon a plea of surprise.

203.  As to the substance of the experts' evidence, Mr Brodie submitted that the evidence of Dr Hoyle was in any event insufficient to justify the judge's finding that interest was recoverable. He asserted that the judge should have preferred the evidence of Professor Ballantyne, the gravamen of whose evidence was not represented by his concession that a thief or receiver could be obliged to account for fruits which could have been obtained but were lost through negligence, but rather by his statement of opinion that the reference to 'fruits' in Article 267 was not intended to be applied to a claim for interest upon monies at all, the concept of 'fruits' being based on historic principles of recovery in relation to the produce of animals or plants and inappropriate to comprehend a claim in respect of lost interest on monies placed on deposit. Having studied the transcript of the expert evidence, we are satisfied that there was before the judge a clear issue between the rival experts as to whether or not Article 267 could be used to require a fiduciary in wrongful receipt of monies to account for interest which he had obtained or failed to obtain through investment, in respect of which issue the judge was entitled to prefer, as he did in fact prefer, the opinion of Dr Hoyle. We therefore reject this ground of appeal.

204.  In these circumstances, the judge's finding that interest was recoverable by way of compensation under the restitutionary provisions of Article 267 represented a finding that there was under Kuwaiti law a provision of substantive law which closely corresponded to the award in England of compound interest against a person whom English law would regard as a trustee or constructive trustee in respect of monies stolen or appropriated by fraud. Accordingly, if the judge was wrong to regard his award of compound interest as a matter of procedural law for the lex fori, he was nonetheless justified in making the award he did, given that it "harmonise[d] with the right according to its nature and extent as fixed by the foreign law" (see *Phrantzes -v- Argenti [1960] 2 QB 19* at 35 and *Dicey & Morris* (13th ed.) at page 171) and was thus the remedy appropriate in English law to give effect to the substantive right contained in Article 267 . That being so, it is strictly unnecessary to decide the question, hitherto devoid of authority, as to whether an award of interest against a person in the position of a trustee or constructive trustee is better regarded as substantive or procedural in character so far as English law is concerned. What does seem clear to us, however, is that (although the judge held it to be so) the answer is not necessarily the same as that in respect of an award under *s.35A of the Supreme Court Act 1981* (which prohibits awards of compound interest).

205.  As to the nature of awards under *s.35A* there is a degree of controversy whether, *for the purposes of the conflict of laws* a claim for and/or the award of simple interest in respect of debt or damages should be characterised as procedural (as the judge concluded) or substantive in nature. In stating his conclusion on that point, the judge said that he found the reasoning of Hobhouse J in Midland International -v- Al Sudairy convincing. In brief summary, that reasoning was that (1) there is no English common law right to be paid general damages by way of interest or otherwise for delay in payment of a debt (see *President of India -v- La Pintada [1985] AC 104* ), the statutory discretion provided by *s.35A* being an alternative to any substantive right and not reflective of it; (2) the power is a broad discretionary power in the court to remedy injustice as part

of its procedure; see the La Pintada decision at p.131 per Lord Brandon, and BP Explorations -v- Hunt No.2 [1979] 1 WLR 793 at 845 et seq per Robert Goff J approved by the House of Lords at [1983] AC 352 ; (3) the statutory power is dependent on and springs from the existence of legal proceedings, rather than altering or adding to the contractual rights of the parties. Thus it is an incident of procedure and not of substantive law.

206.  In coming to his conclusion, Hobhouse J rejected the contrary view, at that time expressed in general terms in *Dicey & Morris (11th Ed)* in the text beneath Rule 199 (now to be found in somewhat expanded form beneath Rule 196 in *Dicey & Morriis (13th ed.)* at pp.1459-60) and adopted by Bristow J in *Miliangos -v- George Frank Textiles (No.2) [1977] QB 489* at 496-7, that in respect of "claims for interest as damages", the right to claim such interest is at common law governed by the law which is applicable to the contract albeit the rate of interest to be awarded is a matter for the lex fori. That view is essentially based on the premise that a claim for interest is in substance a claim for damages in the sense that it is awarded as compensation to the plaintiff for being kept out of money justly due to him, and that the question of whether or not such a claim or award is available to a claimant is (like the availability of heads of damage strictly so called) governed by the law applicable to the contract or tort sued upon. Hobhouse J, like the judge in this case, recognised that a claim for interest due *under an express or implied term* in a contract (like the identification of recoverable heads of damage in the law of tort) is a matter of substantive law for the lex causae. However, he took the view that Rule 199 (now Rule 196) in *Dicey & Morris* should be confined to the context of a *contractual* right to interest and he pointed out that the question whether the general *discretionary* power of the court under s.35A is itself substantive or procedural is a different matter.

207.  While we acknowledge the force of Hobhouse J's reasoning as an analysis of the nature and origins of the English court's general power to award interest, it is also right to observe that the creation of that power creates a right in a claimant to claim interest, which right is recognised and consistently given effect on the basis that it represents compensation to the claimant for having been kept out of money to which he has been held entitled

208.  Because it is not necessary to resolve the controversy over s.35A for the purpose of deciding this appeal, we do not propose to do so. That is because it has not been fully argued before us, and we consider that any thorough review of the proper characterisation of the power of the court under s.35A should take into account the possible effect of Article 10(1) of the *Rome Convention on the Law Applicable to Contractual Obligations 1980* which was imported into English law by the Contracts (Applicable Law) Act 1990 , but which had not come into effect at the time of Hobhouse J's decision. The editors of *Dicey & Morris* express the view at p.1459 of the current (13th) edition that, for the purposes of the Convention, the right to claim interest should be regarded as a substantive matter for the applicable law as one of the 'consequences of breach': see Article 10(1)(c) . However, we express no view upon that point, because we have heard no argument upon it.

209.  All that said, the judge did not make his award of interest as a matter of, or in connection with, a claim for debt, breach of contract or damages for tort. He made it as part of a restitutionary award of compensation for breach of fiduciary duty. Such a claim made on the basis of trusteeship and available to the claimants in the circumstances of the case, is by its origin and nature an equitable proprietary claim moulded and used for the purpose of achieving restitution by a person called to account by equity on the basis of a defaulting trustee. Since there is no jurisdiction in the court to award compound interest at common law or by statute, it was indeed the only basis on which the judge could make an award of compound interest. The jurisdiction which he exercised is that which Lord Brandon stated in the La Pintada case at p.116 is confined to situations

> "where money had been obtained and retained by fraud, or where it had been withheld or misapplied
> by a trustee or anyone else in a fiduciary position"

© 2020 Thomson Reuters.

and which the majority of the House of Lords declined to expand further in the Westdeutsche Bank case (see per Lord Browne-Wilkinson at 717F, Lord Slynn of Hadleigh at 718f-719b and Lord Lloyd of Berwick at 739b-741a).

210.  In such a case, the award of compound interest is made on the basis that a trustee misapplying monies for his own benefit, and a person obtaining or retaining money by fraud who is to be similarly treated, should be obliged either to account in full for the benefit he has unjustly derived or, in lieu of such account, to pay compound interest when the circumstances justify an award on that basis. The rationale is historically and essentially that of restitution i.e. that a fiduciary should not be permitted to make a profit from his trust. As explained by Lord Denning MR in Wallersteiner v Moir (No.2) at page 388, it is also a means of ensuring full compensation where the wrongdoer deprives a person or company of monies employed in trading operations. It is noteworthy that the judgments of Buckley LJ and Scarman LJ did not refer to that aspect as constituting the basis for a compound award. It is nonetheless an element which usually plays a part in the reasoning of the court when considering whether or not to make such an award in modern conditions.

211.  It seems to us that the court's power in such circumstances to award compound interest (although discretionary in the sense that it will be exercised in accordance with established equitable principles) is not only distinct, but different in character, from its broad powers under s.35A , being a necessary adjunct of the claimant's substantive right to restitution. An award of compound interest upon that basis is thus itself substantive rather than merely procedural in nature. Accordingly, whilst we would differ from the reasoning of the judge in that last respect, that difference is not one which leads to any different result so far as the award of interest in this case is concerned, in the light of the provisions of Article 267 of the Kuwait Civil Code.

**Conclusion**

212.  For the above reasons, the appeals of Mr Al Bader and Mr Qabazard will be dismissed. The appeal of Captain Stafford will be allowed to the extent that the sums which he was ordered to pay (see paragraph 3 above) will be reduced by reason of his not being liable in respect of losses incurred after he left Kuwait in September 1989 (see paragraph 164 above). We anticipate that the amount of the reductions will be capable of agreement between the parties.

**Order: appeals of Mr Al Bader and Mr Qabazard dismissed; appeal of Captain Stafford allowed in part; applications to adduce further evidence granted; no order to be drawn up today; counsel for the defendants to have until 9th June to put in written submissions on any points they wish to address; counsel for claimants to have until 16th June to put in any submissions in answer.**

Crown copyright

© 2020 Thomson Reuters.

The Weekly Law Reports 10 December 1993

1489

1 W.L.R.          Armstrong & Holmes Ltd. v. Holmes (Ch.D.)          Judge Paul
                                                                     Baker Q.C.

A     In my judgment, the deputy master correctly found that there was no defence in this case, and hence I dismiss the appeal.

                                        *Appeal dismissed.*

      *Solicitors: Roythorne & Co., Spalding; Rutherford Wallace Mitchell, Nottingham.*

B
                                                    T. C. C. B.

C

                                ————

                        [COURT OF APPEAL]

D     *LONRHO PLC. AND OTHERS v. FAYED AND OTHERS (No. 5)

                        [1991 L. No. 4705]

1993   June 15, 16, 17, 30;          Dillon, Stuart-Smith and Evans L.JJ.
       July 1; 22

E     *Practice—Pleadings—Striking out—Abuse of process of court—Action for conspiracy—Claims for injury to reputation and pecuniary loss—Whether abuse of process of court*

      The plaintiffs, two individuals and a company, claimed against the defendants damages and an injunction for conspiracy, alleging that by that conspiracy the defendants had sponsored and encouraged a third party to publish defamatory statements about the plaintiffs and financed and caused another third party
F     to bring an action against the plaintiffs, and that the plaintiffs had suffered damage. No particulars of the damage were given. The judge struck out the action as an abuse of the process of the court.

      On the plaintiffs' appeal and application for leave to amend the pleadings by alleging injury to the plaintiffs' reputation and feelings and pecuniary loss to the company:—
G     *Held*, (1) that the plaintiffs could recover damages for injury to reputation and injury to feelings only in an action for defamation; that such damages could not be recovered in an action for conspiracy; and that, accordingly, so far as the individual plaintiffs were concerned, the amendments sought would be refused and the action would remain struck out (post, pp. 1496B–C, 1497A, 1498C–D, 1502G, 1505A–B, 1506B, 1507G–H, 1509A, B, C, D, 1511B).
H     *Joyce v. Sengupta* [1993] 1 W.L.R. 337, C.A. and *Spring v. Guardian Assurance Plc.* [1993] I.C.R. 412, C.A. applied.
      *Thurston v. Charles* (1905) 21 T.L.R. 659 disapproved.
      (2) Allowing the appeal in part, that actual pecuniary loss could be recovered in an action for conspiracy and, therefore, the judge's order would be set aside, so far as the company was concerned, and the company given leave to amend the statement of claim by alleging particulars of actual pecuniary loss (post, pp. 1494A–B, 1496D–E, 1498C, 1501B, 1507G–H, 1508E–F, 1511B).

Lonrho Plc. v. Fayed (No. 5) (C.A.)                                    [1993]

> *Per* Dillon L.J. It would be lamentable if a plaintiff could         A
> recover damages against defendants who had combined to tell
> the truth about the plaintiff and so had destroyed his unwarranted
> reputation (post, p. 1496c–d).
> Decision of Macpherson of Cluny J. reversed in part.

The following cases are referred to in the judgments:

*Addis v. Gramophone Co. Ltd.* [1909] A.C. 488, H.L.(E.)
*Bell-Booth Group Ltd. v. Attorney-General* [1989] 3 N.Z.L.R. 148      B
*Berry v. British Transport Commission* [1962] 1 Q.B. 306; [1961] 3 W.L.R.
    450; [1961] 3 All E.R. 65, C.A.
*British Airways Board v. Laker Airways Ltd.* [1985] A.C. 58; [1984]
    3 W.L.R. 413; [1984] 3 All E.R. 39, H.L.(E.)
*British Motor Trade Association v. Salvadori* [1949] Ch. 556
*Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435;
    [1942] 1 All E.R. 142, H.L.(Sc.)                                      C
*Dixon v. Calcraft* [1892] 1 Q.B. 458, C.A.
*Draper v. Trist* [1939] 3 All E.R. 513, C.A.
*Fielding v. Variety Incorporated* [1967] 2 Q.B. 841; [1967] 3 W.L.R. 415;
    [1967] 2 All E.R. 497, C.A.
*Foaminol Laboratories Ltd. v. British Artid Plastics Ltd.* [1941] 2 All E.R.
    393
*Hook v. Cunard Steamship Co.* [1953] 1 W.L.R. 682; [1953] 1 All E.R. 1021   D
*Joyce v. Sengupta* [1993] 1 W.L.R. 337; [1993] 1 All E.R. 897, C.A.
*Letang v. Cooper* [1965] 1 Q.B. 232; [1964] 3 W.L.R. 573; [1964] 2 All E.R.
    929, C.A.
*Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C.173; [1981]
    3 W.L.R. 33; [1981] 2 All E.R. 456, H.L.(E.)
*Lonrho Plc. v. Fayed* [1992] 1 A.C. 448; [1991] 3 W.L.R. 188; [1991] 3 All
    E.R. 303; H.L.(E.)
*Lonrho Plc. v. Fayed (No. 2)* [1992] 1 W.L.R. 1; [1991] 4 All E.R. 961     E
*Martine v. South East Kent Health Authority*, The Times, 8 March 1993;
    Court of Appeal (Civil Division) Transcript No. 245 of 1993, C.A.
*Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* [1892] A.C. 25,
    H.L.(E.)
*Petch v. Customs and Excise Commissioners* [1993] I.C.R. 789, C.A.
*Pratt v. British Medical Association* [1919] 1 K.B. 244
*Quartz Hill Consolidated Gold Mining Co. v. Eyre* (1883) 11 Q.B.D. 674,
    C.A.                                                                  F
*Quinn v. Leathem* [1901] A.C. 495, H.L.(I.)
*Ratcliffe v. Evans* [1892] 2 Q.B. 524, C.A.
*Rookes v. Barnard* [1964] A.C. 1129; [1964] 2 W.L.R. 269; [1964] 1 All
    E.R. 367, H.L.(E.)
*Savile v. Roberts* (1699) 1 Ld.Raym. 374
*Singh v. Observer Ltd.* [1989] 2 All E.R. 751; [1989] 3 All E.R. 777, C.A.
*Solway Prince, The* (1914) 31 T.L.R. 56                               G
*Spalding (A.G.) & Bros. v. A. W. Gamage Ltd.* (1918) 35 R.P.C. 101, C.A.
*Speed Seal Products Ltd. v. Paddington* [1985] 1 W.L.R. 1327; [1986] 1 All
    E.R. 91, C.A.
*Spring v. Guardian Assurance Plc.* [1993] I.C.R. 412; [1993] 1 All E.R. 273,
    C.A.
*Sybron Corporation v. Rochem Ltd.* (unreported), 22 November 1982, Peter
    Gibson J.                                                            H
*Thurston v. Charles* (1905) 21 T.L.R. 659
*Trego v. Hunt* [1896] A.C. 7, H.L.(E.)
*United Australia Ltd. v. Barclays Bank Ltd.* [1941] A.C. 1, H.L.(E.)
*Walter v. Alltools Ltd.* (1944) 61 T.L.R. 39, C.A.

The following additional case was cited in argument:

*Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40,
    C.A.

A       INTERLOCUTORY APPEAL from Macpherson of Cluny J.

By a writ and re-amended statement of claim dated 17 June 1991 the plaintiffs, Lonrho Plc., R. W. Rowland and The Rt. Hon. Sir Edward du Cann, claimed damages against the defendants, Mohamed Fayed, Ali Fayed, House of Fraser Holdings Plc., Richard New, David Royston Webb and Michael Cole. By two orders dated 24 July 1992 the judge struck out the action as an abuse of the process of the court.

B       By two notices of ex parte application dated respectively 18 and 19 August 1992 the plaintiffs sought leave to appeal on the grounds that, inter alia, the judge erred in holding that it was open to him to find, and in finding, that the proceedings had no proper basis and the claims were not made in good faith and with a genuine belief in their merits; the judge erred in holding that it was open to him to find, and in finding,

C       that damages were not palpable and at large, and that the approach to the quantum of damage would not be similar to that which would have been adopted had the claim been framed in defamation; and the judge erred in holding that it was open to him to find, and in finding, that the action was more properly brought as defamation proceedings and that it was wrongly "dressed up as a conspiracy to injure."

The facts are stated in the judgments.

D
*Harvey McGregor Q.C., John Beveridge Q.C.* and *David Mildon* for the plaintiffs.
*James Munby Q.C.* and *Alastair Walton* for the first, second, third, fifth and sixth defendants.
*Edward Faulks* for the fourth defendant.

E
                                                        *Cur. adv. vult.*

22 July.   The following judgments were handed down.

DILLON L.J.   This matter came before this court, under directions given by Neill L.J., as an application by the plaintiffs, Lonrho Plc.

F       ("Lonrho"), Mr. R. W. Rowland and Sir Edward du Cann, for leave to appeal against an order of Macpherson of Cluny J. of 24 July 1992, and on the basis that if leave was granted the hearing of the appeal would immediately follow. In the course of the argument we granted leave to appeal and I now give my judgment on the appeal.

The order of the judge was that the action be struck out against the first six of the remaining defendants ("the defendants"). There were at

G       one stage various other defendants, who have since ceased to be parties to the action, but it seems that there is still one further defendant, a company, with which we are not concerned since it was not a party to the application before the judge and is not a party to this appeal.

It is well known that since 1985 there has been acrimony between Lonrho and Mr. Rowland and the first two defendants ("the Fayeds") as

H       a result of the circumstances in which in 1985 the Fayeds succeeded in gaining control of a company called House of Fraser Holdings Plc. ("House of Fraser"). One result of this has been a substantial amount of hard-fought litigation, and the principal action, after an interlocutory excursion to the House of Lords *(Lonrho Plc. v. Fayed* [1992] 1 A.C. 448), awaits trial next year. A second action, *Lonrho Plc. v. Fayed (No. 2)* [1992] 1 W.L.R. 1, arising out of the same circumstances as the principal action, was started by Lonrho in September 1990. This asserted

Dillon L.J.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          [1993]

that a sale by Lonrho to, in effect, the Fayeds in November 1984 of a        A
29·9 per cent. holding in House of Fraser was induced by fraudulent
misrepresentations by the Fayeds; and it sought consequential relief by
way of a constructive trust. *Lonrho Plc. v. Fayed (No. 2)* was struck out
by Millett J. [1992] 1 W.L.R. 1, 7 on 12 April 1991 on the ground that
Lonrho's claim:

> "has no foundation in fact and is not made in good faith and with a        B
> genuine belief in its merits, but has been manufactured to provide a
> vehicle for a further public denunciation of the Fayeds."

There has been no appeal against that order of Millett J., but the grounds
on which he concluded that the claim had no foundation in fact have no
relevance to the present action.

There is no doubt that there has been extensive public denunciation        C
of the Fayeds by Lonrho, not least in the circulation of a document
entitled "A Hero from Zero" and of a special issue of the "Observer"
newspaper. The matters in issue in the present action are said by the
Fayeds to represent a counter-attack, in self-defence, by the Fayeds
against Lonrho, in order to induce Lonrho to abandon its persistent
campaign of vilification against the Fayeds. There was beyond any
question a campaign of vilification against Lonrho and Mr. Rowland        D
carried on, ostensibly, by a Miss Francesca Pollard in her own name and
for her own reasons. In the course of this campaign scurrilous letters
were sent by Miss Pollard to a large number of people, including
shareholders in Lonrho, people in responsible positions in this country,
and people in responsible positions in the public services of countries in
Africa and the Middle East where Lonrho did business or was hoping to        E
do business. Also, scurrilous pamphlets were published by Miss Pollard
and other actions were taken which I need not mention now. It is said
by the plaintiffs, and accepted by the defendants, that this campaign of
Miss Pollard's was clandestinely sponsored and encouraged by the
defendants. It is said further, but disputed, that the campaign was thus
sponsored and encouraged with the purpose of injuring the plaintiffs. It
is also said by the plaintiffs, and for present purposes accepted by the        F
defendants, that the Fayeds and House of Fraser financed, and caused a
Mr. Esterhuysen to bring, an action in the Chancery Division 1987
E. No. 334 ("the Esterhuysen action") in the name of Jacobus Philipus
Esterhuysen against Lonrho and Mr. Rowland and others which is still
pending. There is no doubt at all that much that was said in the
documents circulated by Lonrho was, unless true, plainly defamatory of        G
the Fayeds, and much that was said in Miss Pollard's letters and
pamphlets was, unless true, plainly defamatory of Lonrho and
Mr. Rowland. But no proceedings in defamation have been brought by
either side.

The present action, which was started on 11 July 1991, claims damages
and injunctive relief against the defendants in respect of Miss Pollard's
campaign and its alleged consequences and the Esterhuysen action; the        H
cause of action relied on is that form of the tort of conspiracy which has
been referred to, not altogether conveniently, as a "lawful means"
conspiracy. That is the form of action in conspiracy, recognised by the
House of Lords in *Lonrho Plc. v. Fayed* [1992] 1 A.C. 448 and *Lonrho
Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 and other
decisions there discussed, where actions which, if done by one person on
his own, would be lawful and cannot be actionable, can be actionable as

A  a tortious conspiracy if done by several persons in combination and if the predominant purpose of those persons was to injure the plaintiff, and not to protect or forward their own interests: see, also, the speech of Viscount Simon L.C. in the *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 442–443. So far as this court is concerned, there is no doubt that we have to recognise the validity of such a cause of action. From the plaintiffs' point of view, the virtue of it is that the

B  truth or otherwise of the allegations against Lonrho and Mr. Rowland in Miss Pollard's letters and pamphlets would not be an issue in the action; it would be no defence to the defendants to justify the allegations and submit that they cannot be actionable because they are true.

This leads to the serious dilemma, to which I shall refer below, as to whether it is possible by this form of action to circumvent the

C  requirements of a defamation action and recover damages for injury to reputation without the defendants being able to plead justification or assert that the high reputation was not deserved. Can a plaintiff by this form of action recover damages for injury to reputation if the defendants have combined to publish the truth about him?

In fact the judge, while very sceptical about the plaintiffs' prospects of obtaining damages or an injunction if the action were to go to trial,

D  struck it out, as an abuse of the process of the court, on the ground that the plaintiffs were misusing the court's processes in seeking to pursue this action at all. The plaintiffs' object was, in the judge's view, simply to continue the plaintiffs' half of the parties' vendetta in the artificial form of an action at law so that at the trial the plaintiffs could ventilate their allegations against the Fayeds and vilify the Fayeds with maximum publicity.

E  The temptation is great to say "a plague on both your houses and let not the court's time be wasted with any further litigation between them" beyond the principal action already fixed for trial in 1994. But the issue as to what the plaintiffs' purpose is in bringing this action is an issue of fact which is disputed and it cannot, in my judgment, be decided at an interlocutory stage on the tendentious affidavits of the solicitors on each

F  side. It can only be decided at the trial: compare *Speed Seal Products Ltd. v. Paddington* [1985] 1 W.L.R. 1327.

The defendants seek to support the judge's conclusion also on grounds on which the judge himself did not base the decision. The defendants say, in particular, that this action must fail because the plaintiffs could not possibly demonstrate, as they must, that the predominant purpose of

G  the defendants, in their clandestine backing of Miss Pollard's campaign or the Esterhuysen action, was to injure the plaintiffs. But what the defendants' predominant purpose was is again a question of fact which cannot be decided on the affidavits and must be left for the trial.

Two other matters I can also dispose of shortly. In the first place, the defendants say that, in view, apart from anything else, of the striking out of *Lonrho Plc. v. Fayed (No. 2)* [1992] 1 W.L.R. 1 as an abuse of the

H  process of the court, the plaintiffs do not come to court with clean hands and, therefore, are forever precluded from obtaining any injunction or other equitable relief against the Fayeds. As I see it, however, there is no absolute bar. The granting of an injunction is a matter for the discretion of the trial judge, if he holds that the purpose of the plaintiffs in bringing the action is not improper and the action is not in itself an abuse of the process of the court. In the second place, the position of the fourth defendant, Mr. Richard New, who is separately represented, does

Dillon L.J.        Lonrho Plc. v. Fayed (No. 5) (C.A.)        [1993]

A

not differ from that of the other defendants. He participated willingly in what was done by and for the Fayeds, and there is no basis for striking the action out against him if it is not struck out against the other defendants.

I come now to the question of damages which has bulked very large in the argument of this appeal.

B

A plaintiff in a civil action for conspiracy must prove actual pecuniary loss, though if he proves actual pecuniary loss the damages are at large, in the sense that they are not limited to a precise calculation of the amount of the actual pecuniary loss actually proved: see *Quinn v. Leathem* [1901] A.C. 495, especially the charge of the trial judge to the jury, as set out at p. 498, which was approved by Lord Halsbury L.C., at p. 508, and by other members of the House of Lords. As Lord Diplock said in *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173, 188: "The gist of the cause of action is damage to the plaintiff." But, relying on the proposition that damages are at large, the plaintiffs had, until the opening of the hearing in this court, merely included in their statement of claim in its original form and as amended, the broad conventional allegation, without any particulars as against the defendants, in paragraph 29 that "by reason of the matters set out above the plaintiffs have suffered loss damage and injury."

C

D

I have no doubt at all that was a grossly inadequate pleading. As Bowen L.J. said in *Ratcliffe v. Evans* [1892] 2 Q.B. 524, 532–533, in giving the judgment of this court:

"In all actions accordingly on the case where the damage actually done is the gist of the action, the character of the acts themselves which produce the damage, and the circumstances under which these acts are done, must regulate the degree of certainty and particularity with which the damage done ought to be stated and proved. As much certainty and particularity must be insisted on, both in pleading and proof of damage, as is reasonable, having regard to the circumstances and to the nature of the acts themselves by which the damage is done. To insist upon less would be to relax old and intelligible principles. To insist upon more would be the vainest pedantry."

E

F

This was applied by Peter Gibson J. in his judgment in *Sybron Corporation v. Rochem Ltd.* (unreported), 22 November 1982. More recently Sir Donald Nicholls V.-C. said, in *Joyce v. Sengupta* [1993] 1 W.L.R. 337, 346H, that the plaintiff would need to give particulars of the financial loss claimed sufficient to ensure that the defendants would not be taken by surprise by any evidence adduced on the amount of this loss.

G

The court having indicated its disapproval of the pleading of damage in the statement of claim up to the date of the hearing in this court, and the hearing having been adjourned for reasons of listing, Mr. Beveridge presented to the court, in advance of the resumed hearing, particulars of damage which he sought leave to insert by amendment in the existing paragraph 29. The new particulars, including schedules, run to some 40 pages, and without them the defendants would not have had notice of the nature of the plaintiffs' case on damage.

H

The principal issue is whether the plaintiffs can recover in this form of action damages for injury to reputation, or, as it is alternatively put, business reputation. A further issue is whether, in the case of Lonrho,

Case 9:20-cv-80599-DMM   Document 22-6   Entered on FLSD Docket 06/12/2020   Page 66 of 242

A   injury to business reputation can be recovered as a form of injury to property, sc. goodwill; that involves considering what is meant by goodwill and, on the way the case has been argued by Mr. Beveridge, whether fluctuations in the share price of a company reflect its goodwill and reputation. In the case of the individual plaintiffs there is an issue whether they can recover in this form of action damages for injury to feelings, in addition or as an alternative to damages for loss of business reputation.

B   Part of the difficulty is that in *Joyce v. Sengupta* [1993] 1 W.L.R. 337, 348F–G Sir Donald Nicholls V.-C. stated that damages for injury to reputation could not be recovered in an action for malicious falsehood; the only remedy for such loss is an action for defamation in which damages for injury to feelings can also be included in a general award of damages. His observations seem to have been founded on the judgment

C   of Lord Denning M.R. in *Fielding v. Variety Incorporated* [1967] 2 Q.B. 841. Sir Michael Kerr, after citing from *McGregor on Damages*, 15th ed. (1988), pp. 871–872, para. 1403–1406, referred in *Joyce v. Sengupta* [1993] 1 W.L.R. 337, 351E to cases which supported the conclusion that, in claims other than for defamation, damages for distress and injury to feelings were not recoverable as a separate head of damages, but only,

D   in appropriate cases, as an ingredient of aggravated damages.

     There is also the recent case in this court of *Spring v. Guardian Assurance Plc.* [1993] I.C.R. 412, which was followed by another division of this court in *Martine v. South East Kent Health Authority,* The Times, 8 March 1993; Court of Appeal (Civil Division) Transcript No. 245 of 1993, decided on 25 February 1993. Those cases applied the law as stated

E   by Sir Robin Cooke P. in the New Zealand case of *Bell-Booth Group Ltd. v. Attorney-General* [1989] 3 N.Z.L.R. 148. He had stressed that the law as to injury to reputation and freedom of speech was a field of its own. He had also pointed out that the common law rules, and their statutory modifications, regarding defamation and injurious falsehood represented compromises gradually worked out by the courts over the years, with some legislative adjustments, between competing values.

F   Therefore, apart from the fact that in defamation truth was an absolute defence, the established rules in defamation as to privilege and fair comment could not be side-stepped by pleading the case in negligence and asserting a duty of care to speak the truth when making a statement.

     Conversely, Mr. Beveridge referred us to the decision of this court in *Walter v. Alltools Ltd.* (1944) 61 T.L.R. 39 and the decision of Slade J.

G   in *Hook v. Cunard Steamship Co. Ltd.* [1953] 1 W.L.R. 682 as showing that in an action for damages for the tort of false imprisonment the court can award aggravated damages for the injury to the plaintiff's reputation caused by the circumstances of his wrongful imprisonment. That does not, in my judgment, help in my present case.

     Mr. Beveridge also referred us to a decision of Walton J. in *Thurston v. Charles* (1905) 21 T.L.R. 659, where damages for injury to the

H   plaintiff's reputation were awarded to the plaintiff as damages for conversion of a letter written to her and which was therefore her property, although damages for defamation in respect of the publication of the contents of the letter could not have been obtained because the occasion of the publication, which was also the conversion of the letter, was privileged. In my judgment that decision is inconsistent with *Joyce v. Sengupta* and *Spring v. Guardian Assurance Plc.* and cannot stand. It is also contrary to the firm views of this court in *Dixon v. Calcraft* [1892]

1 Q.B. 458 that damages for injury to reputation cannot be awarded in an action for wrongful detention of a chattel or trespass to goods: see, *per* Lord Esher M.R., at p. 464, and *per* Lopes L.J., at p. 466.

On the other side, Mr. Faulks referred us to a passage in the judgment of Hallett J. In *Foaminol Laboratories Ltd. v. British Plastics Ltd.* [1941] 2 All E.R. 393, 399:

"a claim for mere loss of reputation is the proper subject of an action for defamation, and cannot ordinarily be sustained by means of any other form of action."

But that was said in the context of reference to *Addis v. Gramophone Co. Ltd.* [1909] A.C. 488 and other authorities on the law of contract.

In my judgment, if the plaintiffs want to claim damages for injury to reputation or injury to feelings, they must do so in an action for defamation, not in this very different form of action. Injury to reputation and to feelings is, with very limited exceptions, a field of its own and the established principles in that field are not to be side-stepped by alleging a different cause of action. Justification, truth, is an absolute defence to an action for defamation and it would, in my judgment, be lamentable if a plaintiff could recover damages against defendants who had combined to tell the truth about the plaintiff and so had destroyed his unwarranted reputation. But that would be the consequence if damages for injury to reputation and injury to feelings could be claimed in a "lawful means" conspiracy action. To tell the truth would be wrongful. I see no difference in this regard between general reputation and commercial or business reputation.

To prove loss of orders and loss of trade is another matter; that is recognisable pecuniary damage. The claim in respect of the joint venture with Iranian interests referred to in part II of schedule 2 to the particulars of damage could come in under this heading if a link between the loss of the venture and Miss Pollard's campaign is sufficiently proved. Such loss of orders, for example, would involve injury to the goodwill of a business which may be one of the most important assets of the business. But goodwill in that sense must have the meaning put on that word in *Trego v. Hunt* [1896] A.C. 7: see especially, *per* Lord Herschell, at pp. 17–18, and *per* Lord Macnaghten, at p. 24. It cannot mean some airy-fairy general reputation in the business or commercial community which is unrelated to the buying and selling or dealing with customers which is the essence of the business of any trading company.

Again, the well-established right to damages in passing off, where deceptive goods have been put on the market and passed off as the plaintiff's goods, has a practical relationship to the plaintiff's business which is a long way from the allegations of injury to the business goodwill of Lonrho in the particulars: see *Draper v. Trist* [1939] 3 All E.R. 513, 519F–G, *per* Sir Wilfrid Greene M.R. and *A. G. Spalding & Bros. v. A. W. Gamage Ltd.* (1918) 35 R.P.C. 101, 116, where Swinfen Eady L.J. cited from the speech of Lord Sumner on the hearing of an earlier stage in that case in the House of Lords; those were straightforward deceptive goods cases which bear no resemblance at all to the elaborate allegation of injury to business goodwill or business reputation in the particulars in the present case.

Beyond that, Lonrho's share price is not an aspect of Lonrho's goodwill in the sense referred to above. The share price of Lonrho is not an asset of Lonrho at all. That the share price may be affected by the

**1 W.L.R.**                    **Lonrho Plc. v. Fayed (No. 5) (C.A.)**                    **Dillon L.J.**

A  perceptions of stock market analysts, financial commentators and business journalists does not mean that the assets of Lonrho are affected by such perceptions or that Lonrho suffers pecuniary damage if its share price falls as a result of the publication of such perceptions.

So far as the individual plaintiffs are concerned, damages for injury to the reputation of each can only be recovered in a defamation action. It would be unreal to say of, e.g., Mr. Rowland that he has a double

B  reputation, a general reputation, which can only be the subject of a defamation action, and a business reputation, which can be the subject of any other cause of action.

[His Lordship considered subheads (a) to (c) of the proposed amendments to the particulars of claim, allowed some of those amendments, and continued:]

C  Subhead (d) claims the cost of managerial and staff time spent in investigating, or mitigating the consequences of, the conspiracy. There is also a claim for out of pocket expenses in respect of extra security guards, small in amount, but obviously related to aspects of the conspiracy. I would allow the subhead to be pleaded. *British Motor Trade Association v. Salvadori* [1949] Ch. 556 indicates that time spent in detecting and countering a conspiracy can be included in a claim for

D  damages, at any rate if, as in that case, there is also other pecuniary loss; in a simple case where there is other pecuniary loss, that seems elementary justice. Mr. Munby submits that, since, with a "lawful means" conspiracy, damage is the gist of the cause of action, it would be self-serving to allow the mere cost of staff time, or payment to third parties, to investigate and uncover the conspiracy to count as damage and warrant the bringing of the action if the acts done by the conspirators have caused

E  no other damage to the victim. But that, in my view, is a matter better gone into at the trial when fuller facts are available to show what actually was done by Lonrho staff that is claimed under this heading.

Subhead (e) is also concerned with management resources and staff time, but in relation to investigating the matters raised in the Esterhuysen action. This is in addition to the claim in subhead (f) for the costs, or

F  alternatively the irrecoverable costs, of defending the Esterhuysen action. Therefore whatever is claimed in subhead (e) would seem to be something so remote that it could not properly be included in a bill of costs of Lonrho as a defendant in the Esterhuysen action. The claim by Lonrho for the costs of the Esterhuysen action cannot be sustained unless Lonrho wins the Esterhuysen action, and that has not yet happened. But it appears from the decision at first instance in *Singh v. Observer Ltd.*

G  [1989] 2 All E.R. 751 that if Lonrho succeeds in the Esterhuysen action, the trial judge in that action would be entitled to order the Fayeds to pay Lonrho's costs of that action. It is established that a party to a civil action cannot, in a separate action, recover against the other party to the first action costs of the first action which he was not awarded at the trial of that action: see *Quartz Hill Consolidated Gold Mining Co. v. Eyre*

H  (1883) 11 Q.B.D. 674, which, in *Berry v. British Transport Commission* [1962] 1 Q.B. 306, was held to be authority binding on this court, so far as civil proceedings are concerned.

It is therefore submitted that the same principle should be applied to the recovery by Lonrho from third parties, the Fayeds, of its costs of the Esterhuysen action. But, before the abolition in 1967 of the tort of maintenance (see Criminal Law Act 1967, section 14), Lonrho would, notwithstanding the principle in *Quartz Hill Consolidated Gold Mining*

Case 9:20-cv-80599-DMM   Document 22-6   The Weekly Law Reports 11 December 1993   Entered on FLSD Docket 06/12/2020   Page 69 of 242

1498

*Co. v. Eyre*, have been entitled to sue the Fayeds for its costs of the   A
Esterhuysen action in a separate action for the tort of maintenance. That
tort has now been abolished and maintenance is not tortious or illegal,
but I do not see that that prevents Lonrho bringing a separate action
under another recognised head of tort, "lawful means" conspiracy, if the
requisite ingredients of that tort can in all other respects be made out.
Accordingly, for my part, I would allow subhead (f) to be pleaded. I
would also allow subhead (e) to be pleaded because if subhead (f) is   B
allowed and succeeds it must be arguable that there is expenditure within
subhead (e) which, subject to examination of the facts at the trial, ought
to be allowed on the *British Motor Trades Association v. Salvadori*
principle.

That leaves subhead (g), a residual claim to damages at large. It adds
nothing, by way of particularity, and I would exclude it as unnecessary.   C

It follows that I would, for my part, allow the appeal of Lonrho, set
aside the order of the judge, so far as Lonrho is concerned, and give
Lonrho limited leave to re-re-amend paragraph 29 of its statement of
claim.

So far as the individual plaintiffs are concerned, I would refuse to
allow the introduction by amendment of either of the heads of damages
suggested. Accordingly, so far as the individual plaintiffs are concerned,   D
the action must remain struck out.

STUART-SMITH L.J.

*The plaintiffs' cause of action*

The plaintiffs' cause of action is conspiracy to injure. The essential   E
ingredients of this tort are an agreement by two or more persons to do
acts, lawful in themselves, for the sole or predominant purpose of causing
injury to the plaintiff, and which cause pecuniary loss to the plaintiff: see
*Lonrho v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 and *Lonrho
Plc. v. Fayed* [1992] 1 A.C. 448. It is not an action for defamation or
malicious falsehood; nor is it a conspiracy to injure by unlawful means.   F
The case is in the main based upon statements made, ostensibly by Miss
Pollard but in reality, it was alleged, by the defendants. There is no plea
in the statement of claim that these statements are false and Mr.
Beveridge accepted, albeit reluctantly, that the case had to proceed on
the basis that the statements were true. Nevertheless he contended that
the defendants committed a tort if two or more agreed to tell the truth
about the plaintiffs, with the sole or predominant purpose of injuring   G
them, and in fact caused them pecuniary loss. Mr. Munby accepted that
in this court that was the law. He reserved the right to argue in the
House of Lords that this type of conspiracy should be confined to acts
rather than words. Lord Diplock, in *Lonrho Ltd. v. Shell Petroleum Co.
Ltd. (No. 2)* [1982] A.C. 173, 189c described the action as anomalous.
This case shows just how anomalous it is.
                                                                H

*The application to strike out the statement of claim*

This being an application to strike out on the basis that the statement
of claim discloses no cause of action and/or is an abuse of the process of
the court, it is trite law that it should only be struck out if there is no
arguable case disclosed on the pleadings and that situation cannot be
cured by amendment or if the action is clearly an abuse of process. The

Case 9:20-cv-80599-DMM   Document 22-6   Entered on FLSD Docket 06/12/2020   Page 70 of 242

The Weekly Law Reports 10 December 1993

1499

1 W.L.R.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          Stuart-Smith L.J.

A   allegations of fact have to be assumed to be true. Furthermore, novel and difficult points of law in an expanding field of law should not be determined against a plaintiff: see *Lonrho Plc. v. Fayed (No. 2)* [1992] 1 W.L.R. 1.

*Proceedings before the judge*

B   Before Macpherson of Cluny J. the defendants made four principal submissions. (1) The plaintiffs could not arguably prove that the sole or predominant purpose of the conspiracy alleged was to injure the plaintiffs, as opposed to serving their own legitimate interests. (2) The plaintiffs could not arguably prove damage of the type necessary to found the cause of action. It is not altogether clear whether they also took the point that such damage was not even pleaded and therefore the statement

C   of claim disclosed no cause of action. (3) The plaintiffs could not obtain relief by way of injunction because they did not come to court with clean hands. (4) The action was an abuse of process because it was not brought for the legitimate purpose of obtaining damages or other relief, for example, by way of injunction, but for a collateral or ulterior purpose. This purpose was said to be to use the court simply as a platform from which to broadcast their vilification of the defendants, and so carry on

D   the campaign and vendetta which had been waged between the parties for many years.

Before the judge rejected the first submission. He also rejected the second submission. But he was not in the least impressed by the plaintiffs' claim for damages. He rejected the submission by Mr. Beveridge that the damages were palpable and at large and could be awarded for loss of reputation as in a defamation action. He said that actual financial loss

E   had to be proved; he pointed to the paucity of the pleadings; he plainly thought little of the claim for loss caused by waste of "managerial time" and loss of profits due to disruption of "commercial relations" which had been pleaded in further and better particulars sought by a defendant against whom the action has now been struck out. Finally, he was shown the memorandum of understanding, dated 23 January 1989, between

F   Lonrho, Mr. Al-Tajir and the Bank of Industry and Mine of Iran and told that the plaintiffs would claim that lucrative projects envisaged by this understanding were aborted as a result of Miss Pollard's letter of the same date addressed to the Iranian Ambassador in London, with copies to Ayatollah Khomeni, the Speaker of the Iranian Parliament and his Ministers. Although the judge did not strike out the claim on this basis, he expressed himself as being most sceptical of the plaintiffs' claim to

G   damages. As to relief by way of injunction he said that the plaintiffs did not come to court with clean hands. He said:

"I cannot conceive that this court would entertain an application for an injunction against the Fayeds or those around them in the present state of this affair, particularly upon the application of the author of 'A Hero from Zero' and the other hyperbolic publications issued by

H   the plaintiffs."

Millett J. in *Lonrho Plc. v. Fayed (No. 2)* [1992] 1 W.L.R. 1 had described "A Hero from Zero" as a comprehensive character assassination of the Fayeds. He had struck out the action, at p.7, on the basis that the plaintiff's claim had:

"no foundation in fact and is not made in good faith and with a genuine belief in its merits, but has been manufactured to provide a vehicle for a further public denunciation of the Fayeds."

Stuart-Smith L.J.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          [1993]

The judge acceded to the defendants' fourth submission. His conclusion          A
is to be found in the following passage of his judgment:

"The more I have listened to this case and considered the documents
and the arguments, the more I have become convinced that the
plaintiffs are misusing the court's processes in seeking to pursue this
action at all. . . . Not only do I believe that any remedy which might
conceivably be available to the plaintiffs would be minimal, but also          B
I firmly believe that the court should not be used for what is in truth
simply a continuation of their half of this vendetta by the plaintiffs
in the artificial form of an action at law. . . . Master Topley referred
in his judgment in this case to the fact that 'Neither party has shrunk
from blackguarding the other in public, and each has used the courts
as a rooftop to crow vilifications against their adversaries.' So far as
is properly in my power, I do not propose to allow that to happen          C
again. I am convinced that exactly that is the objective of the
plaintiffs, and would be the aim of the defendants if they were to
have to defend and counterclaim against the present pleading. There
is no need to say more. In different circumstances and for different
reasons, but with as much emphasis as Millett J., I too find that
upon a consideration of the history of this campaign these
proceedings have no proper basis and these claims are not made in          D
good faith and with a genuine belief in their merits. This is another
attempt, in my judgment, to manufacture a vehicle for further
denunciation of the Fayeds, and an attempt to bring into this court,
which has much other business to conclude, including Lonrho's own
live claim to which I have already referred, yet another round in the
disreputable vendetta between these parties."          E

*Appeal and cross appeal*

Pursuant to leave granted by this court the plaintiffs appeal the
judge's order striking out the action and, in particular, his conclusion
that no injunction could be granted and that the action was an abuse of
process. By his skeleton argument Mr. Munby indicated that if leave to          F
appeal were granted he wished to cross-appeal the judge's conclusions on
his first two submissions. It is convenient to consider these four points in
the order which I have already set out.

*(1) The predominant purpose of the conspiracy*

In this type of conspiracy the plaintiff must prove that the sole or          G
predominant purpose of the conspiracy is to injure the plaintiff. If the
predominant purpose of the defendants is to protect or advance their
own self-interest, even though damage to the plaintiff is an intended
consequence, it is not actionable: *Lonrho Ltd. v. Shell Petroleum Co.
Ltd. (No. 2)* [1982] A.C. 173; *Mogul Steamship Co. Ltd. v. McGregor,
Gow & Co.* [1892] A.C. 25 and *British Airways Board v. Laker Airways
Ltd.* [1985] A.C. 58. Mr. Munby submitted that the matters complained          H
of, if they were proved to have been done by the Fayeds, which was
denied, were plainly done for their own self-interest. He said that they
were counter-attacks for the purpose of putting pressure on the plaintiffs
to desist from their campaign and to devalue those attacks. In my
judgment, it is quite impossible to say that this is so plain that the
contrary is unarguable. The very fact that the defendants' activities, if
proved, as they must be taken to be for present purposes, were covert,

The Weekly Law Reports 10 December 1993

1501

Case 9:20-cv-80599-DMM Document 22-6 Entered on FLSD Docket 06/12/2020 Page 72 of 242

1 W.L.R.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          Stuart-Smith L.J.

A  makes it difficult to assert that the purpose was to put pressure on Lonrho to desist from its campaign. The action cannot be struck out on the basis that the plaintiffs had no arguable case on this point.

*(2) Damages*

Damage to the plaintiff is the gist of the action: see *per* Lord Diplock in *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173, 188F. Moreover, the plaintiff must prove actual pecuniary or financial loss. In *Quinn v. Leathem* [1901] A.C. 495, 498 the trial judge said:

"I told the jury that pecuniary loss, directly caused by the conduct of the defendants must be proved in order to establish a cause of action, and I advised them to require to be satisfied that such loss to a substantial amount had been proved by the plaintiff. I declined to tell them that if actual and substantial pecuniary loss was proved to have been directly caused to the plaintiff by the wrongful acts of the defendants, they were bound to limit the amount of damages to the precise sum so proved. I told them that if the plaintiff gave the proof of actual and substantial loss necessary to maintain the action, they were at liberty in assessing damages to take all the circumstances of the case, including the conduct of the defendants, reasonably into account."

This direction was approved by the Earl of Halsbury L.C., at p. 508, Lord Brampton, at p. 521, and Lord Lindley, at p. 540: see, also, *Pratt v. British Medical Association* [1919] 1 K.B. 244, 281–282.

Actual pecuniary loss is not the same as injury or damage which can be measured or compensated by a monetary award. The latter would include damages for personal injury or injury to reputation, though, of course, actual pecuniary loss may result as a consequence of personal injury or defamation. Nor is it sufficient, in my judgment, to constitute the tort that the defendants' actions were merely calculated to cause pecuniary loss, unless they actually did so. In the torts of slander of title, slander of goods, or other malicious falsehood, at common law actual pecuniary loss had to be proved. This was changed by section 3 of the Defamation Act 1952, which provides that in relation to these torts it shall not be necessary to allege or prove special damage, which in this context means actual pecuniary loss, if the words are calculated to cause pecuniary damage and are published in writing or other permanent form, or are calculated to cause pecuniary damage to the plaintiff in respect of any office, profession, calling, trade or business held or carried on by him. On the other hand, I do not think that precise calculation of the pecuniary loss is necessary, particularly where such loss may be continuing. Loss of employment, loss of profit because of cancellation of a potentially profitable contract or general loss of custom would suffice, though if losses had already been incurred from such cause, for my part, I would expect some calculation to be pleaded. In *Ratcliffe v. Evans* [1892] 2 Q.B. 524, 532–533, Bowen L.J. giving the judgment of the court, which included Lord Esher M.R. and Fry L.J., indicated what had to be pleaded.

The re-amended statement of claim, as it came before the judge and this court, was in my judgment totally defective in relation to the plea of damages. All that was said was that the plaintiffs claimed damages. I have no doubt that it did not disclose a cause of action, since an essential ingredient, namely, actual pecuniary loss, was not alleged. Unless the

pleading can be cured by amendment, in my opinion the action should   A
be struck out. In his reply to Mr. Munby's submissions, Mr. Beveridge
sought for the first time leave to amend. I consider hereafter to what
extent leave should be granted.

### (3) Relief by way of injunction

The court has a discretion to refuse equitable relief by way of   B
injunction if the plaintiff has been guilty of unconscionable behaviour
and does not come with clean hands. But, in my judgment, this is a
matter for the discretion of the trial judge. It seems to me to be arguable
that the plaintiffs' behaviour in conducting their vendetta against the
Fayeds, however intemperate and immoderate it may have been, is not a
sufficient ground for barring them from all relief, provided the other
ingredients of the tort, including actual pecuniary loss, are made out.   C
Nor do I think the fact that the plaintiffs did not act bona fide in bringing
the action struck out by Millett J. (Lonrho Plc. v. Fayed (No. 2) [1992]
1 W.L.R. 1) unarguably debars them from pursuing this action. I differ
from the judge on this point.

### (4) Abuse of process

If an action is not brought bona fide for the purpose of obtaining   D
relief but for some ulterior or collateral purpose, it may be struck out as
an abuse of the process of the court. The time of the court should not be
wasted on such matters, and other litigants should not have to wait till
they are disposed of. It may be that the trial judge will conclude that this
is the case here; in which case he can dismiss the action then. But for the
court to strike it out on this basis at this stage it must be clear that this is   E
the case. I cannot agree with the judge that the point is so plain as to be
unarguable.

### The application for leave to re-re-amend the statement of claim

The proposed amendment, which runs to some 40 pages, puts forward
seven heads of claim by Lonrho and two by Mr. Rowland and Sir   F
Edward du Cann. Leave should be granted provided it involves no
injustice to the defendants which cannot be compensated for in costs.
And a pleading should not be struck out if it can be cured by amendment.
The defendants, however, contend that each of the heads of claim is
unsustainable or misconceived. Before turning to the specific claims it is
necessary to deal with certain points of principle.

                                                                            G

### Can the plaintiff recover damages for injury to reputation?

An individual can sue for injury to reputation, and a trading company
can sue for injury to its business reputation but, in my judgment, to do
so it must sue in defamation. I think this follows as a matter of principle
and also on authority. The reason in principle is that no one has a right
to a reputation which is unmerited. Accordingly one can only suffer an   H
injury to reputation if what is said is false. In defamation the falsity of
the libel or slander is presumed; but justification is a complete defence.
In malicious falsehood, the plaintiff has to prove that the statement is
false.

In Bell-Booth Group Ltd. v. Attorney-General [1989] 3 N.Z.L.R. 148
the plaintiff claimed in defamation and, alternatively, in negligence. The
trial judge rejected the claim in defamation on the ground of justification,

Case 9:20-cv-80599-DMM  Document 22-6  Entered on FLSD Docket 06/12/2020  Page 74 of 242

1503

1 W.L.R.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          Stuart-Smith L.J.

A    but found for the plaintiff in negligence. The New Zealand Court of
Appeal allowed the defendant's appeal. Cooke P., giving the judgment
of the court, said, at pp. 156–157:

"The common law rules, and their statutory modifications, regarding
defamation and injurious falsehood represent compromises gradually
worked out by the courts over the years, with some legislative
B    adjustments, between competing values. Personal reputation and
freedom to trade on the one hand have to be balanced against
freedom to speak or criticise on the other. In the result the present
rules are in broad terms well known and reasonably clear. To an
action for defamation truth is an absolute defence. Privilege, where
applicable, is in a few areas an absolute but in most a qualified
defence. Fair comment is a qualified defence subject to rather
C    different rules. In injurious falsehood, on the other hand, the
plaintiff has the burden of proving both falsity and malice. These
evolved compromises may not draw the lines in places that will
always be found generally acceptable in the community. Some argue,
for instance, for greater media freedom or licence; statutory changes
have been recommended but not enacted. It is a controversial area.
D    The important point for present purposes is that the law as to injury
to reputation and freedom of speech is a field of its own. To impose
the law of negligence upon it by accepting that there may be
common law duties of care not to publish the truth would be to
introduce a distorting element. It was argued for the appellant, inter
alia, that neither defamation nor slander of goods requires a
background duty or breach; and if injury does or may involve those
E    separate elements, there is no ground for depriving the plaintiff of a
separate cause of action. That is really no more than a semantic
point. The duty in defamation may be described as a duty not to
defame without justification or privilege or otherwise than by way of
fair comment. The duty in injurious falsehood may be defined as a
duty not to disparage goods untruthfully and maliciously. In
F    substance the appellant would add to these duties a duty in such a
case as this to take care not to injure the plaintiff's reputation by
true statements. All the arguments for the appellant, though put
skilfully in various ways by counsel, reduce to that proposition. In
our opinion, to accept it would be to introduce negligence law into
a field for which it was not designed and is not appropriate. . . . For
these reasons in our opinion justice does not require or warrant an
G    importation of negligence law into this class of case. Where remedies
are needed they are already available in the form of actions for
defamation, injurious falsehood, breach of contract or breach of
confidence. Accordingly the cross-appeal must be allowed, and the
findings of duty of care and breach and the award of damages for
negligence set aside."

H    In *Spring v. Guardian Assurance Plc.* [1993] I.C.R. 412, 437,
Glidewell L.J., giving the judgment of the Court of Appeal, said that
that passage represented the law of England. The decision has been
followed in two further decisions of this court in *Petch v. Customs and
Excise Commissioners* [1993] I.C.R. 789 and *Martine v. South East Kent
Health Authority*, The Times, 8 March 1993; Court of Appeal (Civil
Division) Transcript No. 245 of 1993.

Stuart-Smith L.J.        Lonrho Plc. v. Fayed (No. 5) (C.A.)        [1993]

In *Joyce v. Sengupta* [1993] 1 W.L.R. 337 the defendants published a
defamatory statement of the plaintiff in a national newspaper. The
plaintiff sued for malicious falsehood, and not defamation, because she
could not get legal aid for the latter claim. It was held that she was
entitled to sue provided she could prove that the statement was false, it
was published maliciously and she had suffered financial loss. But she
could not recover damages for injury to reputation at large. Sir Donald
Nicholls V.-C. said, at p. 348:

"It would be going too far to hold that all non-pecuniary loss
suffered by a plaintiff is recoverable in a malicious falsehood action,
because that would include injury to reputation at large. The history
of malicious falsehood as a cause of action shows it was not designed
to provide a remedy for such injury; the remedy for such loss is an
action for defamation in which, incidentally, damages for injury to
feelings may be included in a general award of damages: see the
*Fielding* case [1967] 2 Q.B. 841, *per* Lord Denning M.R., at
p. 851D–F, and *per* Salmon L.J., at p. 855A, D."

The other two members of the court agreed with this. Nor, in my
judgment, can such a claim be tacked on as parasitic damages to some
head of pecuniary loss in this case.

In cases of malicious prosecution it is possible to get damages for
injury to reputation: see *Savile v. Roberts* (1699) 1 Ld.Raym. 374 and
*Berry v. British Transport Commission* [1962] 1 Q.B. 306. So, also, in
cases of false imprisonment: see *Walter v. Alltools Ltd.* (1944) 61 T.L.R.
39, 40, and *Hook v. Cunard Steamship Co.* [1953] 1 W.L.R. 682. But
these are cases where the wrongful act of the defendant casts an
imputation on the reputation of the plaintiff which, ex hypothesi, is not
justified. Moreover, they are also cases in which the plaintiff probably
cannot sue for defamation, since statements in court are absolutely
privileged and in false imprisonment there may be no statement at all.
These cases do not assist the plaintiffs.

In *Thurston v. Charles* (1905) 21 T.L.R. 659 the defendant wrongfully
communicated to another person a letter written by a third person to the
plaintiff which had come into the defendant's possession. The plaintiff
brought an action to recover damages for the detention and conversion
of the letter and also for libel. The claim in defamation failed because
the publication was privileged, but the claim in conversion succeeded.
The judge awarded substantial damages for what appears to be loss of
reputation. In my judgment, that decision is inconsistent with the recent
cases in this court which I have cited.

### Damages at large

If the plaintiff establishes pecuniary loss it is common ground that
damages are at large. But the parties have a different view of what is
meant by this. In *Rookes v. Barnard* [1964] A.C. 1129, 1221 Lord Devlin
said:

"It must be remembered that in many cases of tort damages are at
large, that is to say, the award is not limited to the pecuniary loss
that can be specifically proved. In the present case, for example, and
leaving aside any question of exemplary or aggravated damages, the
appellant's damages would not necessarily be confined to those
which he would obtain in an action for wrongful dismissal. He can
invite the jury to look at all the circumstances, the inconveniences

The Weekly Law Reports 10 December 1993

1505

1 W.L.R.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          Stuart-Smith L.J.

A   caused to him by the change of job and the unhappiness maybe by a change of livelihood. In such a case as this, it is quite proper without any departure from the compensatory principle to award a round sum based on the pecuniary loss proved."

B   For reasons I have already given in this case the plaintiffs cannot recover damages for injury to reputation. Nor can they recover damages for injured feelings. In the case of Lonrho, it has no feelings. In the case of the personal plaintiffs, they allege no pecuniary loss, so in my judgment they have no cause of action and injured feelings would simply be an adjunct of injury to reputation.

   But the plaintiffs also contend that if they can prove some pecuniary loss, for example, in relation to the Iranian contracts, they can also maintain some general, unspecified and unquantified plea of damage to C   goodwill arising from all the other overt acts relied upon which are wholly unconnected with any loss resulting from the Iranian contracts. I cannot accept this submission. In my judgment the matters alleged in paragraphs 11 to 28 of the statement of claim are acts relied upon as showing the agreement between the defendants, and that their predominant purpose was to injure the plaintiffs. But in so far as such D   acts cause damage to the plaintiffs it must, in my view, be pecuniary damage and it must be pleaded with sufficient particularity. In other words, there must be a sufficient nexus between the act causing pecuniary loss and the other damage for which compensation is claimed. Since the tort of conspiracy to injure is not complete without pecuniary loss, any damages at large must be referable to the act causing the pecuniary loss which constitutes the tort.

E   I turn to the specific heads of damage in the proposed re-re-amendments.

   [His Lordship considered subheads (a) to (e) of the proposed amendments to the particulars of claim, agreed with the decision of Dillon L.J. in relation to those amendments, and continued:]

   This claim (subhead (f)) is for the costs of defending the Esterhuysen F   proceedings or, alternatively, the irrecoverable costs. In my judgment this claim is unsustainable. Mr. Beveridge accepts that he can have no claim unless Lonrho wins the Esterhuysen litigation. He also accepts that if it is proved in that litigation that the Fayeds have maintained the action, the judge in those proceedings has jurisdiction and discretion to order the Fayeds to pay the costs: *Singh v. Observer Ltd.* [1989] 2 All E.R. 751, reversed on the facts [1989] 3 All E.R. 777. For the purposes G   of the present proceedings it must be assumed that the allegation that the Fayeds are maintaining the Esterhuysen action is true. So far as the question of costs in that action is concerned, therefore, the Fayeds are in the same position as if they were plaintiffs. It is well established that a party cannot recover in a separate action costs which he could have been, but was not, awarded at the trial of a civil action, or the difference H   between the costs he recovers from the other party and those he has to pay his own solicitors: see *Clerk & Lindsell on Torts*, 16th ed. (1989), pp. 290–292, para. 5.35 and *Quartz Hill Consolidated Gold Mining Co. v. Eyre* (1883) 11 Q.B.D. 674. In *Berry v. British Transport Commission* [1962] 1 Q.B. 306 the Court of Appeal refused to extend this principle to the difference between costs awarded to a successful defendant in a criminal trial and her actual costs where the claim is for malicious prosecution. But, apart from expressing concern at the unreality of the

1506

Stuart-Smith L.J.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          [1993]

position in civil cases, since party and party costs were assessed on the  A
basis of necessary and not reasonable costs incurred, the court did not
disapprove the principle stated in the *Quartz* case. That problem has now
been mitigated since standard costs are taxed on the basis of a reasonable
amount in respect of all costs reasonably incurred: R.S.C., Ord. 62,
r. 12. In my judgment it is vexatious and an abuse of process for the
plaintiff to sue for these costs in this action, when they can be recovered
in the Esterhuysen action. The defendants should not have to face a  B
claim for the same matter in two sets of proceedings.

Subhead (g) of the proposed amended claim, as Mr. Beveridge
frankly accepts, adds nothing. I would not allow it.

The claim in respect of Mr. Rowland and Sir Edward du Cann are
for damages for loss of business reputation and injury to feelings. The
word business adds nothing to damages for reputation. That claim, for  C
reasons already given is unsustainable. The claim for injury to feelings is
dependent on the claim for loss of reputation and therefore cannot be
sustained. Neither claim is for actual pecuniary loss and they fall on that
basis also.

EVANS L.J.   It is common knowledge that Mr. Rowland and Lonrho,
which it is tempting to call his company, fell out with the Fayeds over  D
the acquisition of House of Fraser in 1985 and that there has been a
bitter, highly publicised dispute between them ever since. For his part,
Mr. Rowland has extended his allegations to ministers, advisers and
many others. His campaign has been described as ill-tempered,
immoderate and obsessive, and the accuracy of this description is not
denied, at least for the purposes of this appeal. For their part, the Fayeds  E
have responded in kind. They commissioned an accountants' report into
the financial status of Lonrho which was critical, and they sought to use
this to the company's detriment, at the annual general meeting
("A.G.M.") and elsewhere.

Mr. Rowland has had a controversial business career. This is
confirmed by a recently published biography, even if, as Mr. Rowland
asserts, only part of its contents is true. But it has also been a highly  F
successful career in terms of financial rewards for himself and for others.
Undoubtedly he has made many enemies. These include Miss Pollard.
She claims that she was cheated out of her inheritance, some £40,000,000,
by Mr. Rowland and others. She pursued a relentless campaign against
him from before 1986 until 1991. Although, possibly, on a somewhat
smaller scale than his against the Fayeds, her campaign has matched his
for obsession and ill-tempered abuse.  G

It is alleged in the present proceedings that from 1986 she and her
campaign were sponsored by the Fayeds. It is said that they supported,
encouraged and, above all, financed her in her efforts to denigrate and
cause damage to Mr. Rowland and Lonrho. The latter became aware of
this in 1989, and one question which arises is whether they should have
taken action at that time. But in 1991 there was a dramatic turn of  H
events. Miss Pollard turned her coat. Now, Mr. Rowland is said to have
supported her financially, and she has become a potential witness in
these proceedings who will support his allegation that she and the Fayeds
conspired to cause damage to him and to Lonrho.

It is unlawful to combine with others with the sole or predominant
object of causing injury to another person, even if the means used for
that purpose are not themselves unlawful. The scope of "lawful means"

A  conspiracy was considered by the House of Lords in other proceedings between these parties, *Lonrho Plc. v. Fayed* [1992] 1 A.C. 448: see, in particular, the speech of Lord Bridge of Harwich, at p. 465. Even so, as the present case demonstrates, the limits of the tort are far from clear. The essential facts are, first, a combination between the defendant and others; second, with the sole or predominant object of causing injury to another person; and, third, damage in fact so caused. There is, however,
B  a recognised defence of self-interest, which, in essence, is the converse of the requirement that the plaintiff must prove that the predominant, if not the sole, object was to cause injury, rather than to serve the defendant's own lawful interest. It may well be said, as a preliminary observation, that any proceedings which raise these issues are quintessentially a case for trial. The nature of the allegations in the
C  present case is such that a long and expensive trial is inevitable, but that is the result of the way in which the tort is defined.

The defendants deny all the allegations, including the allegation of primary fact that there was a combination between Miss Pollard and the Fayeds and others, as Miss Pollard apparently will assert. But they also rely upon a variant of the self-interest defence, contending that the virulence of the Rowland/Lonrho campaign against them was such that a
D  counter-attack by means of supporting Miss Pollard was justified as a form of self-defence. This leaves open the question why, if their intention was to bring pressure to bear on Mr. Rowland and Lonrho to desist from waging war against them, the defendants supported Miss Pollard secretly, if they did so at all, thereby running the risk that their association with her would not be realised, as it was not, until, apparently, 1989. Their
E  support of the proceedings brought by Mr. Esterhuysen which is acknowledged is justified on similar grounds.

A notable feature of the mass of material before us, only a small portion of which has been read or referred to during the appeal, is that the statement of claim makes only one reference to the House of Fraser dispute, and that is to provide historical support for the allegation that the defendants combined in order to cause damage to the plaintiffs. It is
F  the defendants who in their voluminous affidavit evidence and exhibits go over the detailed history of the affair and its many consequences, including the report of inspectors appointed by the Department of Trade and Industry, in order to provide grounds for their self-interest defence. This does not mean that the defendants are not entitled to apply to have the proceedings struck out. But it would be strange if the scope and nature of an intended defence should lead to the conclusion that a claim
G  not itself objectionable should be struck out at this preliminary stage. The sole current issue, in my judgment, is whether the claim is objectionable or not.

Dillon and Stuart-Smith L.JJ. are in agreement on all issues save one item of the heads of damage claimed in the draft re-re-amended points of claim and further particulars which were produced during the hearing.
H  I respectfully agree with their judgments on all these issues and I would add only the followng further comments.

First, the modern definition of "cause of action" is found in the judgments of Lord Denning M.R. and Diplock L.J. in *Letang v. Cooper* [1965] 1 Q.B. 232. Diplock L.J. said, at pp. 242–243:

"A cause of action is simply a factual situation the existence of which entitles one person to obtain from the court a remedy against another person."

Evans L.J.          Lonrho Plc. v. Fayed (No. 5) (C.A.)          [1993]

The old "forms of action" which ruled all common law civil proceedings    A
were rules of pleading and these have long since been abolished. Despite
Maitland's famous dictum, "the forms of action we have buried, but they
still rule us from their graves" (see *Maitland, Forms of Action* (1909)
p. 296), the forms of action can now be disregarded: cf. Lord Atkin's
equally famous remark in *United Australia Ltd. v. Barclays Bank Ltd.*
[1941] A.C. 1, 29. Both dicta are quoted in Lord Denning M.R.'s          B
judgment [1965] 1 Q.B. 232, 239. The forms of action no longer form a
guide to substantive rights: [1965] 1 Q.B. 232, 239. Those rights depend
upon the factual situation described by Diplock L.J. [1965] 1 Q.B. 232,
242–243.

In *Joyce v. Sengupta* [1993] 1 W.L.R. 337, therefore, the question
was not one of form or the correct method of pleading. It was whether
the facts relied upon by the plaintiff—the factual situation described in     C
her claim—established one or more than one cause of action. If more
than one, then there was no justification for depriving her of the remedies
which the facts relevant to each cause of action entitled her to obtain.

Essentially the same problem arises in the present case. "Damage" is
an essential ingredient of the cause of action which the plaintiffs assert.
It is "the gist of the action:" *per* Lord Diplock in *Lonrho Ltd. v. Shell
Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173, 188F. The original statement     D
of claim contained no allegation of damage other than a formal and
wholly unparticularised averment in general terms. Unless the plaintffs
allege and prove the kind of damage which forms part of the factual
situation giving rise as a matter of law to the cause of action upon which
they rely, then their claim will fail; and unless they allege such damage,
their claim, in my judgment, can be struck out at this preliminary stage.     E

Second, and following on from the first, is the question, what kind of
damage must the plaintiffs prove in order to succeed, and allege in order
to avoid their claim being struck out? It is common ground that this must
include pecuniary loss, which I take to mean loss that is capable of being
measured in money terms, and not merely capable of being assessed as
financial compensation for some other kind of injury, as general damages
for personal injury or for loss of reputation in defamation actions are.     F
Where the plaintiffs allege facts which, if proved, will establish damage
of this kind, as with the alleged loss of immensely valuable contracts (or
contacts) in Iran, then the claim cannot be struck out unless the
proceedings are brought for some improper or collateral motive. Where,
however, the pleading itself asserts that the plaintiffs are presently unable
to identify any such loss, or to allege that any measurable loss has     G
occurred, then the claim is defective because it fails to describe a factual
situation which gives rise to the cause of action upon which the plaintiffs
rely. In such cases, the claim is not necessarily struck out at once. A
proper opportunity to amend or to add to particulars may well be given,
as it has been given here. The failure to allege damage of an appropriate
kind may be explained and it may be apparent that existing defects are     H
not only understandable but will be remedied before the trial, e.g., if
further time for investigations is required or if documents have first to be
disclosed by the defendants or obtained from other persons. But no such
factors operate here. The plaintiffs, despite their huge resources, cannot
even say that any identifiable loss has occurred which is pecuniary in the
sense described above. In my judgment, these other claims should
properly be struck out on these grounds.

A    Third, the question whether damages for loss of reputation, or loss of business reputation, can be recovered in these proceedings, where defamation is not alleged, seems to me to involve two issues, one a question of law and the other largely a matter of semantics. The question of law is whether damage of that kind is sufficient to establish the cause of action in conspiracy upon which the plaintiffs rely. In my judgment it is not. Such damages are not pecuniary loss, in the sense which I have

B    described, and it follows that they form no part of the factual situation which entitles the plaintiffs to the remedy they seek. Nor can such damages be recovered parasitically, in my judgment, in addition to damages for pecuniary loss, for the reasons given by Dillon and Stuart-Smith L.JJ. Conversely, the factual situation which gives a remedy in respect of loss of reputation is the cause of action in defamation which

C    the plaintiffs conspicuously fail to assert. *Spring v. Guardian Assurance Plc.* [1993] I.C.R. 412 is Court of Appeal authority for this proposition, following *Bell-Booth Group Ltd. v. Attorney-General* [1989] 3 N.Z.L.R. 148, 156, where Cooke P. used a graphic phrase: "The important point for present purposes is that the law as to injury to reputation and freedom of speech is a field of its own." More prosaically, damage of that kind is part of the factual situation which establishes a cause of

D    action in defamation, but not in other torts, including negligence (*Bell-Booth Group Ltd. v. Attorney-General*) and "lawful means" conspiracy (here).

The same conclusion is justified on wider grounds. If damages for loss of reputation could be recovered by alleging and proving a "lawful means" conspiracy, then it would be unlawful to combine with another

E    person in order to tell the truth about the plaintiff with the object of depriving him of a reputation which he enjoys but does not deserve. The implications are far-reaching, and this result could only be prevented by introducing, for example, a defence of justification and other safeguards which have evolved as part of the law of defamation. In other words, "lawful means" conspiracy should not exist as a separate tort for damage of this kind.

F    The matter of semantics is the need to distinguish between loss of reputation in the defamation sense and loss of reputation which is synonymous with a loss of customer goodwill resulting in a loss of business which can therefore be measured in money terms. The authorities which have been referred to by Dillon and Stuart-Smith L.JJ. illustrate the proposition that the plaintiff is not limited to damage which

G    can be precisely measured and specifically proved, but is entitled more generally to damage representing the court's best assessment of financial loss in fact suffered and proved.

Finally, the defendants appeal to the court's power to regulate all proceedings before it, and they contend that in the present case the court should refuse altogether to entertain the plaintiffs' claim. Like Macpherson of Cluny J. I find it unappetising that the parties or either

H    of them should use the proceedings as a platform to air their grievances or as a roof top from which to crow. I have already pointed out that it is the defendants, not the plaintifs, who seek to introduce the full history of the House of Fraser affair. The plaintiffs' allegation is that the defendants carried the warfare into different territory, that is the Miss Pollard and the Esterhuysen allegations, and they did so covertly, in order that those allegations should appear distinct. The plaintiffs cannot be said to be bringing the proceedings with a collateral or improper

motive, in my judgment, in so far as they allege facts which entitle them       A
to damages for conspiracy, and there are no grounds for depriving the
plaintiffs of that remedy if they are entitled to it. But the court can and
will keep the proceedings within proper limits, which at this stage means
restricting the plaintiffs to the cause of action upon which they rely. The
need for control and discipline will continue throughout the proceedings
and it will affect both parties equally; the defendants no less than the
plaintiffs will be required to keep their factual allegations, and the related       B
pleadings and discovery, within bounds. The mass of unread documents
produced for the purposes of this application and appeal shows just how
much scope for discipline there is.

*Damage—particulars (f)*
                                                                                 C
     The defendants accept that they are supporting the plaintiff in the
Esterhuysen proceedings and that, if those proceedings fail, then the trial
judge will have power to award costs against them as well as against the
plaintiff: *Singh v. Observer Ltd.* [1989] 2 All E.R. 751. Mr. Beveridge,
for the plaintiff, accepts that no claim will lie under this head if the
Esterhuysen proceedings against Lonrho succeed. Nor does he dispute
that no claim lies, as between the parties to a civil action, for the       D
recovery of any balance of the costs actually incurred in defending the
action which are not awarded to the successful defendant by the costs
order made in the action. The principle was affirmed by the Court of
Appeal in *Berry v. British Transport Commission* [1962] 1 Q.B. 306.
Devlin L.J. said, at p. 323, that the rule against recovery in a separate
action was based on the "the fiction that taxed costs are the same as costs
reasonably incurred." That fiction has now largely disappeared. The       E
amount recoverable on taxation under R.S.C., Ord. 62, r. 12 is "a
reasonable amount in respect of all costs reasonably incurred" (the
standard basis, rule 12(1)) or "all costs . . . except in so far as they are
of an unreasonable amount or have been unreasonably incurred" (the
indemnity basis, rule 12(2)), and the essential difference between the two
bases lies in the burden of proof. It is no longer necessary, therefore, to       F
regret the common law rule, and, in addition, there are other reasons of
policy which continue to support it, not least the desirability of bringing
litigation to a close.
     There is authority, however, that no such bar exists to a claim for
unrecovered costs against a third party, that is, against a person who was
not a party to the original action. Such claims are commonplace as damages
for breach of contract, and they have been admitted also in tort: *per* Devlin       G
L.J. in *Berry v. British Transport Commission* [1962] 1 Q.B. 306, 321, citing
*The Solway Prince* (1914) 31 T.L.R. 56. The measure of such damages
under the old costs rules was the difference between the plaintiff's costs of
the action taxed as between solicitor and client and as between party and
party: *McGregor on Damages*, p. 459, para. 713. Now that the fiction has
become largely fact—although the difference between costs actually       H
charged and those recoverable on taxation, even on an indemnity basis,
may still remain large in certain types of litigation—it is questionable
whether the right to recover so-called extra costs is still justified, even when
the claim is made against a third party to the original action. But, in my
judgment, the present case is not in the third party category. By aligning
themselves with the plaintiff in the Esterhuysen proceedings, the defendants
have admittedly rendered themselves liable to whatever costs order the

1 W.L.R.  Lonrho Plc. v. Fayed (No. 5) (C.A.)  Evans L.J.

A    trial judge considers appropriate in those proceedings. No point has been taken as to what the position will be if the defendants withdraw their support at some time in the future. In these circumstances, it seems to me that the common law rule applies and I am in agreement with Stuart-Smith L.J. that the claim under subhead (f) should be disallowed.

     The general claim under subhead (g) can add nothing which is permissible in law to the claim made under subheads (b) and (c), which in

B    my view could conveniently be amalgamated, and I agree that subhead (g) should be disallowed.

     I also agree that the claims by the personal plaintiffs should be struck out.

     To the extent indicated above, the appeal by Lonrho, in my judgment, should be allowed, with limited leave to re-re-amend the statement of

C    claim.

*Order accordingly.*

     Solicitors: *Denton Hall Burgin & Warrens; Herbert Smith; Titmuss Sainer & Webb.*

D

                                       B. O. A.

E

                               [COURT OF APPEAL]

                     *EASTON v. FORD MOTOR CO. LTD.

F    1993    April 22                  Dillon and Butler Sloss L.JJ.

     *Practice—Pleadings—Amendment—Defendants applying to plead new defence five years after issue of writ—Action not ready for trial— No fixed trial date—Whether amendment to be allowed—R.S.C., Ord. 20, r. 5*

G         Where there had been delay in prosecuting an action following the issue of the writ and the action was not yet ready for trial, the normal rule in R.S.C., Ord. 20, r. 5[1] as to amendment of the pleadings applied (post, p. 1521G–H).

        Where, therefore, the defendants appealed against the refusal to allow amendment of their defence to raise a new issue five years after the issue of the writ but before the summons for directions had been taken out or a trial date had been set:—

H         *Held*, allowing the appeal, that since the delay after the issue of the writ was largely the responsibility of the plaintiff and since the point sought to be raised did not raise the need for new evidence, the amendment would be allowed (post, p. 1521G–H).

[1] R.S.C., Ord. 20, r. 5 provides: "(1) Subject to Ord. 15, r. 6, 7 and 8 and the following provisions of this rule, the court may at any stage of the proceedings allow the plaintiff to amend his writ, or any party to amend his pleading, on such terms as to costs or otherwise as may be just and in such manner (if any) as it may direct."

[HOUSE OF LORDS]                                                    A

LONRHO PLC.        .      .      .      Respondent and Cross-Appellant

AND

FAYED AND OTHERS .      .      .      Appellants and Cross-Respondents

1991  April 22, 23, 24, 25, 29, 30;      Lord Bridge of Harwich, Lord Brandon of      B
      May 1;                             Oakbrook, Lord Templeman, Lord Goff of
      June 27                            Chieveley and Lord Jauncey of Tullichettle

> *Tort—Cause of action—Unlawful interference with business—Take-*
> *over bid—Misrepresentations to Secretary of State to prevent bid*
> *being referred to Monopolies and Mergers Commission—*
> *Competitor prevented from bidding for share capital—Whether*
> *case to be met—Whether statement of claim to be struck out*          C
> *Tort—Cause of action—Conspiracy—Unlawful act—Business rivals*
> *allegedly making false statements to prevent take-over bid being*
> *referred to Monopolies and Mergers Commission—Predominant*
> *purpose protection of own legitimate business interests—Whether*
> *conspiracy to interfere with unsuccessful competitor's business—*
> *Whether pleadings disclosing cause of action*

The plaintiff wished to acquire control over another company      D
but was prevented from increasing its stake of the share capital
by an undertaking given to the Secretary of State pending the
outcome of a reference to the Monopolies and Mergers
Commission. The first three defendants, through the medium
of the fourth defendant, made a rival bid for 100 per cent. of
the share capital of the company. That offer was approved by
the directors of the company, was not referred to the commission      E
and the defendants gained control of the company. The plaintiff
issued a writ against the defendants and by its statement of
claim alleged, inter alia, that the first three defendants, by false
statements about their financial capacity to acquire the share
capital and develop the company's business, had persuaded the
board of directors to accept their bid and the Secretary of State
not to refer their bid to the commission; that, by such action
·the defendants had tortiously interfered with the plaintiff's right      F
to bid for the shares, alternatively, had conspired against the
plaintiff. It was alleged against the fifth and sixth defendants,
merchant bankers to the other defendants, that they were
fraudulent in that they were reckless as to the truth of the
representations and against the sixth defendants that they acted
negligently and in breach of the duty of care owed to the
plaintiff.
The defendants applied for an order striking out the      G
statement of claim on the ground that it disclosed no cause of
action. The application was rejected by the master but was
granted by the judge in chambers and the action was dismissed.
The plaintiff appealed save in respect of the claim in negligence.
It was accepted before the Court of Appeal that since the
statement of claim did not allege that the predominant purpose
of the alleged conspiracy was to injure the plaintiff the court      H
was bound by previous authority to hold that the pleaded cause
of action in conspiracy must fail, but the plaintiff reserved the
right to contest that issue in the House of Lords. The Court of
Appeal allowed the appeal.

A    On appeal by the defendants and cross-appeal by the plaintiff in respect of the claim in conspiracy:—

*Held*, dismissing the appeal and allowing the cross-appeal, (1) that where the primary or predominant purpose of conspirators was to further or protect their own legitimate interests but there was also the intent to injure the plaintiff, it sufficed to make their conduct tortious that they used unlawful means; that accordingly, albeit the plaintiff did not dispute the

B    defendants' pleaded intention that to cause injury to the plaintiff was not the predominant purpose of their alleged unlawful conduct, that was not necessarily fatal to the claim in conspiracy and therefore did not constitute a separate ground for striking out that part of the pleading (post, pp. 463c–d, 465g–466a, 468e–h, 470h–471a, c–d).

Dictum of Lord Wilberforce in *Allen v. Gulf Oil Refining*

C    *Ltd.* [1981] A.C. 1001, 1010–1011, H.L.(E.) applied.

*Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173, H.L.(E.) considered.

*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391, C.A. overruled.

(2) That at the interlocutory stage of the proceedings the two pleaded causes of action stood or fell together, and that if the defendants failed to establish that the plaintiff's primary

D    pleading alleging the tort of interference with business by unlawful means should be struck out they were in no stronger position in respect of the claim in conspiracy; that the inherent difficulty of the issues raised by the proceedings could in no wise be described as plain and obvious, nor could the plaintiff's cause of action be characterised as unarguable or almost incontestably bad; and that, therefore, it was not an appropriate case for striking out but should proceed to trial (post, pp. 468h–

E    469b, f–g, 470e, h–471a, c–d).

Decision of the Court of Appeal [1990] 2 Q.B. 479; [1989] 3 W.L.R. 631; [1989] 2 All E.R. 65 reversed in part.

The following cases are referred to in their Lordships' opinions:

*Allen v. Gulf Oil Refining Ltd.* [1981] A.C. 1001; [1981] 2 W.L.R. 188; [1981] 1 All E.R. 353, H.L.(E.)

F    *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435; [1942] 1 All E.R. 142, H.L.(Sc.)

*Drummond-Jackson v. British Medical Association* [1970] 1 W.L.R. 688; [1970] 1 All E.R. 1094, C.A.

*Dyson v. Attorney-General* [1911] 1 K.B. 410, C.A.

*Hubbuck & Sons Ltd. v. Wilkinson, Heywood & Clark Ltd.* [1899] 1 Q.B. 86, C.A.

G    *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* (unreported), 1 December 1980, Parker J.; 6 March 1981; Court of Appeal (Civil Division) Transcript No. 51 of 1981, C.A.; [1982] A.C. 173; [1981] 3 W.L.R. 33; [1981] 2 All E.R. 456, H.L.(E.)

*Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391; [1989] 3 W.L.R. 563; [1989] 3 All E.R. 14, C.A.

*Nagle v. Feilden* [1966] 2 Q.B. 633; [1966] 2 W.L.R. 1027; [1966] 1 All

H    E.R. 689, C.A.

*Quinn v. Leathem* [1901] A.C. 495, H.L.(I.)

*Rookes v. Barnard* [1964] A.C. 1129; [1964] 2 W.L.R. 269; [1964] 1 All E.R. 367, H.L.(E.)

*Sorrell v. Smith* [1925] A.C. 700, H.L.(E.)

A

*Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, C.A.

*Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986] A.C. 368; [1986] 2 W.L.R. 24; [1986] 1 All E.R. 129, H.L.(E.)

The following additional cases were cited in argument:

*Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; [1971] 3 All E.R. 1175, C.A.

B

*Allen v. Flood* [1898] A.C. 1, H.L.(E.)

*Anns v. Merton London Borough Council* [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.)

*Associated British Ports v. Transport and General Workers' Union* [1989] 1 W.L.R. 939; [1989] I.C.R. 557; [1989] 3 All E.R. 796; [1989] 3 All E.R. 822, C.A. and H.L.(E.)

*Brekkes Ltd. v. Cattel* [1972] Ch. 105; [1971] 2 W.L.R. 647; [1971] 1 All E.R. 1031

C

*Chaplin v. Hicks* [1911] 2 K.B. 786, C.A.

*Canada Cement La Farge Ltd. v. British Columbia Lightweight Aggregate Ltd.* (1983) 145 D.L.R. (3d) 385

*Daily Mirror Newspapers Ltd. v. Gardner* [1968] 2 Q.B. 762; [1968] 2 W.L.R. 1239; [1968] 2 All E.R. 163, C.A.

*Dominion Rent A Car Ltd. v. Budget Rent A Car Systems (1970) Ltd.* [1987] 2 N.Z.L.R. 395

D

*Donoghue v. Stevenson* [1932] A.C. 562, H.L.(Sc.)

*Fairbairn, Wright & Co. v. Levin & Co.* (1914) 34 N.Z.L.R. 1

*Geary & Son (Pty.) Ltd. v. Gove,* 1964 (1) S.A. 434

*Greenhalgh v. Mallard* [1947] 2 All E.R. 255, C.A.

*Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191; [1982] 2 W.L.R. 322; [1982] 1 All E.R. 1042, H.L.(E.)

*Hollywood Silver Fox Farm Ltd. v. Emmett* [1936] 2 K.B. 468; [1936] 1 All E.R. 825

E

*Island Records Ltd., Ex parte* [1978] Ch. 122; [1978] 3 W.L.R. 23; [1978] 3 All E.R. 795, C.A.

*Kearney v. Lloyd* (1889) 26 Ir. 268

*Keeble v. Hickeringill* (1706) 11 East 574n

*Lumley v. Gye* (1853) 2 E. & B. 216

*Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570; [1983] 2 W.L.R. 778; [1983] 2 All E.R. 189, H.L.(E.)

F

*Midland Bank Trust Co. Ltd. v. Green (No. 3)* [1979] Ch. 496; [1979] 2 W.L.R. 594; [1979] 2 All E.R. 193

*Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, C.A.; [1892] A.C. 25, H.L.(E.)

*National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, C.A.

G

*R.C.A. Corporation v. Pollard* [1983] Ch. 135; [1982] 3 W.L.R 1007; [1982] 3 All E.R. 771, C.A.

*Reg. v. Scott* [1975] A.C. 819; [1974] 3 W.L.R. 741; [1974] 3 All E.R. 1032, H.L.(E.)

*Reg. v. Secretary of State for Trade and Industry, Ex parte Lonrho Plc.* [1989] 1 W.L.R. 525; [1989] 2 All E.R. 609, H.L.(E.)

*Salaman v. Warner* (1891) 65 L.T. 132, C.A.

H

*Stratford (J.T.) & Son Ltd. v. Lindley* [1965] A.C. 269; [1964] 3 W.L.R. 541; [1964] 3 All E.R. 102, H.L.(E.)

*Thomson (D.C.) & Co. Ltd. v. Deakin* [1952] Ch. 646; [1952] 2 All E.R. 361, C.A.

A     *Torquay Hotel Co. Ltd. v. Cousins* [1969] 2 Ch. 106; [1969] 2 W.L.R 289;
       [1969] 1 All E.R. 522, C.A.
     *Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354
     *Volkswagen Canada Ltd. v. Spicer* (1978) 91 D.L.R. (3d) 42
     *Warnink (Erven) Besloten Vennootschap v. J. Townend & Sons (Hull) Ltd.*
       [1979] A.C. 731; [1979] 3 W.L.R 68; [1979] 2 All E.R. 927, H.L.(E.)

B     APPEAL and CROSS-APPEAL from the Court of Appeal.
     This was an appeal by the defendants, Mohamed Al-Fayed, Salah
Fayed, Ali Fayed, House of Fraser Holdings Plc., John MacArthur and
Kleinwort Benson Ltd., the first, second, third, fourth, fifth and sixth
defendants respectively and a cross-appeal by the plaintiff, Lonrho Plc.,
both by leave dated 14 December 1989 of the House of Lords (Lord
Bridge of Harwich, Lord Brandon of Oakbrook and Lord Jauncey of
C    Tullichettle) from the judgment and order dated 2 March 1989 of the
Court of Appeal (Dillon, Ralph Gibson and Woolf L.JJ.) [1990] 2 Q.B.
479 whereby it was ordered, inter alia, that the plaintiff's appeal be
allowed and that the order of Pill J. [1990] 1 Q.B. 490, dated 22 June
1988, be set aside save in so far as the order struck out paragraphs 42 to
47 (inclusive) and paragraphs 55 to 56 (inclusive) of the statement of
D    claim and the words "and/or conspiracy and/or breach of duty" in
paragraph 57 thereof.
     The facts are stated in the opinion of Lord Bridge of Harwich.

     *Lord Irvine of Lairg Q.C., David Oliver Q.C., Alastair Walton* and
*Philip Sales* for the first four defendants. The appeal concerns the
proper limits of the tort of interfering with the trade or business of
E    another by unlawful means. To establish the tort it must be shown that
the unlawful means used by the defendant were specifically directed at
the plaintiff.
     Where a person who happens to be in competition to acquire an
asset uses unlawful means for the purpose of promoting his bid for that
asset, those means cannot be said also to be aimed or directed at any
F    competitor or competitors who may exist, where the self-same unlawful
means would have been used by the defendant to promote his own bid
out of his desire to acquire that asset had no competitors existed.
     Nothing that the Al Fayeds (the first three defendants) did interfered
with any business assets of Lonrho (the plaintiff). The tort in its widest
formulation is "interfering with business by unlawful means." Lonrho
recognises that to succeed it has to show that the lost opportunity of
G    bidding for House of Fraser was an asset. This is too nebulous to qualify
as a business interest. Further the tort requires as an essential element
that the unlawful means used were directed at the plaintiff. It must be
an actual intention on the part of the defendant to strike at the plaintiff
so that but for that intention he would not have practised the unlawful
means on the third party: see the second limb of the dictum of Lord
Watson in *Allen v. Flood* [1898] A.C. 1, 96; *Quinn v. Leathem* [1901]
H    A.C. 495, 534–535 and *National Phonograph Co. Ltd. v. Edison-Bell
Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335, 356, 359, 360. As
to later developments relating to the ambit of the tort see *D. C.
Thomson & Co. Ltd. v. Deakin* [1952] Ch. 646, 690, 691, 693; *Rookes*

v. *Barnard* [1964] A.C. 1129, 1167, 1181, 1182, 1208; *J. T. Stratford & Son Ltd. v. Lindley* [1965] A.C. 269, 323–324, 326D, 329G, 337F and *Torquay Hotel Co. Ltd. v. Cousins* [1969] 2 Ch. 106, 133E, 137, 138G–H.

A

To impose liability where the reasons which actuate the defendant to use unlawful means are wholly independent of a wish to interfere with the plaintiffs' business, and any interference is no more than an incidental consequence foreseen by and gratifying to the defendant, would be stretching the tort too far: see *Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354, 360, *per* Cooke J. In other words, the intent to cause injury to the plaintiff must be the effective cause of the defendants' conduct. Lonrho does not allege that the predominant purpose of the Al Fayeds was to harm Lonrho. Therefore the predominant purpose of the Al Fayeds in making the false statements was to further their own interests. To the question: was the pleaded intent a simple actual intent to cause injury to the plaintiff? The answer is manifestly in the negative.

B

C

There is no question that the Al Fayeds made the false statements outside the context of acquiring House of Fraser for themselves. It would be preposterous that they should have made them for the purpose of injuring Lonrho. This is not alleged. It follows that a sufficient cause for making the false statements was the furtherance of the Al Fayeds' own interest. Since, therefore, the statements were not made with the purpose of injuring Lonrho the intent pleaded in paragraph 19 of the statement of claim is not an actuating intent. It has no causal effect whatever. The tort on the pleadings is not made out.

D

Lonrho's reliance on *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191 is misconceived, for the plaintiffs there had a right to exploit their film programmes without interference with themselves or with those who wished to do business with them.

E

A mere opportunity to bid is not a sufficient business interest for the purposes of establishing the tort. [Reference was made to *Reg. v. Secretary of State for Trade and Industry, Ex parte Lonrho Plc.* [1989] 1 W.L.R. 525, 536A–B.]

*Anthony Grabiner* Q.C. and *Nicolas Bratza* Q.C. for the fifth and sixth defendants. The essential difference between the first four defendants and the present defendants (the merchant bankers) is that the latter acted as financial advisers to the Al Fayeds. It is alleged that the bank acted recklessly in advising the Al Fayed brothers. The Court of Appeal based its judgment on the premise that the boundaries of the tort of unlawful interference with business had not been established and, therefore, it was not apposite to strike out the statement of claim. The tort, however, is not so wide as to include Lonrho's claim.

F

G

Essential elements of the tort have not been satisfied. (1) There is no pleaded business right or asset which is capable of protection in law. (2) Even if Lonrho's opportunity to bid could constitute a legitimate business interest, on the pleaded case nothing said or done by the defendants interfered with a relevant business interest of Lonrho, nor did the bankers use any unlawful means of which Lonrho can complain. Nothing that was done could have affected the decision of the Secretary of State. (3) On Lonrho's own pleaded case there was no sustainable

H

A      case of an intent to injure Lonrho's business interests. (4) Nothing alleged or said to have been done by the bankers affected the freedom of Lonrho to buy shares in or bid for House of Fraser.

As to (1), it is not alleged by Lonrho and could not be alleged that either their existing contractual relationships or their future contractual relationships have been interfered with, nor is it alleged that there has

B      been any interference with Lonrho's ability to carry on its general trade or business. Nevertheless it is asserted that the ability to bid for House of Fraser while a competitor to whom Lonrho had sold its entire shareholding was prevented from doing so amounted to a business asset which the law can and should protect. But whatever are the boundaries of this tort the circumstances here do not come within the ambit of a protectable interest: see *R.C.A. Corporation v. Pollard* [1983] Ch. 135,

C      138E–F, 150, 152, 153E–F, 155G and *Ex parte Island Records Ltd.* [1978] Ch. 122, 131D. The interest claimed is too amorphous and nebulous.

On (2), two questions arise. (i) Assuming a protectable legal interest is disclosed, did the defendants interfere with that interest? *Pre-acquisition.* Nothing which the defendants are alleged to have said or done prevented Lonrho from bidding for the share capital of House

D      of Fraser in March 1985. Further, the pleaded fraud was not only not causative of the deferment of the release of Lonrho's undertaking it was also not causative of the acquisition by Holdings of over the 50 per cent. level of the share capital of House of Fraser: [1990] 2 Q.B. 479, 490. In these circumstances no nexus whatever has been shown to exist between the pleaded wrongful acts and the pleaded business interest. *Post-acquisition.* A fortiori, there can have been no interference with

E      Lonrho's opportunity to bid for House of Fraser *after* the acquisition by Holdings, since no such opportunity arose.

(ii) Do the unlawful acts complained of constitute unlawful means on which Lonrho can rely in asserting an unlawful interference with that interest? As to unlawful means, the authorities on which Lonrho rely all relate to private law claims. The unlawful matters complained of are

F      public law matters. The Fair Trading Act 1973 provides no remedy for a private person to complain of maladministration. At the relevant time there was no relevant offence of making false statements to the Secretary of State. The legislation has since been amended: see section 151 of the Companies Act 1989. There are very powerful policy reasons for not allowing private litigants to use public law for claiming private law remedies. For the structure of the Fair Trading Act 1973, see sections 4,

G      5, 63, 64, 69, 70, 72, 73, 75, 84, 88, 90, Schedule 8, para. 14. Even if in principle that Act was applicable there are too many imponderables for it to be applicable in the circumstances of the present case. The wrongful act of which complaint is made is the alleged deception of the Secretary of State. But Lonrho can be in no better position in seeking to rely on this wrongful act than the plaintiffs were in *Lonrho Ltd. v. Shell*

H      *Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 and *R.C.A. Corporation v. Pollard* [1983] Ch. 135.

Lonrho accepts that an essential element of the tort is an intent to injure a particular person: *Allen v. Flood* [1898] A.C. 1 and *R.C.A.*

*Corporation v. Pollard* [1983] Ch. 135. But it cannot show that what the defendants did was directed at them.

*Sydney Kentridge Q.C., Ian Geering Q.C.* and *David Pannick* for the plaintiff. The tort of unlawful interference with business is an innominate tort and it is still developing. It extends beyond damage to property, a legal right to property so-called or financial damage to a plaintiff. It is a tort which may involve undue pressure being placed on a third party. Historically and on the authorities, it can be defined as consisting of the doing of an intentional unlawful act, namely, an act done with the intent of causing damage in the form of economic loss to the plaintiff or an act in some way directed at the plaintiff and actually causing him damage. The tort has developed out of situations where damage having been done indirectly against the plaintiff, there was no cause of action. It has been necessary to limit the scope of the tort because in the 19th century any intent to injure the plaintiff was claimed to be a tort. The element of unlawfulness was brought in to limit its ambit: see *Allen v. Flood* [1898] A.C. 1.

Predominant motive or purpose is not an element of the tort. In trade competition there is never a single motive. A trader always seeks to benefit himself. It is only in certain types of conspiracy that the courts have considered the question of predominant purpose. Motives are often mixed: *Sorrell v. Smith* [1925] A.C. 700, 741, 742.

The origins of the tort are to be found in the 18th century: see *Holdsworth, A History of English Law*, 2nd. ed., vol. VIII (1937), pp. 425, 426, 431 and *Keeble v. Hickeringill* (1706) 11 East 574n. For the locus classicus in this field, see the judgment of Bowen L.J. in *Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* (1889) 23 Q.B.D. 598, 611, 613 et seq. There is no suggestion in that case that the wrongful means have to be independently actionable. Thus the misrepresentation does not have to be actionable misrepresentation. No subsequent case has suggested limiting the ambit of Bowen L.J.'s judgment in the *Mogul* case. It was approved in *Allen v. Flood* [1898] A.C. 1, 94. As early as *Lumley v. Gye* (1853) 2 E. & B. 216, 233, 236, it was held that knowingly to interfere with lawful contractual relations without sufficient reason gave rise to a cause of action. "Unlawful means" in the present context includes any means which in law the defendant is not at liberty to employ: fraud, violence, deliberate misrepresentation.

It is hard to believe that any court would hold that deliberate deceit did not amount to "unlawful means." The defendants' intention was to ensure that Lonrho did not have the opportunity to bid for the House of Fraser. The intention was that the Al Fayeds by using unlawful means should obtain the House of Fraser before Lonrho had the opportunity to bid. The interest which was damaged caused the plaintiff economic loss, whether it is called an opportunity or a spes. The defendants contend that Lonrho had no business interest. This is in essence the "floodgates" argument.

The public interest for the purposes of the Fair Trading Act is much wider than has been contended for by the defendants.

A   The cases show a gradual development of the tort. In this branch of the law, there is no case comparable to *Donoghue v. Stevenson* [1932] A.C. 562 or *Anns v. Merton London Borough Council* [1978] A.C. 728 in the field of negligence. [Reference was made to *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335; *Fairbairn, Wright & Co. v. Levin & Co.* (1914) 34 N.Z.L.R. 1;

B   *Rookes v. Barnard* [1964] A.C. 1129; *J. T. Stratford & Son Ltd. v. Lindley* [1965] A.C. 269; *Daily Mirror Newspapers Ltd. v. Gardner* [1968] 2 Q.B. 762; *Acrow (Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676; *Brekkes Ltd. v. Cattel* [1972] Ch. 105; *Volkswagen Canada Ltd. v. Spicer* (1978) 91 D.L.R. (3d) 42; *R.C.A. Corporation v. Pollard* [1983] Ch. 135; *Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570; *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C.

C   191 and *Associated British Ports v. Transport and General Workers' Union* [1989] 1 W.L.R. 939.]

There evolved from the 19th century cases the clear and salutary principle that a person who does an intentional unlawful act in the furtherance of his own business interest, or who aims to injure another and as a result causes damage to that other in the form of economic

D   loss, or alternatively, economic loss relating to his business, has committed an actionable tort. As early as *Allen v. Flood* [1898] A.C. 1 it was seen that *Lumley v. Gye*, 2 E. & B. 216 was an example of a broader principle than that laid down in that case. It punishes only a deliberate wrongdoing which is aimed at a particular person. But there is no reason why the court should be tender to prevent the extension of the tort when the wrongdoing consists of fraud or deceit. For the

E   defendants to invoke the public interest on the facts pleaded verges on the absurd. The proper approach should be that adopted by this House in *Erven Warnink Besloten Vennootschap v. J. Townend & Sons (Hull) Ltd.* [1979] A.C. 731, 742E et seq.

Four aspects of the tort call for enlargement: (1) unlawful means, (2) intention, (3) business interests or expectations, (4) causation.

F   (1) Fraud has been an unlawful means since the decision in *Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.*, 23 Q.B.D. 598. As to the representations made to the Secretary of State, they constituted "unlawful means" for the purposes of the tort because deceitful means used in order to steal a march on one's competitor constitute such unlawful means.

G   (2) The intention required is an intention which is directed at the particular plaintiff and must initially do harm to the particular plaintiff, but the intention does not have to be a predominant intention. *Van Camp Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354 is not consistent with English law: see *Sorrell v. Smith* [1925] A.C. 700, 739, 742. Further, it is distinguishable on its facts: the defendant in that case was very remote from the plaintiff. [Reference was made to *Dominion*

H   *Rent A Car Ltd. v. Budget Rent A Car Systems (1970) Ltd.* [1987] 2 N.Z.L.R. 395, 438]. *Geary & Son (Pty.) Ltd. v. Gove*, 1964 (1) S.A. 434 is an example of a case in a civil law jurisdiction where a tort comparable to that alleged in the present case has been recognised.

(3) In none of the cases is there any attempt to limit the ambit of economic loss. In English law the courts have time and again decided that the destruction of an expectation which is of value sounds in damages. Damages have been awarded for the loss of an expectation even where it is subject to a complex series of contingencies: see *Chaplain v. Hicks* [1911] 2 K.B. 786 and *McGregor on Damages*, 15th ed. (1988), pp. 224 et seq.

(4) It is Lonrho's case that but for the wrongful acts of the defendants, the Secretary of State would, prior to or after 14 March 1985, have referred to the Monopolies and Mergers Commission the bid made by the fourth defendant ("Holdings") for House of Fraser on 4 March 1985 which resulted in Holdings acquiring a 50 per cent. share of House of Fraser by 11 March. But for those wrongful acts the bid would have been referred to the commission prior to 11 March 1985 and Holdings would not have acquired a 50 per cent. share holding in House of Fraser. Consequently, on or after 14 March 1985 (but for the wrongful acts complained of) Lonrho could have bid for House of Fraser, whether or not in competition with Holdings and the Fayeds. It is also Lonrho's case that the acquisition by Holdings of more than 50 per cent. of the shares in House of Fraser was a step in the fraudulent scheme alleged by Lonrho. The defendants would not have taken the risk of acquiring part or all of the shares in House of Fraser save in contemplation of their deception of the authorities and consequent freedom from Monopolies and Mergers Commission reference which would otherwise have been inevitable, as would a report from the commission adverse to the interests of Holdings.

The case is not a case which should be dealt with by striking it out. It is a substantial case which should go to trial. [Reference was made to *Quinn v. Leathem* [1901] A.C. 495, 535, 537 and *Associated British Ports v. Transport and General Workers' Union* [1989] 1 W.L.R. 939, 952F–953D, 954H–959B, 961A–H, 965D–966G.]

*The cross-appeal: the tort of conspiracy.*

It is well established that there are two types of conspiracy actionable in tort: (i) conspiracy to injure by the use of lawful means and (ii) conspiracy to perform an unlawful act or to use unlawful means.

The main issue on this aspect of the appeal is whether an essential element in the tort of conspiracy by unlawful conduct is that the defendants' predominant purpose was to injure the plaintiff, or whether it suffices that the defendants knew and intended that the plaintiff would be injured by the relevant acts, albeit the defendants' primary purpose was to benefit themselves.

This issue raises the question: what is the proper interpretation of *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173. That decision has given rise to considerable difficulty in the lower courts. Hitherto it has been generally understood that a claim in tort for conspiracy to perform an unlawful act or use unlawful means did not depend upon the plaintiff showing that the defendant's predominant purpose was to injure the plaintiff but required only the presence of an intention to injure. But a detailed analysis in *Metall und Rohstoff A.G.*

A  *v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 of the single speech in the *Lonrho* case concluded that if there were two purposes in an alleged conspiracy and the intent to injure was not the predominant purpose the claim in conspiracy would fail. The present appeal, therefore, is, in effect, an appeal from the decision of the Court of Appeal in the *Metall* case. In the *Lonrho* case [1982] A.C. 172, 180c, 182, 183d, the point in issue was whether it sufficed to found the claim

B  in conspiracy to cause foreseeable damage rather than intentional damage to the plaintiff.

To ascertain the narrow field to which the tort of conspiracy is confined it is necessary to refer to the earlier cases. There is an accurate survey of the purport of the three early cases in this House (*Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.* [1892] A.C. 25; *Allen v.*

C  *Flood* [1898] A.C. 1 and *Quinn v. Leathem* [1901] A.C. 495) by Professor A. V. Dicey in (1902) 18 L.Q.R. 1 et seq. [Reference was also made to *Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, 67, 90 and *Sorrell v. Smith* [1925] A.C. 700, 712, 714.] It is plain from the foregoing cases that the defendants acted for the predominant purpose of advancing their own self-interest and that that was a defence only in situations where such self-interest was legitimate

D  and they had not used unlawful means. This principle is reinforced by the later cases of *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 443–447, 450–453, 462, 469, 472, 477, 486; *Greenhalgh v. Mallard* [1947] 2 All E.R. 255, 259 and *Rookes v. Barnard* [1964] A.C. 1129, 1170, 1204.

The approach of the Court of Appeal in the *Metall* case [1990] 1

E  Q.B. 391, in analysing in detail the speech of Lord Diplock in the *Lonrho* case, was misconceived. It cannot be that Lord Diplock intended merely by implication to overthrow the previous law. The House of Lords does not overthrow sub silentio. The alternative proposition is that in an appeal the House has the task of deciding the specific issues before it.

In *Lonrho v. Shell* Parker J. held that the plaintiffs were attempting

F  to bring into the law of conspiracy a conspiracy where there was only *foreseeable injury*. He held that there was no intention to harm the plaintiffs and therefore no conspiracy. In the House of Lords [1982] A.C. 173, Lord Diplock approved Parker J.'s judgment. He was concerned with this question and no other. In the *Metall* case [1990] 1 Q.B. 391, 459–460 the Court of Appeal stated that Lord Diplock's

G  speech in *Lonrho v. Shell* was in conflict with the judgments in the Court of Appeal in that case when, in fact, all the judgments in the Court of Appeal were approved. If it were to be held that Slade L.J.'s analysis of the *Lonrho* case in the *Metall* case was correct then the House should depart from its previous decision.

Lord Diplock's observations on conspiracy in *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191, 228g–h do not advance the

H  defendants' argument on conspiracy.

Where deliberate unlawful means are used which are directed against a particular plaintiff there seems to be no reason of policy why there should have to be a predominant purpose to injure the plaintiff and not

a mixed purpose. The existence of a predominant intention or purpose is necessary only as a limiting factor where there is no other unlawfulness involved. The House should not endorse the view expressed in the *Metall* case [1990] 1 Q.B. 391, 412, 466. In *Midland Bank Trust Co. Ltd. v. Green (No. 3)* [1979] Ch. 496 there was no allegation of a predominant intent to injure pleaded, nor could there have been on the facts of that case. Nevertheless, it was held that the plaintiff was entitled to succeed in conspiracy.

*Lord Irvine of Lairg Q.C.* in reply. The argument for the plaintiff has glossed over whether Lonrho is complaining of loss of an opportunity to bid simpliciter, or of loss of an opportunity to bid *without competition from the Al Fayeds.* The relevant opportunity is the latter, as a matter of pleading and fact. The argument has accordingly failed to make the point that Lonrho's complaint is, in substance, not of any interference by the Al Fayeds with Lonrho's private, economic or business interests, but an interference by the Al Fayeds with the due operation of procedures under the Fair Trading Act 1973.

As to intention "directed at," the plaintiff is constrained to accept this requirement on the authorities but contends (i) that it is satisfied where the defendant knows that loss to the plaintiff will result from his act and (ii) that, in a competition case, the gain to the defendant necessarily results in a loss to the plaintiff, so that the defendant's intention to benefit himself is to be treated also as an intention to harm the plaintiff.

As regards business or economic interest, nothing that the Al Fayeds said to the Secretary of State caused him to take any action against Lonrho injurious to its economic or business interests. The Secretary of State's actions which were injurious to Lonrho's business interest (i.e. the three references and the extraction of the undertaking) represented decisions of the Secretary of State unaffected by anything said or done by the Al Fayeds. The Al Fayeds by their alleged lies induced the Secretary of State to abstain from action which would have been injurious to the Al Fayeds' business interests.

It was sought to maintain that Lonrho's claim as pleaded represented either an application of existing law or no more than a modest incremental advance upon it. That is not so. What distinguishes the present case from the ordinary interference with business interest cases (e.g. *J. T. Stratford & Son Ltd. v. Lindley* [1965] A.C. 269; *Hadmor Productions Ltd. v. Hamilton* [1983] 1 A.C. 191 and *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335) is that the future contracts said to have been lost in those cases depended only upon ordinary, existent contingencies in the commercial state of affairs inherent in the situation at the date of the interference. On the facts of those cases, the plaintiff's private business interests had been interfered with.

By contrast, Lonrho's ordinary, private, economic or business interest to make a bid for House of Fraser has not been interfered with by the Al Fayeds, although it has been interfered with by the legitimate actions of the Secretary of State. Lonrho's complaint is of interference by the Al Fayeds with the implementation of public administrative procedures

A   and not with Lonrho's private economic interests. There has been a similar failure to meet the argument that the remedy for which Lonrho argues would cut across the remedies which the Act of 1973 and public law provide: see section 64(4)(*b*). Moreover, an interested party may always seek judicial review of any administrative decisions taken under the Act. Thus the Act itself, and public law, provide a correcting mechanism where it is alleged that the Secretary of State has been

B   materially misled. In the present case, Lonrho has exhausted these public law remedies available to it, and there is no reason in policy why a private law remedy should be created to add to Lonrho's public law remedies.

On the analogy with breach of statutory duty, it is plain that in *Lonrho v. Shell (No. 2)* [1982] A.C. 173 Lord Diplock treated the

C   breaches of the statutory orders, which conferred no cause of action on Lonrho, as equivalent to lawful means, in that they required a predominant purpose to injure for conspiracy involving such breaches. It would be highly anomalous if that which was not unlawful means for conspiracy were to be treated as unlawful means for the tort of interference with business by unlawful means.

The House of Lords' decision in the *Lonrho* case is soundly based in

D   public policy: where Parliament cannot be regarded as having intended to give a plaintiff a remedy for breach of a statutory duty, the common law ought not to supply a remedy itself. This is particularly true in the case of the Fair Trading Act 1973, which creates a statutory framework for the implementation of high economic policy and is not intended to confer rights upon any private individual. Lonrho's present case cannot

E   be stronger than it would have been had the present statutory duty in section 93B (as inserted by section 151 of the Companies Act 1989) of the Fair Trading Act 1973 existed in 1984–1985.

The tort requires that the unlawful acts of the defendant, practised upon a third party, be directed at the plaintiff: *Allen v. Flood* [1898] A.C. 1, 96; *Quinn v. Leathem* [1901] A.C. 495, 535; *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.*

F   [1908] 1 Ch. 335; *Rookes v. Barnard* [1964] A.C. 1129 and *Merkur Island Shipping Corporation v. Laughton* [1983] 2 A.C. 570. An actual and actuating intention to harm the plaintiff is required. It is not sufficient that a mere incidental consequence, which is foreseen, is harmful to the plaintiff. The gap between mere foresight of harm to the plaintiff and aiming at him is vast. To equate the two would be to extend the tort far beyond its true limits as laid down. *Van Camp*

G   *Chocolates Ltd. v. Aulsebrooks Ltd.* [1984] 1 N.Z.L.R. 354 gives the only possible content to the requirement of "directed at." The distinction between direct interference with the plaintiffs' rights and indirectly attacking the plaintiff by unlawful means practised on a third party but aimed at the plaintiff is expressly recognised in the authorities. In *Allen v. Flood* [1898] A.C. 1, 96, Lord Watson stated that there were two

H   distinct principles. See also *National Phonograph Co. Ltd. v. Edison-Bell Consolidated Phonograph Co. Ltd.* [1908] 1 Ch. 335; *D.C. Thomson & Co. v. Deakin* [1952] Ch. 646, 695–698; *Torquay Hotel Co. Ltd. v. Cousins* [1969] 2 Ch. 106, 139B and *Associated British Ports v. Transport*

*and General Workers' Union* [1989] 1 W.L.R. 939, 963D–G, 965B–C. The   A
argument for Lonrho would deprive the "directed at" requirement of
the tort of its ordinary meaning since mere foresight of harm to the
plaintiff would suffice. The test in the *Van Camp* case [1984] 1 N.Z.L.R.
354 is the only coherent test which gives proper meaning to "directed
at" and explains all the cases. The test is not the same as the
predominant purpose requirement in the tort of conspiracy.

As to conspiracy to injure, *Metall und Rohstoff A.G. v. Donaldson*   B
*Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 was rightly decided.
Alternatively, if it was wrongly decided, the mental element required in
a case of conspiracy to injure by unlawful means is that the conspiracy
be directed at or aimed at the plaintiff: see the *Lonrho* case,
1 December 1980, Parker J.; 6 March 1981; Court of Appeal (Civil
Division) Transcript No. 51 of 1981. That mental element is the same as   C
that for the tort of interference with business by unlawful means and so
cannot be satisfied in this case.

In any event, if the tort of conspiracy to injure by unlawful means is
to be treated as different from conspiracy to injure by lawful means, the
unlawful means in question should be independently actionable by the
plaintiff. They are not in this case if either the interest which Lonrho
asserts has been damaged is not an interest protected by the wrongful   D
interference tort, or if the acts of the Al Fayeds are not to be treated as
having been aimed at Lonrho. The effect of a plea of conspiracy in cases
of conspiracy to injure by unlawful means is to seek to render the
conspirators jointly liable for the actionable wrongs committed in the
course of implementing the conspiracy: *Kearney v. Lloyd* (1889) 26 Ir.
268, 280–283; *Salaman v. Warner* (1891) 65 L.T. 132, 134; *D. C.*   E
*Thomson & Co. Ltd. v. Deakin* [1952] Ch. 646, 673–674 and *Rookes v.*
*Barnard* [1964] A.C. 1129, 1204.

*Grabiner Q.C.*, replying on the issue of unlawful interference with
business, referred to *Keeble v. Hickeringill*, 11 East. 574n; *Allen v.*
*Flood* [1898] A.C. 1; *Hollywood Silver Fox Farm Ltd. v. Emmett* [1936]
2 K.B. 468; *Mogul Steamship Co. Ltd. v. McGregor, Gow & Co.*, 23
Q.B.D. 598; *National Phonograph Co. Ltd. v. Edison-Bell Consolidated*   F
*Phonograph Co. Ltd.* [1908] 1 Ch. 335; *Fairbairn, Wright & Co. v.*
*Levin & Co.*, 34 N.Z.L.R. 1; *Rookes v. Barnard* [1964] A.C. 1129;
*Daily Mirror Newspapers Ltd. v. Gardner* [1968] 2 Q.B. 762; *Acrow*
*(Automation) Ltd. v. Rex Chainbelt Inc.* [1971] 1 W.L.R. 1676;
*Volkswagen Canada Ltd. v. Spicer*, 91 D.L.R. (3d) 42; *R.C.A.*
*Corporation v. Pollard* [1983] Ch. 135; *Merkur Island Shipping*
*Corporation v. Laughton* [1983] 2 A.C. 570 and *Hadmor Productions*   G
*Ltd. v. Hamilton* [1983] 1 A.C. 191.

As to conspiracy, in *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)*
[1982] A.C. 173 the House of Lords concluded that it was free to decide
whether or not the tort of conspiracy should be confined to the case
where the predominant purpose of the conspirators was to injure the
plaintiff or whether it should be extended to include the case of an   H
"unlawful means" conspiracy even without a predominant purpose to
injure. In his speech Lord Diplock (at p. 189C) (with whom the rest of
their Lordships agreed) "unhesitatingly" decided to restrict the tort of

A   conspiracy. The Court of Appeal in *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 unanimously decided that this was the correct interpretation of the decision of your Lordships' House in *Lonrho v. Shell*, and your Lordships should reach the same conclusion. The courts in Canada have construed the *Lonrho* decision in the House of Lords in the same way although they have decided not to follow it: *Canada Cement La Farge Ltd. v. British*

B   *Columbia Lightweight Aggregate Ltd.* (1983) 145 D.L.R. (3d) 385.

    *Kentridge Q.C.*, in reply on the issue of conspiracy, referred to *Reg. v. Scott* [1975] A.C. 819; *Lonrho Ltd. v. Shell Petroleum Co. Ltd. (No. 2)* [1982] A.C. 173 and *Clerk & Lindsell on Torts*, 16th ed. (1989), pp. 850–891.

C   Their Lordships took time for consideration.

    27 June.  LORD BRIDGE OF HARWICH.  My Lords; the litigation giving rise to this interlocutory appeal and cross-appeal is another instalment of the long-running dispute about the take-over in 1985 of House of Fraser Plc., the company which owns, inter alia, Harrods department store. The

D   plaintiff in this action, Lonrho Plc., had been anxious to acquire control of House of Fraser since early 1981. Following a reference by the Secretary of State for Trade and Industry to the Monopolies and Mergers Commission ("the M.M.C.") under section 64 of the Fair Trading Act 1973 of the "merger situation" arising from the proposed acquisition and a report of the M.M.C. dated 9 December 1981, Lonrho gave an undertaking to the

E   Secretary of State not to acquire more than 30 per cent. of the equity share capital in House of Fraser. A further reference relating to the proposed acquisition by Lonrho was made to the M.M.C. on 31 May 1984. The M.M.C.'s report on this reference was expected to be made not later than 28 February 1985. If this report were favourable to Lonrho, it was to be expected that the Secretary of State would release it from the undertaking and that Lonrho would be free to proceed to bid for control

F   of House of Fraser.

    The first three defendants in the action are brothers named Fayed. The Fayeds own and control a company now called House of Fraser Holdings Plc. ("Holdings"). In November 1984 Holdings acquired most of Lonrho's shares in House of Fraser and were intending to acquire a controlling interest. This gave rise to a new merger situation under section 64 of the

G   Act of 1973. If the Secretary of State had referred this merger situation to the M.M.C., the Fayeds and Holdings would have been prevented from acquiring control of House of Fraser unless and until the M.M.C. had made a favourable report on the reference. In the event no such reference was made. On 3 March 1985 Holdings made a cash offer of 400p. per share for the whole of the issued ordinary share capital of House of Fraser which was recommended to the shareholders by the board of directors of

H   House of Fraser and was publicly announced on 4 March. By 11 March Holdings had acquired more than 50 per cent. of the shares. Following a favourable report by the M.M.C. on the May 1984 reference relating to Lonrho's proposed acquisition of House of Fraser the Secretary of State,

on 14 March 1985, released Lonrho from the undertaking given in December 1981.

Lonrho's pleaded case, in very short summary, is as follows. Lonrho at all material times intended to acquire control of House of Fraser. The Fayeds and Holdings induced the Secretary of State to abstain from referring their proposed acquisition of House of Fraser to the M.M.C. by false and fraudulent representations about themselves, their commercial background and the source of the finance available to them for the acquisition of House of Fraser. If the Secretary of State had known the truth, he would have made a reference either before or after Holdings had acquired control. If the reference had been made before Holdings had acquired control, this would have left Lonrho, when released from its undertaking, in a position to bid for control of House of Fraser without competition from the Fayeds or Holdings. If the reference had been made after Holdings acquired control, this would probably have led to an order under the Act of 1973 requiring Holdings to divest itself of its controlling interest, which again Lonrho would have had the opportunity to acquire.

The fifth and sixth defendants to the action are Mr. MacArthur, a director of Kleinwort Benson Ltd., and Kleinwort Benson Ltd., the merchant bankers who were advising the Fayeds and Holdings in connection with the take-over. Lonrho pleads that some of the relevant false statements which induced the Secretary of State not to refer Holdings' proposed acquisition to the M.M.C. were made by these defendants fraudulently, not in the sense that they knew of the falsity, but in the sense that they acted recklessly not caring whether the statements were true or false.

As against all the defendants, Lonrho's statement of claim pleads that their intention was both to benefit the Fayeds and Holdings by furthering their interest in the acquisition of House of Fraser and to injure Lonrho by preventing them from acquiring House of Fraser. Lonrho claims to have lost the opportunity to acquire House of Fraser by bidding for the shares without competition from the Fayeds or Holdings and thereby to have suffered damage. Lonrho asserts that these facts are sufficient to establish a cause of action for the common law tort of interfering with business by unlawful means. But the statement of claim also relies additionally or alternatively on the same allegations of fact as establishing the tort of conspiracy to injure and, as against Mr. MacArthur and Kleinworts, it originally pleaded a distinct cause of action claiming damages for negligence.

The defendants applied by summons to strike out the statement of claim under R.S.C., Ord. 18, r. 19 on the ground that it disclosed no cause of action, was frivolous and vexatious and an abuse of the process of the court. Master Topley dismissed the application, but an appeal against his decision was allowed by Pill J. [1990] 1 Q.B. 490. Lonrho did not appeal against the striking out of the claim in negligence against Mr. MacArthur and Kleinworts, accepting no doubt that these defendants did not owe Lonrho any duty of care, but did appeal against the remainder of Pill J.'s order. It was, however, accepted in the Court of Appeal that the statement of claim had not alleged that the *predominant* purpose of the alleged conspiracy was to injure Lonrho and that accordingly the Court of Appeal were bound by their own decision in *Metall und Rohstoff A.G. v.*

A    *Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 to hold that the
pleaded cause of action in conspiracy could not succeed. The Court of
Appeal (Dillon, Ralph Gibson and Woolf L.JJ.) [1990] 2 Q.B. 479 allowed
the appeal in relation to the cause of action founded on the tort of
interfering with business by unlawful means. The defendants now appeal
and Lonrho cross-appeals in relation to the cause of action in conspiracy
by leave of your Lordships' House.

B        It will be convenient to consider first the clear cut issue of law which
arises on the cross-appeal. In the *Metall* case the Court of Appeal
interpreted the decision of this House in *Lonrho Ltd. v. Shell Petroleum
Co. Ltd. (No. 2)* [1982] A.C. 173 as holding it to be an essential ingredient
in the civil tort of conspiracy to establish that the predominant purpose of
the conspirators was to injure the plaintiff irrespective of whether the

C    means they used to effect that purpose were lawful or unlawful. In
inviting us to overrule the *Metall* case, Mr. Kentridge submits that the true
position in law is that the tort of conspiracy to injure, whilst requiring *an*
intention to injure the plaintiff, may be established *either* by showing that
this intention was the predominant purpose of the conspirators, even
though the means used were lawful, *or* by showing that unlawful means
were used. Where the primary or predominant purpose of the conspirators

D    is to further or protect some legitimate interest of their own, but they also
have the intention of injuring the plaintiff, it is sufficient to make their
action tortious that they used unlawful means. This, Mr. Kentridge,
submits, is the law as it was always understood before the decision in
*Lonrho v. Shell* and it is inconceivable that this House should have
intended to overturn that understanding in a case where no issue arose

E    with respect to predominant purpose and the point was never argued.
        In *Rookes v. Barnard* [1964] A.C. 1129, 1204, Lord Devlin said:

        "There are, as is well known, two sorts of conspiracies, the *Quinn v.
        Leathem* [1901] A.C. 495 type which employs only lawful means but
        aims at an unlawful end, and the type which employs unlawful
        means."

F    Of these two types of tortious conspiracy the *Quinn v. Leathem* type,
where no unlawful means are used, is now regarded as an anomaly for the
reasons so clearly explained by Lord Diplock in *Lonrho v. Shell* [1982]
A.C. 173 in the following passage, at pp. 188–189:

        "Why should an act which causes economic loss to A but is not
        actionable at his suit if done by B alone become actionable because B

G        did it pursuant to an agreement between B and C? An explanation
        given at the close of the nineteenth century by Bowen L.J. in the
        *Mogul* case when it was before the Court of Appeal (1889) 23 Q.B.D.
        598, 616 was: 'The distinction is based on sound reason, for a
        combination may make oppressive or dangerous that which if it
        proceeded only from a single person would be otherwise.' But to

H        suggest today that acts done by one street-corner grocer in concert
        with a second are more oppressive and dangerous to a competitor
        than the same acts done by a string of supermarkets under a single
        ownership or that a multinational conglomerate such as Lonrho or oil
        company such as Shell or B.P. does not exercise greater economic

A

power than any combination of small businesses, is to shut one's eyes to what has been happening in the business and industrial world since the turn of the century and, in particular, since the end of World War II. The civil tort of conspiracy to injure the plaintiff's commercial interests where that is the predominant purpose of the agreement between the defendants and of the acts done in execution of it which caused damage to the plaintiff, must I think be accepted by this House as too well-established to be discarded however anomalous it may seem today. It was applied by this House 80 years ago in *Quinn v. Leathem* [1901] A.C. 495, and accepted as good law in the *Crofter* case [1942] A.C. 435, where it was made clear that injury to the plaintiff and not the self-interest of the defendants must be the predominant purpose of the agreement in execution of which the damage-causing acts were done."

B

C

But this reasoning has no relevance to the second type of conspiracy which employs unlawful means. Of this type Lord Devlin said in his speech in *Rookes v. Barnard* [1964] A.C. 1129, 1204, immediately following the passage I have just cited: "In the latter type . . . the element of conspiracy is usually only of secondary importance since the unlawful means are actionable by themselves."

D

It is no doubt for the reason mentioned by Lord Devlin that there is no direct authority, unless it be *Rookes v. Barnard* itself, establishing the negative proposition that the tort of conspiracy to injure by unlawful means may be established without proof that the intention to injure the plaintiff was the predominant purpose of the conspirators. But in the many cases where plaintiffs have asserted a conspiracy to injure, but have been unable to prove that any unlawful means were used, judgments in the Court of Appeal and speeches in your Lordships' House emphasising the requirement of a predominant purpose to injure have repeatedly included dicta indicating that this requirement does not apply where the means used to effect the conspirator's purpose are unlawful. I need do no more than cite some outstanding examples.

E

In *Ware and De Freville Ltd. v. Motor Trade Association* [1921] 3 K.B. 40, 67, Scrutton L.J. said:

F

"I take the *Mogul* case [1892] A.C. 25 as deciding that a combination to do acts, the natural consequence of which was to injure another in his business, was not actionable, *if those acts were not otherwise unlawful*, such as assaults, or threats of assaults, and were done in furtherance of the trade interests of those combining."

G

In *Sorrell v. Smith* [1925] A.C. 700, 712, Viscount Cave L.C. said:

"I deduce as material for the decision of the present case two propositions of law, which may be stated as follows:—(1) A combination of two or more persons wilfully to injure a man in his trade is unlawful and, if it results in damage to him, is actionable. (2) If the real purpose of the combination is, not to injure another, but to forward or defend the trade of those who enter into it, then no wrong is committed and no action will lie, although damage to another ensues. The distinction between the two classes of case is

H

A

sometimes expressed by saying that in cases of the former class there is not, while in cases of the latter class there is, just cause or excuse for the action taken."

He added, at p. 714:

"The second proposition, of course, *assumes the absence of means which are in themselves unlawful*, such as violence or the threat of

B

violence or fraud."

In *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 445, Viscount Simon L.C. said:

"It is enough to say that if there is more than one purpose actuating a combination, liability must depend on ascertaining the predominant

C

purpose. If that predominant purpose is to damage another person and damage results, that is tortious conspiracy. If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (*no illegal means being employed*), it is not a tortious conspiracy, even though it causes damage to another person."

In the same case Lord Wright said, at pp. 461–462:

D

"The concept of a civil conspiracy to injure has been in the main developed in the course of the last half century, particularly since the great case of the *Mogul Steamship Co. v. McGregor & Co.* [1892] A.C. 25. Its essential character is described by Lord Macnaghten in *Quinn v. Leathem* [1901] A.C. 495, 510, basing himself on Lord Watson's words in *Allen v. Flood* [1898] A.C. 1, 108: 'a conspiracy to injure might give rise to civil liability even though the end were

E

brought about by conduct and acts which by themselves and apart from the element of combination or concerted action could not be regarded as a legal wrong.' In this sense the conspiracy is the gist of the wrong, though damage is necessary to complete the cause of action. . . . The rule may seem anomalous, so far as it holds that conduct by two may be actionable if it causes damage, whereas the same conduct done by one, causing the same damage, would give no

F

redress. In effect the plaintiff's right is that he should not be damnified by a conspiracy to injure him, and it is in the fact of the conspiracy that the unlawfulness resides. *It is a different matter if the conspiracy is to do acts in themselves wrongful*, such as to deceive or defraud, to commit violence, or to conduct a strike or lock-out by means of conduct prohibited by the Conspiracy and Protection of

G

Property Act 1875, or which contravenes the Trade Disputes and Trade Unions Act 1927."

The emphasis added in each of these passages is mine.

The reasoning in these passages is both clear and cogent. Where conspirators act with the predominant purpose of injuring the plaintiff and in fact inflict damage on him, but do nothing which would have been

H

actionable if done by an individual acting alone, it is in the fact of their concerted action for that illegitimate purpose that the law, however anomalous it may now seem, finds a sufficient ground to condemn their action as illegal and tortious. But when conspirators intentionally injure

the plaintiff and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests; it is sufficient to make their action tortious that the means used were unlawful.

Did the House in *Lonrho v. Shell* [1982] A.C. 173 depart from this reasoning and lay down for the first time a new principle that a plaintiff, seeking to establish the tort of conspiracy to injure, must in every case prove that the intention to injure him was the predominant purpose of the defendants, whether the means used were lawful or unlawful? Lonrho Ltd., as plaintiffs in that case, owned and operated a pipeline designed to carry oil from a port on the coast of Mozambique to an oil refinery in Southern Rhodesia. Following the unilateral declaration of independence ("U.D.I.") by the Government of Southern Rhodesia, the United Kingdom enacted the Southern Rhodesia Act 1965 and the Southern Rhodesia (Petroleum) Order 1965 (S.I. 1965 No. 2140), made under that Act, prohibited Shell and B.P., as companies incorporated in the United Kingdom, from supplying oil to Southern Rhodesia. The facts to be assumed for the purpose of answering the questions of law posed in the consultative case stated by arbitrators which brought the matter before the courts were that Shell and B.P., by assuring the Government of Southern Rhodesia that they would maintain the supply of oil to Southern Rhodesia, in spite of sanctions, had influenced both the inception and the continuation of U.D.I., and by supplying oil in breach of the sanctions Order of 1965 had prolonged the period during which Lonrho's pipeline was prevented from operating and thereby caused Lonrho foreseeable damage. But it was throughout common ground that the respondents had no intention to injure Lonrho.

The only questions considered in detail when the case came before this House were, first, whether breach of the sanctions Order gave rise to a right of action for breach of statutory duty and, secondly, in a question referred to in the consultative case as Question 5(b) "whether the claimants have a cause of action for damage alleged to have been caused by such breaches by virtue only of the allegation that there was an agreement to effect them." Both questions had been answered in the negative by Parker J. at first instance (unreported), 1 December 1980 and by Lord Denning M.R., Eveleigh and Fox L.JJ. in the Court of Appeal (unreported), 6 March 1981; Court of Appeal (Civil Division) Transcript No. 51 of 1981. They were similarly answered by the unanimous judgment of the House in which Lord Diplock delivered the only speech.

As the judgments in both courts below and the speech of Lord Diplock make clear, the fact dictating a negative answer to the second question was the absence of any intention to injure Lonrho. Parker J. said:

"The claimants accept that there is no case in which an undirected crime, not itself a civil wrong, committed without intent to injure, has been held, or, I think, even alleged to be actionable on the mere ground that it was committed pursuant to agreement."

He concluded his judgment by saying:

"I answer Question 5(b) in the negative on the specific ground that if the acts done in combination are not done with intent to harm the

A  plaintiff and are not themselves actionable, the tort of conspiracy is not committed."

Lord Denning M.R. said:

"So this point of law arises directly: Is an agreement to do an unlawful act actionable at the suit of anyone who suffers damage from it which is reasonably foreseeable? Even though the agreement is not directed at him, nor done with intent to injure him? In discussing this point of law I put aside the many modern cases on conspiracy—in which there is an agreement by two or more to do a *lawful* act. It is now settled by the House of Lords that such an agreement is actionable if it is done with the predominant motive of injuring the plaintiff and does in fact injure him: see *Crofter Hand Woven Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, where Lord Simon L.C. said, at p. 445: 'Liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and damage results, that is tortious conspiracy.' Here we are concerned with a different problem altogether. It is an agreement by two or more to do an *unlawful* act. . . . I think there is a cause of action when it is remembered that the tort is a conspiracy *to injure*. I would suggest that a conspiracy to do an *unlawful* act—when there is no intent to injure the plaintiff and it is not aimed or directed at him—is not actionable, even though he is damaged thereby. But if there is an intent to injure him then it is actionable. The intent to injure may not be the predominant motive. It may be mixed with other motives. In this context, when the agreement is to do an *unlawful* act, we do not get into the 'quagmire of mixed motives,' as Lord Simon L.C. described them in the *Crofters* case at p. 445. It is sufficient if the conspiracy is aimed or directed at the plaintiff, and it can reasonably be foreseen that it may injure him, and does in fact injure him. That is what Parker J. thought. I agree with him."

The relevant passage from Lord Diplock's speech in this House is at [1982] A.C. 173, 188:

"Question 5(b), to which I now turn, concerns conspiracy as a civil tort. Your Lordships are invited to answer it on the assumption that the purpose of Shell and B.P. in entering into the agreement to do the various things that it must be assumed they did in contravention of the sanctions Order, was to forward their own commercial interests; *not* to injure those of Lonrho. So the question of law to be determined is whether an intent by the defendants to injure the plaintiff is an essential element in the civil wrong of conspiracy, even where the acts agreed to be done by the conspirators amount to criminal offences under a penal statute. It is conceded that there is no direct authority either way upon this question to be found in the decided cases; so if this House were to answer it in the affirmative, your Lordships would be making new law."

Then, following the passage which I have already cited earlier in this opinion pointing to the anomalous character of the *Quinn v. Leathem*

[1901] A.C. 495 type of conspiracy, Lord Diplock continued [1982] A.C.   A
173, 189:

> "My Lords, in none of the judgments in decided cases in civil actions
> for damages for conspiracy does it appear that the mind of the author
> of the judgment was directed to a case where the damage-causing acts
> although neither done for the purpose of injuring the plaintiff nor
> actionable at his suit if they had been done by one person alone, were   B
> nevertheless a contravention of some penal law. I will not recite the
> statements in those judgments to which your Lordships have been
> referred by the appellants as amounting to dicta in favour of the view
> that a civil action for conspiracy does lie in such a case. Even if the
> authors' minds had been directed to the point, which they were not, I
> should still find them indecisive. This House, in my view, has an
> unfettered choice whether to confine the civil action of conspiracy to   C
> the narrow field to which alone it has an established claim or whether
> to extend this already anomalous tort beyond those narrow limits that
> are all that common sense and the application of the legal logic of the
> decided cases require. My Lords, my choice is unhesitatingly the
> same as that of Parker J. and all three members of the Court of
> Appeal. I am against extending the scope of civil tort of conspiracy   D
> beyond acts done in execution of an agreement entered into by two or
> more persons for the purpose not of protecting their own interests but
> of injuring the interests of the plaintiff. So I would answer Question
> 5(b): 'No.'"

In the *Metall* case [1990] 1 Q.B. 391 Slade L.J. delivering the judgment
of the court, whilst expressly disclaiming any intention to construe Lord   E
Diplock's speech as if it were a statute, nevertheless subjected it to a
detailed textual analysis leading to the conclusion that it laid down a rule
of law that the tort of conspiracy to injure required proof in every case not
merely of an intention to injure the plaintiff but also that injury to the
plaintiff was the predominant purpose of the conspiracy.

My Lords, I am quite unable to accept that Lord Diplock or the other
members of the Appellate Committee concurring with him, of whom I was   F
one, intended the decision in *Lonrho v. Shell* [1982] A.C. 173 to effect,
sub silentio, such a significant change in the law as it had been previously
understood. The House, as is clear from the parties' printed cases, which
we have been shown, had never been invited to take such a step.
Moreover, to do so would have been directly contrary to the view of Lord
Denning M.R. expressed in the judgment which the House was affirming   G
and inconsistent with the dicta in what Lord Diplock described, at p. 188,
as "Viscount Simon L.C.'s now classic speech in *Crofter Hand Woven
Harris Tweed Co. Ltd. v. Veitch* [1942] A.C. 435, 439." I would overrule
the *Metall* case in this respect.

It follows from this conclusion that Lonrho's acceptance that the
pleaded intention on the part of the appellants to cause injury to Lonrho
was not the predominant purpose of their alleged unlawful action is not   H
necessarily fatal to the pleaded cause of action in conspiracy and therefore
affords no separate ground for striking out that part of the pleading. If the
appellants fail to establish that Lonrho's primary pleading asserting the tort

A   of interference with business by unlawful means should be struck out, they
are in no stronger position in relation to the pleaded cause of action in
conspiracy. It is not, I think, necessary for present purposes to consider
whether the pleaded conspiracy adds anything of substance or raises any
significantly different issues from those on which the rest of the pleading
depends. At this interlocutory stage it is sufficient to say that the two
pleaded causes of action must stand or fall together. Either both should
B   be struck out or both should go to trial.

It is trite law that the summary procedure for striking out pleadings
under Ord. 18, r. 19, the successor to Ord. XXV, r. 4 is not the same as
the old procedure by demurrer and is only to be used in plain and obvious
cases. In *Hubbuck & Sons Ltd. v. Wilkinson, Heywood & Clark Ltd.*
[1899] 1 Q.B. 86, 90-91, Sir Nathaniel Lindley M.R. said:

C        "Order XXV abolished demurrers and substituted a more summary
process for getting rid of pleadings which show no reasonable cause of
action or defence. Two courses are open to a defendant who wishes
to raise the question whether, assuming a statement of claim to be
proved, it entitles the plaintiff to relief. One method is to raise the
question of law as directed by Ord. XXV, r. 2; the other is to apply
D        to strike out the statement of claim under Ord. XXV, r. 4. The first
method is appropriate to cases requiring argument and careful
consideration. The second and more summary procedure is only
appropriate to cases which are plain and obvious, so that any master
or judge can say at once that the statement of claim as it stands is
insufficient, even if proved, to entitle the plaintiff to what he asks."

E        In *Dyson v. Attorney-General* [1911] 1 K.B. 410, 414, Sir H. H.
Cozens-Hardy M.R. said that the procedure "ought not to be applied to an
action involving serious investigation of ancient law and questions of
general importance" and Fletcher Moulton L.J. in the same case, at
p. 419, thought it should be confined to cases where the cause of action
was "obviously and almost incontestably bad." More recently Salmon L.J.
said in *Nagle v. Feilden* [1966] 2 Q.B. 633, 651:
F
"It is well settled that a statement of claim should not be struck out
and the plaintiff driven from the judgment seat unless the case is
unarguable."

Of course, it is true, as was pointed out by Sir Gordon Willmer in
*Drummond-Jackson v. British Medical Association* [1970] 1 W.L.R. 688,
G   700, that "the question whether a point is plain and obvious does not
depend upon the length of time it takes to argue." However, it is not the
length of arguments in this case, but the inherent difficulty of the issues
which they have to address which persuades me that the case cannot by
any stretch of language be properly described as plain and obvious, nor
can Lonrho's pleaded cause of action be characterised as unarguable or
almost incontestably bad.
H        It may sometimes be appropriate, where proceedings to strike out have
reached this House on appeal and have been fully argued, to relax the
rigour of these criteria in exceptional circumstances: see, for example,
*Williams and Humbert Ltd. v. W. & H. Trade Marks (Jersey) Ltd.* [1986]

A.C. 368. But here the only possible reason for departing from the   A
application of the ordinary tests would be if the House were satisfied that it
was possible to distill from the pleadings a clearly defined issue of law
which it would have been appropriate to determine as a preliminary
question if the correct procedure to that end had been followed and which
can be answered in a way which disposes of the action. But here it is
important to remember how frequently the House has protested, where   B
parties have agreed the terms of a preliminary question of law, at being
required to answer difficult questions of law on hypothetical and disputed
facts stated in general terms. In the course of the argument, counsel for
the appellants were invited to formulate the terms of any question of law
which they were able to submit would have been appropriate for
preliminary determination, but I do not believe that any of the formulations
suggested would have been accepted as appropriate for preliminary   C
determination if a contested application had come before the court under
Ord. 33, r. 3. In a passage which seems to me peculiarly apt to the
circumstances of this case, Lord Wilberforce said in *Allen v. Gulf Oil
Refining Ltd.* [1981] A.C. 1001, 1010-1011:

> "My Lords, I and other of your Lordships have often protested
> against the procedure of bringing, except in clear and simple cases,   D
> points of law for preliminary decision. The procedure indeed exists
> and is sometimes useful. In other cases, and this is frequently so
> where they reach this House, they do not serve the cause of justice.
> The present is such an example. . . . The fact is that the result of the
> case must depend upon the impact of detailed and complex findings of
> fact upon principles of law which are themselves flexible. There are
> too many variables to admit of a clear-cut solution in advance."   E

For these reasons, and for the reasons given in the judgments of the
Court of Appeal, I have reached the conclusion that it would be
inappropriate to strike out the statement of claim and that the case must
accordingly proceed to trial. In the circumstances it would be inappropriate
to embark upon any discussion of the issues canvassed in counsels'
submissions on the hearing of the appeal. I would emphasise that the only   F
question of law which, in my opinion, it is appropriate for the House to
decide at this stage is that involved in overruling the *Metall* case [1990] 1
Q.B. 391. The facts pleaded in the statement of claim are strongly
disputed. When the facts have been found at trial they may or may not
give rise to important questions of law requiring resolution, but for the
present purposes it suffices to say that the appellants fail to demonstrate   G
that Lonrho's claim is obviously doomed to fail. Nothing in this opinion
should be understood as saying any more than that.

I would dismiss the appeal, allow the cross-appeal, and set aside so
much of the orders of the courts below as order the striking out of
paragraphs 55 and 56 of the statement of claim and the words "and/or
conspiracy" in paragraph 57. I see no reason to disturb the orders for
costs made in the Court of Appeal, but I would order the appellants to   H
pay the respondent's costs in this House.

LORD BRANDON OF OAKBROOK. My Lords, I have had the advantage

A    of reading in draft the speeches prepared by my noble and learned friends, Lord Bridge of Harwich and Lord Templeman. I agree with both speeches and for the reasons given in them I would dismiss the appeal and allow the cross-appeal.

B    LORD TEMPLEMAN.   My Lords, In my opinion, the Court of Appeal having refused to strike out the statement of claim in this case, the plaintiff should not be prevented from proceeding with this action. I agree with my noble and learned friend, Lord Bridge of Harwich, that some of the observations of Slade L.J. in *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1990] 1 Q.B. 391 were not in accordance with previous authorities. Without encouraging the continuation or initiation of litigation by the present or any future disputants, I apprehend that the

C    ambit and ingredients of torts of conspiracy and unlawful interference may hereafter require further analysis and reconsideration by the courts. I agree with the order proposed by Lord Bridge.

D    LORD GOFF OF CHIEVELEY.   My Lords, I have had the advantage of reading in draft the speeches prepared by my noble and learned friends, Lord Bridge of Harwich and Lord Templeman. I agree with both speeches and for the reasons given in them I would dismiss the appeal and allow the cross-appeal.

E    LORD JAUNCEY OF TULLICHETTLE.   My Lords, I have had the advantage of reading in draft the speeches of my noble and learned friends, Lord Bridge of Harwich and Lord Templeman. I agree with the reasons therein stated and with the order which they propose.

*Appeal dismissed.*
*Cross-appeal allowed.*

F    *Solicitors: Herbert Smith; Slaughter and May; Denton Hall Burgin & Warrens.*

J. A. G.

G    ———————

H

All England Official Transcripts (1997-2008)*

## Total Network SL (a company incorporated in Spain) v Her Majesty's Revenue and Customs (suing as Commissioners of Customs and Excise)

[2008] UKHL 19

(Transcript)

**HOUSE OF LORDS**

**LORDS, HOPE, SCOTT, WALKER, MANCE, NEUBERGER**

**26, 27 NOVEMBER 2007, 12 MARCH 2008**

*Tort – Conspiracy – Ingredients of tort – Unlawful means conspiracy – Whether criminal conduct could constitute unlawful means – Whether unlawful act having to be actionable at suit of claimant – Whether open to Revenue and Customs Commissioners to bring private law action for damages for unlawful means conspiracy to recover otherwise irrecoverable value added tax*

**12 MARCH 2008**

J Martin QC and P Coppel for the Appellants

C Flint QC and T Weisselberg for the Respondents

Solicitor Her Majesty's Revenue and Customs; Byrne and Partners

**LORD HOPE:**

My Lords,

**[1]**   The issue in this case is whether the Commissioners can maintain a civil claim for damages under the tort of unlawful means conspiracy against a participant in a missing trader intra-community, or carousel, fraud. Two questions need to be considered. The first is whether it is open to the Commissioners to maintain a cause of action in damages at common law as a means of recovering VAT from a person who has not been made accountable or otherwise liable for that tax by Parliament. The second is whether, if so, it is an essential requirement of the tort of unlawful means conspiracy that the conduct which is said to amount to the unlawful means should give rise to a separate action in tort against at least one of the conspirators.

**[2]**   On the second issue the Court of Appeal considered itself bound by prior Court of Appeal authority to hold that the unlawful means had to be independently actionable: [2007] EWCA Civ 39, paras 78–79. Its decision to strike out the Commissioner's claim for this reason is the subject of the appeal to this House by the Commissioners. The Court of Appeal decided the first issue in favour of the Commissioners: paras 31–32. Total Network SA ("Total") has cross-appealed on the first issue.

*The facts*

**[3]**   Total is a company incorporated in Spain which has a bank account in the United Kingdom. The Commissioners claim that Total is liable to them in damages at common law for conspiracy in sums equivalent to amounts of VAT which the Commissioners say they have lost as a result of 13 carousel frauds which were participated in by Total. There are alleged to have been 13 such conspiracies over five months from May to October 2002.

**[4]**   In its simplest form a carousel fraud begins with the sale of taxable goods by a trader registered for VAT in one member state, A, to a VAT-registered trader in another member state, B. Under art 28c(A)(a) of European Council Directive 77/388/EEC of 17 May 1977 (JL 145, 13 June 1977) on the harmonisation of the laws of the member states relating to turnover taxes (the Sixth Directive), the supply of goods to a trader in another member state is exempted from VAT. In the words of s 30 of the Value Added Tax Act 1994 ("VATA 1994"), it is zero-rated. B then sells the goods to another VAT-registered trader, C, in its own member state, charging and receiving VAT on the consideration. It fails to account for that VAT to the taxing authorities and disappears. It becomes a missing trader. But before doing so it provides a tax invoice to C, which claims and receives the VAT that it has paid to B as input tax. C, the middleman or broker, then sells the goods to a registered trader in another member state. This sale is zero-rated, so there is no output tax to set off against the input tax which C has received. B's disappearance has resulted in a profit to the conspirators which is equivalent to the amount of the input tax received by C. It is the circularity of the transaction that gives rise to the description of the fraud as a carousel.

**[5]**   The fraud is the product of a dishonest application of the system of value added tax. C has a claim for input tax arising from its transaction with the missing trader, B, which it is entitled to recover under art 17(2)(d) of the Sixth Directive. Its sale to A is zero-rated in its own member state. So it is not required to account to the taxing authorities for any output tax on that sale. The result of the fraud is that the missing trader, B, has received the VAT from C. But it has not accounted for that VAT as output tax to the taxing authorities. They must nevertheless pay the VAT, or give credit for it, to C when it is claimed as input tax. The goods are no more than a token to give the transaction the semblance of reality. A has no genuine business motive in buying back what it has sold. Typically the goods are high volume articles such as computer chips or mobile telephones.

**[6]**   As the Court of Appeal observed in para 3 of its judgment, this type of fraud is not confined to the United Kingdom. It is common in other countries within the EU. It has been described as a sophisticated attack on the VAT system. It was estimated to have cost in excess of £1bn in the year 2004/2005 to the United Kingdom by way of lost revenue. The Commissioners refer in their written case to estimates that show that this figure was exceeded substantially in the succeeding financial years. There is no doubt that this is a pernicious stratagem, and that member states are justified in making use of every means at their disposal within the scope of the Sixth Directive to eradicate it.

**[7]**   It is sufficient for the purposes of this case to summarise the details of the first of the thirteen conspiracies alleged in the Statement of Claim. It has been treated as representative of all of them. On or about 15 October 2002 Total sold 3,780 Nokia mobile phones to Redlaw Ltd, a company incorporated in England and Wales, for £1,672,224.75. On the same day Redlaw sold the mobile phones to Lockparts Ltd for £1,423,170 plus £249,054.75 as VAT, amounting in total to £1,672,224.75. On the same day Lockparts sold them to GAK Ltd, for £1,428,840 plus £250,047 as VAT, amounting in total to £1,678,887. Both Redlaw and Lockparts thereafter ceased to trade and did not pay the VAT due on these transactions. On the same day GAK sold the mobile telephones to The Accessory People plc, for £1,436,400 plus £251,370 as VAT, amounting in total to £1,687,770. On the same day The Accessory People sold them to Alldech Ltd, the broker, for £1,447,740 plus £253,345.50 as VAT, amounting in total to £1,701,094.50. In due course GAK and The Accessory People paid VAT on the transactions which they had entered into. Finally, on the same day Alldech sold the mobile telephones to Total for £1,508,220. That sale, being a sale out of the United Kingdom, was zero-rated. Alldech claimed and was paid a refund of input tax from the Commissioners which included the sum of £253,345.50 of VAT which it had paid to The Accessory People.

**[8]**   Reduced to its essentials, the position is that Redlaw, the first missing trader, was liable to pay VAT of £249,054.75 on its taxable supply which it failed to pay to the Commissioners. The intermediaries in the chain, other than Lockparts, did properly account for and pay VAT on the supplies. Alldech, the broker, did actually pay VAT of £253,345.50 on the supply it received from The Accessory People. Alldech then claimed and received a VAT credit for £253,345 in respect of the zero-rated supply out of the United Kingdom to Total. If Redlaw, the first missing trader, had paid the VAT due from it of £249,054.75 the result would have been that substantially all the VAT due on these transactions would have been paid or accounted for. The difference between the amounts paid and due at each end of the chain is accounted for by the fact that VAT of £992.25 due by Lockparts, the second missing trader, was not paid to the Commissioners.

**[9]**   The total number of mobile phones involved in the thirteen conspiracies was 30,704. They were sold by Total to the various missing traders for a total of £12,299,117.40 and re-purchased by Total from the various brokers for a total of £11,663,423. The total amount of VAT due but unpaid on the sales by the missing traders is £1,921,331.12. The total amount of the VAT refund claimed by the brokers and allowed by the Commissioners is £1,958,714.95. That is the sum claimed in this action.

**[10]**   The cause of action relied on by the Commissioners is the tort known as unlawful means conspiracy. The unlawful means on which they rely in their re-re-amended Particulars of Claim are (a) the commission by Redlaw and/or Alldech of the common law offence of cheating the revenue and (b) the making by Alldech of a fraudulent misrepresentation that the transactions had a genuine economic purpose and that VAT was chargeable and/or recoverable on them by the submission to the Commissioners of a VAT return in the relevant form claiming that it was entitled to a VAT credit. The claim relating to four of the alleged conspiracies was issued on 2 July 2003. On the same day Fulford J granted a freezing injunction against Total, the amount of which was increased on several subsequent occasions as other alleged conspiracies were added to the claim. On 10 January 2005 Hodge J held that the Commissioners had a cause of action in conspiracy where the unlawful means alleged was the common law offence of cheating the public revenue. On 31 January 2007 the Court of Appeal allowed Total's appeal against that order. The Commissioners were granted permission to appeal to this House and Total were granted permission to cross-appeal. The freezing injunction was continued pending the determination of the appeal and the cross-appeal.

*The statutory scheme*

**[11]**   Value added tax is a creature of statute. More precisely, it is the product of a series of EC Directives, of which the Sixth Directive was the most recent. (The Sixth Directive was repealed and replaced by Council Directive 2006/112/EC of 28 November 2006. But it was still in force at the time when the transactions that gave rise to this case were entered into). They provided for the harmonisation of this form of sales tax throughout all the member states of the EU: see Pt I of the Finance Act 1972, which brought the then Directives into force in the UK following its accession to the EEC. It is a Community tax. There is no common law to which reference can be made. So it is important, to set the issues into their proper context, to identify the provisions of the statute that apply to the transactions that were involved in the alleged fraud. They are to be found in the Value Added Tax Act 1994, as amended. It is important also to identify the extent of the remedial steps that are available under the Act to the Commissioners. There are, as Mr Flint QC for Total explained, three aspects of the statutory scheme that need to be considered. These are (a) the application of VATA 1994 to transactions of the type complained of in this action; (b) whether VATA 1994 creates an exclusive regime for the enforcement of liabilities arising out of the failure to account for or pay VAT; and (c) the nature of the duties and rights of the Commissioners.

**[12]**   Section 1(1) VATA 1994 provides that VAT shall be charged, in accordance with the provisions of the Act, on the supply of goods or services in the United Kingdom and on the acquisition in the United Kingdom from another member State of any goods. Section 1(2) provides that VAT on the supply of goods or services is a liability of the person making the supply and that, subject to provisions about accounting and payment, it becomes due at the time of the supply. That section must be read with ss 4(1) and 10(1) which make it clear that VAT is charged on the events referred to in s 1 only when the person who makes the supply or acquisition is a taxable person. Section 3(1) provides that a person is a taxable person while he is, or is required to be, registered under the Act. Total is not, and does not require to be, registered as it is a Spanish company carrying on business outside the United Kingdom. On the other hand Redlaw, the first missing trader, was registered under the Act, as was the broker, Alldech.

**[13]**   Section 7 VATA 1994 deals with the place of supply. It applies for determining whether, for the purposes of the Act, goods or services are supplied in the United Kingdom. Section 13 deals with the place of acquisition. It applies for determining whether, for the purposes of the Act, goods acquired from another member state are acquired in the United Kingdom. Section 25(1) provides that a taxable person shall account for and pay VAT in respect of supplies made by him and in respect of the acquisition by him of goods from another member State. This is to be done by reference to prescribed accounting periods. Section 25(2) provides that he is entitled at the end of each accounting period to credit for so much of his input tax as is allowable under s 26 and then to deduct that amount from any output tax that is due from him. So Redlaw was liable under s 25(1) VATA 1994 to pay the output tax due on the supplies of the mobile telephones that it made in the United Kingdom, and Alldech was entitled under the same subsection to recover the VAT that it paid on their supply to it as input tax allowable under s 26.

**[14]**   Part IV VATA 1994, which is headed "Administration, Collection and Enforcement", is introduced by s 58, which provides that Sch 11 shall have effect with respect to the administration, collection and enforcement of VAT. Paragraph 1(1) of Sch 11, as originally enacted, provided that VAT was to be under the care and management of the Commissioners. Paragraph 5(1) provides that VAT due from any person shall be recoverable as a debt due to the Crown. These provisions must now be read together with the Commissioners for Revenue and Customs Act 2005, which provides for the appointment of the Commissioners to exercise the functions previously vested in the Commissioners of Customs and Excise and for the transfer to them of the ancillary powers that were conferred on the former Commissioners by the Customs and Excise Management Act 1979.

**[15]**   Various provisions are included within Pt IV to enable the Commissioners to collect and to enforce the payment of VAT. Section 60 enables a civil penalty to be recovered in cases of dishonest evasion of VAT or the making of false input tax or repayment claims. Section 61 extends liability to a civil penalty to the director

or managing officer where the person liable under s 60 is a body corporate. Section 72 makes it an offence for a person to be knowingly concerned in, or in the taking of steps with a view to, the fraudulent evasion of VAT by him or by any other person. This provision supplements other common law offences with which the offender may be charged, including conspiracy to cheat the revenue. All persons knowingly concerned in the fraudulent evasion who are subject to the criminal jurisdiction of the relevant part of the United Kingdom are within its reach. Section 73 enables the Commissioners to assess the amount of VAT due where there has been a failure for whatever reason to make any returns required by the Act. The making of assessments under this provision is subject to the time limits set out in s 73(6). They may not be made after the later of two years after the end of the prescribed accounting period or one year after the evidence of the facts came to the knowledge of the Commissioners. Section 76 enables the Commissioners to assess amounts due by way of penalty, interest or surcharge. Section 77 prescribes a long-stop time limit, normally six years in the section as originally enacted and now three as substituted by s 47(10) of the Finance Act 1997, on the making of assessments, including assessments for penalties, interest or surcharge, under s 76.

[16]  Two further provisions, added to VATA 1994 by amendment to address the problem of intra-community fraud, are also relevant to an understanding of the scheme of VATA 1994. First, s 77A was added by s 18(1) and (4) of the Finance Act 2003 with effect from 10 April 2003. It enables the Commissioners, where a taxable supply of goods to which the section applies has been made to a taxable person, and at the time of supply that person knew or had reasonable grounds to suspect that some or all of the VAT payable in respect of that supply would go unpaid, to serve a notice on the taxable person making him jointly and severally liable with the person who is liable to the Commissioners for that amount. Section 77A(1) provides that the section applies to telephones and equipment made or adapted for use in connection with telephones, computers and equipment made or adapted for use in connection with computers and various other equipment of a similar nature which it specifies.

[17]  Secondly, s 55A was added by s 19(1) of the Finance Act 2006, together with s 26AB which provides for the adjustment of accounts to give effect to it. It introduced a system known as reverse charge accounting which had been permitted by a derogation from art 21(1)(a) of the Sixth Directive that had been requested by the UK government under art 27(1) to combat missing trader intra-community fraud. Its core is to be found in s 55A(3) by which the purchaser rather than the seller is liable to account for and pay the VAT on the supply. It applies to goods of a description specified in an order made by the Treasury. In June 2007 reverse charge accounting was implemented in respect of mobile phones and computer chips.

[18]  Neither of these additional measures to combat fraud has the effect of enabling the Commissioners to obtain a statutory remedy against persons in another member state whom it believes to have been involved in intra-community fraud who are not registered for VAT in the UK. No provision for this is made in the Sixth Directive. There is no statutory remedy against Total. Redlaw and Alldech on the other hand are within the reach of the statute. Redlaw's failure to pay was a breach of s 25(1) VATA 1994. Alldech can be assessed under s 73(2) for an amount as being VAT due from it to the Commissioners which is equivalent to the amount of the VAT that it recovered as input tax, on the ground that the Commissioners would have been entitled to withhold payment of the VAT if the purpose of the transaction had been disclosed to them.

[19]  Mention should also be made of the provision which VATA 1994 makes for appeals. Section 82(1) provides that a reference to a tribunal is a reference to a tribunal constituted in accordance with Sch 12. Section 83 provides that an appeal shall lie to a tribunal with respect to the various matters listed in that section which, as amended, include the amount of any input tax that may be credited to any person, any liability to a penalty or a surcharge under ss 59 to 69, any assessment made under s 73 and any liability arising by virtue of s 77A.

[20]  Overall the impression that is conveyed by VATA 1994 as amended is of a comprehensive scheme for the administration, collection and enforcement of VAT by the Commissioners under the powers that are given to them by the statute. This is consistent with the propositions which I set out in para 11: VAT is a creature of statute, the limits of which are set by the Sixth Directive which requires member states to comply

strictly with the harmonised rules that it lays down. It is designed to apply throughout the EU. So there is no common law to which reference can be made to fill any gaps in the scheme as to the persons from whom the Commissioners may collect amounts due to it as VAT. This is the background to the first issue, which is whether the Commissioners can maintain a cause of action in damages at common law as a means of re-covering VAT that ought not to have been paid or credited from a person who has not been made accounta-ble or otherwise liable for that tax by Parliament.

*The first issue: The exclusive regime issue*

**[21]**   Total submits that it is a fundamental constitutional principle that no money shall be levied for or to the use of the Crown except by grant of Parliament, and that this in substance is what the Commissioners are seeking to do in this case without Parliamentary authority. Although their claim is presented as one for the award of damages, what they are really seeking to do is to recover by indirect means sums due as tax. Their action was ultra vires of the statute, from which alone they derive their powers. It was also contrary to art 4 of the Bill of Rights 1688, which declares "That levying money for or to the use of the Crown, by pretence of prerogative, without Grant of Parliament for longer time, or in other manner than the same is or shall be granted, is illegal." The Commissioners had no power under VATA 1994 to raise an assessment on Total for the tax that had been not been paid on the transactions. Nor was there any power under the Act to com-mence civil proceedings by action to recover unpaid tax from Total as a debt, as Total was not a taxable person. The absence of any such power was to be contrasted with the powers to recover unpaid tax that were now available to the Commissioners in terms of ss 55A and 77A of the Act, as amended.

**[22]**   The Court of Appeal did not, of course, question the fundamental constitutional principle. Ample sup-port for it is to be found in the authorities. In *Gosling v Veley* (1850) 12 QB 328, 407, Wilde CJ said:

> "The rule of law that no pecuniary burden can be imposed upon the subjects of this country, by whatever name it may be called, whether tax, due, rate or toll, except upon clear and distinct legal authority, established by those who seek to impose the burden, has been so often the subject of legal decision that it may be deemed a legal axiom, and requires no authority to be cited in support of it."

In *Attorney General v Wilts United Dairies Ltd* (1921) 19 LGR 534, (1921) 37 TLR 884 the Food Controller under the Defence of the Realm Acts sought to impose a charge as a condition of the grant of a licence to purchase milk in certain areas for which no authority had been given by Parliament. It was held that he had no power to do so. Atkin LJ referred at p 886 to the Bill of Rights and to what he described as the elaborate custom of Parliament by which money for the service of the Crown is only granted at the request of the Crown made by a responsible Minister and assented to by the House of Commons. He went on to draw this conclusion:

> "In these circumstances, if an officer of the executive seeks to justify a charge upon the subject made for the use of the Crown (which includes all the purposes of the public revenue), he must show, in clear terms, that Parliament has authorised the particular charge."

In the House of Lords, where the decision was affirmed, Lord Buckmaster said that the imposition could only be properly described as a tax, which could not be levied except by direct statutory means: (1922) 38 TLR 781.

**[23]**   Having recognised the principle, the Court of Appeal said in para 31 of its judgment that the crucial issue was to determine the nature of the claim in conspiracy:

> "Assuming for the purpose of this argument that a claim in conspiracy does lie, then this is a claim for damages for a perfectly proper, well-recognised tort, the tort of conspiring together to defraud the claimant. That the measure of damages suffered by such a claimant may be measured by reference to the amount by which the Exchequer's income is depleted does not in our view alter the essential character of the claim as one for damages, not as a levy of money for the use of the Crown without grant of Parliament."

Having distinguished the nature of the claim in the *Wilts United Dairies* case, the court summed up its conclusion with these words:

> "Properly characterised this claim by the Commissioners is not a direct claim for VAT. It is a claim brought on a wholly different basis. It is a claim against conspirators to recover loss occasioned by fraud. It would make a mockery of the law to suggest that a fraudster can escape with impunity by piously claiming the benefit of the Bill of Rights designed for the innocent down-trodden citizen, not the scheming international fraudster."

[24]   The Court of Appeal took a different view, at a later stage in its judgment, of the possibility that the Commissioners might have an independent actionable claim of damages at common law against Alldech: paras 83–85. The Commissioners had a statutory method for clawing back tax wrongly paid or credited to a trader under ss 73(2) and 77 VATA 1994. So the common law claim would be met by the defence that the only remedy was one provided by the statute. In that respect the statutory provisions could be said to provide a comprehensive regime for collecting tax which had been wrongly paid or credited. The Commissioners have issued an assessment under s 73(2) against Alldech to recover the amount of VAT with which they were wrongly credited.

[25]   At first sight the argument that Total is entitled to invoke the Bill of Rights to avoid liability for its part in the alleged conspiracy seems to fly in the face of common sense. But, as Mr Flint pointed out, the protection of the Bill of Rights is available to everyone. Fraudsters and cheats are as much entitled to be protected against the levying of taxes without the authority of Parliament as anyone else. At the heart of his argument however there lie more fundamental questions about the nature of the Commissioners' claim and their interest, if any, to seek to recover tax wrongly paid or credited as damages against a person upon whom no liability to pay that amount can be imposed under the statute.

[26]   The claim that is made in this case is presented as a claim for damages. As presented it is, as the Court of Appeal said, a claim for the loss caused by a perfectly proper, well recognised tort. I agree with my noble and learned friend Lord Neuberger of Abbotsbury (para 172) that such a claim is simply not within the territory of art 4 of the Bill of Rights. But I do not think that the claim in this case is truly of that character. The function of an action of damages is to provide a remedy for interests that are recognised by the law as entitled to protection. Obvious examples are protection against injury to the person, to reputation and to privacy. Economic interests are entitled to protection too, such as a person's business or his property. As Hazel Carty, *An Analysis of the Economic Torts* (2001), p 3, puts it, the economic torts are to be seen as protecting against the infliction of economic harm. Tony Weir, *A Casebook on Tort* (10th ed, 2004), p 17, makes the same point. Compensation, he says, is the principal function of tort law. The very concept of compensation entails the notion or harm or damage, since only harm or damage can be compensated.

[27]   It is not difficult to think of situations where the Commissioners could properly bring a claim of damages for loss sustained with regard to some interest that falls within the law's protection, such as damage to their buildings or their equipment. In *IRC v Hambrook* [1956] 2 QB 641, [1956] 3 All ER 338, [1956] 3 WLR 643 the Revenue's claim for loss resulting from its being deprived of the services of a taxing officer due to a vehicle accident was dismissed. But this was because an action for that kind of loss did not lie where its relationship was with an established civil servant. In this case it is said that an action lies for loss sustained as a

result of an unlawful means conspiracy. But can the amount sued for be said to be a loss sustained by the Commissioners for which they can sue in damages?

[28]   The Commissioners' duties and responsibilities are set out comprehensively in the statute. Paragraph 1(1) of Sch 11 VATA 1994, as originally enacted, stated that VAT was to be under the care and management of the Commissioners. Section 1(1) VATA 1994 states that references in the Act to VAT are references to value added tax charged in accordance with the provisions of the Act. Paragraph 5(1) of Sch 11 states that VAT due from any person shall be recoverable as a debt due to the Crown. The Commissioners are not authorised by the statute to carry on a business for profit. They have no commercial interests that need to be protected by the tort of conspiracy: see *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173, 189B-C, [1981] 2 All ER 456, [1981] 3 WLR 33 per Lord Diplock. Their only function is to gather in and account to the Crown for VAT charged in accordance with the provisions of the Act. My noble and learned friend Lord Walker of Gestingthorpe, very properly, draws attention to the fact that the point that the Commissioners have no commercial interests needing to be protected by the tort of conspiracy was not raised by Mr Flint in his written and oral submissions (para 40). But in my respectful opinion it follows inevitably from his analysis of the statute.

[29]   The sum that is claimed as damages in this action is the amount of the VAT that the Commissioners say was wrongly paid to Alldech in response to its claim for a refund or credit of input tax. It is the same amount as is recoverable as a debt due to the Crown from Alldech by means of an assessment made under s 73(2). It is not recoverable from Total under VATA 1994 because the statute makes no provision for the recovery of VAT from someone who is not a taxable person within the meaning of s 3. There is, it may be said, a gap in the statute. But this does not mean that the Commissioners have suffered a loss for which they can sue in damages. All that can be said is that payment was made to Alldech which ought not to have been made. It is an amount that can be recovered as a debt due to the Crown from Alldech. It does not change its character as a debt due to the Crown because, when it is sought to be recovered from someone else, it is described as damages. It is an inescapable fact that the sums claimed as damages will become VAT for the purposes of the statute if and when they are paid to the Commissioners because they have no power under the statute to deal with those sums in any other way. But the Commissioners have no power to recover such a debt from strangers to the Act such as Total. In form the claim is one for damages, outside the scope of art 4 of the Bill of Rights. But in substance it is a claim for the recovery of VAT from a person who is under no liability to pay that tax under the statute. No provision for this is made in the Sixth Directive. Total do not need to invoke the protection of art 4. The issue is resolved by the terms of the statute. The statutory code precludes the claim.

[30]   As the Court of Appeal noted when it was considering, and then rejecting, the possibility of an independent actionable claim in damages at common law against Alldech, the statutory provisions can properly be said to provide a comprehensive regime for collecting VAT which has been wrongly paid or credited to a taxable person. Various aspects of that regime sit uneasily with the idea that there is an independent common law remedy. For example, time limits are built into the provisions for the making of assessments under s 73(2) VATA 1994 that are different from those that apply to a common law remedy: see s 77. And exclusive jurisdiction for the determination of all appeals arising from the Commissioners' exercise of their powers under the Act is given by s 82 to a tribunal constituted under Sch 12. As Lord Nicholls of Birkenhead said in *Autologic plc v IRC* [2005] UKHL 54, [2006] 1 AC 118, para 13, [2005] 4 All ER 1141, the taxpayer must use the remedies provided by the tax legislation. It would seem odd for the court to have the exclusive jurisdiction to determine disputes about the amount of VAT claimed as damages from a non-taxable person such as Total, when a tribunal has exclusive jurisdiction to determine disputes as to exactly the same amount of VAT at the instance of a taxpayer who, under the tort on which the Commissioners rely, is jointly and several liable.

[31]   These additional points reinforce the fundamental point that the regime for the administration and collection of VAT which is set out in VATA 1994 is indeed comprehensive and does not admit the use by the Commissioners of means for collecting VAT which are not provided for by the statute. The steps which Parliament has taken to address the problem of carousel fraud by conferring additional statutory powers on the

Commissioners, authorised where necessary by a derogation from the Sixth Directive, are entirely consistent with this view. The taking of these powers would not have been necessary if common law remedies were available. The fact that Parliament has followed this route is, of course, due to its long tradition of insisting that power to raise money for the public revenue may be exercised only with statutory authority. In my opinion the Commissioners' attempt to resort to the common law for this purpose, which is without precedent, is contrary to principle.

[32]   I do not think, with the greatest of respect, that it is an answer to say, as Lord Walker does, that the Commissioners regularly seek and obtain remedies against defaulting taxpayers which are not conferred on them expressly by statute or that the courts must be astute to deal with progressive techniques of tax avoidance when they are construing the taxing statutes. These points do not meet the fundamental objection that the purpose of this action is to recover VAT from a person who is not, for any of the purposes of VATA 1994, a taxpayer. Nor is it met by the example of cash representing collected taxes which was stolen from a vehicle belonging to the Commissioners while in transit. I agree that the Commissioners would have a civil remedy to reclaim the money if it could be traced to the robbers' bank account. But it would be recovered as a debt due by them to the Commissioners, not from a third party as damages. If the claim is properly to be seen as one for damages, the amount due would need to be assessed, as my noble and learned friend Lord Scott of Foscote points out. But the fact that techniques are available for the assessment of damages does not answer the question whether the Commissioners are in a position to make such a claim.

[33]   For these reasons I consider that the Court of Appeal was wrong to hold that this ground of appeal was wholly devoid of merit. I would hold, in agreement with Lord Neuberger, that the Commissioners' claim is precluded by the statute and ought to have been struck out on this ground.

*The second issue: Unlawful means conspiracy*

[34]   The Court of Appeal said in para 67 of its judgment that it could see no reason, on the assumed facts of this case, why the Commissioners ought not to be able to rely on the tort of conspiracy by unlawful means. If it had been open to it to do so, it would have held that the allegation of conspiracy to cheat the Commissioners, provided there was an intention, albeit not a predominant intention, to injure them, was sufficient. But it felt itself prevented from doing so by the decision of the Court of Appeal in *Powell v Boladz* [1998] Lloyd's Rep Med 116, 39 BMLR 35 in which Stuart-Smith LJ said, in a judgment with which the two other members of the court agreed, that the unlawful act relied upon must be actionable at the suit of the Plaintiff and that it was not sufficient that it amounted to a crime or a breach of contract with a third party.

[35]   The authorities relied upon by Stuart-Smith LJ in support of that proposition were *Clerk & Lindsell on Torts*, 17th ed, para 23-80; *Marrinan v Vibart* [1963] 1 QB 234 and 528, [1962] 1 All ER 869, [1962] 2 WLR 1224; *Hargreaves v Bretherton* [1959] 1 QB 45, [1958] 3 All ER 122, [1958] 3 WLR 463 and *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173 per Lord Diplock at p 186 and following. The discussion of the topic in *Clerk & Lindsell*, as can be seen from the 19th ed (2006), pp 1615-1620, is wide-ranging and does not come down firmly on either one side or the other. Mr Flint accepted in the Court of Appeal and in your Lordships' House that neither *Marrinan v Vibart nor Hargreaves v Bretherton* supports the proposition for which they were cited. So the question is whether support for it is to be found in Lord Diplock's speech in *Lonrho v Shell* and, if it can be found there, how what Lord Diplock said in that case stands up to examination in the light of the speech of Lord Bridge of Harwich in *Lonrho plc v Fayed* [1992] 1 AC 448, [1991] 3 All ER 303, [1991] BCLC 779.

[36]   The background to Lord Diplock's speech in *Lonrho v Shell* is to be found in the way the issue was dealt with in the Court of Appeal: The Times, 7 March 1981, [1981] Com LR 74. The judge, Parker J, had held that there was no claim in conspiracy because the acts, if done, were not done with intent to harm the Plaintiff and were not in themselves actionable. Lord Denning MR made it clear at the outset of his discussion that the important point was that the agreement, if any, to which Shell was a party was not made with

any intent to injure the pipeline companies. The point of law was whether the agreement to do an unlawful act was actionable by anyone who suffers damage even though there was no intention to injure him. He pointed out that the problem only arises where the unlawful act is one which does not itself give rise to a cause of action but it is sought to make it actionable by reason of an agreement by two or more to do it. His answer to it was that the tort was a conspiracy to injure. That intention may not be the predominant motive. It might be mixed with others. But it was sufficient if the conspiracy was aimed or directed at the Plaintiff, it could reasonably be foreseen that it might injure him and it did in fact do so. Eveleigh LJ's judgment was to the same effect. Fox LJ said:

> "I agree with the judge, that where persons combine to do an unlawful act with the intention of injuring another person there is every reason why that person should have a cause of action if he suffers damage. The position is otherwise if, there being no cause of action in respect of the act if done by an individual, there was no intent by the combiners to injure the Complainant. To give such a cause of action gives undue weight to the mere fact of the combination. An intention to injure is, it seems to me, a necessary element in the tort."

**[37]**   In the House of Lords counsel for the Appellants made it clear in his speech that his cause of action based on conspiracy assumed that no breach of contract, no private rights arising out of breach of the sanctions orders and no allegations of intent to injure. All that was alleged was actual knowledge that the acts done could cause damage to *Lonrho*: [1982] AC 173, 180C–D. Having held that there was no independent cause of action against any of the alleged conspirators, Lord Diplock proceeded at p 188C nevertheless to consider the conspiracy claim. In the discussion which followed he said that the civil tort of conspiracy to injure the Plaintiff's commercial interests, where that was the predominant purpose of the agreement and of the acts done in execution of it, was too well established to be discarded: p 189 B-C. Turning to actions for damages for conspiracy where the damage-causing acts, although neither done for the purpose of injuring the Plaintiff nor actionable at his suit if they had been done by one person only, he said that the House had an unfettered choice whether to confine the civil action of conspiracy to a narrow field or to extend it beyond the narrow limits which were all that common sense and the application of the legal logic of the decided cases required: p 189F. He concluded these remarks with this passage at p 189G:

> "My Lords, my choice is unhesitatingly the same as that of Parker J and all three members of the Court of Appeal. I am against extending the scope of the civil tort of conspiracy beyond acts done in execution of an agreement entered into by two or more persons for the purpose not of protecting their own interests but of injuring the interests of the Plaintiff."

**[38]**   I agree with the Court of Appeal, para 57, that the real point decided in that case was that to establish the tort the Plaintiff had to prove that the Defendant's purpose in the conspiracy was to injure the Plaintiff. It is difficult to find in what Lord Diplock said a clear and unequivocal statement that where there is such an intention, and the Plaintiff suffers the intended damage, the unlawful acts that were used by the conspirators to bring this about must themselves be actionable. When account is taken of the absence of any indication of disapproval of the judgments in the Court of Appeal, which were to the contrary, the argument that Lord Diplock intended to confine the unlawful means conspiracy to cases where the unlawful acts were themselves actionable becomes even more tenuous. But the previous cases to which he had referred were concerned with lawful means conspiracy, where there is no liability unless the predominant motive of the conspirators was to injure the Plaintiff. This gave rise to doubt in subsequent cases as to whether a predominant motive to injure the Plaintiff was also an essential element in unlawful means conspiracy.

**[39]**   In *Lonrho plc v Fayed* [1992] 1 AC 448, Lord Bridge of Harwich quoted Lord Diplock's speech in *Lonrho v Shell* without disapproval. At p 463F he said that the tort of conspiracy where no unlawful means were used is regarded as an anomaly, for the reasons that had been explained by Lord Diplock. But at p 464D-E he observed that there were many cases where dicta had indicated that the predominant purpose requirement did not apply where the means used to effect the conspirators' purpose were unlawful. At pp 465G–466A he said:

"Where conspirators act with the predominant purpose of injuring the plaintiff and in fact inflict damage on him, but do nothing which would have been actionable if done by an individual acting alone, it is in the fact of their concerted action for that illegitimate purpose that the law, however anomalous it may now seem, finds a sufficient ground to condemn their action as illegal and tortious. But when conspirators intentionally injure the plaintiff and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests; it is sufficient to make their action tortious that the means used were unlawful."

No mention is made in this passage of a requirement that the unlawful means must be independently actionable.

[40]  A clear indication in these speeches that the unlawful means need not be independently actionable is not easily found. Statements to that effect can be seen in the judgments of the Court of Appeal in *Lonrho v Shell*, and the assumptions to which counsel for the Appellants referred in his speech in the House of Lords are a further pointer to the conclusion that ought to be drawn. The Court of Appeal concluded in this case that an allegation of conspiracy to cheat was sufficient, provided there was an intention to injure the Claimant, and not a predominant intention: para 67. I respectfully agree. But I think that it has to be acknowledged that textual analysis of this kind is an incomplete answer to the problem. The question then is whether the general principles on which the tort is based support the proposition that the unlawful means must be independently actionable.

[41]  When *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435, [1942] 1 All ER 142, 111 LJPC 17 was in the Court of Session Clerk Aitchison LJ said (1940 SC 141, 155–156):

"When the end of a combination is not a crime or a tort in the accepted sense, and the means are not in the accepted sense criminal or tortious – cases which give rise to no difficulty – the question always is – What is the real purpose of the combination? If it is to injure, without reference to anyone's lawful gain, or the enjoyment of one's rights, or the furtherance of one's legitimate interests, then what is done may become a wrongful act and be actionable. If, on the other hand, the real purpose of the combination is to further the lawful interests of the parties to it- these not necessarily being identical interests – no wrong is committed even when the means, employed not being in themselves illegal, are calculated, and even intended, to injure the persons against whom they are directed."

He did not understand there to be any real dispute about the law, which was to be found in the cases from *Allen v Flood* [1898] AC 1, 62 JP 595, 67 LJQB 119 to *Sorrell v Smith* [1925] AC 700, 94 LJ Ch 347, [1925] All ER Rep 1. The question was whether a purpose to injure was the real root of the acts that grew from it: *Sorrell v Smith*, per Lord Dunedin at p 717. If that was its purpose, he saw no reason to distinguish between means that were criminal and means that were tortious. As Lord Wright put it in the House of Lords, it is in the fact of the conspiracy that the unlawfulness resides: [1942] AC 435, p 462. That is the essence of the lawful means conspiracy. It is for the Claimant to show that to harm his economic interests was the predominant purpose of the conspiracy. The situation that was contemplated in that case was one where the combination had more than one purpose, which Viscount Simon LC described at p 445 as "the quagmire of mixed motives". In a case of that kind the issue has to be resolved by ascertaining the predominant intention. If the predominant intention of the combination is to injure, what is done is actionable even though the means used were lawful. Harm caused by a conspiracy where the means used were unlawful would seem no less in need of a remedy.

[42]  The means that are alleged in this case are the commission by Redlaw and/or Alldech of the common law offence of cheating the revenue and the making by Alldech of a fraudulent misrepresentation: see para

10. The second alternative can be ignored for the purposes of the argument. The conduct alleged was tortious, but on the evidence it may be the weaker alternative. So the Commissioners wish to have their argument tested on the first alternative. Their primary contention is that where the conspirators agree to engage in conduct against the Claimant which amounts to a criminal offence, and the carrying out of that conduct results in loss or damage to the Claimant, the conduct will supply the unlawful means for the purposes of an unlawful act conspiracy although it is not itself actionable. They do not offer to prove that harm to their economic interests was the predominant purpose of the conspiracy. But the case does not appear to be one of mixed motives where predominant purpose is a necessary ingredient. Their case is more straightforward. It is that the criminal offence was directed at the Commissioners for the purpose of persuading them to give Alldech a VAT credit to which it was not entitled. The unlawful means chosen by the conspirators were intended to secure that result which could not have been secured by either of them acting alone.

**[43]**   In *OBG Ltd v Allan* [2007] UKHL 21, [2007] 4 All ER 545, [2007] 2 WLR 920, para 56 Lord Hoffmann said that the courts should be cautious in extending the tort of causing loss by unlawful means beyond the description given by Lord Watson in *Allen v Flood* [1898] AC 1, 96 and Lord Lindley in *Quinn v Leathem* [1901] AC 495, 535, 65 JP 708, 70 LJPC 76, which was designed only to enforce standards of civilised behaviour in economic competition between traders or between employers and labour. I entirely appreciate the point that he makes that caution is needed where the unlawful act is directed against a third party at whose instance it is not actionable because he suffers no loss. There the Claimant's cause of action is, as Hazel Carty, *An Analysis of the Economic Torts* (2001), p 274 puts it, parasitic on the unlawful means used by the Defendant against another party. As to that situation I would prefer to reserve my opinion. But in this case there was no third party. The means used by the conspirators were directed at the Claimants themselves. This is a case where the Claimants were persuaded by the unlawful means to act to their own detriment which, in para 61 of *OBG*, Lord Hoffmann said raises altogether different issues. One has to ask why, in this situation, the law should not provide a remedy.

**[44]**   The situation that is contemplated is that of loss caused by an unlawful act directed at the Claimants themselves. The conspirators cannot, on the Commissioners' primary contention, be sued as joint tortfeasors because there was no independent tort actionable by the Commissioners. This is a gap which needs to be filled. For reasons that I have already explained, I do not accept that the Commissioners suffered economic harm in this case. But assuming that they did, they suffered that harm as a result of a conspiracy which was entered into with an intention of injuring them by the means that were deliberately selected by the conspirators. If, as Lord Wright said in *Crofter Hand Woven Harris Tweed Co v Veitch* [1942] AC 435, 462, it is in the fact of the conspiracy that the unlawfulness resides, why should that principle not apply here? As a subspecies of the tort of unlawful means conspiracy, the case is virtually indistinguishable from the tort of conspiracy to injure. The fact that the unlawful means were not in themselves actionable does not seem, in this context at least, to be significant. As Professor Joe Thomson put it in *An island legacy – The delict of conspiracy*, Comparative and Historical Essays in Scots Law, ed Carey Miller and Meyers (1992), p 148, the rationale of the tort is conspiracy to injure. These factors indicate that a conspiracy is tortious if an intention of the conspirators was to harm the Claimant by using unlawful means to persuade him to act to his own detriment, even if those means were not in themselves tortious.

**[45]**   I would hold that the decision of the Court of Appeal in *Powell v Boladz* [1998] Lloyd's Rep Med 116 was erroneous and that it should be overruled. I would also hold, in agreement with all your Lordships' that criminal conduct at common law or by statute can constitute unlawful means in unlawful means conspiracy. Had it been open to the Commissioners to maintain a civil claim of damages the tort of unlawful means would have been available to them, even though the unlawful means relied upon were not in themselves actionable.

*Conclusion*

**[46]**   For these reasons I would allow the appeal by the Commissioners. But I would also allow the cross-appeal by Total. For reasons that are different from those given by the Court of Appeal, I would affirm that part of the Court of Appeal's order by which the Commissioners' claim was struck out.

**LORD SCOTT:**

My Lords,

**[47]**   I have had the great advantage of reading in advance the opinions prepared by all my noble and learned friends. The relevant facts are fully set out in the opinion of Lord Hope of Craighead and I gratefully adopt his exposition. The close, and to my mind completely convincing, analysis of the legal principles applicable to the two issues that arise on this appeal (see para 1 of Lord Hope's opinion) contained in the opinion of Lord Walker of Gestingthorpe probably say all that needs to be said. In view, however, of the importance of the two issues I propose to express in my own words why I have reached the same conclusions.

**[48]**   It is important to keep in mind that the two issues arise from a preliminary issue directed to be tried by a Consent Order made on 9 July 2004. The preliminary issue asked this question "Does the Claimant [ie the Commissioners] have, as a matter of law, a cause of action in conspiracy against the Defendant [ie Total] as pleaded in the Consolidated and Amended Particulars of Claim?" The question directs attention to the facts as pleaded by the Commissioners. These facts must, for the purposes of the preliminary issue, be assumed to be true. Whether they will, or which of them will, be proved to be true, only time will tell.

**[49]**   There are some aspects of the pleaded facts that I wish to emphasise for they bear upon each of the two issues that arise. Paragraph 6 of the Agreed Statement of Facts and Issues, signed by leading and junior counsel for both parties, described the litigation, of which this appeal is the latest, but almost certainly not the last, stage as arising out of "a series of carousel, or missing trader intra-community, frauds". An alternative, and equally apt, description of each carousel, as pleaded by the Commissioners in this case, would be "charade". "Charade" is the name given to a game played frequently at birthday and Christmas parties but has also the colloquial meaning of an "absurd pretence" (see *The Concise Oxford Dictionary* 9th ed). The description of a "carousel fraud" taken from the decision of the VAT Tribunal in *Bond v Commissioners of Customs & Excise*, quoted by Ward LJ in para 2 of his judgment in the present case, refers to the fraud as consisting of a series of sales of taxable goods, of which sales the initial one is zero-rated, under the next one the initial buyer sells the goods and receives VAT from its buyer but then disappears without accounting to the Revenue for the VAT it has received, and the third sale made by the buyer from the "missing trader", is a zero rated sale of the goods back to the original vendor. This seller, who has paid VAT to the "missing trader", then claims back from the Revenue as input tax the amount of the VAT paid to the missing trader. The invoices are all in order so the Revenue accepts the claim for repayment of the input tax but because the "missing trader" has not accounted to the Revenue for the VAT it had apparently received, the Revenue is out-of-pocket by the amount it has had to pay to the vendor under the third sale. This description of a "carousel fraud" assumes valid sales of goods at each step.

**[50]**   A charade, however, a pretence and in the present case a fraudulent pretence, is something else. Diplock LJ (as he then was) in *Snook v London and West Riding Investments Ltd* [1967] 2 QB 786 at 802, [1967] 1 All ER 518, [1967] 2 WLR 1020 described as a "sham":

". . . acts done or documents executed by the parties to the 'sham' which are intended to give to third parties or to the court the appearance of creating between the parties legal rights and obligations different from the actual legal rights and obligations (if any) which the parties intend to create."

A "sale", at its simplest, is the exchange of property for money and it is, I suggest, plain that a contract of sale of goods requires, if the contract is to justify that description, an intention that there should be the payment of a price in exchange for the transfer of property in the goods (see s 2(1) and (3), Sale of Goods Act 1979). Consider these requirements against the facts of the "First Conspiracy" set out in para 5 of the Commissioners' Consolidated Particulars of Claim and taken to be typical of each of the other 12 pleaded conspiracies.

[51]   Paragraph 5 pleads that Total ". . . carried out and otherwise participated in a series of transactions in a chain of supply that had no economic purpose other than to cheat and/or defraud [the Commissioners] of revenue . . .". The transactions, as pleaded, related to 3,780 Nokia mobile telephones and consisted of the following events, all taking place on 15 October 2002:

(1) Total sold the telephones to Redlaw Ltd for £1,672,224 under a zero rated transaction.

(2) On the same day Redlaw sold the telephones to Lockparts Ltd for £1,423,170 plus VAT of £249,054, a total of £1,672,224. If this is taken to be a genuine sale it would have been a sale at an immediate loss of £249,054, the amount of the VAT for which Redlaw was accountable to the Revenue. But it was plainly never intended that Redlaw should pay £249,054 to the Revenue and Redlaw did not do so. Redlaw simply disappeared and became the "missing trader".

(3) On the same day Lockparts sold the telephones to GAK Ltd for £1,428,840 plus VAT of £250,047, a total of £1,678,887. The VAT payable by Lockparts on its purchase from Redlaw was £249,054. Lockparts was therefore accountable to the Revenue for the balance, £993. But Lockparts, too, became a "disappeared" trader and the £993 remains unaccounted for. Leaving aside the £993 VAT balance, Lockparts made an instant paper profit of £6,550 odd on its transaction with GAK.

(4) On the same day GAK, pursuant to written instructions given on that day by Lockparts, paid £1,672,224 into Total's UK bank account, thereby purporting to discharge the sum owing by Redlaw to Total and owing to Redlaw by Lockparts. That left £6,663 still owing by GAK to Lockparts.

(5) On the same day GAK sold the telephones to The Accessory People for £1,436,400 plus VAT of £251,370, a total of £1,687,770. GAK had paid, or purported to have paid, £250,047 VAT on its transaction with Lockparts and so was accountable, and did account, to the Revenue for the balance, £1323. GAK had made an instant paper profit of over £6200 on its transaction with Lockparts.

(6) On the same day The Accessory People sold the telephones to Alldech Ltd for £1,447,740 plus VAT of £253,345. The Accessory People were liable to pay £251,370 VAT under their transaction with GAK and so were liable to account, and did account, to the Revenue for the balance, £1975. The Accessory People had made an instant paper profit of over £9375.

(7) Finally, on the same busy day, Alldech sold the telephones back to Total for £1,508,220 under a zero rated transaction. So Total made an instant paper profit of £164,004 (ie £1,672,224 less £1,508,220).

Alldech later claimed, and obtained, from the Commissioners the repayment as input tax of the £253,345 VAT that it had paid to The Accessory People. Alldech had made, therefore, an instant profit of £60,480. This profit, and Total's £164,004 profit, The Accessory People's profit of £9375, GAK's profit of £6200 odd and Lockpart's profit of £6,660 odd (if the £6,663 was ever paid by GAK to Lockparts) were funded by the £253,345 input tax repayment made by the Commissioners to Alldech (less, of course, the £1323 and £1975 for which GAK and The Accessory People accounted to the Revenue).

[52]   What are your Lordships to make of these transactions that had "no economic purpose other than to cheat and/or defraud [the Commissioners] of revenue" and, as pleaded in para 4 of the Consolidated Particulars of Claim, were entered into ". . . with intent to cheat [the Commissioners] of revenue and/or to defraud the Revenue . . ."? The telephones, if they existed, did not physically move from the place or custody in which they were in the morning of 15 October 2002, when the carousel began, to anywhere else or anyone else's custody by midnight. At best, if they existed, they started and ended with Total. If it is to be said that property in these telephones, if they existed, left Total, passed down the chain of companies and ended back with Total, at what point during 15 October 2002 did this process begin? We know that no money was ever paid to or by Redlaw and it does not appear that any authority was ever given by Redlaw for the payment made by GAK to Total. But these questions are, perhaps, pointless for it seems clear that the telephones, as objects of an intended sale, were irrelevant. The passing of property in the telephones was not the purpose of the transactions. The purpose was the creation of book entries enabling a claim for repayment of input tax to be made.

[53]   Article 2 of the First Council Directive, 67/227/EEC of 11 April 1967 says that ". . . The principle of the common system of value added tax involves the application to goods and services of a general tax *on consumption* . . ." (emphasis added) and art 2(1) of the Sixth Directive says that ". . . a supply of goods and services effected for consideration by a taxable person acting as such is subject to VAT". Article 4(1) of the Sixth Directive defines "taxable person" as ". . . any person who independently carries out in any place any economic activity . . ." and "economic activities" are defined in art 4(2) as comprising ". . . all activities of producers, traders and persons supplying services . . .". On what basis could it be suggested that the carousel of 15 October 2002, on the basis of the facts as pleaded, involved the participants in trading in goods or supplying services? The several transactions were plainly orchestrated and pre-ordained. None of the participants wanted mobile telephones. All that they wanted to obtain a money profit at no risk and without doing anything that could remotely be described as trading or supplying goods in a commercial transaction.

[54]   On the Commissioners' pleaded case Alldech was a fraudulent conspirator, not an innocent trader caught up in somebody else's fraudulent scheme. The pleaded case does not allege that GAK or The Accessory People were conspirators. It is difficult to believe that they did not know or suspect the fraudulent purpose of a scheme under which they were to sign up to buy goods they had never seen and immediately to sell on the goods for an enhanced price. And if they did not know of the fraudulent purpose it is difficult to believe that their lack of knowledge was not attributable to a decision not to enquire, a convenient adoption of a Nelsonian blind eye. Be that as it may, Alldech, on the pleaded case, was a participating conspirator with knowledge of all the pleaded features of the conspiracy and neither expected nor intended to become the owner of mobile telephones. That was not the purpose of the carousel. In my opinion, there was, on 15 October 2002 when the several transactions were entered into, no supply or intention to supply mobile telephones, no change of the property rights in any mobile telephones and no transaction that could claim the description of a contract of sale or a contract for the supply of telephones. This was a fraudulent scheme designed to extract by deception money from the Revenue. If the pleaded facts had been known to the Revenue at the time that Alldech's input tax repayment claim was made, the Revenue would not have paid and would not have been liable to pay.

[55]   The ECJ's judgment in *Optigen Ltd v Customs & Excise* [2006] Ch 218, [2006] 2 WLR 456, [2006] STC 419 is no authority to the contrary. The ECJ emphasise in their judgment that the terms "supply of goods" and "taxable person acting as such" in the Sixth Directive require an objective assessment to be made (see para 44 of the judgment). In para 46 of the judgment the ECJ said this:

> "An obligation on the tax authorities to take account, in order to determine whether a given transaction constituted a supply by a taxable person acting as such and an economic activity, of the intention of a trader other than the taxable person concerned involved in the same chain of supply and/or the possible fraudulent nature of another transaction in the chain . . . of which that taxable person had no knowledge and no means of knowledge, would a fortiori be contrary to [the objectives of the Sixth Directive]."

And in para 51 the ECJ repeated that whether a supply of goods had been made by a taxable person acting as such was to be objectively ascertained:

> ". . . regardless of the intention of a trader other than the taxable person concerned involved in the same chain of supply and/or the possible fraudulent nature of another transaction in the chain, prior or subsequent to the transaction carried out by that taxable person, *of which that taxable person had no knowledge and no means of knowledge*" (emphasis added).

It follows from this that if a trader becomes innocently involved in a fraudulent and/or sham chain of supply, the innocent trader does not necessarily cease to be a person liable to pay output VAT and eligible to claim input VAT. If objectively assessed without regard to the fraud, there would appear to have been a supply of goods by or to the innocent trader, the innocent trader does not by reason of the fraud fall outside the VAT loop. None of this, in my opinion, assists Total in the present case. Alldech was not an innocent trader. GAK and The Accessory People may have been. If Alldech was not an innocent trader but a conspirator in the fraud there is no need to disregard the intentions of the conspirators, the fraudsters, in assessing the true nature of the transactions into which they entered. In my opinion, on the facts as pleaded, neither Total when it entered into its transaction with Redlaw, nor Alldech when it entered into its transaction with The Accessory People, nor Total and Alldech when they entered into the final transaction with one another, were intending to buy or sell, as the case may be, mobile telephones. They were intending to produce pieces of paper in-voices, in order to pretend to the Revenue that genuine commercial transactions had taken place and there-by to deceive the Commissioners into paying-up on a spurious input tax repayment claim. The issue is whether in these circumstances the Commissioners have a civil action in tort to recover from Total, as dam-ages for the tort, the loss suffered by the Commissioners by the success of the fraudulent scheme.

*The tort of conspiracy*

[56]   The pleaded tort is a conspiracy to cheat and/or defraud the Commissioners by unlawful means. The issue is whether this tort requires that the unlawful means relied on include some civil wrong actionable by the Claimant against at least one of the conspirators. On this issue I can add nothing of value to the conclu-sion and reasoning of my noble and learned friends. The Court of Appeal felt bound to follow the earlier Court of Appeal decision in *Powell v Boladz* [1998] Lloyd's Rep Med 116 in which Stuart-Smith LJ, with whose judgment the other two members of the court agreed, had said at 126 that: ". . . the unlawful act relied on must be actionable at the suit of the Plaintiff. It is not sufficient that it amounts to a crime or breach of con-tract with a third party". My Lords, in agreement with my noble and learned friends and for the reasons they have given I too would hold that criminal conduct can constitute unlawful means for the purposes of a tor-tious conspiracy to injure by unlawful means (see para 95 of Lord Walker's opinion). It must, in my opinion, be kept in mind that the whole of this branch of the law of tort is the result of a step by step development by judges of the action on the case. We were taught at law school that the action on the case was the means whereby our judicial forbears allowed tortious remedies in damages where harm had been caused in circum-stances where the conduct of the authors of the harm had been sufficiently reprehensible to require the con-clusion that they ought to be held responsible for the harm. The law whereby harm caused by negligence can be remedied by an action in tort for damages results from a development of the action on the case. The law enabling an action for tortious damages to be brought where two or more persons have joined together with the predominant intention of injuring another person and have successfully carried out their intention is another, and for present purposes highly relevant, example of a judicial development of the action on the

case. This is the so-called "lawful means" conspiracy which is tortious notwithstanding that the means employed to cause the harm are themselves neither criminal nor tortious. The essential ingredient of this type of action is the combination of people all intent on causing harm to the victim, not on the type of means employed for doing so. As it was put by Viscount Simon in *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435 at 445:

> "If that predominant purpose is to damage another person and damage results, that is tortious conspiracy. If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (no illegal means being employed), it is not a tortious conspiracy, even though it causes damage to another person."

Where, however, unlawful means are employed by the conspirators to achieve their object and their object involves causing harm to the victim, the intent to cause that harm does not have to be the predominant purpose of the conspiracy. This difference between the torts of lawful means conspiracy and unlawful means conspiracy is sometimes described as anomalous. In my opinion it is not. The difference reflects and demonstrates the essential flexibility of the action on the case. It is not all conduct foreseeably likely to cause, and that does cause, economic harm to another that is tortious. Nor should it be. The circumstances must be such as to make the conduct sufficiently reprehensible to justify imposing on those who have brought about the harm liability in damages for having done so. Bearing that in mind, the proposition that a combination of two or more people to carry out a scheme that is criminal in its nature and is intended to cause economic harm to some person does not, when carried out with that result, constitute a tort actionable by that person is, in my opinion, unacceptable. Such a proposition is not only inconsistent with the jurisprudence of tortious conspiracy, as Lord Walker has demonstrated and explained, but is inconsistent also with the historic role of the action on the case.

[57]   In my opinion, any coherent law of tortious liability for conspiracy must hold Total liable in tort if the facts of the conspiracies pleaded in this case can be proved.

*The second issue*

[58]   The second issue is whether the Commissioners can bring a private law action to recover the loss they have been caused by the fraudulent conspiracy. It is said that the damages claim is, in substance, a claim to recover the tax that Redlaw has failed to pay. The action constitutes, it is said, an attempt to make Total liable to pay the tax, an attempt that is barred by art 4 of the Bill of Rights (see para 21 of Lord Hope's opinion). It is said, alternatively, that the statutory VAT scheme establishes exclusive remedies for the recovery of tax or for dealing with false input tax repayment claims and that these remedies cannot be supplemented by a tortious action for damages. Lord Hope, in para 15 of his opinion, has listed the various statutory remedies available under the statutory VAT scheme.

[59]   My Lords, there is, in my opinion, nothing whatever in the Bill of Rights point. It is true that Total are not taxable under the statutory VAT scheme in respect of any of the pleaded transactions, but the claim against Total is not a claim for tax. It is a claim for damages, for loss, caused by the fraudulent conspiracy. The Consolidated Particulars of Claim claim from Total damages (for the first conspiracy) of "not less than £253,345.50". That was the sum paid by the Revenue to Alldech in response to Alldech's claim for repayment of the VAT Alldech had paid as input tax to The Accessory People. It was not the amount of the VAT in respect of which Redlaw, the missing trader, should have accounted to the Revenue. The claim for a sum in damages not less than the sum paid by the Revenue to Alldech is, however, capable of leading to a misunderstanding. The sum recoverable by the Commissioners as damages may well be less than £253,345. A tortious damages claim must bring into account benefits, as well as losses, that have accrued to the victim from the wrongful conduct. So the Commissioners must give credit for the £1323 and £1975 for which GAK and The Accessory People accounted to the Revenue and must give credit, also, for the value of any statutory right of the Commissioners under the VAT scheme to recover the £253,345 from Alldech (see s 73(2) of

the Value Added Tax Act 1994). But this would all be part of the assessment of the quantum of damages recoverable by the Commissioners from Total if the Commissioners succeed in establishing the tort. It is not the levying of tax.

[60]   As for the point that the statutory VAT scheme prescribes exclusive remedies for the Commissioners, I can, for my part, see no reason why the statutory scheme should be thought to provide protection against tort claims for those who by fraudulent schemes succeed in extracting money from the Commissioners. If the Commissioners have a statutory remedy against Alldech to recover the £235,345 and if Alldech are good for the money, then the economic damage caused by the conspiracy will, presumably, be nil. But if Alldech is not good for the money, or if there is no statutory remedy available in a case such as this, I can see no reason why the Commissioners, the victims of a fraudulent conspiracy, should be barred from recovering damages against the principal conspirator, Total. An intention that that should be so cannot, in my opinion, be attributed to the legislature in enacting the VAT scheme.

*Conclusion*

[61]   In agreement, therefore, with all my noble and learned friends on the tort of conspiracy point and with Lord Walker and Lord Mance on all other points, I would allow the Commissioners' appeal, dismiss Total's cross-appeal, restore para 1 of the order of Hodge J made on 10 January 2005, and set aside para 1 of the order of the Court of Appeal made on 31 January 2007.

**LORD WALKER:**

My Lords,

*The two issues*

[62]   This appeal on a preliminary point of law raises two issues, each of which is important. The first is whether the Appellants, the Commissioners of HM Revenue and Customs ("the Commissioners") are entitled to resort to a private law remedy – an action for damages for the tort of conspiracy – in order to recoup value added tax (VAT), which would otherwise be irrecoverable. The second issue is whether (on the facts which the House is required to assume for the purposes of the preliminary issue) the requirements of the common law tort of conspiracy can be established.

[63]   Although they are distinct the two issues touch at a single point. That is whether (if, contrary to the Commissioners' primary case, a claimant alleging an "unlawful means" conspiracy must establish that the unlawful means consisted of or included the commission of a civil wrong actionable at the suit of the Claimant) the Commissioners would have been able to bring a private law claim for fraudulent misrepresentation against a company called Alldech Ltd ("Alldech"), which was (on the assumed facts) a participant in a fraudulent conspiracy with the Respondent Total Network SL ("Total").

[64]   I have set out the two issues in what seems to be their logical order. But the Commissioners' appeal (on the second issue) was opened before Total's cross-appeal (on the first issue) and I will follow the same

course. I gratefully adopt the exposition of the facts and the legislation set out in the opinion of my noble and learned friend Lord Hope of Craighead.

*The tort of conspiracy: Background*

[65]   The essential dispute between the parties, on the Commissioners' appeal, is whether the Court of Appeal was right in holding that, in order to establish the tort of "unlawful means" conspiracy, the Claimant must show that the unlawful means constituted or included a civil wrong which had been committed by at least one of the conspirators, and was actionable at the suit of the Claimant himself. The Court of Appeal made clear that it would not have reached that conclusion had it not felt bound to follow the decision of the Court of Appeal in *Powell v Boladz* [1998] Lloyd's Rep Med 116.

[66]   That decision referred (on the material point) to only three authorities, only one being a decision of this House, that is *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173 ("*Lonrho v Shell*"). It might therefore appear to be a short point. But your Lordships have had the advantage of full argument and full citation of authority. Mr Flint QC for Total (echoing Lord Diplock in *Lonrho v Shell* at p 189) urged the House not to extend the scope of an already anomalous tort. Against that Mr Martin QC for the Commissioners argued that on Total's case the tort would be reduced to no more than a barren iteration of joint tortfeasance. In these circumstances it is necessary, I think, to go back to some of what Lord Diplock (in *Lonrho v Shell* at p 188) called the tort's "chequered history" between the first-instance decision of Lord Coleridge CJ in *Mogul Steamship Co Ltd v McGregor, Gow & Co* (1888) 21 QBD 544 ("*Mogul*") and *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435 ("*Crofter*"). The decision of this House in *Crofter* can, I think, be seen as the final emergence of the tort of conspiracy in its modern form. But it is necessary to go back further to see why the tort is generally regarded as anomalous, and why the notion of "predominant purpose" or "real and predominant purpose" was defined in *Crofter* (especially in the speeches of Viscount Simon LC and Lord Wright at pp 445–447 and pp 477–478 respectively) as a necessary ingredient of an "unlawful object" (or "lawful means").

[67]   In looking at the older cases I have the advantage of traversing some of the same ground as has recently been covered by Lord Hoffmann in his opinion in *OBG Ltd v Allan* and associated appeals [2007] 2 WLR 920 ("*OBG*"), paras 6 to 21 and paras 45 to 64. In the latter group of paragraphs Lord Hoffmann concluded (with the concurrence of the majority) that a wrong actionable in private law is a necessary ingredient of the tort of intentionally causing harm by unlawful means (which I shall for brevity call "the intentional harm tort"). That may be thought to add a further layer of anomaly to the tort of conspiracy, if the Commissioners are right on the first issue. That there is an anomaly, or at least something calling for explanation, was recognised as long ago as 1889, when Bowen LJ said in *Mogul* in the Court of Appeal (1889) 23 QBD 598, 616 "Of the general proposition, that certain kinds of conduct not criminal in any one individual may become criminal if done by combination among several, there can be no doubt." He proceeded to state what he saw as sound reasons for the distinction, but some other distinguished judges have been more sceptical.

[68]   In *Mogul* the Plaintiffs complained that the Defendants (an association of shipowners) had conspired to obtain a monopoly of the China tea trade, mainly by offering a discount on the freight charged to those who confined their shipments to the Defendants' vessels. The claim failed at first instance before Lord Coleridge CJ sitting without a jury (1888) 21 QBD 544, before the Court of Appeal (Bowen and Fry LJJ, Lord Esher MR dissenting) (1889) 23 QBD 598 and in this House [1892] AC 25. The distinction between the two varieties of the tort was seen in terms of combination for an unlawful object, or combination to cause harm by unlawful means. The real difficulty (exemplified in the difference of opinion in the Court of Appeal) was in identifying what was unlawful, either as an object or as a means to an end, in the *laissez-faire* Victorian world of trade competition.

[69]   Lord Coleridge CJ described the two categories of the tort 21 QBD 544, 550:

> "And in this case it is clear that if the object were unlawful, or if the object were lawful but the means employed to effect it were unlawful, and if there were a combination either to effect the unlawful object or to use the unlawful means, then the combination was unlawful, then those who formed it were misdemeanants and a person injured by their misdemeanour has an action in respect of his injury."

He was almost but not quite persuaded (pp 553–554) that there was a "wrongful and malicious combination to ruin a man in his trade". He concluded that: "I cannot see that these Defendants have in fact passed the line which separates the reasonable and legitimate selfishness of traders from wrong and malice." Here Lord Coleridge CJ was identifying the problem of mixed motives – the trader who wants to damage his competitor's business because that will make his own business more profitable – which runs through the development of the law of economic torts, including conspiracy. This point was recently made by Lord Hoffmann (in the context of causing loss by unlawful means) in *OBG* [2007] 2 WLR 920 paras 134–135, quoting Lord Sumner in *Sorrell v Smith* [1925] AC 700, 742: "When the whole object of the Defendants' action is to capture the Plaintiff's business, their gain must be his loss."

**[70]**   In the Court of Appeal in Mogul Lord Esher MR stated nine rules (23 QBD 598, 609-610). The first seven enunciated a doctrine of "fair trade competition" which, had they prevailed, would have set the development of the law on a very different course. They applied to all traders, whether or not they were acting in concert, and Lord Esher MR treated the Defendants' combination as a sort of *a fortiori* footnote (at p 710). But the views of Bowen and Fry LJJ (which were approved unanimously by this House) insisted in much-quoted passages (at pp 614–618 and pp 626–628) that trade competition, however fierce, was not unlawful unless it involved fraud, misrepresentation, intimidation or molestation; that the Defendants did not intend to injure their competitors further than was necessarily involved in the activity of competition; and that a combination of traders to engage in such activity did not amount to an unlawful conspiracy, although the doctrine of restraint of trade might make it unenforceable.

**[71]**   *Allen v Flood* [1898] AC 1, the case about the demarcation dispute between the ironworkers and the woodworkers at a shipyard in Millwall, was regarded at the time as a case of the highest importance, and its importance is still recognised over a century later. It was first argued over four days before an appellate committee of seven, and then again over six days before a committee of nine (three Lords of Appeal in Ordinary and six other peers who held or had held high judicial office). On the second occasion eight judges attended to give the House the benefit of their opinions (the last time that ever occurred). The judges divided 6–2 in favour of the Plaintiffs (the Respondents in the appeal) but the House divided 6–3 in favour of Allen (one of the three original Defendants, but by then the only Appellant). The Lord Chancellor, Lord Halsbury, presided but was in the minority. The case is of enormous interest as a matter of legal and social history (see RFV Heuston, "Legal Prosopography" (1986) 102 LQR 90). But as regards conspiracy it is of limited importance since although conspiracy was an issue on the pleadings, at first instance (Kennedy J with a jury) the judge ruled that there was no evidence of conspiracy (or of intimidation, coercion or breach of contract). Allen, the London representative of the Boilermakers' Society, had simply been summoned to the shipyard, and (acting on his own initiative) told the management what would happen if Flood and Taylor (woodworkers who were known to have done ironwork at another yard) were not discharged (as they could be without a breach of contract, since they were employed by the day). The absence of a conspiracy was most strongly emphasised by Lord Macnaghten [1898] AC 1, 153:

> "the decision of this case can have no bearing on any case which involves the element of oppressive combination. The vice of that form of terrorism commonly known by the name of 'boycotting', and other forms of oppressive combination, seem to me to depend on considerations which are, I think, in the present case conspicuously absent."

**[72]**   To my mind the main significance of *Allen v Flood* to the present appeal is in explaining the delicacy with which, about four years later, the House approached *Quinn v Leathem* [1901] AC 495. The Earl of

Halsbury LC was again presiding, and the committee included several law lords who had sat in *Allen v Flood*. (Heuston's article does not advert to the curious fact that when this House gave judgment on 5 August 1901, there were according to the Law Reports six speeches, given by the Earl of Halsbury LC, Lord Macnaghten, Lord Shand, Lord Brampton, Lord Robertson and Lord Lindley. Lord Davey is recorded as having read the speeches of Lord Shand, Lord Robertson and Lord Lindley but not as having given any speech of his own. Mr G R Dymond of the House of Lords Library has kindly checked that the Lords' Journals confirm what is in the Law Reports.)

[73]   Quinn was treasurer of a Belfast butchers' association. Leathem, who traded as a butcher, employed some non-union men, although when the union made difficulties he asked for them to be admitted to the union, and offered to pay their dues. The union put pressure on Munce, a wholesale customer of Leathem, to stop buying his meat. It also called out Dickie, one of Leathem's employees. The jury found for Leathem, holding that there had been a malicious conspiracy between Quinn and other officers of the union. The Irish Court of Appeal affirmed this. So, unanimously, did this House. The House's anxiety to explain why *Allen v Flood* was not in point makes it quite difficult to discern what *Quinn v Leathem* did decide. But it can, at any rate with hindsight, be recognised as a case of "unlawful object" (or "lawful means") conspiracy, since (on the facts found) the union did not have the justification of advancing its own interests, and was acting primarily for the purpose of punishing and injuring Leathem (see especially the speeches of Lord Macnaghten at p 511 and Lord Shand at p 515; Lord Lindley, however, at p 538 seems to have regarded it as a case of unlawful means). In *Sorrell v Smith* [1925] AC 700 most of the House saw *Quinn v Leathem* as a case of unlawful object, not unlawful means (see especially Viscount Cave LC at p 712, Lord Dunedin at pp 719 and 724, Lord Sumner at p 735 and Lord Buckmaster at p 744).

[74]   In *Crofter* [1942] AC 435 the House, building on *Sorrell v Smith*, finally established the basic principles of the modern tort. There is a key passage in the speech of Viscount Simon LC at p 445:

> "The combiners may feel that they are killing two birds with one stone, and, even though their main purpose may be to protect their own legitimate interests notwithstanding that this involves damage to the Plaintiffs, they may also find a further inducement to do what they are doing by feeling that it serves the Plaintiffs right. The analysis of human impulses soon leads us into the quagmire of mixed motives, and even if we avoid the word 'motive', there may be more than a single 'purpose' or 'object'. It is enough to say that if there is more than one purpose actuating a combination, liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and damage results, that is tortious conspiracy. If the predominant purpose is the lawful protection or promotion of any lawful interest of the combiners (no illegal means being employed), it is not a tortious conspiracy, even though it causes damage to another person."

[75]   Another very important passage is in the speech of Lord Wright, at p 462, and it has been the subject of a good deal of discussion before your Lordships:

> "The rule may seem anomalous, so far as it holds that conduct by two may be actionable if it causes damage, whereas the same conduct done by one, causing the same damage, would give no redress. In effect the Plaintiffs right is that he should not be damnified by a conspiracy to injure him, and it is in the fact of the conspiracy that the unlawfulness resides. It is a different matter if the conspiracy is to do acts in themselves wrongful, such as to deceive or defraud, to commit violence, or to conduct a strike or lock-out by means of conduct prohibited by the Conspiracy and Protection of Property Act 1875, or which contravenes the Trade Disputes and Trade Unions Act 1927."

[76]   My Lords, I would draw attention to three general features of the authorities down to, and including, *Crofter*. First, the debate is overwhelmingly about intention (or purpose, or object) culminating in the approval

of "real and predominant purpose" (Viscount Simon LC in *Crofter* at p 446) as the essential ingredient of the "unlawful object" variety of the tort. Second, there is little or no discussion of whether unlawful means can include conduct which is a criminal offence but cannot found a civil cause of action. Most of the examples of unlawful means given in the speeches and judgments are expressed in general, fairly non-technical terms (fraud, misrepresentation, molestation, intimidation, obstruction). Lord Wright, in the passage just quoted from his speech in *Crofter*, includes some statutory offences, but he does not seem to have regarded it as a point calling for reasoned discussion. Third, there are frequent references (again, the quotation from Lord Wright in *Crofter* is an example) to the anomaly that the conduct of two or more persons may be actionable whereas the same conduct on the part of a single person would not be.

**[77]**   This third point calls for a little more discussion. In Mogul, Bowen LJ (23 QBD 598, 616) gave two reasons for it:

> "The distinction is based on sound reason, for a combination may make oppressive or dangerous that which if it proceeded only from a single person would be otherwise, and the very fact of the combination may shew that the object is simply to do harm, and not to exercise one's own just rights."

The first reason is not very satisfactory, since (as has very often been pointed out, for instance by Lord Sumner in *Sorrell v Smith* at p 741 and Lord Diplock in *Lonrho v Shell* at p 189) it all depends on the particular facts. The second reason seems to me more principled, focusing as it does on the fact that the Claimant's damage is caused by two or more persons acting in concert to carry out an unlawful plan. That is, I think, what was behind an observation of Lord Dunedin in *Sorrell v Smith* at p 725:

> "Now the moment that that is recognised, ie that the essence of conspiracy on which civil action is founded is a criminal conspiracy, though of course unless actual damage has followed no civil action will lie, the moment that fact is recognised, you at once bring in the spirit of the criminal law, where motive or intention – the mens rea – is everything."

That identifies what sets conspiracy apart from other torts, and emphasises the first point made above – the intense focus, in the tort of conspiracy, on intention. It is also worth noting that in some factual situations (such as that in the present appeal) the fraud disclosed by the assumed facts could not have been carried out otherwise than by a number of persons acting in concert.

**[78]**   I suspect that the judges at the end of the 19th century also had a third reason, largely unarticulated but appearing in Lord Macnaghten's dictum about boycotts in *Allen v Flood*. That was the deep suspicion which the governing class had, in Georgian and Victorian England, of collective action in the political and economic spheres, as potential threats to the constitution and the framework of society. It is a theme from the Gordon Riots in 1780 to the Land League in Ireland a century later (see *R v Parnell* (1881) 14 Cox CC 508), with the conventions called by the corresponding societies in the 1790s, the Peterloo Massacre in 1819, the Tolpuddle Martyrs in 1834 and the Chartist Movement (1838-1848) and the rise of the trade unions in between.

*The tort of conspiracy: The modern cases*

**[79]**   The litigation in *Lonrho v Shell* [1982] AC 173 arose from sanctions imposed against Southern Rhodesia, after UDI, under the Southern Rhodesia Act 1965. Lonrho's claim was that Shell and its co-defendant BP had breached the sanctions and caused loss to Lonrho and its Portuguese co-owner of a pipeline from Beira in Mozambique to a refinery in what was then Southern Rhodesia. The matter came before the court as issues of law arising on assumed facts in the course of an arbitration. The relevant issue was numbered 5(b):

"Whether the Claimants have a cause of action for damage alleged to have been caused by such breaches [of the sanctions orders] by virtue only of the allegation that there was an agreement to effect them."

That is a rather bald way of putting the issue: the essential point was whether it was fatal that there was no pleading of an intention to injure Lonrho and its co-plaintiff, as Lord Diplock explained at p 188:

"Question 5(b), to which I now turn, concerns conspiracy as a civil tort. Your Lordships are invited to answer it on the assumption that the purpose of Shell and BP in entering into the agreement to do the various things that it must be assumed they did in contravention of the sanctions Order, was to forward their own commercial interests; not to injure those of Lonrho. So the question of law to be determined is whether an intent by the Defendants to injure the Plaintiff is an essential element in the civil wrong of conspiracy, even where the acts agreed to be done by the conspirators amount to criminal offences under a penal statute."

[80]   So the question was clearly understood as being one of intention, and the reference to "criminal offences under a penal statute" (introduced as it was by the words "even where") does not suggest that the criminal element was seen as a potential flaw in Lonrho's case. Lord Diplock then briefly discussed the classic authorities on the tort of conspiracy; I have already mentioned some of his observations. He stated (at p 189) that none of the authorities:

"was directed to a case where the damage-causing acts although neither done for the purpose of injuring the Plaintiff nor actionable at his suit if they had been done by one person alone, were nevertheless a contravention of some penal law."

He concluded that the House had an unfettered choice, and his unhesitating choice (agreeing with the courts below in their conclusion if not in their reasoning) was not to extend the scope of the tort, and to answer question 5(b) in the negative. The other members of the House agreed.

[81]   My Lords, the reasoning in Lord Diplock's speech seems to me to be very compressed, especially in the passage from which I have just quoted. I am very conscious of the danger of trying to expound speeches and judgments (even of the most eminent judges) as if they were Acts of Parliament. It is a danger of which Slade LJ (delivering the judgment of the Court of Appeal in *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391, [1989] 3 All ER 14, [1989] 3 WLR 563 – "*Metall*") was conscious. Nevertheless he did subject the speech of Lord Diplock to "detailed textual analysis" (as Lord Bridge of Harwich put it in *Lonrho plc v Fayed* [1992] 1 AC 448, 468 – "*Lonrho v Fayed*"). In analysing *Lonrho v Shell*, Slade LJ also quoted from and paid close attention to the reasoning of the arbitrators, Parker J and the Court of Appeal, although it is far from clear that Lord Diplock (whose speech on this issue runs to no more than one and a half pages) had the reasoning in the lower courts at the forefront of his mind.

[82]   In *Lonrho v Fayed* this House unanimously disapproved of the views which the Court of Appeal in *Metall* had expressed about the effect of Lord Diplock's speech in *Lonrho v Shell*. In doing so the House also clarified the law, which had fallen into some confusion as a result of *Lonrho v Shell* as interpreted in *Metall*. In those circumstances it is unnecessary and inappropriate, I suggest, for your Lordships to revisit the exegesis of Lord Diplock's speech. It is sufficient to repeat that it was concerned solely with the issue of intention, and that Lord Diplock uncharacteristically failed to make a clear distinction between the requirement of predominant purpose under one variety of the tort of conspiracy and the lower requirement of intentional injury needed for the other variety.

**[83]**  Clarity was restored by the speech of Lord Bridge in *Lonrho v Fayed* [1992] 1 AC 448, with which the rest of the House agreed. (Lord Templeman also stated, with the agreement of the majority, that the ambits and ingredients of the torts of conspiracy and unlawful interference might require further analysis and reconsideration.) The key passage in the speech of Lord Bridge is at p 464, after a citation of Lord Diplock's reference to injury to the plaintiff being the predominant purpose of the conspiracy:

> "But this reasoning has no relevance to the second type of conspiracy which employs unlawful means. Of this type Lord Devlin said in his speech in *Rookes v Barnard* [1964] AC 1129, 1204, . . . 'In the latter type . . . the element of conspiracy is usually only of secondary importance since the unlawful means are actionable by themselves.' It is no doubt for the reason mentioned by Lord Devlin that there is no direct authority, unless it be *Rookes v Barnard* itself, establishing the negative proposition that the tort of conspiracy to injure by unlawful means may be established without proof that the intention to injure the Plaintiff was the predominant purpose of the conspirators. But in the many cases where Plaintiffs have asserted a conspiracy to injure, but have been unable to prove that any unlawful means were used, judgments in the Court of Appeal and speeches in your Lordships' House emphasising the requirement of a predominant purpose to injure have repeatedly included dicta indicating that this requirement does not apply where the means used to effect the conspirator's purpose are unlawful."

**[84]**  Lord Bridge then gave some examples, including a passage from the speech of Lord Wright in *Crofter*, of which I have already quoted part. He also quoted from the judgments below in *Lonrho v Shell* before coming to *Metall*. Of that case he said (at p 468):

> "My Lords, I am quite unable to accept that Lord Diplock or the other members of the Appellate Committee concurring with him, of whom I was one, intended the decision in *Lonrho v Shell* [1982] AC 173 to effect, sub silentio, such a significant change in the law as it had been previously understood. The House, as is clear from the parties' printed cases, which we have been shown, had never been invited to take such a step. Moreover, to do so would have been directly contrary to the view of Lord Denning MR expressed in the judgment which the House was affirming and inconsistent with the dicta in what Lord Diplock described, at p 188, as 'Viscount Simon LC's now classic speech in [*Crofter*].' I would overrule the *Metall* case in this respect."

**[85]**  I now come to *Powell v Boladz* [1998] Lloyd's Rep Med 116, which the Court of Appeal saw as compelling it to require civil actionability as an ingredient of unlawful means. It was a very unusual conspiracy claim, alleging falsification of hospital records. I need not go further into the complicated facts. Stuart-Smith LJ (with whom Morritt and Schiemann LJJ agreed) saw three answers to the claim for conspiracy. The second (at p 126) is in point:

> "Secondly the unlawful act relied upon must be actionable at the suit of the plaintiff. It is not sufficient that it amounts to a crime or breach of contract with a third party. (See *Clerk & Lindsell on Torts*, 17th ed para 23–80; *Marrinan v Vibart* [1963] 1 QB 234 & 528; *Hargreaves v Bretherton* [1959] 1 QB 45; *Lonrho v Shell* [1982] AC 173 per Lord Diplock at p 186 etc.) For this reason this form of unlawful act conspiracy adds little to the remedies available to a plaintiff."

**[86]**  Mr Martin QC (for the Commissioners) described this passage as plainly wrong. Mr Flint QC (for Total) showed little enthusiasm for its reasoning. But to say that the reasoning in *Powell v Boladz* is unsound is only the first step towards identifying the correct principle. That question has been considered in a number of recent cases, which (to say the least) do not speak with one voice. The judgment of the Court of Appeal in this case, holding itself bound by *Powell v Boladz*, was handed down on 31 January 2007. That judgment referred to the unreported decision of Davis J in *Mbasogo v Logo Ltd* [2005] EWHC 2034 (QB) ("*Mbasogo*") but not to the fact that that case had by then gone to the Court of Appeal (Sir Anthony Clarke MR, Dyson and

Moses LJJ) [2006] EWCA Civ 1370; [2007] 2 WLR 1062 which gave its reserved judgment on 23 October 2006. That division of the Court of Appeal declined to go far into the law on unlawful means conspiracy (since it held the claim unjusticiable on wider grounds) but the court did (at para 104) express doubt as to whether it was bound by *Powell v Boladz*.

[87]  Davis J's judgment in *Mbasogo* contains an admirable discussion of the "unlawful means" issue, with mention of all the recent cases. Because the judgment is unreported I will give a brief summary. Davis J pointed out that in an interlocutory appeal in *Associated British Ports v Transport & General Workers' Union* [1989] 1 WLR 939, [1989] ICR 557, [1989] ICR 557, Stuart-Smith LJ had (in agreement with Butler-Sloss LJ but contrary to the view of Neill LJ) taken the view, for the purposes of the intentional harm tort (p 966) "that at the very least it is strongly arguable that where the unlawful relied upon in this tort is a breach of statute, it is not necessary that it should be one that is actionable in tort at the suit of the plaintiff". That case was not referred to in *Powell v Boladz* (decided on 1 July 1997), nor in *Credit Lyonnais Bank Nederland NV v Export Credit Guarantee Department* [1998] 1 Lloyd's Rep 19, decided by the Court of Appeal (Stuart-Smith, Hobhouse and Thorpe LJJ) on 23 July 1997. At p 32 Stuart-Smith LJ recorded (using the same language and referring to the same authorities) counsel's concession that the unlawful act must be actionable at the suit of the Plaintiff. That statement of the law was followed by Toulson J in *Yukong Line Ltd of Korea v Rendsburg Investments Corp of Liberia* [1998] 4 All ER 82, [1998] 2 BCLC 485, [1998] 1 WLR 294, 311–314. Toulson J's reasoning was based, it seems to me, on an over-elaborate textual analysis of Lord Diplock's speech in *Lonrho v Shell*, without regard to the authoritative explanation given by Lord Bridge in *Lonrho v Fayed*. I would make the same respectful criticism of the judgment of Laddie J in *Michaels v Taylor Woodrow Developments Ltd* [2001] Ch 493, [2000] 4 All ER 645, [2001] 2 WLR 224 (especially paras 30–34).

[88]  In *Surzur Overseas Ltd v Koros* [1999] 2 Lloyd's Rep 611, the Court of Appeal refused to strike out a claim alleging an unlawful means conspiracy by deception of the court (leading it to lift an order preventing the sale of three ships). Waller LJ (with whom Hirst and Aldous LJJ agreed) stated at p 617:

> "This aspect was not debated in any detail before Longmore J at all and was raised very much at the last moment in argument [before] us. It would clearly be wrong to reach any final conclusion. What is clear, in my view, is that it is eminently arguable that in an unlawful means conspiracy the unlawful means do not have to be actionable at the suit of the plaintiff."

*Crime as unlawful means*

[89]  My Lords, faced with this confusion in the recent case-law, the House must, I suggest, go back to the general principles to be derived from the older cases in which the economic torts have been developed. It is however necessary to bear in mind that their development has been a long and difficult process, and may not yet be complete, as Lord Templeman observed (with the concurrence of the majority) in *Lonrho v Fayed* [1992] 1 AC 448, 471. A particular difficulty is that it has been generally assumed, throughout the 20th-century cases, that "unlawful means" should have the same meaning in the intentional harm tort and in the tort of conspiracy. A good deal of legal reasoning in the speeches and judgments (as to the ingredients of one or other of these torts) has been based on the assumption that the meaning must be the same in both. That assumption is however challenged, if the Commissioners are correct, by the speech of Lord Hoffmann in *OBG* (with which the majority concurred). I shall have to come back to that difficulty.

[90]  In searching for general principle I start with a very simple, even naïve point. The man in the street, if asked what an unlawful act was, would probably answer "a crime". He might give as an example theft, obtaining money by false pretences, or assault occasioning actual bodily harm. He might or might not know that each of these was also a civil wrong (or tort) but it is unlikely that civil liability would be in the forefront of his mind.

[91]   The reaction of a lawyer would be more informed but it would not, I suggest, be essentially different. In its ordinary legal meaning "unlawful" certainly covers crimes and torts (especially intentional torts). Beyond that its scope may sometimes extend to breach of contract, breach of fiduciary duty, and perhaps even matters which merely make a contract unenforceable, but the word's appropriateness becomes increasingly debatable and dependent on the legal context. In the very important criminal case of *R v Clarence* (1888) 22 QBD 23, 53 JP 149, 58 LJMC 10 (in which a question of law on ss 20 and 47 of the Offences against the Person Act 1861 was argued before a court of 13 judges, several of whom later gave their opinions to the House in *Allen v Flood*) Stephen J (at p 40) expressed the view that:

> "The word 'unlawfully' must here be construed to mean 'unlawfully' in the wide general sense in which the word is used with reference to acts which if done by conspirators are indictable, though not if they are done by individuals. This general sense may, I think, be said to be 'immoral and mischievous to the public'. I do not agree with the doctrine that the word 'unlawfully' is used here in this wide sense. The use of the word in relation to conspiracy appears to me to be exceptional."

What was exceptional about it was its extension downwards in the scale of blameworthy conduct. The unlawfulness of criminal conduct was at the top end of the scale, and too obvious to call for mention.

[92]   The enquiry how far downwards to go seems to me to be a feature common to all the leading cases in which the tort of unlawful means conspiracy has been developed. Until Lord Diplock's speech in *Lonrho v Shell* there was never a clear issue as to whether the alleged unlawful means must be actionable (as a separate tort) at the suit of the Plaintiff. Lord Diplock himself acknowledged this [1982] AC 173, 189. His attention may have been drawn to the point by his earlier disapproval (at p 187) of some wide observations made by Lord Denning MR in an interlocutory appeal in *ex parte Island Records Ltd* [1978] Ch 122, [1978] 3 All ER 824, [1978] 3 WLR 23.

[93]   In the long period during which this issue did not arise for decision there is, unsurprisingly, little discussion of it in the authorities. They concentrate on the issue of intention (which was also at the heart of question 5(b) in *Lonrho v Shell*). But all the statements of general principle in the classic cases seem to me to be consistent with the proposition that unlawful means, both in the intentional harm tort and in the tort of conspiracy, include both crimes and torts (whether or not they include conduct lower on the scale of blameworthiness) provided that they are indeed the means by which harm is intentionally inflicted on the Claimant (rather than being merely incidental to it). I do not want to multiply citations but I would instance Lord Watson in *Allen v Flood* at p 96 (emphasising "illegal means directed against that third party"); Viscount Cave LC in *Sorrell v Smith* at p 714 ("means which are in themselves unlawful, such as violence or the threat of violence or fraud"); Lord Wright in *Crofter* at p 462 (quoted in para 75 above, and instancing some statutory offences); Lord Devlin in *Rookes v Barnard* [1964] AC 1129, 1209, [1964] 1 All ER 367, [1964] 2 WLR 269 ("in some of the dicta [on conspiracies] the language suggests that the means must be criminal or tortious and in others that breach of contract would do; but in no case was the point in issue"; in the earlier much-discussed sentence at p 1204 I would not give much weight to the position that the word "usually" occupies in the sentence); and Lord Denning MR and Russell LJ in *Daily Mirror Newspapers Ltd v Gardner* [1968] 2 QB 762, 783, 785 (though that decision is questionable: see (1968) 84 LQR 310).

[94]   From these and other authorities I derive a general assumption, too obvious to need discussion, that criminal conduct engaged in by conspirators as a means of inflicting harm on the Claimant is actionable as the tort of conspiracy, whether or not that conduct, on the part of a single individual, would be actionable as some other tort. To hold otherwise would, as has often been pointed out, deprive the tort of conspiracy of any real content, since the conspirators would be joint tortfeasors in any event (and there are cases discussing the notion of conspiracy "merging" into some other tort, but I need not go far into those: *Surzur Overseas Ltd v Koros* [1999] 2 Lloyd's Rep 611; *Kuwait Oil Tanker Co SAK v Al Bader* [2000] 2 All ER (Comm) 271).

[95]   In my opinion your Lordships should clarify the law by holding that criminal conduct (at common law or by statute) can constitute unlawful means, provided that it is indeed the means (what Lord Nicholls of Birkenhead in *OBG* at para 159 called "instrumentality") of intentionally inflicting harm. In *Lonrho v Shell* the sanctions order against Southern Rhodesia was part of the story, but it was not the instrument for the intentional infliction of harm. With great respect to Lord Hoffmann (in *OBG* at para 57) it is in my view what Shell and BP did not intend, rather than what Parliament did not intend, that is most relevant to that decision.

[96]   Having said that I would accept that the sort of considerations relevant to determining whether a breach of statutory duty is actionable in a civil suit (*Cutler v Wandsworth Stadium Ltd* [1949] AC 398, [1949] 1 All ER 544, [1949] LJR 824) may well overlap, or even occasionally coincide with, the issue of unlawful means in the tort of conspiracy. But the range of possible breaches of statutory duty, and the range of possible conspiracies, are both so wide and varied that it would be unwise to attempt to lay down any general rule. What is important, to my mind, is that in the phrase "unlawful means" each word has an important part to play. It is not enough that there is an element of unlawfulness somewhere in the story.

*OBG revisited*

[97]   I must now come back to *OBG* [2007] 2 WLR 920. It was a case about an invalid appointment of receivers in which the Appellants sought to widen the scope of the tort of conversion. It was heard with *Douglas v Hello! Ltd*, which raised issues about breach of confidence, and *Mainstream Properties Ltd v Young*, a case which might have been run as a claim for dishonest assistance in breach of fiduciary duty. Despite these disparate issues the appeals were heard together because they all raised issues as to the intentional harm tort. In a passage of his opinion with which the majority concurred (paras 45–60) Lord Hoffmann observed in relation to the intentional harm tort (para 49):

> "In my opinion, and subject to one qualification, acts against a third party count as unlawful means only if they are actionable by that third party. The qualification is that they will also be unlawful means if the only reason why they are not actionable is because the third party has suffered no loss."

Lord Nicholls of Birkenhead took a different view (paras 149–163).

[98]   Lord Hoffmann stated at para 56:

> "Your Lordships were not referred to any authority in which the tort of causing loss by unlawful means has been extended beyond the description given by Lord Watson in *Allen v Flood* [1898] AC 1, 96 and Lord Lindley in *Quinn v Leathem* [1901] AC 495, 535. Nor do I think it should be."

He added at para 57 (on which I have already commented):

> "Likewise, as it seems to me, in a case like [*Lonrho v Shell*], it is not for the courts to create a cause of action out of a regulatory or criminal statute which Parliament did not intend to be actionable in private law."

And at para 60:

> "I do not think that the width of the concept of 'unlawful means' can be counteracted by insisting upon a highly specific intention, which 'targets' the Plaintiff. That, as it seems to me, places too much of a strain on the concept of intention."

**[99]**   These passages (on which Mr Flint relied in his printed case and his oral submissions) prompted me to mention, near the beginning of this opinion, the risk of a new layer of anomaly being added to the tort of conspiracy (that is, that "unlawful means" would have a meaning for the purposes of a conspiracy claim different from its meaning for the purposes of a claim based on the intentional harm tort). But as Lord Hoffmann develops his reasoning in paras 51–58 of his opinion it becomes apparent that he is concerned, not only with the legal quality of the unlawful means (tort or crime?) but also with their effect in interfering with a third party's freedom of economic action. Cases like *RCA Corporation v Pollard* [1983] Ch 135, [1982] 3 All ER 771, [1982] 3 WLR 1007 and *Isaac Oren v Red Box Toy Factory* [1999] FSR 785, show that a trader may suffer economic loss as the result of a civil wrong by a bootlegger actionable by the proprietor (or sometimes, an exclusive licensee) of intellectual property rights, without the trader having a remedy. The breach of the intellectual property rights is a statutory tort, but it is actionable only by those with a sufficient title to them. As I understand his opinion, Lord Hoffmann was concerned to limit the intentional harm tort to cases where the Claimant has been "intentionally struck at through others" (in the words of Lord Lindley in *Quinn v Leathem* [1901] AC 495, 535, quoted by Lord Hoffmann at para 46). He made clear (para 61) that "two party intimidation" raises quite different issues. This point is developed in para 43 of the opinion of my noble and learned friend Lord Hope of Craighead, and in para 124 of the opinion of my noble and learned friend Lord Mance, and I respectfully agree with their observations.

**[100]**   The intentional harm tort and the "unlawful means" variety of conspiracy share the ingredients of the intentional infliction of harm on the Claimant. But that variety of conspiracy is not simply the intentional harm tort committed by joint tortfeasors. The gist of the intentional harm tort (apart from exceptional "two party" cases) is striking at the Claimant through a third party, and doing so by interfering with his freedom of economic activity. The gist of conspiracy is damage intentionally inflicted by persons who combine for that purpose (Viscount Simon LC in *Crofter* at p 444) and the Claimant need not be a trader who is injured in his trade, though that is the most common case. In my opinion your Lordships are driven to the conclusion that, as the economic torts have developed, "unlawful means" has a wider meaning in the tort of conspiracy than it has in the intentional harm tort.

**[101]**   Some scholars have classified the tort of unlawful means conspiracy as a form of secondary liability (notably Hazel Carty, *An Analysis of the Economic Torts* (2001) p 22, agreeing with Philip Sales, *The Tort of Conspiracy and Civil Secondary Liability* [1990] CLJ 491). They would not apply this classification to a conspiracy to injure by lawful means. If an unlawful means conspiracy is indeed a form of secondary liability for a civil wrong then the need for the unlawful means to be actionable as a civil wrong would be self-evident.

**[102]**   However the premise is in my opinion mistaken. The best judicial support for it seems to be some comments by Palles CB in *Kearney v Lloyd* (1889) 26 LR Ir 268, but in *Crofter* [1942] AC 435, 461-462 Lord Wright said that later cases have decisively held the contrary (this passage immediately precedes the passage which I have set out in para 75 above). Sales' article was written (like other scholarly comments such as John Eekelaar, *The Conspiracy Tangle* (1990) 106 LQR 223) in the uneasy period after this House's decision in *Lonrho v Shell* and the Court of Appeal's decision in *Metall* and before the House's decision in *Lonrho v Fayed*. A later well-regarded article by Sales and Stilitz, *Intentional Infliction of Harm by Unlawful Means* (1999) 115 LQR 411 repeated (at p 435) the proposition:

> "It is now clear that conspiracy to injure another by unlawful means is a distinct form of liability, under which the conspirators are made jointly liable for acts committed by one or more of them, which are acts which would be independently actionable by P if committed by only one person. Unlawful means conspiracy is thus an example of secondary liability, and is quite distinct from the intentional harm tort (for which the unlawful means involved do not have to be actionable independently of the tort itself)."

[103]   The last part of this passage has been shown to be incorrect by the decision of this House in *OBG* (see the speech of Lord Hoffmann at paras 59–61). In my opinion the first part of the passage is also unsustainable. The authors cite in support of it *Lonrho v Shell*; *Lonrho v Fayed*; *Rookes v Barnard*; *Marrinan v Vibart*; and *Powell v Boladz*. I need not repeat why those authorities do not in my opinion support it, beyond noting the passage relied on in the speech of Lord Bridge in *Lonrho v Fayed* [1992] 1 AC 448, 466G:

> "As the judgments in both courts below and the speech of Lord Diplock make clear, the fact dictating a negative answer to the second question was the absence of any intention to injure *Lonrho*.  Parker J said:
>
> 'The Claimants accept that there is no case in which an undirected crime, not itself a civil wrong, committed without intent to injure, has been held, or, I think, even alleged to be actionable on the mere ground that it was committed pursuant to agreement.'"

The whole context of *Lonrho v Shell* shows that the emphasis in this passage (and the other passages quoted) was on the absence of an intention to injure, and not on the need for an independently actionable wrong.

[104]   In short, and with great respect to those who take a different view, any suggestion that the unlawful means conspiracy is a form of secondary liability, and must therefore have an actionable wrong as an essential ingredient, seems to me to be a circular argument which assumes what it sets out to prove.

*Is a private law action open to the Commissioners?*

[105]   All the foregoing discussion is academic if, as my noble and learned friend Lord Hope of Craighead would hold, a private law action for damages for conspiracy is not open to the Commissioners. Lord Hope founds his conclusion, as I understand it, not so much on the Bill of Rights 1688 as on the comprehensive and exhaustive nature of the statutory code for the administration and collection of VAT contained in the Value Added Tax Act 1994. My noble and learned friend also considers that the Commissioners have no commercial interests needing to be protected by the tort of conspiracy. This last point was not, so far as I can see, raised by Mr Flint in his written and oral submissions.

[106]   I respectfully differ from Lord Hope on this part of the case. The Commissioners' statutory powers are not derived solely from the Value Added Tax Act 1994. They are also derived from the Commissioners for Revenue and Customs Act 2005, which lays down the Commissioners' statutory functions in connection with VAT (s 5(1)(b) and (2)(b)). The Commissioners have ancillary powers (s 9) and specific power to conduct civil proceedings (s 25).

[107]   The Commissioners regularly present bankruptcy petitions and winding-up petitions against defaulting taxpayers of all sorts. In a winding up they can if necessary proceed against a receiver for misfeasance (*IRC v Goldblatt* [1972] Ch 498, [1972] 2 All ER 202, [1972] 2 WLR 953). They do so in order to recover tax (not to "levy" it). So far as I can see they have no express statutory power to seek these remedies, but it has never been doubted that they are available. Similarly (though your Lordships heard no argument on the point from either side) there does not appear to be any specific statutory power for the Commissioners to obtain a freezing order. But it was only by obtaining a freezing order in private law proceedings that the Commissioners were able to prevent the conspirators from removing their ill-gotten gains out of the jurisdiction. But for a freezing order, there would have been a severe loss to the Commissioners and to the general body of taxpayers.

[108]   The Commissioners' action in this case has been described in Total's written and oral submissions as unprecedented. That may be so. The first-ever application for a freezing order (originally called a Mareva

injection) was unprecedented, but it has proved very efficacious in strengthening civil remedies against fraud. In the well-known case of *Ramsay v IRC* [1982] AC 300, 326, [1981] 1 All ER 865, [1981] 2 WLR 449, Lord Wilberforce said:

> "While the techniques of tax avoidance progress and are technically improved, the courts are not obliged to stand still. Such immobility must result either in loss of tax, to the prejudice of other taxpayers, or to Parliamentary congestion or (most likely) to both."

Lord Wilberforce said that in relation to artificial (but not unlawful) tax avoidance which was then costing the Exchequer millions of pounds a year. Your Lordships are now concerned with illegal, fraudulent tax evasion which is costing the Exchequer more than a billion pounds a year. Indeed it is worse than evasion: it is the fraudulent extraction of money from the Exchequer.

[109]   The Commissioners do not now handle large sums of cash, since there are safer means for the transfer of money. But if an official vehicle carrying cash belonging to the Commissioners (cash representing collected taxes) were hijacked and the cash stolen, it seems to me that the Commissioners would undoubtedly have a civil remedy available to reclaim it, if the robbers were apprehended and the proceeds of the robbery traced to a bank account. In my opinion the present case is essentially the same.

[110]   For these reasons I disagree with the conclusion of the Court of Appeal on what it called the third issue (paras 80–87 of its judgment). I would therefore, if necessary, have upheld the Commissioners' fallback position (para 63 above). I would allow the Commissioners' appeal and dismiss Total's cross-appeal.

**LORD MANCE:**

My Lords,

[111]   I have had the benefit of reading in draft the opinions of my noble and learned friends, Lord Hope of Craighead, Lord Scott of Foscote, Lord Walker of Gestingthorpe and Lord Neuberger of Abbotsbury. I gratefully adopt the summary of the facts in paras 3 to 10 of Lord Hope's and paras 49 and 51 of Lord Scott's opinions. The questions to which they give rise are (a) whether the pursuit of any claim by the Commissioners against Total Network SL in conspiracy is precluded by (i) the Bill of Rights and/or (ii) the statutory scheme of the Value Added Tax Act 1994 ("the VAT Act 1994") and (b) whether, if it is not, it can as pleaded exist in law.

[112]   I will start with issue (b). All of your Lordships are of the view on issue (b) that the Commissioners' pleaded claim can as pleaded exist in law. The Commissioners put their claim in two alternative ways, as Lord Neuberger explains in paras 142 and 164–167 of his opinion. I agree with him that both are arguable under the domestic and European legal principles that he examines. But I would put this on a narrow basis.

[113]   One way in which the Commissioners put their case focuses on the non-payment of VAT by Redlaw (£249,054.75) and, to a much lesser extent, Lockparts (£993); the other on the VAT credit which was claimed by, and in respect of which the Commissioners were induced to pay £253,345.50 to, Alldech. The Commissioners allege a conspiracy to cause them loss by unlawful means, consisting of the commission of

the common law offence of cheating the public revenue  either in respect of the VAT which the Commissioners should have received from Redlaw and Lockparts or out of the VAT credit they were induced to pay to Alldech. It is not, for present purposes, disputed that there is a good case for saying that Total, Redlaw, Lockparts and Alldech were together guilty of this common law offence of cheating the revenue. There is nothing in the scheme of the VAT Act 1994, or in the various  civil and criminal remedies for which it provides, to prevent  prosecution for the common law offence such as was pursued under the predecessor legislation in *R v Mavji* [1987] 2 All ER 758, [1987] 1 WLR 1388, 84 Cr App Rep 34.

[114]   Total's primary response is that the commission of a crime alone is insufficient to constitute "unlawful means" for the purposes of grounding a tortious cause of action for conspiracy. Total submits that for this purpose "unlawful means" would have to consist in conduct that was itself actionable by the Commissioners in tort (or possibly breach of contract). In the case of the payment made to Alldech, the Commissioners do allege that the cheating was accompanied by positive deceit, itself actionable by them in tort against Alldech. In response to this, Total submits, and the Court of Appeal held, that the statutory scheme of the VAT Act 1994 precludes any independent  actionable remedy in tort against Alldech.

[115]   The House is not concerned with an alleged conspiracy committed with the predominant intention of injuring the Commissioners. In the Court of Appeal, counsel for the Commissioners declined on instructions, for reasons which he explained to the Court, to seek to amend to plead that the conspirators' predominant purpose was to injure the Commissioners. The House is concerned with the other branch of conspiracy depending upon an intention (although  not a predominant  intention) to injure by unlawful means. The existence of unlawful means is therefore critical to the Commissioners' case.

[116]   In agreement with the reasoning of Lord Walker and Lord Neuberger, I consider that the history and jurisprudence relating to this type of conspiracy point clearly to the conclusion that at least some criminal acts, not amounting to torts, may suffice to ground the tort. Lord Wright's speech in *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435, cited by Lord Walker, contains particularly clear support for the view that this type of conspiracy is not to be regarded as a purely secondary form of liability, limited (apart from the possibility that the wrongful  means might consist of breach of contract) to duplicating liability that the conspirators would anyway have as joint tortfeasors. The decision in *Lonhro  Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173 proceeded, as explained in *Lonhro plc v Fayed* [1992] 1 AC 448, on the basis that a purely criminal act, consisting of Shell's alleged breach of the United Kingdom's sanctions Orders making it a criminal offence to supply oil to Rhodesia,  could constitute relevant  unlawful means for the purposes of the tort of conspiracy by unlawful  means. The conclusion that no tort had been committed derived from the absence – admitted by counsel for *Lonhro plc* (p 180B–C) – of any allegation of any intention at all to injure Lonhro plc. (It was also the fact that the sanctions Orders were "not passed for the protection of any particular section of the public and [gave] rise to no special duty to [Lonhro]": see the concession at p 179B-C.)

[117]   In *Lonhro plc v Fayed* at pp 467A to 468H Lord Bridge Harwich, giving the leading speech with which all other members of the House agreed, quoted extensively from the judgment of Lord Denning MR in the Court of Appeal as well as from Lord Diplock's speech in the House of Lords in *Lonhro  Ltd v Shell Petroleum Co Ltd (No 2)* to show that what was fatal in the latter case had been the absence of any intent at all to injure; and on that basis he concluded that conspiracy by unlawful  means, where there was an intention to injure the Claimant, even  if this was not the Defendant's predominant  intention, continued to exist as an English law tort. It is also worth noting that in *Lonhro plc v Fayed* the unlawful means alleged consisted in misleading the board of directors of the House of Fraser and the Secretary of State, in other words of torts committed at most against third parties. Yet the House accepted that the claim for conspiracy by unlawful means was arguable.

[118]   Liability in conspiracy has been described as an anomaly. But it is again to be noted that in *Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc* [1990] 1 QB 391, the Court of Appeal at p 460C-D thought that to interpret *Lonhro  Ltd v Shell Petroleum Co Ltd (No 2)* as preventing  a Plaintiff from relying on a damage-causing act which was merely a breach of the criminal law but gave  no right of action in tort would be to

treat the House as having intended to introduce a new anomaly. It would mean that "a cause of action in conspiracy would exist where it was least needed (ie where the acts done pursuant to the agreement were torts, which would in themselves provide a cause of action) but not where it was most needed . . . .". The Court of Appeal's understanding of *Lonhro Ltd v Shell Petroleum Co Ltd (No 2)* in another respect (that on which its decision was overruled by *Lonhro plc v Fayed*) does not detract from this observation.

[119]   Caution is nonetheless necessary about the scope of the tort of conspiracy by unlawful means. Not every criminal act committed in order to injure can or should give rise to tortious liability to the person injured, even where the element of conspiracy is present. The pizza delivery business which obtains more custom, to the detriment of its competitors, because it instructs its drivers to ignore speed limits and jump red lights (Lord Walker in *OBG Ltd v Allan* [2007] UKHL 21, [2007] 2 WLR 920, para 266) should not be liable, even if the claim be put as a claim in conspiracy involving its drivers and directors. And – as in relation to the tort of causing loss by unlawful means inflicted on a third party – there is a legitimate objection to making liability "depend upon whether the Defendant has done something which is wrongful for reasons which have nothing to do with the damage inflicted on the Claimant": per Lord Hoffmann in *OBG Ltd v Allan* at para 59.

[120]   But the same concern does not apply where, as here, the offence exists in its very nature to protect the Revenue; where its commission is necessarily, directly and intentionally targeted at and injurious to the Revenue; and where its intended result is the wrongful non-payment of VAT by Redlaw and Lockparts of statutorily recoverable VAT or the payment to Alldech of a VAT credit not properly due under the VAT Act 1994. Like others of your Lordships, I think that there would be an evident lacuna if the law did not respond to this situation by recognising a civil liability.

[121]   It may be asked why the liability should only exist through the medium of a claim for unlawful means conspiracy, and not on the basis of the cheating alone. There is force in the point. It was not argued on this appeal that mere cheating of the Revenue would (without either conspiracy or the commission of another recognised tort such as deceit) give rise to liability in tort. But I would reserve my opinion about that. The assumption in the case-law recognising the common law offence of cheating the public revenue appears to have been that cheating would as between subject and subject be actionable (though actionable only) by civil action: see eg *R v Bainbridge* (1783) 22 St Tr 1, 155 per Lord Mansfield CJ, cited in *R v Hudson* [1956] 2 QB 252, 260, [1956] 1 All ER 814, [1956] 2 WLR 914, per Lord Goddard CJ (and 253, in counsel's argument). I note the observations of Sales and Stilitz in *Intentional Infliction of Harm by Unlawful Means* (1999) 115 LQR 411, at pp 420-425 as well as by Lord Hoffmann and Lord Nicholls of Birkenhead in *OBG Ltd v Allan* at paras 61 and 161 about the possibility of civil liability in the case of deliberate infliction of harm in "two-party" situations. In practical terms, however, the possibility of the point now arising in relation to cheating the public revenue must be negligible, having regard to the statutory scheme of civil liability arising under the VAT and other taxing statutes. The statutory scheme would in a two-party situation be likely to supersede any tortious liability: see further below.

[122]   Assuming that cheating the public revenue is not, even apart from the statutory scheme of the VAT and other taxing statutes, itself tortious in the absence of some other recognised tort such as deceit, the fact of conspiracy in my opinion offers a sufficient justification for recognising tortious responsibility in the present context, as it does in cases of predominant purpose to injury. The present appeal illustrates the extent to which cheating the revenue is a crime likely to be facilitated by a combination of conspirators. A devious individual or entity might – possibly – achieve the same result by himself or itself, but would be a great deal less likely to try or succeed.

[123]   Heavy reliance was placed by Total on *OBG Ltd v Allan* [2007] UKHL 21. In that case, the House considered and distinguished the accessory or secondary liability which exists under the principle in *Lumley v Gye* (1853) 2 E & B 216, 22 LJQB 463, 17 Jur 827, where C induces B to break B's contract with A, and the primary liability which exists under the tort of causing loss to a person (A) by unlawful means where C commits acts (including the threat to do acts) against B which are actionable by B or would be if B had suffered loss and which affect B's freedom to deal with A (see paras 49, 51, 129 and 136, per Lord Hoffmann).

The majority of the House in *OBG* held the actionability (or potential actionability) of C's acts against B to be a pre-requisite to A having a claim in tort against C for causing loss by unlawful means. The submission made to the House on this appeal is that the House should adopt the same view of unlawful means in the context of the tort of conspiracy to injure. The submission has on its face attraction, as I have myself said in *Grupo Torras SA v Al-Sabah* [1999] CLC 1,469, 1,649 (though in support of an analysis according to which actionability at the suit of the Plaintiff was *not* necessary). But another view has been suggested at the highest level (*Rookes v Barnard* [1964] AC 1129, 1210–1211 per Lord Devlin), and, on reflection, there can be danger in what Lord Goff of Chieveley called "the temptation of elegance" (*Henderson v Merrett Syndicates Ltd* [1995] 2 AC 145, 186B–C, [1994] 3 All ER 506, [1994] 3 WLR 761). The two torts are different in their nature, and the interests of justice may require their development on somewhat different bases.

**[124]**   Lord Hope (in para 43) and Lord Neuberger (in para 223) note that Lord Hoffmann at para 61 in *OBG*, in "defining the tort of causing loss by unlawful means as a tort which requires interference with the actions of a third party in relation to the Plaintiff", made clear that "a case of 'two party intimidation' raises altogether different issues". In relation to the three-party tort of causing loss by unlawful means, Lord Hoffmann's criticism of the Court of Appeal's reasoning in *OBG* was that it first expanded the concept of "unlawful means", and then sought to counteract the width of the concept "by insisting upon a highly specific intention, which 'targets' the Plaintiff"; this, he considered, "places too much strain on the concept of intention" (paras 60 and 135). That problem does not to my mind arise with anything like the same force in the present context. I accept that conspiracy can be categorised as a three – rather than two-party tort, in that liability depends on at least two persons joining together to injure another: see also Hazel Carty in *An Analysis of the Economic Torts* at eg pp 271 and 278. Nevertheless, there is in my view a distinction between the infliction of harm through the intermediary of a third party (as in the case of the tort of causing harm by unlawful means under consideration in *OBG Ltd v Allan*) and the present situation where two wrongdoers join and act together to inflict injury directly upon another person or body; and to do so, moreover, by committing an offence integrally related to the Revenue and recognised specifically to protect it from such injury. This in turn assists to delimit the liability for conspiracy by unlawful means which the House is recognising by its present decision.

**[125]**   So far as the Commissioners' claim relates of the VAT credit paid to Alldech, I would only add that the Commissioners ought on any view to succeed on issue (b). It matters not if the Commissioners' only remedy to recover the VAT credit as against Alldech (as opposed to other conspirators responsible for the deceit) is under s 73(2) of the VAT Act 1994. The wrongful extraction of the money from the Commissioners by deceit involved unlawful means and a sufficiently actionable wrong to justify a civil claim in conspiracy.

**[126]**   I would therefore answer affirmatively issue (b) identified in para 112 above. This brings me to the issue on which my opinion proves critical to the outcome of this appeal. It is a curious feature that the appeal was in terms brought only on pt (i) of issue (a), that is the Bill of Rights point. Part (ii), the inconsistent statutory scheme point, was taken below, but not in either the cross-notice of appeal or the statement of issues. Total's case only mentions the statutory scheme as a background factor to its submissions on issue (b) and to the Bill of Rights. Even during oral argument before the House, Mr Charles Flint QC for Total did no more than say that issue (a) could also be put on a pure "ultra vires/statutory" basis, but that art 4 of the Bill of Rights was how they had formulated it. However, as all aspects of issue (a) involve pure questions of law and raise questions of general importance, I agree that they need deciding.

**[127]**   Lord Hope and Lord Neuberger have helpfully analysed the detailed provisions of the VAT Act 1994. The Act was of course passed in the context of the Sixth VAT Directive 77/388, but it has not been suggested by counsel that the Directive contains anything presently material. I agree with Lord Scott (para 59) and Lord Neuberger (paras 168-172) in rejecting Total's submission that the Commissioners' claim infringes art 4 of the Bill of Rights (issue (a) pt (i)). For the reasons they give the Commissioners' claim is a damages claim for being wrongfully cheated of monies or revenue with the management or collection of which the Commissioners were entrusted, rather than a claim to levy money for or to the use of the Crown within the meaning of art 4. The Commissioners are claiming damages against a conspirator (Total) whose wrongdoing either prevented the recovery of tax which was due under Parliamentary authority (from Redlaw and Lockparts) or

led to the Commissioners mistakenly paying (to Alldech) a VAT credit which was not due and which is in law recoverable under Parliamentary authority (from Alldech). In short, although the claim is against Total, it is a claim aimed at the recovery of damages to uphold, not to extend, the tax system. Such a claim is in my view outside the language and mischief of art 4. Article 4 aims to prevent the levying of taxation for which there is no Parliamentary authority, not the recovery of compensation for wrongdoing causing the loss of monies belonging or due to the Commissioners.

[128]   The statutory scheme point (issue (a) pt (ii)) is, self-evidently in view of the division in the House, more difficult. Lord Neuberger identifies and examines various aspects of the point: the Commissioners' functions, the remedial rights given to them and the procedural and other stipulations relating to such rights. Some of his reasoning in relation to the Commissioners' functions echoes Mr Flint's reference to vires. But for my part, I do not find vires a problem. First, no question of vires in a strict sense has ever been raised. The most that was argued below or touched on in the House is the suggestion that the statutory scheme excludes the ordinary common law rights that the Commissioners would otherwise have in respect of Total's alleged conduct. Second, the Commissioners had, in the language which applied until 2005, "the care and management" of VAT (sch 11, para 1(1) to the 1994 Act). They were charged with "the duty of collecting and accounting for, and otherwise managing, the revenues of customs and excise" (s 6(2) of the Customs and Excise Management Act 1979). If, as their alternative case involves, their loss consists in paying out in respect of a false claim to a VAT credit, that involves loss of money under their direct management. Lord Neuberger accepts (at para 184) that the Commissioners could bring tortious claims for theft of monies in their possession. Wrongful abstraction of monies as a result of a successful deceit or conspiracy seems no different in principle. And if, as their primary case involves, the Commissioners' loss is their inability, as a result of the conspiracy, to recover VAT due from the missing traders, the recovery of such loss seems to me also to fall within the scope of their competence. I see no reason why it should be outside the Commissioners' competence, if the statutory scheme otherwise permits, to take common law action in respect of a successful conspiracy which abstracts monies en route to the Commissioners or which prevents the Commissioners from recovering from others what is due from such others to the Commissioners. It is in my view neither wrong nor artificial to describe the Commissioners as having suffered loss or as seeking compensation, in whichever way their case is put; and I see no incongruity in their and the public's interests being in this respect protected by a common law action for conspiracy. Again, the claim is not for the VAT due or for repayment of the VAT credit, it is for damages in respect of loss suffered by the Commissioners due to a successful conspiracy to manipulate the VAT system.

[129]   The decision in *IRC v Goldblatt* [1972] Ch 498 is in my opinion of interest, even though, and to some degree because it was taken for granted that the Commissioners were entitled to pursue private law remedies to recoup loss which they had suffered through the receivers' and/or debenture holder's failure to pay tax out of monies available for the purpose. Goff J accepted that the Commissioners could bring both a misfeasance claim for breach by a receiver and/or debenture holder of the statutory duty to pay the revenue preferentially (pp 505B–C, 506E and 506G–507C), and claim in equity on the footing of constructive trusteeship (pp 507G–508A). Goff J based his decision on each of these grounds, and the existence of the latter as well as the former appears to me to strengthen, rather than weaken, the significance of the case. A claim for breach of a statutory duty specifically designed to protect preferential creditors such as the Commissioners might be argued to fall into a different category to the Commissioners' present claim to invoke the common law tort of conspiracy. Nonetheless, a claim on this basis enables the Commissioners to recover compensation for wrongdoing causing a loss of tax due to them. In that respect, it mirrors the Commissioners' present claim. A claim in equity on the footing of constructive trust cannot on any view be distinguished as belonging to some special category associated with breach of statutory duty.

[130]   The critical question, in my view, is whether the statutory scheme supersedes and displaces the common law rights and remedies which the Commissioners would otherwise have: see *Deutsche Morgan Grenfell Group plc v IRC* [2006] UKHL 49, [2007] 1 AC 558, [2007] 1 All ER 449, per Lord Walker at para 135. For this to be the case, it seems to me that the statute must positively be shown to be inconsistent with the continuation of the ordinary common law remedy otherwise available, and further that this must be shown to be the case as against the particular Defendant. In support of the passage cited above, Lord Walker re-

ferred to two cases where an exclusive scheme would have been "set at nought" or "defeated" if a common law claim had been permitted. In *Marcic v Thames Water Utilities Ltd* [2003] UKHL 66, [2004] 2 AC 42, [2004] 1 All ER 135, the statutory scheme for ensuring that water undertakers performed their statutory duties appropriately would have been set at nought if a common law claim for damages in nuisance had been possible; and in *Autologic Holdings plc v IRC* [2004] UKHL 54, [2005] 1 All ER 191, [2005] 1 All ER (Comm) 117, the majority in this House held that, at least where the time limit for use of the statutory scheme had not expired, a taxpayer's only way of challenging a taxing provision as contrary to European law was by making use of the statutory tribunal scheme, as opposed to judicial review. In contrast, in *Woolwich Equitable Building Society v IRC* [1993] AC 70, [1992] 3 All ER 737, [1992] 3 WLR 366, also cited by Lord Walker, there had been no lawful assessment, it was not therefore possible to seek a remedy through the statutory scheme (which "where applicable, overlaid and replaced the common law principles") and so a common law claim for restitution could lie: per Lord Goff of Chieveley at pp 168G–170D, esp at p 169H–170B. The case of *Johnson v Unisys Ltd* [2001] UKHL 13, [2003] 1 AC 518, [2001] 2 All ER 801 falls in my opinion into the same category. The Claimant was contending for a common law remedy covering the same ground as the statutory right available to him under the Employment Rights Act 1996 through the Employment Tribunal system, and it was held that it would have been contrary to Parliament's intention to recognise such a remedy: per Lord Nicholls of Birkenhead at para 2 and Lord Hoffmann at paras 58–59.

[131]   As against any taxable person, including in the present case Redlaw, Lockparts and Alldech, the legislation provides direct remedies for the recovery of any VAT due as well as of any sums paid as a VAT credit which ought not to have been so paid: cf para 5 of sch 11 to the VAT Act 1994 and s 73(2). In each case, as I read the statute, the Commissioners could only pursue the person concerned in respect of VAT due from or a VAT credit paid to him, her or it.

[132]   Section 77A, introduced only with effect from 10 April 2003 by the Finance Act 2003 and so not applicable at the times relevant to this appeal, contains a major extension, by creating potentially joint and several liability for unpaid VAT on the part of any taxable person who, at the time a supply was made to such person, "knew or had reasonable grounds to suspect that some or all of the VAT payable in respect of that supply, or on any previous or subsequent supply of those goods, would go unpaid" (s 77A(2)). The permissibility and validity of that extension under art 21(3) of the Sixth Directive were upheld by the European Court of Justice in *Commissioners of Customs and Excise v Federation of Technological Industries* Case C-384/04; [2006] 3 CMLR 11. But, even s 77A would not have created a liability for VAT on the part of Total, which was not a taxable person. The possibility that art 21(3) might have permitted the United Kingdom to go further than it did in s 77A, by imposing liability for VAT on an otherwise non-taxable overseas company such as Total, was not raised or explored before the House. It may be the case that this would not be possible. But, assuming for the moment that it would, it did not happen. Nothing in the language of art 21(3) of the Sixth Directive seems to me (or was suggested by Mr Flint QC before the House) to exclude, or preclude the pursuit by the Commissioners of, any ordinary civil remedy that would otherwise be available to them against a third party for tortiously causing the Commissioners a loss of VAT or a loss by way of payment of a VAT credit.

[133]   In the light of the statutory scheme, I would accept as correct the Court of Appeal's answer to the third question before it, namely that the Commissioners cannot pursue an independent actionable remedy (outside the statute) against Alldech. But the issue on the present appeal is whether the Commissioners can pursue such a remedy against Total. It was not, as I understand it, suggested, nor would it in my view be correct to suggest, that the Commissioners' inability in law to pursue anything but a statutory remedies against Alldech (or any other of the United Kingdom companies in the chain) means that they cannot still pursue Total for the conspiracy to which it is alleged that all were in fact party.

[134]   No statutory remedy to recover VAT or repayment of a VAT credit from Total has been identified as available to the Commissioners in this respect. Total happens to be a company in the chain of suppliers and purchasers involved in the present alleged "carousel" fraud, and it is its overseas status and the fact that it is not a taxable person that takes it outside the statutory scheme. But the claim for conspiracy does not depend

upon its membership of the chain of suppliers and purchasers or its overseas status. It is quite possible to conceive of other conspirators here or abroad, including financial and legal advisers, involved in the conception, preparation and implementation of a carousel fraud, who would themselves have no liability under the statutory scheme for VAT or its repayment (except perhaps criminal liability under eg s 72, which I address below).

[135]   It is, I think, on the statutory scheme of liability for VAT and the repayment of VAT paid that attention should primarily be focused when considering whether a separate common law claim for being cheated by a conspiracy out of VAT can be pursued. A penalty is a sanction, and differs in nature from compensation for loss. But, when one does look at the penalty provisions which the VAT Act 1994 also contains, they also do not apply to Total. Section 60 in particular is, as I read it, concerned with evasion of VAT by the person liable to the VAT or claiming a credit or refund. Section 61 provides a minor qualification to this, by allowing a penalty to be imposed on a director or managing officer of a body corporate liable to a penalty under s 60. Neither the liability for VAT which the VAT Act 1994 imposes on taxable and some other persons, nor the potential liability to a penalty or criminal offences which it also imposes on certain persons, including some who are not themselves taxable persons under the Act, seem to me reasons for treating the Act as excluding or precluding the exercise of ordinary civil remedies against non-taxable persons like Total against whom the Act provides no parallel statutory remedy.

[136]   Section 72 of the VAT Act 1994 creates a criminal offence of considerable width, which may lead to a court ordering a penalty of up to three times the VAT evaded and/or imprisonment. In so far as the evasion of VAT – which Total in combination with other companies is alleged to have been concerned in or to have taken steps with a view to – took place in England, it is arguable, and I am ready for present purposes to assume, that the principle of territoriality of criminal legislation would not preclude the application of s 72 to Total. But s 72 is capable of co-existing with the common law offence of cheating the revenue (cf *R v Mavji* cited in para 113 above), and I see nothing in the existence of either of these criminal offences to exclude or preclude the use of ordinary civil law remedies, if otherwise available. The practicalities, the ease of pursuit, the aims and results and the enforcement of civil and criminal proceedings all differ radically. There are under the VAT Act 1994 provisions whereby a conviction under s 72 or for cheating the revenue will preclude the assessment of a penalty under s 60 or s 63 (see s 60(6) and s 63(11)(a)), and the assessment of a penalty under s 60 will preclude the assessment of a penalty under s 63 (see s 63(11)(b)). But I see no inconsistency or even incongruity in it being possible, despite the conviction of one conspirator under s 72, to pursue a common law remedy in tort against another conspirator. I do not think that the conspirator who has been convicted can be regarded as having escaped liability. The likelihood is, if anything, that s/he will suffer a considerably heavier penalty, including it may well be a financial penalty in excess of any loss that the Revenue could claim to have suffered in civil proceedings.

[137]   It is of course the case that, if a common law claim against Total is possible, it will be pursued through the courts, and the statutory rules, procedures and mechanisms relating to such matters as limitation, appeals against assessments and mitigation of penalties will not apply. But, as I have already noted, the Commissioners might have a claim for conspiracy against persons such as financial and legal advisers, against whom the statutory scheme could not afford any right to recover the VAT or VAT repayment in issue. If such persons have by a successful conspiracy caused the Commissioners to pay out a false VAT credit to other conspirators, is it to be said that the statute precludes any civil claim against them? Further, it is of the essence of any such civil claim that it is brought to recoup any loss that the Commissioners may ultimately suffer after all statutory remedies reasonably available have been exhausted. The Commissioners have to mitigate their loss by taking reasonable steps in that regard. A court assessing damages will have to take into account the Commissioners' statutory rights and, so far as they have not been exhausted and enforced, make an assessment as to their value. That is a different exercise from any which a tax tribunal will have to undertake. Parallel, though different, exercises of this nature have not infrequently to take place in various legal contexts, where all connected proceedings cannot be combined, and I do not see their possibility as any indication that the statutory scheme should be treated as precluding the Commissioners' claiming damages for conspiracy at common law.

[138]   The possibility under s 70(1) of a tax tribunal reducing a penalty imposed under the statute (though not by reference to any of the matters specified in s 70(4)) appears to me irrelevant. As I have already said, the sanction of a penalty is conceptually distinct from the compensation afforded by a common law claim for damages. There is no call or basis in the case of a common law claim for reducing whatever the court may find to be the properly recoverable loss suffered by a Claimant.

[139]   For these reasons, I would, in common with Lords Scott and Walker, answer issue (a)(ii) in the Commissioners' favour, by holding that there is nothing in the statutory scheme to preclude the Commissioners' pursuit of a common law claim for conspiracy against Total. It follows that I would allow the Commissioners' appeal on issue (b) and hold that the Commissioners' common law conspiracy claim based on unlawful means can as pleaded exist in law, while I would dismiss Total's cross-appeal on issue (a) and hold that the pursuit of such a claim is not precluded by either the Bill of Rights or the statutory scheme of the Value Added Tax Act 1994.

**LORD NEUBERGER:**

My Lords,

*Introductory*

[140]   The Commissioners' pleaded case raises a claim for damages against Total based on the tort of conspiracy. The core allegation is that Total was party to a so-called carousel fraud, which resulted in the Commissioners not recovering VAT which they should have recovered, or paying an alleged VAT credit which they should not have paid. The preliminary issue to be determined is whether the Commissioners "have, as a matter of law, a cause of action" against Total "as pleaded in [their] Consolidated and Amended Particulars of Claim".

[141]   The preliminary issue proceeds on the assumption that the Commissioners will make out the factual allegations which they have pleaded. These allegations have been very clearly set out and explained by my noble and learned friends, Lord Hope of Craighead, and Lord Scott of Foscote, in paras 3 to 10 and paras 49 and 51 of their respective opinions, which I have had the privilege of seeing in draft.

[142]   The Commissioners put their case on conspiracy on two bases. The first involves accepting the carousel transactions, as summarised by Lord Hope in para 7 and by Lord Scott in para 51, as effective for VAT purposes, on the ground that each transaction constituted an economic activity within the meaning of art 4(2) of the Sixth Directive (77/388/EEC). On this basis, the loss suffered by the Commissioners is the output tax that ought to have been paid by Redlaw, but was not. The second basis involves treating the carousel transactions as deceitful shams falling outside the ambit of art 4(2) of the Sixth Directive. On this basis, the Commissioners' loss arises from the credit claimed by and accorded to Alldech in respect of input tax, which was paid by the Commissioners.

[143]   As a result of the arguments which have been advanced before your Lordships, it seems to me that the issues which need to be resolved are as follows:

a. Whether, even if otherwise justified, the Commissioners' claim based on conspiracy must fail because:

i. The claim falls foul of art 4 of the Bill of Rights 1688 ("the Bill of Rights issue");

ii. The Value Added Tax Act 1994 constitutes a regime which excludes the claim ("the complete code issue");

b. Whether the claim cannot in any event be made out on the Commissioners' pleaded case ("the conspiracy tort issue").

**[144]**   I set out the issues in this way, because it appears to me that the Bill of Rights issue and the complete code issue are to some extent connected. The conspiracy tort issue involves a rather different argument, which, if successful, may have the same effect. Before considering those three issues, which raise points of difficulty and significance, it is convenient briefly (a) to summarise the relevant provisions of the Value Added Tax Act 1994 ("the 1994 Act"), as they play such a crucial part in the arguments on the first two issues, and (b) to consider the viability of the Commissioners' two ways of putting their case in the light of the Sixth Directive, which is, of course, the overarching legislative code relating to VAT. All references to sections and schedules hereafter are to those of the 1994 Act unless the contrary is stated.

*The Value Added Tax Act 1994*

**[145]**   Part I of the 1994 Act is concerned with the "Charge to Tax" and it identifies the items upon which tax is chargeable, the persons who are chargeable, and when they are chargeable. Section 24(1) defines "input tax" as VAT on the supply to a taxpayer of goods or services or on the acquisition by him of goods from another member state. Section 24(2) defines "output tax" as VAT on the supply by a taxpayer of goods and services or on the acquisition by him of goods from another member state. Section 25(1) effectively requires a taxable person to account for and pay output tax by reference to "accounting periods", in accordance with regulations. Sections 25(2) and 26 entitle a taxable person to credit for input tax, again in accordance with regulations. Those regulations enable a taxpayer whose input tax exceeds his output tax to recover the difference from the Commissioners.

**[146]**   Part II of the 1994 Act, which deals with "Reliefs, Exemptions and Repayments", and Pt III, which is concerned with "Application of [the 1994 Act] in Particular Cases", are not relevant for the purposes of this appeal.

**[147]**   Part IV of the 1994 Act is entitled "Administration, Collection and Enforcement" and is of significance in the present context. Section 58 provides that Sch 11 shall have effect "with respect to the administration, collection and enforcement of VAT". The functions of the Commissioners are defined in para 1 of Sch 11. Until 2005, this provided that VAT should be "under the care and management of the Commissioners". This was amplified by s 6(2) of the Customs and Excise Management 1979 ("the 1979 Act") which charged the Commissioners with "the duty of collecting and accounting for, and otherwise managing, the revenues of customs and excise". (In 2005, s 6 of the 1979 Act was repealed by the Commissioners for Revenue and Customs Act 2005 ("the 2005 Act"), and para 1 of Sch 11 was amended so that it states that the Commissioners are "responsible for the collection and management of VAT".)

**[148]**   Paragraphs 2 to 4 of Sch 11 concern procedures for accounting for and paying VAT. They include obligations to register for VAT and to make periodic returns, and to pay VAT, by certain dates. Paragraph 5(1) provides that "VAT due from any person shall be recoverable as a debt due to the Crown", and it has further provisions dealing with the recovery of VAT. Paragraphs 6 to 13 are concerned with taxpayers' duties to keep records and the like, and the Commissioner's powers to inspect etc.

**[149]**   Section 59(1) makes provision for a default surcharge where a taxable person fails to make a return on time or to pay tax on time. The amount is specified in sub-ss (4) to (6) and is calculated by reference to the amount of the outstanding VAT. By sub-s (7), no surcharge is payable if the person concerned satisfies the Commissioners "or, on appeal, a tribunal" either that the return or VAT was despatched in time or that he had "a reasonable excuse". By sub-s (9), any penalty under s 69 for the same default is to be credited against any s 59 liability.

**[150]**   Section 60 (1) provides:

"In any case where –

(a) for the purpose of evading VAT, a person does any act or omits to take any action, and

(b) his conduct involves dishonesty (whether or not it is such as to give rise to criminal liability),

he shall be liable, subject to sub-section (6) below, to a penalty equal to the amount of VAT evaded or, as the case may be, sought to be evaded, by his conduct."

Section 60(2) gives an extended meaning to "evading VAT", so that it includes "obtaining . . . a VAT credit . . . in circumstances where the person concerned is not entitled to that sum", and s 60(3)(a) states that a "VAT credit" extends to an amount "falsely claimed by way of credit for input tax". Section 60(6) excludes the application of s 60(1) where "by reason of conduct falling within sub-s (1) above, a person is convicted of an offence".

**[151]**   (It has not been suggested that s 60(1) can be relied on by the Commissioners against a person, such as Total, who was not liable for the VAT evaded or sought to be evaded. As a matter of language, there may be an argument for saying that s 60(1) is capable of bearing such a meaning, although, apart from anything else, the way in which sub-s (2) is worded may well call the argument into question. In any event, for present purposes, one must proceed on the common assumption of the parties, which I am inclined to think is right, namely that the section cannot be relied on by the Commissioners against Total.)

**[152]**   Section 61 states that, where s 60 applies and the person concerned is a company, its directors can, in some circumstances, be liable for the penalty. Section 62 provides for a penalty where a person gives an invalid certificate in relation to zero rating, s 63(1) provides for a penalty (in addition to the VAT recoverable) where a person's VAT return contains a "mis-declaration" – ie it understates his liability for VAT or overstates his entitlement to a VAT credit in a single accounting period, in excess of an amount specified in succeeding subsections. Section 63(10) provides that such a penalty can be avoided if "there is a reasonable excuse" for the mis-declaration. Section 63 is disapplied by sub-s (11) where the person concerned is penalised under s 60, or convicted, in respect of the mis-declaration.

**[153]**   Section 64(1) provides for a penalty, specified in sub-s (3) for "repeated mis-declarations", and, like s 63, it is disapplied where the mis-declarations have been the subject of a s 60 penalty or a criminal conviction – see s 64(6). Section 65 to 69 also provide for specified penalties for various other defaults, including (in ss 65 and 66) failure to comply with rules relating to EC sales statements, (in s 67) failure to register for VAT or to comply with the rules relating to invoices, and (in s 69) failure to comply with various other regulatory provisions in the 1994 Act. They include exoneration provisions if the person concerned satisfies "the Commissioners or, on appeal, a tribunal that there is a reasonable excuse" for the default, and disapplication provisions if a penalty has been exacted under other sections (eg s 60) or there has been a criminal conviction (see for instance sub-ss (8) and (9) of s 69).

**[154]**   Section 70 entitles the Commissioners or, on appeal, the VAT Tribunal, to mitigate any penalty levied under ss 60, 63, 64 or 67. However the grounds set out in s 70(4) are specifically excluded from being taken into account. Those grounds include (a) "the insufficiency of . . . funds available", (b) "in the case in question or in that case taken with any other cases . . . no significant loss of VAT", and (c) the person liable for the penalty "has acted in good faith".

**[155]**   Section 72(1) is in these terms:

"If any person is knowingly concerned in, or in the taking of steps with a view to, the fraudulent evasion of VAT by him or any other person, he shall be liable –

(a) on summary conviction, to a penalty of the statutory maximum or of three times the amount of the VAT, whichever is greater, or to imprisonment for a term not exceeding six months or to both; or

(b) on conviction on indictment, to a penalty of any amount or to imprisonment for a term not exceeding seven years or to both."

Section 72(2) gives a wide meaning to "evasion of VAT", and it includes, in para (a), "the obtaining of . . . the payment of a VAT credit", and the reference to VAT credit is extended by sub-para (i) to an "amount (if any) falsely claimed by way of credit for input tax". Sub-sections (8) and (10) of s 72 create further offences, in connection with the production of false documents, and dealings with goods and services upon which VAT was evaded; conviction of such offences can give rise to substantial fines as well as imprisonment.

**[156]**   Section 73(1) empowers the Commissioners to make assessments for VAT where a person makes no or "incomplete or inaccurate" returns or fails to maintain satisfactory records. Section 73(2) enables the Commissioners to assess a person who transpires to have wrongly received a refund of VAT or a VAT credit. Section 73(6) imposes a time limit of two years (or, if later, one year after sufficient facts come to the attention of the Commissioners) for such assessments. Section 73(7B), added in 1996, enables the Commissioners to assess a person who removed goods, on which VAT had not been paid, from certain types of warehouse. Section 74 entitles the Commissioners to interest on sums recovered under s 73, and it is normally subject to a three-year maximum.

**[157]**   Section 75(1) enables the Commissioners to assess "a person who . . . was not a taxable person" for VAT in cases involving the import of certain classes of goods from other member states. Subsection (2) imposes similar time limits to those in s 73(6). Section 76 enables the Commissioners to make assessments of amounts due, where a person is liable for a surcharge under s 59, for a penalty under ss 60 to 69, or for interest under s 74.

**[158]**   Section 77 provides for certain time limits within which the Commissioners have to bring claims and make assessments. The period in question is normally three years (although it is sometimes two years) in relation to assessments under ss 73 and 76, but, where the assessment is based on s 60(1), or is made in circumstances where s 67 applies, the period is 20 years. Section 80 enables overpayments of VAT to be recovered from the Commissioners by a taxpayer, albeit usually subject to a limitation period of six years.

**[159]**   Section 77A was introduced by the Finance Act 2003, and was therefore not in force when the events in this case occurred. It applies where, at the time of a taxable supply of telecommunication goods, the taxable person to whom the supply was made "knew or had reasonable grounds to suspect" that VAT would go unpaid on that supply "or on any previous or subsequent supply of those goods". It enables the Commissioners to recover such unpaid VAT from that person notwithstanding the fact that he would not otherwise be liable. The section appears to have been specifically designed to ensure that, in the case of a carousel fraud,

the Commissioners could recover any VAT not just from the person who would normally be liable, but from many of the other parties involved in transactions in the carousel. However, as my noble and learned friend Lord Mance points out, it would appear that the new section would not catch a party such as Total.

**[160]**   Part V of the 1994 Act is concerned with "Appeals". Section 82 incorporates Sch 12, which establishes and sets out the procedures of VAT Tribunals. Under para 9, the Lord Chancellor is empowered to make rules including provisions "(a) for limiting the time within which appeals may be brought" and for other purposes. Section 83 sets out a list of over thirty different types of matter on which an appeal lies to such a tribunal. They include in paragraph (n) "any liability to a penalty or surcharge by virtue of any of ss 59 to 69A" and any assessments or penalties under ss 73, 75, 76 or 77.

*The Commissioners' case and the Sixth Directive*

**[161]**   As I have mentioned, the Commissioners have pleaded and argued their case on two alternative bases, which I have summarised in para 142 above. On the first basis, the Commissioners allege no tort other than the conspiracy involving Total, Redlaw, and Alldech (and, quite possibly, some or all of the other parties to the carousel transactions). The second basis additionally involves an allegation of deceit, most specifically on the part of Alldech when it claimed the VAT credit from the Commissioners. The way the Commissioners put this point is that, by claiming a VAT credit from the Commissioners, Alldech deceitfully, if impliedly, represented that the transactions to which it was party had a genuine economic purpose.

**[162]**   In their written cases, the parties did not give much consideration to the viability of these two ways of putting the Commissioners' case in the light of the provisions of the Sixth Directive. And they gave even less consideration to that aspect in their oral submissions. In view of the difficulties thrown up by the three points on which the preliminary issue was treated as focussing, and the time available for the hearing, this is scarcely surprising, and is not meant as a criticism. However, it does seem to me that this aspect requires some discussion, albeit of a limited nature, given that domestic courts should not proceed on a basis which conflicts with the provisions of the Sixth Directive.

**[163]**   In this connection, it is necessary to consider the decision of the European Court of Justice in *Optigen Ltd v Customs and Excise Commissioners* [2006] Ch 218. The effect of that decision was that the fact that a transaction was a step in a carousel fraud did not prevent an innocent party to the transaction contending that it constituted a supply and a genuine economic activity, so that it was within the ambit of the Sixth Directive and subject to the VAT regime.

**[164]**   In the light of the remarks of the ECJ in paras 46 and 51 (quoted by Lord Scott in para 55 of his opinion), it seems to me that the reasoning and conclusion in *Optigen* may very well only apply to traders in a carousel fraud who are innocent of any involvement in the fraud, as was assumed in relation to the traders in that case. Further, it may be difficult to reconcile the suggestion that the reasoning in *Optigen* applies to parties to the fraud with the conclusion reached by the ECJ in a case decided a month later, *Halifax plc v Customs and Excise Commissioners* [2006] Ch 387, [2006] 2 WLR 905, [2006] STC 919. If, as was held in that latter case, the steps in an honest but "abusive" scheme designed to avoid VAT should be "redefined" in relation to the parties to the scheme so that VAT is not avoided, it is not easy to see why each step in a dishonest and "abusive" scheme designed to evade VAT should be treated, in effect, as genuine and effective in relation to the parties to the dishonesty.

**[165]**   In my opinion, it is therefore well arguable that each of the two ways in which the Commissioners seek to put their case against Total is consistent with the Sixth Directive. So far as the first basis is concerned, the assumption that the transactions constituting the carousel fraud in the present case are similarly effective for VAT purposes, even in relation to a party to the fraud, such as Total, may well be right (and, indeed, it appears to have been assumed by the legislature when enacting s 77A). However, that conclusion does not necessarily follow from *Optigen*, as already explained. Even if the transactions could be treated as

a sham, which is the assumption made by the second basis, it seems to me that, at least as a matter of do-
mestic law, it is open to a victim of the sham transaction to treat the transaction as genuine if he wishes to do
so. The parties to a sham transaction must, I would have thought, be estopped from raising the argument
that it was a sham, at the very least where, as here, the person seeking to treat the transaction as genuine
has suffered loss in the belief that it was genuine. Nonetheless, it may conceivably be the case that such an
estoppel argument could not be relied on under the Sixth Directive as interpreted by the ECJ.

[166]    As to the second basis, it appears to me likely, at least in the absence of compelling authority to the
contrary, that, if a transaction in a carousel fraud involves a party to the fraud, it should be possible to allege
against him that the transaction is a sham not merely for domestic law purposes but for VAT purposes as
well. A carousel transaction is not so much one of a pre-ordained set of transactions: it is, in reality, not a
transaction at all. It is merely a chimera which is used as an excuse or a front to justify the creation of one of
several purported invoices, which are brought into existence by the parties to the fraud to obtain money dis-
honestly from the Commissioners. However, whether that argument is correct in the light of the Sixth Di-
rective is not entirely clear, in the light of the reasoning in *Optigen* (and see especially the reasoning of the
Advocate General at para 28 of his opinion).

[167]    For the reasons I have given, at least on the basis of the arguments that have been put before your
Lordships' House, I would not regard it as clear that both the ways in which the Commissioners put their case
would withstand scrutiny under Community law. However, it may very well be that they both would withstand
such scrutiny, and, as at present advised, I think that at least one of them must do so. I do not regard it as
necessary to consider the question further, at least at this stage. Your Lordships are only concerned with a
preliminary point, which throws up the three issues identified above, and, in view of the analysis just under-
taken, I am prepared to proceed for that purpose on the basis that each of the two ways in which the Com-
missioners put their case is strongly arguable as a matter of Community law.

*The Bill of Rights issue: Is the claim barred by the Bill of Rights?*

[168]    Article 4 of the Bill of Rights 1688 renders "illegal", "levying money for or to the use of the Crown", if it
is "by pretence of prerogative, without grant of Parliament". It appears to me that, in order to decide whether
this provision bars the present claim, it is necessary to identify the proper characterisation of the Commis-
sioners' claim. In particular, is their claim for damages in tort, or for recovery of tax, or indeed should it be
characterised in some other way? In my judgment, the claim is not for recovery of tax, but for damages in
tort. It is quite clear that the Commissioners' case is pleaded, and has been argued throughout, solely in tort,
as explained by Lord Hope in paras 7 to 10 of his opinion. The Commissioners accept that Total is not liable
for any VAT (whether by way of payment or repayment of tax or penalty) under the 1994 Act, insofar as it
was in force at the time relevant for the purpose of these proceedings: hence the complete code issue. In-
deed, they go further, and accept that, in order to succeed, they have to establish that a claim in common
law is made out: hence the conspiracy tort issue.

[169]    Further, as my noble and learned friend Lord Scott has explained in para 59 of his opinion, the
amount which the Commissioners would recover in these proceedings by way of damages would not neces-
sarily be the same as the amount of tax out of which the Commissioners were cheated. The amount of out-
put tax which should have been paid by Redlaw or, on the Commissioners' alternative case, the amount that
they wrongly paid to Alldech is not necessarily the same as their recoverable damages in tort. Unlike any tax
so payable, the award of damages in tort would, of course, have to give credit for any VAT which had been
paid to the Commissioners in the context of the totality of the transactions involved in the carousel fraud:
such VAT would not have been paid if there had been no such fraud.

[170]    Once one concludes that the claim which the Commissioners make is for damages in tort, it seems to
me, in agreement with the Court of Appeal, that the basis of Total's case on the Bill of Rights issue falls
away. While the claim for damages may be assailable on one of the other two grounds which have been

raised on this appeal, I am of the view that a genuine claim for damages in tort does not fall within either the spirit or the literal meaning of the words of art 4 of the Bill of Rights. Seeking damages under a claim which is made pursuant to a properly established common law ground does not fall within the expression "levying money" within the meaning of the Article, which, in my view, is directed to claims which would have no other legal basis than the fact that they are made by or on behalf of the Crown. That point is, I think, made clear by the words "by pretence of prerogative" in the Article. Looking at the realities of the early 21st century, as opposed to those of the late seventeenth century, the effect of the Article is that the executive cannot impose or claim a tax or other imposition without the authority of the legislature.

[171]   If the Crown has suffered a wrong which, in common law, would give it the right to claim damages, art 4 of the Bill of Rights would not serve to prevent the Crown from raising a claim. If the Crown were to sue in debt for a sum due under an agreement or for damages for breach of an agreement, there would similarly be no "levying [of] money", and no "pretence [or invocation] of prerogative", because the juridical basis for the Crown's claim would be an established legal right in contract, such as that enjoyed by any other individual or entity. So, too, if money were stolen from the Crown, it could maintain a claim for recovery or damages: again, there would be no "levying" or reliance on the prerogative: the claim would be based on an established legal right in tort.

[172]   I should add that, if art 4 of the Bill of Rights had otherwise applied, I would have unhesitatingly agreed with Lord Hope and disagreed with the Court of Appeal on the issue of whether it would have been open to Total to invoke the Article. Far from it being "a mockery of the law" for Total "as a fraudster" to invoke the Article, as the Court of Appeal suggested, it seems to me that such a statutorily enshrined unqualified fundamental right, intended to curb the powers of the Crown (and the executive), exists for the benefit of everyone. Indeed, it is when the unmeritorious seek to rely on such a right that it truly comes into its own and is properly put to the test. Outlawry, which is what the reasoning of the Court of Appeal appears to me to involve, may have existed in the past, but the concept has long ceased to be recognised by the law. As it is, however, it seems to me that this case is simply not within the territory of art 4 of the Bill of Rights.

*The Complete Code issue: Does the 1994 Act preclude the claim?*

[173]   That, then, leads to the question whether a common law claim, such as that sought to be raised by the Commissioners in the present case, is precluded by the 1994 Act, and in particular its provisions relating to the functions of the Commissioners, the recovery of VAT and other sums, and procedures and the like.

[174]   The issue is not dissimilar from that in *Deutsche Morgan Grenfell Group plc v IRC* [2007] 1 AC 558, to which your Lordships were referred and in which my noble and learned friend Lord Walker of Gestingthorpe said this at para 135:

> "When Parliament enacts a special regime providing special rights and remedies, that regime may (but does not always) supersede and displace common law rights and remedies (or more general statutory rights and remedies). Whether it has that effect is a question of statutory construction . . ."

(A comparable point in relation to equitable rights was made by Lord Wilberforce in *Shiloh Spinners Ltd v Harding* [1973] AC 691 at 724G to 725C, [1973] 1 All ER 90, [1973] 2 WLR 28). In other words, one is seeking to discern from the terms of the legislation concerned whether the legislature intended a common law claim to be displaced by the statute, as in *Deutsche* or to exist outside the statute, as in this case.

[175]   It is convenient initially to consider this issue separately in relation to the two alternative bases upon which the Commissioners put their case. The first is that each of the transactions in the carousel should be taken as genuine for VAT purposes, so that the payment by the Commissioners to Alldech was a proper

credit of input tax. On that basis, the Commissioners contend that the conspiracy deprived them of the receipt of output tax due from Redlaw. The alternative basis is that the whole set of alleged transactions was a fraud and a deceit on the Commissioners, in which case the conspiracy resulted in Alldech being wrongly credited with, and paid, input tax by the Commissioners.

*The claim based on unpaid output tax: General*

[176]   Does the 1994 Act constitute a "complete code" which excludes the Commissioners from raising claims for damages based on unlawful means conspiracy (which would otherwise be well-founded) in respect of any tax which should have been, but was not, paid to them? The reasoning of Lord Walker, Lord Scott, and Lord Mance (whose draft opinions I have had the benefit of seeing) as to why the Commissioners are entitled to maintain a common law claim in tort is powerful, and has resulted in even greater diffidence than I had already felt about reaching a conclusion to the contrary effect.

[177]   Nonetheless, in agreement with Lord Hope, I am of the view that the statutory scheme of the 1994 Act precludes the Commissioners from pursuing a common law claim for non-payment of VAT which they should have recovered. In other words I consider that not only the Commissioners' right to recover VAT, but also their right to recover compensation for not recovering, or for wrongly being induced to pay, VAT, are exclusively governed by the 1994 Act, and that it is thus not open to them to raise claims outside that Act to recover damages for loss of tax which they should have recovered or which they should not have paid. Three aspects of the 1994 Act are relevant in this connection: the functions of the Commissioners, the remedial rights given to the Commissioners, and the procedural and similar stipulations relating to such rights.

*The claim based on unpaid output tax: The Commissioners' Functions*

[178]   The contents of para 1 of Sch 11 changed in 2005, and, although it makes no difference to my conclusion, the relevant provisions are, in my view, those in force when the tax was lost and when these proceedings were issued. The fact that VAT was to be "under the care and management of the Commissioners" does not, as a matter of ordinary language, appear to me to carry with it a right to pursue a common law claim for damages, based on the contention that tax has been wrongly not paid to them or which has been wrongly paid by them, against someone who is not liable for VAT or any other sum under the 1994 Act. Nor can it be fairly claimed, in my opinion, that the pursuit of such a claim is within the ambit of the duty in the 1979 Act to "collect", "account for" or "manage" the customs and excise revenues. In these proceedings, the Commissioners are claiming neither VAT nor a penalty or similar sum under the 1994 Act, as is emphasised by their successful rebuttal of Total's argument based on art 4 of the Bill of Rights.

[179]   The Commissioners, an arm of the executive, appear to have suffered no loss if VAT which ought to have been paid or recovered is not paid or recovered: they have merely collected less tax then the 1994 Act intended. In this connection, para 1-39 of *Clerk and Lindsell on Torts* (19th edition) starts with the proposition that: "the primary function of the law of tort remains to protect private rights and private interests". The exceptions that it then considers constitute breaches of public rights, which can give rise to claims by private persons who suffer particular damage. I consider that this reinforces the view that an action which results in non-payment of tax due under a statute should not amount to a tort actionable at the suit of the Commissioners.

[180]   In another leading textbook, *McGregor on Damages* (17th edition), it is stated at para 1-021 that "the object of an award of damages is to give the Claimant compensation for the damage, loss or injury he has suffered". At least on the face of it, it is difficult to say that the Commissioners have suffered loss or damage simply because tax which they ought to have been entitled to collect is not capable of collection or because they have paid tax they ought not to have paid. The answer to that point might lie in para 5(1) of Sch 11, which specifically empowers the Commissioners to recover VAT payable under the 1994 Act as a debt due to the Crown. However, that appears to me to be directed to identifying how the tax is to be juridically char-

acterised for the purpose of legal proceedings. Indeed, the paragraph gives some indirect support for the conclusion that there is no room for a tortious claim such as that raised in the present case. If the Commissioners were entitled to maintain a claim in tort arising out of non-payment of VAT, their right to claim VAT due under the 1994 Act as a debt would be *a fortiori*, and there would be no need for such a right to be expressly conferred. I would add that para 5(1) cannot have been inserted to defeat any argument based on art 4 of the Bill of Rights, as the right to "levy" VAT is clear from other provisions of the 1994 Act, especially elsewhere in Sch 11.

**[181]**   Mention has been made of ss 5, 9, and 25 of the 2005 Act. They did not come into force until 2005, and I therefore do not think that they could be relied on in this case, where the alleged tort occurred in 2002 and the proceedings were started in 2003. In any event, they would not cause me to change my view. Section 5 of the 2005 Act takes matters no further. Section 9 of the 2005 Act gives the Commissioners power to do things which are "necessary or expedient" for, or "incidental or conducive to", the exercise of their functions. These are general words, which are all contingent on their existing functions (ie the recovery of VAT and other sums statutorily levied on persons statutorily designated as liable), and cannot, to my mind, possibly extend the nature of the Commissioners' powers to enable them to bring a common law claim against someone not liable for tax or other payment under the 1994 Act. Section 25 of the 2005 Act is only concerned with rights of audience.

**[182]**   It is true, as Lord Walker has pointed out, that the Commissioners seek freezing orders and present winding-up petitions against defaulting taxpayers. However, it seems to me that such applications or petitions can fairly and properly be said to fall within the ambit of their statutory function of "collect[ing]" VAT as a "debt", and are now plainly within the powers given to the Commissioners by s 9 of the 2005 Act. I cannot agree that the fact they bring such proceedings with a view to recovering what is undoubtedly VAT (or other sums due under the 1994 Act), from someone who is undoubtedly liable under the terms of the 1994 Act, assists the Commissioners' argument that they can bring proceedings for damages in tort against someone who is not a taxable person or otherwise liable under the 1994 Act.

**[183]**   The successful claim for misfeasance by the Commissioners, as preferential creditors, against the receiver, and the debenture holder to whom he had wrongly paid out money, in *IRC v Goldblatt* [1972] Ch 498 appears at first sight to present greater difficulties. However (although Goff J said at 509B that counsel for the Defendants "took every point that could possibly be taken") the contention that the IRC had no power to bring the claim for misfeasance was not run – see at 501C to 502D. In any event, even if the point had been taken, the claim would, I think, still have succeeded, on the basis that the money paid by the receiver to the debenture holder was impressed with a trust for the payment of the tax – see at 507G to 508A.

**[184]**   It is also true that the Commissioners could bring claims in tort in some circumstances; for instance, if cash belonging to them was stolen from a vehicle. However, that would be a claim for money which was their property in their possession, albeit money representing what had been paid as tax. Such a claim would be covered by the passage quoted above from *Clerk & Lindsell*, as it would be a private law claim, albeit by a public body. Such examples do not, to my mind, assist on the issue whether the statutory scheme under the 1994 Act permits extra-statutory common law claims by the Commissioners to recover damages for not having recovered tax which should have been paid to them.

*The claim based on unpaid output tax: Statutory claims and remedies*

**[185]**   The second relevant group of provisions in the 1994 Act are ss 59 to 69, 72 and 73, which, when taken together, have a long and broad reach. It is important in the present context to note that those provisions extend (a) to many more payments than of the simple VAT which is described in ss 24 to 26, and (b) to persons other than the primarily taxable person under those three sections.

[186]   Thus, the 1994 Act deals with recovery of other payments (such as surcharges, penalties and assessments) effectively compensating for failure to pay VAT or to comply with other statutory requirements, where the non-payment, or non-compliance, has occurred through dishonesty, recklessness negligence or mistake. It is hard to believe that a common law right to claim for such failures should co-exist with those statutory rights. The legislation also often extends the Commissioners' rights of recovery of such sums from the person responsible for paying the tax to others who are involved with the failure. Examples where others are rendered liable include ss 61, 72, 73(7B) and 75; many aspects of ss 65 to 69 also appear to me to be capable of extending to those who are not taxable persons. Again, it seems to me unlikely that the legislature envisaged common law claims being brought against such persons in addition to claims under the 1994 Act.

[187]   Further, a s 60(1) claim is excluded by s 60(6) where there has been a conviction, and many of the succeeding sections are expressly disapplied where s 60 has been successfully invoked or where there has been a criminal conviction. It cannot have been intended that the Commissioners could get round such exclusions, in cases where there had been criminal convictions, by bringing common law claims based on the defaults covered by those sections.

[188]   An answer to these points might be that common law claims can only be brought where the statute does not provide a remedy. I am unimpressed with that argument for two reasons. First, and more generally, it strikes me as unconvincing and unattractive that the common law should be invoked to "fill in the gaps" in a taxing statute in favour of the Crown, by providing remedies for non-compliance, where the statute has many provisions which clearly provide such remedies. Secondly, and more particularly, it seems unlikely that it can have been intended that the principal wrongdoer, if convicted (eg under s 72, or of cheating the Revenue), can escape liability, whereas a person jointly liable with him, who has similarly been convicted, should not. It also seems unlikely that the principal wrongdoer could only be liable under s 60, while his fellow wrongdoers could only be liable in tort.

*The claim based on unpaid output tax: Procedure and mitigation*

[189]   The third strand of relevant statutory provisions are those relating to assessment, appeal, interest, limitation, and mitigation. If common law, as well as statutory, claims could be brought, these provisions serve to emphasise the curious differences which would arise between the two types of case. In my judgment, the differences become positively capricious once one considers a case of conspirators or other joint wrongdoers, some of whom are within the ambit of the statutory code and others of whom are not.

[190]   The assessment provisions in ss 75 and 76, which enable the Commissioners to determine the surcharges, penalties and interest for which a person is statutorily liable under the preceding sections, would not apply in relation to common law damages, which would have to be assessed by the court. Nor would the procedural provisions of those sections apply to common law claims brought by the Commissioners. This would be particularly odd if one conspirator was liable statutorily (eg Redlaw under s 60) and the co-conspirators (eg Total) were liable at common law.

[191]   The statutory appeal provisions in Sch 12 to the 1994 Act are designed to provide an exclusive set of routes and procedures whereby any liability determined by the Commissioners, whether to VAT or to any statutory surcharges, penalties or assessments, can be challenged. It would seem somewhat surprising if claims such as the present, which, while they do not strictly constitute claims for payment of VAT, nonetheless involve very similar considerations, should be subject to different procedures in different tribunals, namely the Civil Procedure Rules in the High Court or the County Court. Again, this would be particularly odd in a case such as this, where s 60 appears to apply to Redlaw, but not to Total.

[192]   If common law claims could be brought, the interest provisions in s 74 would mean that different rates of interest could apply to claims under the 1994 Act and common law claims, and, indeed, that the interest

might run for different periods. Once again, this would appear particularly odd where the Act applied only to the person who failed to pay the tax, but not to his co-conspirators.

[193]    As for the time limits, ss 73(6) and 75(2) contain two year time limits, and, more generally, s 77 contains two or three year time limits and 20 year time limits. Thus, penalties, surcharges and assessments under the 1994 Act are subject sometimes to shorter, and sometimes to longer, time limits than would apply to any claims brought in tort, which would be governed  by the Limitation Act 1980. Most claims under the 1994 Act are subject to a three or two-year limitation period, which would represent an eccentric mismatch with the six year limitation period which would normally apply under the 1980 Act. If the Commissioners had an unrestricted right to sue in tort, then they would often be able to avoid the shorter limitation period in s 77. If the Commissioners could only rely on tort to "fill the gaps" in the 1994 Act, then it would be equally unsatisfactory. There would, in a case such as this, be different  time limits for claims against joint wrongdoers,  with the principle wrongdoer being liable under the 1994 Act, and therefore  often benefiting from a shorter limitation period than could avail his co-conspirators.

[194]    In relation to some claims under the 1994 Act, including those under s 60, the limitation period is 20 years, which is again different from that in tort. In many cases it would be longer than the period under the 1980 Act, but bearing in mind the fraud and concealment provisions  in s 32 of the 1980 Act, that would not always be the case. In any event, there would still be a curious mismatch between the limitation period appropriate for the principal wrongdoer  under s 60, and that applicable to his collaborators if they are liable in tort. Accordingly, these procedural  provisions  also suggest to me that no claim such as that sought to be raised here could have  been intended by the legislature.

[195]    A claim based on tort for loss of VAT on a transaction would, as Lord Scott points out, have  to give credit for any VAT paid on another transaction which was part of the same scheme; yet that would not be true of a claim based on s 60 – see s 70(4)(b). Further, although this may be less significant in practice, good faith would be a defence to a claim in tort involving  dishonesty, but it would not operate as a defence to a s 60 claim – see s 70(4)(c). Even if common law claims are limited to "filling gaps", it seems unlikely that the legislature could have  intended that quantum in statutory claims should be subject to different mitigation from that in common law claims, especially as common law claims will normally be against co-conspirators of the person who is statutorily liable.

*The claim based on wrongly  credited and paid input tax*

[196]    As already explained, the alternative  basis of the claim involves  treating the whole carousel, and each purported transaction within it, as a fraud and a deceit on the Commissioners. If each transaction can be treated as bogus, then the Commissioners' claim fastens not on the output tax which should have  been paid by Redlaw to the Commissioners, but on the payment by the Commissioners to Alldech in respect of purported input tax which should not have been paid. On that basis, the Commissioners' case is that, as a result of a deception (to which Total was a party), they were dishonestly deprived of money.

[197]    The question is whether this way of putting the Commissioners' claim is also defeated on the "complete code issue". At least on the face of it, on this basis, the Commissioners would appear to have  a strong argument to the effect that, while, at the time the money was paid to Alldech, they may have  believed it to have  been a payment in respect of input tax, it was not, and therefore  the whole transaction was outside the ambit of the 1994 Act, and could properly  be the subject of a common law claim. In other words,  the Commissioners would argue that this was a straightforward case of Claimants being defrauded  of money by a deceitful statement, and the fact that they were led to believe  by the deceit that the money was paid in the context of the VAT regime  does not mean that that regime governs  the claim.

[198]    Attractive though that submission (and indeed its consequences)  may be, it does not appear to me to tie in with the wide way in which the provisions  of the 1994 Act, and ss 60 and 72 in particular,  are drafted.

Sections 60(2)(b) and 60(3)(a) extend the concept of "evading VAT" in s 60(1) to "obtaining . . . a VAT credit" where "the person concerned is not entitled to that sum" so that it plainly applies to a case where a non-existent VAT credit is falsely claimed. Section 72(2)(a), especially sub-para (i), contain similar provisions for the purpose of extending the ambit of s 72(1). It appears to me, therefore that the legislature has decided to extend the statutory regime in explicit terms to cases where money is wrongly claimed and paid out as a VAT credit, which would apply here in relation to the claim made by Alldech.

[199]   Further, as already mentioned, in view of its wide words, s 72(1) would extend to all the other parties involved in the fraud, including (in the present case) Total; indeed, in view of s 61, s 60 has a longer reach than merely to the taxable person. It is also worth mentioning that ss 63 and 64 apply to cases where a person "overstates his entitlement to a VAT credit". Although not quite as specific as the provisions of ss 60 and 72, these provisions also seem to me to embrace a case such as this, where a VAT credit has been wrongly claimed.

[200]   In these circumstances, it appears to me that the same principles and conclusions apply in relation to the second way in which the Commissioners put their case as in relation to the first.

*Conclusion on the effect of the 1994 Act on the claim*

[201]   If a common law claim, whether based on unpaid tax or on a payment of an unjustified claim for a tax credit, could be maintained, it would either sometimes overlap with statutory remedy or be limited to cases where there was no statutory remedy. It would plainly be unsatisfactory and inappropriate to have concurrent claims under the statute and in tort. It would also, as I have just been discussing, risk rendering the limitation, procedural and mitigation provisions in the 1994 Act nugatory. The notion of the common law filling in the holes in a taxing statute, particularly one containing many remedial rights in favour of the Commissioners, often not only against the primarily taxable person, appears wrong in principle, as I have already indicated; indeed, it is getting very close to art 4 of the Bill of Rights territory. Further, it would lead to many and significant substantive and procedural inconsistencies, and indeed duplication of process, in claims against co-conspirators, where one or more of the conspirators are liable under the statute and others are not.

[202]   For these reasons, I am of the view that a claim in tort such as that raised by the Commissioners in these proceedings is precluded as a matter of law. It is tempting to hold that an exception should be made in the case of those who dishonestly evade paying VAT or make dishonest claims, and of those who assist in their dishonesty. However, simply to invoke the doctrine that "fraud unravels everything" would seem to me to involve palm tree justice. In other words, one would be relying on a general sense of morality or indignation, without regard to principle or the rule of law. Such a course would be inconsistent with principle, especially in the context of a taxing statute, and would effectively represent *carte blanche* for any tribunal to do what it likes.

[203]   A more principled approach might appear to involve holding Total liable on the basis that it was seeking to invoke the 1994 Act "as an engine of fraud". This doctrine has, so far as I am aware, only been applied to s 4 of the Statute of Frauds 1677 (re-enacted in a partial and amended form in s 40 of the Law of Property Act 1925, which has now been replaced by s 2 of the Law of Property (Miscellaneous Provisions) Act 1989). The basis of the doctrine and the consequent development of the law of part performance was explained by Lord Selborne LC in *Maddison v Alderson* (1883) 8 App Cas 467 at 474 to 480, 47 JP 821, 52 LJQB 737.

[204]   The present case can be said to be in some ways a stronger candidate for the application of the doctrine than the normal case where part performance is invoked. Total has not merely been fraudulent in the equitable sense, but has been guilty of conspiracy to deceive and to cheat the Revenue. Nonetheless, it seems to me that the doctrine is inapplicable here, as its invocation would involve the Commissioners pulling themselves up by their own bootstraps: the only reason they have a claim at all is because of the existence

of the 1994 Act, so they can scarcely complain if the person against whom they are claiming relies on that Act.

[205]   The conclusion that the Commissioners cannot claim common law damages from a party to a dishonest "scam" which deprived the public purse of substantial sums might appear surprising and unsatisfactory. However, although art 4 of the Bill of Rights does not come directly into play in this case, I consider that there is a policy argument for rejecting the existence of such a claim which as mentioned is similar to the policy behind art 4. If the Government wishes to raise tax, or to recover compensation for not having received tax which it ought to have received, it is for the legislature to give the executive, presumably the Commissioners, the appropriate powers and duties; it is not for the courts to permit the executive to rely on the common law to fill in gaps in the legislation.

[206]   According to Lord Nicholls of Birkenhead, "the taxpayer must use the remedies provided by the tax legislation" – see *Autologic plc v IRC* [2006] 1 AC 118 at para 13. Although that statement was made in a case where the legislation concerned contained a remedy, it has some resonance here. It does appear appropriate, as a matter of principle, and consistent with the spirit of art 4, that the Commissioners should be limited to their statutory remedies. The law relating to direct and indirect tax is comprehensively reviewed annually by the legislature through a Finance Bill which is presented by the Chancellor of the Exchequer, no doubt after consultation with the Commissioners. Other changes in revenue law can be introduced relatively easily during the year (particularly during the passage of a Finance Bill), and this presumably sometimes happens at the instigation of the Commissioners. Such reviews and changes are often retrospective, in the sense of taking effect from the date they are publicly announced.

[207]   In the present connection, I am unpersuaded that the Commissioners can gain any assistance from the way the court has treated "artificial transactions" for the purposes of taxing statutes in cases since *WT Ramsay Ltd v IRC* [1982] AC 300. I appreciate that there have been dicta (eg per Lord Wilberforce in that very case at p 326) which appear to suggest that the court in such cases was almost acting as a quasi-legislator, filling in gaps in the legislation. However, the rationale of such cases has been conclusively explained in *MacNiven v Westmoreland Investments Ltd* [2001] UKHL 6, [2003] 1 AC 311, [2001] 1 All ER 865 as involving the normal principles of a purposive approach to interpretation and giving effect to the statutory language (see at para 7 per Lord Nicholls, and at paras 33 to 64 per Lord Hoffmann).

[208]   In his opinion, Lord Mance, also relying on the *Deutsche Morgan Grenfell* case, suggests that, in order for Total to succeed, the 1994 Act must positively be shown to be inconsistent with the existence of a common law claim such as the Commissioners seek to bring. I have already identified the points which seem to me to support such a conclusion in this case. However, I should also mention the reasoning of your Lordships' House in *Johnson v Unisys Ltd* [2003] 1 AC 518, to which my attention has been drawn by Lord Mance. In that case, it was held to be inappropriate to develop the common law in relation to employee dismissal because (per Lord Nicholls at para 2):

> "[A] common law right embracing the manner in which an employee is dismissed cannot satisfactorily coexist with the statutory right not to be unfairly dismissed. A newly developed common law right of this nature, covering the same ground as the statutory right, would fly in the face of limits Parliament has already prescribed on matters such as the classes of employees who have the benefit of the statutory right, the amount of compensation payable and the short time limits for making claims. It would also defeat the intention of Parliament that claims of this nature should be decided by specialist tribunals, not the ordinary courts of law."

Lord Hoffmann (after full consideration of the legislation) and Lord Millett said much the same at paras 43 to 66 and para 80 respectively.

**[209]** Many of the factors relating to statutory rights and remedies which persuaded the House that there should be no common law claim in *Johnson* are applicable here. It is true that the Commissioners' claim would not involve extending the common law, as in *Johnson.* However, unlike in *Johnson,* the claim here is not based on a relationship recognised by the common law, but on obligations created by the very statute which contains the rights and remedies. In those circumstances, I do derive some support for my conclusion from *Johnson.*

**[210]** In reaching my conclusion, I do not rely directly on the existence of s 77A of the 1994 Act, which now enables the Commissioners to visit liability for VAT on any party to a transaction who "knew or had reasonable grounds to suspect" that it was part of a carousel fraud. However, its relatively recent enactment illustrates both the principle and the practicality of the legislature dealing with carousel fraud by claiming the unpaid VAT from a party such as Total. Perhaps of greater support is what the Advocate-General said in para 42 of his Opinion in *Optigen* in answer to the UK Government's concern about combating carousel fraud. He accepted the desirability of "member states . . . taking appropriate measures against carousel fraud", and went on to point out that "art 21 of the Sixth Directive gives member states the opportunity to introduce joint and several fiscal liability", so that a person can be made responsible for the VAT due from a "co-contractor, if he knew or should have known of his co-contractor's fraudulent activities". Another point arises from s 77A. Parliament has now legislated to ensure that certain parties involved in a carousel fraud, in addition to the primary taxpayer, should be liable for the VAT the Commissioners have lost as a result of the fraud, but this new legislation does not extend to a party such as Total. In those circumstances, it would seem wrong for the common law to intervene and hold Total nonetheless effectively liable to the Commissioners for that VAT. The alternative possibility, namely that the enactment of s 77A would now exonerate Total from common law liability would appear to run counter to the notion that the common law can "fill the holes" in the statutory scheme.

**[211]** Article 21.3 of the Sixth Directive provides that, where there is a taxable supply, "Member States may provide that someone other than the person liable for payment of the tax shall be held jointly and severally liable for payment of the tax". (This only came into effect in October 2000, but the predecessor article contained similar provisions in at the end of art 21.1(a) and 21.1(b)). The 1994 Act was intended to give effect to the Sixth Directive. The fact that the Directive clearly permits the legislature to extend liability for payment of VAT to persons not primarily liable for payment reinforces the conclusion that, as it did not do so in relation to cases such as this, it is not for the courts to do so. All the more so where the legislature has taken advantage of that right in the 1994 Act in relation to other types of case.

**[212]** For these reasons, and for those given by Lord Hope (which I believe are much the same), I am of the view that the Commissioners' claim in these proceedings, whether based on the contention that they were wrongly deprived of output tax or on the contention that they were wrongly induced to credit and pay input tax, is effectively precluded by the 1994 Act. This conclusion renders it unnecessary to resolve the third issue, but I shall nonetheless consider it, not least because I understand that the majority of your Lordships consider that the Commissioners' claim is not barred by the 1994 Act.

*If a claim in tort is permissible, is it made out on the pleadings?*

**[213]** The Commissioners' case, as advanced both in writing and orally, against Total relies on the tort of unlawful means conspiracy. It is common ground that that tort involves an arrangement between two or more parties, whereby they effectively agree that at least one of them will use "unlawful means" against the Claimant, and, although damage to the Claimant need not be the predominant intention of any of the parties, the Claimant must have suffered loss or damage as a result. It is also common ground that all those ingredients are present in the pleaded case against Total.

**[214]** The reason the Court of Appeal, albeit with regret, held that the Commissioners had not made out the claim in the present case was that there was an additional requirement of the tort which was not present.

That requirement was that the unlawful means relied on must be independently actionable by the Claimant against at least one of the parties to the alleged conspiracy. The question for your Lordships is whether that is correct.

[215]   This issue appears to me only to arise in relation to the first basis upon which the Commissioners put their case. That claim alleges a conspiracy which involves no independent cause of action on the part of any of the alleged conspirators; what is relied on is that the conspiracy involved criminal means, namely cheating the Revenue. However, the second basis upon which the case is put seems to me to avoid the problem identified by the Court of Appeal. That is because, as already mentioned, the Commissioners contend that the conspiracy involved means which included an independently actionable tort, namely deceit on the part of Alldech. However, in case it transpires that this second basis is not maintainable and the first basis is otherwise maintainable, the Court of Appeal's reason for holding the tort was not made out needs to be addressed.

[216]   Unlawful means conspiracy is one of the so-called economic torts, which include procuring a breach of contract, unlawful interference, causing loss by unlawful means, intimidation, and conspiracy to injure (or lawful means conspiracy). These torts present problems even if they are considered individually (and yet more problems arise if they are treated as a genus). This is as true of unlawful means conspiracy as of any of the other economic torts. The issue in the present case is what constitutes "unlawful means" in unlawful means conspiracy, and in particular whether, at least in a case such as the present, a criminal act is enough, or whether it must involve an act by at least one of the conspirators which is actionable at the suit of the Claimant.

[217]   This issue had not been expressly addressed by any court before it was specifically discussed and decided by the Court of Appeal in *Powell v Boladz* [1998] 1 Lloyd's Rep Med 116. The reasoning of Stuart-Smith LJ (who gave the only reasoned judgment) is not only brief but, with respect, unsatisfactory. He cited three cases to justify the proposition that the unlawful means in the tort of unlawful conspiracy must be a civil wrong committed by at least one of the conspirators, actionable at the suit of the Claimant; however, none of those cases in fact provides such support. In their opinions, Lord Walker and Lord Mance have authoritatively and fully considered the decisions which touched on this issue, before *Powell*, and I agree with their analyses.

[218]   Not only has the issue not been addressed in your Lordships' House, but it has really only been considered in any detail at first instance, most fully and impressively by Davis J in *Mbasogo v Logo Ltd* [2005] EWHC 2034 (QB) at paras 51 to 89. As Davis J said at para 69, referring to *Lonrho Ltd v Shell Petroleum Co Ltd (No 2)* [1982] AC 173 and *Lonrho plc v Fayed* [1992] 1 AC 488, "there are statements in the various speeches in the cases on this topic in the House of Lords which are capable of being read either way", but they do not really grapple with the issue (because it was not relevant to the conclusion in either appeal).

[219]   Accordingly, it appears to me that your Lordships' House is free to decide the issue as it sees fit. However, we should plainly resolve the issue on a principled basis, in so far as that is possible in this very tricky area.

[220]   At para 57 of his opinion in *OBG v Allan* [2007] 2 WLR 920, Lord Hoffmann (expressing the majority view in this House) said that the fact that the means involve a crime, without also involving a civilly actionable wrong, was insufficient to establish a claim for loss caused by unlawful means. Given the obvious desirability of consistency and coherence as between the economic torts, it can fairly be said that the same rule should apply to a claim in unlawful means conspiracy. Further, the point made by Lord Hoffmann at para 57 of *OBG*, that "it is not for the courts to create a cause of action out of a . . . criminal statute which Parliament did not intend to be actionable in private law" can fairly be said to be as applicable to unlawful means conspiracy as to causing loss by unlawful means.

**[221]**   On the other hand, it appears that the law of tort takes a particularly censorious view where conspiracy is involved. Thus, a claim based on conspiracy to injure can be established even where no unlawful means, let alone any other actionable tort, is involved. That tort is therefore frequently described as anomalous; yet its existence is very well established. Its centrally important feature is that the conspiracy must have as its primary purpose injury to the Claimant. In my judgment, given the existence of that tort, it would be anomalous if an unlawful means conspiracy could not found a cause of action where, as here, the means "merely" involved a crime, where the loss to the Claimant was the obvious and inevitable, indeed in many ways the intended, result of the sole purpose of the conspiracy, and where the crime involved, cheating the revenue, has as its purpose the protection of the victim of the conspiracy. The difference between intending to make a profit at the Claimant's expense and intending to cause injury to the Claimant is pretty fine and, in economic terms, artificial: that point emerges most clearly from the discussion in paras 130 to 134 in Lord Hoffmann's opinion in *OBG*.

**[222]**   I do not think that the conclusion, at least on the facts of in this case, that the "mere" crime of cheating the Revenue can constitute unlawfulness for unlawful means conspiracy can be said to involve illegitimately creating a tort out of a crime, as mentioned in para 57 of *OBG*. First, there is the narrow point that the crime (or at least the crime primarily relied on in the Commissioners' argument) in the present case is a common law one, and therefore there is no question of disregarding the legislature's intention, which only arises where the tort is statutory. Secondly, there is the more general and telling point that the tort in this case involves the element of conspiracy, which is, of course, lacking in the tort considered in *OBG*. The importance of the ingredient of conspiracy has been examined and explained by Lord Walker and Lord Mance in their speeches, and is, as already mentioned, underlined in the field of economic torts by the anomalous tort of conspiracy to injure (or lawful means conspiracy). Thirdly, as already mentioned, the crime in the present case exists for the protection of the victim.

**[223]**   Further, in para 61 of his speech in *OBG*, Lord Hoffmann made it clear that his "discussion of unlawful means" was limited to cases involving "interference with the actions of a third party in relation to the Plaintiff", and did not necessarily apply to "a case of 'two party intimidation'", which, he said, "raises altogether different issues". In this case, as Lord Hope and Lord Mance have explained, the tort is of a "two party" nature, in that the conspiracy could be said to have been directed against the Commissioners. After all, it was directly intended (albeit for the purpose of enriching the conspirators) to deprive the Commissioners of money to which they were entitled, and, if successful, it was inevitably and foreseeably going to do so, and no tort, harm or crime as against any party other than the Commissioners was involved. As Lord Hoffmann implicitly recognised, it may therefore not be inappropriate to hold that the Commissioners have a cause of action in such circumstances, even though they might not have had a claim if they had suffered loss (particularly if it was as an incidental result) as a result of a crime directed at a third party.

**[224]**   Thus the notion that the Commissioners have a claim here is not, in my view inconsistent with the reasoning of the majority in *OBG*, upon which Total relies. In any event, the notion of a single consistent approach as to what constitutes unlawfulness in relation to all the economic torts can be said to be inconsistent with what *Clerk & Lindsell* refer to as the "ramshackle" nature of the economic torts (at para 25-001) and with the statement in Stevens on *Torts and Rights* (2007) at p 297 that the economic torts "have no inherent unity" and that it is "a mistake to group these 'torts' together". I would in any event, at least in a case such as this, where injury to the Claimant is the direct, inevitable and foreseeable result of the conspiracy succeeding, and where the crime can be said to exist for the protection of the victim, I would find it far less offensive to hold that unlawfulness can extend to a "mere" crime in unlawful means conspiracy, when it cannot do so in causing loss by unlawful means, than to hold that a "mere" crime cannot in any circumstances constitute unlawfulness in unlawful means conspiracy, when there is a tort of conspiracy to injure by means which are neither tortious nor criminal.

**[225]**   In this connection, I should record my agreement with Lord Walker and Lord Mance that, for the reasons they give, the tort of unlawful means conspiracy is not a form of secondary liability. Furthermore, although it involves an element of pulling oneself up by one's own bootstraps, it is hard to see what role the tort

of unlawful means conspiracy, whose existence is accepted by Total, could have if it did not apply in a case such as this. This is well illustrated by Stevens's suggestion, at p 249, that there is no need for the tort of unlawful means conspiracy. This is on the basis that there are three well-established tortious principles which, between them, effectively "catch" almost all who would be caught by a claim in unlawful means conspiracy. First, there is the tort of causing loss by unlawful means, the tort considered in *OBG*. Secondly, there is the tort of conspiracy to injure, where injury to the Claimant has to be the principle purpose of the conspiracy. Thirdly, there is the well-established principle that, where two or more parties join together in some way with a view to assisting or enabling one or more of them to commit a tort, all are liable for the tort as joint tortfeasors.

[226]   On this basis, Stevens suggests that there is really no role for an additional tort of conspiring to injure by unlawful means. However, if a criminal act is sufficient unlawful means, at least in some circumstances (which Stevens challenges), the present case is an example of a claim which can (at least on the basis that the case has been argued by both parties) only succeed in unlawful means conspiracy. Conspiracy to injure cannot be relied on as injury to the Commissioners was not, it is apparently accepted by the Commissioners, the primary aim of the carousel fraud. Total could not be a joint tortfeasor if there is no claim in unlawful means conspiracy, because unlawful means conspiracy is the only tort relied on. There can be no claim in causing loss by unlawful means, as if the means involve a crime which is not civilly actionable, it does not count as unlawful means for that purpose (see *OBG* at para 57).

[227]   Accordingly, in my view, on the basis of the arguments before your Lordships, a claim in unlawful means conspiracy could have been maintained on the Commissioners' first basis of claim, as well as on the second basis, were it not precluded by the 1994 Act representing a "complete code". That is because, at least where the conspiracy has loss or damage to the Claimant as the direct, foreseeable and inevitable consequence of its success, the fact that the means "only" involve a crime, at least where that is other than incidentally, appears to me to give rise to sufficient unlawfulness to establish a claim in unlawful means conspiracy.

[228]   However, it seems to me that, although this argument was abandoned by the Commissioners, it may be that the better route to this conclusion is that this is a case of conspiracy to injure, and that, as Stevens suggests, there is no need for the tort of unlawful means conspiracy. I referred earlier to the point that the reasoning in paras 130 to 134 of *OBG* supports the view that, in this case, there is little, if any, difference between the conspirators' intention to make money and their intention to deprive the Commissioners of money: each is the obverse of the other. On that basis, it may well be that it could be said that the predominant purpose of Total and the other conspirators was indeed to inflict loss on the Commissioners just as much as it was to profit the conspirators, and hence the claim in tort is made out in conspiracy to injure.

[229]   That analysis would not, I am inclined to think, significantly extend the ambit of the tort of conspiracy to injure. A defence often available to a claim based on that tort is that the conspirators inflicted the loss for "the lawful protection . . . of any lawful interest . . . (no illegal means being employed)" or that "the object is the[ir] legitimate benefit" (see *Crofter Hand Woven Harris Tweed Co Ltd v Veitch* [1942] AC 435, per Viscount Simon LC at 445 and Lord Wright at 469 respectively). Such a defence would not, as I see it, be open to the conspirators here: they used "illegal means" and the benefit they sought, and indeed obtained, was plainly not "legitimate".

[230]   However, because the claim based on conspiracy to injure was not argued, indeed was abandoned, by the Commissioners, and because Total accepts that there is such a tort as unlawful means conspiracy, I think it is more appropriate to rest my decision on the basis of that latter tort, and leave open for another case any argument along the lines discussed in the preceding two paragraphs.

*Conclusion*

**[231]**   For these reasons, I would allow both the Commissioners' appeal and Total's cross-appeal, and consequently would uphold the order of the Court of Appeal dismissing the Commissioners' claim.

*Judgment accordingly.*

# CBS Songs Ltd and others v Amstrad Consumer Electronics plc and another

*a*

HOUSE OF LORDS

LORD KEITH OF KINKEL, LORD TEMPLEMAN, LORD GRIFFITHS, LORD OLIVER OF AYLMERTON AND LORD JAUNCEY OF TULLICHETTLE

15, 16, 17, 21, 22, 23 MARCH, 12 MAY 1988

*b*

*Copyright – Infringement – Right of action – Authorisation of infringement – Incitement to make infringing copies – Defendants advertising and selling twin-deck tape recorders – Machines capable of being used for copying of copyright material – Defendants advertising machines in manner likely to encourage copying – Plaintiffs' copyright material likely to be infringed – Plaintiffs bringing action alleging defendants inciting members of public to commit offence of making infringing copies – Plaintiffs seeking injunction and damages – Whether plaintiffs having good cause of action – Copyright Act 1956, s 21(3).*

*c*

The first respondent manufactured twin-deck tape-recording machines which were sold by the second respondent. A tape-to-tape facility on the machines meant that they could be used to reproduce one tape directly onto another and they were advertised in a manner which was likely to encourage home taping and copying of copyright material. However, the first respondent's advertising warned that some copying required permission and made it clear that the first respondent had no authority to grant such permission. The appellants, who were three record companies suing on behalf of themselves and other copyright owners in the music business, brought an action against the respondents seeking an injunction to restrain them from selling the machines without ensuring that the appellants' copyrights in sound recordings were not infringed by use of the machines. The appellants subsequently sought leave to amend their statement of claim to allege that the first respondent had advertised and the second respondent had sold the machines in such a way as unlawfully to incite members of the public to commit an offence under s 21(3)[a] of the Copyright Act 1956, which prohibited the making of infringing copies of a copyright work. The judge allowed the amendment, holding that the appellants had an arguable case for both injunctive relief and damages arising out of the incitement. On appeal by the respondents, the Court of Appeal refused to allow the amendment and struck out the appellants' claim, on the ground that the respondents' breach of the criminal law by incitement would not, even if proved, give the appellants the right to sue for an injunction to compel the respondents not to breach the criminal law and for damages. The appellants appealed to the House of Lords, contending that the first respondent had authorised infringement or was a joint infringer with any person who used the machine to make an infringing reproduction of a copyright recording or, alternatively, the activities of the first respondent constituted incitement to commit a tort, incitement to commit a criminal offence under s 21(3), or negligence, and therefore the amendment should be allowed.

*d*

*e*

*f*

*g*

*h*

**Held** – The appeal would be dismissed for the following reasons—

(1) The first respondent had not authorised any infringement which fell within the 1956 Act, because although the first respondent's sale of the tape machines might have facilitated copying in breach of copyright neither its advertising nor the sale of the machines 'authorised' such a breach, since the advertising made it clear that the first respondent had no authority to grant the required permission and the first respondent had no control over the use of the machines once they were sold (see p 486 *f*, p 492 *d* to *f* *h*, p 493 *d*, p 494 *c* and p 499 *e* to *g*, post); dicta of Atkin LJ in *Falcon v Famous Players Film*

*j*

---

*a*   Section 21(3) is set out at p 489 *j*, post

*a*   *Co* [1926] 2 KB at 499 and of Lawton LJ in *Amstrad Consumer Electronics plc v British Phonographic Industry Ltd* [1986] FSR at 207 applied.

(2) The first respondent was not a joint infringer with persons who used the machines unlawfully, since the first respondent had no control over the use of the machines after they were sold, the machines' receiving and recording facilities were capable of being used by the buyer for both lawful and unlawful purposes and the first respondent had not acted with users in a common design to infringe copyright (see p 486 *f*, p 494 *d e*,

*b*   p 495 *c f g* and p 499 *e* to *g*, post).

(3) The advertising and sale of the first respondent's machines did not constitute incitement to commit a tort, namely procuring the infringement of copyright, since the first respondent was not concerned to procure and could not procure infringement, still less a particular infringement by a particular infringer (see p 486 *f*, p 496 *g* to p 497 *a* and p 499 *e* to *g*, post).

*c*   (4) Nor did the advertising and sale of the first respondent's machines amount to incitement to commit a criminal offence, namely having possession of a 'plate' knowing that it was to be used to make infringing copies contrary to s 21(3) of the 1956 Act, since a record was not a plate (see p 486 *f*, p 490 *a* p 497 *c d* and p 499 *e* to *g*, post).

(5) The first respondent's actions did not amount to negligence since the first respondent had not committed and had not participated in any breach of statutory duty

*d*   and, although it owed a duty not itself to infringe copyright or to authorise any infringement, it did not owe a duty to prevent or discourage or warn against infringement by others (see p 486 *f*, p 497 *h j* and p 499 *e* to *g*, post).

Decision of the Court of Appeal [1987] 3 All ER 151 affirmed.

### Notes

*e*   For incitement of another to commit an offence, see 11 Halsbury's Laws (4th edn) para 57, and for cases on the subject, see 14(1) Digest (Reissue) 115–117, 770–788.

For infringement of copyright, see 9 Halsbury's Laws (4th edn) paras 909–923, and for cases on the subject, see 13 Digest (Reissue) 117, 962–968.

For criminal offences in relation to copyright, see 9 Halsbury's Laws (4th edn) para 959,

*f*   and for cases on the subject, see 13 Digest (Reissue) 158–159, 1338–1340.

For the right of action for breach of copyright, see 9 Halsbury's Laws (4th edn) para 940, and for cases on the subject, see 13 Digest (Reissue) 138–143, 1136–1178.

For the Copyright Act 1956, s 21, see 11 Halsbury's Statutes (4th edn) 279.

### Cases referred to in opinions

*g*   *Amstrad Consumer Electronics plc v British Phonographic Industry Ltd* [1986] FSR 159, Ch D and CA.

*Anns v Merton London Borough* [1977] 2 All ER 492, [1978] AC 728, [1977] 2 WLR 1024, HL.

*Belegging- en Exploitatiemaatschappij Lavender BV v Witten Industrial Diamonds Ltd* [1979] FSR 59, CA.

*h*   *CBS Inc v Ames Records and Tapes Ltd* [1981] 2 All ER 812, [1982] Ch 91, [1981] 2 WLR 973.

*Dunlop Pneumatic Tyre Co Ltd v David Moseley & Sons Ltd* [1904] 1 Ch 164; *affd* [1904] 1 Ch 612, CA.

*Evans v E Hulton & Co Ltd* (1924) 131 LT 534, [1924] All ER Rep 224.

*Falcon v Famous Players Film Co* [1926] 2 KB 474, CA.

*j*   *Hill v Chief Constable of West Yorkshire* [1988] 2 All ER 238, [1988] 2 WLR 1049, HL.

*Innes v Short and Beal* (1898) 15 RPC 449.

*Invicta Plastics Ltd v Clare* [1976] RTR 251, DC.

*Koursk, The* [1924] P 140, [1924] All ER Rep 168, CA.

*Lumley v Gye* (1853) 2 E & B 216, [1843–60] All ER Rep 208.

*Macmillan & Co Ltd v K & J Cooper* (1923) LR 51 Ind App 109, PC.

*Monckton v Pathé Frères Pathephone Ltd* [1914] 1 KB 395, CA.
*Moorhouse v University of New South Wales* [1976] RPC 151, Aust HC.                    *a*
*Peabody Donation Fund (Governors) v Sir Lindsay Parkinson & Co Ltd* [1984] 3 All ER 529,
    [1985] AC 210, [1984] 3 WLR 953, HL.
*RCA Corp v John Fairfax & Sons Ltd* [1982] RPC 91, NSW SC.
*Rotocrop International Ltd v Genbourne Ltd* [1982] FSR 241.
*Rowling v Takaro Properties Ltd* [1988] 1 All ER 163, [1988] 2 WLR 418, PC.
*Townsend v Haworth* (1875) 48 LJ Ch 770, Ch D and CA.                                  *b*
*Yuen Kun-yeu v A-G of Hong Kong* [1987] 2 All ER 705, [1988] AC 175, [1987] 3 WLR 776,
    PC.

### Appeal

CBS Songs Ltd (suing on its own behalf and on behalf of other members of Mechanical
Rights Society Ltd) and EMI Records Ltd and Chrysalis Records Ltd (both suing on behalf  *c*
of themselves and other members of British Phonographic Industry Ltd (BPI)) appealed
with the leave of the Court of Appeal against the decision of that court (Fox and Nicholls
LJJ, Sir Denys Buckley dissenting) ([1987] 3 All ER 151, [1988] Ch 61) on 25 February
1987 allowing appeals by the respondents, Amstrad Consumer Electronics plc (Amstrad)
and Dixons Ltd (Dixons), from the order of Whitford J ([1987] RPC 429) sitting in
chambers dated 8 May 1986 where he dismissed the respondents' summons to strike out   *d*
BPI's writ and statement of claim in the action claiming an injunction and damages for
breach of copyright as disclosing no reasonable cause of action. The facts are set out in
the opinion of Lord Templeman.

*Sydney Kentridge QC* and *James Munby* for BPI.
*Robert Alexander QC* and *Geoffrey Hobbs* for Amstrad.                                  *e*
*Robert Alexander QC* and *Michael Fysh* for Dixons.

Their Lordships took time for consideration.

12 May. The following opinions were delivered.                                           *f*

**LORD KEITH OF KINKEL.** My Lords, I have had the opportunity of considering in
draft the speech to be delivered by my noble and learned friend Lord Templeman. I
agree with it, and for the reasons stated by him would dismiss the appeal.

**LORD TEMPLEMAN.** My Lords, during the past half-century there have been  *g*
continuous improvements in sciences and techniques concerned with the transmission,
reception, recording and reproduction of sounds and signals. These developments were
required for serious purposes such as war, espionage, safety and communications. The
benefits of advances made for serious purposes have been employed for purposes of
leisure and pleasure and have spawned two flourishing industries, the electronic
equipment industry and the entertainment industry. The electronic equipment industry  *h*
manufactures and sells sophisticated machines which enable individual members of the
public to transmit, receive, record and reproduce sounds and signals in their own homes.
The entertainment industry transmits and records entertainment on an enormous scale.
Each industry is dependent on the other. Without the public demand for entertainment,
the electronic equipment industry would not be able to sell its machines to the public.
Without the facilities provided by the electronic equipment industry, the entertainment  *j*
industry could not provide entertainment in the home, and could not, for example,
maintain orchestras which fill the air with twentieth century cacophony or make
gratifying profit from a recording of a group without a voice singing a song without a
tune. Although the two industries are interdependent and flourish to their mutual
satisfaction there is one area in which their interests conflict. It is in the interests of the

*a* electronic equipment industry to put on the market every facility which is likely to induce customers to purchase new machines made by the industry. It is in the interests of the entertainment industry to maintain a monopoly in the reproduction of entertainment. Facilities for recording and reproducing incorporated in machines sold to the public by the electronic equipment industry are capable of being utilised by members of the public to copy the published works of the entertainment industry, thus reducing the public demand for the original works and recordings of the entertainment

*b* industry itself. The electronic equipment industry invents and markets new and improved facilities which enable records to be made and copied. The public make use of those facilities to copy the recordings issued by recording companies and thus infringe the copyrights of the recording companies and of the composers, lyricists and others engaged in the entertainment industry. Hence arises the conflict between the electronic equipment industry and the entertainment industry which has resulted in these

*c* proceedings.

This appeal is the climax of a conflict between the makers of records and the makers of recording equipment. The appellants, British Phonographic Industry Ltd (BPI), represent the makers of records while the respondents, Amstrad Consumer Electronics plc and Dixons Ltd, represent the makers and sellers respectively of recording equipment. BPI argue that it is unlawful for Amstrad to make recording equipment which will be

*d* used by members of the public to copy records in which copyright subsists. In the alternative BPI argue that Amstrad must not advertise their equipment in such a way as to encourage copying. Amstrad and Dixons argue that they may lawfully make and sell to the public any recording equipment which ingenuity may devise and may lawfully advertise the advantages of such equipment.

By the Copyright Act 1956:

*e*

'**1.**—(1) . . . "copyright" in relation to a work . . . means the exclusive right, by virtue and subject to the provisions of this Act, to do, and to authorise other persons to do . . . in relation to that work . . . those acts which, in the relevant provision of this Act, are designated as the acts restricted by the copyright in a work of that description.

*f* (2) . . . the copyright in a work is infringed by any person who, not being the owner of the copyright, and without the licence of the owner thereof, does, or authorises another person to do, any of the said acts in relation to the work . . . to which the relevant provision of this Act extends . . .

**2** . . . (2) Where an original literary, dramatic or musical work has been published, then, subject to the provisions of this Act, copyright shall subsist in the

*g* work . . .

(3) . . . copyright subsisting in a work by virtue of this section shall continue to subsist until the end of the period of fifty years from the end of the calendar year in which the author died, and shall then expire . . .

(5) The acts restricted by the copyright in a literary, dramatic or musical work

*h* are—(*a*) reproducing the work in any material form . . . (*c*) performing the work in public; (*d*) broadcasting the work . . .

**4.**—(1) . . . the author of a work shall be entitled to any copyright subsisting in the work . . .

**12** . . . (2) . . . copyright shall subsist . . . in every sound recording . . .

(3) Copyright subsisting in a sound recording . . . shall continue to subsist until

*j* the end of the period of fifty years from the end of the calendar year in which the recording is first published, and shall then expire.

(4) . . . the maker of a sound recording shall be entitled to any copyright subsisting in the recording . . .

(5) The acts restricted by the copyright in a sound recording are the following, whether a record embodying the recording is utilised directly or indirectly in doing

them, that is to say,—(a) making a record embodying the recording; (b) causing the recording to be heard in public; (c) broadcasting the recording . . .'

*a*

By s 48 '"reproduction" . . . includes a reproduction in the form of a record . . .' and '"record" means any disc, tape, perforated roll or other device in which sounds are embodied so as to be capable (with or without the aid of some other instrument) of being automatically reproduced therefrom . . .'

Thus a sound recording of a performance of a song with words may involve three or more separate copyrights, each with different periods of duration of not less than 50 years. There is copyright in the composer in respect of his musical work, copyright in the lyricist in respect of his literary work and copyright in the recording company in respect of its sound recording. In the case of Beethoven and Bach and other copyright owners who died more than 50 years ago, the musical works copyright will no longer subsist. In the case of recordings published more than 50 years ago the recording copyright will no longer subsist. But every tape or other copy of a sound recording of a song with words will infringe any subsisting copyrights in the works recorded and in the sound recording.

*b*

*c*

BPI represent the various owners of copyrights in musical and literary works and in sound recordings. Amstrad make and Dixons sell equipment which makes it possible for sound recordings to be copied onto tape. Any purchaser of Amstrad's equipment who makes use of the equipment for the purpose of copying a sound recording infringes any and all of the subsisting copyrights in the relevant works recorded and in the sound recording.

*d*

There are broadly two types of infringers who concern BPI. First there are 'pirates' who make large numbers of copies of a sound recording for the purposes of sale. Pirates do not generally employ the equipment which Amstrad sell to the public but use different equipment which enables the mass production of infringing copies at low cost. The infringing copies are then sold in competition with the original sound recording which has been produced at great expense. With some difficulty but with marked success in this country, BPI and other owners of copyright are able to detect infringing copies offered for sale, to identify pirates by means of Anton Piller orders and then to obtain the remedies of injunction, confiscation and damages.

*e*

*f*

The second types of infringers are 'home copiers', that is to say members of the public who, by using Amstrad or other machines which are capable of making copies of sound recordings, can copy on to a blank tape for an expenditure of less than £1 an original recording priced at £5 or £10. A home copier makes a copy for his own private use and is thus to be distinguished from a pirate who makes infringing copies for sale. The infringements of a home copier are almost impossible to detect and a successful action for infringement against one copier would have little deterrent effect. The sales of sound recordings in 1984 were estimated at forty million, and the sales of blank tapes at seventy million or thereabouts. Blank tapes may be employed for purposes which do not infringe copyright but on average for every authorised copy of a record there will now be two infringing copies.

*g*

Home copiers are entitled to make copies of sound broadcasts but may, nevertheless, infringe copyright in the works broadcast. By s 14 of the 1956 Act:

*h*

'(1) Copyright shall subsist . . . (a) in every television broadcast made by the British Broadcasting Corporation . . . or by the Independent Television Authority . . . and (b) in every sound broadcast made by the Corporation or the Authority . . .

(2) . . . the Corporation or the Authority, as the case may be, shall be entitled to any copyright subsisting in a television broadcast or sound broadcast made by them; and any such copyright shall continue to subsist until the end of the period of fifty years from the end of the calendar year in which the broadcast is made, and shall then expire . . .

*j*

(4) The acts restricted by the copyright in a television broadcast or sound

*a*
broadcast are . . . (*b*) in the case of a sound broadcast, or of a television broadcast in so far as it consists of sounds, making, otherwise than for private purposes, a sound recording of it or a record embodying such a recording . . .

(5) The restrictions imposed . . . in relation to a television broadcast or sound broadcast . . . shall apply whether the act in question is done by the reception of the broadcast or by making use of any record, print, negative, tape or other article on which the broadcast has been recorded . . .

*b*
(7) For the purposes of subsection (4) of this section . . . a sound recording or a record embodying a recording, shall be taken to be made otherwise than for private purposes if it is made for the purposes of the doing by any person of any of the following acts, that is to say,—(*a*) the sale or letting for hire of any copy . . . of any record embodying the recording; (*b*) broadcasting the . . . recording . . . (*c*) causing the . . . recording to be . . . heard in public . . .'

*c*
Thus, where a live broadcast is made, the home copier may lawfully record the broadcast on tape for his own 'private purposes'. But by s 16(6) copyright in a sound recording or broadcast shall be in addition to, and independent of, any copyright subsisting in the musical or literary work recorded or broadcast. It appears, therefore, that a home copier may lawfully record on tape a live broadcast of a Schubert song but

*d*
cannot lawfully record on tape a live broadcast of a Beatle song without infringing the Beatles' copyright. A home copier who is recording a live concert of the works of Bach and Walton must be careful to switch off his machine during the performance of Walton's work. It appears also that an authorised broadcast of a sound recording cannot be recorded on tape by a home copier without infringing the copyright in the sound recording and any subsisting copyrights in the work recorded.

*e*
By s 17(1) of the 1956 Act:

'. . . infringements of copyright shall be actionable at the suit of the owner of the copyright; and in any action for such an infringement all such relief, by way of damages, injunction, accounts or otherwise, shall be available to the plaintiff as is available in any corresponding proceedings in respect of infringements of other proprietary rights.'

*f*
By s 17(3), if the court is satisfied that effective relief would not otherwise be available to the plaintiff, the court, having regard in addition to all other material considerations to the flagrancy of the infringement, and any benefit shown to have accrued to the defendant by reason of the infringement, may award additional damages.

*g*
By s 18(1):

'. . . the owner of any copyright shall be entitled to all such rights and remedies, in respect of the conversion or detention by any person of any infringing copy, or of any plate used or intended to be used for making infringing copies, as he would be entitled to if he were the owner of every such copy or plate and had been the owner thereof since the time when it was made . . .'

*h*
Section 21 creates certain copyright offences punishable with fines and imprisonment. These crimes are concerned with pirates and others dealing with infringing copies by way of sale, hire or trade but BPI contend in the present proceedings that every home copier commits a criminal offence under s 21(3), which is in the following terms:

*j*
'Any person who, at a time when copyright subsists in a work, makes or has in his possession a plate, knowing that it is to be used for making infringing copies of the work, shall be guilty of an offence under the subsection.'

By s 18(3) '"plate" includes any stereotype, stone, block, mould, matrix, transfer, negative or other appliance'.

The argument is that, when a home copier borrows a record intending to use it for

making infringing copies, the record which has been borrowed becomes 'a plate'. I do not accept that a record can become a plate and I do not agree that a home copier commits a criminal offence. By the Performers' Protection Acts 1958 to 1972 it is an offence knowingly to make a record of a performance of literary, dramatic, musical or artistic work without the consent in writing of the performers, but it is a defence to prove that the record was made for private and domestic use only.

Under and by virtue of s 17 of the Copyright Act 1956, a home copier is liable in civil proceedings to pay damages for infringement, and to be restrained by injuncion against further infringement and his unlawful copy may be confiscated by a copyright owner. For at least a decade members of the public, including home copiers, have been able to buy from a variety of manufacturers and retailers listening and recording equipment housed in a compact console. The listening facilities are enhanced by high fidelity speakers and extend to sound broadcasting, the playing of a record from a disc held on a turntable and the playing of a record from a recorded tape housed in a cassette and held in a cassette deck incorporated in the console. The recording facilities may include the power to record on a blank tape, housed in a cassette held in the cassette deck, any sound broadcast, disc record or taped record. These recording facilities may be used for lawful or unlawful purposes. A live broadcast may be heard and lawfully recorded and copied by means of the console by a home copier for his own use. Live recordings may be lawfully made on blank tape and may be copied with the permission of the recorder. Records with no subsisting copyright may be copied. But there is nothing to prevent the recording facilities of the console being used to copy on to a blank tape commercial records and commercial tapes in infringement of copyright. It is statistically certain that most but not all consoles are used for the purpose of home copying in breach of copyright.

There is competition between the manufacturers of consoles to improve the facilities offered by their models. About 1982 the company Aiwa improved the recording facilities of their products by increasing the speed by which recorded tape could be copied on to a blank tape by a factor of four. Other manufacturers, including Amstrad, Sanyo, Philips and Sharp, increased the speed of tape-to-tape recording by a factor of two. BPI persuaded Aiwa to reduce its unique high speed to the speed offered by other manufacturers. Amstrad then provoked BPI by hypocritical and disingenuous forms of advertising. An Amstrad model, as advertised, consisted of—

'A Remote Control operated hi-fi system (supplied with speakers) comprising . . . two functional cassette machines with HI-SPEED DUBBING facility, BSR belt-driven turntable, stereo amplifier . . . and tuner sections. This elegant flush-look system is internally connected and fitted in its own rack and comes with a smoked glass door and lid for dust protection and castors for manoeuvrability.'

Translated into plain speech, the model enabled the purchaser to receive broadcast transmissions, to play disc records, to play taped records and, on blank tape, to record broadcasts, disc records and taped records. The advertisement boasted that the model—

'now features HI-SPEED DUBBING enabling you to make duplicate recordings from one cassette to another, record direct from any source and then make a copy and you can even make a copy of your favourite cassette.'

A record on tape could be copied on to blank tape at twice the speed of play-back. An asterisk drew attention to the following footnote:

'The recording and playback of certain material may only be possible by permission. Please refer to the Copyright Act 1956, the Performers' Protection Acts 1958–1972.'

The consoles which incorporated a twin cassette deck at twice play-back speed and which were advertised by Amstrad and sold by Dixons were models SM104, TS87 and TS39. BPI wrote to Amstrad asserting that—

*a*

'the sale to the public of any machine offering a double-headed copying facility encourages, incites or otherwise facilitates the copying of pre-recorded and other cassettes containing copyright sound recordings and musical works.'

*b*

BPI also asserted that Amstrad's advertisement which had appeared on television was an 'encouragement to break the law'. After some correspondence, Amstrad issued proceedings and by its statement of claim dated 2 November 1984 sought a declaration that by advertising and offering its models for sale it was not acting unlawfully. CBS Songs Ltd, suing on its own behalf and on behalf of the other members of Mechanical Rights Society Ltd, and EMI Records Ltd and Chrysalis Records Ltd, suing on their own behalf and on behalf of the other members of BPI, also issued a writ and by their amended statement of claim dated 16 November 1984 claimed against Amstrad and Dixons:

*c*

'An injunction to restrain the Defendants . . . from parting with possession of models SM104, TS87 and TS39 cassette reproducing machines (or any like machine) without taking such precautions as are necessary reasonably to ensure that copyrights in sound recordings or musical works owned or exclusively licensed to the Plaintiffs or a member of the British Phonographic Industry Limited or the Mechanical Rights Society Limited are not infringed by the use of such machines.'

*d*

Since the plaintiffs were suing in a representative capacity the appellants are referred to in this speech as 'BPI'.

BPI also claimed an inquiry as to damages or an account of profits. In the course of interlocutory proceedings Whitford J ordered Amstrad to produce all returned guarantee cards from customers who had purchased Amstrad's impugned models. Amstrad produced 25,000 guarantee cards. BPI selected 1,600 for further investigation and

*e* ultimately called three representative witnesses. The first had not seen Amstrad's advertisement, the second knew before he saw the advertisement that home copying was unlawful, and the third had seen the advertisement but also knew that home copying was unlawful.

On 17 June 1985 Whitford J dismissed Amstrad's action claiming a declaration that its actions were lawful (see *Amstrad Consumer Electonics plc v British Phonographic Industry Ltd*

*f* [1986] FSR 159). The judge held that Amstrad was authorising infringement, was a joint tortfeasor and might be guilty of negligence and of inciting, procuring, aiding or abetting infringement contrary to law or equity. The Court of Appeal (Lawton, Slade and Glidewell LJJ) ([1986] FSR 159 at 201) disagreed, but on 29 October 1985 declined to make a declaration in favour of Amstrad on the grounds that Amstrad's advertisement might amount to an incitement to a home copier to commit a criminal offence under

*g* s 21(3) of the 1956 Act. On 8 May 1986 Whitford J heard and dismissed a summons by Amstrad to strike out BPI's action for an injunction and damages on the grounds that the statement of claim did not disclose a cause of action. On 25 February 1987 the Court of Appeal (Fox and Nicholls LJJ, Sir Denys Buckley dissenting) ([1987] 3 All ER 151, [1988] Ch 61) struck out BPI's action. BPI now appeal to this House and, in brief, contend that the decision of Whitford J in both actions should be upheld. In the course of argument,

*h* counsel for BPI, acting on instructions from BPI, amplified the reliefs which BPI seek. BPI ask for an injunction which would prevent Amstrad from selling machines with a copying facility. That relief, if available against all manufacturers, would appear to be the only form of relief which would eliminate home copying. In the alternative, BPI seek an injunction which would prevent Amstrad from selling machines with a high-

*j* speed copying facility. This might reduce home copying. If an injunction restraining manufacture and sale is not considered to be appropriate, BPI seek an injunction which will restrain Amstrad from extolling the advantages of double-speed taping and will compel Amstrad to give due notice to a purchaser that copying of copyright material is unlawful. It is doubtful whether this would effect any material reduction in home copying. My Lords, the only relevant rights vested in BPI by the 1956 Act are the

exclusive rights to reproduce and to authorise others to reproduce BPI's records, and the only relevant remedy conferred on BPI by the Act is the remedy of injunction to restrain *a* an infringement by a person who reproduces or authorises another person to reproduce BPI's records. There is nothing express or implied in the Act which inhibits the invention, manufacture, sale or advertisement of electronic equipment capable of lawful or unlawful reproduction.

BPI's initial submissions are that Amstrad 'authorised' infringement and that Amstrad is a joint infringer together with any person who uses an Amstrad machine for the *b* purpose of making an infringing reproduction of a recording in which copyright subsists.

Section 1(1) of the 1956 Act confers on the copyright owners in a record the 'exclusive right ... to authorise other persons' to copy the record. BPI submit that by selling a model which incorporates a double-speed twin-tape recorder Amstrad 'authorise' the purchaser of the model to copy a record in which copyright subsists and therefore Amstrad infringe the exclusive right of the copyright owner. My Lords, twin-tape *c* recorders, fast or slow, and single-tape recorders, in addition to their recording and playing functions, are capable of copying on to blank tape, directly or indirectly, records which are broadcast, records on discs and records on tape. Blank tapes are capable of being employed for recording or copying. Copying may be lawful or unlawful. Every tape recorder confers on the operator who acquires a blank tape the facility of copying; the double-speed twin-tape recorder provides a modern and efficient facility for *d* continuous playing and continuous recording and for copying. No manufacturer and no machine confers on the purchaser authority to copy unlawfully. The purchaser or other operator of the recorder determines whether he shall copy and what he shall copy. By selling the recorder Amstrad may facilitate copying in breach of copyright but do not authorise it.

BPI's next submission is that Amstrad by their advertisement authorise the purchaser *e* of an Amstrad model to copy records in which copyright subsists. Amstrad's advertisement drew attention to the advantages of their models and to the fact that the recorder incorporated in the model could be employed in the copying of modern records. But the advertisement did not authorise the unlawful copying of records; on the contrary, the footnote warned that some copying required permission and made it clear that Amstrad *f* had no authority to grant that permission. If Amstrad had considered the interests of copyright owners, Amstrad could have declined to incorporate double-tape double-speed recorders in Amstrad's models or could have advertised the illegality of home copying. If Amstrad had deprived themselves of the advantages of offering improved recording facilities, other manufacturers would have reaped the benefit. The effect of double-tape double-speed recorders on the incidence of home copying is altogether speculative. If *g* Amstrad had advertised the illegality of home copying the effect would have been minimal. Amstrad's advertisement was deplorable because Amstrad thereby flouted the rights of copyright owners. Amstrad's advertisement was cynical because Amstrad advertised the increased efficiency of a facility capable of being employed to break the law. But the operator of an Amstrad tape recording facility, like all other operators, can alone decide whether to record or play and what material is to be recorded. The Amstrad *h* advertisement is open to severe criticism but no purchaser of an Amstrad model could reasonably deduce from the facilities incorporated in the model or from Amstrad's advertisement that Amstrad possessed or purported to possess the authority to grant any required permission for a record to be copied.

In *Monckton v Pathé Frères Pathephone Ltd* [1914] 1 KB 395 at 403 Buckley LJ said: 'The *j* seller of a record authorizes, I conceive, the use of the record, and such use will be a performance of the musical work.' In that case a performance of the musical work by the use of the record was bound to be an infringing use and the record was sold for that purpose. In *Evans v E Hulton & Co Ltd* (1924) 131 LT 534 at 535, [1924] All ER Rep 224 at 225–226 Tomlin J said:

a

'. . . where a man sold the rights in relation to a [manuscript] to another with a view to its production, and it was in fact produced, both the English language and common sense required him to hold that this man had "authorised" the printing and publication.'

b

The object of the sale, namely publication, was bound to infringe. In *Falcon v Famous Players Film Co* [1926] 2 KB 474 the defendants hired to a cinema a film based on the plaintiff's play. It was held that the defendants infringed the plaintiff's exclusive right conferred by the Copyright Act 1911 to authorise a performance of the play. Here again, the hirer sold the use which was only capable of being an infringing use. Bankes LJ following *Monckton v Pathé Frères Pathephone Ltd* and *Evans v E Hulton & Co Ltd*, accepted that for the purpose of the 1911 Act the expression 'authorise' meant 'sanction, approve, and countenance' (at 491). Atkin LJ said (at 499):

c

'. . . to "authorize" means to grant or purport to grant to a third person the right to do the act complained of, whether the intention is that the grantee shall do the act on his own account, or only on account of the grantor . . .'

d

In the present case, Amstrad did not sanction, approve or countenance an infringing use of their model and I respectfully agree with Atkin LJ and with Lawton LJ in the present case that in the context of the Copyright Act an authorisation means a grant or purported grant, which may be express or implied, of the right to do the act complained of (see [1986] FSR 159 at 207). Amstrad conferred on the purchaser the power to copy but did not grant or purport to grant the right to copy.

e

In *Moorhouse v University of New South Wales* [1976] RPC 151 at 159, in the High Court of Australia, where the facilities of a library included a photocopying machine, Gibbs J said:

f

'. . . a person who has under his control the means by which an infringement of copyright may be committed—such as a photocopying machine—and who makes it available to other persons, knowing, or having reason to suspect, that it is likely to be used for the purpose of committing an infringement, and omitting to take reasonable steps to limit its use to legitimate purposes, would authorise any infringement that resulted from its use.'

Whatever may be said about this proposition, Amstrad have no control over the use of their models once they are sold. In this country the duties of some libraries are defined by the Copyright (Libraries) Regulations 1957, SI 1957/868, made under s 15 of the 1956 Act.

g

In *CBS Inc v Ames Records and Tapes Ltd* [1981] 2 All ER 812, [1982] Ch 91 Whitford J held that a record library which lent out records and simultaneously offered blank tapes for sale at a discount did not authorise the infringement of copyright in the records. He said ([1981] 2 All ER 812 at 821, [1982] Ch 91 at 106):

h

'Any ordinary person would, I think, assume that an authorisation can only come from somebody having or purporting to have authority and that an act is not authorised by somebody who merely enables or possibly assists or even encourages another to do that act, but does not purport to have any authority which he can grant to justify the doing of the act.'

This prescisely describes Amstrad.

j

In *RCA Corp v John Fairfax & Sons Ltd* [1982] RPC 91 at 100, in the Supreme Court of New South Wales, Kearney J approved a passage in Laddie Prescott and Vitoria *The Modern Law of Copyright* (1980) para 12.9, p 403, in these terms:

'. . . a person may be said to authorize another to commit an infringement if the one has some form of control over the other at the time of infringement or, if he

has no such control, is responsible for placing in the other's hands materials which by their nature are almost inevitably to be used for the purpose of an infringement.'

This proposition seems to me to be stated much too widely.

As Whitford J pointed out in *CBS Inc v Ames Records and Tapes Ltd* [1981] 2 All ER 812 at 821, [1982] Ch 91 at 107:

'... you can home tape from bought records, borrowed records, borrowed from friends or public libraries, from the playing of records over the radio, and indeed, at no expense, from records which can be obtained for trial periods on introductory offers from many record clubs who advertise in the papers, who are prepared to let you have up to three or four records for a limited period of trial free of any charge whatsoever.'

These borrowed records together with all recording machines and blank tapes could be said to be 'materials which by their nature are almost inevitably to be used for the purpose of an infringement'. But lenders and sellers do not authorise infringing use.

For these reasons, which are to be found also in the judgments of the Court of Appeal ([1986] FSR 159 at 207, 210, 217), I am satisfied that Amstrad did not authorise infringement.

BPI next submitted that Amstrad were joint infringers; they became joint infringers if and as soon as a purchaser decided to copy a record in which copyright subsisted; Amstrad could become a joint infringer not only with the immediate purchaser of an Amstrad model but also with anyone else at any time in the future used the model to copy records. My Lords, Amstrad sells models which include facilities for receiving and recording broadcasts, disc records and taped records. All these facilities are lawful although the recording device is capable of being used for unlawful purposes. Once a model is sold Amstrad has no control over or interest in its use. In these circumstances the allegation that Amstrad is a joint infringer is untenable. In *Townsend v Haworth* (1875) 48 LJ Ch 770 the defendant sold chemicals to be used by the purchaser in infringement of patent and agreed to indemnify the purchaser if the patent should prove to be valid. Mellish LJ said (at 773):

'Selling materials for the purposes of infringing a patent to the man who is going to infringe it, even although the party who sells it knows that he is going to infringe it and indemnifies him, does not by itself make the person who so sells an infringer. He must be a party with the man who so infringes, and actually infringe.'

Counsel for BPI relied on the decision in *Innes v Short and Beal* (1898) 15 RPC 449. In that case the defendant Short sold powdered zinc and gave instructions to a purchaser to enable the purchaser to infringe a process patent. Bingham J said (at 452):

'There is no reason whatever why Mr. *Short* should not sell powdered zinc, and he will not be in the wrong, though he may know or expect that the people who buy it from him are going to use it in such a way it will amount to an infringement of Mr. *Innes*' patent rights. But he must not ask the people to use it in that way, and he must not ask the people to use it in that way in order to induce them to buy his powdered zinc from him.'

Assuming that decision to be correct, it does not assist BPI because in the present case Amstrad did not ask anyone to use an Amstrad model in a way which would amount to an infringement.

In *Dunlop Pneumatic Tyre Co Ltd v David Moseley & Sons Ltd* [1904] 1 Ch 612 the defendant sold tyre covers which were an essential feature of a combination patent for tyres and rims. The tyre covers were adapted for use in the manner described in the patent but not necessarily solely for use in that manner. Swinfen Eady J said that probably

most of the 'covers would ultimately form part of' one or other of the patented method but that—

**a**

> 'those combinations do not exhaust the purposes to which the covers may be put, and that they would be useful for other purposes in connection with other tyres . . .'

(See [1904] 1 Ch 164 at 171.) Swinfen Eady J, upheld by the Court of Appeal (see [1904] 1 Ch 612), decided that the defendants did not infringe.

**b**

In *The Koursk* [1924] P 140 at 156, [1924] All ER Rep 168 at 175, where the question was whether the navigators of two ships had committed two separate torts or one tort in which they were both tortfeasors, Scrutton LJ adopted the passage in *Clerk and Lindsell on Torts* (7th edn, 1921) p 59 to the effect that:

> 'Persons are said to be joint tortfeasors when their respective shares in the commission of the tort are done in furtherance of a common design . . .'

**c**

In the present case there is no common design between Amstrad and anybody else to infringe copyright.

In *Rotocrop International Ltd v Genbourne Ltd* [1982] FSR 241 Graham J held, perhaps surprisingly, that there was novelty in a patent for a compost bin with removable panels and, less surprisingly, that a rival manufacturer who made and sold infringing bins in parts with assembly instructions was a joint tortfeasor with his customers. In that case, as in *Innes v Short and Beal* (1898) 15 RPC 449, the vendor and the purchaser had a common design to carry out an infringing act.

**d**

In *Belegging- en Exploitatiemaatschappij Lavender BV v Witten Industrial Diamonds Ltd* [1979] FSR 59 the defendants were alleged to have sold diamond grit for the sole purpose of making grinding tools in which it was to be embedded in a resin bond as part of a grinding material patented by the plaintiffs. Buckley LJ held (at 66) that the defendants could not be infringers unless they—

**e**

> 'sold the grits in circumstances which in some way made them participants in their subsequent embodiment in resin bonded grinding wheels, or that they induced someone so to embody them . . .'

**f**

My Lords, joint infringers are two or more persons who act in concert with one another pursuant to a common design in the infringement. In the present case there was no common design. Amstrad sold a machine and the purchaser or the operator of the machine decided the purpose for which the machine should from time to time be used. The machine was capable of being used for lawful or unlawful purposes. All recording machines and many other machines are capable of being used for unlawful purposes but manufacturers and retailers are not joint infringers if purchasers choose to break the law. Since Amstrad did not make or authorise other persons to make a record embodying a recording in which copyright subsisted, Amstrad did not entrench on the exclusive rights granted by the 1956 Act to copyright owners and Amstrad was not in breach of the duties imposed by the Act.

**g**

**h**

BPI submit, however, that, if the 1956 Act is defective to protect them, they are entitled to the protection of the common law. As a foundation for this submission BPI seek to elevate the quality of the rights granted by the Act. They point out that in s 17(1) of the Act the owner of copyright in any action for infringement is entitled to all such relief as is available in any corresponding proceedings in respect of infringements of other proprietary rights, that copyright is an example of intellectual property and that, in *Macmillan & Co Ltd v K & J Cooper* (1923) LR 51 Ind App 109 at 118, Lord Atkinson said that an infringer of copyright disobeyed the injunction, 'Thou shalt not steal.' My Lords, these considerations cannot enhance the rights of owners of copyright or extend the ambit of infringement. The rights of BPI are derived from statute and not from the Ten Commandments. Those rights are defined by Parliament, not by the clergy or the

**j**

judiciary. The rights of BPI conferred by the 1956 Act are in no way superior or inferior to any other legal rights; if BPI prove that on the true construction of the Act Amstrad and Dixons have infringed the rights conferred on BPI by the Act, the court will grant appropriate and effective reliefs and remedies. But the court will not invent additional rights or impose fresh burdens.

On behalf of BPI it was submitted that even if Amstrad did not authorise infringement and were not themselves infringers, nevertheless the activities of Amstrad in the sale and advertisement of Amstrad's models constitute a common law tort. The suggested torts were three in number, namely incitement to commit a tort, incitement to commit a criminal offence and negligence.

BPI base their submission on incitement on a passage in *Lumley v Gye* (1853) 2 E & B 216 at 232, [1843–60] All ER Rep 208 at 214 where Erle J said:

> 'It is clear that the procurement of the violation of a right is a cause of action in all instances where the violation is an actionable wrong, as in violations of a right to property, whether real or personal, or to personal security: he who procures the wrong is a joint wrong-doer, and may be sued, either alone or jointly with the agent, in the appropriate action for the wrong complained of.'

In *Lumley v Gye* an opera singer and the defendant theatre owner were joint wrongdoers. They had a common design that the opera singer should break her contract with the plaintiff theatre owner, refuse to sing in the plaintiff's theatre and instead sing in the defendant's theatre. The plaintiff's cause of action against the opera singer lay in contract, and the plaintiff's cause of action against the defendant lay in tort. But both the opera singer and the defendant were joint wrongdoers participating in an unlawful common design.

BPI referred to *Belegging- en Exploitatiemaatschappij Lavender BV v Witten Industrial Diamonds Ltd* [1979] FSR 59 at 66, where Buckley LJ said:

> 'The plaintiffs do not only assert infringement by the defendants. They also say that the defendants have procured, counselled and/or aided other persons to infringe. This may perhaps amount to an allegation of indirect infringement by the defendants themselves, but I am inclined to think that it is a claim in respect of a distinct suggested tort of procuring infringement by others (based upon the principle enunciated by Erle J. in *Lumley v. Gye* ((1853) 2 E & B 216 at 231, [1843–60] All ER Rep 208 at 213)) . . .'

My Lords, I accept that a defendant who procures a breach of copyright is liable jointly and severally with the infringer for the damages suffered by the plaintiff as a result of the infringement. The defendant is a joint infringer; he intends and procures and shares a common design that infringement shall take place. A defendant may procure an infringement by inducement, incitement or persuasion. But in the present case Amstrad does not procure infringement by offering for sale a machine which may be used for lawful or unlawful copying and it does not procure infringement by advertising the attractions of its machine to any purchaser who may decide to copy unlawfully. Amstrad is not concerned to procure and cannot procure unlawful copying. The purchaser will not make unlawful copies because he has been induced or incited or persuaded to do so by Amstrad. The purchaser will make unlawful copies for his own use because he chooses to do so. Amstrad's advertisements may persuade the purchaser to buy an Amstrad machine but will not influence the purchaser's later decision to infringe copyright. Buckley LJ observed in *Belegging- en Exploitatiemaatschappij Lavender BV v Witten Industrial Diamonds Ltd* (at 65): 'Facilitating the doing of an act is obviously different from procuring the doing of an act.' Sales and advertisements to the public generally of a machine which may be used for lawful or unlawful purposes, including infringement of copyright, cannot be said to 'procure' all breaches of copyright thereafter by members of the public who use the machine. Generally speaking, inducement, incitement or persuasion to

infringe must be by a defendant to an individual infringer and must identifiably procure a particular infringement in order to make the defendant liable as a joint infringer.

The next tort suggested by BPI was incitement to commit a criminal offence. In *Invicta Plastics Ltd v Clare* [1976] RTR 251 the defendant company manufactured, advertised and sold a device to give warning of police radar speed traps. The device necessarily involved the unlawful use of apparatus for wireless telegraphy without a licence which would never have been granted. The defendants were convicted of incitement. In the present case it is submitted that Amstrad by the sale and advertisement of their models committed the tort of inciting the purchasers to commit a criminal offence. By s 21(3) of the 1956 Act it is an offence for any person to have in his possession a 'plate' knowing that it is to be used for making infringing copies. By s 18(3) 'plate' includes any stereotype, stone, block, mould, matrix, transfer negative or other applicance. It is said that when a purchaser of an Amstrad model has in his possession a record in which copyright subsists that record becomes a 'plate' and the purchaser commits an offence under s 21(3) as soon as he forms the intention of copying that record.

There are two answers to this submission. First, as a matter of construction a record is not a plate but the product of the master recording which is a plate and from which the record is derived. Second, it is a mistake to compare crime and tort. If three persons are incited by a fourth to break into a house and cause damage each will be guilty of a crime and will receive separate punishment. The inciter will be guilty of the criminal offence of inciting others to commit crime. The other three will be guilty of the crime of breaking in. If the damage caused amounts to £5,000 then in a civil action the three who caused the damage will be jointly and severally liable for £5,000 and no more. The inciter will also be jointly and severally liable for the damage if he procures the commission of the tort and is a joint tortfeasor.

Finally, BPI submit that Amstrad committed the tort of neligence, that Amstrad owes to all owners of copyright a duty to take care not to cause or permit purchasers to infringe copyright or, alternatively, that Amstrad owes a duty to take care not to facilitate by the sale of their models or by their advertisement the infringement of copyright. My Lords, it is always easy to draft a proposition which is tailor-made to produce the desired result. Since *Anns v Merton London Borough* [1977] 2 All ER 492, [1978] AC 728 put the floodgates on the jar, a fashionable plaintiff alleges negligence. The pleading assumes that we are all neighbours now, Pharisees and Samaritans alike, that foreseeability is a reflection of hindsight and that for every mischance in an accident-prone world someone solvent must be liable in damages. In *Governors of the Peabody Donation Fund v Sir Lindsay Parkinson & Co Ltd* [1984] 3 All ER 529, [1985] AC 210 the plaintiffs were the authors of their own misfortune but sought to make the local authority liable for the consequences. In *Yuen Kun-yeu v A-G of Hong Kong* [1987] 2 All ER 705, [1988] AC 175 the plaintiff chose to invest in a deposit-taking company which went into liquidation; the plaintiff sought to recover his deposit from the commissioner charged with the public duty of registering deposit-taking companies. In *Rowling v Takaro Porperties Ltd* [1988] 1 All ER 163, [1988] 2 WLR 418 a claim for damages in negligence was made against a minister of the Crown for declining in good faith to exercise in favour of the plaintiff a statutory discretion vested in the minister in the public interest. In *Hill v Chief Constable of West Yorkshire* [1988] 2 All ER 238, [1988] 2 WLR 1049 damages against a police force were sought on behalf of the victim of a criminal. In the present proceedings damages and an injunction for negligence are sought against Amstrad for a breach of statutory duty which Amstrad did not commit and in which Amstrad did not participate. The rights of BPI are to be found in the 1956 Act and nowhere else. Under and by virtue of that Act Amstrad owed a duty not to infringe copyright and not to authorise an infringement of copyright. They did not owe a duty to prevent or discourage or warn against infringement.

BPI complain and the Court of Appeal agreed that the law is in an unsatisfactory state, as indeed it is. The present position is infuriating from the point of view of BPI because they conceive that, if the use of fifty million blank tapes could be prevented, there would

a sale of roughly thirty million more records. This may not be so. If the home copier were denied recording machines or blank tapes he would not necessarily wish to buy or might not be able to afford to buy a popular record which in the space of a month might only remain a permanent reminder of a transient attraction. It is possible that if the public could not obtain recording machines or blank tapes enthusiasm for records would decline and be replaced by other enthusiasms. For present purposes, however, it must be assumed that the profits of the recording industry would be greatly increased if the home copying of records involving breach of copyright could be prevented or if home copiers were required to pay, directly or indirectly, a licence fee for copying.

From the point of view of society the present position is lamentable. Millions of breaches of the law must be committed by home copiers every year. Some home copiers may break the law in ignorance, despite extensive publicity and warning notices on records, tapes and films. Some home copiers may break the law because they estimate that the chances of detection are non-existent. Some home copiers may consider that the entertainment and recording industry already exhibit all the characteristics of undesirable monopoly, lavish expenses, extravagant earnings and exorbitant profits, and that the blank tape is the only restraint on further increases in the prices of records. Whatever the reason for home copying, the beat of Sergeant Pepper and the soaring sounds of the Miserere from unlawful copies are more powerful than law-abiding instincts or twinges of conscience. A law which is treated with such contempt should be amended or repealed.

In these proceedings the court is being asked to forbid the sale to the public of all or some selected types of tape recorder or to ensure that advertisements for tape recorders shall be censored by the court on behalf of copyright owners. The court has no power to make such orders and judges are not qualified to decide whether a restraint should be placed on the manufacture of electronic equipment or on the contents of advertising. No one is to blame for the present situation. Copyright law could not envisage and now cannot cope with mass-production techniques and inventions which create a vast market for the works of a copyright owner but also provide opportunities for his rights to be infringed. Parliament could place limitations on the manufacture or sale of certain types of tape recorder and could prescribe notices and warnings to be included in advertisements. Parliament might take the view that any such restraints and prescriptions would constitute an unwarrantable interference with the development of the electronic industry and be ineffective.

Parliament could legalise home copying just as the copying of sound broadcasts was expressly authorised for 'private purposes'. The Whitford Committee appointed to consider the Law on Copyright and Designs reported in March 1977 (Cmnd 6732) and made a number of important comments and recommendations. Some of those comments and recommendations illustrate the grievances of the recording industry, the impossibility of coping with home copying and the uselessness and unfairness of singling out double-speed twin-tape recorders or any other type of recorder for condemnation. The Whitford Report included the following paragraphs:

'292. It is generally accepted that the use of tape recording equipment, particularly in the home, is resulting in the widespread infringement of rights in musical and other works, as well as in sound recordings . . . the practical problems of policing acts of infringement which take place in private render it impossible for copyright owners to exercise their rights.

293 . . . Whereas in the 1940s and early 1950s tape recording was little used outside professional circles, advances in technology have made the tape recorder almost standard equipment in the home and in schools . . .

294. [A survey in 1975] showed that 45 per cent of homes have access to a recording facility and that 20 per cent of persons over 16 have used recording equipment at some time or other to record from commercial records or tapes. [A sample survey in 1972] showed that . . . two-thirds of the persons recording took

recordings off radio at least occasionally, and over half copied borrowed recordings . . .

*a*        301. The German Copyright Act of 1965 imposed a levy on a wide range of recording equipment in return for a blanket licence to make recordings in single copies for personal use . . .

308. The possibility of imposing a levy on blank tape, either as an alternative to or as an addition to a levy on equipment, was considered by a number of bodies and almost universally rejected as being unsatisfactory. Although in theory such a levy

*b*   should reflect, more accurately, actual usage for recording, it would involve a much larger operation and, in view of the smaller values of tapes compared with equipment and the fact that tape can be re-used, might be less productive of revenue.

322. It is our view that, for private recording, the only satisfactory solution is the introduction of a levy on the sale price of recording equipment. A major problem in the case of private recording, which no other system seems able to overcome, is

*c*   that of policing; we feel the levy approach will effectively meet this difficulty . . .'

Since 1977 when the Whitford Committee reported, a levy on blank tapes has met with more favourable consideration. In face of the difficulties inherent in the problem generated by the mass-production of electronic equipment capable of infringing copyright Parliament has not yet determined on any course of action. These proceedings

*d*   will have served a useful purpose if they remind Parliament of the grievances of the recording companies and other owners of copyright and if at the same time they draw the attention of Parliament to the fact that home copying cannot be prevented, is widely practised and brings the law into disrepute. As the law now stands I would dismiss the appeal of BPI.

*e*   **LORD GRIFFITHS.** My Lords, I have had the opportunity of considering in draft the speech to be delivered by my noble and learned friend Lord Templeman. I agree with it, and for the reasons stated by him would dismiss the appeal.

**LORD OLIVER OF AYLMERTON.** My Lords, I have had the advantage of reading in draft the speech prepared by my noble and learned friend Lord Templeman. I agree

*f*   with it and would dismiss the appeal for the reasons which he has given.

**LORD JAUNCEY OF TULLICHETTLE.** My Lords, I have had the opportunity of considering in draft the speech to be delivered by my noble and learned friend Lord Templeman. I agree with it, and for the reasons stated by him would dismiss the appeal.

*g*   *Appeal dismissed.*

Solicitors: *Hamlin Slowe* (for BPI); *Herbert Smith* (for Amstrad); *Wilkinson Kimbers* (for Dixons).

Mary Rose Plummer    Barrister.

endorsed in *Reg. v. Mandair* [1995] 1 A.C. 208. Also a quite separate    A
appeal against sentence which was not before the House will fall to be
considered if the occasion demands.

LORD SLYNN OF HADLEY.  My Lords, for the reasons given by my
noble and learned friend, Lord Mustill, whose speech I have had the
advantage of reading in draft, I, too, would allow this appeal and remit
the matter as he proposes.                                                B

*Appeal allowed.*

*Solicitors: Crown Prosecution Service, Headquarters; Edward Harte &
Co., Brighton.*

J. A. G.                    C

D

[PRIVY COUNCIL]

ROYAL BRUNEI AIRLINES SDN. BHD.    .    .    .    APPELLANT
AND                                            E
PHILIP TAN KOK MING    .    .    .    .    .    .    RESPONDENT

[APPEAL FROM THE COURT OF APPEAL OF BRUNEI DARUSSALAM]

1995  March 22;              Lord Goff of Chieveley, Lord Ackner,
     May 24                  Lord Nicholls of Birkenhead, Lord Steyn
                                       and Sir John May            F

*Trusts—Constructive   trust—Dishonesty—Controlling   director   of
   company dishonestly assisting in breach of trust by company—
   Whether director liable to beneficiary for resulting loss*

The plaintiff airline appointed as its agent in a particular area
for the sale of passenger and cargo transportation a company of    G
which the defendant was the managing director and principal
shareholder. Under the agreement the company was to hold in
trust for the airline money received from such sale until it was
accounted for by the company to the airline. With the defendant's
knowledge and assistance the company paid the money into its
current bank account instead of into a separate account, and in
breach of trust the company used that money for its own business
purposes. The company failed to pay to the airline sums due    H
within the time specified by the agreement. The airline terminated
the agreement and, the company having become insolvent,
commenced proceedings against the defendant to recover the
money owed by the company. The judge held that the defendant

**2 A.C.**                    **Royal Brunei Airlines v. Tan (P.C.)**

A    was liable as constructive trustee to pay that amount to the
airline. On appeal the Court of Appeal of Brunei Darussalam
reversed that decision, holding that the defendant could not be so
liable because it had not been established that the company was
guilty of fraud or dishonesty in relation to the money held in
trust for the airline.

On the airline's appeal to the Judicial Committee:—

B    *Held*, allowing the appeal, that where a third party dishonestly
assisted a trustee to commit a breach of trust or procured him to
do so, the third party would be liable to the beneficiary for the
loss occasioned by the breach of trust, even though the third
party had received no trust property and irrespective of whether
the trustee had been dishonest or fraudulent; that in the context
of such accessory liability honesty was to be judged objectively
and acting dishonestly, or with a lack of probity, which was
synonymous, meant not acting as an honest person would act in
C    the circumstances and could usually be equated with conscious
impropriety as distinct from inadvertent or negligent conduct or
carelessness, although a third party might be acting dishonestly if
he recklessly disregarded the rights of others; that the third party's
conduct had to be assessed on the basis of his actual knowledge
at the time not what a reasonable person would have known or
appreciated, and regard could be had to his personal attributes
D    including experience and intelligence and the reason for him
acting in that way; and that, accordingly, since the defendant had
caused or permitted the company to commit a breach of trust by
using in the conduct of its business money held in trust for the
airline when he knew that the company was not authorised to do
so by the terms of the trust, the defendant had acted dishonestly,
and was, therefore, liable to the airline for the amount owed to it
by the company (post, pp. 385A–B, 389C–D, 390G, 391B, 392F–G,
E    393B).

Dictum of Lord Selborne L.C. in *Barnes v. Addy* (1874) L.R.
9 Ch.App. 244, 251–252 and *Belmont Finance Corporation Ltd.
v. Williams Furniture Ltd.* [1979] Ch. 250, C.A. considered.

*Semble.* Although mere negligence by a third party acting for
or dealing with trustees would not normally render him liable to
the beneficiaries in respect of losses resulting from a breach of
F    trust, there might be cases where, in the light of particular facts,
an honest third party will owe a duty of care to the beneficiaries
in respect of the conduct of the trustees (post, p. 392B–C).

Decision of the Court of Appeal of Brunei Darussalam
reversed.

The following cases are referred to in the judgment of their Lordships:

G    *Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265; [1989] 3 W.L.R. 1367; [1992]
4 All E.R. 385
*Attorney-General v. Corporation of Leicester* (1844) 7 Beav. 176
*Baden v. Société Générale pour Favoriser le Développement du Commerce et de
l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509; [1992] 4 All E.R.
161
*Barnes v. Addy* (1874) L.R. 9 Ch.App. 244
H    *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250;
[1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, C.A.
*Carl Zeiss Stiftung v. Herbert Smith & Co. (No. 2)* [1969] Ch. 276; [1969]
2 W.L.R. 427; [1969] 2 All E.R. 367, C.A.
*Cowan de Groot Properties Ltd. v. Eagle Trust Plc.* [1992] 4 All E.R. 700

Royal Brunei Airlines v. Tan (P.C.) [1995]

*D.P.C. Estates Pty. Ltd. v. Grey and Consul Development Pty. Ltd.* [1974] A
   1 N.S.W.L.R. 443; sub nom. *Consul Development Pty. Ltd. v. D.P.C.*
   *Estates Pty. Ltd.* (1975) 132 C.L.R. 373
*Eagle Trust Plc. v. S.B.C. Securities Ltd.* [1993] 1 W.L.R. 484; [1992] 4 All
   E.R. 488
*Eaves v. Hickson* (1861) 30 Beav. 136
*Equiticorp Industries Group Ltd. v. Hawkins* [1991] 3 N.Z.L.R. 700
*Fyler v. Fyler* (1841) 3 Beav. 550
*Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602; [1972] 1 All   B
   E.R. 1210
*Marr v. Arabco Traders Ltd.* (1987) 1 N.Z.B.L.C. 102,732
*Marshall Futures Ltd. v. Marshall* [1992] 1 N.Z.L.R. 316
*Montagu's Settlement Trusts, In re* [1987] Ch. 264; [1987] 2 W.L.R. 1192;
   [1992] 4 All E.R. 308
*Nimmo v. Westpac Banking Corporation* [1993] 3 N.Z.L.R. 218
*Polly Peck International Plc. v. Nadir (No. 2)* [1992] 4 All E.R. 769, C.A.   C
*Powell v. Thompson* [1991] 1 N.Z.L.R. 597
*Reg. v. Ghosh* [1982] Q.B. 1053; [1982] 3 W.L.R. 110; [1982] 2 All E.R. 689,
   C.A.
*Selangor United Rubber Estates Ltd. v. Cradock (No. 3)* [1968] 1 W.L.R.
   1555; [1968] 2 All E.R. 1073
*Springfield Acres Ltd. v. Abacus (Hong Kong) Ltd.* [1994] 3 N.Z.L.R. 502
*Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41   D

The following additional cases were cited in argument:

*Gathergood v. Blundell & Brown Ltd.* [1992] 3 N.Z.L.R. 643
*Lion Breweries Ltd. v. Scarrot* (1986) 2 B.C.R. 242
*Reg. v. Sinclair* [1968] 1 W.L.R. 1246; [1968] 3 All E.R. 241, C.A.
*Savin & Boyle v. De Vere* (1983) 1 B.C.R. 545   E

APPEAL (No. 52 of 1994) with leave of the Court of Appeal of Brunei
Darussalam by the plaintiff airline, Royal Brunei Airlines Sdn. Bhd., from
the judgment of the Court of Appeal of Brunei Darussalam (Fuad P.,
Cons and Kempster, Judicial Commissioners) given on 2 June 1994
allowing an appeal by the defendant, Philip Tan Kok Ming, from the
judgment of Roberts C.J. delivered on 14 October 1993 in the High Court   F
of Brunei Darussalam at Bandar Seri Begawan, whereby he had ordered
the defendant to pay the airline the amount which was owed by Borneo
Leisure Travel Sdn. Bhd. to the airline. The Chief Registrar of the High
Court on 14 December 1993 had assessed the damages to which the airline
was entitled as amounting to B.\$335,160 with interest.

The facts are stated in the judgment of their Lordships.   G

*Michael Beloff Q.C., Raymond Lam* (of the Brunei Bar) and *Murray
Hunt* for the airline. Where a controlling director of a company assists in
a deliberate, as opposed to inadvertent or negligent, breach of trust by the
company of which ex hypothesi he has actual knowledge his behaviour is
unconscionable and he is liable as a constructive trustee.

The airline had to prove (1) the existence of a trust; (2) breach of trust   H
by the company; (3) dishonesty (lack of probity) in the breach of trust by
the company; (4) assistance by the defendant in the breach of trust; and
(5) knowledge of the foregoing by the defendant. The first and second

**2 A.C.**                      **Royal Brunei Airlines v. Tan (P.C.)**

A  requirements were rightly conceded, and the fourth and fifth were self-evidently established since the company acted through the defendant in all material respects. If dishonesty by the company was proved, it is indisputable that the defendant had knowledge of it. The company was dishonest, or acted with lack of probity, in that it deliberately used trust moneys for its own purposes and without the authority of the airline. The principles stated by Lord Selborne L.C. in *Barnes v. Addy* (1874) L.R. 9

B  Ch.App. 244, 251–252 apply. Strangers to a trust will not be at risk if they are innocent.

The test as to whether a third party is liable to account in equity for knowingly assisting a trustee to commit a breach of trust is to be found in *Baden v. Société Générale pour Favoriser le Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993] 1 W.L.R. 509. [Reference

C  was also made to *Savin & Boyle v. De Vere* (1983) 1 B.C.R. 545; *Westpac Banking Corporation v. Savin* [1985] 2 N.Z.L.R. 41; *Lion Breweries Ltd. v. Scarrot* [1986] 2 B.C.R. 242 and *Gathergood v. Blundell & Brown Ltd.* [1992] 3 N.Z.L.R. 643.] If a trustee takes a risk with trust property knowing that he has no right to take that risk, that is sufficient to constitute fraud or dishonesty on the part of the trustee. The Court of Appeal erred in law in holding that the company had not acted

D  fraudulently or dishonestly in relation to the amounts which it held in trust for the airline, and so the defendant is liable as constructive trustee and the judge's order should be restored.

*Daljit Singh Sandhu* and *Geoffrey Sim* (both of the Brunei Bar) for the defendant. For the defendant to be liable as constructive trustee the airline had to prove that the company had acted fraudulently or dishonestly with

E  regard to the sums which it held in trust for the airline, and that the defendant had knowingly assisted the company to commit that breach of trust. The Court of Appeal was entitled to conclude that fraud or dishonesty by the company had not been established. The Court of Appeal applied the proper test. The test in the *Baden* case [1993] 1 W.L.R. 509 is correct and the four elements stated therein must be established. One of the four elements is that there must be a dishonest and fraudulent design

F  on the part of the trustee in order to hold a stranger liable as a constructive trustee. [Reference was made to *Reg. v, Sinclair* [1968] 1 W.L.R. 1246 and *Belmont Finance Corporation Ltd. v. Williams Furniture Ltd.* [1979] Ch. 250.]

*Beloff Q.C.* replied.

G                                              *Cur. adv. vult.*

24 May.  The judgment of their Lordships was delivered by LORD NICHOLLS OF BIRKENHEAD.

The proper role of equity in commercial transactions is a topical question. Increasingly plaintiffs have recourse to equity for an effective remedy when the person in default, typically a company, is insolvent.

H  Plaintiffs seek to obtain relief from others who were involved in the transaction, such as directors of the company, or its bankers, or its legal or other advisers. They seek to fasten fiduciary obligations directly onto the company's officers or agents or advisers, or to have them held

personally liable for assisting the company in breaches of trust or fiduciary   A
obligations.

This is such a case. An insolvent travel agent company owed money to
an airline. The airline seeks a remedy against the travel agent's principal
director and shareholder. Its claim is based on the much-quoted dictum of
Lord Selborne L.C., sitting in the Court of Appeal in Chancery, in *Barnes
v. Addy* (1874) L.R. 9 Ch.App. 244, 251–252:

   B

> "[The responsibility of a trustee] may no doubt be extended in equity
> to others who are not properly trustees, if they are found . . . actually
> participating in any fraudulent conduct of the trustee to the injury of
> the cestui que trust. But . . . strangers are not to be made constructive
> trustees merely because they act as the agents of trustees in
> transactions within their legal powers, transactions, perhaps of which
> a court of equity may disapprove, unless those agents receive and   C
> become chargeable with some part of the trust property, or unless
> they assist with knowledge in a dishonest and fraudulent design on
> the part of the trustees."

In the conventional shorthand, the first of these two circumstances in
which third parties (non-trustees) may become liable to account in equity
is "knowing receipt," as distinct from the second, where liability arises   D
from "knowing assistance." Stated even more shortly, the first limb of
Lord Selborne L.C.'s formulation is concerned with the liability of a
person as a *recipient* of trust property or its traceable proceeds. The
second limb is concerned with what, for want of a better compendious
description, can be called the liability of an *accessory* to a trustee's breach
of trust. Liability as an accessory is not dependent upon receipt of trust
property. It arises even though no trust property has reached the hands of   E
the accessory. It is a form of secondary liability in the sense that it only
arises where there has been a breach of trust. In the present case the
plaintiff airline relies on the accessory limb. The particular point in issue
arises from the expression "a dishonest and fraudulent design on the part
of the trustees."

   F

*The proceedings*

The essential facts are these. In 1986 the plaintiff airline, Royal Brunei
Airlines Sdn. Bhd., appointed Borneo Leisure Travel Sdn. Bhd. ("B.L.T.")
to act, in various places in Sabah and Sarawak, as its general travel agent
for the sale of passenger and cargo transportation. The terms of the
appointment were set out in a written agreement of 1 April 1986. B.L.T.   G
was required to account to the airline for all amounts received from sales
of tickets. For its services it was to be paid a sales commission. The
agreement was expressed to be subject to the regulations of the
International Air Transport Association, one of which provided:

> "All moneys collected by the agent for transportation and ancillary
> services sold under this agreement, including applicable commissions
> which the agent is entitled to claim thereunder, shall be the property   H
> of the carrier and shall be held by the agent in trust for the carrier or
> on behalf of the carrier until satisfactorily accounted for to the carrier
> and settlement made. . . . Unless otherwise instructed by the carrier

2 A.C.                    Royal Brunei Airlines v. Tan (P.C.)

A  the agent shall be entitled to deduct from remittances the applicable commission to which it is entitled hereunder."

It was common ground that the effect of this provision was to constitute B.L.T. a trustee for the airline of the money it received from the sale of passenger and cargo transportation for the airline.

In practice what happened was that money received by B.L.T. on
B behalf of the airline was not paid into a separate bank account. It was paid into B.L.T.'s ordinary, current account with its bank. By a standing arrangement with the bank, any balance in its current account in excess of a stated amount was transferred to a fixed deposit account of B.L.T. or, at times, of the defendant, Philip Tan Kok Ming. The defendant had founded B.L.T. He was managing director and principal shareholder. He
C was effectively in charge and control of B.L.T. The other director and shareholder was his wife. Nothing turns on these transfers of money to other accounts because, with one immaterial exception, all the transferred money eventually found its way back to B.L.T.'s current account.

B.L.T. was required to pay the airline within 30 days, but at various times from 1988 onwards it was in arrears. In August 1992 the airline terminated the agreement. In January 1993 the airline commenced this
D action against the defendant in respect of the unpaid money. The defendant was not himself a party to the agency agreement, although he had signed it on behalf of B.L.T.

At the trial held in October 1993 Roberts C.J. rejected a claim by the airline that the defendant had orally guaranteed payment of the money. Roberts C.J. also rejected a claim that the defendant had diverted the money to his own use. Roberts C.J. upheld a claim that the defendant
E was liable as a constructive trustee, under the accessory limb of Lord Selborne L.C.'s formulation in *Barnes v. Addy*, L.R. 9 Ch.App. 244, 251–252. Although not particularised, this issue was pleaded explicitly and unequivocally. The defendant knew there was an express trust of the money. The money appeared to have been used by B.L.T. for its ordinary business purposes, paying salaries, overheads and other expenses, and
F keeping down its bank overdraft. It must be assumed that the defendant authorised the use of the money for these purposes. That was sufficient to make him liable. A fraudulent and dishonest design is not confined to personal gain. It is sufficient if the stranger knowingly assists in the use of trust property in a way which is not permitted by the trust. Judgment was entered for the airline for B.$335,160.

G The Court of Appeal of Brunei Darussalam allowed the defendant's appeal. Counsel for the defendant conceded that a trust of the money had been created, and that there had been a breach of that trust in which the defendant had assisted with actual knowledge. The issue was whether a dishonest and fraudulent design on the part of B.L.T. had been established. The court held that the evidence revealed a sorry tale of mismanagement and broken promises, but that it was not established that B.L.T. was
H guilty of fraud or dishonesty in relation to the amounts it held in trust for the airline. Delivering the judgment of the court, Fuad P. stated:

  "As long standing and high authority shows, conduct which may amount to a breach of trust, however morally reprehensible, will not

render a person who has knowingly assisted in the breach of trust   A
liable as a constructive trustee if that conduct falls short of
dishonesty."

This view of the state of the law has the support of the (English) Court
of Appeal. In *Selangor United Rubber Estates Ltd. v. Cradock (No. 3)*
[1968] 1 W.L.R. 1555, 1591, Ungoed-Thomas J. held that the expression
"dishonest and fraudulent design" was to be understood according to the   B
principles of a court of equity. That approach was emphatically rejected
by the Court of Appeal in *Belmont Finance Corporation Ltd. v. Williams
Furniture Ltd.* [1979] Ch. 250. Buckley L.J. observed, at p. 267, that the
rule as formulated by Lord Selborne L.C. had stood for more than 100
years, and that to depart from it would introduce an undesirable degree
of uncertainty to the law over what degree of unethical conduct would
suffice if dishonesty was not to be the criterion. Goff L.J., at p. 274,   C
agreed that it would be dangerous and wrong to depart from "the safe
path of the principle as stated by Lord Selborne L.C. to the uncharted sea
of something not innocent . . . but still short of dishonesty."

In short, the issue on this appeal is whether the breach of trust which
is a prerequisite to accessory liability must itself be a dishonest and
fraudulent breach of trust by the trustee.   D

*The honest trustee and the dishonest third party*

It must be noted at once that there is a difficulty with the approach
adopted on this point in the *Belmont* case [1979] Ch. 250. Take the simple
example of an honest trustee and a dishonest third party. Take a case
where a dishonest solicitor persuades a trustee to apply trust property in   E
a way the trustee honestly believes is permissible but which the solicitor
knows full well is a clear breach of trust. The solicitor deliberately conceals
this from the trustee. In consequence, the beneficiaries suffer a substantial
loss. It cannot be right that in such a case the accessory liability principle
would be inapplicable because of the innocence of the trustee. In ordinary
parlance, the beneficiaries have been defrauded by the solicitor. If there is
to be an accessory liability principle at all, whereby in appropriate   F
circumstances beneficiaries may have direct recourse against a third party,
the principle must surely be applicable in such a case, just as much as in
a case where both the trustee and the third party have been dishonest.
Indeed, if anything, the case for liability of the dishonest third party seems
stronger where the trustee is innocent, because in such a case the third
party alone was dishonest and that was the cause of the subsequent   G
misapplication of the trust property.

The position would be the same if, instead of *procuring* the breach, the
third party dishonestly *assisted* in the breach. Change the facts slightly.
A trustee is proposing to make a payment out of the trust fund to a
particular person. He honestly believes he is authorised to do so by the
terms of the trust deed. He asks a solicitor to carry through the
transaction. The solicitor well knows that the proposed payment would be   H
a plain breach of trust. He also well knows that the trustee
mistakenly believes otherwise. Dishonestly he leaves the trustee under his
misapprehension and prepares the necessary documentation. Again, if the

A  accessory principle is not to be artificially constricted, it ought to be
applicable in such a case.

These examples suggest that what matters is the state of mind of the
third party sought to be made liable, not the state of mind of the
trustee. The trustee will be liable in any event for the breach of trust, even if he
acted innocently, unless excused by an exemption clause in the trust
instrument or relieved by the court. But *his* state of mind is essentially
B  irrelevant to the question whether the *third party* should be made liable to
the beneficiaries for the breach of trust. If the liability of the third party is
fault-based, what matters is the nature of his fault, not that of the trustee.
In this regard dishonesty on the part of the third party would seem to be
a sufficient basis for his liability, irrespective of the state of mind of the
trustee who is in breach of trust. It is difficult to see why, if the third
C  party dishonestly assisted in a breach, there should be a further prerequisite
to his liability, namely that the trustee also must have been acting
dishonestly. The alternative view would mean that a dishonest third party
is liable if the trustee is dishonest, but if the trustee did not act dishonestly
that of itself would excuse a dishonest third party from liability. That
would make no sense.

D
*Earlier authority*

The view that the accessory liability principle cannot be restricted to
fraudulent breaches of trust is not to be approached with suspicion as a
latter-day novelty. Before the accessory principle donned its *Barnes
v. Addy,* L.R. 9 Ch.App. 244 strait-jacket, judges seem not to have
E  regarded the principle as confined in this way. In *Fyler v. Fyler* (1841)
3 Beav. 550, 568, Lord Langdale M.R. expressed the view that, if trustees
invested in an unauthorised investment, solicitors who knowingly procured
that to be done for their own benefit "ought to be considered as partakers
in the breach of trust" even though the trustees intended in good faith
that the investment would be beneficial to the life tenant and not
prejudicial to the beneficiaries with interests in capital. The same judge,
F  Lord Langdale M.R., in *Attorney-General v. Corporation of Leicester*
(1844) 7 Beav. 176, 179, stated:

"it cannot be disputed that, if the agent of a trustee, whether a
corporate body or not, knowing that a breach of trust is being
committed, interferes and assists in that breach of trust, he is
personally answerable, although he may be employed as the agent of
G  the person who directs him to commit that breach of trust."

In *Eaves v. Hickson* (1861) 30 Beav. 136 trustees, acting in good faith,
paid over the fund to William Knibb's adult children on the strength of a
forged marriage certificate produced to them by William Knibb. Sir John
Romilly M.R. held that William Knibb was liable to replace the fund, to
the extent that it was not recovered from his children, and to do so in
H  priority to the liability of the trustees. Far from this being a case of fraud
by the trustees, Sir John Romilly M.R., at p. 141, described it as a very
hard case on the trustees, who were deceived by a forgery which would
have deceived anyone who was not looking out for forgery or fraud.

This point did not arise in *Barnes v. Addy*, L.R. 9 Ch.App. 244. There    A
the new sole trustee was engaged in a dishonest and fraudulent design. He
intended to misapply the trust fund as soon as it reached his hands. The
two solicitors were held not liable because there was no evidence that
either of them had any knowledge or suspicion of this.

What has gone wrong? Their Lordships venture to think that the
reason is that, ever since the *Selangor* case [1968] 1 W.L.R. 1555
highlighted the potential uses of equitable remedies in connection with    B
misapplied company funds, there has been a tendency to cite and interpret
and apply Lord Selborne L.C.'s formulation in *Barnes v. Addy*, L.R. 9
Ch.App. 244, 251–252, as though it were a statute. This has particularly
been so with the accessory limb of Lord Selborne L.C.'s apothegm. This
approach has been inimical to analysis of the underlying concept. Working
within this constraint, the courts have found themselves wrestling with the    C
interpretation of the individual ingredients, especially "knowingly" but
also "dishonest and fraudulent design on the part of the trustees," without
examining the underlying reason why a third party who has received no
trust property is being made liable at all. One notable exception is the
judgment of Thomas J. in *Powell v. Thompson* [1991] 1 N.Z.L.R. 597,
610–615. On this point he observed, at p. 613:

> "Once a breach of trust has been committed, the commission of    D
> which has involved a third party, the question which arises is one as
> between the beneficiary and that third party. If the third party's
> conduct has been unconscionable, then irrespective of the degree of
> impropriety in the trustee's conduct, the third party is liable to be
> held accountable to the beneficiary as if he or she were a trustee."
>
    E
To resolve this issue it is necessary to take an overall look at the
accessory liability principle. A conclusion cannot be reached on the nature
of the breach of trust which may trigger accessory liability without at the
same time considering the other ingredients including, in particular, the
state of mind of the third party. It is not necessary, however, to look even
more widely and consider the essential ingredients of recipient liability.
The issue on this appeal concerns only the accessory liability principle.    F
Different considerations apply to the two heads of liability. Recipient
liability is restitution-based; accessory liability is not.

*No liability*

The starting point for any analysis must be to consider the extreme
possibility: that a third party who does not receive trust property ought    G
never to be liable directly to the beneficiaries merely because he assisted
the trustee to commit a breach of trust or procured him to do so. This
possibility can be dismissed summarily. On this the position which the law
has long adopted is clear and makes good sense. Stated in the simplest
terms, a trust is a relationship which exists when one person holds
property on behalf of another. If, for his own purposes, a third party
deliberately interferes in that relationship by assisting the trustee in    H
depriving the beneficiary of the property held for him by the trustee, the
beneficiary should be able to look for recompense to the third party as
well as the trustee. Affording the beneficiary a remedy against the third

A  party serves the dual purpose of making good the beneficiary's loss should the trustee lack financial means and imposing a liability which will discourage others from behaving in a similar fashion.

The rationale is not far to seek. Beneficiaries are entitled to expect that those who become trustees will fulfil their obligations. They are also entitled to expect, and this is only a short step further, that those who become trustees will be permitted to fulfil their obligations without

B  deliberate intervention from third parties. They are entitled to expect that third parties will refrain from intentionally intruding in the trustee-beneficiary relationship and thereby hindering a beneficiary from receiving his entitlement in accordance with the terms of the trust instrument. There is here a close analogy with breach of contract. A person who knowingly procures a breach of contract, or knowingly interferes with the due

C  performance of a contract, is liable to the innocent party. The underlying rationale is the same.

### Strict liability

The other extreme possibility can also be rejected out of hand. This is the case where a third party deals with a trustee without knowing, or having any reason to suspect, that he is a trustee. Or the case where a

D  third party is aware he is dealing with a trustee but has no reason to know or suspect that their transaction is inconsistent with the terms of the trust. The law has never gone so far as to give a beneficiary a remedy against a non-recipient third party in such circumstances. Within defined limits, proprietary rights, whether legal or equitable, endure against third parties who were unaware of their existence. But accessory liability is concerned

E  with the liability of a person who has not received any property. His liability is not property-based. His only sin is that he interfered with the due performance by the trustee of the fiduciary obligations undertaken by the trustee. These are personal obligations. They are, in this respect, analogous to the personal obligations undertaken by the parties to a contract. But ordinary, everyday business would become impossible if

F  third parties were to be held liable for *unknowingly* interfering in the due performance of such personal obligations. Beneficiaries could not reasonably expect that third parties should deal with trustees at their peril, to the extent that they should become liable to the beneficiaries even when they received no trust property and even when they were unaware and had no reason to suppose that they were dealing with trustees.

G

### Fault-based liability

Given, then, that in some circumstances a third party may be liable directly to a beneficiary, but given also that the liability is not so strict that there would be liability even when the third party was wholly unaware of the existence of the trust, the next step is to seek to identify the touchstone of liability. By common accord dishonesty fulfils this role.

H  Whether, in addition, negligence will suffice is an issue on which there has been a well-known difference of judicial opinion. The *Selangor* decision [1968] 1 W.L.R. 1555 in 1968 was the first modern decision on this point. Ungoed-Thomas J., at p. 1590, held that the touchstone was whether the

**Royal Brunei Airlines v. Tan (P.C.)**                                    [1995]

third party had knowledge of circumstances which would indicate to "an    A
honest, reasonable man" that the breach in question was being committed
or would put him on inquiry. Brightman J. reached the same conclusion
in *Karak Rubber Co. Ltd. v. Burden (No. 2)* [1972] 1 W.L.R. 602. So did
Peter Gibson J. in 1983 in *Baden v. Société Générale pour Favoriser le
Développement du Commerce et de l'Industrie en France S.A. (Note)* [1993]
1 W.L.R. 509. In that case the judge accepted a five-point scale of
knowledge which had been formulated by counsel.                          B

Meanwhile doubts had been expressed about this test by Buckley and
Goff L.JJ. in the *Belmont* case [1979] Ch. 250, 267, 275. Similar doubts
were expressed in Australia by Jacobs P. in *D.P.C. Estates Pty. Ltd.
v. Grey and Consul Development Pty. Ltd.* [1974] 1 N.S.W.L.R. 443, 459.
When that decision reached the High Court of Australia, the doubts were
echoed by Barwick C.J., Gibbs and Stephen JJ.: see *Consul Development
Pty. Ltd. v. D.P.C. Estates Pty. Ltd.* (1975) 132 C.L.R. 373, 376, 398, 412.   C

Since then the tide in England has flowed strongly in favour of the test
being one of dishonesty: see, for instance, Sir Robert Megarry V.-C. in
*In re Montagu's Settlement Trusts* [1987] Ch. 264, 285, and Millett J. in
*Agip (Africa) Ltd. v. Jackson* [1990] Ch. 265, 293. In *Eagle Trust Plc.
v. S.B.C. Securities Ltd.* [1993] 1 W.L.R. 484, 495, Vinelott J. stated that
it could be taken as settled law that want of probity was a prerequisite to    D
liability. This received the imprimatur of the Court of Appeal in *Polly
Peck International Plc. v. Nadir (No. 2)* [1992] 4 All E.R. 769, 777, *per*
Scott L.J.

Judicial views have diverged also in New Zealand. In *Westpac Banking
Corporation v. Savin* [1985] 2 N.Z.L.R. 41, 70, Sir Clifford Richmond
preferred the approach in *Belmont Finance Corporation Ltd. v. Williams    E
Furniture Ltd.* [1979] Ch. 250, as did Tompkins J. in *Marr v. Arabco
Traders Ltd.* (1987) 1 N.Z.B.L.C. 102,732, 102,762. In *Powell v. Thompson*
[1991] 1 N.Z.L.R. 597, 612, 613, 615, Thomas J. considered that the
suggestion that negligence is not enough to found liability is to be resisted.
The test is one of unconscionable behaviour. This, and knowledge to
match, whether actual or constructive, will suffice to herald a visit from
equity. In *Equiticorp Industries Group Ltd. v. Hawkins* [1991] 3 N.Z.L.R.    F
700, 728, Wylie J. disagreed. He adhered to the concept of want of probity
as the standard by which unconscionability was to be measured. In
*Marshall Futures Ltd. v. Marshall* [1992] 1 N.Z.L.R. 316, 325, Tipping J.
was concerned about the difficulty of identifying as unconscionable
conduct which was less reprehensible than conduct which can be described
as dishonest. He would, he said, at p. 325, prefer the herald of equity to    G
be wearing more distinctive clothing than that suggested by Thomas J. In
*Nimmo v. Westpac Banking Corporation* [1993] 3 N.Z.L.R. 218, 228,
Blanchard J. preferred a test of dishonesty. Most recently, in *Springfield
Acres Ltd. v. Abacus (Hong Kong) Ltd.* [1994] 3 N.Z.L.R. 502, 510, Henry J.
observed that the law in New Zealand could not be regarded as settled.

Most, but not all, commentators prefer the test of dishonesty: see,    H
among others, Peter Birks, "Misdirected funds: restitution from the
recipient" (1989) L.M.C.L.Q. 296; M. J. Brindle and R. J. A. Hooley,
"Does constructive knowledge make a constructive trustee?" (1987) 61
A.L.J. 281; Charles Harpum, "The stranger as constructive trustee" (1986)

**2 A.C.**                    **Royal Brunei Airlines v. Tan (P.C.)**

A   102 L.Q.R. 114, 267; *Birks, The Frontiers of Liability* (1994), vol. 1, p. 9;
Patricia Loughlan, "Liability for assistance in a breach of fiduciary duty"
(1989) 9 O.J.L.S. 260; *Parker and Mellows, The Modern Law of Trusts*,
6th ed. (1994), p. 253; *Pettit, Equity and the Law of Trusts*, 7th ed. (1993),
p. 172; Philip Sales, "The tort of conspiracy and civil secondary liability"
(1990) 49 C.L.J. 491; *Snell's Equity*, 29th ed. (1990), p. 194; and *Underhill's
Law of Trusts and Trustees*, 14th ed. (1987), p. 355 and noter-up.

B

*Dishonesty*

   Before considering this issue further it will be helpful to define the
terms being used by looking more closely at what dishonesty means in
this context. Whatever may be the position in some criminal or other
contexts (see, for instance, *Reg. v. Ghosh* [1982] Q.B. 1053), in the context
C   of the accessory liability principle acting dishonestly, or with a lack of
probity, which is synonymous, means simply not acting as an honest
person would in the circumstances. This is an objective standard. At first
sight this may seem surprising. Honesty has a connotation of subjectivity,
as distinct from the objectivity of negligence. Honesty, indeed, does have
a strong subjective element in that it is a description of a type of conduct
D   assessed in the light of what a person actually knew at the time, as distinct
from what a reasonable person would have known or appreciated. Further,
honesty and its counterpart dishonesty are mostly concerned with
advertent conduct, not inadvertent conduct. Carelessness is not dishonesty.
Thus for the most part dishonesty is to be equated with conscious
impropriety. However, these subjective characteristics of honesty do not
mean that individuals are free to set their own standards of honesty in
E   particular circumstances. The standard of what constitutes honest conduct
is not subjective. Honesty is not an optional scale, with higher or lower
values according to the moral standards of each individual. If a person
knowingly appropriates another's property, he will not escape a finding of
dishonesty simply because he sees nothing wrong in such behaviour.
   In most situations there is little difficulty in identifying how an honest
F   person would behave. Honest people do not intentionally deceive others
to their detriment. Honest people do not knowingly take others' property.
Unless there is a very good and compelling reason, an honest person does
not participate in a transaction if he knows it involves a misapplication of
trust assets to the detriment of the beneficiaries. Nor does an honest
person in such a case deliberately close his eyes and ears, or deliberately
not ask questions, lest he learn something he would rather not know, and
G   then proceed regardless. However, in the situations now under
consideration the position is not always so straightforward. This can best
be illustrated by considering one particular area: the taking of risks.

*Taking risks*

H   All investment involves risk. Imprudence is not dishonesty, although
imprudence may be carried recklessly to lengths which call into question
the honesty of the person making the decision. This is especially so if the
transaction serves another purpose in which that person has an interest of
his own.

Royal Brunei Airlines v. Tan (P.C.)                    [1995]

This type of risk is to be sharply distinguished from the case where a   A
trustee, with or without the benefit of advice, is aware that a particular
investment or application of trust property is outside his powers, but
nevertheless he decides to proceed in the belief or hope that this will be
beneficial to the beneficiaries or, at least, not prejudicial to them. He takes
a risk that a clearly unauthorised transaction will not cause loss. A risk of
this nature is for the account of those who take it. If the risk materialises
and causes loss, those who knowingly took the risk will be accountable   B
accordingly. This is the type of risk being addressed by Peter Gibson J. in
the *Baden* case [1993] 1 W.L.R. 509, 574, when he accepted that fraud
includes taking "a risk to the prejudice of another's rights, which risk is
known to be one which there is no right to take."

This situation, in turn, is to be distinguished from the case where there
is genuine doubt about whether a transaction is authorised or not. This   C
may be because the trust instrument is worded obscurely, or because there
are competing claims, as in *Carl Zeiss Stiftung v. Herbert Smith & Co.
(No. 2)* [1969] 2 Ch. 276, or for other reasons. The difficulty here is that
frequently the situation is neither clearly white nor clearly black. The
dividing edge between what is within the trustee's powers and what is not
is often not clear-cut. Instead there is a gradually darkening spectrum
which can be described with labels such as clearly authorised, probably   D
authorised, possibly authorised, wholly unclear, probably unauthorised
and, finally, clearly unauthorised.

The difficulty here is that the differences are of degree rather than of
kind. So far as the trustee himself is concerned the legal analysis is
straightforward. Honesty or lack of honesty is not the test for his liability.
He is obliged to comply with the terms of the trust. His liability is strict.   E
If he departs from the trust terms he is liable unless excused by a provision
in the trust instrument or relieved by the court. The analysis of the
position of the accessory, such as the solicitor who carries through the
transaction for him, does not lead to such a simple, clear-cut answer in
every case. He is required to act honestly; but what is required of an
honest person in these circumstances? An honest person knows there is
doubt. What does honesty require him to do?   F

The only answer to these questions lies in keeping in mind that honesty
is an objective standard. The individual is expected to attain the standard
which would be observed by an honest person placed in those
circumstances. It is impossible to be more specific. Knox J. captured the
flavour of this, in a case with a commercial setting, when he referred to a
person who is "guilty of commercially unacceptable conduct in the   G
particular context involved:" see *Cowan de Groot Properties Ltd. v. Eagle
Trust Plc.* [1992] 4 All E.R. 700, 761. Acting in reckless disregard of
others' rights or possible rights can be a tell-tale sign of dishonesty. An
honest person would have regard to the circumstances known to him,
including the nature and importance of the proposed transaction, the
nature and importance of his role, the ordinary course of business, the
degree of doubt, the practicability of the trustee or the third party   H
proceeding otherwise and the seriousness of the adverse consequences to
the beneficiaries. The circumstances will dictate which one or more of the
possible courses should be taken by an honest person. He might, for

A  instance, flatly decline to become involved. He might ask further questions. He might seek advice, or insist on further advice being obtained. He might advise the trustee of the risks but then proceed with his role in the transaction. He might do many things. Ultimately, in most cases, an honest person should have little difficulty in knowing whether a proposed transaction, or his participation in it, would offend the normally accepted standards of honest conduct.

B  Likewise, when called upon to decide whether a person was acting honestly, a court will look at all the circumstances known to the third party at the time. The court will also have regard to personal attributes of the third party, such as his experience and intelligence, and the reason why he acted as he did.

Before leaving cases where there is real doubt, one further point should
C  be noted. To inquire, in such cases, whether a person dishonestly assisted in what is later held to be a breach of trust is to ask a meaningful question, which is capable of being given a meaningful answer. This is not always so if the question is posed in terms of "knowingly" assisted. Framing the question in the latter form all too often leads one into tortuous convolutions about the "sort" of knowledge required, when the truth is that "knowingly" is inapt as a criterion when applied to the
D  gradually darkening spectrum where the differences are of degree and not kind.

### Negligence

It is against this background that the question of negligence is to be addressed. This question, it should be remembered, is directed at whether
E  an honest third party who receives no trust property should be liable if he procures or assists in a breach of trust of which he would have become aware had he exercised reasonable diligence. Should he be liable to the beneficiaries for the loss they suffer from the breach of trust?

The majority of persons falling into this category will be the hosts of people who act for trustees in various ways: as advisers, consultants, bankers and agents of many kinds. This category also includes officers
F  and employees of companies in respect of the application of company funds. All these people will be accountable to the trustees for their conduct. For the most part they will owe to the trustees a duty to exercise reasonable skill and care. When that is so, the rights flowing from that duty form part of the trust property. As such they can be enforced by the beneficiaries in a suitable case if the trustees are unable or unwilling to do
G  so. That being so, it is difficult to identify a compelling reason why, in addition to the duty of skill and care vis-à-vis the trustees which the third parties have accepted, or which the law has imposed upon them, third parties should also owe a duty of care directly to the beneficiaries. They have undertaken work for the trustees. They must carry out that work properly. If they fail to do so, they will be liable to make good the loss suffered by the trustees in consequence. This will include, where
H  appropriate, the loss suffered by the trustees, being exposed to claims for breach of trust.

Outside this category of persons who owe duties of skill and care to the trustees, there are others who will deal with trustees. If they have not

accepted, and the law has not imposed upon them, any such duties in       A
favour of the trustees, it is difficult to discern a good reason why they
should nevertheless owe such duties to the beneficiaries.

There remains to be considered the position where third parties are
acting for, or dealing with, dishonest trustees. In such cases the trustees
would have no claims against the third party. The trustees would suffer
no loss by reason of the third party's failure to discover what was going
on. The question is whether in this type of situation the third party owes       B
a duty of care to the beneficiaries to, in effect, check that a trustee is not
misbehaving. The third party must act honestly. The question is whether
that is enough.

In agreement with the preponderant view, their Lordships consider
that dishonesty is an essential ingredient here. There may be cases where,
in the light of the particular facts, a third party will owe a duty of care to       C
the beneficiaries. As a general proposition, however, beneficiaries cannot
reasonably expect that all the world dealing with their trustees should owe
them a duty to take care lest the trustees are behaving dishonestly.

### Unconscionable conduct

Mention, finally, must be made of the suggestion that the test for       D
liability is that of unconscionable conduct. Unconscionable is a word of
immediate appeal to an equity lawyer. Equity is rooted historically in the
concept of the Lord Chancellor, as the keeper of the Royal Conscience,
concerning himself with conduct which was contrary to good conscience.
It must be recognised, however, that unconscionable is not a word in
everyday use by non-lawyers. If it is to be used in this context, and if it is
to be the touchstone for liability as an accessory, it is essential to be clear       E
on what, *in this context*, unconscionable *means*. If unconscionable means
no more than dishonesty, then dishonesty is the preferable label. If
unconscionable means something different, it must be said that it is not
clear what that something different is. Either way, therefore, the term is
better avoided in this context.

F

### The accessory liability principle

Drawing the threads together, their Lordships' overall conclusion is
that dishonesty is a necessary ingredient of accessory liability. It is also a
sufficient ingredient. A liability in equity to make good resulting loss
attaches to a person who dishonestly procures or assists in a breach of
trust or fiduciary obligation. It is not necessary that, in addition, the
trustee or fiduciary was acting dishonestly, although this will usually be so       G
where the third party who is assisting him is acting dishonestly.
"Knowingly" is better avoided as a defining ingredient of the principle,
and in the context of this principle the *Baden* [1993] 1 W.L.R. 509 scale of
knowledge is best forgotten.

### Conclusion                                                      H

From this statement of the principle it follows that this appeal
succeeds. The money paid to B.L.T. on the sale of tickets for the airline
was held by B.L.T. upon trust for the airline. This trust, on its face,

**2 A.C.**                    **Royal Brunei Airlines v. Tan (P.C.)**

A    conferred no power on B.L.T. to use the money in the conduct of its
business. The trust gave no authority to B.L.T. to relieve its cash flow
problems by utilising for this purpose the rolling 30-day credit afforded
by the airline. Thus B.L.T. committed a breach of trust by using the
money instead of simply deducting its commission and holding the money
intact until it paid the airline. The defendant accepted that he knowingly
assisted in that breach of trust. In other words, he caused or permitted his
B    company to apply the money in a way he knew was not authorised by the
trust of which the company was trustee. Set out in these bald terms, the
defendant's conduct was dishonest. By the same token, and for good
measure, B.L.T. also acted dishonestly. The defendant was the company,
and his state of mind is to be imputed to the company.

  The Court of Appeal held that it was not established that B.L.T. was
C    guilty of fraud or dishonesty in relation to the amounts it held for the
airline. Their Lordships understand that by this the Court of Appeal
meant that it was not established that the defendant intended to defraud
the airline. The defendant hoped, maybe expected, to be able to pay the
airline, but the money was lost in the ordinary course of a poorly-run
business with heavy overhead expenses. These facts are beside the point.
The defendant had no right to employ the money in the business at all.
D    That was the breach of trust. The company's inability to pay the airline
was the consequence of that breach of trust.

  The Court of Appeal observed that it would have been unrealistic to
expect B.L.T. to keep the money in a separate bank account and not use
any of the money in the conduct of the business, particularly as B.L.T.
was also the ticketing agent for a number of other airlines. Their Lordships
E    express no view on this, or on what the parties are to be taken to have
intended would happen in practice when the company's current bank
account was overdrawn. It is possible that in certain circumstances these
points might sustain an argument that, although there was a failure to
pay, there was no breach of trust. They do not arise in this case because
of the defendant's acceptance that there was a breach of trust.

  Their Lordships will report their advice to His Majesty The Sultan and
F    Yang Di-Pertuan that this appeal should be allowed, the order of the
Court of Appeal set aside and the order of Roberts C.J. restored. The
defendant must pay the airline's costs before their Lordships' Board and
before the Court of Appeal.

  *Solicitors: Norton Rose; Denton Hall.*

G
                                                        S. S.

H
                              ————

[1990]

[HOUSE OF LORDS]

A

CAPARO INDUSTRIES PLC. . . . . . RESPONDENTS

AND

DICKMAN AND OTHERS . . . . . . . APPELLANTS

B

1989 Nov. 16, 20, 22, 23, 27, 28;   Lord Bridge of Harwich, Lord Roskill,
1990 Feb. 8   Lord Ackner, Lord Oliver of Aylmerton and
Lord Jauncey of Tullichettle

*Negligence—Duty of care to whom?—Auditor—Appointment by
company to audit and certify company's accounts—Statutory duty
to make report to shareholders—Another company making take-
over bid by initial purchase of shares—Claim that subsequent
completion of take-over by purchase of total issued shares made
in reliance on negligently made audit—Whether auditor owing
duty of care to shareholders—Whether duty owed to non-
shareholding investor—Companies Act 1985 (c. 6), ss. 236(1)(2),
237(1)*

C

The plaintiffs, a public limited company, which had
accomplished the take-over of F. Plc., brought an action against
its directors alleging fraudulent misrepresentation and against its
auditors claiming that they were negligent in carrying out the
audit and making their report, which they were required to do
within the terms of sections 236 and 237 of the Companies Act
1985. In the statement of claim the plaintiffs alleged that they
had begun purchasing shares in F. Plc. a few days before the
annual accounts had been published to shareholders, that in
reliance on those accounts they made further purchases of
shares so as to take over the company, and that the auditors
owed both shareholders and potential investors a duty of care in
respect of the certification of the accounts and should have
known that as F. Plc.'s profits were not as high as projected and
its share price had fallen significantly, that it was susceptible to
a take-over bid and that reliance on the accuracy of the accounts
would be placed by any potential bidder such as the plaintiffs.
On the trial of a preliminary issue against the auditors, on the
facts as alleged, the judge determined that the auditors did not
owe the plaintiffs a duty of care at common law either as a
shareholder of F. Plc. or as an investor holding no shares. On
appeal by the plaintiffs the Court of Appeal, by a majority,
held that a duty of care was owed to the plaintiffs as shareholders
but not as investors.

D

E

F

G

On appeal by the auditors and cross-appeal by the plaintiffs:—
*Held*, allowing the appeal and dismissing the cross-appeal,
that liability for economic loss due to negligent mis-statement
was confined to cases where the statement or advice had been
given to a known recipient for a specific purpose of which the
maker was aware and upon which the recipient had relied and
acted upon to his detriment; that since the purpose of the
statutory requirement for an audit of public companies under
the Act of 1985 was the making of a report to enable
shareholders to exercise their class rights in general meeting and
did not extend to the provision of information to assist
shareholders in the making of decisions as to future investment
in the company, and since, additionally, there was no reason in
policy or principle why auditors should be deemed to have
a special relationship with non-shareholders contemplating

H

Caparo Plc. v. Dickman (H.L.(E.))

A     investment in the company in reliance on the published accounts, even when the affairs of the company were known to be such as to render it susceptible to an attempted take-over, the auditors had not owed any duty of care to the plaintiffs in respect of their purchase of F. Plc.'s shares (post, pp. 368c–e, 370b, 372g—373a, b–h, 374a–c, 375c–e, h, 377g–h, 383h—384b, 394g—395a, 398g—399b, 402h—403a, 406a–f).

B     *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465, H.L.(E.) and *Smith v. Eric S. Bush* [1989] 2 W.L.R. 790, H.L.(E.) applied.

Dicta of Denning L.J. in *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164, 179–182 and *Al Saudi Banque v. Clarke Pixley* [1990] 2 W.L.R. 344 approved.

*Scott Group Ltd. v. McFarlane* [1978] N.Z.L.R. 553 considered.

C     *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All E.R. 289 and *Twomax Ltd. v. Dickson, McFarlane & Robinson,* 1982 S.C. 113 distinguished.

*Per* Lord Bridge of Harwich, Lord Roskill, Lord Ackner and Lord Oliver of Aylmerton. Whilst recognising the importance of the underlying general principles common to the whole field of negligence, the law has now moved in the direction of attaching greater significance to the more traditional

D     categorisation of distinct and recognisable situations as guides to the existence, the scope and the limits of the varied duties of care which the law imposes (post, pp. 365c–d, 374h—375a, h, 379f–h, 381a–b).

Dicta of Brennan J. in *Sutherland Shire Council v. Heyman* (1985) 60 A.L.R. 1, 43–44 considered.

Decision of the Court of Appeal [1989] Q.B. 653; [1989] 2 W.L.R. 316; [1989] 1 All E.R. 798 reversed in part.

E

The following cases are referred to in their Lordships' opinions:

*Al Saudi Banque v. Clarke Pixley* [1990] 2 W.L.R. 344; [1989] 3 All E.R. 361

*Anns v. Merton London Borough Council* [1978] A.C. 728; [1977] 2 W.L.R. 1024; [1977] 2 All E.R. 492, H.L.(E.)

F     *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164; [1951] 1 All E.R. 426, C.A.

*Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd.* [1986] A.C. 1; [1985] 3 W.L.R. 381; [1985] 2 All E.R. 935, P.C.

*Cann v. Willson* (1888) 39 Ch.D. 39

*Cattle v. Stockton Waterworks Co.* (1875) L.R. 10 Q.B. 453

*Clayton v. Woodman & Sons (Builders) Ltd.* [1962] 2 Q.B. 533; [1961] 3 W.L.R. 987; [1961] 3 All E.R. 249; [1962] 1 W.L.R. 585; [1962] 2 All E.R. 33, Salmon J. and C.A.

G     *Donoghue v. Stevenson* [1932] A.C. 562, H.L.(Sc.)

*Dorset Yacht Co. Ltd. v. Home Office* [1970] A.C. 1004; [1970] 2 W.L.R. 1140; [1970] 2 All E.R. 294, H.L.(E.)

*Elliott Steam Tug Co. Ltd. v. Shipping Controller* [1922] 1 K.B. 127, C.A.

*Glanzer v. Shepard* (1922) 135 N.E. 275

*Grant v. Australian Knitting Mills Ltd.* [1936] A.C. 85, P.C.

H     *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465; [1963] 3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)

*Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53; [1988] 2 W.L.R. 1049; [1988] 2 All E.R. 238, H.L.(E.)

*JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All E.R. 289

*Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520; [1982] 3 W.L.R. 477; [1982] 3 All E.R. 201, H.L.(Sc.)

*Leigh and Sillavan Ltd. v. Aliakmon Shipping Co. Ltd.* [1986] A.C. 785; [1986] 2 W.L.R. 902; [1986] 2 All E.R. 145, H.L.(E.)

A

*Le Lievre v. Gould* [1893] 1 Q.B. 491, C.A.

*McLoughlin v. O'Brian* [1983] 1 A.C. 410; [1982] 2 W.L.R. 982; [1982] 2 All E.R. 298, H.L.(E.)

*Ministry of Housing and Local Government v. Sharp* [1970] 2 Q.B. 223; [1970] 2 W.L.R. 802; [1970] 1 All E.R. 1009, C.A.

*Mutual Life and Citizens' Assurance Co. Ltd. v. Evatt* [1971] A.C. 793; [1971] 2 W.L.R. 23; [1971] 1 All E.R. 150, P.C.

B

*Peabody Donation Fund (Governors of) v. Sir Lindsay Parkinson & Co. Ltd.* [1985] A.C. 210; [1984] 3 W.L.R. 953; [1984] 3 All E.R. 529, H.L.(E.)

*Perl (P.) (Exporters) Ltd. v. Camden London Borough Council* [1984] Q.B. 342; [1983] 3 W.L.R. 769; [1983] 3 All E.R. 161, C.A.

*Rondel v. Worsley* [1969] 1 A.C. 191; [1967] 3 W.L.R. 1666; [1967] 3 All E.R. 993, H.L.(E.)

*Ross v. Caunters* [1980] Ch. 297; [1979] 3 W.L.R. 605; [1979] 3 All E.R. 580

C

*Rowling v. Takaro Properties Ltd.* [1988] A.C. 473; [1988] 2 W.L.R. 418; [1988] 1 All E.R. 163, P.C.

*Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553

*Smith v. Eric S. Bush* [1989] 2 W.L.R. 790; [1989] 2 All E.R. 514, H.L.(E.)

*Smith v. Littlewoods Organisation Ltd.* [1987] A.C. 241; [1987] 2 W.L.R. 480; [1987] 1 All E.R. 710, H.L.(Sc.)

D

*Sutherland Shire Council v. Heyman* (1985) 60 A.L.R. 1

*Twomax v. Dickson, McFarlane & Robinson,* 1982 S.C. 113

*Ultramares Corporation v. Touche* (1931) 174 N.E. 441; 255 N.Y. 170

*Wagon Mound, The* [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1 All E.R. 404, P.C.

*Yuen Kun Yeu v. Attorney-General of Hong Kong* [1988] A.C. 175; [1987] 3 W.L.R. 776; [1987] 2 All E.R. 705, P.C.

E

The following additional cases were cited in argument:

*Allen, Craig and Co. (London) Ltd., In re* [1934] Ch. 483

*Aswan Engineering Establishment Co. (M/S) v. Lupdine Ltd.* [1987] 1 W.L.R. 1; [1987] 1 All E.R. 135, C.A.

*Blue Bell Inc. v. Peat Marwick, Mitchell & Co.* (1986) 715 S.W.2d 408

F

*Clarke v. Bruce Lance & Co.* [1988] 1 W.L.R. 881; [1988] 1 All E.R. 364, C.A.

*Clay v. A. J. Crump & Sons Ltd.* [1964] 1 Q.B. 533; [1963] 3 W.L.R. 866; [1963] 3 All E.R. 687, C.A.

*Credit Alliance Corporation v. Arthur Andersen & Co.* (1985) 483 N.E.2d 110

*Customs and Excise Commissioners v. Hedon Alpha Ltd.* [1981] Q.B. 818; [1981] 2 W.L.R. 791; [1981] 2 All E.R. 697, C.A.

G

*Dutton v. Bognor Regis Urban District Council* [1972] 1 Q.B. 373; [1972] 2 W.L.R. 299; [1972] 1 All E.R. 462, C.A.

*Farr v. Butters Brothers and Co.* [1932] 2 K.B. 606, C.A.

*Haig v. Bamford* (1976) 72 D.L.R. (3d) 68

*Hickman v. Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch. 881

*McInery v. Lloyds Bank Ltd.* [1974] 1 Lloyd's Rep. 246, C.A.

H

*Otto v. Bolton and Norris* [1936] 2 K.B. 46

*Pacific Associates Inc. v. Baxter* [1989] 3 W.L.R. 1150; [1989] 2 All E.R. 159, C.A.

*Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A.

*Rosenblum (H.) Inc. v. Adler* (1983) 461 A.2d 138

*S.C.M. (United Kingdom) Ltd. v. W. J. Whittal and Son Ltd.* [1971] 1 Q.B. 337; [1970] 3 W.L.R. 694; [1970] 3 All E.R. 245, C.A.

2 W.L.R.               **Caparo Plc. v. Dickman (H.L.(E.))**

A      *Spartan Steel & Alloys Ltd. v. Martin & Co. (Contractors) Ltd.* [1973] Q.B.
           27; [1972] 3 W.L.R. 502; [1972] 3 All E.R. 557, C.A.
       *Toro Co. v. Krouse, Kern & Co. Inc.* (1987) 827 F.2d 155

       APPEAL from the Court of Appeal.
           This was an appeal by the third defendants, Touche Ross & Co., a
       firm of accountants, and a cross-appeal by the plaintiffs, Caparo
B      Industries Plc., in respect of the trial of a preliminary issue in an action
       by the plaintiffs against the first and second defendants, Steven Graham
       Dickman and Robert Anthony Dickman, two directors of Fidelity Plc.,
       alleging fraudulent misrepresentation, and against the third defendants
       alleging negligence in the carrying out of an audit of the accounts of
       Fidelity for the year ended 31 March 1984, whereby (1) the third
C      defendants appealed against that part of the order of the Court of
       Appeal (Bingham and Taylor L.JJ., O'Connor L.J. dissenting) [1989]
       Q.B. 653 allowing the plaintiffs' appeal against the decision of Sir Neil
       Lawson, sitting as a judge of the Queen' Bench Division [1988] B.C.L.C.
       387, that the third defendants did not owe a duty of care to the plaintiffs
       as shareholders of Fidelity; and (2) the plaintiffs cross-appealed against
       that part of the order of the Court of Appeal dismissing their appeal
D      against the decision of Sir Neil Lawson that the third defendants did not
       owe them a duty of care as non-shareholding buyers.
           The facts are set out in the opinion of Lord Bridge of Harwich.

       *Peter Goldsmith Q.C.* and *Stephen Moriarty* for the auditors.
           *Christopher Bathurst Q.C., Michael Brindle* and *Craig Orr* for the
       plaintiffs, Caparo Industries Plc.
E          The first and second defendants did not appear and were not
       represented.

           Their Lordships took time for consideration.

           8 February 1990. LORD BRIDGE OF HARWICH. My Lords, the
F      appellants are a well known firm of chartered accountants. At all times
       material to this appeal, they were the auditors of a public limited
       company, Fidelity Plc. ("Fidelity"), which carried on business as
       manufacturers and vendors of electrical equipment of various kinds and
       whose shares were quoted on the London Stock Exchange. On 22 May
       1984 the directors of Fidelity announced the results for the year ended
G      31 March 1984. These revealed that profits for the year fell well short
       of the figure which had been predicted, and this resulted in a dramatic
       drop in the quoted price of the shares which had stood at 143p per share
       on 1 March 1984 and which, by the beginning of June 1984, had fallen
       to 63p. Fidelity's accounts for the year to 31 March 1984 had been
       audited by the appellants and had been approved by the directors on the
       day before the results were announced. On 12 June 1984 they were
H      issued to the shareholders, with notice of the annual general meeting,
       which took place on 4 July 1984 and at which the auditor's report was
       read and the accounts were adopted.
           Following the announcement of the result, the respondents Caparo
       Industries Plc. ("Caparo") began to purchase shares of Fidelity in the
       market. On 8 June 1984 they purchased 100,000 shares but they were
       not registered as members of Fidelity until after 12 June 1984 when the
       accounts were sent to shareholders although they had been registered in

respect of at least some of the shares which they purchased by the date    A
of the annual general meeting, which they did not attend. On 12 June
1984, they purchased a further 50,000 shares, and by 6 July 1984 they
had increased their holding in Fidelity to 29.9 per cent. of the issued
capital. On 4 September 1984 they made a bid for the remainder at
120p per share, that offer being increased to 125p per share on 24
September 1984. The offer was declared unconditional on 23 October    B
1984, and two days later Caparo announced that it had acquired 91.8
per cent. of the issued shares and proposed to acquire the balance
compulsorily, which it subsequently did.

   The action in which this appeal arises is one in which Caparo alleges
that the purchases of shares which took place after 12 June 1984 and the
subsequent bid were all made in reliance upon the accounts and that
those accounts were inaccurate and misleading in a number of respects    C
and in particular in overvaluing stock and underproviding for after-sales
credits, with the result that an apparent pre-tax profit of some £1.3m.
should in fact have been shown as a loss of over £400,000. Had the true
facts been known, it is alleged, Caparo would not have made a bid at
the price paid or indeed at all. Caparo accordingly commenced
proceedings on 24 July 1985 against two of the persons who were    D
directors at the material time, claiming that the overvaluations were
made fraudulently, and against the appellants, claiming that they
were negligent in certifying, as they did, that the accounts showed a true
and fair view of Fidelity's position at the date to which they related.
The substance of the allegation against the appellants is contained in
paragraph 16 of the statement of claim which is in the following terms:
                                                                        E
   "Touche Ross, as auditors of Fidelity carrying out their functions as
   auditors and certifiers of the accounts in April and May 1984, owed
   a duty of care to investors and potential investors, and in particular
   to Caparo, in respect of the audit and certification of the accounts.
   In support of that duty of care Caparo will rely upon the following
   matters: (1) Touche Ross knew or ought to have known (a) that in
   early March 1984 a press release had been issued stating that profits    F
   for the financial year would fall significantly short of £2.2m., (b)
   that Fidelity's share price fell from 143p per share on 1 March 1984
   to 75p per share on 2 April 1984, (c) that Fidelity required financial
   assistance. (2) Touche Ross therefore ought to have foreseen that
   Fidelity was vulnerable to a take-over bid and that persons such as
   Caparo might well rely on the accounts for the purpose of deciding    G
   whether to take over Fidelity and might well suffer loss if the
   accounts were inaccurate."

   On 6 July 1987, Sir Neil Lawson, sitting as judge in chambers, made
an order for the trial of a preliminary issue, as follows:

   "Whether on the facts set out in paragraphs 4 and 6 and in sub-    H
   paragraphs (1) and (2) of paragraph 16 of the statement of claim
   herein, the third defendants, Touche Ross & Co., owed a duty of
   care to the plaintiffs, Caparo Industries Plc., (a) as potential
   investors in Fidelity Plc.; or (b) as shareholders in Fidelity Plc. from
   8 June 1984 and/or from 12 June 1984; in respect of the audit of the
   accounts of Fidelity Plc. for the year ended 31 March 1984 published
   on 12 June 1984."

363

2 W.L.R.  Caparo Plc. v. Dickman (H.L.(E.))  Lord Bridge
of Harwich

A  Paragraphs 4 and 6 of the statement of claim are those paragraphs in which are set out the purchases of shares by Caparo to which I have referred and in which it is claimed that the purchases made after 12 June 1984 were made in reliance upon the information contained in the accounts. There is, however, one correction to be made. Paragraph 4 alleges that the accounts were issued on 12 June 1984 "to shareholders, including Caparo" but it is now accepted that at that date Caparo,

B  although a purchaser of shares, had not been registered as a shareholder in Fidelity's register of members.

On the trial of this preliminary issue Sir Neil Lawson, sitting as a judge of the Queen's Bench Division [1988] B.C.L.C. 387, held (i) that the appellants owed no duty at common law to Caparo as investors and (ii) that, whilst auditors might owe statutory duties to shareholders as a

C  class, there was no common law duty to individual shareholders such as would enable an individual shareholder to recover damages for loss sustained by him in acting in reliance upon the audited accounts.

Caparo appealed to the Court of Appeal [1989] Q.B. 653 which, by a majority (O'Connor L.J. dissenting) allowed the appeal holding that, whilst there was no relationship between an auditor and a potential investor sufficiently proximate to give rise to a duty of care at common

D  law, there was such a relationship with individual shareholders, so that an individual shareholder who suffered loss by acting in reliance on negligently prepared accounts, whether by selling or retaining his shares or by purchasing additional shares, was entitled to recover in tort. From that decision the appellants now appeal to your Lordships' House with the leave of the Court of Appeal, and the respondents cross-appeal

E  against the rejection by the Court of Appeal of their claim that the appellants owed them a duty of care as potential investors.

In determining the existence and scope of the duty of care which one person may owe to another in the infinitely varied circumstances of human relationships there has for long been a tension between two different approaches. Traditionally the law finds the existence of the

F  duty in different specific situations each exhibiting its own particular characteristics. In this way the law has identified a wide variety of duty situations, all falling within the ambit of the tort of negligence, but sufficiently distinct to require separate definition of the essential ingredients by which the existence of the duty is to be recognised. Commenting upon the outcome of this traditional approach, Lord Atkin, in his seminal speech in *Donoghue v. Stevenson* [1932] A.C. 562, 579–

G  580, observed:

"The result is that the courts have been engaged upon an elaborate classification of duties as they exist in respect of property, whether real or personal, with further divisions as to ownership, occupation or control, and distinctions based on the particular relations of the

H  one side or the other, whether manufacturer, salesman or landlord, customer, tenant, stranger, and so on. In this way it can be ascertained at any time whether the law recognises a duty, but only where the case can be referred to some particular species which has been examined and classified. And yet the duty which is common to all the cases where liability is established must logically be based upon some element common to the cases where it is found to exist."

It is this last sentence which signifies the introduction of the more       A
modern approach of seeking a single general principle which may be
applied in all circumstances to determine the existence of a duty of care.
Yet Lord Atkin himself sounds the appropriate note of caution by
adding, at p. 580:

> "To seek a complete logical definition of the general principle is
> probably to go beyond the function of the judge, for the more       B
> general the definition the more likely it is to omit essentials or to
> introduce non-essentials."

Lord Reid gave a large impetus to the modern approach in *Dorset Yacht
Co. Ltd. v. Home Office* [1970] A.C. 1004, 1026–1027, where he said:

> "In later years there has been a steady trend towards regarding the
> law of negligence as depending on principle so that, when a new       C
> point emerges, one should ask not whether it is covered by authority
> but whether recognised principles apply to it. *Donoghue v.
> Stevenson* [1932] A.C. 562 may be regarded as a milestone, and the
> well known passage in Lord Atkin's speech should I think be
> regarded as a statement of principle. It is not to be treated as if it
> were a statutory definition. It will require qualification in new       D
> circumstances. But I think that the time has come when we can
> and should say that it ought to apply unless there is some
> justification or valid explanation for its exclusion."

  The most comprehensive attempt to articulate a single general
principle is reached in the well known passage from the speech of Lord
Wilberforce in *Anns v. Merton London Borough Council* [1978] A.C.       E
728, 751–752:

> "Through the trilogy of cases in this House—*Donoghue v. Stevenson*
> [1932] A.C. 562, *Hedley Byrne & Co. Ltd. v. Heller & Partners
> Ltd.* [1964] A.C. 465, and *Dorset Yacht Co. Ltd. v. Home Office*
> [1970] A.C. 1004, the position has now been reached that in order
> to establish that a duty of care arises in a particular situation, it is
> not necessary to bring the facts of that situation within those of       F
> previous situations in which a duty of care has been held to exist.
> Rather the question has to be approached in two stages. First one
> has to ask whether, as between the alleged wrongdoer and the
> person who has suffered damage there is a sufficient relationship of
> proximity or neighbourhood such that, in the reasonable contem-
> plation of the former, carelessness on his part may be likely to       G
> cause damage to the latter—in which case a prima facie duty of care
> arises. Secondly, if the first question is answered affirmatively, it is
> necessary to consider whether there are any considerations which
> ought to negative, or to reduce or limit the scope of the duty or the
> class of person to whom it is owed or the damages to which a
> breach of it may give rise: see *Dorset Yacht* case [1970] A.C. 1004       H
> *per* Lord Reid at p. 1027."

But since the *Anns* case a series of decisions of the Privy Council and of
your Lordships' House, notably in judgments and speeches delivered by
Lord Keith of Kinkel, have emphasised the inability of any single
general principle to provide a practical test which can be applied to
every situation to determine whether a duty of care is owed and, if so,
what is its scope: see *Governors of Peabody Donation Fund v. Sir*

A  *Lindsay Parkinson & Co. Ltd.* [1985] A.C. 210, 239F–241C; *Yuen Kun Yeu v. Attorney-General of Hong Kong* [1988] A.C. 175, 190E–194F; *Rowling v. Takaro Properties Ltd.* [1988] A.C. 473, 501D–G; *Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53, 60B–D. What emerges is that, in addition to the foreseeability of damage, necessary ingredients in any situation giving rise to a duty of care are that there should exist between the party owing the duty and the party to whom it

B  is owed a relationship characterised by the law as one of "proximity" or "neighbourhood" and that the situation should be one in which the court considers it fair, just and reasonable that the law should impose a duty of a given scope upon the one party for the benefit of the other. But it is implicit in the passages referred to that the concepts of proximity and fairness embodied in these additional ingredients are not

C  susceptible of any such precise definition as would be necessary to give them utility as practical tests, but amount in effect to little more than convenient labels to attach to the features of different specific situations which, on a detailed examination of all the circumstances, the law recognises pragmatically as giving rise to a duty of care of a given scope. Whilst recognising, of course, the importance of the underlying general principles common to the whole field of negligence, I think the law has

D  now moved in the direction of attaching greater significance to the more traditional categorisation of distinct and recognisable situations as guides to the existence, the scope and the limits of the varied duties of care which the law imposes. We must now, I think, recognise the wisdom of the words of Brennan J. in the High Court of Australia in *Sutherland Shire Council v. Heyman* (1985) 60 A.L.R. 1, 43–44, where he said:

E      "It is preferable, in my view, that the law should develop novel categories of negligence incrementally and by analogy with established categories, rather than by a massive extension of a prima facie duty of care restrained only by indefinable 'considerations which ought to negative, or to reduce or limit the scope of the duty or the class of person to whom it is owed.' "

F      One of the most important distinctions always to be observed lies in the law's essentially different approach to the different kinds of damage which one party may have suffered in consequence of the acts or omissions of another. It is one thing to owe a duty of care to avoid causing injury to the person or property of others. It is quite another to avoid causing others to suffer purely economic loss. A graphic

G  illustration of the distinction is embodied in the proposition that:

      "In case of a wrong done to a chattel the common law does not recognise a person whose only rights are a contractual right to have the use or services of the chattel for purposes of making profits or gains without possession of or property in the chattel. Such a person cannot claim for injury done to his contractual right:" see *Elliott Steam Tug Co. Ltd. v. Shipping Controller* [1922] 1 K.B. 127,

H      139 *per* Scrutton L.J.

The proposition derives from *Cattle v. Stockton Waterworks Co.* (1875) L.R. 10 Q.B. 453. It has recently been reaffirmed in *Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd.* [1986] A.C. 1 and *Leigh & Sillavan Ltd. v. Aliakmon Shipping Co. Ltd.* [1986] A.C. 785. In the former case Lord Fraser of Tullybelton, delivering the judgment of the Privy Council, said, at p. 25:

A

"Their Lordships consider that some limit or control mechanism has to be imposed upon the liability of a wrongdoer towards those who have suffered economic damage in consequence of his negligence. The need for such a limit has been repeatedly asserted in the cases, from *Cattle's* case, L.R. 10 Q.B. 453, to *Caltex [Oil (Australia) Pty. Ltd. v. Dredge "Willemstad" (1976)]*, 136 C.L.R. 529, and their Lordships are not aware that a view to the contrary has ever been judicially expressed."

B

The damage which may be caused by the negligently spoken or written word will normally be confined to economic loss sustained by those who rely on the accuracy of the information or advice they receive as a basis for action. The question what, if any, duty is owed by the maker of a statement to exercise due care to ensure its accuracy arises typically in relation to statements made by a person in the exercise of his calling or profession. In advising the client who employs him the professional man owes a duty to exercise that standard of skill and care appropriate to his professional status and will be liable both in contract and in tort for all losses which his client may suffer by reason of any breach of that duty. But the possibility of any duty of care being owed to third parties with whom the professional man was in no contractual relationship was for long denied because of the wrong turning taken by the law in *Le Lievre v. Gould* [1893] 1 Q.B. 491 in overruling *Cann v. Willson* (1888) 39 Ch.D. 39. In *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164, Denning L.J., in his dissenting judgment, made a valiant attempt to correct the error. But it was not until the decision of this House in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465 that the law was once more set upon the right path.

C

D

E

Consistently with the traditional approach it is to these authorities and to subsequent decisions directly relevant to this relatively narrow corner of the field that we should look to determine the essential characteristics of a situation giving rise, independently of any contractual or fiduciary relationship, to a duty of care owed by one party to another to ensure that the accuracy of any statement which the one party makes and on which the other party may foreseeably rely to his economic detriment.

F

In *Cann v. Willson*, 39 Ch.D. 39 mortgagees advanced money in reliance on a valuation of the mortgaged property supplied to them by a valuer employed by the mortgagor. On the mortgagor's default, the property, having been negligently undervalued, proved insufficient to cover the mortgage loan. The mortgagees recovered their loss from the valuer. In his judgment, Chitty J. said, at pp. 42–43:

G

"In this case the document called a valuation was sent by the defendants direct to the agents of the plaintiff for the purpose of inducing the plaintiff and his co-trustee to lay out the trust money on mortgage. It seems to me that the defendants knowingly placed themselves in that position, and in point of law incurred a duty towards him to use reasonable care in the preparation of the document called a valuation."

H

In *Candler v. Crane, Christmas & Co. Ltd.* [1951] 2 K.B. 164 the plaintiff invested money in a limited company in reliance on accounts of the company prepared by the company's accountants at the request of the managing director, which were shown to the plaintiff and discussed

A    with him by the accountants in the knowledge that he was interested as a potential investor in the company. The accounts were inaccurate and misleading and the plaintiff, having invested in the company in reliance upon them, lost his money. Denning L.J., in his dissenting judgment, held the plaintiff entitled to recover damages for the accountants' negligence.

B    In *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465 bankers were asked about the financial stability of a customer of the bank. They gave a favourable reference, albeit with a disclaimer of responsibility. The circumstances of the inquiry made it clear to the bankers that the party on whose behalf the inquiry was made wanted to know if they could safely extend credit to the bank's customer in a substantial sum. Acting on the reference given, the plaintiffs extended

C    credit to the bank's customer who in due course defaulted. Although the House held that the bankers were protected by the disclaimer of responsibility, the case provided the opportunity to review the law, which led to the reinstatement of *Cann v. Willson*, the overruling of the majority decision in the *Candler* case and the approbation of the dissenting judgment of Denning L.J. in that case.

D    The most recent decision of the House, which is very much in point, is that of the two appeals heard together of *Smith v. Eric S. Bush* and *Harris v. Wyre Forest District Council* [1989] 2 W.L.R. 790. The plaintiffs in both cases were house purchasers who purchased in reliance on valuations of the properties made by surveyors acting for and on the instructions of the mortgagees proposing to advance money to the plaintiffs to enable them to effect their purchases. In both cases

E    the surveyors' fees were paid by the plaintiffs and in both cases it turned out that the inspections and valuations had been negligently carried out and that the property was seriously defective so that the plaintiffs suffered financial loss. In the case of *Smith* the mortgagees were a building society, the surveyors who carried out the inspection and valuation were a firm employed by the building society and their report was shown to the plaintiff. In the case of *Harris* the mortgagees were

F    the local authority who employed a member of their own staff to carry out the inspection and valuation. His report was not shown to the plaintiff, but the plaintiff rightly assumed from the local authority's offer of a mortgage loan that the property had been professionally valued as worth at least the amount of the loan. In both cases the terms agreed between the plaintiff and the mortgagee purported to exclude any liability on the part of the mortgagee or the surveyor for the accuracy of

G    the mortgage valuation. The House held that in both cases the surveyor making the inspection and valuation owed a duty of care to the plaintiff house purchaser and that the contractual clauses purporting to exclude liability were struck down by section 2(2) and section 11(3) of the Unfair Contract Terms Act 1977.

H    The salient feature of all these cases is that the defendant giving advice or information was fully aware of the nature of the transaction which the plaintiff had in contemplation, knew that the advice or information would be communicated to him directly or indirectly and knew that it was very likely that the plaintiff would rely on that advice or information in deciding whether or not to engage in the transaction in contemplation. In these circumstances the defendant could clearly be expected, subject always to the effect of any disclaimer of responsibility, specifically to anticipate that the plaintiff would rely on the advice or

information given by the defendant for the very purpose for which he
did in the event rely on it. So also the plaintiff, subject again to the
effect of any disclaimer, would in that situation reasonably suppose that
he was entitled to rely on the advice or information communicated to
him for the very purpose for which he required it. The situation is
entirely different where a statement is put into more or less general
circulation and may foreseeably be relied on by strangers to the maker
of the statement for any one of a variety of different purposes which the
maker of the statement has no specific reason to anticipate. To hold the
maker of the statement to be under a duty of care in respect of
the accuracy of the statement to all and sundry for any purpose for
which they may choose to rely on it is not only to subject him, in the
classic words of Cardozo C.J. to "liability in an indeterminate amount
for an indeterminate time to an indeterminate class:" see *Ultramares
Corporation v. Touche* (1931) 174 N.E. 441, 444; it is also to confer on
the world at large a quite unwarranted entitlement to appropriate for
their own purposes the benefit of the expert knowledge or professional
expertise attributed to the maker of the statement. Hence, looking only
at the circumstances of these decided cases where a duty of care in
respect of negligent statements has been held to exist, I should expect to
find that the "limit or control mechanism . . . imposed upon the liability
of a wrongdoer towards those who have suffered economic damage in
consequence of his negligence"* rested in the necessity to prove, in this
category of the tort of negligence, as an essential ingredient of the
"proximity" between the plaintiff and the defendant, that the defendant
knew that his statement would be communicated to the plaintiff, either
as an individual or as a member of an identifiable class, specifically in
connection with a particular transaction or transactions of a particular
kind (e.g. in a prospectus inviting investment) and that the plaintiff
would be very likely to rely on it for the purpose of deciding whether or
not to enter upon that transaction or upon a transaction of that kind.

I find this expectation fully supported by the dissenting judgment of
Denning L.J. in *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164,
179, 180–181, 182–184 in the following passages:

> "Let me now be constructive and suggest the circumstances in which
> I say that a duty to use care in statement does exist apart from a
> contract in that behalf. First, what persons are under such duty?
> My answer is those persons such as accountants, surveyors, valuers
> and analysts, whose profession and occupation it is to examine
> books, accounts, and other things, and to make reports on which
> other people—other than their clients—rely in the ordinary course
> of business."

> "Secondly, to whom do these professional people owe this duty? I
> will take accountants, but the same reasoning applies to the others.
> They owe the duty, of course, to their employer or client; and also
> I think to any third person to whom they themselves show the
> accounts, or to whom they know their employer is going to show
> the accounts, so as to induce him to invest money or take some
> other action on them. But I do not think the duty can be extended
> still further so as to include strangers of whom they have heard
> nothing and to whom their employer without their knowledge may

---

* *Reporter's note. Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Ltd.*
[1986] A.C. 1, 25.

A     choose to show their accounts. Once the accountants have handed their accounts to their employer they are not, as a rule, responsible for what he does with them without their knowledge or consent. . . . The test of proximity in these cases is: did the accountants know that the accounts were required for submission to the plaintiff and use by him?"

B     "Thirdly, to what transactions does the duty of care extend? It extends, I think, only to those transactions for which the accountants knew their accounts were required. For instance, in the present case it extends to the original investment of £2,000. which the plaintiff made in reliance on the accounts, because the accountants knew that the accounts were required for his guidance in making that investment; but it does not extend to the subsequent £200.

C     which he made after he had been two months with the company. This distinction, that the duty only extends to the very transaction in mind at the time, is implicit in the decided cases. . . . It will be noticed that I have confined the duty to cases where the accountant prepares his accounts and makes his report for the guidance of the very person in the very transaction in question. That is sufficient for the decision of this case. I can well understand that it would be

D     going too far to make an accountant liable to any person in the land who chooses to rely on the accounts in matters of business, for that would expose him to 'liability in an indeterminate amount for an indeterminate time to an indeterminate class': see *Ultramares Corporation v. Touche*, per Cardozo C.J. Whether he would be liable if he prepared his accounts for the guidance of a specific class

E     of persons in a specific class of transactions, I do not say. I should have thought he might be, just as the analyst and lift inspector would be liable in the instances I have given earlier. It is perhaps worth mentioning that Parliament has intervened to make the professional man liable for negligent reports given for the purposes of a prospectus: see sections 40 and 43 of the Companies Act 1948.

F     That is an instance of liability for reports made for the guidance of a specific class of persons—investors, in a specific class of transactions—applying for shares. That enactment does not help, one way or the other, to show what result the common law would have reached in the absence of such provisions; but it does show what result it ought to reach. My conclusion is that a duty to use

G     care in statement is recognised by English law, and that its recognition does not create any dangerous precedent when it is remembered that it is limited in respect of the persons by whom and to whom it is owed and the transactions to which it applies."

It seems to me that this masterly analysis, if I may say so with respect, requires little, if any, amplification or modification in the light

H     of later authority and is particularly apt to point the way to the right conclusion in the present appeal.

Some of the speeches in the *Hedley Byrne* case derive a duty of care in relation to negligent statements from a voluntary assumption of responsibility on the part of the maker of the statements. In his speech in *Smith v. Eric S. Bush* [1989] 2 W.L.R. 790, 813, Lord Griffiths emphatically rejected the view that this was the true ground of liability and concluded that:

**Caparo Plc. v. Dickman (H.L.(E.))**                    **[1990]**

> "The phrase 'assumption of responsibility' can only have any real    A
> meaning if it is understood as referring to the circumstances in
> which the law will deem the maker of the statement to have
> assumed responsibility to the person who acts upon the advice."

I do not think that in the context of the present appeal anything turns
upon the difference between these two approaches.

These considerations amply justify the conclusion that auditors of a    B
public company's accounts owe no duty of care to members of the public
at large who rely upon the accounts in deciding to buy shares in the
company. If a duty of care were owed so widely, it is difficult to see
any reason why it should not equally extend to all who rely on the
accounts in relation to other dealings with a company as lenders or
merchants extending credit to the company. A claim that such a duty    C
was owed by auditors to a bank lending to a company was emphatically
and convincingly rejected by Millett J. in *Al Saudi Banque v. Clarke
Pixley* [1990] 2 W.L.R. 344. The only support for an unlimited duty of
care owed by auditors for the accuracy of their accounts to all who may
foreseeably rely upon them is to be found in some jurisdictions in the
United States of America where there are striking differences in the law
in different states. In this jurisdiction I have no doubt that the creation    D
of such an unlimited duty would be a legislative step which it would be
for Parliament, not the courts, to take.

The main submissions for Caparo are that the necessary nexus of
proximity between it and the appellants giving rise to a duty of care
stems (1) from the pleaded circumstances indicating the vulnerability of
Fidelity to a take-over bid and from the consequent probability that    E
another company, such as Caparo, would rely on the audited accounts
in deciding to launch a take-over bid, or (2) from the circumstance that
Caparo was already a shareholder in Fidelity when it decided to launch
its take-over bid in reliance on the accounts. In relation to the first of
these two submissions, Caparo applied, in the course of the hearing, for
leave to amend paragraph 16(2) of the statement of claim by adding the    F
words "or alternatively that it was highly probable that such persons
would rely on the accounts for that purpose."

The case which gives most assistance to Caparo in support of this
submission is *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553.
The audited consolidated accounts of a New Zealand public company
and its subsidiaries overstated the assets of the group because of an
admitted accounting error. Under the relevant New Zealand legislation    G
its accounts were, as in England, accessible to the public. The
circumstances of the group's affairs were such as to make it highly
probable that it would atttract a take-over bid. The plaintiffs made such
a bid successfully and when the accounting error was discovered claimed
from the auditors in respect of the shortfall in the assets. Quilliam J.
held that the auditors owed the plaintiffs no duty of care. The majority    H
of the New Zealand Court of Appeal (Woodhouse and Cooke JJ.) held
that the duty of care arose from the probability that the company would
attract a take-over bid and the bidder would rely on the audited
accounts, although Cooke J. held that the shortfall in the assets below
that erroneously shown in the accounts did not amount to a loss
recoverable in tort. Richmond P. held that no duty of care was owed.
He said, at p. 566:

A

"All the speeches in *Hedley Byrne* seem to me to recognise the need for a 'special' relationship: a relationship which can properly be treated as giving rise to a special duty to use care in statement. The question in any given case is whether the nature of the relationship is such that one party can fairly be held to have assumed a responsibility to the other as regards the reliability of the advice or information. I do not think that such a relationship

B

should be found to exist unless, at least, the maker of the statement was, or ought to have been, aware that his advice or information would in fact be made available to and be relied on by a particular person or class of persons for the purposes of a particular transaction or type of transaction. I would especially emphasise that to my mind it does not seem reasonable to attribute an assumption of

C

responsibility unless the maker of the statement ought in all the circumstances, both in preparing himself for what he said and in saying it, to have directed his mind, and to have been able to direct his mind, to some particular and specific purpose for which he was aware that his advice or information would be relied on. In many situations that purpose will be obvious. But the annual accounts of

D

a company can be relied on in all sorts of ways and for many purposes."

I agree with this reasoning, which seems to me to be entirely in line with the principles to be derived from the authorities to which I have earlier referred and not to require modification in any respect which is relevant for present purposes by reference to anything said in this House in

E

*Smith v. Eric S. Bush* [1989] 2 W.L.R. 790. I should in any event be extremely reluctant to hold that the question whether or not an auditor owes a duty of care to an investor buying shares in a public company depends on the degree of probability that the shares will prove attractive either en bloc to a take-over bidder or piecemeal to individual investors. It would be equally wrong, in my opinion, to hold an auditor under a

F

duty of care to anyone who might lend money to a company by reason only that it was foreseeable as highly probable that the company would borrow money at some time in the year following publication of its audited accounts and that lenders might rely on those accounts in deciding to lend. I am content to assume the high probability of a take-over bid in reliance on the accounts which the proposed amendment of the statement of claim would assert but I do not think it assists Caparo's

G

case.

The only other English authority to which I need refer in this context in *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All E.R. 289, a decision at first instance of Woolf J. This was another case where the plaintiffs, who had made a successful take-over bid for a company in reliance on audited accounts which had been negligently prepared, sued

H

the accountants for damages. Woolf J. held that the auditors owed the plaintiffs a duty of care in the preparation of the accounts. He relied on both the *Anns* case [1978] A.C. 728 and *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553, in reaching the conclusion that the duty could be derived from foreseeability alone. For the reasons already indicated, I do not agree with this. It may well be, however, that the particular facts in the *JEB* case were sufficient to establish a basis on which the necessary ingredient of proximity to found a duty of care could be

derived from the actual knowledge on the part of the auditors of the      A
specific purpose for which the plaintiffs intended to use the accounts.

The position of auditors in relation to the shareholders of a public
limited liability company arising from the relevant provisions of the
Companies Act 1985 is accurately summarised in the judgment of
Bingham L.J. in the Court of Appeal [1989] Q.B. 653, 680–681:

> "The members, or shareholders, of the company are its owners.      B
> But they are too numerous, and in most cases too unskilled, to
> undertake the day to day management of that which they own. So
> responsibility for day to day management of the company is
> delegated to directors. The shareholders, despite their overall
> powers of control, are in most companies for most of the time
> investors and little more. But it would of course be unsatisfactory
> and open to abuse if the shareholders received no report on the      C
> financial stewardship of their investment save from those to whom
> the stewardship had been entrusted. So provision is made for the
> company in general meeting to appoint an auditor (section 384 of
> the Companies Act 1985), whose duty is to investigate and form an
> opinion on the adequacy of the company's accounting records and
> returns and the correspondence between the company's accounting
> records and returns and its accounts: section 237. The auditor has      D
> then to report to the company's members (among other things)
> whether in his opinion the company's accounts give a true and fair
> view of the company's financial position: section 236. In carrying
> out his investigation and in forming his opinion the auditor
> necessarily works very closely with the directors and officers of the
> company. He receives his remuneration from the company. He      E
> naturally, and rightly, regards the company as his client. But he is
> employed by the company to exercise his professional skill and
> judgment for the purpose of giving the shareholders an independent
> report on the reliability of the company's accounts and thus on their
> investment. 'No doubt he is acting antagonistically to the directors
> in the sense that he is appointed by the shareholders to be a check
> upon them:' *In re Kingston Cotton Mill Co.* [1896] 1 Ch. 6, 11, *per*      F
> Vaughan Williams J. The auditor's report must be read before the
> company in general meeting and must be open to inspection by any
> member of the company: section 241. It is attached to and forms
> part of the company's accounts: sections 238(3) and 239. A copy of
> the company's accounts, including the auditor's report, must be sent
> to every member: section 240. Any member of the company, even      G
> if not entitled to have a copy of the accounts sent to him, is entitled
> to be furnished with a copy of the company's last accounts on
> demand and without charge: section 246."

No doubt these provisions establish a relationship between the
auditors and the shareholders of a company on which the shareholder is
entitled to rely for the protection of his interest. But the crucial      H
question concerns the extent of the shareholder's interest which the
auditor has a duty to protect. The shareholders of a company have a
collective interest in the company's proper management and in so far as
a negligent failure of the auditor to report accurately on the state of the
company's finances deprives the shareholders of the opportunity to
exercise their powers in general meeting to call the directors to book
and to ensure that errors in management are corrected, the shareholders

A   ought to be entitled to a remedy. But in practice no problem arises in
this regard since the interest of the shareholders in the proper
management of the company's affairs is indistinguishable from the
interest of the company itself and any loss suffered by the shareholders,
e.g. by the negligent failure of the auditor to discover and expose a
misappropriation of funds by a director of the company, will be recouped
by a claim against the auditors in the name of the company, not by
B   individual shareholders.

I find it difficult to visualise a situation arising in the real world in
which the individual shareholder could claim to have sustained a loss in
respect of his existing shareholding referable to the negligence of the
auditor which could not be recouped by the company. But on this part
of the case your Lordships were much pressed with the argument that
C   such a loss might occur by a negligent undervaluation of the company's
assets in the auditor's report relied on by the individual shareholder in
deciding to sell his shares at an undervalue. The argument then runs
thus. The shareholder, qua shareholder, is entitled to rely on the
auditor's report as the basis of his investment decision to sell his existing
shareholding. If he sells at an undervalue he is entitled to recover the
loss from the auditor. There can be no distinction in law between the
D   shareholder's investment decision to sell the shares he has or to buy
additional shares. It follows, therefore, that the scope of the duty of
care owed to him by the auditor extends to cover any loss sustained
consequent on the purchase of additional shares in reliance on the
auditor's negligent report.

I believe this argument to be fallacious. Assuming without deciding
E   that a claim by a shareholder to recover a loss suffered by selling his
shares at an undervalue attributable to an undervaluation of the
company's assets in the auditor's report could be sustained at all, it
would not be by reason of any reliance by the shareholder on the
auditor's report in deciding to sell; the loss would be referable to the
depreciatory effect of the report on the market value of the shares
before ever the decision of the shareholder to sell was taken. A claim
F   to recoup a loss alleged to flow from the purchase of overvalued shares,
on the other hand, can only be sustained on the basis of the purchaser's
reliance on the report. The specious equation of "investment decisions"
to sell or to buy as giving rise to parallel claims thus appears to me to be
untenable. Moreover, the loss in the case of the sale would be of a loss
of part of the value of the shareholder's existing holding, which,
G   assuming a duty of care owed to individual shareholders, it might
sensibly lie within the scope of the auditor's duty to protect. A loss, on
the other hand, resulting from the purchase of additional shares would
result from a wholly independent transaction having no connection with
the existing shareholding.

I believe it is this last distinction which is of critical importance and
which demonstrates the unsoundness of the conclusion reached by the
H   majority of the Court of Appeal. It is never sufficient to ask simply
whether A owes B a duty of care. It is always necessary to determine
the scope of the duty by reference to the kind of damage from which A
must take care to save B harmless. "The question is always whether the
defendant was under a duty to avoid or prevent that damage, but the
actual nature of the damage suffered is relevant to the existence and
extent of any duty to avoid or prevent it:" see *Sutherland Shire Council
v. Heyman*, 60 A.L.R. 1, 48, *per* Brennan J. Assuming for the purpose

of the argument that the relationship between the auditor of a company     A
and individual shareholders is of sufficient proximity to give rise to a
duty of care, I do not understand how the scope of that duty can
possibly extend beyond the protection of any individual shareholder
from losses in the value of the shares which he holds. As a purchaser of
additional shares in reliance on the auditor's report, he stands in no
different position from any other investing member of the public to
whom the auditor owes no duty.     B

I would allow the appeal and dismiss the cross-appeal.

LORD ROSKILL. My Lords, I have had the advantage of reading in
draft the speeches prepared by three of your Lordships. I agree with
them and would allow the appeal and dismiss the cross-appeal for the
reasons there given. I only add some observations of my own out of     C
respect for the two Lords Justices from whom your Lordships are
differing and because of the importance of this case in relation to the
vexed question of the extent of liability of professional men, especially
accountants, for putting into circulation allegedly incorrect statements
whether oral or in writing which are claimed to have been negligently
made or prepared and which have been acted on by a third party to that
third party's detriment.     D

That liability for such negligence if established can exist has been
made clear ever since the decision of this House in *Hedley Byrne & Co.
v. Heller & Partners Ltd.* [1964] A.C. 465 in which the well known
dissenting judgment of Denning L.J. in *Candler v. Crane, Christmas &
Co.* [1951] 2 K.B. 164 was held to have stated the law correctly.
Thenceforth it was clear that such a duty of care could be owed by a     E
professional man to third parties in cases where there was no contractual
relationship between them, a view of the law long denied as the result of
a succession of late 19th century cases of which this House then took the
opportunity of disapproving.

But subsequent attempts to define both the duty and its scope have
created more problems than the decisions have solved. My noble and
learned friends have traced the evolution of the decisions from *Anns v.     F
Merton London Borough Council* [1977] A.C. 728 until and including
the most recent decisions of your Lordships' House in *Smith v. Eric S.
Bush* [1989] 2 W.L.R. 790. I agree with your Lordships that it has now
to be accepted that there is no simple formula or touchstone to which
recourse can be had in order to provide in every case a ready answer to
the questions whether, given certain facts, the law will or will not
impose liability for negligence or in cases where such liability can be     G
shown to exist, determine the extent of that liability. Phrases such as
"foreseeability," "proximity," "neighbourhood," "just and reasonable,"
"fairness," "voluntary acceptance of risk," or "voluntary assumption of
responsibility" will be found used from time to time in the different
cases. But, as your Lordships have said, such phrases are not precise
definitions. At best they are but labels or phrases descriptive of the     H
very different factual situations which can exist in particular cases and
which must be carefully examined in each case before it can be
pragmatically determined whether a duty of care exists and, if so, what
is the scope and extent of that duty. If this conclusion involves a return
to the traditional categorisation of cases as pointing to the existence and
scope of any duty of care, as my noble and learned friend Lord Bridge
of Harwich, suggests, I think this is infinitely preferable to recourse to

375

**2 W.L.R.**                 Caparo Plc. v. Dickman (H.L.(E.))                 **Lord Roskill**

A   somewhat wide generalisations which leave their practical application matters of difficulty and uncertainty. This conclusion finds strong support from the judgment of Brennan J. in *Sutherland Shire Council v. Heyman,* 60 A.L.R. 1, 43–44 in the High Court of Australia in the passage cited by my noble and learned friends.

My Lords, I confess that like my noble and learned friend, Lord Griffiths, in *Smith v. Eric S. Bush* [1989] 2 W.L.R. 790, 813, I find B   considerable difficulty in phrases such as "voluntary assumption of responsibility" unless they are to be explained as meaning no more than the existence of circumstances in which the law will impose a liability upon a person making the allegedly negligent statement to the person to whom that statement is made; in which case the phrase does not help to determine in what circumstances the law will impose that liability or C   indeed, its scope. The submission that there is a virtually unlimited and unrestricted duty of care in relation to the performance of an auditor's statutory duty to certify a company's accounts, a duty extending to anyone who may use those accounts for any purpose such as investing in the company or lending the company money, seems to me untenable. No doubt it can be said to be foreseeable that those accounts may find their way into the hands of persons who may use them for such purposes D   or indeed other purposes and lose money as a result. But to impose a liability in those circumstances is to hold, contrary to all the recent authorities, that foreseeability alone is sufficient, and to ignore the statutory duty which enjoins the preparation of and certification of those accounts.

I think that before the existence and scope of any liability can be E   determined, it is necessary first to determine for what purposes and in what circumstances the information in question is to be given. If a would-be investor or predator commissions a report which he will use, and which the maker of the report knows he will use, as a basis for his decision whether or not to invest or whether or not to make a bid, it may not be difficult to conclude that if the report is negligently prepared and as a result a decision is taken in reliance upon it and financial losses F   then follow, a liability will be imposed upon the maker of that report. But I venture to echo the caution expressed by my noble and learned friend, Lord Oliver of Aylmerton, that because different cases may display certain common features, they are necessarily all cases in which the same consequences regarding liability or the scope of liability will follow. Moreover, there may be cases in which the circumstances in which the report was commissioned justify the inclusion of and reliance G   upon a disclaimer such as succeeded in the *Hedley Byrne* case but by reason of subsequent statutory provisions failed in *Smith v. Eric S. Bush.*

My Lords it, is for these reasons, in addition to those given by my noble and learned friends, that, as already stated, I would allow this appeal and dismiss the cross-appeal.

H

LORD ACKNER. My Lords, I have had the advantage of reading the speeches of Lord Bridge of Harwich, Lord Roskill, Lord Oliver of Aylmerton and Lord Jauncey of Tullichettle and for the reasons they give I, too, would allow this appeal and dismiss the cross-appeal.

LORD OLIVER OF AYLMERTON. My Lords, this appeal, having come to this House on a preliminary point, involves the making of a number

of assumptions of fact which might or might not be substantiated at the
trial of the action. To begin with, it is to be assumed against the
appellants that they showed a lack of reasonable care in certifying that
the accounts of Fidelity for the year ended 31 March 1984 gave a true
and fair view of Fidelity's position. It is also to be assumed that, when
they certified the accounts, the appellants knew or would, if they had
thought about it, have known that Fidelity was vulnerable to take-over
bids, that a potential bidder would be likely to rely upon the accuracy of
the accounts in making his bid and that investors in the market generally,
whether or not already members of Fidelity, would also be likely to or
might well rely upon the accounts in deciding to purchase shares in that
company.

Your Lordships are not, however, either required or entitled to
make any assumption that the purpose of the certification was anything
other than that of fulfilling the statutory duty of carrying out the annual
audit with a view to the circulation of the accounts to persons who were
either registered shareholders or debenture-holders of Fidelity and the
subsequent laying of the accounts before the annual general meeting of
that company.

Thus, if and so far as the purpose for which the audit was carried out
is a relevant consideration in determining the extent of any general duty
in tort owed by the appellants to persons other than the company which
is their immediate employer, that purpose was simply that of fulfilling
the statutory requirements of the Companies Act 1985. That, in turn,
raises the question—and it is one which lies at the threshold of the
inquiry upon which your Lordships are invited to embark—of what is
the purpose behind the legislative requirement for the carrying out of an
annual audit and the circulation of the accounts. For whose protection
were these provisions enacted and what object were they intended to
achieve?

My Lords, the primary purpose of the statutory requirement that a
company's accounts shall be audited annually is almost self-evident. The
structure of the corporate trading entity, at least in the case of public
companies whose shares are dealt with on an authorised Stock Exchange,
involves the concept of a more or less widely distributed holding of
shares rendering the personal involvement of each individual shareholder
in the day-to-day management of the enterprise impracticable, with the
result that management is necessarily separated from ownership. The
management is confided to a board of directors which operates in a
fiduciary capacity and is answerable to and removable by the shareholders
who can act, if they act at all, only collectively and only through the
medium of a general meeting. Hence the legislative provisions requiring
the board annually to give an account of its stewardship to a general
meeting of the shareholders. This is the only occasion in each year
upon which the general body of shareholders is given the opportunity to
consider, to criticise and to comment upon the conduct by the board of
the company's affairs, to vote upon the directors' recommendation as to
dividends, to approve or disapprove the directors' remuneration and, if
thought desirable, to remove and replace all or any of the directors. It
is the auditors' function to ensure, so far as possible, that the financial
information as to the company's affairs prepared by the directors
accurately reflects the company's position in order, first, to protect the
company itself from the consequences of undetected errors or, possibly,
wrongdoing (by, for instance, declaring dividends out of capital) and,

A     secondly, to provide shareholders with reliable intelligence for the
      purpose of enabling them to scrutinise the conduct of the company's
      affairs and to exercise their collective powers to reward or control or
      remove those to whom that conduct has been confided.
          The requirement of the appointment of auditors and annual audit of
      the accounts, now contained in sections 235 to 246 of the Companies
      Act 1985, was first introduced by the Companies Act 1879 (25 & 26
B     Vict. c. 76) in relation to companies carrying on the business of banking
      and was extended to companies generally by the Companies Act 1900.
      Section 23 of that Act required the auditors to make a report to the
      shareholders on the company's balance sheet laid before the company in
      general meeting, stating whether the balance sheet exhibited a true and
      correct view of the state of the company's affairs. By the same section,
C     the report was required to be read before the company in general
      meeting. Section 19 of the Companies Act 1907 substituted a new
      section 23 which, whilst repeating the requirement that the auditors'
      report should be read before the company in general meeting, added a
      requirement that it should be open to inspection by any shareholder,
      who was entitled, on payment of the fee, to be furnished with a copy of
      the balance sheet and report. The new section also made it an offence
D     for any officer of the company to be party to issuing, circulating or
      publishing any copy of the balance sheet which did not either append or
      contain a reference to the auditors' report. The matter was carried one
      stage further by section 130 of the Companies Act 1929 (consolidating
      provisions contained in sections 39 and 41 of the Companies Act 1928)
      which required the annual balance sheet and auditors' report of a public
E     company to be sent not less than seven days before the date of the
      meeting to every member of the company entitled to receive notice of
      the meeting and entitled any member of the company and any debenture
      holder to be furnished on demand and without charge with a copy of the
      last balance sheet and the auditors' report. Finally, for relevant
      purposes, section 158 of the Companies Act 1948 required the accounts
      and report to be sent to every member of the company and to every
F     debenture holder not less than 21 days before the general meeting
      before which the accounts are to be laid.
          Thus the history of the legislation is one of an increasing availability
      of information regarding the financial affairs of the company to those
      having an interest in its progress and stability. It cannot fairly be said
      that the purpose of making such information available is solely to assist
      those interested in attending general meetings of the company to an
G     informed supervision and appraisal of the stewardship of the company's
      directors, for the requirement to supply audited accounts to, for instance,
      preference shareholders having no right to vote at general meetings and
      to debenture holders cannot easily be attributed to any such purpose.
      Nevertheless, I do not, for my part, discern in the legislation any
      departure from what appears to me to be the original, central and
H     primary purpose of these provisions, that is to say, the informed exercise
      by those interested in the property of the company, whether as
      proprietors of shares in the company or as the holders of rights secured
      by a debenture trust deed, of such powers as are vested in them by
      virtue of their respective proprietary interests.
          It is argued on behalf of the respondent that there is to be discerned
      in the legislation an additional or wider commercial purpose, namely
      that of enabling those to whom the accounts are addressed and

Lord Oliver
of Aylmerton                Caparo Plc. v. Dickman (H.L.(E.))                [1990]

circulated, to make informed investment decisions, for instance, by    A
determining whether to dispose of their shares in the market or whether
to apply any funds which they are individually able to command in
seeking to purchase the shares of other shareholders. Of course, the
provision of any information about the business and affairs of a trading
company, whether it be contained in annual accounts or obtained from
other sources, is capable of serving such a purpose just as it is capable    B
of serving as the basis for the giving of financial advice to others, for
arriving at a market price, for determining whether to extend credit to
the company, or for the writing of financial articles in the press. Indeed,
it is readily foreseeable by anyone who gives the matter any thought that
it might well be relied on to a greater or less extent for all or any of
such purposes. It is, of course, equally foreseeable that potential
investors having no proprietary interest in the company, might well avail    C
themselves of the information contained in a company's accounts
published in the newspapers or culled from an inspection of the
documents to be filed annually with the Registrar of Companies (which
includes the audited accounts) in determining whether or not to acquire
shares in the company. I find it difficult to believe, however, that the
legislature, in enacting provisions clearly aimed primarily at the protection
of the company and its informed control by the body of its proprietors,    D
can have been inspired also by consideration for the public at large and
investors in the market in particular.

   The question is, I think, one of some importance when one comes to
consider the existence of that essential relationship between the appellants
and the respondent to which, in any discussion of the ingredients of the
tort of negligence, there is accorded the description "proximity," for it is    E
now clear from a series of decisions in this House that, at least so far as
concerns the law of the United Kingdom, the duty of care in tort
depends not solely upon the existence of the essential ingredient of the
foreseeability of damage to the plaintiff but upon its coincidence with a
further ingredient to which has been attached the label "proximity" and
which was described by Lord Atkin in the course of his speech in
*Donoghue v. Stevenson* [1932] A.C. 562, 581 as:    F

   "such close and direct relations that the act complained of directly
   affects a person whom the person alleged to be bound to take care
   would know would be directly affected by his careless act."

It must be remembered, however, that Lord Atkin was using these
words in the context of loss caused by physical damage where the    G
existence of the nexus between the careless defendant and the injured
plaintiff can rarely give rise to any difficulty. To adopt the words of
Bingham L.J. in the instant case [1989] Q.B. 653, 686:

   "It is enough that the plaintiff chances to be (out of the whole
   world) the person with whom the defendant collided or who
   purchased the offending ginger beer."    H

The extension of the concept of negligence since the decision of this
House in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964]
A.C. 465 to cover cases of pure economic loss not resulting from
physical damage has given rise to a considerable and as yet unsolved
difficulty of definition. The opportunities for the infliction of pecuniary
loss from the imperfect performance of everyday tasks upon the proper
performance of which people rely for regulating their affairs are

A   illimitable and the effects are far reaching. A defective bottle of ginger beer may injure a single consumer but the damage stops there. A single statement may be repeated endlessly with or without the permission of its author and may be relied upon in a different way by many different people. Thus the postulate of a simple duty to avoid any harm that is, with hindsight, reasonably capable of being foreseen becomes untenable without the imposition of some intelligible limits to keep the law of

B   negligence within the bounds of common sense and practicality. Those limits have been found by the requirement of what has been called a "relationship of proximity" between plaintiff and defendant and by the imposition of a further requirement that the attachment of liability for harm which has occurred be "just and reasonable." But although the cases in which the courts have imposed or withheld liability are capable

C   of an approximate categorisation, one looks in vain for some common denominator by which the existence of the essential relationship can be tested. Indeed it is difficult to resist a conclusion that what have been treated as three separate requirements are, at least in most cases, in fact merely facets of the same thing, for in some cases the degree of foreseeability is such that it is from that alone that the requisite proximity can be deduced, whilst in others the absence of that essential

D   relationship can most rationally be attributed simply to the court's view that it would not be fair and reasonable to hold the defendant responsible. "Proximity" is, no doubt, a convenient expression so long as it is realised that it is no more than a label which embraces not a definable concept but merely a description of circumstances from which, pragmatically, the courts conclude that a duty of care exists.

E   There are, of course, cases where, in any ordinary meaning of the words, a relationship of proximity (in the literal sense of "closeness") exists but where the law, whilst recognising the fact of the relationship, nevertheless denies a remedy to the injured party on the ground of public policy. *Rondel v. Worsley* [1969] 1 A.C. 191 was such a case, as was *Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53, so far as concerns the alternative ground of that decision. But such cases do

F   nothing to assist in the identification of those features from which the law will deduce the essential relationship on which liability depends and, for my part, I think that it has to be recognised that to search for any single formula which will serve as a general test of liability is to pursue a will-o'-the wisp. The fact is that once one discards, as it is now clear that one must, the concept of foreseeability of harm as the single

G   exclusive test—even a prima facie test—of the existence of the duty of care, the attempt to state some general principle which will determine liability in an infinite variety of circumstances serves not to clarify the law but merely to bedevil its development in a way which corresponds with practicality and common sense. In *Sutherland Shire Council v. Heyman*, 60 A.L.R. 1, 43–44, Brennan J. in the course of a penetrating analysis, observed:

H        "Of course, if foreseeability of injury to another were the exhaustive criterion of a prima facie duty to act to prevent the occurrence of that injury, it would be essential to introduce some kind of restrictive qualification—perhaps a qualification of the kind stated in the second stage of the general proposition in *Anns* [1978] A.C. 728. I am unable to accept that approach. It is preferable, in my view, that the law should develop novel categories of negligence

380

Lord Oliver
of Aylmerton                    Caparo Plc. v. Dickman (H.L.(E.))                    [1990]

incrementally and by analogy with established categories, rather   A
than by a massive extension of a prima facie duty of care restrained
only by indefinable 'considerations which ought to negative, or to
reduce or limit the scope of the duty or the class of person to whom
it is owed.' "

The same approach is, I think, reflected in that passage in the speech of
Lord Devlin in the *Hedley Byrne* case [1964] A.C. 465, 524–525 in which   B
he considered the impact of *Donoghue v. Stevenson* on the facts of that
case and in which he analysed and described the method by which the
law develops:

"In his celebrated speech in that case Lord Atkin did two things.
He stated what he described as a 'general conception' and from that
conception he formulated a specific proposition of law. In between   C
he gave a warning 'against the danger of stating propositions of law
in wider terms than is necessary, lest essential factors be omitted in
the wider survey and the inherent adaptability of English law be
unduly restricted.'

"What Lord Atkin called a 'general conception of relations giving
rise to a duty of care' is now often referred to as the principle of
proximity. You must take reasonable care to avoid acts or omissions   D
which you can reasonably foresee would be likely to injure your
neighbour. In the eyes of the law your neighbour is a person who
is so closely and directly affected by your act that you ought
reasonably to have him in contemplation as being so affected when
you are directing your mind to the acts or omissions which are
called in question. . . .

"Now, it is not, in my opinion, a sensible application of what Lord   E
Atkin was saying for a judge to be invited on the facts of any
particular case to say whether or not there was 'proximity' between
the plaintiff and the defendant. That would be a misuse of a
general conception and it is not the way in which English law
develops. What Lord Atkin did was to use his general conception
to open up a category of cases giving rise to a special duty. It was   F
already clear that the law recognised the existence of such a duty in
the category of articles that were dangerous in themselves. What
*Donoghue v. Stevenson* did may be described either as the widening
of an old category or as the creation of a new and similar one. The
general conception can be used to produce other categories in the
same way. An existing category grows as instances of its application
multiply until the time comes when the cell divides. . . .   G

"In my opinion, the appellants in their argument tried to press
*Donoghue v. Stevenson* too hard. They asked whether the principle
of proximity should not apply as well to words as to deeds. I think
it should, but as it is only a general conception it does not get them
very far. Then they take the specific proposition laid down by
*Donoghue v. Stevenson* and try to apply it literally to a certificate or   H
a banker's reference. That will not do, for a general conception
cannot be applied to pieces of paper in the same way as to articles
of commerce or to writers in the same way as to manufacturers.
An inquiry into the possibilities of intermediate examination of a
certificate will not be fruitful. The real value of *Donoghue v.
Stevenson* to the argument in this case is that it shows how the law
can be developed to solve particular problems. Is the relationship

381

2 W.L.R.　　　Caparo Plc. v. Dickman (H.L.(E.))　　　Lord Oliver
of Aylmerton

A　between the parties in this case such that it can be brought within a category giving rise to a special duty? As always in English law, the first step in such an inquiry is to see how far the authorities have gone, for new categories in the law do not spring into existence overnight."

B　　Perhaps, therefore, the most that can be attempted is a broad categorisation of the decided cases according to the type of situation in which liability has been established in the past in order to found an argument by analogy. Thus, for instance, cases can be classified according to whether what is complained of is the failure to prevent the infliction of damage by the act of the third party (such as *Dorset Yacht Co. Ltd. v. Home Office* [1970] A.C. 1004, *P. Perl (Exporters) Ltd. v.*
C　*Camden London Borough Council* [1984] Q.B. 342, *Smith v. Littlewoods Organisation Ltd.* [1987] A.C. 241 and, indeed, *Anns v. Merton London Borough Council* [1978] A.C. 728 itself), in failure to perform properly a statutory duty claimed to have been imposed for the protection of the plaintiff either as a member of a class or as a member of the public (such as the *Anns* case, *Ministry of Housing and Local Government v. Sharp* [1970] 2 Q.B. 223, *Yuen Kun Yeu v. Attorney-General of Hong*
D　*Kong* [1988] A.C. 175) or in the making by the defendant of some statement or advice which has been communicated, directly or indirectly, to the plaintiff and upon which he has relied. Such categories are not, of course, exhaustive. Sometimes they overlap as in the *Anns* case, and there are cases which do not readily fit into easily definable categories (such as *Ross v. Caunters* [1980] Ch. 297). Nevertheless, it is, I think, permissible to regard negligent statements or advice as a separate
E　category displaying common features from which it is possible to find at least guidelines by which a test for the existence of the relationship which is essential to ground liability can be deduced.
　　The damage which may be occasioned by the spoken or written word is not inherent. It lies always in the reliance by somebody upon the accuracy of that which the word communicates and the loss or damage consequential upon that person having adopted a course of action upon
F　the faith of it. In general, it may be said that when any serious statement, whether it takes the form of a statement of fact or of advice, is published or communicated, it is foreseeable that the person who reads or receives it is likely to accept it as accurate and to act accordingly. It is equally foreseeable that if it is inaccurate in a material particular the recipient who acts upon it may suffer a detriment which, if
G　the statement had been accurate, he would not have undergone. But it is now clear that mere foreseeability is not of itself sufficient to ground liability unless by reason of the circumstances it itself constitutes also the element of proximity (as in the case of direct physical damage) or unless it is accompanied by other circumstances from which that element may be deduced. One must, however, be careful about seeking to find any
H　general principle which will serve as a touchstone for all cases, for even within the limited category of what, for the sake of convenience, I may refer to as "the negligent statement cases," circumstances may differ infinitely and, in a swiftly developing field of law, there can be no necessary assumption that those features which have served in one case to create the relationship between the plaintiff and the defendant on which liability depends will necessarily be determinative of liability in the different circumstances of another case. There are, for instance, at

**Lord Oliver
of Aylmerton**          Caparo Plc. v. Dickman (H.L.(E.))          **[1990]**

A

least four and possibly more situations in which damage or loss may
arise from reliance upon the spoken or written word and it must not be
assumed that because they display common features of reliance and
foreseeability they are necessarily in all respects analogous. To begin
with, reliance upon a careless statement may give rise to direct physical
injury which may be caused either to the person who acts on the faith of
the statement or to a third person. One has only to consider, for

B

instance, the chemist's assistant who mis-labels a dangerous medicine, a
medical man who gives negligent telephonic advice to a parent with
regard to the treatment of a sick child, or an architect who negligently
instructs a bricklayer to remove the keystone of an archway (as in
*Clayton v. Woodman & Sons (Builders) Ltd.* [1962] 2 Q.B. 533). In
such cases it is not easy to divorce foreseeability simpliciter and the
proximity which flows from the virtual inevitability of damage if the

C

advice is followed. Again, economic loss may be inflicted upon a third
party as a result of the act of the recipient of the advice or information
carried out in reliance upon it (as, for instance, the testator in *Ross v.
Caunters* [1980] Ch. 297 or the purchaser in *Ministry of Housing and
Local Government v. Sharp* [1970] 2 Q.B. 223, both cases which give
rise to certain difficulties of analysis). For present purposes, however, it
is necessary to consider only those cases of economic damage suffered

D

directly by a recipient of the statement or advice as a result of his
personally having acted in reliance upon it.

In his dissenting judgment in *Candler v. Crane, Christmas & Co.*
[1951] 2 K.B. 164, Denning L.J. suggested three conditions for the
creation of a duty of care in tort in such cases. First, the advice must be
given by one whose profession it is to give advice upon which others rely

E

in the ordinary course of business, such as accountants, surveyors,
valuers and the like: p. 179. Secondly, it must be known to the adviser
that the advice would be communicated to the plaintiff in order to
induce him to adopt a particular course of action: p. 180. Thirdly, the
advice must be relied upon for the purpose of the particular transaction
for which it was known to the advisers that the advice was required:
p. 182. It is plain, however, from other passages in his judgment, that

F

Denning L.J. did not consider these conditions as necessarily exhaustive
criteria of the existence of a duty and the speeches in this House in the
*Hedley Byrne* case [1964] A.C. 465, where his judgment was approved,
indicate a number of directions in which such criteria are to be extended.
To begin with, Lord Reid, at p. 486, would not have confined liability to
statements made or advice given in the exercise of a profession involving
the giving of such advice but would have extended it to:

G

> "all those relationships where it is plain that the party seeking
> information or advice was trusting the other to exercise such a
> degree of care as the circumstances required, where it was reasonable
> for him to do that, and where the other gave the information or
> advice when he knew or ought to have known that the inquirer was
> relying on him."

H

Lord Morris of Borth-y-Gest, with whom Lord Hodson agreed, whilst
initially, at p. 502, referring to persons "possessed of a special skill"
nevertheless went on to state the conditions in which a duty of care
might arise in very much wider terms, at p. 503:

> "Furthermore, if in a sphere in which a person is so placed that
> others could reasonably rely upon his judgment or his skill or upon

383

2 W.L.R.  Caparo Plc. v. Dickman (H.L.(E.))  Lord Oliver
of Aylmerton

A his ability to make careful inquiry, a person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to, another person who, as he knows or should know, will place reliance upon it, then a duty of care will arise."

Nonetheless, the subsequent decision of the Privy Council in *Mutual Life and Citizens' Assurance Co. Ltd. v. Evatt* [1971] A.C. 793, from
B which Lord Reid and Lord Morris dissented, would have confined the duty of care to where the advice relied upon was given in the course of a business or profession involving the giving of advice of the kind in question. For present purposes, it is unnecessary to attempt a resolution of the difference of opinion arising from the *Mutual Life* case, since there is no question here but that the certifying of the accounts was
C something done in the course of the ordinary business of the appellants.

Leaving this on one side, however, it is not easy to cull from the speeches in the *Hedley Byrne* case [1964] A.C. 465 any clear attempt to define or classify the circumstances which give rise to the relationship of proximity on which the action depends and indeed Lord Hodson, at p. 514, expressly stated (and I respectfully agree) that he did not think it possible to catalogue the special features which must be found to exist
D before the duty of care will arise in the given case. Lord Devlin, at p. 530, is to the same effect. The nearest that one gets to the establishment of a criterion for the creation of a duty in the case of a negligent statement is the emphasis to be found in all the speeches upon "the voluntary assumption of responsibility" by the defendant. This is a convenient phrase but it is clear that it was not intended to be a test for
E the existence of the duty for, on analysis, it means no more than that the act of the defendant in making the statement or tendering the advice was voluntary and that the law attributes to it an assumption of responsibility if the statement or advice is inaccurate and is acted upon. It tells us nothing about the circumstances from which such attribution arises.

The point that is, as it seems to me, significant in the present
F context, is the unanimous approval in this House of the judgment of Denning L.J. in *Candler's* case [1951] 2 K.B. 164, 181 in which he expressed the test of proximity in these words: "did the accountants know that the accounts were required for submission to the plaintiff and use by him?" In so far as this might be said to imply that the plaintiff must be specifically identified as the ultimate recipient and that the precise purpose for which the accounts were required must be known to
G the defendant before the necessary relationship can be created, Denning L.J.'s formulation was expanded in the *Hedley Byrne* case, where it is clear that, but for an effective disclaimer, liability would have attached. The respondents there were not aware of the actual identity of the advertising firm for which the credit reference was required nor of its precise purpose, save that it was required in anticipation of the placing
H of advertising contracts. Furthermore, it is clear that "knowledge" on the part of the respondents embraced not only actual knowledge but such knowledge as would be attributed to a reasonable person placed as the respondents were placed. What can be deduced from the *Hedley Byrne* case, therefore, is that the necessary relationship between the maker of a statement or giver of advice ("the adviser") and the recipient who acts in reliance upon it ("the advisee") may typically be held to exist where (1) the advice is required for a purpose, whether particularly

A  specified or generally described, which is made known, either actually or inferentially, to the adviser at the time when the advice is given; (2) the adviser knows, either actually or inferentially, that his advice will be communicated to the advisee, either specifically or as a member of an ascertainable class, in order that it should be used by the advisee for that purpose; (3) it is known either actually or inferentially, that the advice so communicated is likely to be acted upon by the advisee for

B  that purpose without independent inquiry, and (4) it is so acted upon by the advisee to his detriment. That is not, of course, to suggest that these conditions are either conclusive or exclusive, but merely that the actual decision in the case does not warrant any broader propositions.

Those propositions are, I think, in accord with the two United States authorities which were referred to in the course of the speeches in the *Hedley Byrne* decision. In *Glanzer v. Shepard* (1922) 135 N.E. 275,

C  where a public weigher negligently certified an overweight so that the purchaser of the goods paid too much for them, the identity of the recipient of the certificate was known, the purpose of the certificate was known, and the certificate was issued for the very purpose of enabling the price of the goods to be ascertained and with the knowledge that it would be acted upon by the recipient for that purpose. In *Ultramares*

D  *Corporation v. Touche*, 174 N.E. 441, on the other hand—a case much nearer to the present—the action failed. There auditors, although aware generally that the certified accounts of the company would be shown to others by the company as the basis of financial dealings generally "according to the needs of the occasion," were unaware of the company's specific purpose of obtaining financial help from the plaintiff.

E  The most recent authority on negligent misstatement in this House— the two appeals in *Smith v. Eric S. Bush* and *Harris v. Wyre Forest District Council* [1989] 2 W.L.R. 790 which were heard together do not, I think, justify any broader proposition than that already set out, save that they make it clear that the absence of a positive intention that the advice shall be acted upon by anyone other than the immediate recipient—indeed an expressed intention that it shall not be acted upon

F  by anyone else—cannot prevail against actual or presumed knowledge that it is in fact likely to be relied upon in a particular transaction without independent verification. Both appeals were concerned with surveyors' certificates issued to mortgagees in connection with the proposed purchases for which the mortgagees were contemplating making advances. In each case there was an express disclaimer of responsibility, but in each case it was known to the surveyor that the substance of the

G  report (in the sense of what was important to a purchaser)—that is to say whether or not any repairs to the property were considered essential—would be made known by the mortgagee to the purchaser, the plaintiff in the action, and would be likely to be acted upon by him in entering into a contract to purchase the property. In so far as the case was concerned with the effects of the disclaimer, it does not require

H  consideration in the present context, but there are important passages in the speeches in this House bearing upon the questions which arise on this appeal and indicative of the features which, in that case, led their Lordships to conclude that the necessary relationship of proximity existed between the surveyors and the purchasers of the respective properties. Lord Templeman deduced the relationship from a combination of factors. He said, at pp. 799–800:

385

2 W.L.R.          Caparo Plc. v. Dickman (H.L.(E.))          Lord Oliver
                                                            of Aylmerton

A        "I agree that by obtaining and disclosing a valuation, a mortgagee
         does not assume responsibility to the purchaser for that valuation.
         But in my opinion the valuer assumes responsibility to both
         mortgagee and purchaser by agreeing to carry out a valuation for
         mortgage purposes knowing that the valuation fee has been paid by
         the purchaser and knowing that the valuation will probably be
         relied upon by the purchaser in order to decide whether or not to
B        enter into a contract to purchase the house. . . . In general I am of
         the opinion that in the absence of a disclaimer of liability the valuer
         who values a house for the purpose of a mortgage, knowing that
         the mortgagee will rely and the mortgagor will probably rely on the
         valuation, knowing that the purchaser mortgagor has in effect paid
         for the valuation, is under a duty to exercise reasonable skill and
C        care and that duty is owed to both parties to the mortgage for
         which the valuation is made."

    Lord Griffiths at p. 813, rejected the voluntary "assumption of
responsibility" as a helpful formula for testing the existence of a duty of
care observing that the phrase:

D        "can only have any real meaning if it is understood as referring to
         the circumstances in which the law will deem the maker of the
         statement to have assumed responsibility to the person who acts
         upon the advice."

    He continued, at pp. 813–814, 815–816:

E        "The essential distinction between the present case and the situation
         being considered in *Hedley Byrne* [1964] A.C. 465 and in the two
         earlier cases, is that in those cases the advice was being given with
         the intention of persuading the recipient to act upon it. In the
         present case, the purpose of providing the report is to advise the
         mortgagee but it is given in circumstances in which it is highly
         probable that the purchaser will in fact act on its contents, although
         that was not the primary purpose of the report. I have had
F        considerable doubts whether it is wise to increase the scope of the
         duty for negligent advice beyond the person directly intended by the
         giver of the advice to act upon it to those whom he knows may do
         so."
         "I therefore return to the question in what circumstances should the
         law deem those who give advice to have assumed responsibility to
         the person who acts upon the advice or, in other words, in what
G        circumstances should a duty of care be owed by the adviser to those
         who act upon his advice? I would answer—only if it is foreseeable
         that if the advice is negligent the recipient is likely to suffer
         damage, that there is a sufficiently proximate relationship between
         the parties and that it is just and reasonable to impose the liability.
         In the case of a surveyor valuing a small house for a building
H        society or local authority, the application of these three criteria
         leads to the conclusion that he owes a duty of care to the purchaser.
         If the valuation is negligent and is relied upon damage in the form
         of economic loss to the purchaser is obviously foreseeable. The
         necessary proximity arises from the surveyor's knowledge that the
         overwhelming probability is that the purchaser will rely upon his
         valuation, the evidence was that surveyors knew that approximately
         90 per cent. of purchasers did so, and the fact that the surveyor

only obtains the work because the purchaser is willing to pay his    A
fee. It is just and reasonable that the duty should be imposed for
the advice is given in a professional as opposed to a social context
and liability for breach of the duty will be limited both as to its
extent and amount. The extent of the liability is limited to the
purchaser of the house—I would not extend it to subsequent
purchasers. The amount of the liability cannot be very great
because it relates to a modest house. There is no question here of    B
creating a liability of indeterminate amount to an indeterminate
class. I would certainly wish to stress that in cases where the advice
has not been given for the specific purpose of the recipient acting
upon it, it should only be in cases when the adviser knows that
there is a high degree of probability that some other identifiable
person will act upon the advice that a duty of care should be    C
imposed. It would impose an intolerable burden upon those who
give advice in a professional or commercial context if they were to
owe a duty not only to those to whom they give the advice but to
any other person who might choose to act upon it."

Finally, in relation to the *Smith* appeal, Lord Jauncey of Tullichettle
observed, at p. 822:    D

"The four critical facts are that the appellants knew from the outset:
(1) that the report would be shown to Mrs. Smith; (2) that Mrs.
Smith would probably rely on the valuation contained therein in
deciding whether to buy the house without obtaining an independent
valuation; (3) that if, in these circumstances, the valuation was,
having regard to the actual condition of the house, excessive, Mrs.    E
Smith would be likely to suffer loss; and (4) that she had paid the
building society a sum to defray the appellants' fee. In the light of
this knowledge the appellants could have declined to act for the
building society, but they chose to proceed. In these circumstances
they must be taken not only to have assumed contractual obligations
towards the building society but delictual obligations towards Mrs.
Smith, whereby they became under a duty towards her to carry out    F
their work with reasonable care and skill. It is critical to this
conclusion that the appellants knew that Mrs. Smith would be likely
to rely on the valuation without obtaining independent advice. In
both *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164 and
*Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C.
465, the provider of the information was the obvious and most    G
easily available, if not the only available, source of that information.
It would not be difficult therefore to conclude that the person who
sought such information was likely to rely upon it. In the case of
an intending mortgagor the position is very different since, financial
considerations apart, there is likely to be available to him a wide
choice of sources of information, to wit, independent valuers to
whom he can resort, in addition to the valuer acting for the    H
mortgagee. I would not therefore conclude that the mere fact that
a mortgagee's valuer knows that his valuation will be shown to an
intending mortgagor of itself imposes upon him a duty of care to
the mortgagor. Knowledge, actual or implied, of the mortgagor's
likely reliance upon the valuation must be brought home to him.
Such knowledge may be fairly readily implied in relation to a
potential mortgagor seeking to enter the lower end of the housing

A     market but non constat that such ready implication would arise in the case of a purchase of an expensive property whether residential or commercial."

Thus *Smith v. Eric S. Bush* [1989] 2 W.L.R. 790, although establishing beyond doubt that the law may attribute an assumption of responsibility quite regardless of the expressed intentions of the adviser, provides no

B     support for the proposition that the relationship of proximity is to be extended beyond circumstances in which advice is tendered for the purpose of the particular transaction or type of transaction and the adviser knows or ought to know that it will be relied upon by a particular person or class of persons in connection with that transaction. The judgment of Millett J. in the recent case of *Al Saudi Banque v.*

C     *Clarke Pixley* [1990] 2 W.L.R. 344 (decided after the decision of the Court of Appeal in the instant case) contains an analysis of the decision of this House in *Smith v. Eric S. Bush* and concludes—and I agree—that it established a more stringent test of the requirements for proximity than that which had been applied by the Court of Appeal in the instant case. At p. 354B–G of his judgment, Millett J. gives what I find a helpful analysis of that case and of the features which distinguished it

D     from the *Hedley Byrne* case and from the instant case:

     "In each of the cases considered by the House of Lords, therefore, there was a tripartite transaction in which the valuation could realistically be regarded as provided by the valuer to the purchaser. In each of the cases the valuation was given to the mortgagee with the intention of being acted on by him in a specific transaction

E      known to the valuer, viz: the making of a mortgage offer in connection with a specific transaction of house purchase, and in the knowledge that the valuation or the gist of the valuation would be communicated to the purchaser and would in all probability be relied upon by him in deciding whether to go ahead with the very transaction for which the mortgage offer was sought. This was a

F      much more restricted context in which to found a duty of care than was present in the *Caparo* case, for there was in contemplation not only a particular and identified recipient of the information to whom the defendant knew that it would be communicated, but a particular and known purpose for which he could foresee that it would be relied on.

G      "In *Hedley Byrne* [1964] A.C. 465 and the cases which followed it, the statement was made directly to the plaintiff with the intention that the plaintiff should act upon it. The *JEB Fasteners* case [1983] 1 All E.R. 583 can be supported only on the basis that the statement was impliedly confirmed directly to the plaintiff without any such intention, but with a particular transaction in contemplation, and it was foreseeable that the plaintiff would rely upon it in that

H      transaction. In *Caparo's* case [1989] Q.B. 653 it was made to the plaintiff without any such intention and without any particular transaction in contemplation, but it was foreseeable that the plaintiff might rely upon it in some unknown future transaction. In *Smith v. Eric S. Bush* [1989] 2 W.L.R. 790 it was made to a third party with the intention that he should act upon it in a known and contemplated transaction, but in the knowledge that it would be communicated to the plaintiff and would almost certainly be relied upon by him in

Lord Oliver
of Aylmerton                 Caparo Plc. v. Dickman (H.L.(E.))              [1990]

connection with a transaction without which the transaction of the    A
third party could not proceed."

My Lords, no decision of this House has gone further than *Smith v.
Eric S. Bush*, but your Lordships are asked by the respondents to widen
the area of responsibility even beyond the limits to which it was
extended by the Court of Appeal in this case and to find a relationship
of proximity between the adviser and third parties to whose attention    B
the advice may come in circumstances in which the reliance said to have
given rise to the loss is strictly unrelated either to the intended recipient
or to the purpose for which the advice was required. My Lords, I
discern no pressing reason of policy which would require such an
extension and there seems to me to be powerful reasons against it. As
Lord Reid observed in the course of his speech in *Hedley Byrne* [1964]
A.C. 465, 483, words can be broadcast with or without the consent or    C
foresight of the speaker or writer; and in his speech in the same case,
Lord Pearce drew attention to the necessity for the imposition of some
discernible limits to liability in such cases. He said, at p. 534:

> "The reason for some divergence between the law of negligence in
> word and that of negligence in act is clear. Negligence in word
> creates problems different from those of negligence in act. Words    D
> are more volatile than deeds. They travel fast and far afield. They
> are used without being expended and take effect in combination
> with innumerable facts and other words. Yet they are dangerous
> and can cause vast financial damage. How far they are relied on
> unchecked . . . must in many cases be a matter of doubt and
> difficulty. If the mere hearing or reading of words were held to    E
> create proximity, there might be no limit to the persons to whom
> the speaker or writer could be liable."

As I have already mentioned, it is almost always foreseeable that
someone, somewhere and in some circumstances, may choose to alter
his position upon the faith of the accuracy of a statement or report
which comes to his attention and it is always foreseeable that a report—    F
even a confidential report—may come to be communicated to persons
other than the original or intended recipient. To apply as a test of
liability only the foreseeability of possible damage without some further
control would be to create a liability wholly indefinite in area, duration
and amount and would open up a limitless vista of uninsurable risk for
the professional man.
    On the basis of the pleaded case, as amended, it has to be assumed    G
that the appellants, as experienced accountants, were aware or should
have been aware that Fidelity's results made it vulnerable to take-over
bids and that they knew or ought to have known that a potential bidder
might well rely upon the published accounts in determining whether to
acquire shares in the market and to make a bid. It is not, however,
suggested that the appellants, in certifying the accounts, or Parliament,    H
in providing for such certification, did so for the purpose of assisting
those who might be minded to profit from dealings in the company's
shares. The respondents, whilst accepting that it is no part of the
purpose of the preparation, certification and publication of the accounts
of a public company to provide information for the guidance of predators
in the market, nevertheless argue that the appellants' knowledge that
predators might well rely upon the accounts for this purpose sufficiently

A  establishes between them and potential bidders that relationship of
"proximity" which founds liability. On the face of it, this submission
appears to equate "proximity" with mere foreseeability and to rely upon
the very misinterpretation of the effect of the decision of this House in
the *Anns* case [1978] A.C. 728 which was decisively rejected in the
*Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co.
Ltd.* [1985] A.C. 210 and in *Yuen Kun Yeu v. Attorney-General of Hong
B  Kong* [1988] A.C. 175. Your Lordships have been referred, however, to
three authorities, one from New Zealand and two from the United
Kingdom, which do undoubtedly support the respondents' contention.

In *Scott Group Ltd. v. McFarlane* [1978] N.Z.L.R. 553, the
defendants were the auditors of a company which had been successfully
taken over in reliance upon certified consolidated accounts in which, as
C  a result of double-counting, the assets were overstated. It was admitted
that the failure of the defendants to discover the discrepancy was due to
negligence. In the Supreme Court of New Zealand, Quilliam J.
dismissed the plaintiffs' claim on the ground that the appellants, though
careless, owed them no duty of care. An appeal to the Court of Appeal
failed but the court was divided as to the reasons. Richmond P. held
that the appeal failed for the same reason as that stated by the trial
D  judge. Woodhouse J. would have allowed the appeal. Cooke J., on the
other hand, whilst concurring with Woodhouse J. that the respondents
did in fact owe a duty of care to the appellants, held that the appeal
failed because they had failed to show any recoverable loss.

The more restrictive view was expressed by Richmond P. in the
following terms, at pp. 566–567:

E      "The question in any given case is whether the nature of the
relationship is such that one party can fairly be held to have
assumed a responsibility to the other as regards the reliability of the
advice or information. I do not think that such a relationship
should be found to exist unless, at least, the maker of the statement
was, or ought to have been, aware that his advice or information
F      would in fact be made available to and be relied on by a particular
person or class of persons for the purposes of a particular transaction
or type of transaction. I would especially emphasise that to my
mind it does not seem reasonable to attribute an assumption of
responsibility unless the maker of the statement ought in all the
circumstances, both in preparing himself for what he said and in
saying it, to have directed his mind, and to have been able to direct
G      his mind, to some particular and specific purpose for which he was
aware that his advice or information would be relied on. In many
situations that purpose will be obvious. But the annual accounts of
a company can be relied on in all sorts of ways and for many
purposes. It would be going too far to treat accountants as
assuming a responsibility towards all persons dealing with the
H      company or its members, in reliance to some greater or lesser
degree on the accuracy of the accounts, merely because it was
reasonably foreseeable, in a general way, that a transaction of the
kind in which the plaintiff happened to become involved might
indeed take place. The relationship between the parties would, I
think, be too general and not sufficiently 'special' to come within
the principles underlying the decision in *Hedley Byrne*. As I have
said, I believe it to be essential to the existence of a 'special

Caparo Plc. v. Dickman (H.L.(E.)) **[1990]**

A    relationship' that the maker of the statement was or should have
been aware that his advice was required for use in a specific type of
contemplated transaction. This requirement has not always required
emphasis in the course of judicial discussion as to the nature of a
special relationship. Probably this is because in most cases the
purpose for which the information was required was, on the facts,
quite obvious. But certainly this particular point was made very
B    clear indeed in Denning L.J.'s judgment in *Candler v. Crane,
Christmas & Co.* I would think that it must almost inevitably
follow, once the maker of the statement is aware of a specific
purpose for which his information will be used, that he will also
have in direct contemplation a specific person or class of persons,
even though unidentified by name."

C    The New Zealand Companies Act 1955 contained provisions relating
to the auditors' report which is similar in substance to those contained in
the United Kingdom legislation but with this variation, that the "true
and fair view" which group accounts are certified to give are qualified by
the words "so far as concerns members of the company." In relation to
these provisions, Richmond P. observed, at p. 568:

D    "The provisions of the Act to which I have just referred are aimed
essentially at the protection of the members of the company and of
course the auditors, whose contract of employment is with the
company itself, are under a contractual duty of care to the company.
These provisions do not encourage me to take the view that there is
any reason why the auditors of a public company should thereby
come under a common law duty of care to third persons dealing
E    with the company or its members on the faith of their audit
certificate, such liability being in some way based on a much wider
principle than would apply, for example, in the case of auditors
certifying the accounts of a private company. Like Quilliam J., I
can also see no reason to differentiate between auditors as such and
a firm of chartered accountants employed to prepare the accounts of
F    the company. The only point which has given me some concern, so
far as the statutory provisions are concerned, is the requirement of
section 133(1) whereby a copy of the balance sheet and auditors'
report is required to be annexed to the annual return and thus
becomes available to the public under section 9(1) of the Act. But
on reflection, this only means that the auditor of the accounts of a
public company knows that the accounts and his report will become
G    available to the public generally and, consequently, may be relied
on by one or more members of the public, to some greater or lesser
degree, as the basis of some business transaction. It is not
suggested, however, that the Companies Act imposes any statutory
duty of care as between auditors and members of the public who
rely on the accounts. In the case of a company whose shares are
listed on the Stock Exchange the auditor will also know that under
H    the Stock Exchange rules a copy of the accounts must be made
available. He knows, too, that shareholders will receive copies of
the accounts and that the company itself may well make copies
available to business institutions and individuals for various purposes.
In the end all these matters merely add up to the fact that the
auditor of a public company will necessarily have in his contemplation
the possibility that the accounts may be relied on in all sorts of ways

2 W.L.R.          Caparo Plc. v. Dickman (H.L.(E.))          Lord Oliver
of Aylmerton

A    by persons other than the company and its members. This, as I
have said, is not sufficient to bring about a 'special relationship.' "

Both Woodhouse and Cooke JJ., who favoured a wider view of
responsibility, based themselves upon an interpretation of the speech of
Lord Wilberforce in the *Anns* case [1978] A.C. 728 which required, as
the first stage of the two-stage inquiry to which he there referred, no
B    more than a consideration of whether harm was foreseeable, thus
equating the "proximate relationship" as comprehending foresight and
nothing more. This is made quite clear from the following passage in
the judgment of Woodhouse J., at p. 574:

"In this regard it will be noticed that although the first part of the
inquiry outlined by Lord Wilberforce is to ask whether 'there is a
sufficient relationship of proximity' in order to decide whether there
C    is a prima facie duty of care, he would test the sufficiency of
proximity simply by the reasonable contemplation of likely harm.
And, with respect, I do not think that there is any need for or any
sound reason in favour of a more restrictive approach. The issue
has been made increasingly complex by the successive and varying
formulas that have been used in an effort to confine the general
D    area of responsibility, in particular for negligent words or in respect
of purely economic losses. At this initial stage at least it should be
possible to remove some degree of uncertainty—in my opinion it
is done by the comprehensible and straightforward test of
foreseeability."

Woodhouse J., again emphasised foreseeability as the relevant test for
E    the creation of the relationship of proximity in his judgment where he
said, at p. 575:

"Although an audit is undertaken on behalf of the members of a
public company it must be within the reasonable contemplation of
any auditor that confidence in its ability to handle its commercial
arrangements would depend upon the authenticity of its accounts—
F    a confidence that would disappear if reliance could not be put upon
the audit report. So I think that when auditors deliberately
undertake to provide their formal report upon the accounts of a
public company they must be taken to have accepted not merely a
direct responsbility to the shareholders but a further duty to those
persons whom they can reasonably foresee will need to use and rely
upon them when dealing with the company or its members in
G    significant matters affecting the company assets and business. An
example, no doubt, would be the banker asked to make substantial
advances on the security of the company undertaking. On the other
hand, there would seem to be formidable difficulties for a plaintiff
who attempted to prove that an auditor should have foreseen the
plaintiff's likely reliance upon some newspaper or a Stock Exchange
reference to a company's accounts. However, it is sufficient for
H    present purposes to restrict consideration to a take over offer
related, as so frequently is the position, to the value of shareholders'
funds. In such a situation the need to rely upon audited accounts
is, I think, quite obvious. As a matter of commercial reality I think
the auditor and offeror are in a relationship of close proximity."

Cooke J. was to the same effect. At p. 583 he adopted, as the first step
of Lord Wilberforce's two-stage approach, the formulation which equates

the relationship of proximity with foreseeability, although at an earlier          A
stage of his judgment he seemed to be disposed to regard the essential
relationship as arising not simply from the foreseeability that a member
of the public might rely on the accounts as a basis of some transaction
but, for a reason which I confess I do not fully understand, from the
foreseeability that some member of the public might rely on the accounts
for the making of a take-over bid. He said, at p. 581:

B

> "The learned judge in the Supreme Court was disposed to regard
> the requirement of filing audited accounts, which are available for
> public inspection, as not imposed by Parliament for the purpose of
> enabling people to deal confidently in reliance on the accuracy of
> the accounts. He thought it much more likely that the purpose was
> to enable a proper supervision to be exercised over the activities of
> companies, and to enable those concerned to ensure that the          C
> companies were not trading illegally or dishonestly. With respect, I
> am unable to agree with him on that point. The statutory
> requirements regarding the filing of financial information stem, I
> think, from the view that those *dealing with* or *investing in* a limited
> liability company have a legitimate interest in being afforded
> reasonable access to relevant information; and that this interest has
> to be balanced against the wish for confidentiality naturally          D
> entertained by family companies and the like which do not appeal
> to the public for funds. . . . I would agree, though, that the
> provisions are probably not aimed, or at least not primarily, at
> protecting purchasers of shares in the market."

Thus the majority of the Court of Appeal favoured a more extensive          E
view of the circumstances from which the essential relationship between
plaintiff and defendant may be inferred in a negligent statement case
than had yet emerged from any decision in the United Kingdom.

Now, of course, any decision of the Court of Appeal of New
Zealand is entitled to the very greatest respect, but it has to be observed
that the majority view was based upon an interpretation of Lord
Wilberforce's observations in the *Anns* case [1978 A.C. 728, 751–752          F
which has since been severely qualified by subsequent decisions of this
House.

The *Scott Group* case [1978] N.Z.L.R. 553 has, however, since been
referred to and accepted in two cases decided in the United Kingdom.
In *JEB Fasteners Ltd. v. Marks Bloom & Co.* [1981] 3 All E.R. 289, the
plaintiffs who had acquired the shares of the company as a result of a
take-over, claimed damages against the company's auditors who, it was          G
claimed, had been negligent in certifying the accounts. Woolf J.
dismissed the claim on the ground that the plaintiffs failed to show the
causative connection between reliance on the erroneous accounts and
the take-over and his decision was subsequently affirmed by the Court of
Appeal [1983] 1 All E.R. 583. In the course of his judgment, however,
Woolf J. made the following observation with regard to the auditors'
liability [1981] 3 All E.R. 289, 296–297:          H

> "Without laying down any principle which is intended to be of
> general application, on the basis of the authorities which I have
> cited, the appropriate test for establishing whether a duty of care
> exists appears in this case to be whether the defendants knew or
> reasonably should have foreseen at the time the accounts were
> audited that a person might rely on those accounts for the purpose

**2 W.L.R.** Caparo Plc. v. Dickman (H.L.(E.)) *Lord Oliver of Aylmerton*

A of deciding whether or not to take over the company and therefore could suffer loss if the accounts were inaccurate. Such an approach does place a limitation on those entitled to contend that there has been a breach of duty owed to them. First of all, they must have relied on the accounts and, second, they must have done so in circumstances where the auditors either knew that they would or ought to have known that they might. If the situation is one where

B it would not be reasonable for the accounts to be relied on, then, in the absence of express knowledge, the auditor would be under no duty. This places a limit on the circumstances in which the audited accounts can be relied on and the period for which they can be relied on. The longer the period which elapses prior to the accounts being relied on, from the date on which the auditor gave

C his certificate, the more difficult it will be to establish that the auditor ought to have foreseen that his certificate would, in those circumstances, be relied on."

Now although he disclaimed any intention of laying down a general principle, it is clear that Woolf J., like Woodhouse and Cooke JJ., was interpreting Lord Wilberforce's two-stage approach in the *Anns* case as

D establishing a test of proximity which depended on the foreseeability of harm alone and that he regarded the limits of liability as being set not by the need for any relationship other than such as might be inferred from such foreseeability but by the factual difficulties likely to be encountered in establishing foreseeability in cases in which the reliance essential to the cause of action was separated in time from the statement

E or advice relied upon. In the light, therefore, of the observations of Lord Keith of Kinkel in the *Peabody* case [1985] A.C. 210 and in the *Yuen Kun Yeu* case [1988] A.C. 175, this case provides no very convincing authority for the respondents' proposition, although, as Bingham L.J. observed in the instant case, the facts were such as to justify a finding of a relationship of proximity without any extension of the criteria suggested by Denning L.J. in his judgment in *Candler's* case

F [1951] 2 K.B. 164.

The third case upon which the respondents rely is the decision of the Outer House of the Court of Session in *Twomax Ltd. v. Dickson, McFarlane & Robinson*, 1982 S.C. 113, the facts in which have a broad similarity to those in the *JEB Fasteners* case and in the instant case. The court was concerned with three separate claims from investors (one of whom was a company and two of whom were individuals) who had

G acquired shares in a private company which, shortly after the investments were made, went into receivership and was subsequently wound up. All three investors claimed that their respective investments were made on the faith of the company's audited accounts which had been negligently prepared and certified by the defenders, the company's auditors, in the course of their statutory audit. The Lord Ordinary (Lord Stewart), at

H pp. 122–124, having contrasted the limitations appearing from the speeches of Lord Morris and Lord Hodson in the *Hedley Byrne* case with the broader formulation of general principle in the speech of Lord Wilberforce in the *Anns* case, accepted the latter as governing the proper approach to the question of whether or not the essential relationship between pursuers and defenders was established in a negligent statement case and followed the guidance of the majority judgments of the New Zealand Court of Appeal in the *Scott Group*

case, save that he could not draw any sensible distinction between the $\quad$ **A**
case of the corporate pursuer, which had acquired the controlling
interest, and that of the individual minority investors. He thus, by
implication, rejected the suggestion that a potential bidder in the market
is in some special position as compared with other investors such as to
create between him and the auditors carrying out their statutory duties,
a special relationship which does not arise in the case of an investor
concerned to acquire only a minority interest. And this, with respect, $\quad$ **B**
must be correct, for there can be no logical distinction according to
whether an investor is likely to acquire many shares or only a few. Such
distinction as there is lies only in the scale of the potential loss which
may be little or great according to the magnitude of the investment.
Indeed, as he pointed out, it could legitimately be said that the smaller
the investment the greater the likelihood of the investor accepting the $\quad$ **C**
audited accounts as the basis for his action without making any
independent investigation. In the result, Lord Stewart held that the
knowledge to be imputed to the defenders that there would or might
well be potential investors in the market who would be interested in
purchasing existing shares or subscribing for new shares and who might
be influenced by the accounts was sufficient to create between them and
such investors the relationship of proximity which gave rise to an $\quad$ **D**
enforceable duty of care.

This case, therefore, falls into the same category as the other two
cases. All three were based upon the view of Lord Wilberforce's
exposition in the *Anns* case [1978] A.C. 728 which would result in
foreseeability and proximity being treated as synonymous—a view which
this House (and, indeed, Lord Wilberforce himself in *McLoughlin v.
O'Brian* [1983] 1 A.C. 410) has now decisively rejected. That, of $\quad$ **E**
course, does not conclude the question for it would still be open to your
Lordships to find in the circumstances of this case that a special
relationship existed between the auditor conducting an annual audit in
pursuance of his statutory duty and every potential investor in the
market or, indeed, any other person who might do business with the
company without relying solely upon the foreseeability of potential $\quad$ **F**
damage to such person. Just as, for instance, in *Smith v. Eric S. Bush*
[1989] 2 W.L.R. 790, one of the factors giving rise to the relationship in
that case was the circumstance that the plaintiff was the person who paid
for the report upon which the reliance was placed, so here it might be
said that a special relationship was to be found in the nature and extent
of the statutory duties which the auditor is called upon to fulfil.

For my part, however, I can see nothing in the statutory duties of a $\quad$ **G**
company's auditor to suggest that they were intended by Parliament to
protect the interests of investors in the market and I see no reason in
policy or in principle why it should be either desirable or appropriate
that the ambit of the special relationship required to give rise to liability
in cases such as the present should be extended beyond those limits
which are deducible from the cases of *Hedley Byrne* and *Smith v. Eric S.
Bush*. Those limits appear to me to be correctly and admirably stated in $\quad$ **H**
the passages from the judgment of Richmond P. in the *Scott Group* case
to which I have already referred. In particular, I see no reason why any
special relationship should be held to arise simply from the circumstance
that the affairs of the company are such as to render it susceptible to the
attention of predators in the market who may be interested in acquiring
all or the majority of the shares rather than merely a parcel of shares by

A way of addition to a portfolio. It follows that I would dismiss the respondents' cross-appeal.

I turn, therefore, to the question raised by the appellants' appeal. The Court of Appeal, whilst rejecting unanimously the respondents' contention that the appellants owed them a duty of care simply as potential investors in the market, nevertheless by a majority allowed their claim that a similar duty was owed to them in their capacity as

B shareholders from the date when they first became registered in respect of shares which they had purchased. Now it cannot be nor is it claimed that this event created for the appellants any new or greater risk of harm in relation to a certification which had already taken place; nor can it be claimed that it brought about some change in the quality or extent of the respondents' reliance upon the (ex hypothesi) inaccurate

C information which they had previously received and digested. The only difference in their position before registration and their position afterwards was that, as registered shareholders, they now had the statutory right to receive the accounts on which they had already relied in acquiring their original shares and to receive notice of and attend the annual general meeting of Fidelity at which the accounts were to be read and, if thought fit, approved and passed. This change of position seems,

D on the face of it, less than momentous and in fact they did not trouble to appoint a representative to attend the meeting on their behalf. If a distinction is to be found at all, therefore, it can only be that the nature and purpose of the statutory provisions governing the appointment and duties of auditors and the certification and publication to shareholders and others of the accounts have the effect of creating, between the

E auditors and individual shareholders, as potential investors in that capacity, that special relationship of proximity which is required to give rise to the duty of care and which does not exist between the auditors and the investing public generally.

Now if it be right, as, for my part, I believe that it is and as the Court of Appeal has held, that no relationship of proximity and thus no duty of care exists between auditors and the investing public generally in

F relation to the statutory audit—I say nothing, of course, about a case where accounts are audited specifically for the purpose of submission to a potential investor—the attribution of such a duty arising from the receipt of exactly the same information by a person who happens to be the registered holder of a share in the company whose accounts are in question produces entirely capricious results. O'Connor L.J. [1989]

G Q.B. 653, 715, in his dissenting judgment, instanced the case of a shareholder who, having purchased further shares at an overvalue on the basis of the accounts, shows the accounts to a friend who has no existing shareholding but proceeds to make a similar purchase. Each receives exactly the same information; each relies upon it in exactly the same way and for the same purpose; and the loss sustained in both cases is identical and is equally foreseeable. Yet liability is said to exist in the

H one case but not in the other. One has indeed only to consider the circumstances of the instant case which must ultimately result in drawing a distinction between the loss sustained as a result of the initial purchase of shares (irrecoverable) and that sustained as a result of purchases made after the first registration (recoverable) although all purchases were made in reliance upon exactly the same information.

So unreasonable a distinction must call in question the analysis which leads to it. The majority in the Court of Appeal deduced the

A relationship from what Bingham L.J. described, at p. 684D, as "the degree of closeness between the parties." It was pointed out that although the auditors are appointed and paid by the company that is the result of the vote of the shareholders in general meeting and their remuneration is paid out of funds which might otherwise be available for distribution to shareholders by way of dividend. Their duty is to report to the shareholders whether the accounts give a true and fair view of the company's financial position and their report is sent to each shareholder

B as an identifiable individual. Thus, it was said, the relationship, although not a contractual one, was very close to being contractual and was moreover one in which a lack of care would be likely directly to affect the very person whose interest the auditor is engaged to protect, should that person choose to rely upon the accounts for the purpose of making or disposing of an investment. My Lords, of course I see the force of

C this, but, as I have already suggested, "proximity" in cases such as this is an expression used not necessarily as indicating literally "closeness" in a physical or metaphorical sense but merely as a convenient label to describe circumstances from which the law will attribute a duty of care. It has to be borne in mind that the duty of care is inseparable from the damage which the plaintiff claims to have suffered from its breach. It is

D not a duty to take care in the abstract but a duty to avoid causing to the particular plaintiff damage of the particular kind which he has in fact sustained. I cannot improve on the analysis which is to be found in the judgment of Brennan J. in the High Court of Australia in the *Shire of Sutherland* case, 60 A.L.R. 1 to which I have already referred. After citing the speech of Viscount Simonds in *The Wagon Mound* [1961]

E A.C. 388, 425, where he observed that it was vain to isolate the liability from its context and to say that B is or is not liable and then to ask for what damage he is liable, Brennan J. continued, at p. 48:

"The corollary is that a postulated duty of care must be stated in reference to the kind of damage that a plaintiff has suffered and in reference to the plaintiff or a class of which the plaintiff is a member. I venture to repeat what I said in *John Pfeiffer Pty. Ltd.*

F *v. Canny* (1981) 148 C.L.R. 218, 241–242: 'His duty of care is a thing written on the wind unless damage is caused by the breach of that duty; there is no actionable negligence unless duty, breach and consequential damage coincide . . . for the purposes of determining liability in a given case, each element can be defined only in terms of the others.' It is impermissible to postulate a duty of care to avoid one kind of damage—say, personal injury—and, finding the

G defendant guilty of failing to discharge that duty—to hold him liable for the damage actually suffered that is of another independent kind—say, economic loss. Not only may the respective duties differ in what is required to discharge them; the duties may be owed to different persons or classes of persons. That is not to say that a plaintiff who suffers damage of some kind will succeed or fail in an

H action to recover damages according to his classification of the damage he suffered. The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it."

In seeking to ascertain whether there should be imposed on the adviser a duty to avoid the occurrence of the kind of damage which the

2 W.L.R.        Caparo Plc. v. Dickman (H.L.(E.))       Lord Oliver
of Aylmerton

A   advisee claims to have suffered it is not, I think, sufficient to ask simply whether there existed a "closeness" between them in the sense that the advisee had a legal entitlement to receive the information upon the basis of which he has acted or in the sense that the information was intended to serve his interest or to protect him. One must, I think, go further and ask, in what capacity was his interest to be served and from what was he intended to be protected? A company's annual accounts are capable of being utilised for a number of purposes and if one thinks about it it is entirely foreseeable that they may be so employed. But many of such purposes have absolutely no connection with the recipient's status or capacity, whether as a shareholder, voting or non-voting, or as a debenture-holder. Before it can be concluded that the duty is imposed to protect the recipient against harm which he suffers by reason of the particular use that he chooses to make of the information which he receives, one must, I think, first ascertain the purpose for which the information is required to be given. Indeed the paradigmatic *Donoghue v. Stevenson* case of a manufactured article requires, as an essential ingredient of liability, that the article has been used by the consumer in the manner in which it was intended to be used: see *Grant v. Australian Knitting Mills Ltd.* [1936] A.C. 85, 104 and *Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520, 549, 552. I entirely follow that if the conclusion is reached that the very purpose of providing the information is to serve as the basis for making investment decisions or giving investment advice, it is not difficult then to conclude also that the duty imposed upon the adviser extends to protecting the recipient against loss occasioned by an unfortunate investment decision which is based on carelessly inaccurate information. Bingham L.J. did, indeed, conclude that the provision of guidance for the making of investment decisions was one of the purposes to be discerned in the statutory provisions. He observed [1989] Q.B. 653, 681–682:

    " . . . I think these provisions also reflect a wider and more commercial intention. The growth and development of limited liability companies over a relatively very short period have been phenomenal. Their proliferation and expansion have depended on their acceptance by the investing public as an advantageous and (on the whole) reliable medium of investment. The statutory requirements that companies account to their members and that auditors express an independent opinion to shareholders on the truth and accuracy of company accounts are in my view designed (in part at least) to fortify confidence in the holding of shares as a medium of investment by enabling shareholders to make informed investment decisions. There are obvious reasons, both economic and social, why this end should be regarded as desirable."

How far he regarded this as an essential feature of the relationship of proximity which he held to exist between the appellants and the respondents as shareholders is not, however, entirely clear, for he attributed the same intention to the legislature in relation to investors generally. He said, at p. 682:

    "The publication of accounts must limit, if it cannot eliminate, the scope for rumour-inspired speculation and thus promote an informed and orderly market. It enables prospective investors, like shareholders, to make informed decisions. For such prospective

investors the independent opinion of the auditor has the same    A
significance as for existing shareholders."

As I have already indicated, I am not, for my part, able to share this
view of the intention of the legislature. I do not believe and I see no
grounds for believing that, in enacting the statutory provisions, Parliament
had in mind the provision of information for the assistance of purchasers
of shares or debentures in the market, whether they be already the    B
holders of shares or other securities or persons having no previous
proprietary interest in the company. It is unnecessary to decide the
point on this appeal, but I can see more force in the contention that one
purpose of providing the statutory information might be to enable the
recipient to exercise whatever rights he has in relation to his proprietary
interest by virtue of which he receives it, by way, for instance, of    C
disposing of that interest. I can, however, see no ground for supposing
that the legislature was intending to foster a market for the existing
holders of shares or debentures by providing information for the purpose
of enabling them to acquire such securities from other holders who
might be minded to sell.

For my part, I think that the position as regards the auditor's
statutory duty was correctly summarised by O'Connor L.J. in his    D
dissenting judgment when he said, at p. 714:

"The statutory duty owed by auditors to shareholders is, I think, a
duty owed to them as a body. I appreciate that it is difficult to see
how the over-statement of the accounts can cause damage to the
shareholders as a body; it will be the underlying reasons for the
over-statement which cause damage, for example fraudulent    E
abstraction of assets by directors or servants, but such loss is
recoverable by the company. I am anxious to limit the present case
to deciding whether the statutory duty operates to protect the
individual shareholder as a potential buyer of further shares. If I
am wrong in thinking that under the statute no duty is owed to
shareholders as individuals, then I think the duty must be confined
to transactions in which the shareholder can only participate because    F
he is a shareholder. The Companies Act 1985 imposes a duty to
shareholders as a class and the duty should not extend to an
individual save as a member of the class in respect of some class
activity. Buying shares in a company is not such an activity."

In my judgment, accordingly, the purpose for which the auditors'    G
certificate is made and published is that of providing those entitled to
receive the report with information to enable them to exercise in
conjunction those powers which their respective proprietary interests
confer upon them and not for the purposes of individual speculation
with a view to profit. The same considerations as limit the existence of
a duty of care also, in my judgment, limit the scope of the duty and I
agree with O'Connor L.J. that the duty of care is one owed to the    H
shareholders as a body and not to individual shareholders.

To widen the scope of the duty to include loss caused to an
individual by reliance upon the accounts for a purpose for which they
were not supplied and were not intended would be to extend it beyond
the limits which are so far deducible from the decisions of this House.
It is not, as I think, an extension which either logic requires or policy
dictates and I, for my part, am not prepared to follow the majority of

399

2 W.L.R. Caparo Plc. v. Dickman (H.L.(E.)) Lord Oliver
of Aylmerton

A the Court of Appeal in making. In relation to the purchase of shares of other shareholders in a company, whether in the open market or as a result of an offer made to all or a majority of the existing shareholders, I can see no sensible distinction, so far as a duty of care is concerned, between a potential purchaser who is, vis-à-vis the company, a total outsider and one who is already the holder of one or more shares. I accordingly agree with what has already fallen from my noble and

B learned friend, Lord Bridge of Harwich, and with the speech to be delivered by my noble and learned friend, Lord Jauncey of Tullichettle, which I have had the advantage of reading, and I, too, would allow the appeal and dismiss the cross-appeal.

C LORD JAUNCEY OF TULLICHETTLE. My Lords, it no longer requires a detailed citation of authority to vouch the well-established proposition that a negligent statement may, in certain circumstances, render the maker thereof liable for economic loss occasioned thereby to another. It is sufficient to mention *Cann v. Willson* (1888) 39 Ch.D. 39, the dissenting judgment of Denning L.J. in *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164, and two cases in this House, *Hedley Byrne & Co. Ltd v. Heller & Partners Ltd.* [1964] A.C. 465 and *Smith v. Eric S.*

D *Bush* [1989] 2 W.L.R. 790. Whether liability exists in any particular case will depend upon whether the maker of the statement owes a duty of care to the person who has suffered loss. In this connection I cannot do better than quote the words of Lord Keith of Kinkel in *Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd.* [1985] A.C. 210, 240–241:

E "The true question in each case is whether the particular defendant owed to the particular plaintiff a duty of care having the scope which is contended for, and whether he was in breach of that duty with consequent loss to the plaintiff. A relationship of proximity in Lord Atkin's sense must exist before any duty of care can arise, but the scope of the duty must depend on all the circumstances of the

F case. . . . So in determining whether or not a duty of care of particular scope was incumbent upon a defendant it is material to take into consideration whether it is just and reasonable that it should be so."

The relationship of proximity to which Lord Keith referred is not one which is created solely by the foreseeability of harm resulting from

G carelessness in the statement, but is one in which some further ingredient importing proximity is present. Thus in *Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53, 60 Lord Keith said:

"It has been said almost too frequently to require repetition that foreseeability of likely harm is not in itself a sufficient test of liability in negligence. Some further ingredient is invariably needed to establish the requisite proximity of relationship between plaintiff

H and defendant, and all the circumstances of the case must be carefully considered and analysed in order to ascertain whether such ingredient is present."

Once foreseeability of likely harm from a careless statement has been established, it becomes necessary to examine the circumstances in and the purposes for which the statement was made in order to determine whether there are also present the further ingredients necessary to

A

establish the requisite proximity of relationship between the maker of
the statement and the person who has acted upon it. As Bingham L.J.
observed in the present case, the concept of proximity is somewhat
elusive, extending as it does beyond mere physical proximity. It might
be described as the circumstances in which the law considers it proper
that a duty of care should be imposed on one person towards another.
If in any given circumstances a relation of proximity is found to exist,
consideration must still be given to the scope of the duty which arises
therefrom. In the case of physical proximity, few problems will arise,
but where there exists a duty of care in relation to the making of
statements, written or oral, problems may arise if those statements are
capable of being used for more than one purpose. It is not disputed in
the present case that economic loss to the plaintiff as a shareholder was
foreseeable by the auditors as a result of any failure on their part to
exercise reasonable care in the conduct of the audit. What is disputed is
whether the auditors owed any duty to individual shareholders, and if
so, what was the scope of that duty.

Before examining the circumstances in this case which may be
relevant to the existence of a relationship of proximity, it is helpful to
look in a little more detail at the four cases dealing with negligent
statements to which I have already referred. In *Cann v. Willson*, 39
Ch.D. 39, valuers instructed by an intending mortgagor sent the
valuation to solicitors acting for an intending mortgagee knowing that it
was hoped thereby to induce the mortgagee to make a loan. Chitty J.
held that in the circumstances the valuers owed a duty of care to the
mortgagee. In *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164,
the accountants were aware that the accounts were to be shown by their
employer to the plaintiff who was a potential investor, and indeed their
clerk discussed those accounts with him. Denning L.J., in suggesting
the circumstances in which a duty to use care in a statement by
professional persons would exist apart from contract, posed three
questions: first, what persons are under such duty? Secondly, to whom
do those professional people owe this duty? And thirdly, to what
transactions does the duty of care extend? In relation to the second
question, he said, at pp. 180–181:

> "I will take accountants, but the same reasoning applies to the
> others. They owe the duty, of course, to their employer or client;
> and also I think to any third person to whom they themselves show
> the accounts, or to whom they know their employer is going to
> show the accounts, so as to induce him to invest money or take
> some other action on them. But I do not think the duty can be
> extended still further so as to include strangers of whom they have
> heard nothing and to whom their employer without their knowledge
> may choose to show their accounts. Once the accountants have
> handed their accounts to their employer they are not, as a rule,
> responsible for what he does with them without their knowledge or
> consent. . . . But excluding such cases as those, there are some
> cases—of which the present is one—where the accountants know all
> the time, even before they present their accounts, that their
> employer requires the accounts to show to a third person so as to
> induce him to act on them: and then they themselves, or their
> employers, present the accounts to him for the purpose. In such
> cases I am of opinion that the accountants owe a duty of care to the

B

C

D

E

F

G

H

A  third person. The test of proximity in these cases is: did the accountants know that the accounts were required for submission to the plaintiff and use by him?"

In relation to the third question, he said, at pp. 182–183, 183–184:

B  "[The duty of care] extends, I think, only to those transactions for which the accountants knew their accounts were required. For instance, in the present case it extends to the original investment of £2,000 which the plaintiff made in reliance on the accounts, because the accountants knew that the accounts were required for his guidance in making that investment; but it does not extend to the subsequent £200 which he made after he had been two months with the company. This distinction, that the duty only extends to the very transaction in mind at the time, is implicit in the decided cases"

C  "It will be noticed that I have confined the duty to cases where the accountant prepares his accounts and makes his report for the guidance of the very person in the very transaction in question. That is sufficient for the decision of this case. I can well understand that it would be going too far to make an accountant liable to any person in the land who chooses to rely on the accounts in matters of business, for that would expose him to 'liability in an indeterminate amount for an indeterminate time to an indeterminate class': see *Ultramares Corporation v. Touche,* *per* Cardozo C.J. Whether he would be liable if he prepared his accounts for the guidance of a specific class of persons in a specific class of transactions, I do not say."

D  

E  

F  Denning L.J. clearly considered that the scope of any duty of care was limited to the precise transaction for which the accountants knew that the accounts were to be used. In *Hedley Byrne* [1964] A.C. 465, a company's bankers were asked by the plaintiffs' bankers whether the company "would be good for an advertising contract of £8,000 to £9,000." The company's bankers answered the question in the affirmative but, "without responsibility on the part of the bank." When the company failed, the plaintiffs sought to recover damages from the bankers for negligence in making the statement. The action failed because of the express disclaimer of responsibility, but this House, after detailed review of authority, held that a negligent statement, oral or written, could give rise to an action of damages for economic loss apart from any contractual or fiduciary relationship subsisting between the parties. In the context of this case, *Hedley Byrne* is perhaps most important for its approval of the dissenting judgment of Denning L.J. in *Candler v. Crane, Christmas & Co.* After setting out the facts in *Candler,* Lord Reid said [1964] A.C. 465, 487:

G  

H  "This seems to me to be a typical case of agreeing to assume a responsibility: [the accountants] knew why the plaintiff wanted to see the accounts and why their employers, the company, wanted them to be shown to him, and agreed to show them to him without even a suggestion that he should not rely on them."

Lord Reid is again there emphasising the fact that the maker of the statement was aware of the purpose for which the accounts were required to be seen. Finally, in *Smith v. Eric S. Bush* [1989] 2 W.L.R.

790, the plaintiff applied for a mortgage to a building society which in
pursuance of its statutory duty under the Building Societies Act 1962
instructed independent surveyors to prepare a written report as to the
value of the house in question. The plaintiff paid to the building society
a fee in respect of this report, and subsequently a copy thereof was
provided to her. Without obtaining an independent valuation, the
plaintiff bought the house which later turned out to be structurally
defective. The surveyor was found to have been negligent in failing to
discover the defect. This House held that, notwithstanding the presence
of an exclusion clause in his report, he was thereby in breach of a duty
of care owed to the plaintiff. It is clear from the speeches which were
delivered that the facts which created the proximate relationship between
the surveyor and the plaintiff were that the former knew that the
valuation had been paid for by the plaintiff and would be shown to and
probably relied upon by her in deciding whether or not to buy the
house. Thus, Lord Templeman said, at p. 799:

> "I agree that by obtaining and disclosing a valuation, a mortgagee
> does not assume responsibility to the purchaser for that valuation.
> But in my opinion the valuer assumes responsibility to both
> mortgagee and purchaser by agreeing to carry out a valuation for
> mortgage purposes knowing that the valuation fee has been paid by
> the purchaser and knowing that the valuation will probably be
> relied upon by the purchaser in order to decide whether or not to
> enter into a contract to purchase the house."

Lord Templeman undoubtedly considered that one of the necessary
ingredients of the relationship of proximity was the fact that the valuer
knew of the particular transaction for the purposes of which reliance
would probably be placed on his report.
Lord Griffiths, after setting out three criteria for the imposition of a
duty of care on an adviser, namely, foreseeability of damage, proximity
of relationship and reasonableness continued, at p. 816:

> "The necessary proximity arises from the surveyor's knowledge that
> the overwhelming probability is that the purchaser will rely upon his
> valuation, the evidence was that surveyors knew that approximately
> 90 per cent. of purchasers did so, and the fact that the surveyor
> only obtains the work because the purchaser is willing to pay his
> fee. It is just and reasonable that the duty should be imposed for
> the advice is given in a professional as opposed to a social context
> and liability for breach of the duty will be limited both as to its
> extent and amount. The extent of the liability is limited to the
> purchaser of the house—I would not extend it to subsequent
> purchasers."

Here Lord Griffiths is limiting the existence and scope of the duty of
care to the very person and the very transaction which were in the
contemplation of the surveyor at the material time.
My Lords, in each of these cases where a duty of care has been
held to exist, the statement in question has, to the knowledge of its
maker, been made available to the plaintiff for a particular purpose
upon which he has relied. In the present case, the auditors, by
accepting office, came under a statutory duty to make their report to
the members of the company. The crucial issue is the purpose for
which the report was made. To quote the words of Denning L.J. in

A   the *Candler* case [1951] 2 K.B. 164, 183, what was the "very transaction" for which it was provided? To answer this question, it is necessary to look at the relevant provisions of Part VII of the Companies Act 1985.

     Section 221 requires every company to cause accounting records to be kept which should be sufficient to show and explain the company's transactions, and should be such as (a) to disclose with reasonable

B   accuracy the financial position of the company at the time, and (b) to enable the directors to ensure that any profit and loss account complies with the requirements of the Act. If a company's business involves dealing in goods, the accounting records require to contain statements of stock at the end of each financial year and all statements of stocktaking from which such statements of stock derive. Section

C   227 requires that the directors, by subsection (1) prepare a profit and loss account for the financial year in respect of each accounting reference period of the company and, by subsection (3), prepare a balance sheet as at the last day of the financial year. Section 228(2) is in the following terms:

D     "The balance sheet shall give a true and fair view of the state of affairs of the company as at the end of the financial year; and the profit and loss account shall give a true and fair view of the profit or loss of the company for the financial year."

     In terms of section 235 the directors are required to prepare a report "containing a fair review of the development of the business of the company and its subsidiaries during the financial year and of their position at the end of it," and giving particulars of, inter alia, changes

E   in asset values, directors' shareholdings and other interests and contributions for political and charitable purposes. Section 236 makes provision for an auditors' report in the following, inter alia, terms:

     "(1) A company's auditors shall make a report to its members on the accounts examined by them, and on every balance sheet and profit and loss account, and on all group accounts, copies of

F   which are to be laid before the company in general meeting during the auditors' tenure of office. (2) The auditors' report shall state—(a) whether in the auditors' opinion the balance sheet and profit and loss account and (if it is a holding company submitting group accounts) the group accounts have been properly prepared in accordance with this Act; and (b) without prejudice

G   to the foregoing, whether in their opinion a true and fair view is given—(i) in the balance sheet, of the state of the company's affairs at the end of the financial year; (ii) in the profit and loss account (if not framed as a consolidated account), of the company's profit or loss for the financial year. . . ."

     Section 237(1) defines auditors' duties as follows:

H     "It is the duty of the company's auditors, in preparing their report, to carry out such investigations as will enable them to form an opinion as to the following matters—(a) whether proper accounting records have been kept by the company and proper returns adequate for their audit have been received from branches not visited by them, (b) whether the company's balance sheet and (if not consolidated) its profit and loss account are in agreement with the accounting records and returns."

Section 241 provides, inter alia:

> "(1) In respect of each financial year of a company the directors shall lay before the company in general meeting copies of the accounts of the company for that year. (2) The auditors' report shall be read before the company in general meeting, and be open to the inspection of any member of the company. (3) In respect of each financial year the directors—(a) shall deliver to the registrar of companies a copy of the accounts for the year. . . ."

The accounts of a company are defined by section 239 to include, inter alia, the company's profit and loss account and balance sheet, and the directors' and auditors' reports. In terms of section 240, a copy of the company's accounts must be sent to every member not less than 21 days before the date of the meeting referred to in section 241(1). Finally, section 245 imposes penalties on directors whose defective accounts are laid before the company or delivered to the Registrar of Companies.

Three matters emerge from the statutory provisions, namely: (1) that the responsibility for the preparation of accounts giving a true and fair view of the company's financial state is placed fairly and squarely on the shoulders of the directors; (2) that the role of the auditors is to provide an independent report to the members on the proper preparation of the balance sheet and profit and loss account, and as to whether those documents give a true and fair view respectively of the state of the company's affairs at the end of the financial year and of the company's profit and loss for that year. Their role is thus purely investigative rather than creative; (3) that the company's accounts, including the auditors' report, will be furnished to all members of the company as well as to debenture holders and any other persons entitled to receive notice of general meeting. The accounts will, of course, also be available to any member of the public who chooses to examine the company file in the office of the Registrar of Companies.

So much for the circumstances in which company accounts reach the members. Circumstances which render it inevitable that auditors will be aware that their reports will be seen and relied upon by the members. However, that does not answer the fundamental question of the purpose, and hence the very transactions, for which the annual accounts of a company are prepared and distributed to its members. Mr. Goldsmith, for the auditors, submitted that the principal purpose was to provide an account of the stewardship of the directors to the shareholders as a body, and not to provide individual investors, whether shareholders or members of the public, with comparative information. Mr. Bathurst, for Caparo, on the other hand, argued that the purpose was to enable shareholders to make such individual decisions as they wished in relation to the company, including decisions as to investment, they already being investors, and decisions as to voting in general meetings.

In the Court of Appeal [1989] Q.B. 653, 685D–690F Bingham L.J. concluded that the auditors had voluntarily assumed direct responsibility to individual shareholders to whom they owed a duty to exercise reasonable care in carrying out their audit. He further concluded that such duty was owed to a shareholder in respect of any

A    loss sustained by him in selling, retaining, or buying shares in the company. Bingham L.J. referred to the approval by Cardozo C.J. in *Ultramares Corporation v. Touche*, 174 N.E. 441, 447 of an earlier statement that:

"‘negligent words are not actionable unless they are uttered directly, with knowledge or notice that they will be acted on, to
B    one to whom the speaker is bound by some relation of duty, arising out of public calling, contract or otherwise, to act with care if he acts at all.’"

He then said, at p. 686:

"This formulation would not exclude the finding of a sufficiently proximate relationship in the present case if the words ‘will be
C    acted upon’ are replaced, as in English law I think they should be, by ‘may be acted upon.’"

Taylor L.J. said, at p. 703G:

"once proximity to the shareholder is established, the auditor ought prima facie to be liable for any loss suffered in foreseeable
D    reliance upon the report; . . ."

In my view these observations go too far. Possibility of reliance on a statement for an unspecified purpose will not impose a duty of care on the maker to the addressee. More is required. In *Smith v. Eric S. Bush* [1989] 2 W.L.R. 790 it was probable, if not highly probable, that the potential purchaser would rely on the valuer's report. This
E    probable reliance was an essential ingredient in establishing proximity. Had it merely been a possibility that the purchaser would rely on the report I very much doubt whether this House would have decided that the valuer owed a duty of care to the purchaser. Furthermore, reliance, even if probable, thereby establishing proximity, does not establish a duty of care of unlimited scope. Regard must be had to the transaction or transactions for the purpose of which the statement
F    was made. It is loss arising from such transaction or transactions rather than "any loss" to which the duty of care extends.

I do not understand that either Bingham L.J. or Taylor L.J., in reaching their conclusions, relied to any material extent upon the purpose for which accounts of a company, including the auditors’ report, are provided to members or consequentially upon the
G    transactions for which the members were expected to use them. O’Connor L.J., in a dissenting judgment, considered that the statutory duty owed by auditors to shareholders was owed to them as a body and not as individuals.

My Lords, Part VII of the Companies Act 1985 provides that the accounts of a company for each financial year shall be laid before the company's general meeting, that is to say before the members in
H    general meeting. Copies of the accounts must be sent to the members at least 21 days in advance, and it is obvious that the reason for this is to enable the members to prepare themselves for attendance at and participation in the meeting. The annual general meeting provides the opportunity for members to question the stewardship of the company during the preceding year, to vote for or against election or re-election of directors, to approve or disapprove the appointment or re-appointment of auditors and to take other decisions affecting the

Lord Jauncey
of Tullichettle                Caparo Plc. v. Dickman (H.L.(E.))                **[1990]**

company as a whole or themselves as members of a particular class of shareholders. There is nothing in Part VII which suggests that the accounts are prepared and sent to members for any purpose other than to enable them to exercise class rights in general meeting. I therefore conclude that the purpose of annual accounts, so far as members are concerned, is to enable them to question the past management of the company, to exercise their voting rights, if so advised, and to influence future policy and management. Advice to individual shareholders in relation to present or future investment in the company is no part of the statutory purpose of the preparation and distribution of the accounts. It follows that I am in agreement with the views of O'Connor L.J. as to the nature of the statutory duty owed by auditors to shareholders.

If the statutory accounts are prepared and distributed for certain limited purposes, can there nevertheless be imposed upon auditors an additional common law duty to individual shareholders who choose to use them for another purpose without the prior knowledge of the auditors? The answer must be no. Use for that other purpose would no longer be use for the "very transaction" which Denning L.J. in the *Candler* case [1951] 2 K.B. 164, 183 regarded as determinative of the scope of any duty of care. Only where the auditor was aware that the individual shareholder was likely to rely on the accounts for a particular purpose such as his present or future investment in or lending to the company would a duty of care arise. Such a situation does not obtain in the present case.

The Court of Appeal unanimously rejected a submission by Caparo that an auditor owed a duty to a potential investor who held no shares. In this House it was argued that the relationship of the unwelcome bidder in a potential takeover situation was nearly as proximate to the auditor as was the relationship of a shareholder to whom the report was directed. Since I have concluded that the auditor owed no duty to an individual shareholder, it follows that this argument must also fail. The fact that a company may at a time when the auditor is preparing his report be vulnerable to a take-over bid cannot per se create a relationship of proximity between the auditor and the ultimate successful bidder. Not only is the auditor under no statutory duty to such a bidder but he will have reason at the material time to know neither of his identity nor of the terms of his bid. In this context the recent case of *Al Saudi Banque v. Clarke Pixley* [1990] 2 W.L.R. 344 is in point. There Millett J. held that the auditors of a company owed no duty of care to a bank which lent money to the company, regardless of whether the bank was an existing creditor or a potential one, because no sufficient proximity of relationship existed in either case between the auditor and the bank. I have no doubt that this case was correctly decided and I would only add that I am in entire agreement with the careful process of reasoning whereby the judge reached his decision.

It only remains to mention *Twomax Ltd. v. Dickson, McFarlane & Robinson*, 1982 S.C. 113 to which your Lordships were referred. The Lord Ordinary (Lord Stewart) held that auditors owed a duty of care to potential investors who were not shareholders by applying the test of whether the defenders knew or reasonably should have foreseen at the time the accounts were audited that a person might rely on those accounts for the purpose of deciding whether or not to take over the

A    company, and therefore would suffer loss if the accounts were inaccurate. There were in that case no such findings in fact as would support the existence of a relationship of proximity between the auditor and the unknown potential investor. I therefore consider that the reasoning of the Lord Ordinary was unsound and that the decision cannot be supported.

     For the foregoing reasons, I would allow the appeal.

B

> *Appeal allowed with costs.*
> *Cross-appeal dismissed with costs.*

   Solicitors: *Freshfields; Berwin Leighton.*

C                                              C. T. B.

————

[HOUSE OF LORDS]

D   **BRITISH COAL CORPORATION** . . . . RESPONDENTS

AND

   **CHEESBROUGH** . . . . . . . . APPELLANT

E   1990   Jan. 17, 18;     Lord Bridge of Harwich, Lord Brandon of Oakbrook,
        Feb. 15            Lord Griffiths, Lord Oliver of Aylmerton
                                         and Lord Lowry

   *Employment—Redundancy—Payment, calculation of—Week's pay—*
     *Average hourly rate of remuneration—Incentive bonus paid for*
     *shift work—Overtime rate paid without bonus—Whether overtime*
     *to be calculated at shift rate with bonus—Employment Protection*
F      *(Consolidation) Act 1978 (c. 44), Sch. 14, paras. 3, 5(1)(2)*

     Prior to his redundancy, the employee, a surface worker at a colliery, received remuneration in respect of normal working hours of five eight-hour shifts per week together with a bonus payment for each shift worked. He also regularly worked voluntary overtime for which he was paid a higher rate of pay but which attracted no bonus payment. For the purposes of calculating his redundancy payment the employers were required
G    under paragraph 3(3) of Schedule 14 to the Employment Protection (Consolidation) Act 1978[1] to ascertain his week's pay for the 12 weeks preceding his redundancy by reference to his average hourly rate of remuneration, with an adjustment under paragraph 5(2) of the Schedule so as to treat the overtime payments "as if . . . the work had been done in normal working hours; and . . . the amount of that remuneration had been
H    reduced accordingly." They included in the calculation his earnings for his normal hours of work, including bonus, plus overtime hours worked as if paid at the rate appropriate to normal hours but without bonus, and divided the sum so computed by the total hours worked. The employee applied to

[1] Employment Protection (Consolidation) Act 1978, Sch. 14, para. 3(3): see post, p. 409G–H.
   Para. 5(2): see post, pp. 409H—410A.